**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
BRENNAN CENTER FOR JUSTCE AT NEW          :
YORK UNIVERSITY SCHOOL OF LAW,            :
                                          :
            Plaintiff,                    :
                                          :
      v.                                  :        17 Civ. 7520 (PGG)
                                          :
UNITED STATES DEPARTMENT OF               :
STATE,                                    :
                                          :
            Defendant.                    :
------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, New York 10007
Telephone:  (212) 637-2761
Facsimile:  (212) 637-2786


CHRISTOPHER CONNOLLY
Assistant United States Attorney
      – Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................2

    A.    Executive Order 13780 and the Subsequent Presidential Communications ...........2

    B.    Plaintiff's FOIA Request and Complaint, and the Government's Response ..........6

ARGUMENT—THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT...............7

Standard of Review....................................................................................................................7

I.    THE STATE DEPARTMENT ADEQUATELY SEARCHED FOR RESPONSIVE
    RECORDS .........................................................................................................................8

II.    THE GOVERNMENT PROPERLY WITHHELD THE RECORDS PURSUANT TO
    FOIA'S EXEMPTIONS ...................................................................................................9

    A.    The Records Are Exempt in Full Under Exemption 5 Because They Are
        Protected by the Presidential Communications Privilege ......................................9

    B.    Portions of the Threat Assessments Are Also Exempt Under Other FOIA
        Exemptions ........................................................................................................12

        1.    Exemption 1 ............................................................................................12

        2.    Exemption 5—Deliberative Process Privilege..........................................15

        3.    Exemption 7(E) .......................................................................................18

CONCLUSION..........................................................................................................................19

## TABLE OF AUTHORITIES

**CASES**                                                    **PAGE**

*ACLU v. Dep't of Justice*,
    681 F.3d 61 (2d Cir. 2012)................................................................. 13

*ACLU v. DoD*,
     628 F.3d 612 (D.C. Cir. 2011) ......................................................... 13

*Allard K. Lowenstein Int'l Human Rights Project v. DHS*,
    626 F.3d 678 (2d Cir. 2010)........................................................ 18, 19

*American Civil Liberties Union v. Dep't of Justice*,
    No. 15 Civ. 1954 (CM), 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016).............................. 11

*American Civil Liberties Union v. U.S. Dep't of Homeland Security*,
    973 F. Supp. 2d 306 (S.D.N.Y. 2013)................................................. 7

*Assoc. Press v. U.S. Dep't of Justice*,
    549 F.3d 62 (2d Cir. 2008)................................................................... 7

*Carney v. DOJ*,
    19 F.3d 807 (2d Cir. 1994)................................................................... 8

*CIA v. Sims*,
    471 U.S. 159 (1985)........................................................................... 13

*CREW v. DHS*,
    06-0173, 2008 WL 2872183 (D.D.C. July 22, 2008) ...................................... 11

*Dep't of the Interior v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1 (2001)................................................................................. 7

*Garcia v. U.S. Dep't of Justice*,
    181 F. Supp. 2d 356 (S.D.N.Y. 2002)................................................. 8

*Grand Central Partnership, Inc. v. Cuomo*,
    166 F.3d 473 (2d Cir. 1999)......................................................... 8, 9, 16

*Hopkins v. HUD*,
    929 F.2d 81 (2d Cir. 1991)....................................................... 10, 15, 16, 18

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ................................................... 10, 11

*John Doe Agency v. John Doe Corp.*,
493 U.S. 146 (1989)..............................................................................7

*Judicial Watch, Inc. v. DOJ*,
365 F.3d 1108 (D.C. Cir. 2004) .................................................... 10, 12

*Larson v. Dep't of State*,
565 F.3d 857 (D.C. Cir. 2009) .......................................................... 13

*Loving v. DOD*,
496 F. Supp. 2d 101 (D.D.C. 2007), *aff'd*, 550 F.3d 32 (D.C. Cir. 2008) ...................... 11

*Morley v. CIA*,
508 F.3d 1108 (D.C. Cir. 2007) ..................................................... 13, 15

*N.Y. Times Co. v. U.S. Dep't of Justice*,
756 F.3d 100 (2d Cir. 2014)................................................................ 8

*N.Y. Times Co. v. U.S. Dep't of Justice*,
872 F. Supp. 2d 309 (S.D.N.Y. 2012)............................................... 13

