## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

BRENNAN CENTER FOR JUSTICE AT NEW
YORK UNIVERSITY SCHOOL OF LAW,

      Plaintiff,

            v.

UNITED STATES DEPARTMENT OF STATE,

      Defendant.

17 Civ. 7520 (PGG)

## DECLARATION OF JAMES V.M.L. HOLZER

I, James V.M.L. Holzer, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the Deputy Chief Freedom of Information ("FOIA") Officer for the Department of Homeland Security ("DHS" or the "Department") Privacy Office ("DHS Privacy").

2.      In this capacity, I am the DHS official responsible for implementing FOIA policy across DHS, and for responding to requests for records under the FOIA, 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a, and related records access provisions.  I have been employed by DHS Privacy in this capacity since May 2016.  I previously served as the Director of the Office of Government Information Services within the National Archives and Records Administration, and prior to that I served as the Senior Director of FOIA Operations for DHS.

3.      I respectfully submit this declaration in support of defendant the United States Department of State's motion for summary judgment in the above-captioned FOIA matter.  I make the statements herein based on my personal knowledge, including my review of the Complaint in this matter and the records discussed herein, as well as on information provided to

me by others within the Executive Branch of the federal government with knowledge of the

records at issue in this case, and on information I acquired in the course of performing my

official duties.

## Overview of DHS Privacy's Responsibilities

4.      The mission of DHS Privacy is to preserve and enhance privacy protections for all

individuals, to promote transparency of Department operations, and to serve as a leader in the

privacy community.  DHS Privacy (a) evaluates Department legislative and regulatory proposals

involving collection, use, and disclosure of personally identifiable information ("PII");

(b) centralizes FOIA and Privacy Act operations to provide policy and programmatic oversight,

and to support implementation across the Department; (c) operates a Department-wide Privacy

Incident Response Program to ensure that incidents involving PII are properly reported,

investigated, and mitigated, as appropriate; (d) responds to complaints of privacy violations and

provides redress, as appropriate; and (e) provides training, education, and outreach to build a

culture of privacy across the Department and transparency to the public.

5.      DHS Privacy is responsible for processing all FOIA and Privacy Act requests

pertaining to twelve DHS Headquarters-level offices.  Those offices are: DHS Privacy; the

Office of the Secretary (which includes the Military Advisor's Office and the Office of

Intergovernmental Affairs); the Office of the Citizenship and Immigration Services Ombudsman;

the Office for Civil Rights and Civil Liberties; the Office of the Executive Secretary; the DHS

Management Directorate; the Countering Weapons of Mass Destruction Office; the Office of the

General Counsel; the Office of Legislative Affairs; the Office of Public Affairs; the Office of

Operations Coordination; and the Office of Policy.  DHS Privacy also coordinates the processing

of FOIA requests across DHS components when the subject matter of a particular request

touches on multiple components or is particularly high profile.

6.      Through the exercise of my official duties as DHS Privacy's Deputy Chief FOIA Officer, I became familiar with Plaintiff's FOIA request, its Complaint in this litigation, and the State Department's referral of records to DHS for direct response to Plaintiff.

**<u>Plaintiff's FOIA Request and Complaint, the State Department's Referral,<br>and DHS's Response</u>**

7.      By letter dated July 20, 2017, Plaintiff submitted a FOIA request to the State Department, seeking the disclosure of multiple categories of records relating to "the Administration's visa-applicant vetting policies and procedures."

8.      On October 2, 2017, Plaintiff commenced this lawsuit against the State Department, seeking disclosure of a subset of the records described in its FOIA request. Specifically, Plaintiff sought disclosure of: "[t]he report submitted by the Secretary of the Department of Homeland Security to President Trump on July 9, 2017, referred to in Section 1(c) of the Proclamation issued by President Trump on September 24, 2017"; "[t]he report submitted by the Secretary of Homeland Security to President Trump on September 15, 2017, referred to in Section 1(h) of the Proclamation"; and, "[i]f not included in the reports referred to in Sections 1(c) and 1(h) of the Proclamation, the final reports submitted by the Secretary of Homeland Security to President Trump" concerning certain countries identified in the Proclamation.

