**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BRENNAN CENTER FOR JUSTICE
AT NEW YORK UNIVERSITY
SCHOOL OF LAW,

                    Plaintiff,                    Case No. 17 Civ. 7520 (PGG)

          v.

UNITED STATES DEPARTMENT OF
STATE,

                    Defendant.

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Neil K. Roman
Ishita Kala
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
nroman@cov.com
ikala@cov.com

Mark H. Lynch[i]
Jaclyn E. Martínez Resly[i]
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. NW
Washington, DC 20001-4956
(202) 662-6000
mlynch@cov.com
jmartinezresly@cov.com

[i] Admitted *pro hac vice*

Johnathan Smith
Sirine Shebaya
MUSLIM ADVOCATES
P.O. Box 66408
Washington, DC 20035
(202) 897-1897
johnathan@muslimadvocates.org
sirine@muslimadvocates.org

Richard B. Katskee[i]
Eric Rothschild[i]
Andrew L. Nellis[i]
AMERICANS UNITED FOR SEPARATION
OF CHURCH AND STATE
1310 L St. NW, Suite 200
Washington, DC 20005
(202) 466-3234
katskee@au.org
rothschild@au.org
nellis@au.org

*Attorneys for Plaintiff Brennan Center for Justice at New York University School of Law*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................................ 3

PROCEDURAL HISTORY ........................................................................................................... 7

STANDARD OF REVIEW ........................................................................................................... 8

ARGUMENT ................................................................................................................................. 9

I.      Defendant has not demonstrated that its search was adequate and has therefore
        improperly withheld responsive material................................................................. 9

II.     Defendant has not shown that the presidential-communications privilege applies. ......... 10

        **A.      The documents were distributed within the executive branch and to
                foreign governments.** ................................................................................ 12

        **B.      The documents were broadly disclosed to the public.** ................................... 13

III.    The deliberative process privilege does not apply to shield portions of the
        documents. ......................................................................................................... 16

        **A.      The disputed records are not predecisional.** .................................................. 16

        **B.      The documents are not deliberative.** .............................................................. 17

        **C.      The documents were incorporated or adopted as a final decision.** ................ 19

IV.     Defendant has not shown that Exemption 1 applies to portions of the records. ............... 21

V.      Defendant has not shown that Exemption 7(E) applies to portions of each record. ......... 23

CONCLUSION ............................................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACLU v. DOJ,*
No. 15-civ-1954 (CM), 2016 WL 889739 (S.D.N.Y. Mar. 4, 2016)......................................11

*Associated Press v. DOJ,*
No. 06-Civ-1758, 2007 WL 737476 (S.D.N.Y. Mar. 7, 2007)..................................................9

*Associated Press v. DOJ,*
549 F.3d 62 (2d Cir. 2008)......................................................................................................9

*Aziz v. Trump,*
234 F. Supp. 3d 724 (E.D. Va. 2017) ......................................................................................4

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.,*
601 F.3d 143 (2d Cir. 2010)...........................................................................................8, 23

*Brennan Ctr. for Justice v. U.S. Dep't of Justice,*
697 F.3d 184 (2d Cir. 2012)...........................................................................................18, 20

*Campbell v. U.S. Dep't of Justice,*
164 F.3d 20 (D.C. Cir. 1998)................................................................................................21

*Coastal States Gas Corp. v. Dep't of Energy,*
617 F.2d 854 (D.C. Cir. 1980)..............................................................................................19

*Ctr. for Effective Gov't v. U.S. Dep't of State,*
7 F. Supp. 3d 16 (D.D.C. 2013).............................................................................................

*Darweesh v. Trump,*
No. 1:17-cv-00480 (E.D.N.Y. 2017) ......................................................................................4

*Defenders of Wildlife v. U.S. Border Patrol,*
623 F. Supp. 2d 83 (D.D.C. 2009) .........................................................................................9

*Doyle v. FBI,*
722 F.2d 554 (9th Cir. 1983) ...............................................................................................23

*Grand Cent. P'ship v. Cuomo,*
166 F.3d 473 (2d Cir. 1999)..................................................................................................17

*Halpern v. FBI,*
181 F.3d 279 (2d Cir. 1999).................................................................................8, 9, 21, 23

*Hawaii v. Trump*,
  878 F.3d 662 (9th Cir. 2017) ............................................................................5

*Int'l Refugee Assistance Proj. v. Trump*,
  265 F. Supp. 3d 570 (D. Md. 2017) ................................................................16

*Int'l Refugee Assistance Proj. v. Trump*,
   No. 17-1270, 2018 WL 1256938 (U.S. June 28, 2018) .................................16

*Int'l Refugee Assistance Proj. v. Trump*,
  857 F.3d 554 (4th Cir. 2017) (en banc) ......................................................5, 15

*Islamic Shura Council of S. Cal. v. FBI*,
  635 F.3d 1160 (9th Cir. 2011) .......................................................................23

*Judicial Watch, Inc. v. Dep't of Justice*,
  365 F.3d 1108 (D.C. Cir. 2004) .....................................................................11

*Katzman v. CIA*,
  903 F. Supp. 434 (E.D.N.Y. 1995) ..................................................................9

*Korematsu v. United States*,
  323 U.S. 214 (1944) .........................................................................................2

*Louhghalam v. Trump*,
  230 F. Supp. 3d 26 (D. Mass. 2017) ................................................................4

*N.Y. Times Co. v. U.S. Dep't of Justice*,
  235 F. Supp. 3d 522 (S.D.N.Y. 2017)............................................................21

*Nat'l Archives & Records Admin. v. Favish*,
  541 U.S. 157 (2004).........................................................................................2

*Nat'l Council of La Raza v. Dep't of Justice*,
  411 F.3d 350 (2d Cir. 2005)................................................................16, 19, 20

*Nat'l Day Laborer Org. Network v. U.S. Immig. & Customs Enf't Agency*,
  811 F. Supp. 2d 713 (S.D.N.Y. 2011).............................................................16

*Nat'l Day Laborer Org. Network v. U.S. Immig. & Customs Enf't Agency*,
  827 F. Supp. 2d 242 (S.D.N.Y. 2011).............................................................17

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978).........................................................................................2

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975).......................................................................................19

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997)........................................................................11

*Tigue v. Dep't of Justice*,
    312 F.3d 70 (2d Cir. 2002)...........................................................................17

*Trump v. Hawaii*,
    138 S. Ct. 923 (2018)....................................................................................6

*Trump v. Hawaii*,
    No. 17-965, 2018 WL 3116337 (U.S. June 26, 2018)...........................1, 2, 3, 16, 20

*Trump v. Int'l Refugee Assistance Proj.*,
    137 S. Ct. 2080 (2017)..................................................................................5

*Trump v. Int'l Refugee Assistance Project*,
    No. 17-1270, 2018 WL 1256938 (U.S. June 28, 2018).....................................1, 16

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989)......................................................................................2

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973)....................................................................8, 23

