# Exhibit 15

# BRENNAN
# CENTER
# FOR JUSTICE
# TWENTY
# YEARS

# EXTREME VETTING &
# THE MUSLIM BAN

Harsha Panduranga, Faiza Patel, and Michael W. Price

Brennan Center for Justice *at New York University School of Law*

## ABOUT THE BRENNAN CENTER FOR JUSTICE

The Brennan Center for Justice at NYU School of Law is a nonpartisan law and policy institute that seeks to improve our systems of democracy and justice. We work to hold our political institutions and laws accountable to the twin American ideals of democracy and equal justice for all. The Center's work ranges from voting rights to campaign finance reform, from ending mass incarceration to preserving Constitutional protection in the fight against terrorism. Part think tank, part advocacy group, part cutting-edge communications hub, we start with rigorous research. We craft innovative policies. And we fight for them — in Congress and the states, the courts, and in the court of public opinion.

## ABOUT THE BRENNAN CENTER'S LIBERTY AND NATIONAL SECURITY PROGRAM

The Brennan Center's Liberty and National Security Program works to advance effective national security policies that respect constitutional values and the rule of law, using innovative policy recommendations, litigation, and public advocacy. The program focuses on reining in excessive government secrecy; ensuring that counterterrorism authorities are narrowly targeted to the terrorist threat; and securing adequate oversight and accountability mechanisms.

## ABOUT THE BRENNAN CENTER'S PUBLICATIONS

**Red cover** | Research reports offer in-depth empirical findings.
**Blue cover** | Policy proposals offer innovative, concrete reform solutions.
**White cover** | White papers offer a compelling analysis of a pressing legal or policy issue.

© 2017. This paper is covered by the Creative Commons "Attribution-No Derivs-NonCommercial" license (see http://creativecommons. org). It may be reproduced in its entirety as long as the Brennan Center for Justice at NYU School of Law is credited, a link to the Center's web pages is provided, and no charge is imposed. The paper may not be reproduced in part or in altered form, or if a fee is charged, without the Center's permission. Please let the Center know if you reprint.

## ABOUT THE AUTHORS

**Harsha Panduranga** is a fellow in the Brennan Center's Liberty and National Security program, funded by Simpson Thacher & Bartlett, where he was a litigation associate. Harsha received a B.A., Phi Beta Kappa, and a J.D., cum laude, from the University of Michigan.

**Faiza Patel** serves as co-director of the Brennan Center's Liberty and National Security Program, which seeks to ensure that our counterterrorism laws and policies respect constitutional values and promotes transparency and accountability in national security matters. She has testified before Congress opposing the dragnet surveillance of Muslims, developed legislation creating an independent Inspector General for the NYPD, and organized advocacy efforts against anti-Muslim laws and policies. She has authored and co-authored eight reports: Extreme Vetting and the Muslim Ban (2017), Trump-Russia Investigations: A Guide (2017); The Islamophobic Administration (2017); Countering Violent Extremism (2017), Overseas Surveillance in an Interconnected World (2016), What Went Wrong with the FISA Court (2015), Foreign Law Bans (2013), A Proposal for an NYPD Inspector General (2012), and Rethinking Radicalization (2011). Ms. Patel's writing has been featured in major newspapers including The New York Times and The Washington Post, and she is a frequent commentator on national security and counterterrorism issues for print, televisions, and radio outlets. She is a member of the Board of Editors of the legal blog Just Security. Born and raised in Pakistan, Ms. Patel is a graduate of Harvard College and the NYU School of Law.

**Michael W. Price** serves as Senior Counsel for the Brennan Center's Liberty and National Security Program. He has worked to oppose discriminatory surveillance practices, developed legislation to create an independent Inspector General for the NYPD, and authored numerous amicus briefs on behalf of the Brennan Center and others in cases involving electronic surveillance and privacy issues. Mr. Price is a frequent commentator on national security issues for media and has published widely in academic outlets. He is the author of National Security and Local Police (2013) and Rethinking Privacy: Fourth Amendment "Papers" and the Third-Party Doctrine (2016). Before joining the Brennan Center, Mr. Price was the National Security Coordinator for the National Association of Criminal Defense Lawyers, where he provided legal assistance for the defense of detainees in the military commissions at Guantanamo Bay. Mr. Price also engaged in litigation and public advocacy on issues related to privacy, electronic searches and surveillance, and government secrecy. He holds a J.D. from NYU School of Law and a B.A. from Columbia University in Political Science and Middle East & Asian Languages and Cultures.

## ACKNOWLEDGMENTS

The authors would like to express their deep gratitude to the Brennan Center's Rachel Levinson-Waldman, Andrew Lindsay and Erica Posey for their invaluable assistance in the drafting of this report, as well as the Center's 2017 interns, Margot Adams, Lamya Agarwala, and Naomi Dwork. They would also like to thank Naren Daniel, Liza Goitein, Raffe Jefferson, John Kowal, Jim Lyons, Ryan Witcombe, Alejandra Collado, Jessica Katzen, and Michael Waldman for their input and support. In addition, the authors benefited greatly from conversations and correspondence with Muzna Ansari, David Bier, Adam Cox, Alex Nowrasteh, Scott Kilner, Jeffrey Gorsky, Stephen Legomsky, and Stephen Yale-Lohr.

The Brennan Center also gratefully acknowledges The Bauman Foundation, CS Fund, Ford Foundation, Open Society Foundations, and Security & Rights Collaborative, a Proteus Fund initiative for their generous support of the Liberty and National Security Program.

# TABLE OF CONTENTS

**Introduction**                                                                    **1**

**I.  Terrorism Threat and Existing Vetting**                                        **4**

   A. Exaggerated Claims of Terrorism Threat from Foreign Born Persons          4

   B. Strict Vetting for Visas                                                    5

   C. Intensive National Security Checks                                          8

   D. In-Person Vetting: The Visa Interview                                      10

**II. The "Muslim Ban" and "Extreme Vetting"**                                      **11**

   A. Identity Verification, Information Sharing, and the Muslim Ban 3.0          11

   B. Identifying Applicants Warranting "Additional Scrutiny"                    14

   C. What is "Additional Scrutiny"?                                             16

   D. Ideological Vetting                                                        17

   E. Extreme Vetting by Algorithm                                               19

**III. Costs of Muslim Ban and Extreme Vetting**                                    **20**

   A. Economic Costs                                                            21

   B. Cost to American Values                                                    22

**Conclusion**                                                                      **23**

**Endnotes**                                                                        **24**

## INTRODUCTION

Just one week after taking office, President Trump signed Executive Order 13769, which banned travel from seven predominantly Muslim countries – Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen – for ninety days.[1] The impact of this "Muslim ban" was immediate, dramatic, and highly visible: travelers were detained at airports and prevented from boarding planes to the United States as family and friends waited anxiously for their arrival. The ban's repudiation of America's commitment to religious freedom and nondiscrimination generated protests around the country. It was enjoined by federal courts around the country as discriminatory, until the Supreme Court allowed a limited portion of it to go forward. But the ban was just the beginning. According to Executive Order 13769 and its successor, Executive Order 13780, the ban was just a temporary measure, designed to pave the way for the indefinite suspension of travel from certain countries as well as "extreme vetting."

The new regime, which is just coming into view, operates as a de facto Muslim ban. First, starting in May 2017, the State Department began implementing new vetting procedures for certain categories of visa applicants, the burden of which will likely fall most heavily on Muslims. Further, on September 24, 2017, President Trump issued a proclamation that indefinitely bars almost all travel to the United States from six Muslim-majority countries (Chad, Iran, Libya, Somalia, Syria, and Yemen),[2] and subjects Iraqi nationals to "additional scrutiny."[3] Although the proclamation also bans travel from North Korea (from which a negligible number of people come to the U.S.) and some government officials from Venezuela, its impact is overwhelmingly on Muslims.

There is ample evidence that this is by design. Beginning on December 7, 2015, when then-candidate Trump called for a "total and complete shutdown of Muslims entering the United States," the president made his goal crystal clear, repeatedly.[4] Despite months of litigation accusing the president of intentional religious discrimination, that campaign pledge remained online until May 2017.[5] Extreme vetting and the Muslim ban are ways of fulfilling this promise. As Trump himself said in the second presidential debate, "[t]he Muslim ban is something that in some form has morphed into an extreme vetting from certain areas of the world…"[6] More recently, with the travel ban stopped by courts, Trump was even more explicit, tweeting: "In any event we are EXTREME VETTING people coming into the U.S. in order to help keep our country safe. The courts are slow and political!"[7]

These measures are only part of the administration's broader nationalistic, isolationist agenda which includes plans to cut legal immigration in half over a decade;[8] rescind protections for "Dreamers," undocumented young adults who were brought to the U.S. as children;[9] substantially increase arrests of undocumented people;[10] and build a wall on the U.S./Mexico border.[11] The Trump agenda would also put a damper on travel to the United States by slowing down visa application processing,[12] and increasing the required paperwork by "double, triple or more."[13]

The administration's claim that travel bans and extreme vetting are necessary to protect the nation against terrorist threats from overseas is unsupported by evidence and – particularly in the context of the president's stated goal of banning Muslims – seems pretextual. Multiple federal courts were unconvinced by the administration's argument that national security required a cessation of travel from certain countries.[14] And as a federal appellate court recently pointed out: "There is no finding that present vetting standards are inadequate, and no finding that absent the improved vetting procedures there likely will be harm to our national interests."[15] Indeed, empirical studies show that the risk of a deadly attack on U.S. soil by a foreigner who has been improperly vetted is infinitesimally small. This is not surprising: The process for screening foreign nationals

entering the U.S. is rigorous and the U.S. has one of the world's most thorough visa vetting systems.[16] Applicants not only face an imposing legal standard aimed at ensuring that those planning to visit the U.S. do not intend to stay in the country, but are also are run through a gamut of national security checks.[17] Concerns are treated seriously: Anyone flagged for additional review is thoroughly examined by security officials, a process that can take months.

Nonetheless, the Trump administration appears committed to banning travel from certain Muslim-majority countries and adding further burdens to the already robust visa screening process.

First, the administration has instituted indefinite bans in place of the temporary ones, which again seem targeted as Muslims. The new rules stem from a "worldwide review," mandated by the initial Muslim ban order, to determine whether additional information would be required from some countries to properly adjudicate visa applications.[18] Although the administration has sought to the paint the process for deciding which countries were blacklisted as an objective exercise, it clearly also allowed for substantial discretion to be exercised. According to the Department of Homeland Security (DHS) 47 countries were found to be "inadequate" or "at risk" of becoming "inadequate" in meeting "global requirements for information sharing" related to identity verification and cooperation on counterterrorism matters.[19] But in the end, the president selected eight nations for sanctions, citing "other risk factors" (e.g., significant terrorist presence within a country's territory) and "foreign policy, national security, and counterterrorism goals".[20] These malleable considerations can be and were used to justify selective and sweeping travel restrictions. Indeed, the weight of the sanctions fell primarily on Muslim countries, five of which were on the original Muslim ban list. The addition of North Korea and certain Venezuelan government officials to the blacklist seems to have little to do with the stated counterterrorism purpose of the initiative. Only a tiny number of travelers would be affected (just 109 visas were issued to North Korean nationals in 2016, for example[21]) and neither country has a history of sponsoring terrorism in the United States.[22]

Second, the Trump administration has begun imposing additional requirements on those still eligible for a visa to enter the United States. According to the September 2017 proclamation, nationals of Iran, Iraq, and Somalia will be subjected to additional screening. The State Department has started doing the same for "applicant populations warranting increased scrutiny."[23] We do not yet know how these populations will be chosen, but it is notable that the State Department estimates that 65,000 people annually will be subject to further scrutiny,[24] which is roughly the number of temporary visas granted in fiscal year 2016 to citizens of countries affected by the first two Muslim ban executive orders.[25]

Tagging individuals for additional scrutiny is not out of the ordinary in the visa process. But the context in which extreme vetting has been introduced suggests that it may be a means of erecting barriers based on stereotypes about Muslims rather than individualized assessments. Particularly troubling is the requirement that visa applicants provide consular officers with extensive information about their online presence, such as their social media handles.[26] There are serious questions about the effectiveness of this tool. Anyone seeking to avoid scrutiny could easily erase their social media footprint. And interactions on platforms such as Facebook and Twitter are notoriously open to misinterpretation – especially since they may be truncated, conducted via symbols, and are context, culture and language specific. These types of checks do, however, undermine fundamental freedoms of speech and faith, both of foreigners and their American friends, families and business contacts. The collection of social media profiles also facilitates ideological profiling,[27] a practice that has been rejected by Congress as contrary to American ideals and dismissed by experts as ineffective.

Analysis of social media profiles will not be limited to groups identified as particularly risky: DHS is in the process of developing the requirements for an automatic screening system that will continuously analyze a multitude of databases, including those containing social media information, to evaluate such subjective characteristics as whether a traveler is likely to "becom[e] a positively contributing member of society."[28] Not only is this proposition of dubious efficacy, it raises loud alarm bells about privacy, free speech, and discrimination.

Making our already stringent visa regime more "extreme" also carries significant economic and cultural costs. It dampens international travel, which accounts for billions of dollars in revenue, both from travelers from the countries directly affected and others. Already, the Commerce Department is reporting a 4.2 percent drop in international visitors to the U.S. in the first quarter of 2017 compared to the first quarter of 2016.[29] While it is impossible to say definitively that this was caused by the administration's anti-foreigner policies and rhetoric, this inference hardly seems like a "reach."[30]

Clamping down on travel will also choke off the free exchange of ideas and interaction with the world that are hallmarks of a successful and open democratic society. Anecdotal reports suggest that visiting the U.S. is becoming more difficult. A trade summit at the University of Southern California intended to boost business ties between America and Africa had no Africans – all 60 of those scheduled to participate were denied visas.[31] A gathering at the University of Wisconsin had to be canceled for the same reason.[32] An all-girls robotics team from Afghanistan and a women's soccer team from Tibet, both registered to participate in events intended to foster cross-cultural understanding, were denied visas.[33] There are many other such stories that show how travel restrictions undermine American interests and values.[34] If American universities are to be beacons of innovation and the exchange of ideas, they need to be able to welcome people from across the globe; if American values include gender equality, as the Muslim ban executive orders themselves state,[35] the country should welcome aspiring women engineers and athletes; if America values economic growth, it needs to foster international business partnerships and science and technology learning. This is all to say that the national interest is not served by a reflexive ratcheting up of visa requirements, but requires a thoughtful evaluation of the range of interests at stake.

\*\*\*

This report exposes the stereotypes and discriminatory intent underlying the Trump administration's push for travel bans and extreme vetting and highlights the dangers of such a policy. It begins in Part I by using empirical evidence to debunk the administration's claim that foreign nationals who slip through the visa process pose a serious terrorism risk in the U.S. It demonstrates that the U.S. strictly controls who comes into the country, outlining the demanding process for obtaining a visa to travel to the U.S. and the robust national security safeguards that are part of the visa issuance process. As the chart below shows, citizens from about 80 percent of the countries in the world require visas to visit the United States.[36] Only visitors from a few, wealthy countries that are U.S. allies, such as the United Kingdom, Japan, Chile, and Australia, do not have to obtain a visa to enter the U.S.

This report focuses on the procedures for issuing temporary – or "nonimmigrant" – visas for travelers such tourists, students, and businesspeople. The screenings for obtaining a permanent visa or refugee status are even more rigorous, and continue to be supplemented as part of extreme vetting.[37] Part II analyzes the most recent ban and the Trump administration's vetting plans, demonstrating how they reflect harmful stereotyping that implements President Trump's agenda of choking off travel from many parts of the world. This section explains the contradictions and deficiencies in the administration's stated justification for the September 2017 ban, and also details initiatives to incorporate social media and automated vetting as part of the visa process, arguing that there is little evidence of their effectiveness and considerable evidence suggesting that they will trample on free speech and privacy norms. In Part III, the report discusses the myriad other costs of making travel



**NATIONALITIES NEEDING VISAS FOR U.S. TRAVEL**

NO VISA REQUIRED *(INCLUDING VISA WAIVER PROGRAM)* 21.4%

78.6% VISA REQUIRED

*SOURCE: STATE DEPT.*

to the U.S. more difficult, such as damage to our economy, values, and culture. The report concludes that the U.S. already rigorously vets those seeking to travel to the country and that measures such as travel bans and "extreme vetting" are both unnecessary and harmful.

## I.    TERRORISM THREAT AND EXISTING VETTING

Despite the president's claims to the contrary, the numbers show that the threat of terrorism in the United States from foreign-born persons is very small and the country's visa vetting system is one of the world's most rigorous.

### a.    EXAGGERATED CLAIMS OF TERRORISM THREAT FROM FOREIGN BORN PERSONS

Figure 1 from the Cato Institute shows vividly that murders by foreign-born terrorists are so small in number that, with the exception of the 9/11 attacks, they are functionally counted as zero.[38]

Indeed, over the past ten years, Americans have been more than ten times as likely to be buried alive or die in a lightning strike than to die in a terrorist attack perpetrated by a foreign-born terrorist on U.S. soil.[39]

The Cato Institute study also shows that tightening visa vetting mechanisms would not have stopped four out of five total foreign-born terrorists who have successfully carried out deadly attacks on U.S. soil since September

11, 2001.[40] Four were U.S. permanent residents or citizens who perpetrated attacks years after entering the country, meaning that entry screening would have been unlikely to catch their intentions to commit violence.[41] Only Tashfeen Malik – who, along with her husband killed 14 people and injured 22 others in San Bernardino – entered the U.S. not long before perpetrating an attack.[42] Stepping back and looking at all domestic terrorist attacks committed by foreigners in the U.S. between 1975 and the end of 2015, Cato's analysis of cases shows that 7.38 million visas were issued for every one issued to a terrorist, amounting to a near-zero 0.0000136 percent of visas.[43]

## Figure 1 – U.S. Murder Rates, Excluding Foreign-Born Terrorism



Source: Disaster Center, "United States Crime Rates 1960–2014"; RAND Database of Worldwide Terrorism Incidents; National Consortium for the Study of Terrorism and Responses to Terrorism Global Terrorism Database; and author's calculations

*Reproduced with permission from the Cato Institute.*

Despite this empirical record, Executive Order 13780 (the second version of the Muslim ban) made the unsupported claim that "[s]ince 2001, *hundreds* of persons born abroad have been convicted of terrorism-related crimes in the United States."[44] The only two examples cited in the order demonstrate the paucity of evidence. The first involved two Iraqi refugees who, after coming to the U.S., pled guilty to using improvised explosive devices against U.S. troops in Iraq and attempting to support Al Qaeda efforts to kill U.S. soldiers in Iraq.[45] They were never implicated in possible attacks on U.S. soil, and did not pose a risk of the type from which the order seeks to protect – domestic attacks committed by foreigners. The second example involved a person who came to the U.S. as a child and decided to engage in terrorist activities as an adult, for which a lack of screening cannot account.[46] Indeed, a DHS intelligence assessment found that most foreign-born terrorists turned to violence more than a decade after coming to the U.S., "limiting the ability of screening and vetting officials to prevent their entry because of national security concerns."[47]

The administration has not put forward even a modicum of evidence for its claims that foreigners pose a significant threat to America within its borders. Terrorism – though understandably fear-inducing – remains a rare form of violence in the U.S. Foreign-born perpetrators are even more rare. This at least in part because, as described below, the U.S. has one of the strictest visa vetting regimes in the world.

### b. Strict Vetting for Visas

As anyone who has applied for a visa to the United States can attest, gaining permission to enter the country is not easy. Experts routinely rate the U.S. visa system as one of the toughest in the world,[48] and people have long complained that it is a slow and expensive process.[49]

The process starts by filling out the Form DS-160, which asks for a range of biographical information and contains background and security questions. Applicants must also provide fingerprints and a photograph. Some of the materials and information required to assemble a visa application are shown in Table I below.

---

## Table I: Visa Application: Supporting Documents and Questions[50]

| Biographic and Biometric Information | Supporting Documentation (Recommended) | Security Questions (examples) |
|---|---|---|
| Names and aliases | Passport | "Have you ever or do you intend to provide financial assistance or other support to terrorists or other terrorist organizations?" |
| Home address and address in the U.S. | Proof of travel plans (event invitation, itinerary) | |
| Home / work / cell phone numbers; email address | Family documents (photographs, family tree, marriage and birth certificates) | "Have you committed, ordered, incited, assisted, or otherwise participated in extrajudicial killings, political killings, or other acts of violence?" |
| Travel information (including purpose of trip, U.S. address, source of funding for trip, details on last five U.S. trips, five years' foreign travel history) | Proof of employment and financial viability (letter from employer, business registration, pension book, income tax returns, bank statements) | "Are you coming to the United States to engage in prostitution or unlawful commercialized vice or have you been engaged in prostitution or procuring prostitutes within the past 10 years?" |
| Contacts in the U.S. for identity verification purposes. | Proof of property ownership in home country (deeds, mortgage papers, photographs) | |
| Family information (includes parents' and spouse's names, dates of birth, U.S. residency status) | | "Are you or have you ever been a drug user or addict?" |
| Work / education / training information (primary occupation, employer, work address, salary, description of duties, five years' employment history, education history from middle school) | | "Do you have a communicable disease of public health significance such as tuberculosis (TB)?"