*Nat'l Council of La Raza v. U.S. Dep't of Justice*,
411 F.3d 350 (2d Cir. 2005)............................................................. 17

*Nixon v. Administrator of General Services*,
433 U.S. 425 (1977)................................................................... 10, 12

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975).......................................................... 15, 17, 18

*Oglesby v. U.S. Dep't of Army*,
920 F.2d 57 (D.C. Cir. 1990)........................................................ 8, 9

*Renegotiation Board v. Grumman Aircraft Engineering Corp.*,
421 U.S. 168 (1975)............................................................................ 16

*Tigue v. Dep't of Justice*,
312 F.3d 70 (2d Cir. 2002)................................................................ 16

*United States v. Nixon*,
418 U.S. 683 (1974)........................................................................... 10

*Wilner v. NSA*,
592 F.3d 60 (2d Cir. 2009)............................................................. 8, 13

**STATUTES**

5 U.S.C. § 552(b)(1) ........................................................................ 2, 12

5 U.S.C. § 552(b)(5) ........................................................................ 1, 9, 11

5 U.S.C. § 552(b)(7) ........................................................................ 2, 18

**RULES**

Fed. R. Civ. P. 56(a) ........................................................................ 7

**OTHER**

Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010).......................................... 12, 13, 14, 15

Executive Order 13780, 82 Fed. Reg. 13.209 (Mar. 6, 2017) .......................................... 1, 2, 3, 4

Proclamation No. 9645, 82 Fed. Reg. 45161 (Sept. 24, 2017) .................................................. 4, 5

## PRELIMINARY STATEMENT

The records at issue in this Freedom of Information Act ("FOIA") litigation are Cabinet-level advisory documents drafted pursuant to an Executive Order for the express purpose of making recommendations to the President concerning matters of national security.  In Executive Order 13780, as part of a review of the United States' visa vetting procedures, President Trump directed the Department of Homeland Security ("DHS") to, among other things: (i) conduct a worldwide review to identify what information foreign countries should provide in order to allow the United States to adjudicate applications by foreign nationals for visas, admissions, or other benefits; (ii) report on the results of that review, and identify countries that do not provide the required information; and (iii) recommend a list of countries whose nationals should be subject to entry restrictions, either because those countries do not provide required information or because they otherwise pose a threat to the national security.  The records Plaintiff seeks are the records generated pursuant to the Executive Order.

There can be no question that the State Department conducted an adequate search for the records Plaintiff requested: Plaintiff identified specific records, which the State Department located.  Further, the government has properly withheld the records in full.  The records are exempt from disclosure pursuant to FOIA Exemption 5, 5 U.S.C. § 552(b)(5), because they are protected by the presidential communications privilege.  Indeed, these records are quintessential presidential communications: they were created for (and transmitted directly to) the President, in accordance with an Executive Order, to provide advice and recommendations to aid in Presidential decision-making.

Portions of the records are also properly withheld pursuant to several other FOIA exemptions, the applicability of which also flows logically from the nature of the records

themselves.  First, portions of the records are exempt in part under Exemption 1, 5 U.S.C. § 552(b)(1), because they contain classified information obtained from foreign governments, and classified information concerning the foreign relations or foreign activities of the United States. Second, portions of the records are exempt under Exemption 5 because they are protected by the deliberative process privilege: they consist of advice and recommendations prepared for the purpose of assisting the President in making final decisions concerning visa-vetting procedures and entry restrictions.  Finally, portions of the records are exempt under Exemption 7(E), 5 U.S.C. § 552(b)(7)(E), because they contain information compiled for law enforcement purposes whose disclosure would reveal non-public law enforcement techniques or procedures.

Because the declarations submitted by the government in support of its motion for summary judgment establish the adequacy of the State Department's search, and logically and plausibly establish that the records are properly withheld in full pursuant to Exemption 5, and in part pursuant to other exemptions, the government's motion should be granted in its entirety.

## BACKGROUND

### A.    Executive Order 13780 and the Subsequent Presidential Communications

On March 6, 2017, President Trump issued Executive Order 13780, "Protecting the Nation from Foreign Terrorist Entry into the United States."  E.O. 13780, 82 Fed. Reg. 13209 (Mar. 6, 2017).  Among other things, Executive Order 13780 committed the government to undertaking a series of actions "to improve the screening and vetting protocols and procedures associated with the visa-issuance process and the [United States Refugee Assistance Program]."  *Id.* at 13209.  In section 2(a), Executive Order 13780 directed that:

> The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa,

2

> admission, or other benefit under the [Immigration and Nationality Act]
> (adjudications) in order to determine that the individual is not a security or public-
> safety threat.