9.      Thereafter, the State Department conducted a search for records responsive to the portions of Plaintiff's FOIA request identified in its Complaint. On December 5, 2017, the State Department referred five responsive records to DHS, and requested that DHS provide Plaintiff with a direct response to this portion of its FOIA request. These records comprised a report authored by DHS to the President, the two attachments to the report, a memorandum authored by

the Secretary of Homeland Security to the President, and the one attachment to the memorandum.  Additionally, in a letter dated December 5, 2017, the State Department informed Plaintiff that it had referred the responsive records it had identified to DHS for a direct response.

10.     Following the State Department's referral, DHS undertook its own review of the records for applicable exemptions.  DHS determined that the records are exempt from disclosure in full pursuant to FOIA Exemption 5, 5 U.S.C. § 552(b)(5), because they are protected by the presidential communications privilege.  The Department further determined that parts of the records are exempt from disclosure pursuant to Exemption 1, 5 U.S.C. § 552(b)(1), because they contain classified national security information; Exemption 5, because they are protected by the deliberative process privilege; and Exemption 7(E), 5 U.S.C. § 552(b)(7)(E), because they contain non-public information concerning law enforcement techniques and procedures.

11.     DHS also referred the records for consultation to other agencies with potential equities in the information contained therein.  The exemptions identified by those agencies are addressed in declarations authored by the State Department and the Federal Bureau of Investigation ("FBI"), filed contemporaneously.

12.     In accordance with the Court's Order in this matter dated January 8, 2018, by letter dated February 9, 2018, the government responded to Plaintiff concerning the parts of its FOIA request at issue in the lawsuit.  The government asserted that the responsive records are exempt from disclosure in full pursuant to FOIA Exemption 5, 5 U.S.C. § 552(b)(5), and in part pursuant to other FOIA exemptions.  The government also provided Plaintiff with a *Vaughn* index that described the records identified and the exemptions asserted.

<u>**Description of Withheld Records**</u>

13.     On March 6, 2017, President Trump issued Executive Order 13780, "Protecting

4

the Nation from Foreign Terrorist Entry into the United States," which declared that "it is the

policy of the United States to protect its citizens from terrorist attacks, including those

committed by foreign nationals," and directed the government to undertake a series of actions "to

improve the screening and vetting protocols and procedures associated with the visa-issuance

process and the [United States Refugee Assistance Program]."  Among other things, Executive

Order 13780 provided that:

> The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the [Immigration and Nationality Act] (adjudications) in order to determine that the individual is not a security or public-safety threat.

Sec. 2(a).  The Executive Order further provided that:

> The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the worldwide review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed from each country for adjudications and a list of countries that do not provide adequate information, within 20 days of the effective date of this order. The Secretary of Homeland Security shall provide a copy of the report to the Secretary of State, the Attorney General, and the Director of National Intelligence.

Sec. 2(b).  Subsequently, DHS, in consultation with other Executive Branch agencies,

commenced the worldwide review called for in the Executive Order.

14.     On July 9, 2017, DHS submitted to the President a "20-Day Report to the

President on Section 2(b) of the Executive Order 13780" (the "Report").  The Report

summarized and preliminarily assessed the results of DHS's worldwide review of countries'

information-sharing capabilities; made recommendations concerning the nature of the

identification and security information that countries should be required to provide in order to

avoid having travel and entry restrictions placed on their nationals; and made recommendations

to the President regarding next steps for engaging with foreign governments, and potential

domestic strategies to enhance foreign cooperation in support of visa and immigration screening.