*Washington v. Trump*,
    847 F. 3d 1151 (9th Cir. 2017) ....................................................................4

*Weiner v. FBI*,
    943 F.2d 972 (9th Cir. 1991) ......................................................................23

**Statutes**

5 U.S.C. § 552(a)(4)(B) ...........................................................................8, 9, 23

5 U.S.C. § 552(a)(6)(A)(i) ..............................................................................7

5 U.S.C. § 552(a)(6)(C)(i) ..............................................................................7

5 U.S.C. § 552(b) ..........................................................................................8

5 U.S.C. § 552(b)(5) ....................................................................................10

5 U.S.C. § 552(b)(7)(E) ................................................................................24

**Other Authorities**

Appl. (17A560) for Stay Pending Appeal, *Trump v. Int'l Refugee Assistance
    Proj.*, *Trump v. Int'l Refugee Assistance Proj.*,
    No. 8:17-cv-00361-TDC (S. Ct. Nov. 21, 2017) .......................................15

Federation of American Scientists, *Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States* (2017), https://fas.org/irp/eprint/dhs-7countries.pdf ........................................................5

Anjali Singhvi & Alicia Parlapiano, *Ban: Who Is Barred and Who Is Not*, N.Y. Times (Feb. 3, 2017) ........................................................................4

Br. for Pet'r, *Trump v. Hawaii*, No. 17-965 (U.S. Feb. 2018), https://www.supremecourt.gov/DocketPDF/17/17-965/36179/20180221201616615_17-965tsUnitedStates.pdf.................................18

Donald Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:29 AM), https://twitter.com/realdonaldtrump/status/871675245043888128?lang=en .........................16

Elizabeth Culliford, *Exclusive: U.S. Demands Nations Provide More Traveler Data or Face Sanctions*, Reuters (July 13, 2017) ................................................12

Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Jan. 27, 2017).....................................3, 4

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017)........................................4, 10, 12, 13

Fact Sheet: President Donald J. Trump Strengthens Security Standards for Traveling to America, White House (Sept. 24, 2017), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-strengthens-security-standards-traveling-america/.................................................................14

Fact Sheet: Proclamation on Enhancing Vetting Capabilities & Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats, White House (Sept. 24, 2017), https://www.whitehouse.gov/briefings-statements/fact-sheet-proclamation-enhancing-vetting-capabilities-processes-detecting-attempted-entry-united-states-terrorists-public-safety-threats ................................................14

FAQ: Proclamation on Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats, White House (Sept. 24, 2017), https://www.whitehouse.gov/briefings-statements/faq-proclamation-enhancing-vetting-capabilities-processes-detecting-attempted-entry-united-states-terrorists-public-safety-threats/ ........................................15

Fed. R. Civ. P. 56(a) .....................................................................................8

Indiv. R. of Prac. of Judge Paul G. Gardephe – Civil Cases, § V.A...............................8

L.R. 56.1 .............................................................................................8

Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017) ...........................................4

Harsha Panduranga et al., *Extreme Vetting & the Muslim Ban*, Brennan Ctr. for J. (2017), https://www.brennancenter.org/sites/default/files/publications/extreme_vetting_full_1 0.2.pdf ................................................................................................................................6

President Donald J. Trump Announces Enhanced Security Measures, White House (Sept. 24, 2017), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-announces-enhanced-national-security-measures/ .......................................................15

Press Briefing, U.S. Dep't of State (Sept. 26, 2017) https://www.state.gov/r/pa/prs/dpb/2017/09/274443.htm .......................................................14

Press Release, Donald J. Trump for President, Donald J. Trump Statement on Preventing Muslim Immigration (Dec. 7, 2015), http://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration [https://web.archive.org/web/20151207230751/http://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration]https://web.archive.org/web/20151207230751/http://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration]...............3

Proclamation No. 9723, 83 Fed. Reg. 15,937 (Apr. 10, 2018) .........................................................1

Reply Br. for Pet'r, *Trump v. Hawaii*, No. 17-965 (U.S. Feb. 2018) ...........................................20

## INTRODUCTION

Plaintiff Brennan Center for Justice at New York University School of Law brings this action pursuant to the Freedom of Information Act ("FOIA") for documents related to Proclamation 9645—President Trump's Muslim travel ban. Specifically, Plaintiff seeks reports that the Administration asserts are the product of its "worldwide review" of information-sharing practices, policies, and capabilities of foreign nations—reports which, according to the government, support President Trump's targeting of eight countries in this Proclamation.[1]

As this Court is surely aware, the Supreme Court recently overturned a preliminary injunction barring application of Proclamation 9645, *see Trump v. Hawaii*, No. 17-965, 2018 WL 3116337, at *25 (U.S. June 26, 2018), and similarly vacated the preliminary injunction in *Trump v. International Refugee Assistance Project*, No. 17-1270, 2018 WL 1256938, at *1 (U.S. 2018). Although it remanded both for further proceedings (*see id.*; *Hawaii*, 2018 WL 3116337, at *25), in practice the ban will remain in effect for the foreseeable future. And without disclosure of the records sought in the current FOIA action, so too will the public's uncertainty over whether the President's policy "result[ed] from a justification independent of unconstitutional grounds." *Hawaii*, 2018 WL 3116337, at *21. While there is ample evidence that the President expressly promised to ban Muslims and denigrated Islam (*see id.* at *18-19), there is no equivalent public evidence—only mere assertion by the government—that the ban truly "reflects the results of a worldwide review process undertaken by multiple Cabinet officials and their agencies" (*id.* at *22). The results of the worldwide review process have never been seen by any court or the public, and the disclosure of these documents was not litigated in the travel ban cases.

---

[1] Although originally listed in the Proclamation, Chad was removed from the list of banned countries on April 10, 2018. Proclamation No. 9723, 83 Fed. Reg. 15,937 (Apr. 10, 2018), Kala Decl. Ex. 14.

As Justice Sotomayor noted in her dissent in *Hawaii*, there are "stark parallels" between the travel ban and the Japanese internment at issue in *Korematsu v. United States*, 323 U.S. 214 (1944), *abrogated by Hawaii*, 2018 WL 3116337, at *24. In both instances "there was strong evidence that impermissible hostility and animus motivated the Government's policy"; and in both "the Government was unwilling to reveal its own intelligence agencies' views of the alleged security concerns to the very citizens it purported to protect." *Hawaii*, 2018 WL 3116337, at *48 (Sotomayor, J., dissenting).

Because the government refused to reveal its evidence in the litigation challenging the ban, the public now depends on FOIA to determine whether the deceptions and ensuing national tragedy and disgrace of *Korematsu* are being replayed in the travel ban. "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Or as put more bluntly in another Supreme Court decision, FOIA protects the right of all Americans "to 'know what their Government is up to.'" *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171-72 (2004) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)). And this right is all the more important when the citizenry's principal recourse in the face of potentially unconstitutional executive action must come not through the courts but through the ballot box. Few, if any, FOIA cases implicate the statute's high purpose more compellingly than this one.