"Have you ever been arrested or convicted for any offense or crime, even though subject of a pardon, amnesty, or similar action?" |
| Ten fingerprints; photograph | | |

---

Applicants then face a considerable legal hurdle under the Immigration and Nationality Act (INA),[51] the statute governing visa issuance. They must prove a negative: A temporary visa applicant is "presumed to be an

immigrant" – that is, someone who would stay in the U.S. permanently – unless they affirmatively convince a consular officer that this is not the case.[52] To overcome this presumption, a visa applicant must marshal extensive evidence to prove that they have every incentive to return to their home country. Such evidence includes: proof of income and property ownership; proof of business ownership, or assets; proof of employment; proof of immigration or visa status in the country where they are residing; and travel itinerary or other explanation of the planned trip.[53]

Consular officers probe – asking for additional documentation when appropriate – applicants' reasons for wanting to visit the U.S. as well as for other possible causes under the INA for denying a visa, which are formally called "Grounds for Inadmissibility." These are used to exclude people, for example, with certain medical conditions as well those who have a criminal history, are likely to become a public charge or work without proper certification, or, as discussed in Section II, pose a national security risk.[54]

In sum, potential visitors who come from one of the over 100 countries whose citizens must obtain a visa cannot travel to the U.S. on a whim. They must meet the INA's strict criteria, plan far in advance, and obtain materials in support of their visa applications from a range of sources. Even if they do all that, their application can be denied simply for "fail[ure] to establish to the satisfaction of the consular officer [eligibility] to receive a visa."[55]

### c. INTENSIVE NATIONAL SECURITY CHECKS

National security plays a critical role in the process of deciding whether to grant an individual permission to travel to the U.S.

# APPLICATION PROCESS FOR A U.S. VISA

**DS-160 visa application form**

Required information:
- Home address / U.S. address / all phone numbers / email address
- Purpose of trip, U.S. address and contacts, source of funding for trip, 5 years U.S. and foreign travel history
- Family (parents and spouse)
- Work / education / training (primary occupation, employer, work address, salary, description of duties, 5 years' employment history, education history)
- Security questions
- Ten fingerprints & photograph



**Applicant must overcome presumption that she intends to permanently stay in the U.S. by demonstrating strong links to home country.**

- Proof of travel plans (invitation, itinerary)
- Family documents (photographs, family tree, marriage & birth certificates)
- Proof of employment and financial viability (letter from employer, business registration, pension book, income tax returns, bank statements)
- Proof of property ownership (deeds, mortgage papers)





**Applicant's data is run against several national security and criminal record databases.**



**Interview with a consular officer, who will probe applicant's story.**

**Even if all requirements are met, visa will be denied if an applicant is unable to "establish to the satisfaction of the consular officer [his eligibility] to receive a visa." Visa denials almost never subject to judicial review.**

Consular officers screen all visa applicants against a range of U.S. government and international databases containing voluminous law enforcement, intelligence, and immigration holdings, including classified information, to verify their identity and assess whether they pose a security risk.[56] According to the Migration Policy Institute, "non-citizens are [now] screened at more intervals, against more databases, which contain more detailed data, than ever before."[57] Table II below lists some of the databases consulted to vet visa applicants.

## Table II: National Security Screening Databases

| Kingfisher | Consular Lookout and Support System (CLASS), Consular Consolidated Database (CCD), & Other Checks | Pre-Adjudicated Threat Recognition Intelligence Operations Team (PATRIOT)[58] |
|---|---|---|
| Introduced by the National Counterterrorism Center [59]<br><br>Checks all visa applicants against the U.S. government's central repository of *classified* holdings on known or suspected terrorists, such as the Terrorist Identities Environment ("TIDE")[60]<br><br>Consular officer receives "red" (positive match) or "green" (no match) light. If KFE returns red, a Security Advisory Opinion – or interagency review involving the NCTC, DHS, FBI, and others – must be requested.[61] | All applicants are run through CLASS;[62] consular officer receives printout of CLASS results prior to applicant's interview<br><br>CLASS checks against information submitted by the DHS, FBI, DEA, and other agencies, as well as against non-classified records from the Terrorist Screening Database (commonly referred to as the "Watchlist"), which has data on known or suspected terrorists submitted from across the U.S. government[63]<br><br>CLASS also runs checks against biographic and biometric data held in the CCD, which contains records of all visa applications from the mid-1990s. The CCD has contained photos of all applicants since 2001, and ten finger scans of all applicants since 2007. The database includes over 140 million records.[64]<br><br>Applicants' personal information and fingerprints are run against various law enforcement biometric databases, including: DHS's IDENT, and the FBI's NGI, those agencies' primary suppositories of biometric information, with millions of records. Applicant photos are compared to the FBI's photographic database on known or suspected terrorists.[65] | DHS-run vetting program used at the approximately 30 diplomatic outposts in 25 countries where DHS agents are posted. Will screen all non-immigrant visa applications submitted online prior to adjudication when fully implemented.<br><br>Integrates resources from ICE, CBP, Department of State, and the intelligence community to screen applicants prior to the visa interview stage.<br><br>Potential derogatory matches are investigated by on site DHS personnel. |

An important element of this identity verification and threat detection process is the use of biometric information collected from applicants.[66] Biometric information – such as fingerprints, facial images, and iris scans – is unique to individual travelers and difficult to forge, which makes it a better way to confirm identity

than biographic information (such as names, birthdays, and addresses).[67] Since 2002, people wanting to come to the U.S. have had to include with their visa application ten fingerprints and a photograph, which are then integrated into their visa if they are issued one.[68] As with biographic information, biometric information is compared to the extensive information contained in federal government databases. For example, a consular officer running standard checks will be notified if an applicant's fingerprints matched those from an ongoing Department of Defense criminal investigation or a known terrorist safe house.[69]

Biometric material is not the only additional information on travelers now available to immigration enforcement officials. Cross-border intelligence and data sharing efforts have been significantly stepped up since 2001. Under the EU-US Passenger Name Record (PNR) agreement, for example, DHS receives flight reservation data collected by airlines operating between the U.S. and Europe, including biographical information, contacts, credit cards, and baggage information.[70] This information is not only used at the time of travel, but is distributed through DHS systems that are used to evaluate visa applicants.[71]

Applicants tagged for further scrutiny – either on the basis of their interview with a consular officer or because their names have been flagged through one of these security screenings – are subjected to a Security Advisory Opinion (SAO), or administrative review, a multi-agency security review coordinated by the State Department in Washington, D.C. During this review, the visa application is put on hold until the SAO process is completed and renders approval or rejection.[72] According to the State Department, most security reviews are resolved – one way or another – within 60 days, with the caveat that "the timing will vary based on individual circumstances of each case."[73] Practitioners generally advise clients that SAOs can take months to clear, with terrorism-related reviews taking from 10 - 14 weeks, or even longer to process.[74]

In recent years, visa processing has become more automated. The "Kingfisher Expansion" program, launched in 2013, allows officials to check application information against classified government holdings, directly from any given consular outpost. The official submits a "vetting package" electronically, and the system checks it against databases like the Terrorist Identities Datamart Environment (TIDE), "the US Government's central repository on international terrorist identities,"[75] without the State Department in Washington, D.C., having to act as an intermediary. The system simply responds with either a "red light" or "green light," indicating whether further review is necessary.[76]

**Figure 2 – Refusal Rate for Tourist and Business Visas 2016**



The system as currently configured already results in visas being denied to nationals of countries targeted by the administration's Muslim ban at very high rates, as Figure 2 shows.[88] In other words, they are already being subjected to extraordinary scrutiny.

### d. IN-PERSON VETTING: THE VISA INTERVIEW

After an applicant's materials are processed, consular officers conduct in-person interviews, which the State Department's Foreign Affairs Manual calls "the most significant part of the visa issuing process."[89] The interview is a fraud prevention mechanism, designed to help catch relevant facts that applicants may be concealing.[90] The "vast majority of visa applicants" are interviewed; waivers are only available (although not necessarily granted) for those younger than 14 or older than 79; those seeking to renew visas that expired less than 12 months ago; and persons traveling as diplomats or officials of international organizations.[91]

Consular officers receive extensive (and continuing) training on how to conduct interviews and review applications effectively with a "strong emphasis on border security."[92] Among other things, they must review interview case studies in which they critique recorded interviews and simulate their duties; they must be generally familiar with the culture and speak the language of the country where they are stationed; and they must have a Top Secret security clearance.[93] Officers may ask "all sorts of questions about the applicant's personal situation and are trained to …detect signs of emotion or nervousness that may indicate deception," and have access to extensive

information obtained from background

**Banning Muslims: Ten Trump Statements[77]**

1. "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States"[78]

2. "It's not unconstitutional keeping people out… Because look, we are at war with radical Islam."[79]

3. "The Muslim ban is something that in some form has morphed into extreme vetting for certain areas of the world."[80]

4. "It's an expansion… People were so upset when I used the word Muslim… I'm talking territory instead of Muslim."[81]

5. "Nor can we let the hateful ideology of Radical Islam – its oppression of women, gays, children, and nonbelievers – be allowed to reside or spread within our own countries."[82]

6. "I think Islam hates us… And we can't allow people coming into this country who have this hatred of the United States and of people who are not Muslim."[83]

7. "We're having problems… with Muslims coming into the country"[84]

8. On banning Muslim immigration" "You know my plans all along. I've proven right."[85]

9. Executive Order 13,769 is "a new vetting measure to keep radical Islamic terrorists out of the United States of America"[86]

10. "When [Mr. Trump] first announced it, he said, 'Muslim ban.'… He said, 'Put a commission together. Show me the right way to do it legally.'"[87]

investigations to facilitate the applicants' provision of "full and frank" information relevant to the visa

application.[94]

If an applicant is denied a visa at the end of this long process, they generally have no recourse – the doctrine of consular non-reviewability forecloses judicial review in almost all cases.[95]

Trump has advocated for "extreme vetting" based on the notion that the rigorous screening systems described above are inadequate to protect the American homeland from "Radical Islamic Terrorism."[96] This is wrong. As explained above, the U.S. visa regime is extremely rigorous and particularly since the 9/11 attacks has included extensive national security safeguards. The proof is in the pudding: terrorism by foreign-born persons on U.S. soil is very rare.

## II.   THE "MUSLIM BAN" AND "EXTREME VETTING"

Trump's promises of a "Muslim ban" and "extreme vetting" are closely intertwined. The early versions of the Muslim ban have been replaced by a new, indefinite iteration, issued on September 24, 2017. It is the result of a review process, which examined whether countries adequately cooperate with the U.S. to confirm the identities of those applying for visas or other immigration benefits and provide information necessary to assess whether such individuals pose "a security or public safety threat," as well as a generalized "risk assessment."[97] While secure identity documents, information sharing, and counterterrorism cooperation have long been goals of the U.S. government, the Trump administration's initiative departs from previous efforts by imposing blunt sanctions in the form of near categorical bans. Moreover, the result of the review largely replicated earlier iterations of the Muslim ban, raising obvious questions about the administration's selective application of malleable criteria.

"Extreme vetting" has also begun and is slated for discriminatory application.[98] Whereas the existing screening system has generally used individualized assessments to identify people subject to further scrutiny,[99] the Trump administration has made clear that it will use vetting to target particular nationalities, such as Iraqis, Somalis and Yemenis, as shown in Table III below.[100] In addition, expanded efforts to collect social media data from selected people – especially coupled with DHS's reported plan to analyze all publicly available information on travelers, both potential and actual, and assess them using vague and subjective criteria – only amplify concerns that the visa issuance process will become systematically infused with religious and ideological biases.

### a.   IDENTITY VERIFICATION, INFORMATION SHARING, AND THE MUSLIM BAN 3.0

The declared aim of the Trump administration's "worldwide review" of vetting procedures was to have countries across the globe help the U.S. better screen visa applicants.[101] But in practice, it has led to yet another iteration of the Muslim ban, and a continuation of the same discriminatory policy.

The United States has long encouraged countries to comply with internationally accredited technical standards for issuing travel documents, sharing available information on people who are or may be public safety threats, and answering questions about domestic counterterrorism policies.[102] The United Nations and INTERPOL, with leadership from the U.S., have guided these types of passport security and information sharing initiatives.[103] Increasing compliance with the standards put forward by the International Civil Aviation Organization ("ICAO"), for example, has been a long-held policy goal of the U.S. government.[104] The ICAO standards require that: (1) countries issue "ePassports" that are biometrically capable, meaning they support identity verification linked to features unique to individual people – such as facial images or fingerprints – that

are hard to forge; and (2) submit information authenticating those passports to the ICAO's central database which can be used by other countries to better identify forgeries.[105]

Such efforts are not without their critics,[106] but they rest on agreement among many governments and international agencies on the need to improve systems for verifying identity and preventing passport fraud.[107] Currently, more than 100 countries issue ePassports, and 58 participate in the database.[108] The costs of switching from traditional to biometric passports can be substantial,[109] however, and other factors – such as lack of capacity or conflict – may make it difficult for countries to participate in these systems. Of the countries from which President Trump has banned travel, however, only Syria and Yemen do not issue ePassports.[110] Iran already participates in the ICAO database.[111]

The Trump administration also wants countries to regularly report lost and stolen travel documents to INTERPOL's Stolen and Lost Travel Document Database (SLTD).[112] All 190 INTERPOL-member countries can report these documents through their National Central Bureaus – which theoretically link local law enforcement to the INTERPOL network.[113] The Obama administration too was concerned about improving reporting.[114] However, this is not an easy task.[115] Some countries have not committed to doing so and even the efforts of participating countries are hampered by a "lack of connection…between law enforcement …[and] border control authorities… [and the] cost of deployment and existing IT infrastructure."[116] Additionally, the Trump administration would require countries to share criminal records as well as data on known or suspected terrorists.[117] Commonly, such information sharing is governed by bilateral agreements,[118] several of which have been operational.[119] According to DHS, these exchanges have been helpful for crime fighting and identifying "prospective travelers who may pose a risk to the United States."[120]

Once again, better information sharing and reporting on lost and stolen passports are longstanding U.S. foreign policy goals. Indeed, all countries from which visa-free travel to the U.S. is allowed must conform to these requirements, although they do not always fully meet all of them.[121] But never has non-compliance with these types of requirements triggered a broad travel ban.[122] Such blunt restrictions raise several serious concerns.

First, by totally banning immigrant visas from seven countries, the administration is departing from a longstanding priority of U.S. visa policy which is reflected in the Immigration and Nationality Act: the re-unification of families.[123] A large proportion of immigrant visas are issued to family members of Americans.[124] In fact, an earlier Supreme Court ruling ruling on the Muslim ban enjoined the government from enforcing it against individuals who have "bona fide" relationships in the United States, including close family members of citizens and legal permanent residents.[125] In doing so, the Court recognized the delay of entry into the country as a legal harm to U.S. family members.[126]

The September 2017 proclamation suggests that people admitted to the country based on familial ties "may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants," because they have "more enduring rights" and are "more difficult to remove…even after national security concerns arise."[127] This is a facially implausible justification. If the concern were truly about the lack information available to identify and vet visa applicants, then that concern would be at its lowest ebb with respect to immigrant visas, which generally require sponsorship by a U.S. citizen, permanent resident, or employer. The U.S. sponsor must submit reams of documentation and paperwork[128] – requirements to which the Trump administration has added substantially[129] – in order to verify their relationship with the applicant.[130] In other words, visa officers already have extensive information that allows them to establish the identity of those applying for immigrant visas.

## Table III: Impact of September 2017 Proclamation

| Country | Immigrants | Business Visitors | Tourists | Students |
|---------|-----------|-------------------|----------|----------|
| Chad | Banned | Banned | Banned | As before |
| Iran | Banned | Banned | Banned | Will be subject to "enhanced screening and vetting" |
| Libya | Banned | Banned | Banned | As before |
| North Korea | Banned | Banned | Banned | Banned |
| Syria | Banned | Banned | Banned | Banned |
| Venezuela | As before | Banned: government officials involved in screening and vetting procedures and immediate family members | Banned: government officials involved in screening and vetting procedures and immediate family members | As before |
| Yemen | Banned | Banned | Banned | As before |
| Somalia | Banned | "Subject to additional scrutiny" | "Subject to additional scrutiny" | "Subject to additional scrutiny" |
| Iraq | will be "subject to additional scrutiny" | "subject to additional scrutiny" | "subject to additional scrutiny" | "subject to additional scrutiny" |

Second, just because countries do not meet a specific prescribed standard – say they fail to report lost or stolen documents to INTERPOL's SLTD – does not necessarily mean that permitting their nationals to enter the U.S. will create serious national security risks. As discussed in Section I above, and shown in Table I, a substantial amount of information is already collected from every visa applicant to corroborate their identity, both in the form of biometric data (fingerprints and photographs) and background information (travel, address, employment, or financial history, including corroborating documentation). Indeed, empirical analysis has found no evidence that "lack of reliable information from … governments … has caused higher rates of terrorism-related crimes from [Muslim ban] countries.[131]

Finally, there is little doubt that the criteria for deciding which countries to blacklist have been selectively applied. Banning travel for non-compliance with identity verification protocols, for example, would have devastating economic and diplomatic consequences if applied equally to all countries. For example, China,

India, and Indonesia comprise about 40 percent of the world's population but contribute very little data to the INTERPOL database on stolen and lost passports.[132] Even developed European countries that participate in the Visa Wavier Program struggle to comply with their information sharing obligations.[133] And U.S. officials recognize that the "standards are so high that most countries won't meet them."[134]

Instead, as many experts feared,[135] the countries chosen for sanctions stemming from the "worldwide review" seem to have been handpicked to meet other goals. Several anomalies in the proclamation – as well as its ultimate impact – show why this is the case.

According to the proclamation, DHS initially identified 47 countries that were "inadequate" or "at risk" based on their "identity-management protocols, information-sharing practices, and risk factors."[136] "Engagement" with these governments allowed DHS to whittle the list down to eight countries that did not meet its baseline standards, but only *seven* of these countries became the target of broad travel bans. Iraq was not subject to a ban due to diplomatic and military considerations.[137] In contrast, DHS found that Somalia *did* satisfy the baseline requirements, but nonetheless recommended a travel ban.[138] This raises questions as to the extent to which the process was manipulated, particularly given the president's singling out of Somalis as posing a terrorism threat.[139] The proclamation also claims that its restrictions on non-immigrant visas are "tailored" in order to: 1) mitigate security threats; and 2) to recognize certain countries' willingness to cooperate in U.S. efforts to combat terrorism or to encourage improvements.[140] But as Table III shows, for five countries – Chad, Iran, Libya, Somalia, Yemen – the restrictions are functionally the same. Tourists and business people are forbidden, but students are allowed in. There is no explanation provided for why students might pose less of a risk than other visitors. Perhaps an answer might be found in the success that states such as Hawaii and Washington have enjoyed in asserting their interest in reeiving international students in their public univerisites, but that hardly seems connected to the stated purpose of the order.[141]

Leaving aside process, the practical effects of new travel ban bear a striking resemblance to its predecessor, Executive Order 13780. Using 2016 data as a baseline, the current policy would ban 76% of nonimmigrant visa applicants and 91% of immigrant visa applicants affected by the previous order.[142] The overlap is substantial despite the inclusion of Chad and North Korea, which together only had 1,049 total visas of the kind affected by sanctions issued in 2016 – tourist, business, and immigrant visas for Chad (940), and all visas for North Korea (109).[143] Likewise, the addition of Venezuela does not meaningfully change the calculus because the restrictions apply to government officials and their families, not ordinary applicants.[144]

Far from being "tailored,"[145] these measures are – most charitably – a blunt instrument: the cloak of visa security is being used as an excuse to ban citizens of a select group of Muslim countries, as the administration has been trying to do since January 2017. The inclusion of non-Muslim states cannot erase the president's oft-repeated commitment to use extreme vetting as a way of keeping Muslims out of the United States.

### b. IDENTIFYING APPLICANTS WARRANTING "ADDITIONAL SCRUTINY"

Trump's recent proclamation prescribed additional visa vetting for nationals of Iran, Iraq, and Somalia.[146] Such broad-brush scrutiny is not surprising because the administration's extreme vetting initiative is premised on identifying "populations" warranting additional vetting.[147] While consular officers have long collected additional information when their interviews with visa applicants raised suspicions, or when a traveler's name was flagged by a security database, it appears that the State Department will now target populations, likely identified by their shared religion – with national origin or ideology used as a proxy.