*Id.* at 13212.  Further, in section 2(b), the Executive Order provided that:

> The Secretary of Homeland Security, in consultation with the Secretary of State
> and the Director of National Intelligence, shall submit to the President a report on
> the results of the worldwide review described in subsection (a) of this section,
> including the Secretary of Homeland Security's determination of the information
> needed from each country for adjudications and a list of countries that do not
> provide adequate information, within 20 days of the effective date of this order. The
> Secretary of Homeland Security shall provide a copy of the report to the Secretary
> of State, the Attorney General, and the Director of National Intelligence.

*Id.* at 13212-13.

Thereafter, DHS, in consultation with other Executive Branch agencies, undertook its review and began drafting the records called for in the Executive Order.  *See* Declaration of James V.M.L. Holzer, dated May 14, 2018 ("Holzer Decl.") ¶¶ 13, 16.  On July 9, 2017, as directed by section 2(a) of the Executive Order, DHS submitted to the President a "20-Day Report to the President on Section 2(b) of the Executive Order 13780" (the "Report").  Holzer Decl. ¶ 14.  The Report presented the results of DHS's review of countries' information-sharing capabilities; made recommendations concerning the information that countries should be required to provide in order to avoid having travel and entry restrictions placed on their nationals; and made recommendations regarding next steps for engaging with foreign governments, and potential domestic strategies to enhance foreign cooperation in support of visa and immigration screening.  *Id.*  The Report also proposed baseline requirements for: (i) information sharing about identity management; (ii) information sharing about national security and public safety; and (iii) national security and public-safety risk factors.  *Id.*

Attachment A to the Report included a list of countries that DHS, in consultation with other Executive Branch agencies, deemed to be inadequate in sharing identification and security information with the United States, or that posed a risk to the national security of the United States. *Id.* Attachment B to the Report described the methodology and considerations employed to develop the list of countries in Attachment A, and provided information about law enforcement techniques employed by United States officials when assessing an alien's eligibility for entry into the United States. *Id.*

Executive Order 13780 also required, in Section 2(e), that:

> [T]he Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means.

82 Fed. Reg. at 13213. In accordance with that section, on September 15, 2017, the Acting Secretary of DHS submitted a memorandum directly to the President (the "Memorandum"), which summarized DHS's recommendations concerning which countries' nationals should be subject to travel restrictions owing to deficiencies in identity management or information sharing or to other risk factors those countries presented. Holzer Decl. ¶ 15. Attachment A to the Memorandum summarized DHS's recommendations, providing listings for each country identified. *Id.*

On September 24, 2017, President Trump issued a Proclamation entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats" (the "Proclamation"). Proclamation No. 9645, 82 Fed. Reg. 45161 (Sept. 24, 2017). Section 1(c) of the Proclamation referenced DHS's "worldwide review" as authorized by Executive Order 13780, and explained that:

> [T]he Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, developed a baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States as immigrants and nonimmigrants, as well as individuals applying for any other benefit under the immigration laws, and to assess whether they are a security or public-safety threat.

*Id.* at 45162. Further, Section 1(h) of the Proclamation stated that:

> On September 15, 2017, the Secretary of Homeland Security submitted a report to me recommending entry restrictions and limitations on certain nationals of 7 countries determined to be "inadequate" in providing such information and in light of other factors discussed in the report. According to the report, the recommended restrictions would help address the threats that the countries' identity-management protocols, information-sharing inadequacies, and other risk factors pose to the security and welfare of the United States.

*Id.* at 45163. The Proclamation further explained that, "[i]n evaluating the recommendations of the Secretary of Homeland Security and in determining what restrictions to impose for each country," the President "consulted with appropriate Assistants to the President and members of the Cabinet, including the Secretaries of State, Defense, and Homeland Security, and the Attorney General." *Id.* at 45164. The President also "considered several factors, including each country's capacity, ability, and willingness to cooperate with our identity-management and information-sharing policies and each country's risk factors, such as whether it has a significant terrorist presence within its territory." *Id.* Finally, the President "also considered foreign policy, national security, and counterterrorism goals." *Id.* Based on this process of review and consultation, the President imposed travel restrictions on certain nationals of eight countries: Chad, Iran, Libya, North Korea, Syria, Venezuela, Yemen, and Somalia. *See id.* at 45165-67.