The Report also proposed baseline requirements for: (i) information sharing about identity

management; (ii) information sharing about national security and public safety; and (iii) national

security and public-safety risk factors.  Attachment A to the Report included a list of countries

that DHS, in consultation with the State Department and the Office of the Director of National

Intelligence ("ODNI"), deemed to be inadequate in sharing identification and security

information with the United States, or that otherwise posed a risk to the national security of the

United States.  Attachment B to the Report described in detail the methodology and

considerations employed to develop the "Country List" contained in Attachment A, and provided

information about specific law enforcement techniques employed by United States officials

when assessing an alien's eligibility for entry into the United States.  Portions of these records

were and remain classified at the SECRET level.

15.     Thereafter, on September 15, 2017, the Acting Secretary of DHS submitted a

memorandum directly to the President in accordance with Section 2(e) of the Executive Order

(the "Memorandum").  Section 2(e) provided that:

> [T]he Secretary of Homeland Security, in consultation with the Secretary of State and the
> Attorney General, shall submit to the President a list of countries recommended for
> inclusion in a Presidential proclamation that would prohibit the entry of appropriate
> categories of foreign nationals of countries that have not provided the information
> requested until they do so or until the Secretary of Homeland Security certifies that the
> country has an adequate plan to do so, or has adequately shared information through
> other means.

Sec. 2(e).  The Memorandum summarized DHS's recommendations concerning which countries'

nationals should be subject to travel restrictions or other lawful actions, owing to deficiencies in

identity management or information sharing or to other risk factors those countries presented.

Attachment A to the Memorandum summarized DHS's recommendations in chart form, providing listings for each country identified in the body of the Memorandum.  Portions of these records were and remain classified at the SECRET level.

16.     The DHS Office of Policy ("PLCY"), with the support of the DHS Office of Intelligence and Analysis ("I&A"), was primarily responsible for the collection of information relevant to the review, and for drafting the Report, the Memorandum, and their respective attachments.  Accordingly, certain personnel within those office had access to these documents. In preparing these documents, PLCY and I&A also consulted with personnel from its interagency partners, including personnel from the State Department and ODNI.  These documents were also being concurrently reviewed by personnel from the DHS Office of the General Counsel to ensure their responsiveness to Executive Order 13780.  As the office responsible for issuing the documents, certain personnel of the Office of the Secretary also had access to these documents.

17.     These records were, and remain, closely held within the Executive Branch.  The Report, the Memorandum, and their respective attachments were transmitted directly from the Acting Secretary of Homeland Security to the President.  Consistent with the Executive Order, the records were also provided to the Secretary of State and the Director of National Intelligence among other critical Executive Branch agencies.  Further, DHS circulated the records to a limited number of high-ranking personnel within certain DHS components charged with enforcing the immigration laws and regulating ports of entry: namely U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Citizenship and Immigration Services.

18.     On September 24, 2017, President Trump issued a Proclamation entitled

"Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United

States by Terrorists or Other Public-Safety Threats" (the "Proclamation").  Section 1(c) of the

Proclamation referenced DHS's "worldwide review" as authorized by Executive Order 13780,

and explained that:

> [T]he Secretary of Homeland Security, in consultation with the Secretary of State and the
> Director of National Intelligence, developed a baseline for the kinds of information
> required from foreign governments to support the United States Government's ability to
> confirm the identity of individuals seeking entry into the United States as immigrants and
> nonimmigrants, as well as individuals applying for any other benefit under the
> immigration laws, and to assess whether they are a security or public-safety threat.

Further, Section 1(h) of the Proclamation explained that:

> On September 15, 2017, the Secretary of Homeland Security submitted a report to me
> recommending entry restrictions and limitations on certain nationals of 7 countries
> determined to be "inadequate" in providing such information and in light of other factors
> discussed in the report. According to the report, the recommended restrictions would help
> address the threats that the countries' identity-management protocols, information-sharing
> inadequacies, and other risk factors pose to the security and welfare of the United States.

The Proclamation further explained that, "[i]n evaluating the recommendations of the Secretary

of Homeland Security and in determining what restrictions to impose for each country," the

President "consulted with appropriate Assistants to the President and members of the Cabinet,

including the Secretaries of State, Defense, and Homeland Security, and the Attorney General."