Defendant United States Department of State, which has possession and control of the responsive records, has refused to disclose these records and has moved instead for summary judgment, asserting that the records are protected under several of FOIA's narrow exemptions.

Plaintiff opposes Defendant's motion because Defendant neither performed an adequate search for all responsive records nor carried its burden to show that the claimed exemptions apply to the identified records. Plaintiff also cross-moves for an order declaring that the disputed documents do not fall within Exemption 5. As for Defendant's claims of Exemption 1 and 7(E), the Court should deny Defendant's motion and require further justification.

## FACTUAL BACKGROUND

The President and his advisers made "a series of statements [about Muslims and Islam] casting doubts on the official objective of the Proclamation," *Hawaii*, 2018 WL 3116337, at *18, including calling for a "total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on." *Id.*

One week after his Inauguration, President Trump, in fulfillment of his campaign promise to ban Muslims,[2] issued the first of his three Muslim bans. *See* Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Jan. 27, 2017), Declaration of Ishita Kala ("Kala Decl.") Ex. 8. The first ban temporarily halted entry of nationals from seven Muslim-majority countries—Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen—temporarily suspended the U.S. Refugee Admissions Program, established a policy of prioritizing certain religious denominations over others upon resuming the Refugee Program, and indefinitely barred Syrian refugees. *See id.* §§ 3, 5. The ban also explicitly stereotyped Muslims, stating that they "place violent ideologies over American law" and "engage in acts of bigotry or hatred," such as "'honor killings' [and] other forms of violence against women." *Id.* § 1. The ban extended to legal permanent residents of the United

---

[2] Press Release, Donald J. Trump for President, Donald J. Trump Statement on Preventing Muslim Immigration (Dec. 7, 2015), http://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration [https://web.archive.org/web/20151207230751/http://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration], Kala Decl. Ex. 4.

States, who, in some instances, had never lived outside the United States during their adulthood. *Id.* § 3(c).

It does not appear that the administration consulted experts in its Defense or State Departments or the Department of Homeland Security ("DHS") before issuing the ban. Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017), https://www.nytimes.com/2017/01/29/us/politics/donald-trump-rush-immigration-order-chaos.html, Kala Decl. Ex. 10. Instead, after the ban was in place, it charged the Secretary of DHS, in consultation with the Secretary of State and the Director of National Intelligence, with immediately beginning a "review to determine the information needed from any country to adjudicate any visa . . . in order to determine that the individual seeking the benefit is who the individual claims to be and is not a security or public-safety threat." Exec. Order No. 13,769, 82 Fed. Reg. 8,977, § 3.

Legal challenges were immediately filed in courts across the nation, and courts quickly enjoined key provisions of the ban.[3] While short-lived, the effects of the ban were widespread, as the government revoked "[m]ore than 100,000 visas for foreigners inside and outside the United States" from the listed, Muslim-majority countries.[4]

Rather than appealing these decisions, President Trump issued the second ban. *See* Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017), Kala Decl. Ex. 12. This version instituted a 90-day travel ban against persons from six Muslim-majority countries—the same as in the first

---

[3] *See, e.g.*, *Washington v. Trump*, 847 F. 3d 1151 (9th Cir. 2017); *Aziz v. Trump*, 234 F. Supp. 3d 724 (E.D. Va. 2017); *Darweesh v. Trump*, No. 1:17-cv-00480 (E.D.N.Y. 2017); *Louhghalam v. Trump*, 230 F. Supp. 3d 26 (D. Mass. 2017).

[4] Anjali Singhvi & Alicia Parlapiano, *Ban: Who Is Barred and Who Is Not*, N.Y. Times (Feb. 3, 2017), https://www.nytimes.com/interactive/2017/01/31/us/politics/trump-immigration-ban-groups.html, Kala Decl. Ex. 11.

ban, except Iraq—and a worldwide 120-day suspension of refugee processing. *See id.* The administration did not represent that it had developed additional information about the difficulties of vetting nationals from the affected countries, and did not heed a DHS report concluding that country of citizenship was "unlikely to be a reliable indicator of potential terrorist activity." Federation of American Scientists, *Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States* (2017), https://fas.org/irp/eprint/dhs-7countries.pdf (prepared at the request of the Acting Under Secretary for Intelligence and Analysis, U.S. Dep't of Homeland Security), Kala Decl. Ex. 13. Instead, this second version of the ban again instructed the Secretary of DHS to collect information through a "worldwide review" to "identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat." Kala Decl. Ex. 12, § 2.

The second iteration of the ban was also successfully challenged in court. *See Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc); *Hawaii v. Trump*, 878 F.3d 662 (9th Cir. 2017). In June 2017, however, the Supreme Court allowed the provisions to be implemented against persons who lack a "bona fide relationship with a person or entity in the United States." *Trump v. Int'l Refugee Assistance Proj.*, 137 S. Ct. 2080, 2086 (2017). By its terms, the second ban expired in September 2017.

On September 24, 2017, President Trump released the third iteration of the ban in the form of a Proclamation. *See* Dkt. #1-1. The government asserts that the Proclamation is based on the "worldwide review" ordered in the second ban, and specifically two reports submitted by the Secretary of DHS to the President on July 9 and September 15, 2017. *See id.* § 1(c)-(j). The

Proclamation restricts entry of persons into the United States from six Muslim-majority countries—Chad,[5] Iran, Libya, Somalia, Syria, and Yemen—and two non-Muslim majority countries—North Korea and Venezuela. *See id.* § 2(a)-(h). Functionally, it bans 76% of nonimmigrant visa applicants and 91% of immigrant visa applicants affected by the previous bans and thus restricts predominantly Muslim immigration to the United States.[6]

According to the Proclamation, the July 2017 report by the Secretary of DHS "developed a baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States." Dkt. #1-1, § 1(c). That baseline was allegedly meant to capture information about identity-management, national security, and public safety. *Id.* According to the Proclamation, the Secretary of DHS originally found that sixteen countries were "inadequate" with respect to the baseline and thirty-one countries were "'at risk' of becoming 'inadequate.'" *See id.* § 1(e). Following a 50-day engagement period with foreign countries, the Secretary of DHS issued another report to President Trump identifying countries for inclusion in the Proclamation. *See id.* § 1(f). The Administration has publicly asserted that President Trump "adopt[ed]" the Secretary's conclusions. Transcript of Oral Argument, *Trump v. Hawaii*, 138 S. Ct. 923 (2018) (No. 17-965), Kala Decl. Ex. 16, at 3 ("The proclamation adopts those recommendations."). The reports have not been made public or produced in any court proceeding.

---

[5] *See supra* n.1.

[6] *See* Harsha Panduranga et al., *Extreme Vetting & the Muslim Ban*, Brennan Ctr. for J. (2017), https://www.brennancenter.org/sites/default/files/publications/extreme_vetting_full_10.2.pdf, Kala Decl. Ex. 15, at 14.