While the State Department has stated that travelers will be vetted "based on individual circumstances and information they provide,"[148] the most recent proclamation shows that the U.S. will subject entire countries to this regime.  Even before the September proclamation was issued, the State Department estimated that the new rules would affect 65,000 people.[149] This number closely tracks the roughly 68,000 nonimmigrant visas issued in 2016 to nationals of the seven countries included in the first travel ban (Executive Order 13769), as shown in Figure 3 below.[150] It also aligns with the 66,000 such visas that would have been affected by the proclamation were it applied in 2016.[151] In addition, the Department's first attempt at implementing these requirements – which was halted due to ongoing litigation – directed consular officials to implement these measures to all nationals of the initial Muslim ban countries.[152] In sum, "populations warranting increased scrutiny" could simply be code for people from Muslim countries or some subset thereof.

Notwithstanding Trump's assumptions to the contrary, such an approach is unlikely to make us safer. There is no evidence that religion or national origin are indicative of a propensity to terrorism. Writing in opposition to the Muslim ban, more than 40 national security experts from across the political spectrum argued that vetting should be responsive to "specific, credible threats based on individualized information," not stereotypes of religions or countries.[153] Even an analysis by Trump's own DHS found that citizenship was an unreliable indicator of terrorism threat,[154] a finding echoed by two federal appeals courts in rejecting the security rationale for Muslim ban Executive Order proffered by the administration.[155] As has been detailed in previous Brennan Center reports, decades of counterterrorism research has not been able to confirm traits that could be used to identify people who have a propensity for terrorism.[156] Indeed, national security officials have also warned that banning people from Muslim countries would have broader consequences, damaging the "strategic and national security interests of the United States," corroding relationships with allies and reinforcing the terrorist propaganda.[157]



**Figure 3 – Number of Nonimmigrant and Immigrant Visas Issued 2016**

The administration has argued that the Muslim ban was based on the Obama administration's previous identification of Iran, Iraq, Sudan, Syria, Libya, Somalia, and Yemen as "sources of terror."[158] This is only half true. Under Obama, a combination of legislative and executive action made it so people previously eligible for visa-free travel to the U.S. who had traveled to Iran, Iraq, Sudan, Syria, Libya, Somalia, and Yemen on or after March 1, 2011 were required to apply for visas to enter the U.S and therefore go through the same, individualized vetting process through which citizens of non-visa waiver countries proceed.[159] Dual nationals of Iran, Iraq, Sudan, and Syria were also required to obtain visas even if they held European passports.[160] Though not a blanket ban, this policy does discriminate solely on the basis of travelers' links to predominantly Muslim countries, and has been criticized for doing so. The E.U. considered a reciprocal measure to strip U.S.

citizens' visa-free travel privileges;[161] the technology industry has assailed it as discriminatory and bad for business; [162] and prominent lawmakers, both Democratic and Republican, have censured the visa requirement for dual nationals.[163] Nonetheless, it is notable that the change was, in some sense, a vote of confidence in the existing visa vetting process, which was considered sufficiently robust to "help neutralize the threat from foreign terrorists entering our country," in the words of House Speaker Paul Ryan (R.- WI).[164]

However Obama-era vetting policies came about, Trump is now president. And his Islamophobic statements combined with circumstantial evidence of which affected "populations" will be chosen for additional scrutiny give rise to a worry that the onerous and invasive requirements described in detail below will be applied discriminatorily and to the likely detriment of national security.

### c.  WHAT IS "ADDITIONAL SCRUTINY"?

#### i.  BIOGRAPHICAL AND TRAVEL INFORMATION

Applicants falling within "populations" the Trump administration determines need additional scrutiny, as well as visa applicants from Iran, Iraq, and Somalia, will be required to provide additional information including: 15 years' worth of travel, address, and employment history; email addresses, and phone numbers; names of siblings, children, former spouses not already provided; prior passport numbers; and details and documentation on any travel to an area controlled by a terrorist organization.[165] These applicants will almost certainly be subject to additional intensive interagency security reviews, which will, at the very least, delay visas for months on end.[166]

These new requirements would subject potential travelers to significant burdens. For example, gathering travel information for the last 15 years – including details such as locations visited on trips, sources of funds for travel to foreign, and even potentially domestic, locations, and corroborating documentation[167] – could require weeks' worth of time and substantial resources, involve tracking down accommodation and transportation providers, and finding credible people to corroborate trip details. Nor is it clear that reaching so far back in time would offer security benefits, particularly since many current terrorist threats like ISIS did not even emerge until 2013.[168] Indeed, the questions for even a short visit to the U.S. require more personal information than the forms required to get a Top Secret security clearance.[169]

Two consequences of this policy are, however, clear. First, it will enable the collection of more information for government databases, potentially for use in data mining, as discussed below. Second, it imposes a sufficiently heavy burden that people wanting to come to the U.S. will find gathering required supplemental application materials difficult, and many others will be discouraged from even applying for a visa.

#### ii.  SOCIAL MEDIA INFORMATION

The review of social media postings is increasingly touted as a tool for vetting those seeking to enter the U.S. In 2016, DHS added an optional social media identifier field to the portal through which nationals of visa waiver countries apply for entry into the U.S. It also ran a pilot program that screened the social media posting of certain temporary visa applicants.[170] The new rules being implemented by the Trump administration require those from "populations warranting additional scrutiny" to provide all social media platforms and identifiers used over the last five years.[171] Further, social media checks are required for people who have been in an area at any time it was controlled by ISIS, or if a consular outpost suspects that an applicant may be linked to ISIS

or another terrorist group.[172]

The expansion of social media data collection is unsupported by evidence that it is a reliable means of improving visa vetting. In fact, the DHS Office of Inspector General recently audited the Department's existing social media pilot programs to screen applicants for immigration benefits. Its report – titled "DHS' Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-term Success" – found that DHS did not have sufficient metrics in place to measure the programs' effectiveness. The Inspector General concluded that the pilot programs provided little value for guiding the rollout of any department-wide social media screening program.[173]

Social media platforms amplify issues of subjectivity inherent in many human communications. This is for two reasons. First, as with other communications, context is important. Both humans and computers have trouble properly contextualizing social media communications in order to detect sarcasm or other features of local parlance.[174] A few examples illustrate this problem. In 2012, a U.K. citizen was detained for hours at Los Angeles International Airport and denied entry into the U.S. after telling a friend on Twitter, "[f]ree this week, for quick gossip/prep before I go and destroy America," slang for partying; he also said he would "dig[] Marilyn Monroe up," a reference to a popular television show.[175] Rap lyrics have been wrongly interpreted as threatening messages in criminal cases.[176] Further exacerbating these issues, officials will often be looking at posts in different languages, governed by different linguistic conventions.[177] It is not obvious that computers will fare better. For example, DHS's foray into using tone analysis software to identify national security threats has been questioned for defining terms statically, without accounting for historical or linguistic nuances.[178]

Second, social media platforms contain many kinds of non-verbal communications: Facebook has "likes" and other emoji reactions; Twitter users can "heart" or "re-tweet" communications." There is no interpretive consensus on whether many of these kinds of acts count as endorsements.[179] As the Brennan Center and 34 other civil rights and liberties groups explained in a letter to the State Department:

> If a Facebook user posts an article about the FBI persuading young, isolated Muslims to make statements in support of ISIS, and another user "loves" the article, is he sending appreciation that the article was posted, signaling support for the FBI's practices, or sending love to a friend whose family has been affected? …

> A similar dilemma infects Twitter … A user may click the heart simply to mark a post for later review, but it could falsely signal to her followers – or more urgently, the U.S. government – that she agrees with the sentiment expressed….

> In light of the multitude of possible interpretations of both speech and non-verbal communication, consular officers will be able to exercise enormous, unchecked discretion when it comes to assessing foreign residents' suitability to enter the country and quizzing them about the meaning and significance of a range of expression.[180]

Beyond interpretative issues, the accumulation and analysis of social media information corrodes the fundamental freedoms of speech and faith, as well as privacy. The State Department claims that it will not use social media information to deny visas "based on…religion [or] political views."[181] This seems like a rule that begs to be broken. While social media can be used verify identity, it also easily reveals information on political and religious views, as discussed further below. Anyone thinking of coming to the United States will almost

certainly either refrain from expressing views on controversial political or religious matters or sanitize their online personas. Such self-censorship should not be the end result of policies pursued by a democracy committed to the values embodied in the First Amendment to the U.S. Constitution and the International Covenant on Civil and Political Rights, which guarantees "the right to freedom of expression," including the "freedom to seek, receive and impart information and ideas of all kinds."[182]

#### d.   IDEOLOGICAL VETTING

Social media analysis facilitates ideological vetting of visa applicants, which is a stated goal of the Trump administration. During the election campaign Trump promised to bring back a Cold War style "ideological screening test."[183] At a Phoenix rally, he told the crowd that "extreme vetting" would make sure the U.S. only accepts "the right people," using "ideological certification to make sure that those we are admitting to our country share our values and love our people."[184] Trump's many proclamations about Muslims leave no doubt who he is targeting as being ideologically unfit to travel to the country and he has singled out "honor killings" and discrimination on the basis of gender or sexual orientation as aspects of Islam that are incompatible with American values.[185] The intention to use ideological tests is reflected in Trump's executive orders implementing the Muslim ban and triggering extreme vetting, and senior DHS officials have said they are working on such a test.[186]

The original travel ban, Executive Order 13769, contained several coded references to Islam. For example, among its stated goals was to exclude people who "would place violent ideologies over American law."[187] This is a reference to jihad (which is the "violent ideology" that is at the forefront of Trump's counterterrorism policy),[188] and it reflects the view held by fringe Islamophobes, many of whom have been permitted into Trump's inner circle, that Muslims cannot participate in democratic societies because they hold to a "higher law."[189] The order would have excluded those who perpetrated "honor killings" or would discriminate against Americans on the basis of race, gender, or sexual orientation.[190] While all of these reprehensible attitudes can be found in many countries, including the United States, in the Western imagination they are associated with Islam.[191] The order also would have barred "those who persecute minority religions" and included a telling carve out for non-Muslims,[192] provisions which track Trump's frequent remarks about how badly Christians are treated in Muslim countries.[193]

The second version, Executive Order 13780, was designed to withstand obvious charges of anti-Muslim bias that stymied the first version in court. It removed many of the references to Islam, suggesting that the White House had at least some understanding that the stereotypes in the original version were objectionable.[194] But it did not purge them entirely, retaining, for example, an instruction to the DHS Secretary to report on the number of "honor killings" by foreigners in the U.S.[195] Indeed, it seems almost certain that the first order reflects the administration's true intentions. As federal courts have noted in enjoining the second order, Trump has made it obvious that the blatant discrimination that marked the first order also animates its successor.[196] The president called the second order a "watered down, politically correct version," and recently tweeted that the travel ban should be "far larger, tougher, and more specific" than the one reflected in the

second order.[197] His senior advisor Stephen Miller went on record saying that it would achieve the "same basic policy outcome."[198]

The ideological questions that the administration is reportedly considering asking visitors are in line with the stereotypes about Muslims reflected in Trump's public statements and Executive Order 13769. According to

the Wall Street Journal, they "include how visa applicants view the treatment of women in society, whether they value the 'sanctity of human life' and who they view as a legitimate target in a military operation."[199]

Ideological screening of the kind described above has a long history in U.S. immigration law,[200] elements of which still persist.[201] But Congress has largely moved away from this tactic since 1990, when it unanimously repealed broad ideological exclusions that permitted exclusion of those who "engage[d] in activities which would be prejudicial to the public interest," even through speech or writing.[202] Congress jettisoned ideological vetting because it led to absurd exclusions – for example, author Graham Greene, comedian Charlie Chaplin, novelist Gabriel Garcia Marquez, and Pierre Trudeau, who went on to become the Prime Minister of Canada – and had come to be seen as incompatible with the American ethos.[203] In the words of Senator Daniel Patrick Moynihan, who sponsored the repeal, ideological screening projected a "fearful, muddled, intimidated citizen[ry]," inconsistent with the nature of the American body politic.[204]

Fortunately, at least some lawmakers today remain concerned about these principles. Senator Claire McCaskill questioned then-DHS Secretary John Kelly at length about the Department's plans for ideological vetting and expressed deep concern:

> It seems to me we are signaling something that's very un-American to the rest of the world by announcing this policy. Every ambassador in Washington read this article in *The Wall Street Journal* yesterday and every ambassador in Washington called back to their country and said, listen to this, they're going to start asking people for their social media password and about their ideology in America. That is incredibly damaging, and all the bad guys are going to … just lie. I don't get how get we get anything out of it.[205]

In addition to conflicting with American values and legal norms, as former commissioner of the Immigration and Naturalization Service, Doris Meissner has pointed out, ideological tests "have proven to be poorly equipped to actually predict what people are going to do."[206] This is unsurprising. Decades of empirical research have shown that ideology is not a good predictor of violence. Many people hold views that can be described as "extreme" and never act violently; the reverse is also true.[207] Moreover, as discussed above, figuring out the nuances of what people think or believe is difficult, even with social media posts at our disposal.[208] Finally, as noted previously, according to a DHS study, the few foreigners who do commit terrorist acts in the U.S. do so years after coming to the country, so investigating their ideological proclivities is unlikely to identify threats.[209]

Indeed, the law already contains robust mechanisms for identifying and excluding people who support terrorist groups. In particular, the PATRIOT Act passed in the wake of the September 11 attacks provides that those who "endorse[] or espouse[] terrorist activity or persuade[] others to endorse or espouse terrorist activity or support a terrorist organization" can be barred from the country.[210] As part of the visa process, would-be visitors are asked a number of questions aimed at surfacing links to violent behavior or terrorism.[211] If anything, these and related PATRIOT Act amendments to the INA are overbroad,[212] as Congress recognized in 2008, when it made it easier for immigration authorities to grant discretionary waivers for their application.[213]

Overall, ideological tests of the kind the Trump administration appears to embrace reflect the very worst of extreme vetting. They infect policy decisions with religious stereotypes, while providing no identifiable benefits to national security.

### e.    EXTREME VETTING BY ALGORITHM

Despite the president's vocal support for extreme vetting of Muslims, the administration has sought to portray its the measures as applying only to a limited set of people who require additional scrutiny. The State Department claims that it will gather social media information from populations "warranting additional scrutiny" that it estimates will include 65,000 people. Also, when the DHS Secretary was questioned about reports of ideological screening, he insisted that such measures would only be applied to a very small number of people.[214]

In fact, the administration is contemplating something that reaches much further – an automatic vetting system that will ingest reams of information about *all* potential visitors from government databases and publicly accessible platforms such as "media, blogs, public hearings, conferences, academic websites, social media websites…radio, television, press, geospatial sources, internet sites."[215] This would presumably include the extensive biographical and biometric data collected from visa applicants, as well as any social media-related information they provide.[216] According to the Statement of Objectives disclosed at a trade show, the system should evaluate "an applicant's probability of becoming a positively contributing member of society as well as their ability to contribute to national interests," [217] and whether they intended to commit a crime or terrorist attack once they arrived here.[218] It would continue to monitor people even after they come to the U.S., at least for the duration of their visit and potentially afterwards.

Even a cursory examination of the goals of this project demonstrates its fundamental flaws. First, the system is meant to determine whether someone is probable to "positively contribut[e]" to society, "contribut[e] to the national interest." This element of screening was included in the first Muslim ban Executive Order, but removed in its later version.[219] While the State Department perhaps has the authority to evaluate an individual based on their ability to contribute to the national interest, that standard seems a poor one by which to appraise to visitors, students, and businesspeople who are – by definition – only in the country for a limited period of time. Moreover, the characteristics to be evaluated are subjective and political, not scientific. For example, a transgender political activist seeking to attend a conference might be considered as adding value to U.S. discourse by some and as inflammatory by others. Malleable concepts such as value to "society" and the "national interest" could easily be used to keep out Muslims on the theory that they present a threat to American values as this president and his inner circle clearly believe.[220] The fact that a computer conducts this assessment does not mean the results will be objective.

Nor is there cause to believe that an automated system would be able to make accurate predictions about who will commit a terrorist or criminal act at some point in the future. Attempts to predict criminality in the U.S. typically rely on law enforcement records of arrests and crime as a proxy. Such data may not be available for those applying for visas, and is in any event unreliable because it integrates and perpetuates existing biases in policing.[221] Moreover, as experts have repeatedly explained, algorithms are not particularly good at predicting rare events such as terrorism – they generate an unacceptably high rate of errors and should not be used to make decisions that can have a serious impact on individuals' lives.[222]

Finally, ongoing monitoring of visitors to the United States will have tremendous impacts for constitutional privacy and free speech rights. Everyone who is on United States territory is entitled to the same basic constitutional protections, regardless of whether they are a citizen.[223] Such monitoring would threaten the rights of Americans and visitors alike.

In sum, the automatic social media monitoring being proposed by DHS seems to ignore serious issues of effectiveness and principle.

## III.   COSTS OF THE MUSLIM BAN AND EXTREME VETTING

This report has outlined how the U.S. already has one of the most restrictive visa systems in the world with layers of national security checks, and that there is little evidence that banning travel or increasing the hurdles to get a visa to come to the United States would have a measurable national security benefit. There is, however, ample evidence that doing so would impose economic costs. And, travel policies and practices that functionally discriminate on the basis of religion, national origin, or ideology would deal a punishing blow to the values that define America. Simply put, a permanent regime of extreme vetting would stanch the flow of money and talent into the United States and undermine the character of American democracy.

### a.   ECONOMIC COSTS

There is little doubt that restricting travel carries serious economic costs.[224] The United States welcomed more than 180 million temporary visitors in 2015;[225] more than 10 million of them required visas to enter the country.[226] Making it harder to get visas will discourage these people from traveling to the United States. But it will also deter – and seemingly already is deterring – people who are not directly affected by visa policies but are put off by the animus reflected in initiatives like the Muslim ban, extreme vetting, and the border wall. Less travel to the United States means lost revenue, taxes, and jobs.[227] It also means less trade, less foreign direct investment, and fewer scientific and cultural exchanges.[228]

The vast majority of temporary visitors come to America for business or tourism.[229] They stay in hotels, eat at restaurants, and buy things at stores, which in turn generates revenue, taxes, and jobs. In 2016, the United States generated $247 billion from international travel.[230] The State Department estimates that one American job is created for every 67 visitors to the country.[231]

Other temporary visitors include university students, "specialty" workers under the H1-B program (popular in Silicon Valley), as well as seasonal agricultural workers and intra-company transfers.[232] The benefits of such visas are immense for American companies and universities seeking to attract top talent and compete globally.[233] Highly skilled immigrants boost the American economy by increasing innovation and productivity, which helps create new jobs and new opportunities for expansion.[234] Indeed, the history of American innovation is inevitably a history of American immigrants. More than 40% of Fortune 500 companies were founded by immigrants or their children, including AT&T, Apple, Google, Intel, General Electric, Oracle, McDonald's, and eBay.[235] These quintessentially "American" companies owe their existence to immigrants who came to the United States from countries like Syria and Iran, now targeted by President Trump's travel ban.[236] Foreign-educated doctors fill significant gaps in the U.S health care system, treating sicker populations and producing better health care outcomes than domestically educated doctors.[237]

The decade after September 11 offers a cautionary tale on how extreme vetting could hurt the U.S. economy. High security in the aftermath of attacks led to an immediate drop in travel, followed by a "lost decade" for the travel and tourism industry due to strict new visa requirements, including mandatory in-person interviews.[238] According to the U.S. Travel Association, the post-September 11 rules led to 68 million potential visitors lost, $509 billion in spending lost, and 441,000 jobs lost.[239] And impacts can be immediate: in just two days after

Trump ordered the first Muslim ban in January 2017, the country's major airlines lost nearly $5 billion in market value due to worries about its effects.[240]

On the flip side, easing travel restrictions has been shown to have significant benefits for the country. Under the Visa Waiver Program, initiated under President Ronald Reagan in 1986, temporary visitors from 38 mainly developed countries in Europe do not need a visa to enter the U.S.[241] The economic benefits of the waiver program are well documented: the Department of Homeland Security estimates that travelers from visa waiver countries spent about $84 billion on goods and services in FY 2014, or contributed almost $231 million per day to economies around the country.[242]

The September proclamation, as well as the general tenor of the president's statements, makes it clear that travel restrictions will have an outsized impact on Muslims. In the years immediately following September 11, visas issued to visitors from predominantly Muslim countries dropped the most,[243] and early analysis of data suggests such drops may again be occurring.[244] State Department data shows that nonimmigrant visas from Arab nations have declined by 16% in 2017 compared to last year; for the countries included in both previous Muslim bans (Iran, Libya, Somalia, Sudan, Syria and Yemen), that number is 44 percent.[245]

Travel bans and extreme vetting may affect Muslim travelers most directly, but they are likely to cause ripple effects that extend to international travel more generally. In September 2017, the Commerce Department reported a drop of almost 700,000 international visitors in the first quarter of 2017, compared to the previous year – with the largest drops coming from the Middle East and Africa.[246] Indeed, extreme vetting appears likely to dampen all travel,[247] and like the post-September 11 decade, give the impression that America is closed for business.[248]

As a group of over 50 academic and scientific groups explained, the new visa policies promulgated by the State Department would not only prevent specific individuals from coming to the United States, but their "undefined and unclear" nature would have "negative indirect impacts in other areas" as well. "The amount of information that could be collected, the lack of knowledge about what will be done with this additional information, and concerns about their privacy may well lead many to look to other countries for scientific partnerships or higher education pursuits."[249] This would deprive the United States of a wealth of talent and opportunities for collaboration in the fields of science, technology, engineering, and mathematics, all of which are key drivers of our economy.[250]

### b. COST TO AMERICAN VALUES

Visa rules that discriminate against visitors on the basis of religion or nationality will come at the cost of core American values. An open society is central to our national character as a nation of immigrants. Freedom of religion and equality are the basic building blocks of American democracy, drawing people from every corner of the world for centuries.