**B.      Plaintiff's FOIA Request and Complaint, and the Government's Response**

By letter dated July 20, 2017 (ECF No. 1-2), Plaintiff submitted a FOIA request to the State Department, seeking records relating to Executive Orders 13769 and 13780.  *See* Second Declaration of Eric F. Stein, dated May 14, 2018 ("Second Stein Decl.") ¶ 6.  On October 2, 2017, Plaintiff commenced the instant matter in district court, seeking the disclosure of certain records that it claimed were encompassed by its FOIA request.  *See generally* Complaint (ECF No. 1). Specifically, Plaintiff's Complaint sought the Report, the Memorandum, and any related country-specific reports, to the extent such reports existed.  *See id.* ¶ 2.

The State Department conducted a search for responsive records.  *See* Second Stein Decl. ¶¶ 12-19.  The agency located the Report and its two attachments, and the Memorandum and its one attachment; it also determined through consultation with subject-matter experts that no further responsive records existed.  *See id.* ¶ 19.  Because the five responsive records originated with DHS, on December 5, 2017, the State Department referred the records to DHS for a direct reply to Plaintiff, and informed Plaintiff of the referral.  *See id.* ¶ 9; Holzer Decl. ¶ 9.

Following the referral, DHS reviewed the records for applicable exemptions, and also referred the records to other agencies with potential equities in the records for consultation.  Holzer Decl. ¶ 10.  DHS determined that the records are exempt in full pursuant to Exemption 5, because they are protected by the presidential communications privilege.  *Id.* ¶ 10.  Collectively, DHS, the State Department, and the Federal Bureau of Investigation ("FBI") also determined that the records are exempt from disclosure in part pursuant to Exemption 1, because they contain classified national security information; Exemption 5, because they are protected by the deliberative process privilege; and Exemption 7(E), because they contain non-public information concerning law

enforcement techniques and procedures.[1]  The government informed Plaintiff of the results of its

search and its application of exemptions by letter dated February 9, 2018.  *See id.* ¶ 12.

## ARGUMENT

### THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT

#### Standard of Review

"Upon request, FOIA mandates disclosure of records held by a federal agency, unless the

documents fall within enumerated exemptions."  *Dep't of the Interior v. Klamath Water Users

Protective Ass'n*, 532 U.S. 1, 8 (2001) (citations omitted).  Although FOIA is meant to promote

government transparency, *id.*, the FOIA exemptions are "intended to have meaningful reach and

application," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).  FOIA thus balances

"the public's right to know and the government's legitimate interest in keeping certain information

confidential."  *Assoc. Press v. U.S. Dep't of Justice*, 549 F.3d 62, 65 (2d Cir. 2008).

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes."

*American Civil Liberties Union v. U.S. Dep't of Homeland Security*, 973 F. Supp. 2d 306, 313

(S.D.N.Y. 2013).  Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  In a FOIA case, "[a]ffidavits or declarations . . . supplying facts indicating that the

agency has conducted a thorough search and giving reasonably detailed explanations why any

withheld documents fall within an exemption are sufficient to sustain the agency's burden."

---

[1]     The government initially asserted Exemptions 3, 6, and 7(C) over portions of the
records, but has since determined that it will not seek to withhold information pursuant to those
exemptions.  Further, although the government cited Exemption 1 as a basis for withholding
portions of the Report, its attachments, and the Memorandum, it inadvertently failed to identify
Attachment A to the Memorandum as also containing classified national security information
withheld pursuant to Exemption 1; the revised Vaughn index attached to the Second Stein
Declaration corrects this error.  *Compare* ECF No. 31-1 (government's *Vaughn* index provided to
Plaintiff on February 9, 2018), *with* Second Stein Decl., Ex. 2 (revised *Vaughn* index).

*Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994). Such declarations are "accorded a presumption of good faith," *id.* (quotation marks omitted), and "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible," *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009) (citation and quotation marks omitted).