Sec. 1(h)(i).  The President also "considered several factors, including each country's capacity,

ability, and willingness to cooperate with our identity-management and information-sharing

policies and each country's risk factors, such as whether it has a significant terrorist presence

within its territory."  *Id.*  Finally, the President "also considered foreign policy, national security,

and counterterrorism goals."  *Id.*

19.     Based on this review and consultation process, the President announced the

imposition of travel restrictions on certain nationals from Chad, Iran, Libya, North Korea, Syria,

Venezuela, Yemen, and Somalia, sec. 2(a)-(h), and also established certain exceptions to those

restrictions and a process by which individual applicants for entry could obtain waivers of the restrictions, sec. 3(b), (c).

**Explanation of Applicable Exemptions**

20.     Based on its review of the five responsive records described above, DHS has determined that all five records are properly withheld in full pursuant to Exemption 5, because they are protected by the presidential communications privilege.  The records are also properly withheld in part pursuant to Exemptions 1, 5 (deliberative process privilege), and 7(E).

<u>Applicability of Exemption 5 (Presidential Communications Privilege) to the Records In Full</u>

21.     Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).

22.     The records at issue in this case are properly withheld in full pursuant to Exemption 5.  At the threshold, because they are communications generated by, exchanged within, and internal to the Executive Branch, they are "inter-agency and intra-agency" records.  Further, these records "would not be available by law to a party other than an agency in litigation with the agency," because they fall within the scope of the presidential communications privilege.

23.     The presidential communications privilege protects confidential communications that relate to potential presidential decision-making, and that involve the President, his senior advisors, or staff working for senior presidential advisors.  The privilege protects communications in connection with the President's performance of the responsibilities of his office and made in the process of shaping policies and making decisions.  It does so because protecting the frank and candid deliberation of ideas and expression of views is essential to

ensure that Executive Branch officials and advisors are able to thoroughly examine issues,
formulate opinions, and provide appropriate advice to the President.  Accordingly, the privilege
applies to documents in their entirety, and covers final and post-decisional materials as well as
pre-decisional documents.

24.     The records here are protected by the presidential communications privilege
because they are confidential communications from a Cabinet-level official (the Secretary of
Homeland Security) to the President, drafted and submitted pursuant to an Executive Order as
part of the process of shaping policies and Presidential decision-making.  They were distributed
within DHS only to personnel participating in data collection, drafting, review, and issuance of
the records, and to senior leadership of components charged with enforcing immigration laws or
regulating ports of entry.  Relatedly, the records have remained closely held within other
agencies within the Executive Branch, having been provided only to a select and limited group of
senior foreign policy and national security advisors, cabinet officials, and agency heads.  To the
best of my knowledge and based on information that has been provided to me during the course
of my official duties they have not been circulated outside of the Executive Branch.  As required
by the Executive Order, these records present the results of DHS's worldwide review of the
nature and quality of information provided to the United States by foreign governments.  They
advise the President on topics such as the vetting of visa applicants, the admission of aliens into
the United States, and methods of combatting threats to public safety.  Further, they make
recommendations to the President on sensitive issues of national security and foreign policy.  As
such, the records not only disclose advice provided to the President by top advisors at the
President's request, but also describe the nature of the decision-making process being
undertaken, explain the considerations that might be used to guide that decision-making process,

and address specific issues that should be evaluated in order to be of the greatest assistance to the President in making final decisions.

25.     The advisors involved in creating these records would have reasonably expected that their discussions and recommendations regarding sensitive national security and foreign policy issues would remain confidential.  Disclosure of these communications and deliberations therefore would necessarily inhibit presidential advisors from engaging in the full and candid exploration of issues and options that is essential in order to effectively prepare advice and recommendations for the President.  Disclosure would also undermine the President's ability to communicate confidentially with and seek advice from his senior advisors, cabinet officials, and agency heads on sensitive matters that fall within his constitutional duties—namely, the development of a coordinated strategy within the Executive Branch to achieve certain national security goals.  For all these reasons, the records fall within the scope of the presidential communications privilege, and are therefore properly withheld in full pursuant to Exemption 5.