## PROCEDURAL HISTORY

On July 20, 2017, Plaintiff submitted its FOIA request, which generally requested information related to the Administration's extreme vetting practices. Dkt. #1-2. On July 24, 2017, Defendant granted Plaintiff's request for expedited processing, *see* Dkt. #1-3, but had not made a determination on the request as of October 1, 2017—well past the 20-day statutory deadline, *see* Dkt. #24, ¶ 2; 5 U.S.C. § 552(a)(6)(A)(i). Plaintiff's administrative remedies were thus deemed constructively exhausted, 5 U.S.C. § 552(a)(6)(C)(i), and Plaintiff filed the instant action on October 2, 2017, *see* Dkt. #1.

This action seeks only a subset of Plaintiff's original request—the report submitted by the Secretary of DHS to President Trump on July 9, 2017, referred to in Section 1(c) of the Proclamation; the report submitted by the Secretary to the President on September 15, 2017, referred to in Section 1(h) of the Proclamation; and, to the extent not included in those two reports, the final reports submitted by the Secretary to the President for the sixteen "inadequate" countries referenced in Section 1(e) of the Proclamation and the eight countries targeted for visa restrictions and discussed in Section 2 of the Proclamation. *See* Dkt. #1.[7]

Defendant eventually identified five documents responsive to the subset of Plaintiff's request at issue in this action—the July 2017 report ("Report"), Attachments A and B thereto, the September 2017 report ("Memorandum"), and Attachment A thereto—but withheld each document in full based on a claim of the presidential communications privilege under Exemption 5. *See* Second Declaration of Eric F. Stein ("Second Stein Decl.") Exs. 1-2, Kala Decl. Exs. 1-2. Defendant also asserted that Exemption 1 (properly classified information), a different aspect of

---

[7] The remainder of Plaintiff's FOIA request is still pending before the Defendant agency.

Exemption 5 deliberative process privilege), and Exemption 7(E) (law enforcement techniques) applied to the documents in part. *See id.* Defendant moved for summary judgment on May 14, 2018.[8]

## STANDARD OF REVIEW

Summary judgment is warranted where material facts are not in genuine dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Here, as in all FOIA actions, the government has the burden to show that the records fall squarely within the FOIA exemptions. *See* 5 U.S.C. § 552(a)(4)(B). If exemptions apply to only portions of the records, the government must disclose all reasonably segregable non-exempt portions. 5 U.S.C. § 552(b).

In analyzing whether the government has met its burden, the Court must construe the exemptions narrowly, with doubts resolved in favor of disclosure. *See Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010). Because the FOIA statute requires de novo review, *see* 5 U.S.C. § 552(a)(4)(B), "[t]he agency's decision that the information is exempt from disclosure receives no deference," *Bloomberg*, 601 F.3d at 147. The agency must meet its burden of showing that the claimed exemptions apply to the relevant portions of the documents by "describ[ing] in reasonably specific terms the nature of the documents and the justification for nondisclosure." *Halpern v. FBI*, 181 F.3d 279, 285 (2d Cir. 1999). These justifications may be in the form of declarations or an index (collectively known as a *Vaughn* index). *See id.* at 291. But "conclusory and generalized" statements, *id.* at 290; or "explanations [that] read more like a policy justification" that "give[] no contextual

---

[8] Defendant did not include a statement of undisputed material facts along with Defendant's motion papers. *See* L.R. 56.1; Indiv. R. of Prac. of Judge Paul G. Gardephe – Civil Cases, § V.A.

description[s] either of the documents subject to redaction or of the specific redactions made to the various documents" are insufficient. *Id.* at 293.

The Court is also authorized to examine withheld documents *in camera*. *See* 5 U.S.C. § 552(a)(4)(B). If the Court concludes that the government has not sustained its burden to justify withholdings, it may order the government to disclose the records, *see* 5 U.S.C. § 552(a)(4)(B), or alternatively, require further justification for the claimed exemption. *See, e.g.*, *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 88-89 (D.D.C. 2009).

## ARGUMENT

For the reasons outlined below, Defendant has failed to meet its burden to show that its search was adequate and that the claimed exemptions apply in full or in part. With respect to the Defendant's assertion of Exemption 5—which is claimed to apply to the documents in their entirety (under the presidential communications privilege) and in part (under the deliberative process privilege)—the record is sufficient for the Court to rule that the exemption does not apply in this case. With respect to Defendant's assertion of Exemptions 1 and 7(E)—which are claimed to apply only to unspecified portions of the documents—the record is insufficient, and the Court should order Defendant to provide further justifications, correlated to the specific portions of the documents for which these exemptions are claimed.

I. **Defendant has not demonstrated that its search was adequate and has therefore improperly withheld responsive material.**

In a FOIA case, the government bears the burden of demonstrating that its search for responsive records was reasonable. *Associated Press v. DOJ*, No. 06-Civ-1758, 2007 WL 737476, at *3 (S.D.N.Y. Mar. 7, 2007), *aff'd*, 549 F.3d 62 (2d Cir. 2008). In examining the government's description of its search, the Court must construe the facts in the light most favorable to Plaintiff. *See Katzman v. CIA*, 903 F. Supp. 434, 437 (E.D.N.Y. 1995).

The government has not met its burden. The portion of Plaintiff's FOIA request at issue in this suit was for (i) the July and September 2017 reports submitted to President Trump by the Secretary of DHS and, critically, (ii) "the final reports" submitted by the Secretary to the President on the eight countries identified in Section 2 of the Proclamation and the sixteen countries identified by the Secretary as being "inadequate," referred to in Section 1(e) of the Proclamation, to the extent those reports were not included in the July and September 2017 reports. *See* Dkt. #1, ¶ 2. Although the government located the July and September 2017 reports, *see* Kala Decl. Ex. 2, Defendant has not adequately addressed the final country reports. The government's catch-all statement that "no further records existed that were responsive," Second Stein Decl. ¶ 19, is insufficient to establish that a reasonable search was conducted. Country reports were central to the "worldwide review" mandated by the second ban (Exec. Order No. 13,780). Section 1(e) of the Proclamation states that DHS found sixteen countries inadequate, so reports on these countries must exist. Mr. Stein states that only one office (Visa Services) of one bureau (Consular Affairs) of the State Department was searched for these reports. *Id.* at 16-18. This was plainly inadequate. If the reports exist but were not considered responsive because they were not submitted to the President, Defendant should say so.

## II.   Defendant has not shown that the presidential-communications privilege applies.

Defendant asserts that the presidential communications privilege, and thus Exemption 5, supports withholding the disputed documents in their entirety. Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters" that would ordinarily not be disclosed in litigation against the agency. 5 U.S.C. § 552(b)(5). But this privilege is not unbounded as "[c]ourts have long been hesitant to extend the presidential communications privilege" in light of our "democratic form of government where the public's right to know how its government is conducting its business has long been an enduring and cherished value."

*Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1122 (D.C. Cir. 2004). Accordingly, the presidential communications privilege should "be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). Because the documents at issue have been widely shared throughout the executive branch and described both to the public and foreign governments, the presidential communications privilege does not apply here.

In *Center for Effective Government v. U.S. Department of State*, the court rejected the argument that a presidential directive that was widely distributed throughout the executive branch was protected by the presidential-communications privilege. 7 F. Supp. 3d 16 (D.D.C. 2013). While the Administration had not released the directive to the public, it had (1) released a fact sheet describing the directive's goals and initiatives and described the directive in public remarks, *id.* at 19-20; and (2) permitted the initial recipients made up of a "limited group of senior foreign policy advisors, cabinet officials, and agency heads," to disseminate the directive on a "need-to-know basis," *id.* at 20. Under these circumstances, the court held, the presidential-communications privilege could not protect the document. *Id.* at 26 ("[I]t is axiomatic that the privilege's purpose of promoting candor and confidentiality between the President and his closest advisers becomes more attenuated, and the public's interest in transparency and accountability more heightened, the more extensively a presidential communication is distributed."). Judge McMahon, of this Court, in reviewing the *Center for Effective Government* decision, summarized it plainly: "If a document . . . is transmitted to multiple agencies and to staffers who serve in non-advisory roles to the President, the document loses any claim to the presidential communications privilege." *ACLU v. DOJ*, No. 15-civ-1954 (CM), 2016 WL

889739, at *5 (S.D.N.Y. Mar. 4, 2016). Each factor identified in the *Center for Effective Government* decision is present here to an even greater degree.

### A.     The documents were distributed within the executive branch and to foreign governments.

The 50-day engagement with foreign countries on which the third travel ban rests appears to have been initiated by an unclassified cable transmitted by Defendant on July 12, 2017, to *all consular outposts* with no limitation on further dissemination.[9] As the cable stated, its purpose was to "outline[] the results of the report submitted to the President on July 10" pursuant to the second travel ban (Exec. Order No. 13,780)—i.e., the Report that Defendant is attempting to withhold. *Id.* ¶ 4. The cable then describes the Report in considerable detail. The Report, the cable explained, "outlines the new standards that all 191 countries are required to meet for (1) information sharing on identity management and (2) information sharing on security and public safety threats." *Id.* ¶ 5. It "concluded that three types of information sharing/cooperation are needed to establish a traveler's identity, and four types of information sharing/cooperation are needed to ensure that a traveler is not a terrorist or public safety threat." *Id.* The Report further "discusse[d] 'national security risk indicators' that helped prioritize countries for engagement." *Id.* The cable also stated that the Report "provides a classified list of countries that DHS has preliminarily assessed as not providing adequate information, as well as countries at risk of not providing adequate information." *Id.*[10]

---

[9] *See* Elizabeth Culliford, *Exclusive: U.S. Demands Nations Provide More Traveler Data or Face Sanctions*, Reuters (July 13, 2017), http://live.reuters.com/Event/Live_US_Politics/ 1012197528 (emphasis added), Kala Decl. Ex. 24.

[10] Defendant has not claimed Exemption 1 for the Report, and thus does not assert that it contains classified information. *See* Kala Decl. Ex. 2.

The cable then instructed recipients to "[a]nnounce the new standards" laid out in the Report "to all foreign governments" and provided "talking points" for doing so. *Id.* ¶¶ 8-9. The talking points detailed three standards for identity-related information-sharing, five standards for information-sharing related to terrorism or public safety threats, and three security risk indicators relevant to the Administration's ability to vet a country's nationals for admissibility. *Id.* ¶ 9. It provided additional instructions for "non-Visa Waiver Program countries," "Visa Waiver Program countries," "Category A countries," "Category B countries," and "non-VWP countr[ies] that [are] in neither Category A nor B," *id.*; and outlined nine "leave-behind questions" tailored to the Report's standards, *id.* ¶¶ 10-11. The cable also explained that the Report's standards were "buil[t] upon [] existing partnerships with other countries and multilateral organizations such as ICAO[,] [] INTERPOL, . . . [and] UN Security Council Resolutions." *Id.* ¶ 9.

In addition to the disclosures described in the cable, Defendant admits that the documents at issue were distributed within the Executive Branch, although it obscures just how many agencies within the Executive Branch received them.  *See* Declaration of James V.M.L. Holzer ("Holzer Decl.") ¶ 17  (distributed to Secretary of State, Director of National Intelligence, "*among other* critical Executive Branch *agencies*" (emphasis added)). This admission refutes the government's assertion that the disputed documents "were, and remain, closely held within the Executive Branch," *see* Holzer Decl. ¶ 17, and renders the presidential communication privilege inapplicable. *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26.

## B.      The documents were broadly disclosed to the public.

Furthermore, the Administration proactively disclosed its wide dissemination of its standards for conducting the worldwide review. For example, a fact sheet released by the Administration related to the Proclamation stated that the baseline standards proposed in the

13

Report were "communicated . . . *globally*."[11] A separate fact sheet revealed that the global

dissemination of the baseline standard ("minimum security requirements") happened in July

2017.[12] And during a September 2017 news briefing, the spokesperson for Defendant explained

that "the State Department along with DHS sent notes and had diplomatic engagements with

every country around the globe," during which it conveyed "the kind of information . . . that we

required that our consular affairs officials could verify [in order to] give somebody a visa."[13] The

methodology for making the "assessment," and classifying foreign countries was also widely

disseminated to the public. The fact sheets, for example, describe what types of information the

Administration was purportedly assessing—the sharing of electronic passports, criminal data,

and data on known and suspected terrorists, as well as the reporting of lost or stolen passports,

Kala Decl. Ex. 18, at 1—and outlined the "new baseline" requirements for information sharing,

Kala Decl. Ex. 17, at 6.

　　The frequently-asked-questions document released by the Administration along with the

Proclamation explained that the baseline requirements were crafted from "long-standing U.S.

Government goals" and "standards established by . . . the [UN], [ICAO], and INTERPOL,"

which "incorporate best practices derived from proven and effective security partnerships, such

as the Visa Waiver Program, and from internationally-recognized identity management practices,

---

[11] Fact Sheet: Proclamation on Enhancing Vetting Capabilities & Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats, White House (Sept. 24, 2017), https://www.whitehouse.gov/briefings-statements/fact-sheet-proclamation-enhancing-vetting-capabilities-processes-detecting-attempted-entry-united-states-terrorists-public-safety-threats/, Kala Decl. Ex. 17, at 3 (emphasis added).

[12] Fact Sheet: President Donald J. Trump Strengthens Security Standards for Traveling to America, White House (Sept. 24, 2017), Kala Decl. Ex. 18 at 3.