While the American immigration system often does not live up to the nation's highest ideals, it has trended toward more openness and equality over time.[251] After World War II, Congress officially removed race-based restrictions on immigration, even though it maintained a quota system with a heavy preference for western Europeans.[252] Beginning in the civil rights era, Congress began to eliminate national origin as criterion for admission. In 1965, it eliminated the quota system and replaced it with a preference for skilled labor and family unification, flatly rejecting discrimination based on "race, sex, nationality, place of birth, or place of residence."[253] This reform brought the country's immigration laws in line with its "national history and ideals"[254]

and "manifested Congressional recognition that the maturing attitudes of our nation made discrimination on these bases improper."[255] It also led to major demographic changes within the United States, as the next half-century saw a rise in immigration from Latin America and Asia.[256] Further reforms in 1990 and 2000 raised immigration caps and increased the emphasis on skilled workers as advanced sectors of the economy grew.[257]

By contrast, President Trump's extreme vetting and travel ban initiatives come wrapped in fear-laden rhetoric and are accompanied by support for anti-immigrant legislation, which aim to swing the pendulum back toward a pre-civil rights era outlook.[258] Even career State Department officials criticized Trump's executive orders. Using a rare "dissent channel" to protest, the officials emphasized that, "We do not need to alienate entire societies to stay safe. And we do not need to sacrifice our reputation as a nation which is open and welcoming to protect our families."[259]

The travel ban and extreme vetting will undermine American values by conveying to the world that the United States is no longer committed to openness and nondiscrimination. They will eat away at our national character for the sake of speculative national security benefits. The fabric of America depends on equal treatment, regardless of race, gender, ethnicity, national origin, and religion. And it depends on the Establishment Clause to separate religion from the state, and the state from religion. Bans and overzealous vetting are unlikely to provide additional security against terrorism, but will surely corrode the fundamental values that make America strong and united, and undermine the country's ability to foster contact, cordiality, and cooperation with people across the globe. Like the quota system abandoned in 1965, they risk betraying "our basic American tradition"[260] by returning to "a cruel and enduring wrong in the conduct of the American Nation."[261]

## CONCLUSION

Given the threat of terrorism, visa issuance decisions must, and do, include strong national security safeguards. There is no evidence that the U.S. system is not up to the task. In fact, the number of attacks by foreign-born terrorists in the U.S. is de minimis. Against this backdrop, the Trump administration is taking steps – such as banning immigrants and visitors from mostly Muslim countries and identifying "populations" that will officially be deemed risky – that emanate from the religious animus so often expressed by President Trump. This approach, which is part and parcel of a broader anti-immigrant agenda, is inimical to American economic interests and fundamental values. It should be rejected as both unnecessary and harmful.

## Endnotes

[1] Exec. Order No. 13,769, 82 Fed. Reg. 8977 (January 27, 2017), https://www.gpo.gov/fdsys/pkg/FR-2017-02-01/pdf/2017-02281.pdf. The order was enjoined by several courts. Washington v. Trump, No. 17-35105, slip op (W.D. Wash.), *rev'd*, 847 F.3d 1151 (9th Cir. Feb. 9, 2017); Aziz v. Trump, 234 F.Supp.3d 724, slip op. (E.D. Va. Feb. 13, 2017); Hawaii v. Trump, 859 F.3d 741, 771 (9th Cir. 2017), *cert. granted sub nom* Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080 (2017); Int'l Refugee Assistance Project v. Trump, 241 F.Supp.3d 539 (D. Md.), *rev'd*, 857 F.3d 554 (4th Cir. May 25, 2017). In March 2017, it was replaced by Executive Order 13,780, which removed Iraq from the list of banned countries and included modifications designed to overcome the arguments that had resulted in injunctions against its predecessor. Exec. Order No. 13,780, 82 Fed. Reg. 13209, 13215 (March 6, 2017), § 5(a). https://www.gpo.gov/fdsys/pkg/FR-2017-03-09/pdf/2017-04837.pdf
[2] Proclamation No. 9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats," September 24, 2017, https://s3.amazonaws.com/public-inspection.federalregister.gov/2017-20899.pdf (an unpublished Presidential Document by the Executive Office of the President).
[3] Proclamation No. 9645, 6, § 1(g).
[4] David Bier, "A Dozen Times Trump Equated his Travel Ban with a Muslim Ban," *CATO at Liberty* (blog), *CATO Institute*, August 14, 2017, https://www.cato.org/blog/dozen-times-trump-equated-travel-ban-muslim-ban; Associated Press, "How Donald Trump's Plan to Ban Muslim's Has Evolved," *Fortune*, June 28, 2016, http://fortune.com/2016/06/28/donald-trump-muslim-ban/; Daniella Diaz, "Trump seizes on terror incident to call for travel ban," *CNN*, September 15, 2017, http://www.cnn.com/2017/09/15/politics/donald-trump-london-terrorist-attack/index.html. Trump has also made it clear that he preferred the original version of the ban reflected in Executive Order 13769 to the less overtly discriminatory version that he issued in March 2017 in response to court decisions. *Louis Nelson*, "Trump slams Justice Department for 'watered down' travel ban," *Politico*, June 5, 2017, http://www.politico.com/story/2017/06/05/trump-travel-ban-justice-department-239131.
[5] Jessica Estepa, "'Preventing Muslim immigration' statement disappears from Trump's campaign site," *USA Today*, May 8, 2017, https://www.usatoday.com/story/news/politics/onpolitics/2017/05/08/preventing-muslim-immigration-statement-disappears-donald-trump-campaign-site/101436780/.
[6] "Full transcript: Second 2016 presidential debate," *Politico*, October 10, 2016, http://www.politico.com/story/2016/10/2016-presidential-debate-transcript-229519.
[7] Donald Trump (@realDonaldTrump), "In any event we are EXTREME VETTING people coming into the U.S. in order to help keep our country safe. The courts are slow and political!," Twitter, June 5, 2017, 3:44 a.m., https://twitter.com/realdonaldtrump/status/871679061847879682?lang=en. And as Trump has advocated for extreme vetting, he has done so in conjunction with his proposal to ban Muslims from the country. Ibid.; Lesly Stahl, "The Republican Ticket: Trump and Pence," *CBS News*, July 17, 2016, https://www.cbsnews.com/news/60-minutes-trump-pence-republican-ticket/ (In response to a question about his position on Muslim immigration, Trump states: "Call it whatever you want, change territories, but there are territories and terror states and terror nations that we're not gonna allow the people to come into our country. And we're gonna have a thing called 'Extreme vetting.'" And if people wanna come in, there's gonna be extreme vetting.")
[8] Peter Baker, "Trump Supports Plan to Cut Legal Immigration by Half," *New York Times*, August 2, 2017, https://www.nytimes.com/2017/08/02/us/politics/trump-immigration.html?mcubz=1&_r=0.
[9] Catherine E. Shoichet, Susannah Cullinane, and Tal Kopan, "U.S. immigration: DACA and Dreamers explained," *CNN*, September 5, 2017, http://www.cnn.com/2017/09/04/politics/daca-dreamers-immigration-program/index.html.
[10] "ICE ERO immigration arrests climb nearly 40%," Department of Homeland Security, accessed September 15, 2017, https://www.ice.gov/features/100-days; Tal Kopan, "ICE: Arrests still up, deportations still down," *CNN*, August 11, 2017, http://www.cnn.com/2017/08/11/politics/trump-administration-deportations/index.html.
[11] Anna Brand, "Donald Trump: I would force Mexico to build border wall," *MSNBC*, June 28, 2015,

http://www.msnbc.com/msnbc/donald-trump-i-would-force-mexico-build-border-wall; "President Trump Ranted For 77 Minutes in Phoenix. Here's What He Said," *Time*, August 23, 2017, http://time.com/4912055/donald-trump-phoenix-arizona-transcript/.

[12] Department of State, *Implementing Immediate Heightened Screening and Vetting of Visa Applications*, by Rex Tillerson, 17 STATE 24324, ¶ 19, http://fingfx.thomsonreuters.com/gfx/rngs/USA-IMMIGRATION/0100409S0N1/Cables.pdf ("In order to ensure that proper focus is given to each application, posts should generally not schedule more than 120 visa interviews per consular adjudicator/per day."). The administration also repealed an Obama-era directive, Executive Order 13597, which required 80 percent of nonimmigrant visa interviews to be scheduled within three weeks of when applications were received. Exec. Order No. 13,802, 82 Fed. Reg. 28747 (June 21, 2017), https://www.federalregister.gov/documents/2017/06/26/2017-13458/amending-executive-order-13597; Exec. Order No. 13,597, 77 Fed. Reg. 3373 (January 19, 2012), https://www.gpo.gov/fdsys/pkg/FR-2012-01-24/pdf/2012-1568.pdf.

[13] David Bier, "The Trump administration's stealth attack on legal immigration," *Washington Post*, August 28, 2017, https://www.washingtonpost.com/opinions/the-trump-administrations-stealth-attack-on-legal-immigration/2017/08/28/afbf1912-8c04-11e7-8df5-c2e5cf46c1e2_story.html?utm_term=.ca50400f3b91.

[14] Hawai'i v. Trump, 241 F. Supp. 3d at 1140; Aziz v. Trump, 234 F.Supp.3d 724, 737 (E.D. Va. Feb. 13, 2017).
[15] *Hawaii v. Trump*, 859 F.3d at 771.

[16] Robert Lawson (Professor, Southern Methodist University, Cox School of Business) in discussion with Faiza Patel (Co-Director, Liberty and National Security Program, Brennan Center for Justice), March 2017. Data from Lawson's Ease of Travel for Foreign Visitors Index was also published in: Robert Lawson and Jayme Lemke, "Travel Visas," *Public Choice* 153:1-2, 2012, 17-36; James Gwartney, Robert Lawson, and Joshua Hall, *Economic Freedom of the World: 2016 Annual Report*, Fraser Institute, 2016, 182, 280, https://www.fraserinstitute.org/sites/default/files/economic-freedom-of-the-world-2016.pdf.

[17] Overstays of temporary visas do make up a significant number of the overall population that is in the United States without authorization. According to DHS, in 2016, about one percent – or 629,000 – travelers overstayed their temporary visas and became unauthorized to remain in the United States. Department of Homeland Security, *Fiscal Year 2016 Entry/Exit Overstay Report*, Department of Homeland Security, 2017, iv, https://www.dhs.gov/sites/default/files/publications/Entry%20and%20Exit%20Overstay%20Report%2C%20Fiscal%20Year%202016.pdf. This does not, however, mean that the front-end process is inadequate but rather points to the well-recognized need to improve systems for ensuring that travelers leave the country when their visas expire. Office of Inspector General, *DHS Tracking of Visa Overstays is Hindered by Insufficient Technology*, OIG-17-56, Department of Homeland Security, 2017, 21-25, https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-56-May17_0.pdf.

[18] This review was required by Executive Order 13780. 82 Fed. Reg. 13212, § 2. It was temporarily enjoined by a federal court as part of the travel ban litigation, but allowed to go forward in June 2017. *Hawaii v. Trump*, No. 17-00050-DKW-KSC at 23 (D. Haw. Mar. 23, 2017); *Hawaii v. Trump*, 859 F.3d 741.

[19] Proclamation No. 9645, 1, 6.

[20] Ibid. at 7, § 1(h).

[21] Department of State – Bureau of Consular Affairs, "FY 2016 Nonimmigrant Visas Issues,"accessed September 28, 2017, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY16%20NIV%20Detail%20Table.pdf (100 nonimmigrant visas issued); Department of State – Bureau of Consular Affairs, "Table XIV: Immigrant Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories) Fiscal Years 2007-2016," accessed September 28, 2017, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16AnnualReport-TableXIV.pdf (9 immigrant visas issued).

[22] David Bier, "New Travel Ban Would Not Have Prevented the Entry of Any Terrorists Since 9/11," Cato Institute , September 25, 2017, accessed September 28, 2017, https://www.cato.org/blog/new-travel-ban-wouldve-prevented-entry-no-terrorists-911.

[23] "Notice of Information Collection Under OMB Emergency Review: Supplemental Questions for Visa Applicants," 82 Fed. Reg. 20957 (May 4, 2017), https://www.federalregister.gov/documents/2017/05/04/2017-08975/notice-of-information-collection-under-omb-emergency-review-supplemental-questions-for-visa. This initiative was undertaken under Executive Order 13780 (which replaced Executive Order 13769 to better withstand legal scrutiny), presumably under Section 5 which calls for the development of "uniform baseline for screening and vetting standards and procedures" for people coming to the U.S. These vetting standards were to be part of a

program to detect those who: try to enter the country fraudulently; support terrorism, violent extremism, or violence against groups of people; or may otherwise cause harm after gaining entry. 82 Fed. Reg. 13215, § 5(a).

[24] "60-Day Notice of Proposed Information Collection: Supplemental Questions for Visa Applicants," 82 Fed. Reg. 36,180 (August 3, 2017), https://www.gpo.gov/fdsys/pkg/FR-2017-08-03/pdf/2017-16343.pdf.

[25] Visa numbers were taken from the State Department's website. For source, please see note 142's citation of nonimmigrant visa data.

[26] Yeganeh Torbati, "Trump administration approves tougher visa vetting, including social media checks," *Reuters*, May 31, 2017, http://www.reuters.com/article/us-usa-immigration-visa/trump-administration-approves-tougher-visa-vetting-including-social-media-checks-idUSKBN18R3F8; Elizabeth Weise, "U.S. now can ask travelers for Facebook, Twitter handles," *USA Today*, June 1, 2017, https://www.usatoday.com/story/tech/news/2017/06/01/us-now-can-ask-travelers-facebook-twitter-handles/102393236/.

[27] A senior DHS official has said the administration was working on an ideological test, and then-DHS Secretary and current White House Chief of Staff John Kelly admitted that some travelers are asked ideological questions. Laura Meckler, "Trump Administration Considers Far-Reaching Steps for 'Extreme Vetting'," *Wall Street Journal*, April 4, 2017, https://www.wsj.com/articles/trump-administration-considers-far-reaching-steps-for-extreme-vetting-1491303602; *Improving Border Security and Public Safety: Hearing Before the S. Comm. On Homeland Security and Governmental Affairs*, 115th Cong. (April 5, 2017) (transcript at 12, available at https://goo.gl/CKvqEN).

[28] See *Attachment 1: Statement of Objectives*, Immigration and Customs Enforcement Office, U.S. Department of Homeland Security, "Presolicitation Notice, Solicitation No. HSCEMD-17-R-00010, ICE-HIS – Data Analysis Service Amendment," FedBizOpps.Gov, posted June 12, 2017, 3:09 PM, accessed September 18, 2017, https://www.fbo.gov/index?s=opportunity&mode=form&id=3abbda0ebcab146118a6f6a0ec44c2b4&tab=core&_cview=1; See also ibid, *Attachment 2: Background*. The "Industry Day" materials prepared by ICE-HIS for this Presolicitation Notice were obtained and released by The Intercept in August 2017. Sam Biddle and Spencer Woodman, "These Are the Technology Firms Lining Up to Build Trump's 'Extreme Vetting' Program," *Intercept*, August 7, 2017, https://theintercept.com/2017/08/07/these-are-the-technology-firms-lining-up-to-build-trumps-extreme-vetting-program/.

[29] National Travel and Tourism Office, "Table C - Section 1: Total Arrivals, Canada, Mexico, Total Overseas, Europe Non-Resident Arrivals to the U.S. By world region/country of residence April 2017 (Preliminary*)," Department of Commerce (spreadsheet), release date September 2017, accessed September 27, 2017, http://tinet.ita.doc.gov/view/m-2017-I-001/table1.asp.

[30] Elaine Glusac, "International Tourism to the U.S. Declined in Early 2017," *New York Times*, September 19, 2017, https://www.nytimes.com/2017/09/19/travel/tourism-united-states-international-decline.html?mcubz=0.

[31] Sam Levin, "No African citizens granted visas for African trade summit in California," *Guardian*, March 20, 2017, https://www.theguardian.com/us-news/2017/mar/20/no-african-citizens-visas-california-annual-trade-summit.

[32] Shelley K. Mesch, "US-Africa Energy Summit at Monona Terrace canceled after visas denied," *Wisconsin State Journal*, September 7, 2017, http://host.madison.com/wsj/business/u-s--africa-energy-summit-at-monona-terrace-canceled/article_95fcaff6-6bd3-59e9-86f8-8b5d645a619c.html.

[33] Chris Fuchs, "Tibetan Women's Soccer Team Respond After Being Denied U.S. Visas for Tournament," *NBC News*, March 3, 2017, https://www.nbcnews.com/news/asian-america/denied-visas-u-s-tibet-women-s-soccer-team-hold-n728626; Derek Hawkins, "Afghan girls team can travel to U.S. for robotics contest after being denied visas twice," *Washington Post*, July 13, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/07/13/afghan-girls-team-can-travel-to-u-s-for-robotics-contest-after-visas-denied-twice/?utm_term=.fd58135c890a. After being denied twice, and after backlash from human rights advocates, the Afghan robotics team was allowed to enter the country after the State Department formally requested that DHS grant the team members "parole," allowing them one-time entry for humanitarian reasons or "significant public benefit." The Gambian team for the same competition was also initially denied and then granted the same exception. Ibid.

[34] Anastasia Tsioulcas, "Three More SXSW-Bands Denied Entry Into The U.S.," *NPR*, March 13, 2017, http://www.npr.org/sections/therecord/2017/03/13/520010920/three-more-sxsw-bound-bands-denied-entry-into-the-u-s; Padraic Flanagan and Raf Sanchez, "Nigella Lawson barred from boarding US-bound flight," *Telegraph*, April 2, 2014, http://www.telegraph.co.uk/news/celebritynews/10740907/Nigella-Lawson-barred-from-boarding-US-bound-flight.html.

[35] 82 Fed. Reg. 13217, at § 11(iii) (references violence against women and "honor killings"); 82 Fed. Reg. 8977, at § 1 ("The United States cannot, and should not, admit those who do not support the Constitution ... In addition, the United States should not admit those who engage in acts of bigotry or hatred (including "honor" killings, other forms

of violence against women, or the persecution of those who practice religions different from their own) or those who would oppress Americans of any race, gender, or sexual orientation...").

[36] Calculated using publicly available data from the U.S. State Department website. Visa Waiver Program countries are counted as countries from which visas are not required.

[37] Ted Hesson, "Trump administration introduces green card hurdle," *Politico*, August 25, 2017, http://www.politico.com/story/2017/08/25/trump-administration-green-card-hurdle-242050; Bier, "The Trump administration's stealth attack on legal immigration."

[38] Alex Nowrasteh, *Terrorism and Immigration: A Risk Analysis*, Cato Institute, 2016, No. 798, 5, https://object.cato.org/sites/cato.org/files/pubs/pdf/pa798_2.pdf.