## I.   THE STATE DEPARTMENT ADEQUATELY SEARCHED FOR RESPONSIVE RECORDS

At the threshold, the State Department is entitled to summary judgment on the adequacy of its search for responsive records. An agency's search is "adequate" if it was "reasonably calculated to discover" documents responsive to the FOIA request. *Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999). "The adequacy of a search is not measured by its results, but rather by its method." *N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 124 (2d Cir. 2014). "If an agency demonstrates that it has conducted a reasonable search for relevant documents, it has fulfilled its obligations under FOIA and is entitled to summary judgment on this issue." *Garcia v. U.S. Dep't of Justice*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002).

"There is no requirement that an agency search every record system." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Rather, an agency must only search those "files likely to contain responsive materials (if such records exist)." *Id.* In short, an agency is not expected to "take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents." *Garcia*, 181 F. Supp. 2d at 368 (internal quotation marks omitted).

The State Department's search easily meets this standard. Plaintiff's Complaint requested two specific records referenced in the Proclamation, as well as certain other types of records to the extent they existed. Complaint ¶ 2. After reviewing the Complaint, the State Department's Office of Information Programs and Services ("IPS") determined that the Bureau of Consular Affairs—

and specifically, the Office of Visa Services ("CA/VO")—was most likely to possess such records. *See* Second Stein Decl. ¶¶ 15-17.  CA/VO then conducted a search of its classified e-mail system using search terms and a date range, and located the two records that Plaintiff specifically requested, as well as the three attachments to those records.  *See id.* ¶¶ 18-19.  Thereafter, IPS confirmed with subject-matter experts that the records identified were the full and final versions of the records Plaintiff sought, and that no further records existed that were responsive to Plaintiff's request—*i.e.*, that the types of additional reports Plaintiff speculated might exist had not, in fact, been created.  *See id.* ¶ 19.  Because the State Department reasonably identified the office within the agency most likely to possess responsive records, conducted a search of that office's electronic files reasonably calculated to discover the records, and in fact located the records Plaintiff sought, its search was adequate.  *See Grand Central Partnership*, 166 F.3d at 489; *Oglesby*, 920 F.2d at 68.

## II.    THE GOVERNMENT PROPERLY WITHHELD THE RECORDS PURSUANT TO FOIA'S EXEMPTIONS

Not only did the State Department conduct an adequate search, but the government's declarations also logically and plausibly justify the claimed exemptions—most significantly, the applicability of Exemption 5 to the records in full, because they fall within the presidential communications privilege.

### A.    The Records Are Exempt in Full Under Exemption 5 Because They Are Protected by the Presidential Communications Privilege

DHS properly withheld the records in full under Exemption 5, which protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  "By this language, Congress

intended to incorporate into the FOIA all the normal civil discovery privileges." *Hopkins v. HUD*, 929 F.2d 81, 84 (2d Cir. 1991).

Exemption 5 exempts from disclosure information protected by the presidential communications privilege. *See Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1113 (D.C. Cir. 2004). The Supreme Court has recognized a "presumptive privilege for Presidential communications" that is "fundamental to the operation of government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974) ("*Nixon I*"). The presidential communications privilege protects "communications 'in performance of a President's responsibilities,' . . . 'of his office,' . . . and made 'in the process of shaping policies and making decisions.'" *Nixon v. Administrator of General Services*, 433 U.S. 425, 449 (1977) ("*Nixon II*") (quoting *Nixon I*, 418 U.S. at 708, 711, 713). It is justified in part because "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon I*, 418 U.S. at 708.

The presidential communications privilege is broad. It "'applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones.'" *Judicial Watch*, 365 F.3d at 1113 (quoting *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997)); *see also In re Sealed Case*, 121 F.3d at 745 ("Even though the presidential privilege is based on the need to preserve the President's access to candid advice, none of the cases suggest that it encompasses only the deliberative or advice portions of documents."). Further, in addition to protecting communications directly with the President, the privilege protects communications involving senior presidential advisers, including "both [ ] communications which these advisers solicited and received from others as well as those they authored themselves," in order to ensure that such

advisers investigate issues and provide appropriate advice to the President.  *In re Sealed Case*, 121 F.3d at 752.  And the privilege extends to both presidential communications and to records memorializing or reflecting such communications.  *See CREW v. DHS*, 06-0173, 2008 WL 2872183, at *8 (D.D.C. July 22, 2008) (documents memorializing communications that were solicited and received by the President or his immediate advisers are subject to presidential communications privilege).