<u>Applicability of Other FOIA Exemptions to the Records in Part</u>

26.     In addition to being exempt in full pursuant to Exemption 5 and the presidential communications privilege, parts of the records are also properly withheld pursuant to Exemption 1; Exemption 5 and the deliberative process privilege; and Exemption 7(E).

*Exemption 1: Classified National Security Information*

27.     Exemption 1 protects from public disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such an Executive order."  5 U.S.C. § 552(b)(1).

28.     DHS has properly withheld portions of the records pursuant to Exemption 1.

These withholdings meet all of the current requirements for classification, which are set forth in Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010). At the threshold, the withheld information is owned by, and is under the control of, the United States Government. Further, this information was and remains classified at the SECRET level, pursuant to a determination made by an "original classification authority," or pursuant to derivative classification based on the original classification authorities of multiple sources. Portions of Attachments A and B to the Report were derivatively classified based either on a Security Classification Guide issued by a DHS Original Classification Authority, or on the incorporation of information classified by other agencies, including the State Department, ODNI, the National Counterterrorism Center, and the FBI's Terrorist Screening Center. The Memorandum and its attachment were classified by the Assistant Secretary of International Engagement within the DHS Office of Strategy, Policy, and Plans, who is an original classification authority.

29.    This information is also properly withheld under Exemption 1 because it falls within one or more of the protected categories of information listed in section 1.4 of Executive Order 13526. First, withheld portions of the records contain classified "foreign government information," *i.e.*, information provided by a foreign government to the United States government with the expectation that it will be kept in confidence. Such information is properly classified pursuant to section 1.4(b) of the Executive Order. Second, portions of the records contain information pertaining to the "foreign relations and foreign activities of the United States, including confidential sources," which is properly classified pursuant to section 1.4(d) of the Executive Order.

30.    The classified material contained in the records contains information about foreign countries' ability and willingness to provide information about their nationals to the

United States; the nature of the information that certain countries do and do not provide; the

sources for such information; the methods by which such information was obtained and assessed;

and the manner in which the United States has engaged with certain countries concerning their

dissemination of information that the United States deems necessary for purposes of its visa

vetting procedures.

31.     Disclosure of this information would cause serious damage to the national

security.  The ability to obtain information from foreign governments is essential to the

formulation and successful implementation of U.S. foreign policy.  Release of foreign

government information provided in confidence, either voluntarily by DHS or by order of a

court, would cause foreign officials to believe that U.S. officials are not willing or able to

observe the confidentiality expected in such interchanges.  Governments could reasonably be

expected to be less willing in the future to furnish information important to the conduct of U.S.

foreign relations, and in general be less disposed to cooperate with the United States in the

achievement of foreign policy objectives of common interest.  Protecting foreign government

information, and in some cases even the fact that information has been provided, is therefore

important to the United States' conduct of foreign relations.  Here, moreover, to the extent the

records contain analysis that is critical of certain countries' information-sharing practices,

disclosure of such information could have a detrimental effect on the United States' foreign

relations.  Accordingly, the information withheld pursuant to these provisions of the Executive

Order in this case is currently and properly classified, and exempt from disclosure under

Exemption 1.

*Exemption 5: Deliberative Process Privilege*

32.     Parts of the records are also properly withheld pursuant to Exemption 5 because

they fall within the scope of the deliberative process privilege.  The deliberative process privilege is intended to protect the decision-making processes of the Executive Branch from public scrutiny in order to enhance the quality of Executive Branch decisions.  To be protected by the deliberative process privilege, the information at issue must be both "pre-decisional" and "deliberative."