[13] Press Briefing, U.S. Dep't of State (Sept. 26, 2017) https://www.state.gov/r/pa/prs/dpb/2017/09/274443.htm, Kala Decl. Ex. 21.

law enforcement practices, and national security initiatives, such as the adoption of ePassports."[14] And the Administration's press release, along with public statements from Administration officials, also echoed disclosures described above, including the objectives of the Report, Memorandum, and worldwide review.[15] Finally, the Proclamation itself provides granular detail about the purported deficiencies in information-sharing and identity-management practices by the eight countries included in the ban, along with certain of the aforementioned disclosures. *See* Dkt. #1-1, § 2(a)-(h).[16]

Just as in *Center for Effective Government*, the widespread dissemination of the documents at issue within the executive branch—compounded by the disclosures to foreign governments—and the public descriptions of the documents foreclose reliance on the presidential communications privilege to shield the responsive records from the public.

---

[14] FAQ: Proclamation on Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats at 1, White House (Sept. 24, 2017), https://www.whitehouse.gov/briefings-statements/faq-proclamation-enhancing-vetting-capabilities-processes-detecting-attempted-entry-united-states-terrorists-public-safety-threats/, Kala Decl. Ex. 19, at 1.

[15] *See* President Donald J. Trump Announces Enhanced Security Measures, White House (Sept. 24, 2017), https://www.whitehouse.gov/ briefings-statements/president-donald-j-trump-announces-enhanced-national-security-measures/, Kala Decl. Ex. 20; Kala Decl. Ex. 21.

[16] In *Center for Effective Government*, the court also found it significant to its waiver analysis that the Administration had "publicly touted the directive" as a "first of its kind by a U.S. administration." 7 F. Supp. 3d, at 25-26. Here, the Administration has also publicly touted the worldwide review, calling it "the critical difference[] between the President's prior orders and the Proclamation," Appl. (17A560) for Stay Pending Appeal at 5, *Trump v. Int'l Refugee Assistance Proj.*, No. 8:17-cv-00361-TDC (S. Ct. Nov. 21, 2017), Kala Decl. Ex. 22, at 5. The Administration has also asserted that, because of the Report and Memorandum, the President's "[P]roclamation [is] not like any of the other . . . proclamations that have ever come before it." Oral Argument at 1:56:45, *Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554 (2017) (No. 17-1351), https://www.c-span.org/video/?437105-1/fourth-circuit-hears-oral-argument-revised-travel-ban-audio, Kala Decl. Ex. 23; *see also* Kala Decl. Ex. 24, ¶ 9 ("This is the first time that the U.S. Government is setting standards for the information that is required from all countries specifically in support of immigration and traveler vetting.").

### III.     The deliberative process privilege does not apply to shield portions of the documents.

Defendant similarly has failed to meet its burden to show that the deliberative process privilege applies to unspecified portions of the documents. To invoke the deliberative process privilege, the records must be both predecisional *and* deliberative. *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005). Neither requirement is satisfied here.

#### A.     The disputed records are not predecisional.

The records are not predecisional because they implemented a decision already made. In these documents, the President was not shaping a policy or making a decision, but rather was attempting to justify a decision already made in his first travel ban. *See Int'l Refugee Assistance Proj. v. Trump*, 265 F. Supp. 3d 570, 624 (D. Md. 2017), *vacated*, 2018 WL 1256938 ("[A] close read of EO–1 and EO–2 reveals that the outcome of the DHS Review was at least partially pre-ordained."). One of the President's closest advisors confirmed that the second ban would achieve the "same basic policy outcome" as the first ban.[17] And the President himself tweeted that "The Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to S.C."[18]

Thus, these records are not, as Defendant claims, "prototypical documents" that form a part of the process by which governmental decisions and policies are formulated. Def.'s Mot. Summ. J., at 18.[19] The deliberative process privilege therefore does not apply. *See Nat'l Day*

---

[17] *CNN Tonight* (CNN television broadcast Mar. 15, 2017), Kala Decl. Ex. 27 (quoting Stephen Miller, Presidential Advisor).

[18] Donald Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:29 AM), https://twitter.com/realdonaldtrump/status/871675245043888128?lang=en, Kala Decl. Ex. 26.

[19] The Supreme Court appears to recognize that the reports themselves are not predecisional, as opposed to the materials underlying the reports, which may be predecisional. *See Hawaii*, 2018 WL 3116337, at *23 (noting that "a simple page count offers little insight into the actual substance of the final report, much less predecisional materials underlying it.").

*Laborer Org. Network v. U.S. Immig. & Customs Enf't Agency*, 811 F. Supp. 2d 713, 741 (S.D.N.Y. 2011) ("Deliberations about how to present an already decided policy to the public, or documents designed to explain that policy to—or obscure it from—the public, including in draft form, are at the heart of what should be released under FOIA."), *amended on reconsideration* (Aug. 8, 2011); *see also Nat'l Day Laborer Org. Network v. U.S. Immig. & Customs Enf't Agency*, 827 F. Supp. 2d 242, 252 (S.D.N.Y. 2011) ("Based on the additional evidence presented by plaintiffs in the instant motion, it is even clearer that the document was used to justify an already decided policy, rather than to persuade parties debating a policy shift.").

> **B.      The documents are not deliberative.**

Nor are the documents deliberative. In analyzing whether a document is deliberative, courts examine whether the records are "actually ... related to the process by which policies are formulated," or, in other words, whether they "(i) formed an essential link in a specified consultative process, (ii) reflect the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency." *Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (citations omitted). For the reasons already discussed, prong (i) does not apply. And prongs (ii) and (iii) are also not satisfied as to all records.

*First*, the portions of the Report that (1) "made recommendations concerning the nature of the identification and security information that countries should be required to provide in order to avoid having travel and entry restrictions placed on their nationals," (2) "made recommendations to the President regarding next steps for engaging with foreign governments," and (3) "proposed baseline requirements," Holzer Decl. ¶ 14, do not reflect "the personal opinions of the writer," but rather the "policy of the agency." *Tigue v. Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002). As demonstrated by the cable, discussed in section II(A), the Report did

not recommend a policy to the President. Instead, it reflected a statement of agency policy that had already been made. The government has admitted as much in its public statements.[20]

Attachment A to the Report, which is "a list of countries that DHS . . . deemed to be inadequate . . . or that otherwise posed a risk to the national security of the United States," Holzer Decl. ¶ 14, is also not a personal opinion. Rather, these countries represent a list of countries that were evaluated against specific requirements, as set forth in Defendant's cable. *See* Kala Decl. Ex. 24, ¶¶ 10-11. And, Attachment B is not a personal opinion, but rather a factual description of "the methodology and considerations employed to develop [Attachment A]" and the "specific law enforcement techniques employed by United States officials when assessing an alien's eligibility for entry into the United States." Holzer Decl. ¶ 14. These portions are thus non-deliberative for the additional reason that they do not meet prong (ii).[21]

*Second*, because Defendant shared portions of its stated policy widely, publicly, and globally, *see* Kala Decl. Ex. 24, and because President Trump adopted and publicized that policy in the Proclamation, *see supra* II(B), disclosure of the withheld material would not inaccurately or prematurely disclose the agency's views (prong (iii)). Moreover, to assert, as Defendant does, *see* Holzer Decl. ¶ 34, that disclosing the records would "impede the comprehensive discussion of issues . . . necessary to reach a well-reasoned and fully-vetted final decision in matters of

---

[20] *See* Br. for Pet'r, *Trump v. Hawaii*, No. 17-965 (U.S. Feb. 2018), https://www.supremecourt.gov/DocketPDF/17/17-965/36179/20180221201616615_17-965tsUnitedStates.pdf, Kala Decl. Ex. 28, at 60 (Proclamation described the "neutral criteria against which all nations were assessed").