[39] Emmanuelle Saliba, "You're More Likely to Die Choking Than Be Killed by Foreign Terrorists, Data Show," *NBC News*, February 1, 2017, https://www.nbcnews.com/news/us-news/you-re-more-likely-die-choking-be-killed-foreign-terrorists-n715141. Other striking comparative risk statistics: toddlers with guns killed more people than foreign terrorists in 2015. Christopher Ingraham, "People are getting shot by toddlers on a weekly basis this year," *Washington Post*, October 14, 2015, https://www.washingtonpost.com/news/wonk/wp/2015/10/14/people-are-getting-shot-by-toddlers-on-a-weekly-basis-this-year/?utm_term=.ea27df29d3d1; Kim LaCapria, "Toddlers Killed More Americans than Terrorists in 2015," Snopes, accessed September 15, 2017, http://www.snopes.com/toddlers-killed-americans-terrorists/; Gary Younge, "Trump fears terrorists, but more Americans are shot dead by toddlers," *Guardian*, February 8, 2017, https://www.theguardian.com/commentisfree/2017/feb/08/trump-muslim-terrorists-gun-violence-america-deaths. Since September 11, 2001, an average American has been as likely to be crushed by a television or furniture as a terrorist attack. Micah Zenko, "America Is a Safe Place," *Council on Foreign Relations* (blog), February 24, 2012, https://www.cfr.org/blog/america-safe-place.

[40] Nowrasteh, *Terrorism and Immigration: A Risk Analysis*, 13.

[41] One possible exception is Mohamad Hadayet, who opened fire at Los Angeles International Airport in 2002. For more details see, Eddy Rameriz, "Panel Probes LAX Gunman," *Los Angeles Times*, October 10, 2002, http://articles.latimes.com/2002/oct/10/local/me-lax10 (Immigration officials reportedly "doubted Hadayet was a peaceful man when he requested political asylum in 1992.").

[42] Tashfeen Malik entered the U.S. on July 27, 2014. She and Syed Rizwan Farook perpetrated the San Bernardino attacks on December 2, 2015 – just under a year and a half after Ms. Malik entered the U.S. Brian Ross et al., "Welcome to America: New Photo Shows San Bernardino Terror Couple Entering US," *ABC News*, December 7, 2015, http://abcnews.go.com/US/america-photo-shows-terror-couple-entering-us/story?id=35615829.

[43] Nowrasteh, *Terrorism and Immigration: A Risk Analysis*, 8. The statistic takes into account only visas types that have been used by terrorists to enter the U.S.

[44] 82 Fed. Reg. 13212, § 1(h) (emphasis added). The order appears to be referencing a study overseen by then-Senator Jeff Sessions, which purportedly shows that there have been more than 380 convictions of foreign-born people on terrorism-related charges from September 11, 2001 through the end of 2014. Analyses by the Brennan Center and the Cato Institute have shown that this number is significantly inflated. First, the Sessions study covers "terrorism-related" charges, which encompass crimes that might start on a terrorism tip but end in something wholly unrelated – one of the listed cases involves a conviction for receiving stolen cereal shipments, because the initial investigation stemmed from unfounded information on possible arms purchases. Alex Nowrasteh, "42 Percent of 'Terrorism-Related' Convictions Aren't for Terrorism," *CATO at Liberty* (blog*), Cato Institute*, March 6, 2017, https://www.cato.org/blog/42-percent-terrorism-related-convictions-arent-terrorism; In fact, only about half of the convictions included in the Sessions study are actually for terrorism offenses. Andrew Lindsay, "What the Data Tells Us About Immigration and Terrorism," *Brennan Center for Justice* (blog), February 17, 2017, https://www.brennancenter.org/blog/what-data-tells-us-about-immigration-and-terrorism. And even among the terrorism convictions included in Sessions' study, most did not involve any kind of attack in the U.S. but were charges of "material support" for terrorism, which are cases where money, goods or other resources were provided to someone associated with a U.S. designated terrorist group. Ibid.

[45] Department of Justice, "Former Iraqi Terrorists Living in Kentucky Sentenced for Terrorist Activities," news release, January 29, 2013, https://www.justice.gov/opa/pr/former-iraqi-terrorists-living-kentucky-sentenced-terrorist-activities.

[46] Brief of Former Nat'l Sec. Officials as Amicus Curiae in Support of Plaintiff-Appellees at 8, *Hawaii v. Trump*, 859 F.3d 741 (no. 16-1540) (Docket No. 108), available at http://cdn.ca9.uscourts.gov/datastore/general/2017/04/20/17-15589%20Former%20National%20Security%20Officials%20Amicus.pdf.

[47] Office of Intelligence & Analysis, U//FOUO: Most Foreign-born, US-Based Violent Extremists Radicalized after Entering Homeland; Opportunities for Tailored CVE Programs Exist, Department of Homeland Security, IA-0091-12, 2017, 1, http://i2.cdn.turner.com/cnn/2017/images/03/03/dhs.intell.assessment.pdf.

[48] Robert A. Lawson and Saurav Roychoudhury, "Do Travel Visa Requirements Impede Tourist Travel?," Journal of Economics and Finance 40:4, 816-828, 825 (2016).

[49] Ron Nixon and Jasmine C. Lee, "Getting a Visa to Visit the U.S. Is a Long and Extensive Process for Most," New York Times, March 16, 2017, https://www.nytimes.com/interactive/2017/03/16/us/visa-process-united-states.html; David Muir, Christine Brouwer, and Maggy Patrick, "Made in America: Visa Process Slows Down Tourism," ABC News, October 31, 2011, http://abcnews.go.com/US/made-america-visa-process-slowing-tourism/story?id=14853459; American Immigration Council, Why Don't They Just Get In Line? There Is No Line for Many Unauthorized Immigrants, American Immigration Council, 2016, https://www.americanimmigrationcouncil.org/sites/default/files/research/why_dont_they_just_get_in_line_and_come_legally.pdf.

[50] "DS-160 Nonimmigration Visa Application Form: A Complete Step-by-step Instructional Guide," U.S. Embassy Kingston, Jamaica (PowerPoint Presentation), https://photos.state.gov/libraries/jamaica/231771/PDFs/DS-160%20Instructions.pdf; "Safety & Security of U.S. Borders: Biometrics," Department of State – Bureau of Consular Affairs, accessed September 17, 2017, https://travel.state.gov/content/visas/en/general/border-biometrics.html; "USA Visitor Visa - Visitor Documents," Immihelp, accessed September 21, 2017, https://www.immihelp.com/visitor-visa/visitor-documents.html.

[51] Immigration and Nationality Act (INA) of June 27, 1952, Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified as amended in scattered sections of 8 U.S.C.).

[52] INA § 214 (b) (amended as codified in 8 U.S.C. § 1184 (b) (An applicant "shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status."). Failure to meet this burden is by far the most common basis for the denial of a nonimmigrant visa application. "Table XX: Immigrant and Nonimmigrant Visa Ineligibilities (by Grounds for Refusal Under the Immigration and Nationality Act) Fiscal Year 2016," Department of State – Bureau of Consular Affairs, accessed September 18, 2017, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16AnnualReport-TableXX.pdf (approximately 2.8 million out of 3.7 million findings of nonimmigrant ineligibility in fiscal year 2016 were related to "failure to establish entitlement to nonimmigration status" according to section 214(b) of the INA). For all visa applications for admission to the U.S. the burden of proof is on the person applying "to the satisfaction of the consular officer that he is eligible to receive a visa or other document required for entry." INA § 214 (b) (codified as amended in 8 U.S.C. § 1361); Department of State, INA 214 (b), Basis of Refusal Not Equivalent to Inadmissibility or Immigrant Intent, by Collin Powell, UNCLAS STATE 274068, ¶ 9, http://www.nafsa.org/uploadedFiles/dos_cable_reviews_policy.pdf?n=8421.

[53] "Visitor Visa," Department of State – Bureau of Consular Affairs, accessed September 19, 2017, https://travel.state.gov/content/visas/en/visit/visitor.html (see section "Additional Documentation May Be Required"); "Business/Tourist Visa: Supporting Documents," U.S. Travel Documents, accessed September 19, 2017, http://www.ustraveldocs.com/in/in-niv-typeb1b2.asp#supportingdocs (affiliate of the Department of State).

[54] Department of State, "Ineligibilities and Grounds for Refusals," 9 Foreign Affairs Manual 301.4, https://fam.state.gov/fam/09FAM/09FAM030104.html (overviewing and linking to instructions for various grounds of refusal); INA § 212 (a) (codified as amended in 8 U.S.C. § 1182).

[55] INA § 214 (b).

[56] "Ask the State Department: Andrew Simkin," Department of State (Archives), modified February 2, 2006, accessed September 17, 2017, https://2001-2009.state.gov/r/pa/ei/ask/79932.htm.

[57] Doris Meissner et al., Immigration Enforcement in the United States: The Rise of a Formidable Machine, Report in Brief, Migration Policy Institute, 2013, 13, http://www.migrationpolicy.org/pubs/pillars-reportinbrief.pdf.

[58] Hearing on "Overturning 30 Years of Precedent: Is the Administration Ignoring the Dangers of Training Libyan Pilots and Nuclear Scientists," Before the House Committee on the Judiciary Subcommittee on Immigration and Border Security and House Committee on Oversight and Government Reform, Subcommittee on National Security, accessed April 3, 2014, https://www.dhs.gov/news/2014/04/03/written-testimony-plcy-joint-house-judiciary-and-house-oversight-and-government (written testimony of PLCY Office of International Affairs Assistant Secretary and Chief Diplomatic Officer Alan Bersin).

[59] Jerome P. Bjelopera, Bart Elias, and Alison Siskind, *The Terrorist Screening Database and Preventing Terrorist Travel*, Congressional Research Service, R44678, 2016, 10, https://fas.org/sgp/crs/terror/R44678.pdf. The National Counterterrorism Center "leads the way for the USG in terms of analyzing, understanding, and responding to the terrorist threat." "What We Do," National Counterterrorism Center, accessed September 22, 2017, https://www.dni.gov/index.php/nctc-what-we-do.

[60] Hearing on "The Homeland Threat Landscape and U.S. Response" Before the S. Comm. On Homeland Security and Governmental Affairs, November 14, 2013 (testimony of Matthew G. Olsen, Director, National Counterterrorism Center, available at https://www.hsgac.senate.gov/download/?id=4832A095-4FB4-4686-A689-0E14FC665CE9; National Counterterrorism Center, Terrorist Identities Datamart Environment (TIDE) Fact Sheet, , accessed September 22, 2017, https://www.dni.gov/files/Tide_Fact_Sheet.pdf ("The Terrorist Identities Datamart Environment (TIDE) is the US Government's (USG) central repository of information on international terrorist identities.").

[61] Department of State, "Briefing on the Current K-1 Visa Screening Process and Review," news release, December 17, 2015, accessed September 22, 2017, https://2009-2017.state.gov/r/pa/prs/ps/2015/12/250747.htm.

[62] Hearing on "From the 9/11 Hijackers to Amine El-Khalifi: Terrorists and the Visa Overstay Problem" Before the House Committee on Homeland Security Subcommittee on Border and Maritime Security, March 6, 2012, 3, https://homeland.house.gov/files/Testimony%20Donahue.pdf (written statement of David Donahue, Deputy Assistant Secretary for Visa Services, Department of State).

[63] Ibid., 4.; Hearing on "TSC's Role in the Interagency Watchlisting and Screening Process," Before the House Homeland Security Committee, Subcommittee on Transportation Security, September 18, 2014, https://www.fbi.gov/news/testimony/tscs-role-in-the-interagency-watchlisting-and-screening-process (statement by Christopher M. Piehota, Director, Terrorist Screening Center, Federal Bureau of Investigations).

[64] Hearing on "From the 9/11 Hijackers to Amine El-Khalifi: Terrorists and the Visa Overstay Problem" Before the House Committee on Homeland Security Subcommittee on Border and Maritime Security, March 6, 2012, 1, https://homeland.house.gov/files/Testimony%20Donahue.pdf (written statement of David Donahue, Deputy Assistant Secretary for Visa Services, Department of State); Ruth Ellen Wasem, *Immigration: Visa Security Policies*, Congressional Research Service, R43589, 2015, 6, https://fas.org/sgp/crs/homesec/R43589.pdf (summary)

[65] Hearing on "Marriage Fraud," Before the Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/03-15-17%20Donahue%20Testimony.pdf (written testimony of David Donahue, Acting Assistant Secretary of State, Bureau of Consular Affairs, Department of State).

[66] Please see notes 106 and 107 below for further discussion on the pros and cons of biometric systems as they are currently employed.

[67] "Office of Biometric Identity Management Identification Services," Department of Homeland Security, accessed September 17, 2017, https://www.dhs.gov/obim-biometric-identification-services.

[68] "Safety & Security of U.S. Borders: Biometrics," Department of State – Bureau of Consular Affairs, accessed September 17, 2017, https://travel.state.gov/content/visas/en/general/border-biometrics.html. This is an inflexible requirement: applicants who arrive at a consulate or embassy to be fingerprinted with cuts or blisters on any of their fingers or thumbs will not have their application processed. For more details see, for example, "The Interview," U.S. Embassy & Consulates in the United Kingdom, accessed September 17, 2017, https://uk.usembassy.gov/visas/tourism-visitor/the-interview/. Countries whose citizens do not require visas to enter the U.S. must issue passports that contain biometric identifiers. Department of State – Bureau of Consular Affairs, "Visa Waiver Program," accessed September 19, 2017, https://travel.state.gov/content/visas/en/visit/visa-waiver-program.html ("[Y]ou must have an e-passport to use the VWP."); "e-Passports," Department of Homeland Security, accessed September 19, 2017, https://www.dhs.gov/e-passports ("An e-Passport also contains a biometric identifier.").

[69] Kenneth Gantt and Jonathan Cantor, *Privacy Impact Assessment for the Automated Biometric Identification System (IDENT)*, Department of Homeland Security, 2012, 4-5, https://www.dhs.gov/sites/default/files/publications/privacy/PIAs/privacy_pia_usvisit_ident_appendixj_jan2013.pdf. Databases of known or suspected terrorists have long been criticized as being bloated and inaccurate, meaning that many more people are likely to be tagged as positive matches than likely have any connection to terrorism. For more details see, for example, Jeremy Scahill and Ryan Devereaux, "The Secret Government Rulebook for Labelling You a Terrorist," *Intercept*, July 23, 2014, https://theintercept.com/2014/07/23/blacklisted/; Jeremy Scahill and Ryan Deveraux, "Watch Commander: Barack Obama's Secret Terrorist-Tracking System, By the Numbers," *Intercept*, August 5, 2014, https://theintercept.com/2014/08/05/watch-commander/; American Civil Liberties Union,

*U.S. Government Watchlisting: Unfair Process and Devastating Consequences,* American Civil Liberties Union, March 2014, https://www.aclu.org/other/us-government-watchlisting-unfair-process-and-devastating-consequences.
[70] Data from Passenger Name Record (PNR) agreement has reportedly been useful to homeland security officials. For more details see *Ten Years After 9/11: Are We Safer?: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs,* 112th Congress 403 (2011) (testimony of Janet Napolitano, former Secretary, Department of Homeland Security, at 10, available at https://www.hsdl.org/?view&did=733983) ("During 2008 and 2009, PNR helped the United States identify individuals with potential ties to terrorism in more than 3,000 cases, and in Fiscal Year 2010, approximately one quarter of those individuals denied entry to the United States for having ties to terrorism were initially identified through the analysis of PNR."). However, the sharing of PNR information has been widely criticized as violating privacy and opening the door to discrimination – in July 2017, the European Court of Justice struck down a proposed PNR agreement between the E.U. and Canada as contrary to fundamental EU rights, including those relating to privacy and data protection. Opinion of Advocate General Mengozzi in Opinion 1/15 (Request for an opinion submitted by the European Parliament), delivered on 8 September 2016, ECLI:EU:C:2016:656, ¶ 328, https://tinyurl.com/y7abnerj. This suggests that the E.U/U.S. PNR agreement – with laxer data use and retention restrictions – is in legal danger. Kenneth Propp, "The Coming Threat to Trans-Atlantic Data Transfer Agreements," *Lawfare,* June 8, 2016, https://www.lawfareblog.com/needles-haystacks-coming-threat-trans-atlantic-data-transfer-agreements.
[71] Thomas Bush and Mary Ellen Callahan, *Privacy Impact Assessment for the Automated Targeting System,* Department of Homeland Security, 2012, 6, https://www.dhs.gov/xlibrary/assets/privacy/privacy_pia_cbp_ats006b.pdf (the State Department can use ATS-P to vet visa applications).
[72] "FAQ: Administrative Processing," Maggio+Kattar and the Dickinson School of Law at Pennsylvania State University, accessed September 17, 2017, http://www.maggio-kattar.com/sites/default/files/FAQ%20FINAL%20%282%29_0.pdf.
[73] "Administrative Processing Information," Department of State – Bureau of Consular Affairs, accessed September 17, 2017, https://travel.state.gov/content/visas/en/general/administrative-processing-information.html.
[74] Liam Schwartz, Avi Friedman, and Anastasia Tonello, "'DOs' And 'DON'Ts' For Attorneys Representing Visa Applicants (And for Consular Officers, Too!)," from *Immigration Practice Pointers,* American Immigration Lawyers Association, 2010, 530, http://www.ailawebcle.org/resources/Resources%20for%209-13-11%20Seminar.pdf ("Don't anticipate a quick resolution for a Visas Donkey SAO."); "Security Advisory Opinions," Dinsmore Immigration Law, accessed September 6, 2017, http://immigration.dinsmore.com/faq/travel/security-advisory-opinions ("Visas Donkey is requested when there is a direct 'hit' on the visa applicant's name in the CLASS system. This type of SAO is requested if, for example, the applicant's name is a direct match to that of a known terrorist.").
[75] *Threats to the Homeland: Hearing Before the S. Comm. On Homeland Security and Governmental Affairs,* 113th Cong. 426 (2013) (testimony of Matthew G. Olsen, Director, National Counterterrorism Center), at 9-10; "Terrorist Identities Datamart Environment (TIDE)," National Counterterrorism Center, accessed September 17, 2017, https://www.dni.gov/files/NCTC/documents/features_documents/TIDEfactsheet10FEB2017.pdf.
[76] Department of State, "Briefing on the Current K-1 Visa Screening Process and Review."
[77] Additional statements making clear Trump's intention to keep Muslims out of America can be found in: David Bier, "A Dozen Times Trump Equated his Travel Ban with a Muslim Ban," CATO at Liberty (Blog, Cato Institute, August 14, 2017, https://www.cato.org/blog/dozen-times-trump-equated-travel-ban-muslim-ban; Alan Gomez, "What President Trump has said about the travel ban," *USA Today,* June 11, 2017, https://www.usatoday.com/story/news/politics/2017/06/11/what-president-trump-has-said-about-muslims-travel-ban/102565166/; Hawaii v. Trump, 241 859 F.3d 741, at n. 14; *Int'l Refugee Assistance Project v. Trump,* 15-1351, at 18-23.
[78] Fred Barbash, "Muslim ban language suddenly disappears from Trump campaign website after Spicer questions," *The Washington Post,* May 9, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/05/09/trumps-preventing-muslim-immigration-vow-disappears-from-campaign-website-after-spicer-questioned/?utm_term=.0fd2951989b8.

[79] Alan Gomez, "What President Trump has said about the travel ban," USA Today, June 11, 2017, https://www.usatoday.com/story/news/politics/2017/06/11/what-president-trump-has-said-about-muslims-travel-ban/102565166/.

[80] "Transcript of the Second Debate," New York Times, October 10, 2016, https://www.nytimes.com/2016/10/10/us/politics/transcript-second-debate.html?mcubz=1&_r=0.

[81] "Meet the Press – July 24, 2016," NBC News, July 24, 2016, https://www.nbcnews.com/meet-the-press/meet-press-july-24-2016-n615706.

[82] Daniel White, "Read Donald Trump's Ohio Speech on Immigration and Terrorism," Time, August 15, 2016, http://time.com/4453110/donald-trump-national-security-immigration-terrorism-speech/.

[83] "Exclusive Interview with Donald Trump," Anderson Cooper 360 Degrees, CNN, March 9, 2016, http://www.cnn.com/TRANSCRIPTS/1603/09/acd.01.html.

[84] Mathew Wisner, "Donald Trump Calls for End of Visa Waiver Program," FOX Business, March 22, 2016, http://www.foxbusiness.com/politics/2016/03/22/donald-trump-calls-for-end-visa-waiver-program.html.

[85] Katie Reilly, "Donald Trump on Proposed Muslim Ban: 'You Know My Plans,'" Time, December 21, 2016, http://time.com/4611229/donald-trump-berlin-attack/.

[86] Hawaii v. Trump, 241 F.Supp.3d at 1126.

[87] Natasha Bertrand, "Giuliani: Trump asked me how to do a Muslim ban 'legally,'" Business Insider, January 29, 2017, http://www.businessinsider.com/giuliani-trump-asked-me-how-to-do-a-muslim-ban-legally-2017-1.

[88] "Adjusted Refusal Rate – B-Visas Only by Nationality Fiscal Year 2016," Department of State, accessed September 17, 2017, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/RefusalRates/FY16.pdf.