DHS properly withheld the records at issue here pursuant to Exemption 5 and the presidential communications privilege.[2]  Indeed, these records are quintessential examples of records that fall squarely within the bounds of the privilege.   First, these records are communications internal to the Executive Branch, and are therefore "inter-agency and intra-agency" records for the purpose of applying Exemption 5.  *See*  5 U.S.C. § 552(b)(5); *see also* Holzer Decl. ¶¶ 16, 17, 22, 24.  Moreover, they are communications from a Cabinet-level official directly to the President, drafted and disseminated pursuant to an Executive Order, for the express purposes of advising the President in connection with his review of the United States' visa vetting procedures, and assisting the President in carrying out his responsibilities in the areas of immigration and national security.  *See* Holzer Decl. ¶¶ 24.  And the records have been closely held within the Executive Branch.  *See id.* ¶¶ 16, 17, 24; *American Civil Liberties Union v. Dep't of Justice*, No. 15 Civ. 1954 (CM), 2016 WL 889739, at *5 (S.D.N.Y. Mar. 4, 2016).  As such, the advisors involved in creating these records would have reasonably expected their recommendations to remain confidential, *see id.* ¶ 25; indeed, the records formed an integral part of the President's decision-making process, and contain, among other things, recommendations on

---

[2]      In the FOIA context, the presidential communications privilege need not be invoked by the President himself, but may be asserted by the agency withholding the records in question.  *See, e.g., Loving v. DOD*, 496 F. Supp. 2d 101, 108 (D.D.C. 2007), *aff'd*, 550 F.3d 32 (D.C. Cir. 2008).

sensitive issues of national security and foreign policy.  *See id.* ¶ 24.  Most importantly, disclosure of such communications would inhibit precisely the free flow of information and candid exploration of issues between the President and his advisors that lies at the heart of the privilege. *See id.* ¶ 25; *Nixon II*, 433 U.S. at 449.

There can be no question that these records qualify as presidential communications—it is difficult to imagine records falling more plainly within the privilege than classified, Cabinet-level reports created pursuant to an Executive Order for the express purpose of advising the President on sensitive issues of foreign policy and national security.  Accordingly, these records are exempt from disclosure in their entirety.  *See Judicial Watch*, 365 F.3d at 1113.

**B.      Portions of the Records Are Also Exempt Under Other FOIA Exemptions**

As explained below, and for the reasons set forth in the accompanying agency declarations, not only are the records properly withheld in full under Exemption 5, but portions of the records are also exempt pursuant to Exemptions 1, 5, and 7(E).

**1.      Exemption 1**

Exemption 1 protects from public disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).  The current standard for classification is set forth in Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010).  Section 1.1 of the Executive Order lists four requirements for the classification of national security information: (1) an "original classification authority" must classify the information; (2) the information must be "owned by, produced by or for, or [ ] under the control of the United States Government;" (3) the information must fall within one or more of the eight protected categories of information listed in section 1.4 of the E.O.; and (4) an original

classification authority must "determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and be "able to identify or describe the damage."  E.O. 13526 § 1.1(a)(1)-(4).

The government's burden under Exemption 1 "is a light one."  *ACLU v. DoD*, 628 F.3d 612, 624 (D.C. Cir. 2011); *accord Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007) ("little proof or explanation is required beyond a plausible assertion that information is properly classified"); *N.Y. Times Co. v. U.S. Dep't of Justice*, 872 F. Supp. 2d 309, 315 (S.D.N.Y. 2012). Decades of precedent firmly establish that the judiciary must defer to the Executive's predictions of national security harm that may attend public disclosure of classified records so long as such predictions appear logical or plausible.   Deference is mandated because, as the courts have recognized, predictions of national security harm are inherently speculative, and only the agencies with expertise in the area are in a position to make such judgments.  *See, e.g.*, *Wilner*, 592 F.3d at 76 ("it is bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies" regarding whether disclosure of information "would pose a threat to national security" (quotation marks omitted)); *ACLU v. Dep't of Justice*, 681 F.3d 61, 70 (2d Cir. 2012) ("[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."); *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) ("[t]he judiciary is in an extremely poor position to second-guess the predictive judgments made by the government's intelligence agencies" regarding national-security questions (quotation marks omitted)); *see also CIA v. Sims*, 471 U.S. 159, 179 (1985) (intelligence officials must "be familiar with 'the whole picture' as judges are not," and their decisions "are worthy of great deference given the magnitude of the national security interests and potential risks at stake").