33.     The withheld parts of the records are "pre-decisional" because they were prepared to assist the ultimate decision-maker—the President—in reaching a final determination concerning the United States' visa vetting procedures and appropriate entry restrictions on certain foreign nationals.  These records did not constitute the government's final position on these issues and accordingly do not contain binding policy or other guidance.  Instead, they were created to advise and assist the President in carrying out national security policies, and they were drafted antecedent to any final decisions being made.  Accordingly, these records are preliminary and advisory, and do not embody any final Executive Branch action.

34.     Disclosure of this type of pre-decisional information would inhibit Executive Branch decision-making because it would chill frank discussion and collaboration among Executive Branch employees and senior-level decision-makers.  If Executive Branch personnel who engage in the pre-decisional process of making recommendations on matters of national security discern that their preliminary assessments and recommendations, such as those contained in these records, could be released for public consumption, they may be more circumspect in expressing their views to final decision-makers.  The potential loss of forthright analysis and review could ultimately impede the comprehensive discussion of issues that is necessary to reach a well-reasoned and fully-vetted final decision in matters of national security.

35.     The withheld parts of the records are also "deliberative" because they reflect the

President's decision-making process, including advice and recommendations by the Secretary of DHS and other Cabinet-level officials regarding the adequacy of certain countries' information-sharing practices, the efficacy of certain visa vetting procedures, and the proper implementation of certain travel restrictions.  The analysis and recommendations embodied in the Report, the Memorandum, and their attachments were just one of several factors that the President considered in issuing the Proclamation.

36.     Release of sensitive, classified communications such as these would undermine the ability of Executive Branch employees to openly engage in candid analysis presented to senior level officials, including the President, regarding matters of national security.  It would reveal Cabinet-level thinking on a particular set of issues before that thinking had been reduced to a final policy decision, which in turn would hinder the confidentiality necessary to the proper formulation of Presidential policy on issues of national security and foreign policy.  This lack of candor would seriously impair the Executive Branch's ability to foster forthright, internal discussions necessary for efficient and proper decision-making.  It is therefore crucial that the candid views expressed in these records are protected from disclosure to ensure that the President will receive similarly frank advice on such critical matters in the future.  Accordingly, and for the foregoing reasons, these records are protected in part by the deliberative process privilege encompassed by Exemption 5.

*Exemption 7(E): Law Enforcement Techniques and Procedures*

37.     Exemption 7(E) exempts from disclosure "records or information compiled for law enforcement purposes" that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the

15

law."  5 U.S.C. § 552(b)(7)(E).

38.    DHS has properly withheld portions of the records pursuant to Exemption 7(E).

Specifically, the Department withheld information concerning the methodology and criteria used

for identifying countries that inadequately share identification and security information with the

United States, or that otherwise pose a threat to the national security.  This information was

compiled for purposes of enforcing and administering the immigration laws.  Although it is

publicly known that DHS conducts assessments of aliens seeking entry to the United States prior

to admission, it is not publicly known what information DHS considers, the electronic databases

or other sources from which that information is derived, or how DHS weighs and evaluates that

information when making admission determinations.  DHS also applied Exemption 7(E) to

information it compiled regarding the security of various foreign governments' identity and

travel documentation, and the degree to which such countries could serve as departure points for

individuals seeking to exploit vulnerabilities and gain admission to the United States for

purposes of causing harm to the national security.  Third countries' abilities and willingness to

compile and provide relevant information about their nationals is at the heart of the

recommendations to the President concerning visa vetting procedures contained in these records.

39.    The disclosure of this information could enable individual applicants for entry to

circumvent or evade DHS's screening process or the processes in place in foreign countries.

Likewise, disclosure of the withheld information could also allow countries to manipulate the

United States' evaluation process and thereby avoid being placed on the list of countries subject

to restrictions.  Accordingly, this information is properly withheld under Exemption 7(E).

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and information.

Dated:  Washington, D.C.
        May 14, 2018


_____
James V.M.L. Holzer
Deputy Chief FOIA Officer
DHS Privacy Office
U.S. Department of Homeland Security