[21] *See Brennan Ctr. for Justice v. U.S. Dep't of Justice*, 697 F.3d 184, 195 (2d Cir. 2012) (noting that a document falls outside the protection of deliberative process privilege if it "resembles 'final opinions . . . made in the adjudication of cases,' "statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register,' [or] 'administrative staff manuals and instructions to staff that affect a member of the public.'" (citations omitted)).

national security" makes little sense where the government's position is that the policy has been adopted and publicized by the President. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975) ("[T]he probability that an agency employee will be inhibited from freely advising a decision maker for fear that his advice, if adopted, will become public is slight.").

C.    **The documents were incorporated or adopted as a final decision.**

Even if the requested records satisfied the predecisional and deliberative requirements—which they do not—disclosure of the records is required if the government adopts otherwise exempt material as a final opinion, as it did here. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public.").

For example, in *La Raza*, plaintiffs sought to compel the DOJ to release an Office of Legal Counsel ("OLC") memorandum that assessed whether state and local law enforcement had the authority to enforce aspects of federal immigration law. The district court ordered disclosure, and the Second Circuit affirmed that decision, explaining that DOJ had "waived th[e] protection [of the deliberative process privilege] by adopting the Memorandum or incorporating it into official agency policy." *Nat'l Council of La Raza*, 411 F.3d at 352. In finding waiver, the Second Circuit first referenced a press conference where the Attorney General explained that information pertaining to noncitizens who overstayed their visa would be entered into a database accessible to state and local police officers during routine stops and encounters, and that state and local law enforcement could subsequently arrest individuals and transfer them into the custody of federal immigration officials. *Id.* at 357. This, along with "repeated references to the OLC Memorandum made by the Attorney General and his high-ranking advisors," "the substance of their comments, and the way in which their comments were used—that is, to assure third parties as to the legality

19

of the actions" were "sufficient to establish that the Department incorporated the Memorandum" into its policy and thus waived the privilege. *Id.*

Here, notwithstanding statements to the contrary in this litigation, the government has publicly represented—including to the Supreme Court—that the President *adopted* the "recommendations" contained within the responsive records. In a brief submitted to the Supreme Court, the Solicitor General wrote: "[R]espondent's contention that the President 'substantially deviated from the recommendations he received' has no foundation and is contradicted by the Proclamation, which states that the President adopted entry restrictions 'in accordance with the recommendations of the [Acting] Secretary of Homeland Security.'" Reply Br. for Pet'r, *Trump v. Hawaii*, No. 17-965 (U.S. Feb. 2018), Kala Decl. Ex. 29, at 11 (alteration in original) (citation omitted).

The Solicitor General articulated that proposition again in the opening lines of his oral argument to the Supreme Court. Kala Decl. Ex. 16, at 3. ("The *proclamation adopts those recommendations*. It omits the vast majority of the world, including the vast majority of the Muslim world, because *they met the baseline*." (emphases added)). And, significantly, the Court accepted these representations as statements of fact. *Hawaii*, 2018 WL 3116337, at *48 ("After consulting with multiple Cabinet members and other officials, the President adopted the Acting Secretary's recommendations and issued the Proclamation.").

Representations to the Supreme Court that the DHS recommendations were the central justification for the Proclamation is far more public and authoritative than the press conferences, presentations, or letters that satisfied the Second Circuit in *La Raza*. The government is, therefore, not permitted to now "shield" these authorities from disclosure. *See Brennan Ctr. for Justice*, 697 F.3d at 205 (even though an agency does not need to explain its reasoning publicly,

"where it determines there is an advantage to doing so by referencing a protected document as authoritative, it cannot then shield the authority upon which it relies from disclosure.").

For these reasons, Defendant's deliberative process privilege claim cannot stand.

## IV.   Defendant has not shown that Exemption 1 applies to portions of the records.

When Defendant's expansive claims of Exemption 5 are peeled away, the question remains whether Defendant has adequately supported its assertion of Exemption 1. Agencies must justify classification decisions through "itemized descriptions of the context out of which specific redactions are made." *Halpern*, 181 F.3d at 294. And courts must then closely examine these descriptions and ensure that any "deference is not equivalent to acquiescence." *N.Y. Times Co. v. U.S. Dep't of Justice*, 235 F. Supp. 3d 522, 535 (S.D.N.Y. 2017) (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998)). Here, Defendant has not provided the itemized descriptions of the purportedly classified portions of the documents, let alone explained why those portions are properly classified.

Both Defendant and the DHS claim Exemption 1 over unspecified portions of four of the five records at issue. But, neither declaration acknowledges the extensive official public disclosures that have been made about the disputed documents. *See supra* II. These official public disclosures cast grave doubt on the accuracy of the statements in the declarations. Accordingly, the Court should order Defendant to either produce the documents or submit new declarations that specifically explain how the allegedly classified portions of the documents are properly classified in light of the official public statements.

For example, according to Defendant, Attachment A includes "names of countries that performed poorly in the information sharing categories identified in the paragraphs above the list of countries." Second Stein Decl. ¶ 35. And similarly, the withheld portion of the Memorandum "consists of an assessment of the deficiencies in the information that certain countries are willing

21

or able to share with the United States." *Id.* ¶ 37. But, Defendant ignores that President Trump publicized in the Proclamation itself the eight countries found to be "inadequate," or otherwise problematic, with respect to the baseline standard for information-sharing, and that the Proclamation details the exact nature of the countries' alleged "inadequate" performance. *See* Dkt. #1-1, §§ 1(h)(ii), 2. Thus, at least as to those eight countries, Defendant's national security concerns do not appear to be justified.

To the extent DHS claims Exemption 1 protection for the same or similar reasons, that claim necessarily fails too. DHS asserts that disclosure would reveal "foreign government information," "information pertaining to the 'foreign relations and foreign activities of the United States,'" and "information about foreign countries' ability and willingness to provide information." Holzer Decl. ¶¶ 29-30. DHS also claims that it needs to protect "the methods by which [] information was obtained and assessed; and the manner in which the United States has engaged with certain countries concerning their dissemination of information that the United States deems necessary for purposes of its visa vetting procedures." *Id.* ¶ 30. But, as explained above, Defendant's unclassified cable, the Administration's publications and statements, and the Proclamation itself have already publicized this information: the "methods" for collection and "manner" for engagement were interactions with foreign ministries by consular outposts through talking points, questionnaires, and evaluations. *See* Kala Decl. Ex. 24. The "method[s]" for assessment were purportedly based on the baseline set out in the Report and publicized in the cable and Proclamation, among other sources. *See supra* II. Moreover, the fact that DHS claims Exemption 1 over portions of four of the documents but not for any portion of the Report— which, as described by the government, contains contents similar to those four documents, *see*

22

Holzer Decl. ¶¶ 14-15—is yet another reason to doubt the propriety of DHS's Exemption 1 assertion.