[89] Department of State, "Timeliness of Interview," 9 Foreign Affairs Manual 504.7-2(b), available at https://fam.state.gov/fam/09FAM/09FAM050407.html. Though temporary visa interviews typically last a few minutes, the State Department estimates that applicants will spend a longer time at the consulate while application materials are reviewed and processed. For more details see, for example, "Day of the Interview," U.S. Embassy & Consulates in the United Arab Emirates, accessed September 19, 2017, https://uk.usembassy.gov/visas/tourism-visitor/the-interview/. Moreover, the interview is highly significant because it is the point when pieces of the application come together to give the adjudicator a chance to verify claims within provided materials and fill in informational gaps. The process is not perfunctory: consular officers must take notes, and create a "detailed record of the interview" when decisions are difficult or controversial so that "the basis for final action can be fully documented." Department of State, "How to Conduct Visa Interviews," 9 Foreign Affairs Manual 403.5 -3, https://fam.state.gov/searchapps/viewer?format=html&query=u&links=U&url=/FAM/09FAM/09FAM040305.html.

[90] "Ask the State Department: Andrew Simkin," Department of State (Archives) ("The techniques that consular officers use to fight fraud are varied. Probably the best technique is simple: the personal interview.").

[91] Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3735 Sec. 5301 (2004) (requires, subject to such limited exceptions, "every alien applying for a nonimmigrant visa" between the ages of 14 and 79 to be interviewed); The Security of U.S. Visa Programs: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs, 114th Cong. (2016) (written statement of David T. Donahue, Principal Deputy Assistant Secretary for Consular Affairs, Department of State, available at https://www.hsdl.org/?view&did=796753) ("The vast majority of visa applicants are interviewed by a consular officer.").

[92] Intelligence Reform and Terrorism Prevention Act of 2004; The Security of U.S. Visa Programs: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs, 114th Cong. (2016) (written statement of David T. Donahue, Principal Deputy Assistant Secretary for Consular Affairs, Department of State).

[93] The Security of U.S. Visa Programs: Hearing Before the S. Comm. on Homeland Security and Governmental Affairs, 114th Cong. (2016) (written statement of David T. Donahue, Principal Deputy Assistant Secretary for Consular Affairs, Department of State, at 5-6).

[94] "Ask the State Department: Andrew Simkin," Department of State (Archives); Department of State, "Interview by Consular Officer," 9 Foreign Affairs Manual 504.7-3(A)(d), https://fam.state.gov/fam/09FAM/09FAM050407.html.

[95] Kerry v. Din, 135 U.S. 2128, 2141 (2015). For a detailed explanation of the doctrine of consular nonreviewability as applied in Kerry v. Din see Jungmin Choi, "Doctrine of Consulate Nonreviewability After Kerry v. Din," Law360, November 18, 2015, https://www.law360.com/articles/728556/doctrine-of-consulate-nonreviewability-after-kerry-v-din. However, consular managers are supposed to review as many nonimmigrant visa denials as possible, but not fewer than 20 percent of them – this is intended to "ensure uniform and correct application of law

and regulations." Department of State, "(U) NIV Refusal Review Procedures," 9 Foreign Affairs Manual 403.10-3(D)(1), https://fam.state.gov/fam/09FAM/09FAM040310.html.

[96] Donald Trump, "Full text: Donald Trump's speech on fighting terrorism," *Politico,* August 15, 2016, http://www.politico.com/story/2016/08/donald-trump-terrorism-speech-227025; Donald Trump, "Transcript of Donald Trump's Immigration Speech," *New York Times,* September 1, 2016, https://www.nytimes.com/2016/09/02/us/politics/transcript-trump-immigration-speech.html?mcubz=1&_r=0.

[97] Proclamation No. 9645, 5, § 1(c)(iii).

[98] Donald Trump (@realdonaldtrump), "In any event we are EXTREME VETTING people coming into the U.S. in order to help keep our country safe. The courts are slow and political!," Twitter, June 5, 2017, 3:44 a.m., https://twitter.com/realdonaldtrump/status/871679061847879682?lang=en; "President Trump Ranted for 77 Minutes in Phoenix. Here's What He Said," *Time*; Office of the Press Secretary, "Press Briefing by Principal Deputy Press Secretary Sarah Sanders and VA Secretary David Shulkin, 6/5/2017," White House, June 5, 2017, https://www.whitehouse.gov/the-press-office/2017/06/05/press-briefing-principal-deputy-press-secretary-sarah-sanders-and-va (Deputy Press Secretary Sarah Sanders: "Extreme vetting is taking place.").

[99] This is not intended to suggest that the current system operates free of prejudice. Immigration advocates have pointed out that the criteria used to individually vet travelers already operate to disproportionally flag Muslims travelers for further scrutiny. Schwartz, Friedman, and Tonello, "'DOs' And 'DON'Ts' For Attorneys Representing Visa Applicants (And for Consular Officers, Too!)," at 530 ("A [person] with the name "Mohammad Khan" or "Muhammad Ali" will very likely be subject to a Donkey clearance."). Even, Trump administration policies appear to reinforce and institutionalize bias.

[100] The information in Table II is drawn from § 2 of Proclamation No. 9645.

[101] Exec. Order 13780, 82 Fed. Reg. 13,209, 13,212 (§ 2(b)) (March 6, 2017). Countries are also required to "accept the repatriation of their nationals who are subject to a final order of removal in the United States and provide travel documents to facilitate their removal." 17 STATE 7200, ¶ 9. Recently, the administration announced that it would not issue certain visas to citizens of Cambodia, Eritrea, Guinea, and Sierra Leone for failure to allow for such repatriation. Department of Homeland Security, "DHS Announces Implementation of Visa Sanctions on Four Countries," released September 13, 2017, accessed September 19, 2017, https://www.dhs.gov/news/2017/09/13/dhs-announces-implementation-visa-sanctions-four-countries.

[102] 17 STATE 7200, ¶ 5 ("The [information sharing] standards [related to identity management and security and public safety threats] reflect a mix of long-standing U.S. government goals and standards established by international bodies such as the United Nations (UN), the International Civil Aviation Organization (ICAO), and INTERPOL.")

[103] A series of U.N. Security Council resolutions relating to preventing terrorism encourage states to crack down on travel document fraud, enhance law enforcement coordination, and exchange information on threats. 17 STATE 7200, ¶ 9 ("These standards ... reinforce UN Security Council Resolutions 1373, 1624, 2178, and 2322, which call on all member states to cooperate in sharing information on the movements of terrorists and require all states to prevent the movement of terrorists or terrorists groups through effective border controls and controls on the issuance of identity papers and travel documents."); For more details see also S.C. Res. 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001); S.C. Res. 1624, U.N. Doc. S/RES/1624 (Sept. 14, 2005); S.C. Res. 2322, U.N. Doc. S/RES/2322, (Dec. 12, 2016). Improving such cooperation was also a key recommendation of the 9/11 Commission. 9/11 Commission, *9/11 Commission Report,* 2004, 389, https://www.9-11commission.gov/report/911Report.pdf.

[104] 9/11 Commission, *9/11 Commission Report,* 389 ("The international community arrives at international standards for the design of passports through the International Civil Aviation Organization (ICAO)...We must work with others to improve passport standards and provide foreign assistance to countries that need help in making the transition."); *Ten Years after 9/11: Preventing Terrorist Travel* (written statement of Janice Jacobs, Assistant Secretary of State for Consular Affairs, Dept. of State, at 21, available at http://www.hsgac.senate.gov/download/2011-07-13-jacobs-testimony) ("With International Civil Aviation Organization (ICAO) member passport-issuing authorities around the globe, we have strived to ensure that, as with the U.S. passport, other issuing authorities meet internationally established standards for security and interoperability."). ICAO-compliant passports are required to use the Visa Waiver Program. Department of State – Bureau of Consular Affairs, "Visa Waiver Program" ("[Y]ou must have an e-passport to use the VWP.").

[105] "ePassport Validation," International Civil Aviation Organization, accessed September 20, 2017, https://www.icao.int/Security/FAL/PKD/Pages/ePassport-Validation.aspx; "ePassport Basics," International Civil Aviation Organization, accessed September 20, 2017,

https://www.icao.int/Security/FAL/PKD/Pages/ePassportBasics.aspx.https://www.icao.int/Security/FAL/PKD/Pages/ePassportBasics.aspx.

[106] While a full discussion of criticisms of these mechanisms is outside the purview of this report, we note two important issues here. First, there are privacy and civil liberties concerns that are associated with the increased collection of biometric data and expansion of terrorist watchlisting capabilities enabled by greater access to information on those labeled by foreign governments as terrorist threats. For more details see, for example, "Biometrics," American Civil Liberties Union, accessed September 19, 2017, https://www.aclu.org/issues/privacy-technology/surveillance-technologies/biometrics; Editors, "Biometric Security Poses Huge Privacy Risks," *Scientific American,* January 1, 2014, https://www.scientificamerican.com/article/biometric-security-poses-huge-privacy-risks/; Hugh Handeyside, "Numbers Tell the Story of Our Government's Watchlisting Binge," *American Civil Liberties Union* (blog), August 6, 2014, https://www.aclu.org/blog/national-security/numbers-tell-story-our-governments-watchlisting-binge?redirect=blog/numbers-tell-story-our-governments-watchlisting-binge; Katitza Rodriguez, "Biometric National IDs and Passorts: A False Sense of Security," *Electronic Frontier Foundation* (blog), June 19, 2012, https://www.eff.org/deeplinks/2012/06/biometrics-national-id-passports-false-sense-security. Second, there are outstanding operational issues with the International Civil Aviation Organization (ICAO)-prescribed technical standards, and their more harmonized application across countries is required to ensure that accompanying security benefits are fully realized. For more details see, for example, Daniel Morgan and William Krouse, *Biometric Identifiers and Border Security: 9/11 Commission Recommendations and Related Issues,* Congressional Research Service, RS21916, 2005, 6, https://fas.org/sgp/crs/homesec/RS21916.pdf; Antonia Rana and Luigi Sportiello, "Implementation of security and privacy in ePassports and the extended access control infrastructure," *International Journal of Critical Infrastructure Protection* 7:4, December 2014, 233-243, 242, http://www.sciencedirect.com/science/article/pii/S1874548214000614#bib1. Increased compliance with global standards, as the administration's "worldwide review" seeks to obtain, and a focus on improving the accuracy and security of biometric technology could address the latter set of concerns, but do not appear designed to address the need for privacy and due process safeguards.

[107] For more details see Raymond Benjamin, Secretary General, Doc 9303, *Machine Readable Travel Documents Part 9 – Deployment of Biometric Identification and Electronic Storage of Data in MRTDs,* International Civil Aviation Organization, 2015, 4, https://www.icao.int/publications/Documents/9303_p9_cons_en.pdf ("Biometrics can be used in the identification function to improve the quality of the background checking performed as part of the passport, visa or other travel document application process, and they can be used to establish a positive match between the travel document and the person who presents it."); "Biometrics," National Institute of Standards and Technology, modified July 13, 2017, accessed September 17, 2017, https://www.nist.gov/programs-projects/biometrics; "Why use of biometrics?" Government of Canada, modified October 19, 2012, accessed September 17, 2017, http://www.cic.gc.ca/english/department/biometrics-why.asp; "Biometrics," Department of Homeland Security, modified February 6, 2017, accessed September 17, 2017, https://www.dhs.gov/biometrics.
[108] "ePassport Basics," International Civil Aviation Organization, accessed September 26, 2017, https://www.icao.int/Security/FAL/PKD/Pages/ePassportBasics.aspx; "ICAO PKD Participants," International Civil Aviation Organization, accessed September 17, 2017, https://www.icao.int/Security/FAL/PKD/Pages/ICAO-PKDParticipants.aspx.

[109] Comptroller and Auditor General, *Identity and Passport Service: Introduction of ePassports,* National Audit Office, 2007, 14, https://www.nao.org.uk/wp-content/uploads/2007/02/0607152.pdf (In the U.K., ePassports set-up cost £63 million between 2005 to 2006, which was roughly a third of the £195 million allocated for passport production for the next five years.); David Lewis, "Congo's pricey passport scheme sends millions of dollars offshore," *Reuters,* April 13, 2017, http://www.reuters.com/investigates/special-report/congo-passports/ (In the Democratic Republic of Congo, contracts to produce of biometric passports were worth over $200 million, though the process was graft-ridden.); Isobel Leybold-Johnson, "Switzerland launches biometric passport," Swissinfo.ch, modified February 9, 2010, accessed September 21, 2017, https://www.swissinfo.ch/eng/switzerland-launches-biometric-passport/8233316.
[110] "ICAO PKD Participants," International Civil Aviation Organization.
[111] Ibid.
[112] 17 STATE 7200, ¶ 9.
[113] *Passport Fraud: An International Vulnerability: Hearing Before the Subcomm. on Border and Maritime Security of the H. Comm. On Homeland Security,* 113th Cong. 62 (2014) (statement of Shawn Bray, Director, Interpol Washington, at 1-2, available at http://docs.house.gov/meetings/HM/HM11/20140404/102057/HHRG-113-HM11-

Wstate-BrayS-20140404.pdf).

[114] For more details see, for example, *Passport Fraud: An International Vulnerability* (testimony of Alan D. Bersin, Assistant Secretary for International Affairs, Dept. of Homeland Security, and John P. Wagner, Acting Deputy Assistant Commissioner, U.S. Customs and Border Protection, at 2, 6, available at http://docs.house.gov/meetings/HM/HM11/20140404/102057/HHRG-113-HM11-Wstate-BersinA-20140404.pdf).

[115] Ibid. Obama administration officials had characterized the attainment of consistent reporting on stolen and lost passports from a range of wealthier countries as a "milestone." *Ten Years after 9/11: Preventing Terrorist Travel* (testimony of David Heyman, Assistant Secretary for Policy, Dept. of Homeland Security, available at https://www.dhs.gov/news/2011/07/13/testimony-david-heyman-assistant-secretary-policy-senate-committee-homeland-security).

[116] *Passport Fraud: An International Vulnerability* (statement of Shawn Bray, Director, Interpol Washington, 5, available at http://docs.house.gov/meetings/HM/HM11/20140404/102057/HHRG-113-HM11-Wstate-BrayS-20140404.pdf).

[117] 17 STATE 7200, ¶ 12.

[118] Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, Div. O, Title II, § 204(c) (codified as amended in 8 U.S.C. 1187(c)(2)(F)); Government Accountability Office, *Visa Waiver Program: DHS Should Take Steps to Ensure Timeliness of Information Needed to Protect U.S. National Security*, GAO-16-498, Government Accountability Office, 2016, 1-2, 8, https://www.gao.gov/assets/680/676948.pdf.

[119] *U.S. Department of State Counterterrorism Bureau: The FY 2018 Budget*, 115th Cong. 516 (2017) (written statement for the Record of Nathan A. Sales, Coordinator for Counterterrorism, Dept. of State, at 4, available at https://www.hsgac.senate.gov/download/?id=F40AF2FB-8D9A-4A67-B9B8-EF13120E29F5) (noting that the U.S. Government has signed "over 60" HSPD-6 model agreements [which facilitate terrorism-related information sharing]); "International Engagement Results: Information Sharing," Department of Homeland Security, accessed September 15, 2017, https://www.dhs.gov/international-engagement-results (noting that 37 countries have completed versions of Preventing and Combating Serious Crime Agreements [which facilitate criminal record information sharing]).

[120] *The Visa Waiver Program*, 114th Cong. 516 (2015) (testimony of Mark Koumans, Deputy Assistant Secretary for International Affairs, Dept. of Homeland Security, and Maureen Dugan, Deputy Executive Director, National Targeting Center, U.S. Customs and Border Protection, at 1-2, 6, available at https://www.hsgac.senate.gov/hearings/visa-waiver-program-implications-for-us-national-security) ("The VWP and all its elements are a vital part of a robust travel security program.").

[121] "U.S. Visa Waiver Program: Initial and Continuing Designation Requirements," Department of Homeland Security, accessed September 20, 2017, https://www.dhs.gov/visa-waiver-program; Government Accountability Office, *Visa Waiver Program: DHS Should Take Steps to Ensure Timeliness of Information Needed to Protect U.S. National Security*.

[122] 17 STATE 72000 (July 12, 2017), ¶ 6 (The State Department has told missions that "designated categories of foreign nationals" from countries that do not "provide[] the information requested or…an adequate plan" to provide it could be barred from entering United States). However, as mentioned in note 101, this administration has imposed similar travel sanctions for failure of countries to accept repatriation of their nationals. Department of Homeland Security, "DHS Announces Implementation of Visa Sanctions on Four Countries."

[123] H.R. Rep. No. 85-1199, pt. 2 (1957), *reprinted in* 1957 U.S.C.C.A.N. 2016, 2020 ("The legislative history of the immigration and nationality act clearly indicates that the congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of united states citizens and immigrants united."); "United States Citizenship and Immigration Services, Green Card for Family Members of a Permanent Resident," U.S. Citizenship and Immigration Services, accessed September 26, 2017, https://my.uscis.gov/exploremyoptions/family_member_green_card ("To promote family unity, immigration law … certain eligible family members to obtain immigrant visas to come and live permanently in the United States…"); Gabriel "Jack" Chin, "The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965," *North Carolina Law Review* 75:273, 1996, 297-298; Peter Margulies, "The New Travel Ban: Undermining the Immigration and Nationality Act," *Lawfare* (blog), September 25, 2017, accessed September 26, 2017, https://www.lawfareblog.com/new-travel-ban-undermining-immigration-and-nationality-act ("For decades, family reunification has been a central goal of the INA, which removed national origin quotas that had been in place for forty years.").

[124] Jie Zone and Jeanne Batalova, "Green-Card Holders and Legal Immigration to the United States," *Migration*

*Policy Institute,* October 1, 2015, http://www.migrationpolicy.org/article/green-card-holders-and-legal-immigration-united-states ("During the last decade, family-based immigration has represented between 60 percent and 70 percent of total lawful permanent immigration.").

[125] Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087–88, 198 L. Ed. 2d 643 (2017) (recognizing the delay of entry into the U.S. of plaintiffs' family members caused by Executive Order 13780 as a legal harm).

[126] Ibid.

[127] Proclamation No. 9645, 9, § 1(h)(ii).

[128] "The Immigrant Visa Process," Department of State – Bureau of Consular Affairs, accessed September 26, 2017, https://travel.state.gov/content/visas/en/immigrate/immigrant-process.html.

[129] Bier, "The Trump administration's stealth attack on legal immigration."

[130] The Immigrant Visa Process," Department of State – Bureau of Consular Affairs.

[131] Nora Ellingsen and Lisa Daniels, "What the Data Really Shows About Terrorists Who "Came Here," Part II: A Country-by-Country Analysis," Lawfare, April 11, 2017, https://www.lawfareblog.com/what-data-really-show-about-terrorists-who-came-here-part-ii-country-country-analysis.

[132] *Passport Fraud: An International Vulnerability* (testimony of Alan D. Bersin, Assistant Secretary for International Affairs, Dept. of Homeland Security, and John P. Wagner, Acting Deputy Assistant Commissioner U.S. Customs and Border Protection, 3, available at http://docs.house.gov/meetings/HM/HM11/20140404/102057/HHRG-113-HM11-Wstate-BersinA-20140404.pdf) ("[S]ome of the most populous countries in the world including China, India, and Indonesia, have contributed few—if any—records to the SLTD database."); *Passport Fraud: An International Vulnerability* (statement of Brenda Sprague, Deputy Assistant Secretary for Passport Services, 5, available at http://docs.house.gov/meetings/HM/HM11/20140404/102057/HHRG-113-HM11-Wstate-SpragueB-20140404.pdf) ("We believe approximately 70 percent of the SLTD's current data comes from VWP [Visa Waiver Program] countries.").

[133] For more details see, for example, Government Accountability Office, *Visa Waiver Program: DHS Should Take Steps to Ensure Timeliness of Information Needed to Protect U.S. National Security*, 15-17. Signing HSPD-6 and PCSC agreements are among the preconditions for participating in the Visa Waiver Program, whose participants are overwhelmingly developed, European countries. GAO found that, as of May 2016, about a third of these countries were not sharing information as those agreements require. Ibid, 11, 14.

[134] Nahal Toosi and Ted Hesson, "New directive may expand Trump travel ban," *Politico,* July 13, 2017, http://www.politico.com/story/2017/07/13/trump-travel-ban-could-soon-be-applied-worldwide-240539.

[135] For examples of articulated concerns, see "Trump Vetting Review Could Lead to 'Backdoor' Travel Ban," *USA Today,* June 22, 2017, https://www.usatoday.com/story/news/world/2017/06/22/trump-vetting-review-backdoor-travel-ban/419213001/.

[136] Proclamation No. 9645, 6, § 1(e).