The government's declarations in this case amply demonstrate that its assertion of Exemption 1 is proper.  At the threshold, the declarations establish that (1) an original classification authority has determined that the information at issue is currently and properly classified at the Secret level, *see* Second Stein Decl. ¶ 25; Holzer Decl. ¶ 28; (2) the information is under the control of the government, *see* Second Stein Decl. ¶ 25; Holzer Decl. ¶ 28; and (3) the withheld information falls within one or more of the categories described in E.O. 13526 section 1.4, *see* Second Stein Decl. ¶¶ 26-30; Holzer Decl. ¶¶ 29-31.

The declarations also logically and plausibly explain why the unauthorized disclosure of the withheld information could be expected to cause damage to the national security of the United States.  The government has properly withheld foreign government information.  *See* E.O. 13526 § 1.4(b); Second Stein Decl. ¶¶ 26-28; Holzer Decl. ¶¶ 29-31; *see also* E.O. 13526 § 6.1(s) ("foreign government information" includes "information provided to the United States by a foreign government or governments . . . with the expectation that the information, the source of the information, or both, are to be held in confidence").  These records contain, for example, information about certain countries' information-sharing capabilities, which "was based on confidential exchanges with the host governments."  Second Stein Decl. ¶ 35; *see also* Holzer Decl. ¶ 30.  It is logical to predict that disclosure of such information could damage the United States' relations with such foreign entities, who may discount future assurances that information will be kept confidential—thus adversely affecting the United States' information-sharing capabilities.  *See* Second Stein Decl. ¶ 28; Holzer Decl. ¶¶ 31; *see also* E.O. 13526 § 1.1(d) ("The unauthorized disclosure of foreign government information is presumed to cause damage to the national security.").

14

Relatedly, the government has also properly withheld information pertaining to the foreign relations or foreign activities of the United States. E.O. 13526 § 1.4(d); Second Stein Decl. ¶¶ 29-30; Holzer Decl. ¶¶ 29-30. This includes, for example, information concerning "the manner in which the United States has engaged with certain countries concerning their dissemination of information that the United States deems necessary for purposes of its visa vetting procedures," Holzer Decl. ¶ 30, and "frank assessments of other countries' security situations and confidential details about how other countries share information with the United States," Second Stein Decl. ¶ 30. Again, it is logical to conclude that release of such information would "inject friction into, or cause damage to, a number of our bilateral relationships with countries whose cooperation is important to U.S. national security." Second Stein Decl. ¶ 30; *see also* Holzer Decl. ¶ (disclosure of analysis of countries' information-sharing practices "could have a detrimental effect on the United States' foreign relations").

Because the government's declarations make "plausible assertion[s] that information" in the records "is properly classified," *Morley*, 508 F.3d at 1124, the information is properly withheld under Exemption 1.

### 2.    Exemption 5—Deliberative Process Privilege

Exemption 5 applies to the records not only in full because they fall within the presidential communications privilege, but also in part to the extent they are protected by the deliberative process privilege. *See Hopkins*, 929 F.2d at 84 (Exemption 5 encompasses documents protected by "the 'deliberative process' or 'executive' privilege, which protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions"); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975) ("those who

expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision making process" (quotation marks omitted)).

To fall within the deliberative process privilege, an agency record must satisfy two criteria: it "must be both 'predecisional' and 'deliberative.'" *Grand Central*, 166 F.3d at 482 (citations omitted). A document is "predecisional" when it "precedes, in temporal sequence, the 'decision' to which it relates," *id.*, and is "prepared in order to assist an agency decisionmaker in arriving at his decision," *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184 (1975). "A document is 'deliberative' when it is actually . . . related to the process by which policies are formulated." *Grand Central*, 166 F.3d at 482 (quotation marks omitted; alteration in original). In determining whether a document is deliberative, courts look to whether the document "formed an important, if not essential, link in [the agency's] consultative process," *id.* at 483, whether it reflects the opinions of the author rather than the policy of the agency, *id.*; *Hopkins*, 929 F.2d at 85, and whether it might "reflect inaccurately upon or prematurely disclose the views of [the agency]," *Grand Central*, 166 F.3d at 483. Predecisional, deliberative documents include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Tigue v. Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002) (quotation marks omitted); *Grand Central*, 166 F.3d at 482.