With a record that adequately addresses these apparent inconsistencies in the claims of proper classification, the Court will be in a much better position to exercise its statutory duty to perform *de novo* review of the claims of classification. *See Bloomberg*, 601 F.3d at 147. And after Plaintiff has had an opportunity to review supplemental declarations that adequately address the myriad official public disclosures that undermine the assertions of Exemption 1, it will be in a better position to challenge Defendant's withholdings and "controvert th[eir] characterization[s]" as appropriate. *Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973).

At that point, *in camera* review by the Court may also be appropriate. The Court has broad discretion to order *in camera* review, *see* 5 U.S.C. § 552(a)(4)(B), and it may choose to do so in this case to eliminate all doubt, *see Islamic Shura Council of S. Cal. v. FBI*, 635 F.3d 1160, 1166 (9th Cir. 2011), especially to aid it in its examination of the applicability of Exemption 1, *see, e.g.*, *Halpern*, 181 F.3d at 293.

Before resorting to *in camera* review, however, the Court should, to the greatest extent possible, require Defendant to provide more information about and itemized descriptions of the withheld information. *See Weiner v. FBI*, 943 F.2d 972, 979 (9th Cir. 1991) (quoting *Doyle v. FBI*, 722 F.2d 554, 556 (9th Cir. 1983)) ("[R]esort to *in camera* review is appropriate only after '[the agency] has submitted as much detail in the form of public affidavits and testimony as possible.'").

## V.    Defendant has not shown that Exemption 7(E) applies to portions of each record.

Defendant has also failed to acknowledge the effect that the extensive public disclosures have on its Exemption 7(E) justifications. Exemption 7(E) applies to records "compiled for law enforcement purposes" that "would disclose techniques and procedures for law enforcement

investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Defendant spends little time defending its claim of this Exemption, instead only reiterating the types of information that the agencies seek to withhold. *See* Def.'s SJ Br., at 18-19. One of these types of information is the "methodology and criteria used for identifying countries that inadequately share identification and security information with the United States, or that otherwise pose a threat to the national security." Holzer Decl. ¶ 38. But the Administration has extensively outlined that methodology publicly. *See supra* II(B).

Moreover, a close examination of the descriptions of the documents along with justifications asserted in the declarations reveals that at least some portions do not fall under Exemption 7(E). First, DHS claims that Exemption 7(E) applies to portions of Attachment A to the Report that would reveal "information it compiled regarding the security of various foreign governments' identity and travel documentation, and the degree to which such countries could serve as departure points for individuals seeking to exploit vulnerabilities and gain admission to the United States for purposes of causing harm to the national security." Holzer Decl. ¶ 38.[22]  But the government has not explained how the "information it compiled"—especially when conveyed as a mere "list of countries," *id.* ¶ 14—would disclose "techniques and procedures," as

---

[22] DHS was not precise in its explanation of which 7(E) justification corresponded to which document. It offered two separate justifications—one related to the "methodology and criteria used for identifying countries that inadequately share identification and security information with the United States, or that otherwise pose a threat to the national security"; and one related to "information it compiled regarding the security of various foreign governments' identity and travel documentation, and the degree to which such countries could serve as departure points for individuals seeking to exploit vulnerabilities and gain admission to the United States for purposes of causing harm to the national security." Holzer Decl. ¶ 38. Because Attachment A is "a list of countries," *id.* ¶ 14, the latter justification is more likely to apply, as it is not obvious how a list would reveal "methodology and criteria," *id.* ¶ 38. Indeed, Attachment B apparently provides the "methodology" for the list of countries in Attachment A. *See id.* ¶ 14.

required to qualify for FOIA Exemption 7(E) protection.

The FBI asserts that Exemption 7(E) applies to portions of the Report and its Attachment B that would disclose the specific information contained within the Terrorist Screening Database ("TSDB") that the FBI maintains and shares with federal, state, and local law enforcement entities. *See* Declaration of David M. Hardy ¶¶ 9, 10, 12, 14, 15. It asserts that, while both (a) the existence and nature of the TSDB, and (b) the fact that information from it is shared with other law enforcement entities for use with screenings and vetting are publicly known, "the specific information collected, analyzed, and shared from the TSDB is not publicly known." *Id.* ¶¶ 14, 15. While Plaintiff does not dispute that information fitting that specific description would be exempt (unless publicly released already), Plaintiff notes that the State Department did not assert a similar 7(E) claim over the information contained within the Report, although it asserted Exemption 7(E) for other alleged TSDB-related material. *See* Second Stein Decl. ¶ 34 (asserting 7(E) over Attachment B to Report). Nor does any agency contend that TSDB information comprises the entirety of the information for which Exemption 7(E) has been asserted.

Accordingly, as with Exemption 1, the Court should order Defendant to supplement its declarations to address the Administration's public disclosures and, then, if still appropriate, conduct an *in camera* review of the material. *See supra* IV.

<u>**CONCLUSION**</u>

For these reasons, Plaintiff requests that the Court deny Defendant's Motion for Summary Judgment and grant Plaintiff's Cross-Motion for Partial Summary Judgment. Specifically, Plaintiff requests that the Court (i) order Defendant to remedy its inadequate search, (ii) deny Defendant's Exemption 5 claims, (iii) order Defendant to supplement its declarations with respect to Exemptions 1 and 7(E), and (iv) order Defendant to release all reasonably segregable portions of the responsive records.

Dated: New York, New York
     July 9, 2018

Respectfully submitted,

 s/ Neil K. Roman
    Neil K. Roman

Neil K. Roman
Ishita Kala
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
nroman@cov.com
ikala@cov.com

Johnathan Smith
Sirine Shebaya
MUSLIM ADVOCATES
P.O. Box 66408
Washington, DC 20035
(202) 897-1897
johnathan@muslimadvocates.org
sirine@muslimadvocates.org

Mark H. Lynch[i]
Jaclyn E. Martínez Resly[i]
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. NW
Washington, DC 20001-4956
(202) 662-6000
mlynch@cov.com
jmartinezresly@cov.com

Richard B. Katskee[i]
Eric Rothschild[i]
Andrew L. Nellis[i]
AMERICANS UNITED FOR SEPARATION
OF CHURCH AND STATE
1310 L St. NW, Suite 200
Washington, DC 20005
(202) 466-3234
katskee@au.org
rothschild@au.org
nellis@au.org

[i] *Admitted pro hac vice*

*Attorneys for Plaintiff Brennan Center for Justice at New York University School of Law*