[137] Ibid. at 6, § 1(g).

[138] Ibid. at 10, § 1(i) ("Somalia generally satisfies the information-sharing requirements of the baseline described in subsection (c) of this section…").

[139] Amy Davidson Sorkin, "What Does Trump's New Travel Ban Mean For the Supreme Court," *New Yorker,* September 25, 2017, https://www.newyorker.com/news/amy-davidson-sorkin/what-does-trumps-new-travel-ban-mean-for-the-supreme-court.

[140] Proclamation No. 9645, 9, § 1(h)(iii).

[141] *Hawaii v. Trump,* 241 F.Supp.3d at 1129.

[142] This table includes figures on total nonimmigrant U.S. visa types issued to foreign states. Department of State – Bureau of Consular Affairs, "FY 2016 Nonimmigrant Visas Issues,"accessed September 26, 2017, https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY16%20NIV%20Detail%20Table.pdf. This table includes figures on U.S. immigrant visas issued to foreign states. Department of State – Bureau of Consular Affairs, "Table XIV: Immigrant Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories) Fiscal Years 2007-2016," accessed September 26, 2017, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16AnnualReport-TableXIV.pdf. Data from the tables above were used in combination with the visa issuance types exempted from Executive Order 13780 and Proclamation 9645 to calculate the total number of individuals in the new policy banned from entry.

[143] Ibid.

[144] Proclamation No. 9645, 14-15, § 2(f)(ii).

[145] Ibid. at 9-10, § 1(h)(iii).

[146] Ibid. at 6-7, 12, 16, §§ 1(g), 2(b), 2(h).

[147] Yeganeh Torbati, Mica Rosenberg, and Arshad Mohammed, "Exclusive: U.S. embassies ordered to identify population groups for tougher visa screening," *Reuters*, March 23, 2017, http://www.reuters.com/article/us-usa-immigration-visas-exclusive/exclusive-u-s-embassies-ordered-to-identify-population-groups-for-tougher-visa-screening-idUSKBN16U12X.

[148] 82 Fed. Reg. 36,180 (August 3, 2017).

[149] Ibid.

[150] Department of State, "Table XVIII Nonimmigrant Visas Issued by Nationality (Including Border Crossing Cards) Fiscal Year 2007-2016," *Report of the Visa Office 2016*, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16AnnualReport-TableXVIII.pdf. Please see note 142 for reference to immigrant visa data.

[151] "FY 2016 Nonimmigrant Visas Issues," Department of State – Bureau of Consular Affairs; "Table XIV: Immigrant Visas Issued at Foreign Service Posts (by Foreign State Chargeability) (All Categories) Fiscal Years 2007-2016," Department of State – Bureau of Consular Affairs; Alex Nowrasteh, "New Trump Executive Order Fails Cost-Benefit Test," *Cato at Liberty* (blog), *Cato Institute*, September 25, 2017, https://www.cato.org/blog/new-trump-executive-order-fails-cost-benefit-test.

[152] 17 STATE 24324, ¶ 9-14. These new vetting requirements came about through a series of State Department Cables starting March 10, 2017, and Information Collection Requests posted in the Federal Register memorializing aspects of those cables. The first two cables initially implemented the order in whole, but State Department in a subsequent cable halted instructions applicable specifically to nationals of the travel ban countries after the District of Hawaii enjoined Sections 2 and 6 of Executive Order 13780. The final cable of this series largely reaffirmed previous guidance but told consular officers to hold off on asking applicants specific questions highlighted in the previous cables – for example, for 15 years of travel history – until Office of Management and Budget (OMB) approval was received for those questions. Torbati, Rosenberg, and Mohammed, "Exclusive: U.S. embassies ordered to identify population groups for tougher visa screening." Those questions were provisionally approved through OMB on May 25, 2017 valid through November 2017, and were submitted for permanent approval on August 3, 2017. The initial period for public comments on the information collection was set to expire on October 2, 2017. 82 Fed. Reg. 20,956 (May 4, 2017); 82 Fed. Reg. 36,180 (August 3, 2017).

[153] Brief of Former Nat'l Sec. Officials as Amicus Curiae in Support of Plaintiff-Appellees at 13, 28, *Hawaii v. Trump*, 859 F.3d 741 (2017).

[154] Department of Homeland Security, "Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States," Draft Report Obtained by *Associated Press*, February 24, 2017, https://assets.documentcloud.org/documents/3474730/DHS-intelligence-document-on-President-Donald.pdf.

[155] *Int'l Refugee Assistance Project v. Trump*, 857 F.3d at 596; *Hawaii v. Trump*, 859 F.3d at 771.

[156] Faiza Patel and Meghan Koushik, *Countering Violent Extremism*, Brennan Center for Justice, 2017, 10-11, https://www.brennancenter.org/sites/default/files/publications/Brennan%20Center%20CVE%20Report.pdf.

[157] "Letter from Foreign Policy Experts on Travel Ban," *New York Times*, March 11, 2017, https://www.nytimes.com/interactive/2017/03/11/us/politics/document-letter-foreign-policy-trump.html?mtrref=www.nytimes.com. Indeed, pro-ISIS social media accounts are reportedly already using the Muslim ban vindicate the claim that the U.S. is at war with Islam and stoke anti-American sentiments. Joby Warrick, "Jihadist groups hail Trump's travel ban as a victory," *Washington Post*, January 29, 2017, https://www.washingtonpost.com/world/national-security/jihadist-groups-hail-trumps-travel-ban-as-a-victory/2017/01/29/50908986-e66d-11e6-b82f-687d6e6a3e7c_story.html?utm_term=.b834ad9dbe23.

[158] Glenn Kessler, "Trump's Claim that Obama First 'Identified' the 7 Countries in his Travel Ban," *Washington Post*, February 7, 2017, https://www.washingtonpost.com/news/fact-checker/wp/2017/02/07/trumps-claim-that-obama-first-identified-the-seven-countries-in-his-travel-ban/?utm_term=.164ad2ca02b0.

[159] "Visa Waiver Program," Department of State – Bureau of Consular Affairs.

[160] Ibid. "Nationals of VWP countries who are also nationals of Iran, Iraq, Sudan, or Syria" are not eligible for visa-free travel to the U.S.

[161] David Inserra, "EU threatens retaliation against U.S. travelers," *Washington Times*, March 21, 2016, http://www.washingtontimes.com/news/2016/mar/21/david-inserra-eu-threatens-retaliation-against-us-/.

[162] Sarah Parvini, "Silicon Valley Fears European Backlash After Congress Limits Visa Waiver Program," *Los Angeles Times,* March 14, 2016, http://www.latimes.com/local/california/la-me-visa-waiver-changes-20160314-story.html;

[163] Office of U.S. Senator Jeff Flake, "Senators to Introduce Bipartisan Fix to Dual National Visa Waiver Ban," news release, January 13, 2016, accessed September 19, 2017,
https://www.flake.senate.gov/public/index.cfm/2016/1/senators-to-introduce-bipartisan-fix-to-dual-national-visa-waiver-ban.

[164] Deirdre Walsh, "House Passes Visa Waiver Overhaul," *CNN,* December 8, 2015,
http://www.cnn.com/2015/12/08/politics/visa-waiver-program-house/index.html.

[165] Applicants are asked to provide these details if the officer believes they "have been in an area while the area was under the operational control of a terrorist organization." 82 Fed. Reg. 36,181 (August 3, 2017). As the ACLU has pointed out, however, there is no information on how an officer will determine that it "appears" that the applicant was in a region which was under the operational control of a terrorist organization while the applicant was there. American Civil Liberties Union, Comment Submission Regarding Notice of Information Collection under OMB Review: Supplemental Questions for Visa Applicants for Department of State Office of Information and Regulatory Affairs and Visa Office, Bureau of Consular Affairs, May 18, 2017, 3, https://www.aclu.org/other/aclu-comment-supplemental-questions-visa-applicants.

[166] 17 STATE 24324, ¶ 7. Paragraph 7 of this cable instructs consular officers to consider sending a "Donkey Security Advisory Opinion (SAO) request" for populations warranting additional scrutiny as identified by the process described in Paragraph 6. In same paragraph, the additional questions are described as part of the process for "SAO requests based on this guidance, as for all other SAO requests." Ibid. The American Immigration Lawyers Association estimates Donkey SAOs will take 10-14 weeks to resolve. Schwartz, Friedman, and Tonello, "'DOs' And 'DON'Ts' For Attorneys Representing Visa Applicants (And for Consular Officers, Too!)," at 530.

[167] 82 Fed. Reg. 36,180 (August 3, 2017).

[168] "Syria Iraq: The Islamic State militant group," *BBC News*, August 2, 2014, accessed September 21, 2017, http://www.bbc.com/news/world-middle-east-24179084.

[169] U.S. Office of Personnel Management, "Questionnaire For National Security Positions," Standard Form 86 OMB No. 3206 0005, revised December 2010, accessed September 6, 2017, https://www.opm.gov/forms/pdf_fill/sf86-non508.pdf.

[170] "Agency Information Collection Activities: Arrival and Departure Record (Forms I–94 and I–94W) and Electronic System for Travel Authorization," 81 Fed. Reg. 40,892, 40,893 (June 23, 2016),
https://www.gpo.gov/fdsys/pkg/FR-2016-06-23/pdf/2016-14848.pdf; Edward Helmore, "US Government Collecting Social Media Information from Foreign Travelers," *Guardian,* December 26, 2016,
https://www.theguardian.com/world/2016/dec/26/us-customs-social-media-foreign-travelers; John Roth, Inspector General, *DHS' Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-term Success (Redacted),* Department of Homeland Security, 2017, 2-3,
https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-40-Feb17.pdf.

[171] 82 Fed. Reg. 36,180 (August 3, 2017).

[172] *Superseding 17 STATE 24324: Implementing Immediate Heightened Screening and Vetting of Visa Applications,* by Rex Tillerson, 17 STATE 25814, ¶ 9-10, http://live.reuters.com/Event/Live_US_Politics/791255396;
Department of State, Foreign Affairs Handbook, 7-FAH-1 H-943.5-2 (not publicly disclosed).

[173] Roth, Inspector General, *DHS' Pilots for Social Media Screening Need Increased Rigor to Ensure Scalability and Long-term Success (Redacted).*

[174] For further discussion of this issue, see Letter to Department of State Office of Information and Regulatory Affairs and Bureau of Consular Affairs, Visa Office, dated May 18, 2017, 4,
https://www.brennancenter.org/sites/default/files/analysis/State%20Dept%20Information%20Collection%20Comments%20-%2051817_3.pdf; Aaron Cantu and George Joseph, "Trump's Border Security May Search Your Social Media by 'Tone,'" *Nation,* August 23, 2017, https://www.thenation.com/article/trumps-border-security-may-search-your-social-media-by-tone/, ("[in most tone analysis systems,] the term 'trump' indicates positive feeling, something which is likely no longer true for a sizable number of Americans.").

[175] "Caution on Twitter urged as tourists barred from US," *BBC News*, March 08, 2012,
http://www.bbc.com/news/technology-16810312.

[176] See, e.g., Natasha Lennard, "The Way Dzhokhar Tsarnaev's Tweets Are Being Used in the Boston Bombing Trial Is Very Dangerous," *Splinter,* March 12, 2015, http://splinternews.com/the-way-dzhokhar-tsarnaevs-tweets-

are-being-used-in-the-1793846339; Bill Chappell, "Supreme Court Tosses Out Man's Conviction for Making Threat on Facebook," *NPR*, June 1, 2015,  http://www.npr.org/sections/thetwo- way/2015/06/01/411213431/supreme-court-tosses-outman-s-conviction-for-making-threats-on-facebook.

[177] Sarcasm is an example of something of which different cultures have different understandings. Ruth Margolis and Tony Hargis, "Two Brits Debate: Are Americans Sarcasm-Literate?" *BBC America*, accessed September 20, 2017, http://www.bbcamerica.com/anglophenia/2013/02/debate-are-americans-sarcasm-literate (discussing differences between American and British sarcasm).

[178] Cantu and Joseph, "Trump's Border Security May Search Your Social Media by Tone."

[179] For more details see, for example, Abby Ohlheiser, "Is a retweet an endorsement from President-elect Trump?", *Washington Post,* November 30, 2016, https://www.washingtonpost.com/news/the-intersect/wp/2016/11/30/is-a-retweet-an-endorsement-from-president-elect-trump/?utm_term=.de435e7b0cb9; Wendy Davis, "Facebook 'Likes' And Pinterest Photos Can Be Endorsements, FTC Says," *MediaPost,* May 29, 2015, https://www.mediapost.com/publications/article/250932/facebook-likes-and-pinterest-photos-can-be-endor.html; Troutman Sanders LLP, "Facebook 'Likes' – Endorsements or Not?", *Information Intersection*, last modified June 7, 2012, accessed September 16, 2017, http://www.informationintersection.com/2012/06/facebook-likes-endorsements-or-not/; Erin Sumner, Luisa Ruge-Jones, and Davis Alcorn, "A functional approach to the Facebook Like Button: An exploration of meaning, interpersonal functionality, and potential alternative response buttons," *New Media & Society,* March 20, 2017, http://journals.sagepub.com/doi/abs/10.1177/1461444817697917; Karla Porter, "Does liking a page on Facebook equal endorsing it?", Karlaporter.com, modified August 9, 2014, accessed September 16, 2017, https://karlaporter.com/liking-page-facebook-equal-endorsing/.

[180] Brennan Center for Justice, et. al, Comment Submission Regarding *Notice of Information Collection under OMB Review: Supplemental Questions for Visa Applicants (DS-5535),* for Department of State Office of Information and Regulatory Affairs and Visa Office, Bureau of Consular Affairs, May 18, 2017, 5, https://www.brennancenter.org/analysis/brennan-center-urges-state-department-abandon-new-extreme-vetting-initiatives.

[181] 82 Fed. Reg. 36,180 (August 3, 2017).

[182] United Nations General Assembly Resolution 2200A (XXI), "International Covenant on Civil and Political Rights," December 16, 1966, http://www.ohchr.org/EN/ProfessionalInterest/Pages/CCPR.aspx. http://www.ohchr.org/EN/ProfessionalInterest/Pages/CCPR.aspx.

[183] David Iaconangelo, "Why Donald Trump's 'ideological screening' wouldn't be a first for the US," *Christian Science Monitor,* August 17, 2016, https://www.csmonitor.com/USA/2016/0817/Why-Donald-Trump-s-ideological-screening-wouldn-t-be-a-first-for-the-US (quoting presidential candidate Trump's remarks at Youngstown State University in Ohio).

[184] "Transcript: Donald Trump's full immigration speech, annotated," *Los Angeles Times,* August 31, 2016, http://www.latimes.com/politics/la-na-pol-donald-trump-immigration-speech-transcript-20160831-snap-htmlstory.html.

[185] Ibid.

[186] Meckler, "Trump Administration Considers Far-Reaching Steps for Extreme Vetting."

[187] 82 Fed. Reg. 8977 (January 27, 2017).

[188] "RWW News: Michael Flynn: Islam Is A 'Cancer,' 'Political Ideology,' that 'Hides Behind' Religion," YouTube video, from a speech delivered for ACT for America, August 2016,  posted by "RWW Blog," November 18, 2016, https://www.youtube.com/watch?v=fzh9b_vo4vs; Zack Beauchamp, "Trump's counter-jihad," *Vox*, February 13, 2017, https://www.vox.com/world/2017/2/13/14559822/trump-islam-muslims-islamophobia-sharia; Andrea Elliot, "The Man Behind the Anti-Shariah Movement," *New York Times*, July 30, 2011, http://www.nytimes.com/2011/07/31/us/31shariah.html?pagewanted=all&_r=1&.

[189] Beauchamp, "Trump's counter-jihad"; Elliot, "The Man Behind the Anti-Shariah Movement"; Abigail Haulohner, "How a series of fringe anti-Muslim conspiracy theories went mainstream – via Donald Trump," *Washington Post*, November 5, 2016, https://www.washingtonpost.com/national/how-a-series-of-fringe-anti-muslim-conspiracy-theories-went-mainstream--via-donald-trump/2016/11/05/7c366af6-8bf0-11e6-bf8a-3d26847eeed4_story.html?utm_term=.3fcac90b7232.

[190] 82 Fed. Reg. 8977 (January 27, 2017).

[191] Hillary Mayell, "Thousands of Women Killed for Family 'Honor,'" *National Geographic News,* February 12, 2002, http://news.nationalgeographic.com/news/2002/02/0212_020212_honorkilling.html (Widney Brown, Advocacy Director for Human Rights Watch: "In countries where Islam is practiced, they're called honor killings,

but dowry deaths and so-called crimes of passion have a similar dynamic in that the women are killed by male family members and the crimes are perceived as excusable or understandable."): Anna Momigliano, "Honor Killing by Any Other Name," *Nation,* February 2, 2010, https://www.thenation.com/article/honor-killing-any-other-name/.
[192] 82 Fed. Reg. 8977 (January 27, 2017).
[193] Burke, Daniel. "Trump says US will prioritize Christian refugees." CNN. January 30, 2017. Accessed September 27, 2017. http://www.cnn.com/2017/01/27/politics/trump-christian-refugees/index.html.
[194] 82 Fed. Reg. 13,209, 13,215 (§ 5(a)) (March 6, 2017).
[195] Ibid.
[196] *Int'l Refugee Assistance Project v. Trump,* 857 F.3d at 595 ("These statements, taken together, provide direct, specific evidence of what motivated both EO-1 and EO-2: President Trump's desire to exclude Muslims from the United States.").
[197] Donald Trump (@realDonaldTrump), "The Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to S.C.," Twitter, June 5, 2017, 3:29 a.m., https://twitter.com/realdonaldtrump/status/871675245043888128?lang=en; Donald Trump (@realDonaldTrump), "The travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!," Twitter, September 15, 2017, 3:54 a.m., https://twitter.com/realdonaldtrump/status/908645126146265090?lang=en.
[198] "Second Defeat for the White House on the President's Travel Ban," *CNN,* March 15, 2017, 11:00 PM, http://transcripts.cnn.com/TRANSCRIPTS/1703/15/cnnt.02.html (quoting Stephen Miller, Presidential Advisor, as saying that the second travel ban will result in the "same basic policy outcome").
[199] Meckler, "Trump Administration Considers Far-Reaching Steps for 'Extreme Vetting.'"
[200] Immigration and Nationality (McCarran-Walter) Act of 1952, Pub. L. No. 82- 414, § 212 (a)(27), 66 Stat. 18225 (codified at 8 U.S.C. § 1304).
[201] Iaconangelo, "Why Donald Trump's 'ideological screening' wouldn't be a first for the US."
[202] Immigration Act of 1990, Pub. L. No 101-649, § 301, 104 Stat. 4978, 5029-39; John Scanlan, "Why the McCarran-Walter Act Must Be Amended," Maurer Law Digital Repository, 2494 (1987), http://www.repository.law.indiana.edu/cgi/viewcontent.cgi?article=3496&context=facpub; Henry Johnson, "Trump's 'Ideology Test' Could Bring Back a Hated Mc-Carthy-Era Law," *Foreign Policy,* August 17, 2016, http://foreignpolicy.com/2016/08/17/trumps-ideology-test-could-bring-back-a-hated-mccarthy-era-law/.
[203] Scanlan, "Why the McCarran-Walter Act Must Be Amended"; Johnson, "Trump's 'Ideology Test' Could Bring Back a Hated Mc-Carthy-Era Law."
[204] Steven Holmes, "Legislation Eases Limits on Aliens," *New York Times,* February 2, 1990, http://www.nytimes.com/1990/02/02/us/legislation-eases-limits-on-aliens.html?mcubz=1 (quoting Senator Daniel Moynihan, sponsor of the repeal legislation). Senator Moynihan's comments refer to a list of factors which had formerly mandated exclusion from the United States. 8 U.S.C. § 1182(a)(28)(A)-(G) (1987) (citing specific activities and beliefs which would exclude an individual from entry into the United States).
[205] *Improving Border Security and Public Safety: Hearing Before the S. Comm. On Homeland Security and Governmental Affairs,* 115th Cong. (April 5, 2017) (transcript at 13, available at https://goo.gl/CKvqEN)
[206] Deborah Amos and Larry Kaplow, "Trump Backers Want Ideology Test for Extreme Vetting," *NPR,* February 4, 2017 http://www.npr.org/sections/parallels/2017/02/04/513289953/trump-backers-want-ideology-test-for-extreme-vetting. For more details, see also Iaconangelo, "Why Donald Trump's 'ideological screening' wouldn't be a first for the US" (quoting Kenyon Zimmer, assistant professor of history at the University of Texas-Arlington on the difficulty of enforcing ideological tests and the "huge abrogation of freedom of speech" that such screening would imply).
[207] Patel and Koushik, *Countering Violent Extremism,* n. 92-100.
[208] See discussion in Section II.c
[209] Office of Intelligence and Analysis, *(U//FOUO) Most Foreign-born, US-based Violent Extremists Radicalized after Entering Homeland; Opportunities for Tailored CVE Programs;* See discussion at beginning of **Section I**. Linking what are primarily domestic threats to outsiders is not new – now-repealed ideological exclusions targeting anarchists came as xenophobic sentiments tied anarchism to foreigners, even though most anarchists were second-generation Americans, and foreign-born anarchists radicalized after entry. Iaconangelo, "Why Donald Trump's 'ideological screening' wouldn't be a first for the US."