The records at issue here meet both criteria necessary for the deliberative process privilege to apply. First, the records are predecisional: DHS, in consultation with other Executive Branch agencies, prepared the documents to advise and assist the President in reaching final determinations concerning visa-vetting procedures and the placement of entry restrictions on certain foreign nationals. *See* Holzer Decl. ¶ 33. As such, they "did not constitute the

government's final position on these issues and accordingly do not contain binding policy or other guidance." *Id.* Second, the records are deliberative: "they reflect the President's decision-making process, including advice and recommendations by the Secretary of Homeland Security and other Cabinet-level officials regarding the adequacy of certain countries' information-sharing practices, the efficacy of certain visa vetting procedures, and the proper implementation of certain travel restrictions." *Id.* ¶ 35. Indeed, disclosure of these records "would undermine the ability of Executive Branch employees to openly engage in candid analysis presented to senior level officials, including the President, regarding matters of national security." *Id.* ¶ 36.

In narrow circumstances, "[a]n agency may be required to disclose a document otherwise entitled to protection under the deliberative process privilege if the agency has chosen 'expressly to adopt or incorporate by reference [a] . . . memorandum previously covered by Exemption 5 in what would otherwise be a final opinion.'" *Nat'l Council of La Raza v. U.S. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (quoting *Sears*, 421 U.S. at 161 (alterations in original)). Express adoption requires a finding that the agency not only expressly adopted the conclusions in an otherwise deliberative document, but also expressly adopted the analysis in the document. *See id.* at 358 ("Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference."). Here, the government has never expressly adopted the analysis and conclusions contained in the records. Indeed, rather than embodying final agency action, "[t]he analysis and recommendations embodied in the Report, the Memorandum, and their attachments were just one of several factors that the President considered in issuing the Proclamation." Holzer Decl. ¶ 35.

The records are prototypical documents "'reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Hopkins*, 929 F.2d at 84-85 (quoting *Sears*, 421 U.S. at 150). Accordingly, they are properly withheld under Exemption 5.

### 3.    Exemption 7(E)

Finally, the government properly withheld information pursuant to Exemption 7, 5 U.S.C. § 552(b)(7), which exempts from disclosure "records or information compiled for law enforcement purposes" that fall within one or more of the exemption's withholding categories.

Specifically, Exemption 7(E) protects information that "would disclose techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E). Such techniques and procedures are categorically exempt from disclosure, without any need for inquiry into the harm that would result from their disclosure. *See Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 681 (2d Cir. 2010). Here, both the State Department and the FBI withheld information concerning non-public databases accessed by law enforcement personnel for screening and vetting potential entrants to the United States. *See* Second Stein Decl. ¶¶ 34, 36; Declaration of David M. Hardy, dated May 14, 2018 ("Hardy Decl.") ¶¶ 14-15. The State Department also withheld information obtained from foreign governments that is used for the same purpose. *See* Second Stein Decl. ¶¶ 34, 36. Similarly, DHS applied Exemption 7(E) to withhold "what information DHS considers" when assessing aliens seeking entry to the United States, "the electronic databases or other sources from which that information is derived, [and] how DHS weighs and evaluates that information when making admission determinations." Holzer Decl. ¶ 38. DHS also withheld "information it compiled regarding the security of various foreign governments' identity and travel documentation, and the degree to which such countries could

18

serve as departure points for individuals seeking to exploit vulnerabilities and gain admission to the United States for purposes of causing harm to the national security." *Id.* Although not necessary for purposes of establishing the applicability of the exemption, *see Allard K. Lowenstein Int'l Human Rights Project*, 626 F.3d at 681, disclosure of this information could also facilitate the commission of crimes or terrorism, or the evasion of the United States' visa vetting procedures. *See* Second Stein Decl. ¶ 34; Holzer Decl. ¶ 39; Hardy Decl. ¶ 16-17.

<u>**CONCLUSION**</u>

For the foregoing reasons, and all other reasons set forth in the accompanying declarations, the government's motion for summary judgment should be granted.

Date:   New York, New York
        May 14, 2018

                          Respectfully submitted,

                          GEOFFREY S. BERMAN
                          United States Attorney for the
                          Southern District of New York

By:    */s/ Christopher Connolly*
        CHRISTOPHER CONNOLLY
        Assistant United States Attorney
        86 Chambers Street, 3rd Floor
        New York, New York 10007
        Tel.: (212) 637-2671
        Fax: (212) 637-2786
        christopher.connolly@usdoj.gov