[210] Michael German and Michelle Richardson, *Reclaiming Patriotism: A Call to Reconsider the Patriot Act*, American Civil Liberties Union, 2009, 26-27, https://www.aclu.org/files/pdfs/safefree/patriot_report_20090310.pdf; 8 U.S.C. § 1182(a)(3)(B)(i)(VII).

[211] For example, they ask: if the applicant is a member of a terrorist organization; has participated, order, incited, assisted, or otherwise participated in extrajudicial killings; or has been responsible for severe violations of religious freedom as a government official. For more details see, for example, "Guidelines for Completing the DS 160 Non Immigrant Visa Application," U.S. Embassy Baghdad, accessed September 19, 2017, http://blogs.worldlearning.org/iylep/files/2012/03/DS-160-NIV-Instructions-IYLEP-World-Learning.pdf; "DS-160 Nonimmigration Visa Application Form: A Complete Step-by-step Instructional Guide," U.S. Embassy Kingston, Jamaica (Powerpoint Presentation), https://photos.state.gov/libraries/jamaica/231771/PDFs/DS-160%20Instructions.pdf.

[212] For example, those barred have often included Colombians – often asylum seekers – who gave "material support" to the Revolutionary Armed Forces of Colombia ("FARC") under duress. Sweta Sridharan, "Material Support to Terrorism – Consequences for Refugees and Asylum Seekers in the United States," *Migration Policy Institute*, January 30, 2008, http://www.migrationpolicy.org/article/material-support-terrorism-%E2%80%94-consequences-refugees-and-asylum-seekers-united-states. For more details, see also German and Richardson, *Reclaiming Patriotism*, 22-27. One notable example: these provisions were employed in the mid-2000s to exclude from the U.S. a prominent scholar of Islam from Oxford University, Tariq Ramadan, even though he had repeatedly disavowed violence. Professor Ramadan was eventually admitted to the U.S. in 2010. "ACLU Welcomes Formerly 'Ideologically Excluded' Scholar Tariq Ramadan," American Civil Liberties Union, accessed September 19, 2017, https://www.aclu.org/video/aclu-welcomes-formerly-ideologically-excluded-scholar-tariq-ramadan.

[213] Consolidated Appropriations Act of 2008 (CAA), Pub. L. No. 110-161, 121 Stat. 1844 (2007). Section 691 of Division J of this bill made amendments to the inadmissibility grounds of INA § 212 (a)(3)(B) related to "terrorism," and to the authority codified at INA § 212 (d)(3)(B)(i) that gives the Secretaries of State and Homeland Security (in consultation with the Attorney General) discretionary authority to waive these grounds in particular cases. Over 10,000 waivers were granted within two years of the Patriot Act. Trump has tried to roll back this practice as well. Executive Order 13780 called for the Secretary of State and DHS Secretary to "consider rescinding the exercises of authority…relating to the terrorism grounds of inadmissibility, as well as any related implementing directives or guidance." 82 Fed. Reg. 13,215. The State Department has stated that it is not aware of any cases in which such waivers were abused; indeed, a former official called this Trump directive "an attempt to address a non-existent phantom problem." Mica Rosenberg and Yeganeh Torbati, "Trump Administration may change rules that allow terror victims to immigrate to US," *Reuters*, April 21, 2017, http://www.reuters.com/article/usa-immigration-terrorism-exceptions/trump-administration-may-change-rules-that-allow-terror-victims-to-immigrate-to-us-idUSL1N1HT1DC.

[214] *Improving Border Security and Public Safety: Hearing Before the S. Comm. On Homeland Security and Governmental Affairs*, 115th Cong. (April 5, 2017) (transcript at 13, available at https://goo.gl/CKvqEN).

[215] See *Attachment 2: Background*, 3, Immigration and Customs Enforcement Office, U.S. Department of Homeland Security, "Presolicitation Notice, Solicitation No. HSCEMD-17-R-00010, ICE-HIS – Data Analysis Service Amendment."

[216] Ibid at *Attachment 2: Background*, 4.

[217] Ibid at *Attachment 1: Statement of Objectives*, 1.

[218] Ibid at *Attachment 1: Statement of Objectives*, 1.

[219] Compare 82 Fed. Reg. 8977, 8979 § 4(a) (January, 27 2017) with 82 Fed. Reg. 13,209, 13,215 § 5(a) (March 6, 2017).

[220] Faiza Patel and Rachel Levinson-Waldman, *The Islamophobic Administration*, Brennan Center for Justice, 2017, 2-4, http://www.brennancenter.org/sites/default/files/publications/BCJ_Islamophobic_Administration.pdf.

[221] Aaron Shapiro, "Reform predictive policing," *Nature*, January 25, 2017, http://www.nature.com/news/reform-predictive-policing-1.21338; Logan Koepke, "Predictive Policing Isn't About the Future," *Slate*, November 21, 2016, http://www.slate.com/articles/technology/future_tense/2016/11/predictive_policing_is_too_dependent_on_historical_data.html; William Isaac and Andi Dixon, "Column: Why big data analysis of police activity is inherently biased," *PBS NewsHour*, May 10, 2017, http://www.pbs.org/newshour/rundown/column-big-data-analysis-police-activity-inherently-biased/; Julia Angwin et al., "Machine Bias," *ProPublica*, May 23, 2016, https://www.propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing (quoting Former Attorney

General Eric Holder's concerns about risk scores in the context of criminal justice so shifting the axis of decision making are equally applicable here: "I am concerned that [the use of predictive risk scores may] inadvertently undermine our efforts to ensure individualized and equal justice…[and] exacerbate unwarranted and unjust disparities…common in our criminal justice system.").

[222] Bruce Schneier, "Why Data Mining Won't Stop Terror," *Wired*, March 9, 2006, https://www.wired.com/2006/03/why-data-mining-wont-stop-terror-2/?tw=wn_index_2.

[223] Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens… [its provisions are] universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."). Basic First Amendment protections are also afforded to non-citizens. Bridges v. Wixon, 326 U.S. 135, 161 (1945) ("[O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments…")

[224] Lawson and Roychoudhury, "Do Travel Visa Requirements Impede Tourist Travel?"

[225] Jie Zone and Jeanne Batalova, "Frequently Requested Statistics on Immigrants and Immigration in the United States," *Migration Policy Institute*, March 8, 2017, http://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states.

[226] Department of State, "Table I: Immigrant and Nonimmigrant Visas Issued at Foreign Service Posts Fiscal Years 2012 - 2016," *Report of the Visa Office 2016*, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16AnnualReport-TableI.pdf.

[227] Requiring international travelers to obtain a visa can reduce travel by 52-70%. Eric Neumayer, "Visa Restrictions and Bilateral Travel," *Professional Geographer* 62:2, 171, 2010, 172; Eric Neumayer, "On the Detrimental Impact of Visa Restrictions on Bilateral Trade and Direct Investment," *Applied Geography* 31:3, 2011, 901; Lawson and Roychoudhury, "Do Travel Visa Requirements Impede Tourist Travel?"

[228] Neumayer, "Visa Restrictions and Bilateral Travel."

[229] Department of State, "Table XVI(A): Classes of Nonimmigrants Issued Visas (Including Border Crossing Cards) Fiscal Years 2012-2016," *Report of the Visa Office 2016*, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2016AnnualReport/FY16AnnualReport-TableXVIA.pdf.

[230] U.S. Travel Association, "Int'l Travel to U.S. Finally Returns to Pre-9/11 Levels," press release, February 7, 2017, available at https://www.ustravel.org/press/intl-travel-us-finally-returns-pre-911-levels.

[231] Department of State, *Congressional Budget Justification, Department of State, Foreign Operations, and Related Programs, Fiscal Year 2018*, 2017, 55, https://www.state.gov/documents/organization/271013.pdf.

[232] See Department of State, "Table XVI(A): Classes of Nonimmigrants Issued Visas (Including Border Crossing Cards) Fiscal Years 2012-2016."

[233] Brian Crawford, Laurie Flanagan, and Gregg Hartley, "H-2B program benefits small businesses and their workers," *Hill*, June 14, 2016, http://thehill.com/blogs/congress-blog/economy-budget/283440-h-2b-program-benefits-small-businesses-and-their-workers; Paul Solman, "Why seasonal businesses depend on foreign workers," *PBS NewsHour*, July 27, 2017, http://www.pbs.org/newshour/making-sense/seasonal-businesses-depend-foreign-workers/; Aria Bendix, "A Pause in International Students?", *Atlantic*, March 13, 2017, https://www.theatlantic.com/education/archive/2017/03/a-pause-in-international-students/519435/ (International students contribute billions to the U.S. and "typically pay full price for tuition, thereby helping to subsidize the cost of tuition for American students."); Takao Kato and Chad Sparber, "Quotas and Quality: The Effect of H1-B Visa Restrictions on the Pool of Prospective Undergraduate Students from Abroad," *Review of Economics and Statistics* 95:1, March 2013, 109-126 (showing that show that restrictive immigration policy has had an adverse impact on the quality of prospective international applicants to American universities).

[234] "The H-1B Visa Program: A Primer on the Program and Its Impact on Jobs, Wages, and the Economy," American Immigration Council, last accessed September 17, 2017, https://www.americanimmigrationcouncil.org/sites/default/files/research/the_h-1b_visa_program_a_primer_on_the_program_and_its_impact_on_jobs_wages_and_the_economy.pdf; Guinevere Nell and James Sherk, *More H-1B Visas, More American Jobs, A Better Economy*, Heritage Foundation, 2008, http://www.heritage.org/immigration/report/more-h-1b-visas-more-american-jobs-better-economy.

[235] "Report: New American Fortune 500," *Partnership for a New American Economy*, June 15, 2011,

http://www.newamericaneconomy.org/research/new-american-fortune-500/; see also *Patent Pending: How Immigrants are Reinventing the American Economy,* Partnership for a New American Economy, 2012, http://www.newamericaneconomy.org/wp-content/uploads/2013/07/patent-pending.pdf.

[236] Many of these companies have also opposed the travel ban in court, with nearly 100 joining a single amicus brief. See Brief of Technology Companies and other Businesses as Amici Curiae in Support of Appellees, *Washington v. Trump,* 2017 WL 626517 (9th Cir. Feb. 5, 2017).

[237] "Trump's travel ban causing angst for America's health system," *CBS News,* February 21, 2017, https://www.cbsnews.com/news/trump-travel-ban-impact-on-international-doctors-american-health-system/; Jessica Glenza, "Healthcare and Trump's travel ban: data shows success of doctors trained abroad," *Guardian,* February 2, 2017. https://www.theguardian.com/us-news/2017/feb/02/us-doctors-trump-travel-ban-health.

[238] *The Lost Decade: The High Costs of America's Failure to Compete for International Travel,* U.S. Travel Association and Oxford Economics, 2010, 2, https://www.ustravel.org/system/files/Media%20Root/Document/lostdecadereport.pdf. The wait to get an interview appointment can be several months. David Muir, Christine Brouwer, and Maggy Patrick, "Made in America: Visa Process Slows Down Tourism," *ABC News,* October 31, 2011, http://abcnews.go.com/US/made-america-visa-process-slowing-tourism/story?id=14853459; *Ready for Takeoff: A Plan to Create 1.3 Million U.S. Jobs by Welcoming Millions of International Travelers,* U.S. Travel Association, 2011, 11, 37, https://www.ustravel.org/system/files/media_root/document/Ready_for_Takeoff_US_Travel_Blueprint.pdf. Tourism industry groups have argued that the wait for a visa interview is a deterrent for potential visitors and negatively impacts the American economy. Ibid. Nonetheless, Trump has reversed Obama initiatives intended to expedite the interview scheduling process and suggested a cap of 120 visa interviews per consular officer per day, admitting that backlogs may rise. Exec. Order 13,597, 77 Fed. Reg. 3373 (January 19, 2012) (Obama order requiring Department of State to schedule 80 percent of nonimmigrant visa interviews within three weeks of receipt of application); Exec. Order No. 13,802, 82 Fed. Reg. 28747 (June 21, 2017) (rescinding aforementioned Obama order); 17 STATE 25814, ¶ 13 ("In order to ensure that proper focus is given to each application, posts should generally not schedule more than 120 visa interviews per consular adjudicator/per day. Please that limiting scheduling may cause interview appointment backlogs to rise.").

[239] *The Lost Decade: The High Costs of America's Failure to Compete for International Travel,* U.S. Travel Association and Oxford Economics.

[240] Michael Sasso, "Airline Stocks Lose $4.9 Billion as Investors Weigh Travel Ban," *Bloomberg,* January 31, 2017, https://www.bloomberg.com/news/articles/2017-01-31/airlines-fall-for-second-day-as-travel-ban-raises-cost-questions.

[241] The Visa Waiver Program was first a pilot program authorized by President Reagan in 1986. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 313, 100 Stat. 3359 (codified as amended at 8 U.S. §§ 1182, 1187). In 2000, President Clinton signed the Visa Waiver Permanent Program Act, making the pilot program permanent. Visa Waiver Permanent Program Act of 2000, Pub. L. No. 106-396, 114 Stat. 1637. Alison Siskin, *Visa Waiver Program,* Congressional Research Service, RL32221, 2015, 3. https://fas.org/sgp/crs/homesec/RL32221.pdf. The program enjoys broad support from U.S. industry, the academic community, as well as the Departments of State and Homeland Security. Edward Alden, "In praise of the US Visa Waiver Program," *Politico,* November 25, 2015, http://www.politico.eu/article/in-praise-of-the-us-visa-waiver-program/.

[242] "U.S. Visa Waiver Program," Department of Homeland Security, accessed September 20, 2017, https://www.dhs.gov/visa-waiver-program; *Terrorism and the Visa Waiver Program: Hearing Before the H. Subcomm. on National Security and the Subcomm. on Health Care, Benefits, and Administrative Rules, Comm. on Oversight and Government Reform,* 114th Cong. 145 (2015), 4 https://www.gpo.gov/fdsys/pkg/CHRG-114hhrg25881/pdf/CHRG-114hhrg25881.pdf. For more on the economic benefits of the Visa Waiver Program see Siskin, *Visa Waiver Program,* at 11; Lawson and Roychoudhury, "Do Travel Visa Requirements Impede Tourist Travel?"; Michaela D. Platzer and Alison Siskin, *Balancing Tourism Against Terrorism: The Visa Waiver Program,* Congressional Research Service, IN10246, 2015; Riley Walters, *The Visa Waiver Program is Still Great for America,* Heritage Foundation, March 14, 2017, http://www.heritage.org/homeland-security/report/the-visa-waiver-program-still-great-america; Steven Bucci, *Visa Waiver Program Improves Security,* Heritage Foundation, March 17, 2015, http://www.heritage.org/testimony/visa-waiver-program-improves-security; David Inserra, *The Visa Waiver Program: Congress Should Strengthen a Crucial Security Tool,* Heritage Foundation, December 2, 2015, http://www.heritage.org/terrorism/report/the-visa-waiver-program-congress-should-strengthen-crucial-security-tool.

[243] Andrea Elliott, "More Muslims Arrive in U.S., After 9/11 Dip," The New York Times, September 09, 2006, accessed September 27, 2017, http://www.nytimes.com/2006/09/10/nyregion/10muslims.html?mcubz=1.

[244] Nahal Toosi, Ted Hesson, and Sarah Frostenson, "Muslim nations targeted by Trump's travel ban see steep visa drop," *Politico,* September 28, 2017, http://www.politico.com/story/2017/05/25/trump-muslim-visas-238846.

[245] Ibid.

[246] "2017 Monthly Tourism Statistics," National Travel & Tourism Office, accessed September 26, 2017, http://tinet.ita.doc.gov/view/m-2017-I-001/table1.asp (citing preliminary April 2017 data from U.S. Department of Commerce *Summary of International Travel to the U.S. (I-94) Report)*; Glusac, "International Tourism to the U.S. Declined in Early 2017."

[247] Eric Neumayer, "Visa Restrictions and Bilateral Travel."

[248] Christopher Muther, "You Could Call US Tourism a Victim of Trump's Travel Ban," *Boston Globe,* February 14, 2017, https://www.bostonglobe.com/lifestyle/travel/2017/02/14/trump-ban-causes-tourism-drop-and-industry-fears-lasting-effect/yzMAVzeLvqvwP8gEckoFsL/story.html.

[249] American Anthropological Association, et. al, Comment Submission Regarding *Notice of Information Collection under OMB Review: Supplemental Questions for Visa Applicants (DS-5535),* for Department of State Office of Information and Regulatory Affairs and Visa Office, Bureau of Consular Affairs, May 18, 2017, http://www.nafsa.org/_/file/_/amresource/DS5535Comment051817.pdf

[250] Ibid. See also "The H-1B Visa Program: A Primer on the Program and Its Impact on Jobs, Wages, and the Economy," American Immigration Council.

[251] Thanassis Cambanis, "Trump's Dangerous Attack on American Values," *Century Foundation* (blog), January 30, 2017, https://tcf.org/content/commentary/trumps-cowardly-attack-american-values/.

[252] Bill Ong Hing, *Defining America: Through Immigration Policy,* Temple Press, 2015, 77 (quoting Senate Judiciary Committee Report relating to Act); D'vera Cohn, "How U.S. Immigration laws and rules have changed through history," *Pew Research Center,* September 30, 2015, http://www.pewresearch.org/fact-tank/2015/09/30/how-u-s-immigration-laws-and-rules-have-changed-through-history/. The quotas were passed over the veto of President Truman, who called the quota system "a slur on the patriotism…of a large part of our citizenry" that "discriminates, deliberately and intentionally, against many of the peoples of the world." Harry S. Truman, "182- Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality," June 25, 1952, http://www.presidency.ucsb.edu/ws/?pid=14175.

[253] See 8 U.S.C. 1152 (a)(1)(A) ("[N]o person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."); see also Cohn, "How U.S. immigration laws and rules have changed."

[254] *H.R. 2580 To Amend the Immigration and Nationality Act and for Other Purposes: Hearing Before the Subcomm. No. 1 of the H. Comm. on the Judiciary*, 89th Cong. 418 (1965) (statement of Representative Benjamin S. Rosenthal).

[255] Haitian Refugee Center v. Civiletti, 503 F. Supp. 442, 453 (U.S. Dist. Ct. S.D. Fl. 1980).

[256] Cohn, "How U.S. immigration laws and rules have changed."

[257] Faye Hipsman and Doris Meissner, "Immigration in the United States: New Economic, Social, Political Landscapes with Legislative Reform on the Horizon," *Migration Policy Institute,* April 16, 2013, http://www.migrationpolicy.org/article/immigration-united-states-new-economic-social-political-landscapes-legislative-reform.

[258] Indeed, Attorney General Jeff Sessions has publicly praised the national-origin quotas from the Immigration Act of 1924, which broadened bans on Asian immigration to the United States and contained strong preferences for northern and western European immigration. Adam Serwer, "Jeff Sessions's Unqualified Praise for a 1924 Immigration Law," *Atlantic,* January 10, 2017, https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.

[259] Department of State, *Alternatives to Closing Doors in Order to Secure Our Borders*, DISSENT CHANNEL, by Redacted, https://assets.documentcloud.org/documents/3438487/Dissent-Memo.pdf; for further discussion, see Jeffrey Gettleman, "State Department Dissent Cable on Trump's Ban Draws 1,000 Signatures," *New York Times,* January 31, 2017, https://www.nytimes.com/2017/01/31/world/americas/state-dept-dissent-cable-trump-immigration-order.html?mcubz=1&_r=0.

[260] H.R. Rep. No. 89-745, at 11 (1965).

[261] Lyndon B. Johnson, "546 - Remarks at the Signing of the Immigration Bill, Liberty Island, New York," October 3, 1965; see also *H.R. 7700 and 55 Identical Bills To Amend the Immigration and Nationality Act and For Other*

*Purposes: Hearing Before the Subcomm. No. 1 of the H. Comm. on the Judiciary*, 88th Cong. 208 (1964) (statement of Representative Harold Ryan) ("The United States must not support a doctrine of favoritism. We cannot preach the ideals of democracy, and, at the same time, judge the qualifications of men because of their race or national ancestry.").