# Exhibit 22

No. A-_____

_____

_____

IN THE SUPREME COURT OF THE UNITED STATES

_____

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,
APPLICANTS

v.

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, ET AL.

_____

APPLICATION FOR STAY PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT AND PENDING
FURTHER PROCEEDINGS IN THIS COURT

_____

NOEL J. FRANCISCO
  Solicitor General
    Counsel of Record

  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

_____

_____

PARTIES TO THE PROCEEDING

The applicants (defendants-appellants below) are Donald J. Trump, in his official capacity as President of the United States; the Department of Homeland Security; Elaine C. Duke, in her official capacity as Acting Secretary of Homeland Security; the Department of State; Rex W. Tillerson, in his official capacity as Secretary of State; the Office of the Director of National Intelligence; Daniel R. Coats, in his official capacity as Director of National Intelligence; Kevin K. McAleenan, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection; and L. Francis Cissna, in his official capacity as Director of U.S. Citizenship and Immigration Services.

The respondents (plaintiffs-appellees below) are the International Refugee Assistance Project, HIAS, Inc., the Middle East Studies Association of North America, Inc., the Arab American Association of New York, the Yemeni-American Merchants Association, Iranian Alliances Across Borders, Iranian Students' Foundation, Muhammed Meteab, Mohamad Mashta, Grannaz Amirjamshidi, Fakhri Ziaolhagh, Shapour Shirani, Afsaneh Khazaeli, Paul Harrison, Ibrahim Ahmed Mohomed, Eblal Zakzok, Sumaya Hamadmad, Fahed Muqbil, and several John and Jane Does.[*]

---

[*] Samaneh Takaloo and Allan Hakky were plaintiffs in the district court but have since been terminated from the case.

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. A-_____

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,
APPLICANTS

v.

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, ET AL.

_____

APPLICATION FOR STAY PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT AND PENDING
FURTHER PROCEEDINGS IN THIS COURT

_____

Pursuant to this Court's Rule 23 and the All Writs Act, 28 U.S.C. 1651, the Solicitor General, on behalf of applicants President Donald J. Trump, et al., respectfully applies for a stay of the preliminary injunction issued by the United States District Court for the District of Maryland, pending the consideration and disposition of the government's appeal from that injunction to the United States Court of Appeals for the Fourth Circuit and, if the court of appeals affirms the injunction, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court.

The Constitution and Acts of Congress confer on the President broad authority to prevent aliens abroad from entering this country

2

when he deems it in the Nation's interest.  In order to protect national security, the President exercised that authority by issuing Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 27, 2017) (Proclamation).  The Proclamation is the culmination of an extensive, worldwide review process conducted by multiple government agencies to determine what information is necessary from each foreign country in order to admit nationals of that country to the United States while ensuring that travelers do not pose a security or public-safety threat.  Whereas the President's prior immigration orders were temporary measures to facilitate that review, the Proclamation directly responds to the completed review and its specific findings.  After the review, the Acting Secretary of Homeland Security found that some countries continue to be unwilling or unable to share needed information with the United States, to reliably verify the identity of their nationals, or to control terrorists within their borders.  Accordingly, the Acting Secretary recommended that the President impose restrictions on the entry of certain nationals of eight countries -- Chad, Iran, Libya, North Korea, Syria, Venezuela, Yemen, and Somalia -- in order to protect the security of the United States.

The President reviewed the Acting Secretary's recommendation; consulted with the Acting Secretary, the Secretaries of State and Defense, and the Attorney General; considered foreign-policy, national-security, and counterterrorism goals; and assessed each

3

country's distinct circumstances.  The President then issued the Proclamation, which restricts the entry of certain nationals of the eight countries identified in the Acting Secretary's recommendation.  The Proclamation describes the President's judgment that these restrictions are necessary both to prevent the entry of foreign nationals about whom the United States lacks sufficient information, and to elicit more information and more secure practices from foreign governments that are deficient.  The entry suspensions are subject to certain exceptions, case-by-case waivers, and periodic review.

The Proclamation differs from the President's prior executive orders both in process and substance.  It is the product of a review process undertaken by multiple Cabinet officers and government officials, none of whose motives has ever been questioned.  And it is based on express findings of inadequacies in the information-sharing practices, identity-management protocols, and risk factors for certain countries, as well as a Presidential determination that tailored entry restrictions will both protect the Nation and encourage those countries to improve. The Proclamation covers different countries than the prior order: it removes one majority-Muslim country; adds other countries, some of which are not majority-Muslim; and excludes various nonimmigrant travelers from all but one of the majority-Muslim countries.  These differences confirm that the Proclamation is

4

based on national-security and foreign-affairs objectives, not religious animus.

Notwithstanding the significant differences between the Proclamation and the President's prior orders, the district court again issued a preliminary injunction largely barring enforcement worldwide of the Proclamation's entry suspensions.  Whereas the court had previously concluded that the President's prior orders violated the Establishment Clause, the court now concluded that the Proclamation violates the Establishment Clause and the Immigration and Nationality Act.  The government immediately appealed to the Fourth Circuit and requested a stay pending appeal and disposition of a petition for a writ of certiorari and further proceedings in this Court, but the Fourth Circuit has not acted on that request.

All of the relevant factors strongly support a stay of the Maryland court's injunction.  First, if the Fourth Circuit upholds the injunction, there is a reasonable probability that this Court will grant a writ of certiorari, as it did the last time courts barred the President from enforcing entry restrictions on certain foreign nationals in the interest of national security.  See Trump v. IRAP, 137 S. Ct. 2080, 2086 (2017).  The injunction nullifies a formal national-security directive of the President, and the district court's interpretations of the INA would constrain the ability of this and all future Presidents to take measures to

5

protect the Nation and achieve critical foreign-relations objectives. Second, there is more than a fair prospect that this Court will reverse the injunction because respondents' claims are neither justiciable nor meritorious. The district court ignored the critical differences between the President's prior orders and the Proclamation, especially that the latter followed a multi-Department review process and addresses countries that do not currently provide sufficient information to assess the risk that their nationals pose to the United States. Third, preventing the President from effectuating his national-security and foreign-relations judgment will cause ongoing irreparable harm to the government and the public, especially by requiring the Executive to disregard the identified inadequacies and by undermining the Proclamation's goal of inducing cooperation by other nations. At a minimum, the injunction should be stayed to the extent it goes beyond identified aliens whose exclusion allegedly imposes concrete, irreparable injury on these particular respondents. See United States Dep't of Def. v. Meinhold, 510 U.S. 939 (1993).[1]

STATEMENT

1.   The Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., governs admission of aliens into the United States.

---

[1] Although the district court correctly did not extend its injunction to the President himself, Add. 89, the President is injured by the injunction because it prevents the Executive Branch from carrying out his Proclamation.

6

Admission generally requires a valid visa or other valid travel document.  See 8 U.S.C. 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203.  The process of applying for a visa typically includes an in-person interview and results in a decision by a State Department consular officer.  8 U.S.C. 1201(a)(1), 1202(h), 1204; 22 C.F.R. 41.102 (nonimmigrant visa), 42.62 (immigrant visa).  Although a visa often is necessary for admission, it does not guarantee admission; the alien still must be found admissible upon arriving at a port of entry.  8 U.S.C. 1201(h), 1225(a).

Congress also has created a Visa Waiver Program, enabling nationals of certain countries to seek temporary admission without a visa.  8 U.S.C. 1182(a)(7)(B)(iv); 8 U.S.C. 1187 (2012 & Supp. IV 2016).  In 2015, Congress excluded from travel under that Program aliens who are dual nationals of or recent visitors to Iraq or Syria -- where "[t]he Islamic State of Iraq and the Levant * * *  maintain[s] a formidable force" -- and nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (Iran, Sudan, and Syria).[2] Congress also authorized the Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign

---

[2] U.S. Dep't of State, Country Reports on Terrorism 2015, at 6, 299-302 (June 2016), https://goo.gl/40GmOS; see 8 U.S.C. 1187(a)(12)(A)(i) and (ii) (Supp. IV 2016).  As of November 20, 2017, North Korea is a designated state sponsor of terrorism.  See http://www.cnn.com/TRANSCRIPTS/1711/20/cnr.07.html.

7

terrorist organization has a significant presence" in it, and "whether the presence of an alien in the country * * * increases the likelihood that the alien is a credible threat to" U.S. national security. 8 U.S.C. 1187(a)(12)(D)(i) and (ii) (Supp. IV 2016). Applying those criteria, in 2016, DHS excluded from the Program recent visitors to Libya, Somalia, and Yemen.[3]

Congress also has accorded the Executive broad discretion to suspend or restrict the entry of aliens, including aliens who might otherwise be eligible to receive a visa and be admitted to the United States. Section 1182(f) of Title 8 provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may * * * for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Section 1185(a)(1) further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry of aliens, "subject to such limitations and exceptions as [he] may prescribe."

2. In March 2017, the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017) (EO-2), which directed the Secretary of Homeland Security to determine whether foreign governments provide adequate information to vet foreign nationals applying for United States visas before they are

---

[3] DHS, DHS Announces Further Travel Restrictions for the Visa Waiver Program (Feb. 18, 2016), https://goo.gl/OXTqb5.

8

permitted to enter.   See Trump v. IRAP, 137 S. Ct. 2080, 2083
(2017) (describing EO-2).   In order to ensure that dangerous
individuals did not enter while the government was working to
establish adequate standards, and to reduce investigative burdens
on the agencies during the review, EO-2 temporarily suspended the
entry of foreign nationals from six countries previously
identified by Congress or the Executive as presenting terrorism-
related concerns.   See id. at 2083-2084.

EO-2 was challenged in multiple courts, and partially
enjoined by district courts in Maryland and Hawaii.   IRAP v. Trump,
241 F. Supp. 3d 539 (D. Md. 2017); Hawaii v. Trump, 245 F. Supp.
3d 1227 (D. Haw. 2017).   The Fourth and Ninth Circuits upheld those
injunctions in substantial part.   IRAP v. Trump, 857 F.3d 554 (4th
Cir. 2017) (en banc); Hawaii v. Trump, 859 F.3d 741 (9th Cir. 2017)
(per curiam).   This Court granted certiorari and partially stayed
the injunctions pending review.   IRAP, 137 S. Ct. at 2086, 2088-
2089.   The Court allowed EO-2's entry suspension to take effect
except as to "foreign nationals who have a credible claim of a
bona fide relationship with a person or entity in the United
States."   Id. at 2088.   And the Court stated that "the executive
review directed by" EO-2 "may proceed promptly, if it is not
already underway."   Ibid.   After EO-2's temporary entry suspension
expired, this Court vacated the lower courts' rulings as moot.

9

<u>Trump</u> v. <u>IRAP</u>, No. 16-1436, 2017 WL 4518553 (Oct. 10, 2017); <u>Trump</u>
v. <u>Hawaii</u>, No. 16-1540, 2017 WL 4782860 (Oct. 24, 2017).

    3.  On September 24, 2017, the President issued Proclamation
No. 9645, 82 Fed. Reg. 45,161 (Sept. 27, 2017). The Proclamation
is the product of EO-2's comprehensive, worldwide review of whether
foreign governments provide sufficient information and have other
practices to allow the United States to properly screen their
nationals before entry.

    a.  DHS, in consultation with the Department of State and
the Office of the Director of National Intelligence, undertook "to
identify whether, and if so what, additional information will be
needed from each foreign country to adjudicate an application by
a national of that country for a visa, admission, or other benefit
under the INA  * * *  in order to determine that the individual is
not a security or public-safety threat." Procl. § 1(c). The
Acting Secretary of Homeland Security, in consultation with the
Secretary of State and Director of National Intelligence,
developed a "baseline" for the information required from foreign
governments. <u>Ibid.</u>  That baseline incorporated three components:

> (i)  identity-management information, <u>i.e.</u>, "information
> needed to determine whether individuals seeking benefits
> under the immigration laws are who they claim to be," which
> turns on criteria such as "whether the country issues
> electronic passports embedded with data to enable
> confirmation of identity, reports lost and stolen passports
> to appropriate entities, and makes available upon request
> identity-related information not included in its passports";

10

(ii)  national-security and public-safety information about
whether a person seeking entry poses a risk, which turns on
criteria such as "whether the country makes available  * * *
known or suspected terrorist and criminal-history information
upon request," "whether the country impedes the United States
Government's receipt of information about passengers and crew
traveling to the United States," and "whether the country
provides passport and national-identity document exemplars";
and

(iii)  a national-security and public-safety risk assessment
of the country, which turns on criteria such as "whether the
country is a known or potential terrorist safe haven, whether
it is a participant in the Visa Waiver Program  * * *  that
meets all of [the program's] requirements, and whether it
regularly fails to receive its nationals subject to final
orders of removal from the United States."

Ibid.

DHS, in coordination with the Department of State, collected

data on, and evaluated, nearly 200 countries.  Procl. § 1(d).  The

agencies measured each country's performance in issuing reliable

travel documents and implementing adequate identity-management and

information-sharing protocols and procedures.  Ibid.  They also

evaluated terrorism-related and public-safety risks associated

with each country.  Ibid.  The Acting Secretary of Homeland

Security identified 16 countries as having "inadequate"

information-sharing practices and risk factors, and another 31

countries as "at risk" of becoming "inadequate."  Id. § 1(e).  The

Department of State then conducted a 50-day engagement period to

encourage all foreign governments to improve their performance,

which yielded significant improvements from many countries.  Id.

§ 1(f).  Multiple countries provided travel-document exemplars to

11

combat fraud, and/or agreed to share information on known or suspected terrorists. Ibid.

b. After the review concluded, on September 15, 2017, the Acting Secretary of Homeland Security identified seven countries that, even after diplomatic engagement, continue to have inadequate identity-management protocols or information-sharing practices, or whose nationals present other heightened risk factors: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. Procl. § 1(h). The Acting Secretary therefore recommended that the President impose entry restrictions on certain nationals from these countries. The Acting Secretary also recommended entry restrictions for nationals of Somalia, which, although it generally satisfies baseline requirements for information sharing, has identity-management deficiencies and a significant terrorist presence within its territory that the Somali government is unable to control. Id. § 1(i).[4]

c. The President evaluated the Acting Secretary's recommendations in consultation with multiple Cabinet members and other government officials. Procl. § 1(h)(i) and (ii). The President considered a number of factors, including each country's "capacity, ability, and willingness to cooperate with our

_____

[4] The Acting Secretary also assessed that Iraq does not meet the information-sharing baseline, but recommended that the President not restrict entry of Iraqi nationals in light of, among other things, the close cooperative relationship between the United States and the government of Iraq. Procl. § 1(g).

12

identity-management and information-sharing policies and each country's risk factors," as well as "foreign policy, national security, and counterterrorism goals." Id. § 1(h)(i).

Then, "in accordance with the recommendations," the President imposed entry restrictions on certain nationals from the eight countries that are tailored to "each country's distinct circumstances." Procl. § 1(h)(i)-(iii). The President determined that these restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States," and "to elicit improved identity-management and information-sharing protocols and practices from foreign governments." Procl. § 1(h)(i).

For countries that refuse to cooperate regularly with the United States (Iran, North Korea, and Syria), Section 2 of the Proclamation suspends entry of all nationals, except for Iranians seeking nonimmigrant student (F and M) and exchange-visitor (J) visas. Procl. § 2(b)(ii), (d)(ii), and (e)(ii). For countries that are valuable counter-terrorism partners but have information-sharing deficiencies (Chad, Libya, and Yemen), the Proclamation suspends entry only of nationals seeking immigrant visas and nonimmigrant business, tourist, and business/tourist visas. Id. § 2(a)(ii), (c)(ii) and (g)(ii). For Somalia, the Proclamation suspends entry of nationals seeking immigrant visas and requires

13

additional scrutiny of nationals seeking nonimmigrant visas.  Id. § 2(h)(ii).  And for Venezuela, which refuses to cooperate in information sharing but for which alternative means are available to identify its nationals, the Proclamation suspends entry of government officials "involved in screening and vetting procedures" and "their immediate family members" on nonimmigrant business or tourist visas.  Id. § 2(f)(ii).

The Proclamation provides for case-by-case waivers where a foreign national demonstrates that denying entry would cause undue hardship, entry would not pose a threat to the national security or public safety, and entry would be in the national interest. Procl. § 3(c)(i)(A)-(C).  The Proclamation requires periodic reporting to the President about whether entry restrictions should be continued, modified, terminated, or supplemented.  Id. § 4.

4.    a.    Respondents filed suit in the District of Maryland challenging the Proclamation under the INA, various other statutes, and the Establishment, Equal Protection, and Due Process Clauses.  Respondents are 23 individuals and seven organizations. The individual respondents are U.S. citizens or lawful permanent residents who have relatives from Iran, Syria, Yemen, Somalia, or other countries not covered by the Proclamation seeking immigrant or nonimmigrant visas.  Addendum (Add.) 21-22.  Three of the organizational plaintiffs provide services to clients, including refugees and immigrants to the United States.  Add. 22.  The other

14

organizational plaintiffs convene events on issues relating to the Middle East or advocate on behalf of their members.  Ibid.

b.   After highly expedited briefing, the district court granted a worldwide preliminary injunction barring enforcement of Section 2 of the Proclamation, except as to nationals of Venezuela and North Korea, and except for individuals "who have a credible claim of a bona fide relationship with a person or entity in the United States."  Add. 88.

The district court held that at least some respondents have standing and have justiciable claims.  Add. 23-40.  On the merits, the court rejected respondents' claims under 8 U.S.C. 1182(f) because "there is no requirement that a § 1182(f) entry restriction * * * be 'narrowly tailored' or the 'least restrictive means' to obtain its stated aims."  Add. 51.  The court did conclude, however -- in a reversal of its prior position on the question -- that the Proclamation likely violates 8 U.S.C. 1152(a)(1)(A), which bars "discriminat[ing]" or granting a "preference or priority" in the "issuance of an immigrant visa because of," inter alia, an alien's "nationality."  See Add. 42-48.  The court also held that the Proclamation likely violates the Establishment Clause, reiterating its view that EO-2 was the product of animus and holding that the Proclamation fails to "cure" the "taint."  Add. 61-84.

5.   The government promptly appealed the preliminary injunction, requested expedited briefing, and moved for a stay

15

pending appeal as well as a petition for certiorari and proceedings in this Court.  The Fourth Circuit has not acted on the motion.

6.  Meanwhile, litigation over the Proclamation has proceeded in other courts.  As relevant here, the District Court for the District of Hawaii globally enjoined implementation of Section 2's suspension of entry of nationals from the designated countries except Venezuela and North Korea.  Hawaii v. Trump, 2017 WL 4639560 (D. Haw. Oct. 17, 2017).  The Hawaii court held, contrary to the Maryland court, that the Proclamation violates 8 U.S.C. 1182(f) because of insufficient "fit" between the President's findings and the entry restrictions.  Id. at *9.  The court further held that the Proclamation likely violates 8 U.S.C. 1152(a)(1)(A), id. at *12-*13, but the court declined to reach the plaintiffs' constitutional claims, id. at *9.  The government appealed, requested expedited briefing, and sought a stay pending appeal and further proceedings in this Court.  The Ninth Circuit stayed the Hawaii court's injunction "except as to 'foreign nationals who have a credible claim of a bona fide relationship with a person or entity in the United States.'"  Hawaii v. Trump, 2017 WL 5343014, at *1 (9th Cir. Nov. 13, 2017).  The government has filed in this Court an application for a full stay of the Hawaii court's injunction pending appeal and this Court's review.

16

ARGUMENT

Under this Court's Rule 23 and the All Writs Act, 28 U.S.C. 1651, a single Justice or the Court has authority to stay a district-court order pending appeal to a court of appeals.[5]   In considering the application, the Court or Circuit Justice considers whether four Justices are likely to vote to grant certiorari if the court of appeals ultimately rules against the applicant; whether five Justices would then likely conclude that the case was erroneously decided below; and whether, on balancing the equities, the injury asserted by the applicant outweighs the harm to the other parties or the public.  See San Diegans for the Mt. Soledad Nat'l War Mem'l v. Paulson, 548 U.S. 1301, 1302 (2006) (Kennedy, J., in chambers); Hilton v. Braunskill, 481 U.S. 770, 776 (1987) (traditional stay factors).  Here, all of those factors counsel strongly in favor of a stay.  At a minimum, the injunction -- which bars enforcement of the Proclamation's entry suspensions worldwide as to every affected country other than North Korea and Venezuela -- is vastly overbroad and should be stayed to the extent it goes beyond remedying the alleged injury to respondents from the exclusion of identified aliens.

---

[5] See, e.g., Trump v. Hawaii, No. 16-1540, 2017 WL 3045234 (July 19, 2017); West Virginia v. EPA, 136 S. Ct. 1000 (2016); Stephen M. Shapiro et al., Supreme Court Practice § 17.6, at 881-884 (10th ed. 2013).

17

I.  THIS COURT IS LIKELY TO GRANT CERTIORARI IF THE COURT OF
    APPEALS AFFIRMS THE INJUNCTION

     If the Fourth Circuit affirms the injunction against the
Proclamation in whole or in part, this Court is likely to grant
certiorari, as it did when the Fourth and Ninth Circuits upheld
preliminary injunctions against EO-2.  As before, this case
presents exceptionally important questions concerning the
President's authority to exclude aliens abroad based on his
national-security and foreign-policy judgment.  The Proclamation
was expressly authorized by Acts of Congress, 8 U.S.C. 1182(f) and
1185(a)(1), that "implement[] an inherent executive power"
regarding the "admissibility of aliens."  United States ex rel.
Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950).  The district
court's injunction nullifies the President's exercise of that
authority based on a fundamental misreading of the INA and an
accusation that the President was motivated by religious animus.

     This Court has granted certiorari to address interference
with Executive Branch determinations that are of "importance * * *
to national security concerns," Department of Navy v. Egan, 484
U.S. 518, 520 (1988); see Winter v. Natural Res. Def. Council,
Inc., 555 U.S. 7, 12 (2008), and to address "important questions"
of interference with "federal power" over "the law of immigration
and alien status," Arizona v. United States, 567 U.S. 387, 394
(2012); see United States v. Texas, 136 S. Ct. 2271 (2016) (per
curiam).  Both considerations are present here.

18

Indeed, if the Fourth Circuit were to affirm the injunction here, the need for this Court's review would be even greater than before.  Whereas EO-2 was premised on the President's conclusion that uncertainty about the adequacy of other governments' information-sharing warranted a review of their protocols and cooperation, the Proclamation is based on the President's affirmative determinations -- made following a comprehensive, multi-Department review -- that particular countries' information sharing is in fact deficient.  The district court's decision improperly second-guesses those findings and disables the Executive from fully responding to existing and identified national-security risks.  It also undermines the President's ability to use entry restrictions as a means to induce foreign governments' cooperation.

Moreover, by attempting to delve into the President's motives, the district court injected itself into sensitive matters of foreign affairs, risking "what [this] Court has called in another context 'embarrassment of our government abroad' through 'multifarious pronouncements by various departments on one question.'"  Sanchez-Espinoza v. Reagan, 770 F.2d 202, 209 (D.C. Cir. 1985) (Scalia, J.) (quoting Baker v. Carr, 369 U.S. 186, 217, 226 (1962)).  The district court's conclusion that this President cannot avoid a discriminatory "taint" even when he relies on independent assessments by government officials in multiple

19

departments, and after consultation with multiple Cabinet officials, will undermine the President's ability to conduct foreign policy regarding majority-Muslim nations.

II.  THERE IS AT LEAST A FAIR PROSPECT THAT THIS COURT WILL SET ASIDE THE INJUNCTION IN WHOLE OR IN PART

If the Fourth Circuit affirms the injunction in this case, there is at least a "fair prospect" that this Court will vacate the injunction in whole or in part, Lucas v. Townsend, 486 U.S. 1301, 1304 (1988) (Kennedy, J., in chambers), because respondents' claims are not justiciable and because they fail on the merits.

A.  Respondents' Claims Are Not Justiciable

1.  The district court erred in considering respondents' statutory challenges to the Proclamation.  "[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."  Fiallo v. Bell, 430 U.S. 787, 792 (1977).  This Court has accordingly made clear that "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien."  Knauff, 338 U.S. at 543.  The Executive's decision to exclude or deny a visa to an alien abroad therefore "is not subject to judicial review  * * *  unless Congress says otherwise."  Saavedra Bruno v. Albright, 197 F.3d 1153, 1159 (D.C. Cir. 1999).  But Congress has not authorized any judicial review of visa denials -- even when requested by the

20

alien affected, see 6 U.S.C. 236(f) -- much less by third parties like respondents.   In fact, Congress has expressly forbidden "judicial review" of the revocation of a visa even for aliens already in the United States, subject to a narrow exception for an alien in removal proceedings.  8 U.S.C. 1201(i); see also Gov't Br. at 23-26, Trump v. IRAP, No. 16-1436 (Aug. 10 2017).

The district court nevertheless relied on now-vacated opinions from the Fourth and Ninth Circuits to conclude that plaintiffs may challenge "a broader policy as opposed to individual consular determinations."   Add. 37.   But the nonreviewability rule is based on separation-of-powers principles, not the nature of consular officers' individualized visa decisions.  Saavedra Bruno, 197 F.3d at 1159, 1163.  Although the nonreviewability rule is most often applied to individual visa-adjudication decisions, it would invert the constitutional structure to deny review of decisions by consular officers -- subordinate Executive-Branch officials -- while permitting review of a statutory challenge to the President's decision to suspend entry of classes of aliens.

The district court also held that the Administrative Procedure Act (APA), 5 U.S.C. 701 et seq., allows respondents to challenge the Proclamation.  Far from displacing the general rule, the APA embraces it in multiple ways.  First, the APA does not apply at all where Congress has otherwise "preclude[d] judicial

21

review," 5 U.S.C 701(a)(1), and it is "unmistakable" from history that "the immigration laws 'preclude judicial review' of the consular visa decisions." Saavedra Bruno, 197 F.3d at 1160 (citation omitted). Second, the APA's cause of action expressly leaves intact other "'limitations on judicial review,'" which include the nonreviewability rule. Ibid. (quoting 5 U.S.C. 702(1)). Third, unless and until the specific aliens identified by respondents apply for visas, are found by a consular officer to be otherwise eligible to receive visas, and are then denied visas and waivers under the Proclamation, there is no "final agency action" for a court to review, as required by 5 U.S.C. 704. Fourth, the APA does not permit review to the extent "agency action is committed to agency discretion by law." 5 U.S.C. 701(a)(2). The statutes that authorize the Proclamation here, 8 U.S.C. 1182(f) and 1185(a)(1), "exude[] deference" to the President and "foreclose the application of any meaningful judicial standard of review." Webster v. Doe, 486 U.S. 592, 600 (1988).

Review is unavailable for other reasons as well. Respondents' challenges are not ripe because they "rest[] upon 'contingent future events'" -- including that the aliens will not obtain visas -- "'that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300 (1998). And finally, the statute invoked by the district court does not confer on a third party in the United States a judicially cognizable

22

interest in the denial of a visa to an alien abroad that could be the basis for an APA suit.  Section 1152(a)(1)(A) applies to aliens abroad seeking visas, not their relatives or relationship partners in the United States.  The existence of multiple barriers to review of respondents' INA claims counsels against allowing the injunction premised on those claims to disable the Proclamation during an expedited appeal.

2.  The district court further erred in considering respondents' constitutional claims.  This Court has twice permitted limited judicial review where a U.S. citizen claimed that exclusion of an alien violated the citizen's own constitutional rights.  See Kleindienst v. Mandel, 408 U.S. 753, 760, 762 (1972); Kerry v. Din, 135 S. Ct. 2128, 2131 (2015) (opinion of Scalia, J.).  That narrow exception does not permit review of respondents' Establishment Clause challenge because the Proclamation's suspension of entry for certain aliens abroad does not violate respondents' own Establishment Clause rights.

The district court held that some individual respondents have been personally harmed by the Proclamation through the prolonged separation from their relatives, Add. 32-33, but those alleged injuries are not cognizable.  Even if some of the individual respondents' family members would be denied entry under the Proclamation, that would not implicate respondents' own religious-freedom rights under the Establishment Clause, because the denial

23

of a visa to a family member would not result from alleged discrimination against any plaintiff himself. See McGowan v. Maryland, 366 U.S. 420, 429-430 (1961); see also Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 15-18 & n.8 (2004).[6]

Respondents' other asserted injury -- "feelings of marginalization" allegedly arising from the Proclamation, Add. 34 -- fares no better. "[O]nly  * * *  'those persons who are personally denied equal treatment' by  * * *  challenged discriminatory conduct" have suffered a violation of their own rights that confers standing to object to "the stigmatizing injury often caused by racial [or other invidious] discrimination." Allen v. Wright, 468 U.S. 737, 755 (1984) (citation omitted). Regardless of "the intensity" of a plaintiff's feelings of aggrievement, objecting to government action directed at others is not the type of "personal injury" that supports standing to sue, "even though the disagreement is phrased in [Establishment Clause] terms." Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 485-486 (1982).  A plaintiff suffers such injury for Establishment Clause purposes when he himself is "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them."  Id. at 486 n.22.

---

[6] The asserted injuries also are not ripe because the aliens abroad might receive waivers under Section 3(c)(i)(A)-(C) of the Proclamation.  These asserted injuries thus depend on "contingent future events that may not occur."  Texas, 523 U.S. at 300 (citation omitted).

24

Respondents are not subject to the Proclamation; it applies only to aliens abroad.

The district court's contrary holding conflicts with In re Navy Chaplaincy, 534 F.3d 756 (D.C. Cir. 2008) (Kavanaugh, J.), cert. denied, 556 U.S. 1167 (2009).  As the D.C. Circuit explained there, it would "eviscerate well-settled standing limitations" to allow a putative Establishment Clause plaintiff to "re-characterize[]" an abstract injury flowing from "government action" directed against others as a personal injury from "a governmental message [concerning] religion" directed at the plaintiff.  Id. at 764.  If that were permissible, the D.C. Circuit noted, the challengers in Valley Forge and other cases "could have obtained standing to sue simply by targeting not the government's action, but rather the government's alleged 'message' of religious preference communicated through that action."  Ibid.

B.   Respondents' Claims Lack Merit

1.   The Proclamation is consistent with 8 U.S.C. 1152(a)(A)

The district court held that the Proclamation's entry restrictions violate 8 U.S.C. 1152(a)(1)(A), which prohibits "discriminat[ing]" or granting a "preference or priority" in the "issuance of an immigrant visa because of," inter alia, an alien's "nationality."  That interpretation is incorrect, and even the court's reading of Section 1152(a)(1)(A) could not support an

25

injunction against the Proclamation's restrictions on entry as opposed to immigrant-visa issuance.

a. The district court read Section 1152(a)(1)(A) to create a conflict with the President's authority in Section 1182(f) to suspend the entry of "any class" of aliens. There is no conflict, because the two provisions operate in different spheres. Visas are issued by consular officers, but a visa may not be issued if the applicant "is ineligible to receive a visa * * * under [S]ection 1182." 8 U.S.C. 1201(g). Section 1182 lists many grounds for ineligibility, including criminal history, terrorist affiliation, or a Presidential determination under Section 1182(f) that the alien may not enter the United States. Section 1152(a)(1)(A) provides that, within the universe of aliens who are not disqualified from receiving a visa by a Presidential entry suspension under Section 1182(f), under Section 1185(a)(1), or by any other provision of law, consular officers and other government officials are prohibited from discriminating on the basis of nationality in issuing immigrant visas. The 1965 amendment enacting the provision codified at 8 U.S.C. 1152(a)(1)(A) was designed to eliminate the country-based quota system for immigrants that was previously in effect, not to modify the eligibility criteria for admission or limit preexisting restraints on eligibility such as those in Sections 1182(f) or 1185(a)(1).

26

See H.R. Rep. No. 745, 89th Cong., 1st Sess. 12-13 (1965); S. Rep. No. 748, 89th Cong., 1st Sess. 11, 13 (1965).

Historical practice strongly supports that reading. President Reagan, for example, suspended entry of "all Cuban nationals" (with exceptions) based on the Cuban government's decision to suspend execution of an immigration agreement with the United States. Proclamation No. 5517, 51 Fed. Reg. 30,470 (Aug. 26, 1986). President Carter invoked Section 1185(a)(1) in 1979 in response to the Iranian Hostage Crisis and announced that the State Department would "invalidate all visas issued to Iranian citizens" and would not reissue visas or issue new visas "except for compelling and proven humanitarian reasons or where the national interest of our own country requires." The American Presidency Project, Jimmy Carter, Sanctions Against Iran Remarks Announcing U.S. Actions (Apr. 7, 1980), https://goo.gl/3sYHLB; see Exec. Order No. 12,172, § 1-101, 44 Fed. Reg. 67,947 (Nov. 28, 1979). Those actions would be unlawful under the decision below.

The district court's interpretation of the INA raises grave constitutional questions because it would mean that, by statute, the President cannot suspend entry of aliens from a specified country even if he is aware of a particular threat from an unidentified national of that country, or the United States is on the brink of war with it. The district court's response was that Section 1152(a)(1)(A) might not apply to an entry restriction "of

27

limited duration, such as during a specific urgent national crisis." Add. 45. But the text of Section 1152(a)(1)(A) provides no standards that would enable the judiciary to assess whether, for example, the situation in North Korea justifies entry restrictions but the terrorist threat in Somalia does not. That is because Section 1152(a)(1)(A) does not prohibit the President from imposing restrictions on aliens from particular countries in order to protect the Nation in the first place.

b.    Even if Section 1152(a)(1)(A) did conflict with Sections 1182(f) and 1185(a)(1), the latter provisions would govern. The district court's contrary view requires reading Section 1152(a)(1)(A) as partially "repeal[ing]" Sections 1182(f) and 1185(a)(1) by "implication," which is improper unless Congress's "intention" is "clear" and "manifest." National Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 662, 664 n.8 (2007) (citation omitted). Nothing in Section 1152(a)(1)(A) -- which does not mention the President or entry -- demonstrates a "clear and manifest" congressional intent to narrow the grants of authority to the President in Sections 1182(f) and 1185(a)(1). Id. at 662 (citation omitted). Sections 1182(f) and 1185(a)(1) also control as the more specific statutes because they confer distinct powers on the President to suspend entry when he determines the national interest requires in particular circumstances, see Sale v. Haitian Ctrs. Council, Inc., 509 U.S.

28

155, 171-173 (1993), as opposed to Section 1152(a)(1)(A)'s generic prohibition on discrimination in the day-to-day issuance of immigrant visas.  Moreover, Section 1185(a)(1) was enacted in its current form in 1978, after Section 1152(a)(1), and thus it prevails as the most recent statute.  See Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95-426, § 707(a), 92 Stat. 992-993.

c.   The district court's reading of 8 U.S.C. 1152(a)(1)(A) suffers from the additional flaw that it cannot justify an injunction against the Proclamation, because the statute by its terms concerns only the "issuance of  * * *  immigrant visa[s]." Even if Section 1152(a)(1)(A) prohibited the government from denying visas to immigrant applicants from particular countries, Section 1152(a)(1)(A) still would not require the government to take the additional step of allowing the entry of those aliens to the United States.[7]

2.    The    Proclamation    is    consistent    with    the Establishment Clause

Under this Court's precedents, the district court erred in probing behind the facially legitimate and bona fide explanation for the President's national-security directive in search of the President's "true" motive.  But even were it otherwise, the

_____

[7] The district court recognized that Section 1152(a)(1)(A) is limited to immigrant visas.  Add. 48.  As a result, that provision has no bearing on the large number of aliens covered by the Proclamation who seek nonimmigrant visas.

29

district court's reasoning disregards the crucial differences between EO-2 and the Proclamation, especially that the latter reflects tailored restrictions to address specific deficiencies in other countries' identity-management protocols, information-sharing practices, and risk factors, that were revealed in a review process by multiple government officials whose motives have never been questioned.

a. Respondents' constitutional challenge to the exclusion of aliens abroad is foreclosed by Mandel, supra. Mandel held that "when the Executive exercises" its authority to exclude aliens "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens. 408 U.S. at 770. That test -- which this Court has recently described as "minimal scrutiny (rational-basis review)," Sessions v. Morales-Santana, 137 S. Ct. 1678, 1693 (2017) -- reflects the Constitution's allocation of "exclusive[]" authority over the exclusion of aliens to Congress and the Executive. Mandel, 408 U.S. at 765; see Fiallo, 430 U.S. at 792 (applying Mandel in rejecting equal-protection challenge to statute governing admission of aliens).

A straightforward application of Mandel resolves this case. The district court agreed that the Proclamation is premised on a facially legitimate purpose:  protecting national security and the

national interest.  Add. 63.  And the Proclamation sets forth a bona fide factual basis for that justification:  a comprehensive multi-Department review revealed significant deficiencies in the information sharing and identity-management practices of a handful of governments, and those governments did not improve even after diplomatic engagement.  Procl. § 1.

The district court treated Mandel's "bona fide" requirement as a license to ensure that the government's stated reason was not given in "bad faith."  Add. 63.  That was error, as the government has previously explained.  See 16-1436 Gov't Br. 67-69.  The Mandel Court explicitly held that the "bona fide" analysis does not permit "look[ing] behind" the government's stated reason.  408 U.S. at 770.  The district court's approach depends on a misreading of Din, supra, which did not endorse the district court's wide-ranging search for pretext.  See 16-1436 Gov't Br. 67-69.

b.  Even if the district court could appropriately disregard Mandel, its conclusion that the Proclamation is likely unconstitutional still would be untenable.  As the district court recognized, the Proclamation is "facially neutral" with respect to religion, Add. 73, and it is neutral in its operation:  it draws distinctions among countries based on national-security risks identified by Congress and the Executive, not religion, and applies without regard to religion within the eight designated countries. The district court nevertheless reasoned that a different order,

EO-2, was the product of religious animus, and that the Proclamation failed to "cure" that taint.  Add. 64-84.  Both the premise and the conclusion are wrong.

i.  As the government has previously explained, the district court was wrong to start from the premise that EO-2 was illegitimate.  See 16-1436 Gov't Br. 70-78.  The court impermissibly relied on certain extrinsic material, principally comments made by then-candidate Trump and by campaign and presidential aides.  Add. 66-72.  The court's approach was precisely the sort of "judicial psychoanalysis of" a government official's "heart of hearts" that this Court has rejected. McCreary County v. ACLU of Ky., 545 U.S. 844, 862 (2005).  It threatens impermissible intrusion on privileged internal Executive Branch deliberations, see United States v. Nixon, 418 U.S. 683, 708 (1974), and carries the potential for litigant-driven discovery that would disrupt the President's execution of the laws, see Nixon v. Fitzgerald, 457 U.S. 731, 749-750 (1982).

ii. Regardless of any conclusion about EO-2, however, respondents have not plausibly alleged that the Proclamation was the product of religious animus.  The Proclamation differs from EO-2 both in process and in substance.  It is the product of a review and recommendation process undertaken by multiple Cabinet officials and other Executive officers whose motives have never been questioned.  It is based on express findings of inadequacies

32

in other countries' identity-management protocols, information-sharing practices, and risk factors, as well as a Presidential determination that tailored entry restrictions will both protect the Nation and encourage those countries to improve.  And it covers different countries than EO-2:  removing one majority-Muslim country; adding other countries that are both majority-Muslim and non-majority-Muslim; and excluding various categories of nonimmigrant travelers, including from majority-Muslim countries.

The district court's grounds for concluding that the Proclamation is "tainted" by EO-2 do not withstand scrutiny.  The court reasoned that the Proclamation is similar to EO-2 because it imposes entry restrictions on some of the same foreign nationals based on national-security concerns.  Add. 75-78.  EO-2, however, restricted countries that Congress and the Executive had previously identified as posing heightened terrorism-related concerns, pending a full review.  That review has now occurred, and the fact that some but not all of those countries were similarly assessed to be problematic under the Proclamation's criteria cannot possibly be a constitutional disability.

The district court also criticized the Proclamation for "deviating from the general findings of the DHS review," citing the restrictions on Somalia and Venezuela.  Add. 78.  But in each case, the Proclamation explained why the President's determinations were justified by individual country conditions.

33

Although Somalia generally satisfies the government's information-sharing criteria, the Acting Secretary of Homeland Security explained that it has identity-management deficiencies and a persistent terrorist presence, and the President determined that those unique circumstances warranted restrictions.  See Procl. §§ 1(i), 2(h)(ii).  Venezuela does not share needed information, but the Proclamation explains that the United States has alternative means to verify the identity of its nationals, and so the President determined that a less restrictive approach was appropriate.  See id. § 2(f)(ii).

The district court responded that the multi-agency review process is not sufficient to justify the Proclamation because the outcome of that process "was at least partially pre-ordained." Add. 76.  The court pointed to a sentence in Section 2(e) of EO-2 stating that the Acting Secretary of Homeland Security "'shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals,'" which the court read to mean that the Acting Secretary was not permitted "to recommend that no nationality-based travel ban is necessary." Ibid.  That is not a fair reading of EO-2, which specifically reserved judgment about whether it would be "appropriate" to prohibit the entry of any category of foreign nationals.  Moreover, the Proclamation left it to the Acting Secretary to assess what

34

information was required from each country, which was the key factor driving whether any further entry restrictions would be appropriate.   The Proclamation explains the national-security reasons that led the Acting Secretary to recommend entry restrictions on each of the countries covered by the Proclamation, and there is no evidence whatsoever that the Acting Secretary felt constrained by EO-2 to recommend entry restrictions on at least some countries.

The district court also made its own assessment that the Proclamation lacks "facts establishing that a broad nationality-based travel ban is justified."   Add. 79.   No such "facts" are required.   Past Presidents have suspended or restricted entry of aliens from particular nationalities "not because of a particular concern that entry of the individuals themselves would be detrimental, but rather, as retaliatory diplomatic measures."   Hawaii v. Trump, 859 F.3d 741, 772 n.13 (9th Cir. 2017) (per curiam) (emphases added).   In any event, the President here relied on the results of the government's comprehensive review process, which included detailed assessments of the threat conditions in each of the covered countries.   This Court has recognized that the President generally need not "disclose" the specifics of his "reasons for deeming nationals of a particular country a special threat."   Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 491 (1999).   Especially "when it comes to collecting

35

evidence and drawing factual inferences" in the national-security context, "'the lack of competence on the part of the courts is marked,' * * * and respect for the Government's conclusions is appropriate." Holder v. Humanitarian Law Project, 561 U.S. 1, 34 (2010) (HLP).

Finally, the district court once again invoked extrinsic statements of the President characterizing EO-2. Add. 81-83. In addition to being improper for all of the reasons explained above, those statements are inapposite here because the criteria for the review that led to the Proclamation were developed by multiple government agencies and their Cabinet heads. There is no reason to doubt their integrity or the legitimacy of their conclusions, and it is those conclusions that justify the Proclamation.

III. THE BALANCE OF EQUITIES SUPPORTS A STAY

A. The injunction causes direct, irreparable injury to the interests of the government and the public, which merge here, see Nken v. Holder, 556 U.S. 418, 435 (2009). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Maryland v. King, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quoting New Motor Vehicle Bd. v. Orrin W. Fox Co., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)) (brackets in original). A fortiori this is true when a Proclamation of the President of the United States is enjoined.

36

The injunction here, moreover, is particularly harmful because it directly undermines the government's ability to safeguard national security and conduct foreign relations -- "urgent objective[s] of the highest order." Trump v. IRAP, 137 S. Ct. 2080, 2088 (2017) (quoting HLP, 561 U.S. at 28). As discussed, the Proclamation is based on a finding that certain foreign governments have inadequate information-sharing, identity-management protocols, or other risk factors that deny the United States sufficient information to assess the risks posed by their nationals; it thus suspends entry of certain nationals from those countries and applies diplomatic pressure in order to achieve greater cooperation. As this Court previously recognized, "[t]o prevent the Government from pursuing that objective * * * would appreciably injure its interests." Ibid.

The district court was wrong to discount these harms. Add. 86. Despite acknowledging that "no governmental interest is more compelling than the security of the Nation," Add. 86, the court was not persuaded "that national security cannot be maintained without the unprecedented" Proclamation, because "visa applicants from the Designated Countries [will] still be screened." Ibid. But the Proclamation rests on a different policy judgment by the President, informed by a just-completed, multi-agency review, that the information provided by certain foreign governments is not adequate, and furthermore that the tailored restrictions will

motivate foreign governments to improve their practices.  It is the injunction in this case that departs from the status quo by breaking with historical practice to sharply curtail the President's authority.

For the same reason, the fact that the court limited its injunction to parties with a bona fide relationship with a person or entity in the United States is not sufficient to prevent irreparable harm to the government.  That standard was designed to track the limitations that this Court imposed on the injunctions against EO-2.  But as explained, EO-2 involved temporary procedures before the review was conducted and in the absence of a Presidential determination concerning the adequacy of foreign governments' information-sharing.  Now that the review has been completed and identified ongoing deficiencies in the information needed to assess nationals of particular countries, additional restrictions are warranted.  The Proclamation found that persons traveling on immigrant visas create particular challenges, Procl. § 1(h)(ii), yet the district court's order would surely undermine the Proclamation's suspensions on immigrant-visa travel, because most immigrant-visa holders have a bona fide relationship with a person or entity in the United States.

The district court also stated that the public interest is served by barring enforcement of a Proclamation that violates the Establishment Clause and the INA.  Add. 87.  That reasoning

38

conflates the equities and the merits.   And it mistakenly disregards the public's interest in effectuating the Executive's determination to exclude certain aliens from countries that pose a heightened threat.   Cf. Nken, 556 U.S. at 436 (That "there is a public interest in preventing aliens from being wrongfully removed * * * is no basis for the blithe assertion of an 'absence of any injury to the public interest' when a stay [of a removal order] is granted.").   The public has a strong interest in suspension of entry of aliens whose admission the President has determined, in consultation with his Cabinet and pursuant to his statutory authority, would be detrimental to the Nation's interests.

B.   By contrast, respondents have failed to "demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22.   The only concrete harm respondents allege is that the Proclamation will prevent certain identified aliens from entering the United States.   But delay in entry alone, especially for the brief period while the government's appeal of the injunction is pending (on an expedited briefing schedule), does not amount to irreparable harm.   Moreover, as explained above, see p. 21, supra, it is speculative whether any particular aliens abroad would be denied a waiver and actually delayed during the pendency of an appeal.   At the very least, respondents' speculative allegations do not outweigh the harm caused to the Nation as a whole in protecting the national security.

39

IV.  THE GLOBAL INJUNCTION IS OVERBROAD AND SHOULD BE STAYED TO
     THE EXTENT IT GRANTS RELIEF BEYOND RESPONDENTS THEMSELVES

     At a minimum, a stay is warranted because the injunction is
vastly overbroad, as it was in United States Department of Defense
v. Meinhold, 510 U.S. 939 (1993) (unanimously granting stay of
injunction pending appeal insofar as it "grant[ed] relief to
persons other than" the named plaintiff).  Both Article III and
equitable principles require that injunctive relief must be
limited to redressing a plaintiff's own injuries stemming from a
violation of his own rights.  See 16-1436 Gov't Br. 78-79.  That
is especially so for a preliminary injunction in the context of
national security.  But the district court's injunction enjoins
any application of the Proclamation's restrictions to any national
of six of the covered countries with a credible claim of a bona
fide relationship with a person or entity in the United States.
As noted, that would cover most individuals seeking immigrant
visas, and thus many of the foreign nationals covered by the
Proclamation.  The court stated that respondents "are located in
different parts of the United States," Add. 90, and that "an
Establishment Clause violation has impacts beyond the personal
interests of individual parties," ibid., but neither of those
observations explains why a sweeping injunction is necessary to
afford complete relief to respondents themselves.

     The district court also asserted that the need for uniform
immigration law compels nationwide relief.  Add. 90-91.  To the

40

contrary, respect for uniformity requires leaving the Proclamation's global policy in place, with individualized exceptions for any respondents who have established irreparable injury from a violation of their own rights. The Proclamation's severability clause compels the same conclusion. Procl. § 8(a). Tailored relief would impose far less interference than enjoining the Proclamation categorically based on the injuries to a few individuals and organizations. As in Meinhold, this Court at a minimum should stay the injunction to the extent it affords relief beyond respondents themselves.

CONCLUSION

The injunction should be stayed in its entirety pending the disposition of the appeal in the Fourth Circuit and, if that court affirms the injunction, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court. At a minimum, the injunction should be stayed as to all persons other than those aliens specifically identified by respondents whose exclusion would impose a cognizable, irreparable injury on respondents themselves.

Respectfully submitted.

NOEL J. FRANCISCO
Solicitor General

NOVEMBER 2017

ADDENDUM

District Court Memorandum Opinion Granting Preliminary
    Injunction (D. Md. Oct. 17, 2017) ...........................1

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017).....92

Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 27, 2017) ....103

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| INTERNATIONAL REFUGEE ASSISTANCE PROJECT, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. TDC-17-0361 |
| DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*, | |
| Defendants. | |
| IRANIAN ALLIANCES ACROSS BORDERS, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. TDC-17-2921 |
| DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*, | |
| Defendants. | |
| EBLAL ZAKZOK, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. TDC-17-2969 |
| DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

For the third time this year, President Donald J. Trump has issued an order banning the

entry into the United States, with some exceptions, of nationals of multiple predominantly

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 46 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 2 of 91
Add. 2

Muslim nations.  At issue is whether this latest travel ban should be enjoined by this Court because it is the latest incarnation of the "Muslim ban" originally promised by President Trump as a candidate for the presidency, and thus violates the Establishment Clause of the First Amendment to the United States Constitution, or because the issuance of the travel ban exceeds the President's delegated authority under the Immigration and Nationality Act to suspend the entry into the United States of classes of immigrants and nonimmigrants.  For the reasons set forth below, the Court concludes that a preliminary injunction is warranted.

## INTRODUCTION

On January 27, 2017, President Trump issued Executive Order 13,769, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO-1"), 82 Fed. Reg. 8977 (Jan. 27, 2017), which barred the entry into the United States of nationals of seven predominantly Muslim countries for a 90-day period.  On February 7, 2017, Plaintiffs International Refugee Assistance Project ("IRAP"), HIAS, Inc., and seven individuals (collectively, "the IRAP Plaintiffs"), filed a Complaint in this Court alleging that EO-1 violated the Establishment Clause of the First Amendment, U.S. Const. amend. I; the equal protection component of the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V; the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-1537 (2012); the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4 (2012); the Refugee Act, 8 U.S.C. §§ 1521-1524 (2012); and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2012).

On March 6, 2017, after EO-1 was enjoined by other federal courts, President Trump issued Executive Order 13,780 ("EO-2"), which bears the same title as EO-1 and was scheduled to go into effect and supplant EO-1 on March 16, 2017.  82 Fed. Reg. 13209 (Mar. 9, 2017).  Section 2(c) of EO-2 suspended for 90 days the entry into the United States of nationals of Iran,

Add. 3

Libya, Somalia, Sudan, Syria, and Yemen.  On March 10, 2017, the IRAP Plaintiffs amended

their Complaint to seek the invalidation of EO-2, alleging the same causes of action pleaded in

their original Complaint.  The IRAP Plaintiffs also filed a motion for a preliminary injunction

against the enforcement of EO-2, on Establishment Clause and INA grounds.  On March 15,

2017, this Court enjoined enforcement of Section 2(c) after finding that the IRAP Plaintiffs were

likely to succeed on their claim that EO-2 violated the Establishment Clause.  *Int'l Refugee*

*Assistance Project v. Trump* ("*IRAP*"), 241 F. Supp. 3d 539 (D. Md. 2017).  This Court's Order

was then appealed to and in substantial part affirmed by the United States Court of Appeals for

the Fourth Circuit, sitting *en banc*.  *Int'l Refugee Assistance Project v. Trump* ("*IRAP*"), 857

F.3d 554 (4th Cir. 2017).  In light of the expiration of EO-2, the Fourth Circuit's judgment has

since been vacated as moot by the United States Supreme Court.  *Trump v. Int'l Refugee*

*Assistance Project*, No. 16-1436, 2017 WL 4518553  (Oct. 10, 2017).

On September 24, 2017, President Trump issued Presidential Proclamation 9645, entitled

"Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United

States by Terrorists or Other Public-Safety Threats" ("Proclamation"), which will bar

indefinitely the entry into the United States of some or all nationals of Iran, Libya, Somalia,

Syria, Yemen, Chad, North Korea, and Venezuela.  82 Fed. Reg. 45161 (Sept. 27, 2017).

On October 3, 2017, Iranian Alliances Across Borders ("IAAB") and Doe Plaintiffs 1-6

(collectively, the "IAAB Plaintiffs") filed a Complaint in this Court asserting that the

Proclamation violates the INA, the Establishment Clause, the Free Speech Clause of the First

Amendment, and the equal protection and procedural due process components of the Due

Process Clause of the Fifth Amendment.  On October 5, 2017, the IRAP Plaintiffs, now

consisting of IRAP, HIAS, Middle East Studies Association ("MESA"), Arab-American

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 48 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 4 of 91

Add. 4

Association of New York ("AAANY"), Yemeni-American Merchants Association ("YAMA"),
John Does No. 1 and 3-5, Jane Doe No. 2, Muhammed Meteab, Mohamad Mashta, Grannaz
Amirjamshidi, Fakhri Ziaolhagh, Shapour Shirani, and Afsaneh Khazaeli, filed a Second
Amended Complaint in which they repeated their prior causes of action and extended them to the
Proclamation, added a second claim under the INA alleging that the Proclamation exceeded the
President's statutory authority, and added a claim that the Proclamation violated the procedural
due process protections of the Fifth Amendment.  On October 6, 2017, in a separate case, Eblal
Zakzok, Sumaya Hamadmad, Fahed Muqbil, John Doe No. 1, and Jane Does No. 2-3
(collectively, "the Zakzok Plaintiffs") filed a Complaint stating causes of action under the
Establishment Clause, the INA, and the APA.  On October 12, 2017, the IAAB Plaintiffs
amended their Complaint to add the Iranian Students' Foundation ("ISF"), an affiliate of IAAB
at the University of Maryland College Park, as a Plaintiff.  The IAAB Plaintiffs subsequently
filed a Motion for Leave, which the Court has since granted, seeking to file declarations from
representatives of ISF in support of the Motion for a Preliminary Injunction.

Each of these three separate cases name some or all of the following as Defendants:
President Trump; the U.S. Department of Homeland Security; the U.S. Department of State;
Elaine C. Duke, Acting Secretary of Homeland Security; Rex W. Tillerson, Secretary of State;
Dan Coats, Director of National Intelligence; Jefferson Beauregard Sessions, III, Attorney
General; Kevin K. McAleenan, Acting Commissioner of U.S. Customs and Border Protection;
James McCament, Acting Director of U.S. Citizenship and Immigration Services.  All of the
Plaintiffs seek injunctive and declaratory relief.

On October 6, 2017, the IRAP Plaintiffs filed a Motion for a Preliminary Injunction in
which they ask this Court to enjoin the Proclamation in its entirety before it takes effect.  The

Add. 5

IAAB and Zakzok Plaintiffs have also each filed a Motion for a Preliminary Injunction and have joined in the arguments of the IRAP Plaintiffs.   Defendants filed a consolidated brief in opposition to the Motions on October 12, 2017, and Plaintiffs filed separate reply briefs on October 14, 2017.   The Court held a hearing on the Motion on October 16, 2017.   With the matter fully briefed and argued, the Court now issues its findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.      Public Statements

On December 7, 2015, then-presidential candidate Donald J. Trump posted a "Statement on Preventing Muslim Immigration" on his campaign website in which he "call[ed] for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on."  Joint Record ("J.R.") 85.   Trump promoted the Statement on Twitter that same day, stating that he had "[j]ust put out a very important policy statement on the extraordinary influx of hatred & danger coming into our country.   We must be vigilant!"  J.R. 209.  In a March 9, 2016 interview with CNN, Trump stated his belief that "Islam hates us," and that the United States had "allowed this propaganda to spread all through the country that [Islam] is a religion of peace."  J.R. 255-57.   Then, in a March 22, 2016 Fox Business interview, Trump reiterated his call for a ban on Muslim immigration, asserting that his call for the ban had gotten "tremendous support" and that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country."  J.R. 261.

In a May 11, 2016 appearance on *On the Record*, Trump stated that he would ask former New York City Mayor Rudolph W. Giuliani to lead a group to "look at the Muslim ban or temporary ban," that there "has to be something," and that he had "[g]reat Muslim friends who are telling me you are so right. … [T]here is something going on that we have to get to the

Add. 6

bottom of." J.R. 513. In a June 13, 2016 speech, Trump stated that "[w]e have to control the amount of future immigration into this country to prevent large pockets of radicalization from forming inside America," noting that "[e]ach year, the United States permanently admits more than 100,000 immigrants from the Middle East, and many more from Muslim countries outside the Middle East." J.R. 528.

In a July 24, 2016 interview on *Meet the Press* soon after he accepted the Republican nomination, Trump was asked about the "Muslim ban." J.R. 219. Trump responded that immigration should be "immediately suspended" "from any nation that has been compromised by terrorism until such time as proven vetting mechanisms have been put in place." J.R. 219. When questioned whether this formulation was a "rollback" of his December 2015 call for a "Muslim ban," Trump disagreed, stating "I don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territories." J.R. 220. He explained that "[p]eople were so upset when I used the word Muslim," so he was instead "talking territory instead of Muslim." *Id.* During the October 9, 2016 Presidential Debate, when asked by the moderator about his proposed "Muslim ban," he explained that the "Muslim ban" had "morphed into an extreme vetting from certain areas of the world." J.R. 591.

On December 21, 2016, when asked whether a recent attack in Germany affected his proposed Muslim ban, President-Elect Trump replied, "You know my plans. All along, I've proven to be right. 100% correct." J.R. 245. In a written statement about the events, he lamented the attack on people "prepared to celebrate the Christmas holiday" by "ISIS and other Islamic terrorists [who] continually slaughter Christians in their communities and places of worship as part of their global jihad." J.R. 245.

Add. 7

## II.     Executive Order 13,769

On January 27, 2017, a week after his inauguration, President Trump issued EO-1 in which, pursuant to 8 U.S.C. § 1182(f), the President suspended for 90 days the entry into the United States of immigrant and nonimmigrants who were nationals of Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen, based on his finding that such entry was "detrimental to the interests of the United States."   EO-1 § 3(c).   Each of these countries has a predominantly Muslim population, including Iraq, Iran, and Yemen, which are more than 99 percent Muslim.   The provision allowed for exceptions on a "case-by-case basis" when such an exception was "in the national interest."   EO-1 § 3(g).   EO-1 also required changes to the refugee screening process "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality."   EO-1 § 5(b).   It further provided that during this 90-day period, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence ("DNI"), was to initiate a review process beginning with "a review to determine the information needed from any country" to assess whether an individual from that country applying for a "visa, admission, or other benefit . . . is not a security or public-safety threat," the generation of a list of countries that do not provide adequate information of this nature, and a consultation process to request such information from those countries.   EO-1 § 3(a)-(d).   At the end of this review process, the Secretary of Homeland Security was required to "submit to the President a list of countries recommended for inclusion on a Presidential proclamation that would prohibit entry of foreign nationals . . . from countries that do not provide the information requested."   EO-1 § 3(e).

7

Add. 8

When preparing to sign EO-1, President Trump remarked, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.'  We all know what that means." J.R. 142.  That same day, President Trump stated in an interview on the Christian Broadcasting Network that EO-1 would give preference in refugee applications to Christians.  Referring to Syria, President Trump stated that "[i]f you were a Muslim you could come in, but if you were a Christian, it was almost impossible," a situation that he thought was "very, very unfair."  J.R. 201.  The day after EO-1 was issued, President Trump assured reporters that implementation of EO-1 was "working out very nicely and we're going to have a very, very strict ban."  J.R. 123. That same day, Mayor Giuliani appeared on Fox News and asserted that President Trump told him he wanted a Muslim ban and asked Giuliani to "[s]how me the right way to do it legally." J.R. 247.  Giuliani, in consultation with others, proposed that the action be "focused on, instead of religion . . . the areas of the world that create danger for us," specifically "places where there are [*sic*] substantial evidence that people are sending terrorists into our country."  J.R. 247-248.

EO-1 prompted several legal challenges, including an action filed in the United States District Court for the Western District of Washington based on the Due Process, Establishment, and Equal Protection Clauses of the Constitution that resulted in a nationwide temporary restraining order ("TRO") issued on February 3, 2017 against several sections of EO-1.  *See, e.g.*, *Washington v. Trump*, C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).  On February 9, 2017, the United States Court of Appeals for the Ninth Circuit, construing the order as a preliminary injunction, upheld the entry of the injunction.  *Washington v. Trump*, 847 F.3d 1151, 1165-66 (9th Cir. 2017).  Although it did not reach the Establishment Clause claim, the Ninth Circuit noted that the asserted claim raised "serious allegations" and presented "significant constitutional questions."  *Id.* at 1168.  On February 13, 2017, the United States District Court

Add. 9

for the Eastern District of Virginia found a likelihood of success on the merits of an Establishment Clause claim and issued an injunction against enforcement of Section 3(c) of EO-1 as to Virginia residents or students enrolled a Virginia state educational institution. *Aziz v. Trump*, 234 F. Supp. 3d 724, 739 (E.D. Va. 2017).

In response to the injunctions against EO-1, President Trump maintained at a February 16, 2017 news conference that EO-1 was lawful but that a new Order would be issued. J.R. 91. Stephen Miller, Senior Policy Advisor to the President, described the changes being made to the Order as "mostly minor technical differences," emphasizing that the "basic policies are still going to be in effect." J.R. 319. White House Press Secretary Sean Spicer stated that "[t]he principles of the [second] executive order remain the same" and described EO-1 as a legal exercise of the President's power "to suspend immigration." J.R. 78, 118. As of February 12, 2017, Trump's Statement on Preventing Muslim Immigration remained on his campaign website. J.R. 207.

## III.    Executive Order 13,780

On March 6, 2017, President Trump issued EO-2, which was scheduled to go into effect and supplant EO-1 on March 16, 2017. Section 2(c) of EO-2 reiterated the 90-day ban on entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen, but removed Iraq from the list. EO-2 applied only to individuals outside the United States who did not have a valid visa as of the issuance of EO-1 and who had not obtained one prior to the effective date of EO-2. In addition, the travel ban expressly exempted lawful permanent residents ("LPRs"), dual citizens traveling under a passport issued by a country not on the banned list, asylees, and refugees already admitted to the United States, and it provided a list of specific scenarios under which a case-by-case waiver could be granted.

9

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 54 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 10 of 91
Add. 10

To justify its restrictions on entry by nationals of the listed countries, EO-2 stated that "the conditions in these countries present heightened threats" because each country is "a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones." EO-2 § 1(d) (citing information from the State Department's *Country Reports on Terrorism 2015*).  EO-2 stated that, as a result, the governments of the listed countries were less willing or able to provide necessary information for the visa or refugee vetting process, such that there was a heightened chance that individuals from these countries would be "terrorist operatives or sympathizers."  EO-2 § 1(d).  EO-2 therefore concluded that the risk of admitting individuals from these countries was "unacceptably high" because the United States was unable "to rely on normal decision-making procedures" about their travel.  EO-2 § 1(b)(ii), (f).  EO-2 disavowed that EO-1 was motivated by religious animus.

EO-2 also stated that "Since 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States" and referenced two Iraqi refugees who were convicted of terrorism-related offenses and a naturalized U.S. citizen who came to the United States from Somalia as a child refugee and had been convicted of a plot to detonate a bomb at a Christmas tree lighting ceremony.  EO-2 § 1(h).  It did not identify any instances of individuals who came from Iran, Libya, Sudan, Syria, or Yemen engaging in terrorist activity in the United States.

Like EO-1, EO-2 instructed the Secretary of Homeland Security, in consultation with the Secretary of State and the DNI, to conduct a worldwide review to determine whether additional information from foreign governments was needed to enable the United States to determine whether a foreign national applying for a visa or for admission was a security or public safety threat.  The Secretary of Homeland Security was then required to submit a report within 20 days

Add. 11

providing the results of the review, including listing countries that do not provide adequate information and identifying the needed information. The Secretary of State was then required to request that the listed countries begin providing the needed information within 50 days. At the end of the 50-day period, the Secretary of Homeland Security was to "submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means." EO-2 § 2(f). The Secretary of Homeland Security could also identify other countries for other restrictions or limitations that would be appropriate.

The same day that EO-2 was issued, Attorney General Jefferson B. Sessions, III and Secretary of Homeland Security John F. Kelly submitted a letter to the President recommending a temporary suspension on the entry to the United States of nationals of certain countries so as to facilitate a review of security risks in the immigration system. Upon the issuance of EO-2, Secretary of State Rex Tillerson described it as "a vital measure for strengthening our national security." J.R. 115. In a March 7, 2017 interview, Secretary of Homeland Security Kelly stated that the Order was not a Muslim ban but instead was focused on countries with "questionable vetting procedures," but noted that there were 13 or 14 countries with questionable vetting procedures, "not all of them Muslim countries and not all of them in the Middle East." J.R. 150. Other White House officials, noting that EO-2's provisions were temporary, stated that the ban might be extended past 90 days and to additional countries. J.R. 116.

Add. 12

## IV.    Litigation on EO-2

On March 10, 2017, the IRAP Plaintiffs amended their Complaint to seek the invalidation of EO-2, alleging the same causes of action pleaded in their original Complaint.  The IRAP Plaintiffs also filed a motion for a preliminary injunction against the enforcement of EO-2, on Establishment Clause and INA grounds.  On March 15, 2017, this Court enjoined enforcement of Section 2(c) after finding that the IRAP Plaintiffs were likely to succeed on their claim that EO-2 violated the Establishment Clause.  *IRAP*, 241 F. Supp.3d  at 566.  The same day, the United States District Court for the District of Hawaii issued a TRO, later converted to a preliminary injunction, barring enforcement of Sections 2 and 6 of EO-2.  *Hawaii v. Trump*, 241 F. Supp. 3d 1119, 1140 (D. Haw. 2017).

This Court's Order was appealed to and in substantial part affirmed by the Fourth Circuit on May 25, 2017.  *IRAP*, 857 F.3d 554, 606 (4th Cir. 2017) (en banc).  In so ruling, the Fourth Circuit described EO-2 as one that "drips with religious intolerance, animus, and discrimination." *Id.* at 572.  After finding that an individual plaintiff had standing to challenge the ban and concluding that upon a showing of bad faith it could "look behind" a proffered "facially legitimate" reason for the action, the court applied standard Establishment Clause analysis to conclude that because EO-2 "cannot be divorced from the cohesive narrative linking it to the animus that inspired it . . . the reasonable observer would likely conclude that [EO-2's] primary purpose is to exclude persons from the United States on the basis of their religious beliefs." *IRAP*, 857 F.3d at 586, 590-92, 601.

Meanwhile, the Ninth Circuit affirmed in substantial part the preliminary injunction ordered by the District of Hawaii on the grounds that EO-2 exceeded the President's authority under the INA, primarily in that it did not contain a sufficient finding of detrimental interest as

12

Add. 13

required by the statute and that it violated the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas. *Hawaii v. Trump*, 859 F. 3d 741, 774, 779 (9th Cir. 2017). The Government sought review of both the Fourth Circuit and Ninth Circuit decisions by the United States Supreme Court, which consolidated the cases for argument. *Trump v. Int'l Refugee Assistance Project* and *Trump v. Hawaii*, 137 S. Ct. 2080, 2086 (2017) (granting writ of certiorari). Pending resolution of those appeals, the Supreme Court declined the Government's request to stay the injunctions of EO-2 in their entirety, but ordered a partial stay of the injunctions to permit their enforcement against only foreign nationals who lack a credible claim of a bona fide relationship with a person or organization within the United States. *Id.* at 2087.

In light of the expiration of EO-2, the Supreme Court requested supplemental briefing on whether the case relating to EO-2 is now moot. *Trump v. IRAP*, No. 16-1436, 2017 WL 2405595 (Sept. 25, 2017). On October 10, 2017, after that supplemental briefing, the Supreme Court vacated the judgment of the Fourth Circuit with instructions to dismiss as moot the challenge to EO-2. The Supreme Court expressed no opinion on the merits.[1] *Trump v. IRAP*, No. 16-1436, 2017 WL 4518553 (Oct. 10, 2017).

## V.    Public Statements Since EO-2

At a March 16, 2017 rally, President Trump reported to the audience that EO-2 had been enjoined and described it as a "watered down version of the first one" that had been "tailor[ed]" by lawyers in response to prior legal challenges. J.R. 652-53. He emphasized that "we ought to

---

[1]   Because the judgment of the Fourth Circuit has been vacated as moot, it has been "strip[ped] of its binding effect." *Deakins v. Monaghan*, 484 U.S. 193, 200 (1988). Accordingly, this Court does not rely on the Fourth Circuit's opinion as controlling authority and will review all legal questions decided by the Fourth Circuit anew, without reliance on that Court's prior decision. However, as confirmed at the hearing on the Motions, the parties agree that the Court may cite the Fourth Circuit opinion as persuasive authority, so this Court does so on a limited basis.

Add. 14

go back to the first one and go all the way, which is what I wanted to do in the first place."  J.R. 653.

On May 21, 2017, President Trump delivered a speech in Riyadh, Saudi Arabia to Arab and Muslim leaders as part of the Arab Islamic American Summit.  Speaking as "a representative of the American people" delivering "a message of friendship and hope," he decried terrorism, but cautioned that "the nations of the Middle East cannot wait for American power to crush this enemy for them," but instead "have to decide what kind of future they want for themselves." *President Trump's full speech from Saudi Arabia on global terrorism*, Wash. Post (May 21, 2017), https://goo.gl/viJRg2.  They had to "honestly confront" the "crisis of Islamic extremism and the Islamists and Islamic terror of all kinds." *Id.*

In a June 3, 2017 tweet, President Trump emphasized the "need to be smart vigilant and tough," and asserted, "We need the Travel Ban as an extra level of safety!"  J.R. 662.  In a series of tweets on June 5, 2017 referencing the court decisions relating to EO-1 and EO-2, President Trump stated,  "[t]he lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!"  J.R. 664.  He reiterated that "[t]he Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to [the Supreme Court]," and advised the Justice Department to "ask for an expedited hearing of the watered down Travel Ban before the Supreme Court - & seek much tougher version!" *Id.*  The following day, White House Press Secretary Sean Spicer stated that President Trump's tweets should be "considered official statements by the president of the United States."  J.R. 667.

In an August 17, 2017 tweet, Trump endorsed what appears to be an apocryphal story involving General John J. Pershing and a purported massacre of Muslims with bullets dipped in a

14

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 59 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 15 of 91

Add. 15

pig's blood, advising people to "[s]tudy what General Pershing … did to terrorists when caught. There was no more Radical Islamic Terror for 35 years!"  J.R. 679.  In a September 15, 2017 tweet, President Trump again insisted that "the travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!"  J.R. 705.

## VI.   Presidential Proclamation 9645

On September 24, 2017, President Trump issued Presidential Proclamation 9645, which immediately supplanted EO-2 as to foreign nationals who lack a credible claim of a bona fide relationship with a person or organization within the United States, and which is slated to go into effect on October 18, 2017 for all other individuals covered by its terms.  The Proclamation stated that in a July 9, 2017 report issued pursuant to the requirements of EO-2, the Secretary of Homeland Security, in consultation with the Secretary of State and the DNI, had selected baseline criteria for assessing the sufficiency of the information provided by foreign governments to permit the United States to confirm the identities of individuals seeking to enter the country and make a security assessment about them.

Three categories of information were identified.  The first is "identity-management information," consisting of information necessary to confirm that individuals are who they claim to be.  Criteria for assessing the sufficiency of information provided include whether a foreign government employs electronic passports embedded with data on the holder's identity, reports lost or stolen passports, and provides other identity-related information not contained in passports. The second category is "national security and public-safety information," relating to whether individuals seeking to enter the United States pose a national security or public safety risk, the criteria for which include whether a foreign government provides information on known or suspected terrorists and individuals' criminal histories, shares exemplars of its passports and

national identity documents, or impedes the transfer of information about passengers and crew traveling to the United States.  The third category is "national security and public-safety risk assessment," relating to risk indicators about the country itself, the criteria for which include whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program, and whether it regularly refuses to accept its nationals subject to final orders of removal from the United States.

According to the Proclamation, pursuant to the process set forth in EO-2, nearly 200 countries were evaluated based on these criteria.  Of those, 16 nations were found to be "inadequate" and 31 were found to be at risk of becoming so.  In accordance with Section 2(d) of EO-2, those nations were given 50 days to bring their information-sharing practices into compliance with United States expectations.  At the end of that 50-day period, eight countries were determined to have continued inadequate information-sharing practices:  Chad, Iran, Iraq, Libya, North Korea, Syria, Venezuela, and Yemen.  In a September 15, 2017 report to the President ("the DHS Report"), the Acting Secretary of Homeland Security recommended that entry restrictions be imposed on all of those countries with the exception of Iraq.  Although Somalia's information-sharing practices were found to be adequate, the Acting Secretary of Homeland Security recommended that Somalia also be subjected to entry restrictions.

As a result, the Proclamation states that "absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States" of nationals from Chad, Iran, Libya, North Korea, Somalia, Syria, Venezuela, and Yemen (the "Designated Countries") "would be detrimental to the interests of the United States."  Procl. pmbl.  Specifically, the Proclamation suspends the entry of all immigrants from seven of the eight Designated Countries, excepting only Venezuela.  The ban on entry by nonimmigrants is "more

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 61 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 17 of 91

Add. 17

tailored," with a narrower ban imposed on countries with mitigating circumstances such as a willingness to play a substantial role in combatting terrorism.  Procl. § 1(h)(iii).

As to specific countries previously subject to EO-2's travel ban, the Proclamation suspends entirely the entry of Iranian nationals on both immigrant and nonimmigrant visas, with an exception for individuals traveling on nonimmigrant, student ("F" and "M") and exchange visitor ("J") visas.  However, Iranians traveling on F, M, and J visas are to be subjected to enhanced screening and vetting.  As justification, the Proclamation asserts that Iran is a source of significant terrorist threats and a designated state sponsor of terrorism, and that it fails adequately to cooperate with the United States to identify security risks, has at least one unspecified national security risk factor, and refuses to accept its nationals slated for deportation.

The Proclamation suspends entry of all Libyan nationals as immigrants, as well as entry of nonimmigrants using business ("B-1"), tourist ("B-2"), or business/tourist ("B-1/B-2") visas. These restrictions are based on the conclusions that Libya does not provide adequate public safety or terrorism-related information, has deficiencies in its identity-management protocols, has at least one unspecified national security risk factor, and does not reliably accept its nationals slated for deportation.

The entry of nationals from Somalia traveling on immigrant visas is suspended entirely, and adjudications for all nonimmigrant visas are to be subjected to additional scrutiny. According to the Proclamation, these restrictions are justified by the facts that the United States does not recognize the Somali electronic passport, Somalia has been designated a terrorist safe haven, and large parts of Somalia are outside the control of the central government such that its ability to share information about criminal and terrorist risks is compromised.

Add. 18

Regarding Syria, the Proclamation suspends entirely the entry of all Syrian nationals, both immigrants and nonimmigrants, on the basis that Syria does not cooperate with the United States in identifying security risks, is a source of significant terrorist threats and has been designated a state sponsor of terrorism, does not provide adequate public safety or terrorism-related information, has deficiencies in its identity-management protocols, and has at least one unspecified national security risk factor.

The Proclamation suspends entirely the entry of Yemeni nationals as immigrants, as well as entry of Yemeni nonimmigrants traveling under B-1, B-2, and B-1/B-2 nonimmigrant visas. As justification, the Proclamation notes that Yemen does not provide adequate public safety or terrorism-related information, has deficiencies in its identity-management protocols, has at least one national security risk factor, and has a terrorist presence.

As for countries identified for the first time in the Proclamation, entry of Chad nationals as immigrants is suspended entirely, as is entry of nonimmigrants using B-1, B-2, or B-1/B-2 visas.  In support of this determination, the Proclamation asserts that Chad fails to provide adequate public safety and terrorism-related information, and that the nation has at least one unspecified national security risk factor.

All entry of North Korean visa holders, immigrant or nonimmigrant, is entirely suspended, because North Korea has reportedly failed in any way to cooperate or engage in information sharing with the United States.

Venezuela is the only designated country for which entry of immigrants is not suspended. Limitations on the entry of Venezuelan nationals are confined to barring entry of specific government officials and their immediate family members, who are suspended from traveling to the United States on B-1, B-2, and B-1/B-2 visas.  All other Venezuelan nationals are to be

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 63 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 19 of 91

Add. 19

subjected to enhanced screening and vetting procedures but are not otherwise banned from entry. The Proclamation reasons that although Venezuela fails to provide adequate terrorism-related or public safety information, has at least one unspecified national security risk factor, and does not reliably receive its nationals slated for deportation, there are other, unspecified sources available for verifying the identities of Venezuelan nationals.

These suspensions apply to foreign nationals of the Designated Countries who (1) are outside the United States on the applicable effective date of the Proclamation; (2) do not have a valid visa as of the applicable effective date of the Proclamation; and (3) are not among those entitled to receive a new visa or other travel document because their visas were revoked or canceled pursuant to EO-1.  Excepted from the suspensions are a number of other individuals, including LPRs; dual nationals if traveling on a passport issued by a non-designated country; and foreign nationals who have been granted asylum status or who have been already admitted to the United States as refugees.

In addition to these delineated exceptions, the Proclamation provides for waivers, to be granted on a case-by-case basis by either a State Department consular officer or an official of United States Customs and Border Protection ("CBP"), based on criteria to be developed by the Secretary of State and the Secretary of Homeland Security.  Any waiver granted by a consular officer would allow both the issuance of a visa and subsequent entry to the United States on that visa.  The Proclamation expressly provides that waivers may be granted only upon a showing that (1) denying entry would cause the foreign national undue hardship, (2) allowing entry would not pose a national security or public safety threat, and (3) entry would be in the national interest.

The Proclamation charges the Secretary of Homeland Security, in consultation with the Secretary of State, to devise a process for determining whether the suspensions should be

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 64 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 20 of 91

Add. 20

continued, terminated, modified, or supplemented. At 180-day intervals, the Secretary of Homeland Security, after consultation with the Secretary of State, the Attorney General, the DNI, and any other appropriate agency heads, is to submit a report and recommendations to the President on whether any such changes should be made, including whether similar suspensions should be imposed on additional countries. In addition, the Secretary of Homeland Security, after consulting with these same officials, may recommend modifications to the list of suspended countries at any time.

As noted, the Proclamation is already in effect as to foreign nationals currently barred by EO-2. For all other covered foreign nationals, it becomes effective on October 18, 2017.

In a joint declaration, 49 former national security, foreign policy, and intelligence officials who served in the White House, Department of State, Department of Homeland Security, Department of Defense, the Central Intelligence Agency, the United States Senate, and as ambassadors in Republican and Democratic Administrations, some of whom were aware of the available intelligence relating to potential terrorist threats to the United States as of January 19, 2017, state that "[a]s a national security measure," the Proclamation is "unnecessary" and is of "unprecedented scope." J.R. 770. Excluding North Korea and Venezuela, the Proclamation blocks over 150 million people from entering the United States on the basis of their nationality, despite the fact that "concrete evidence" has shown that "country-based bans are ineffective." J.R. 771. The officials note that the Proclamation has internal inconsistencies, such as its uneven application to nonimmigrant visas, which are the most frequently used visas from the banned nations, and its failure to block individuals from non-Muslim majority countries with "widely-documented" problems with information sharing, such as Belgium. J.R. 773. On this score, the officials note that no terrorist acts have been committed on U.S. soil by nationals of the

20

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 65 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 21 of 91

Add. 21

Designated Countries in the last 40 years, and that no intelligence as of January 19, 2017 suggested any such potential threat. Nor, the former officials assert, is there any rationale for the abrupt shift from individualized vetting to group bans, particularly in light of the fact that the present system of individualized vetting places the burden of proving identity and eligibility for travel on the person seeking a visa.

## VII.   The Plaintiffs

Plaintiffs, a combination of 23 individuals ("the Individual Plaintiffs") and seven organizations ("the Organizational Plaintiffs"), assert that they will suffer harm from the implementation of the Proclamation in the form of prolonged separation of family members located in the Designated Countries and stigmatizing injuries arising from the anti-Muslim animus of the travel ban. Of the Individual Plaintiffs, nine are U.S. citizens or LPRs who have an approved visa petition on behalf of an Iranian-national parent, child, or sibling, consisting of IRAP Plaintiffs John Doe No. 4, Shapour Shirani, Fakhri Ziaolhagh, and Afsaneh Khazaeli; and IAAB Doe Plaintiffs Nos. 1-5. Two Plaintiffs, IAAB Doe Plaintiff No. 6 and Grannaz Amirjamshidi seek nonimmigrant visas for their Iranian-national mother or mother-in-law to visit the United States. Four Plaintiffs are U.S. citizens or LPRs with an approved visa petition for their Syrian-national family members, consisting of Mohamad Mashta,[2] IRAP Plaintiff Jane Doe No. 2, and Zakzok Plaintiffs Jane Does No. 1-2. Zakzok Plaintiff Eblal Zakzok, an LPR, has submitted an immigrant visa petition for his Syrian-national daughter but it has not been approved, and Zakzok Plaintiff Sumaya Hamadmad has a sister, a Syrian national, who has applied for a nonimmigrant visa to visit the United States for an academic project. IRAP

---

[2]   At the time the IRAP Amended Complaint was filed, Plaintiff Mohamad Mashta had an approved I-130 visa petition for his Syrian-national wife and was awaiting a visa for her. At the hearing, counsel informed the Court that Mashta's wife had been granted a visa and that she is on her way to the United States, which appears to render his claim moot.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 66 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 22 of 91

Add. 22

Plaintiffs John Doe No. 5 and Fahed Muqbil are U.S. citizens who have approved immigrant visa petitions for their Yemeni-national wife and mother, respectively.  Zakzok Plaintiff Jane Doe No. 3 is a U.S. citizen who has a pending immigrant visa petition for her Somali fiancée.  Three of the Individual Plaintiffs, specifically Mohammed Meteab, and IRAP John Does Nos. 1 and 3, are LPRs of Iranian or Iraqi descent who do not have immediate family members from one of the Designated Countries seeking an immigrant or nonimmigrant visa.

Of the Organizational Plaintiffs, three primarily provide services to clients.  IRAP provides legal services to its clients, displaced persons around the world seeking to come to the United States, to help them navigate the refugee or immigrant application process.  HIAS provides a variety of services to refugees, including assisting their clients with refugee resettlement in the United States.  AAANY primarily serves the Arab-American and Arab immigrant community in New York City by providing legal and other services to its clients.

The remaining Organizational Plaintiffs convene events on issues relating to the Middle East or advocate on behalf of their members.  MESA consists of over 2,400 graduate students and faculty around the world focused on the field of Middle Eastern studies.  YAMA, a membership organization of Yemeni American merchants, seeks to protect its members from harassment and to assist them with immigration issues.  IAAB organizes youth camps, educational events, and international conferences for the Iranian diaspora, including inviting prominent scholars from outside the country to speak at events.  ISF is an affiliate of IAAB and organizes events and fundraisers for its members, approximately 30 Iranian American students at the University of Maryland.  Additional facts relating to certain Organizational Plaintiffs are contained in the Court's discussion of standing. *See infra* part I.A.

Add. 23

## CONCLUSIONS OF LAW

In this Motion, Plaintiffs seek a preliminary injunction based on their claims that the Proclamation violates (1) the Immigration and Nationality Act, (2) the Establishment Clause, and (3) the Equal Protection Clause.

## I.     Justiciability

Defendants raise several arguments that Plaintiffs' claims are not justiciable. Specifically, they assert that Plaintiffs lack standing, the claims are not ripe, the claims are barred by the doctrine of consular nonreviewability, and the statutory claims are not reviewable under the APA.

### A.     Standing

Article III of the Constitution limits the judicial power of the federal courts to actual "Cases" or "Controversies."  U.S. Const. art. III, § 2, cl. 1.  To invoke this power, a litigant must have standing.  *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013).  A plaintiff establishes standing by demonstrating (1) a "concrete and particularized" injury that is "actual or imminent," (2) "fairly traceable to the challenged conduct," (3) and "likely to be redressed by a favorable judicial decision."  *Id.*; *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 428 (4th Cir. 2007).  For claims involving a statutory cause of action, a plaintiff must also have interests that fall within the "zone of interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014).  Standing must be established for each claim.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  The presence of one plaintiff with standing renders a claim justiciable.  *Bostic v. Schaefer,* 760 F.3d 352, 370-71 (4th Cir. 2014).

23

Add. 24

### 1.    Immigration and Nationality Act

The various Individual Plaintiffs assert standing based on the allegation that they are harmed by the prolonged separation from close family members who are unable to travel to the United States under the terms of the Proclamation.  The Supreme Court has reviewed the merits of cases brought by U.S. residents with a specific interest in the entry of a foreigner challenging the application of the immigration laws to that foreign individual.  *See Kerry v. Din*, 135 S. Ct. 2128, 2131, 2138-42 (2015) (considering an action brought by a U.S. citizen challenging the denial of her husband's visa); *Kleindienst v. Mandel*, 408 U.S. 753, 756, 762-65 (1972) (considering the merits of a claim brought by American plaintiffs challenging the denial of a visa to a Belgian journalist whom they had invited to speak in various academic forums in the United States); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998) (stating that because standing relates to a court's power to hear and adjudicate a case, it is normally "considered a threshold question that must be resolved in [the litigant's] favor before proceeding to the merits"); *Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986) ("Presumably, had the Court harbored doubts concerning federal court subject matter jurisdiction in *Mandel*, it would have raised the issue on its own motion.").  Other courts have done the same.  *See Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008) (considering an action by a United States citizen challenging the denial of her husband's visa and holding that the citizen had a procedural due process right to a "limited judicial inquiry regarding the reason for the decision"); *Allende v. Shultz*, 845 F.2d 1111, 1114 & n.4 (1st Cir. 1988) (evaluating the merits of a claim brought by scholars and leaders who extended invitations to a foreign national challenging the denial of her visa).

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 69 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 25 of 91
Add. 25

The United States Court of Appeals for the District of Columbia Circuit has found that U.S. citizens and residents have standing to challenge the denial of visas to individuals in whose entry to the United States they have an interest.  *See Abourezk*, 785 F.2d at 1050 (finding that U.S. citizens and residents had standing to challenge the denial of visas to foreigners whom they had invited to "attend meetings or address audiences" in the United States); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 45 F.3d 469, 471 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) ("LAVAS").  In LAVAS, the court held that U.S. resident sponsors had standing to assert that the State Department's failure to process visa applications of Vietnamese citizens in Hong Kong violated one of the same provisions at issue here, 8 U.S.C. § 1152, based on the cognizable injury of prolonged "separation of immediate family members" resulting from the State Department's inaction.  *Id.* at 471.  And in a related case, the Ninth Circuit held that an individual plaintiff had standing to challenge EO-2 where the plaintiff's mother-in-law was a Syrian national with a pending immigration visa application, because the "prolonged separation" from her constituted a sufficient injury-in-fact.  *Hawaii*, 859 F.3d at 763.

Here, several Individual Plaintiffs, specifically IRAP Plaintiffs John Doe No. 4, John Doe No. 5, Jane Doe No. 2, Shapour Shirani, and Fakhri Ziaolhagh; IAAB Plaintiffs Doe Plaintiff No. 1, Doe Plaintiff No. 3, Doe Plaintiff No. 4, and Doe Plaintiff. No. 5; and Zakzok Plaintiffs Eblal Zakzok, John Doe No. 1, and Jane Doe No. 2 have standing to assert their claims that the Proclamation violates the INA.  Each of these Plaintiffs are U.S. citizens or lawful permanent residents who have immediate family members who are nationals of the Designated Countries and currently in the process of securing a visa to come to the United States as immigrants.  As one illustrative example, John Doe No. 4 is a U.S. citizen whose wife is an Iranian national

Add. 26

seeking an immigrant visa to join him in the United States.  Other Plaintiffs, including IRAP

Plaintiff Grannaz Amirjamshidi, IAAB Plaintiff Doe Plaintiff No. 6, and Zakzok Plaintiff

Sumaya Hamadmad have standing as U.S. citizens who are separated from close family

members who are nationals of Designated Countries seeking nonimmigrant visas to travel to the

United States.  The Proclamation's indefinite ban on the issuance of immigrant and

nonimmigrant visas for nationals of the Designated Countries has imposed an actual, imminent

injury on these Plaintiffs by prolonging their separation from their family members.  *See LAVAS*,

45 F.3d at 471; *Hawaii*, 859 F.3d at 763.  Because a "threat" of an injury that is "real and

immediate" can support standing, *Friends of the Earth, Inc. v Gaston Copper Recycling Corp.*,

204 F.3d 149, 160 (4th Cir. 2000), it is not necessary that the family member's visa application

already be denied.  Where the Proclamation halts issuance of visas to nationals of the Designated

Countries indefinitely, the threat is quite real.

This injury is "fairly traceable" to the challenged practice in that the implementation of

the travel ban imposed by the Proclamation would cause the prolonged separation, and an

injunction against the Proclamation would likely redress that injury.  *See Hollingsworth*, 133 S.

Ct. at 2661.  The Court therefore finds that these Individual Plaintiffs have standing to assert the

claim that the Proclamation violates the INA.

The Organizational Plaintiffs assert standing for the INA claim in their own right and on

behalf of their members.  For an organization's claim of standing, the Court conducts the same

inquiry as in the case of an individual.  *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012).  An

organization suffers an injury-in-fact when "a defendant's actions impede its efforts to carry out

its mission."  *Lane*, 703 F.3d at 674; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363,

379 (1982)  ("Such concrete and demonstrable injury to the organization's activities–with the

26

Case 1:17-cv-07520-PGG  Document 50-23  Filed 08/02/18  Page 71 of 158
Case 8:17-cv-00361-TDC  Document 219  Filed 10/17/17  Page 27 of 91

Add. 27

consequent drain on the organization's resources–constitutes far more than simply a setback to the organization's abstract social interests."). However, an injury to an organization generally does not arise from a decision to expend resources on member education or litigation in response to legislation. *See Lane*, 703 F.3d at 675.

Here, several organizations have asserted sufficient injury to their proprietary and organizational interests to constitute an injury-in-fact for standing purposes. Both MESA and IAAB argue that the Proclamation will disrupt upcoming conferences and events in the United States by preventing individuals from the Designated Countries from attending. Specifically, the Proclamation would bar scholars from some of the Designated Countries from MESA's annual meeting in November, including one prospective attendee from Iran, which would harm MESA financially because approximately half of MESA's budget is derived from the annual meeting. The inability of scholars to travel to the annual meeting would also hinder the exchange of ideas among scholars and thus adversely impact MESA's mission of "fostering study and public understanding of the Middle East." J.R. 430-31. Likewise, the Proclamation will prevent Iranian nationals from attending IAAB's International Conference on the Iranian Diaspora, scheduled for April 2018 in New York, at which scholars, students, journalists, artists, and community leaders gather to exchange ideas on issues affecting the worldwide Iranian community. Where approximately half of the invited speakers for this event typically come from Iran, the inability of Iranian nationals to travel to the United States would hinder IAAB's mission of "address[ing] issues affecting the Iranian Diaspora community." Kharazzi Aff. ¶ 17, IAAB Mot. Prelim. Inj. Ex. 1, ECF No. 26-3. Although the Proclamation excepts Iranian nationals traveling on a student (F and M) or exchange visitor (J) visa, such visas typically are for individuals enrolling in an academic or vocational program or in a specific exchange visitor

Add. 28

program such as an au pair, summer camp, or summer work travel program. *See* 22 C.F.R. §§ 41.61–41.62 (2017); U.S. Dep't of State, 9 Foreign Affairs Manual §§ 402.5-5–402.5-6. Attendees at educational, professional, or business conferences would generally use a B-1 visa, which is now unavailable to Iranian nationals. *See* 9 Foreign Affairs Manual § 402.2-5(B)(5) (stating that one of the permitted activities on a B-1 visa is to "participate in scientific, educational, professional, or business conventions, conferences, or seminars"). The Proclamation also impacts IRAP's ability to bring one of its Syrian-national employees back to the United States to participate in its annual, week-long strategic planning and training retreat at its headquarters in New York, which would adversely impact IRAP's operations and mission.

These injuries are not "merely speculative." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). MESA has described at least one specific individual from Iran who would attend the MESA annual meeting and whose fees would have to be refunded if he cannot attend, and IRAP has referenced a specific employee who cannot receive the in-person training and participate in strategic planning at its annual retreat. Even without identifying specific individuals who will definitely be barred from entry into the United States to attend its events, IAAB has alleged that the Proclamation presently constrains their efforts to recruit attendees for their upcoming meetings and conferences and to secure their arrival in time for the events. *Cf. Hawaii* 859 F.3d at 766 (finding that Hawaii had standing based on its interest in students attending the University of Hawaii). Thus, the Proclamation would injure MESA, IAAB, and IRAP by impeding their efforts to accomplish their missions and by disrupting their ability to raise money, train staff, and convene programs designed to foster the free flow of ideas on topics of significance to their organization's purpose. *See Lane*, 703 F.3d at 674.

28

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 73 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 29 of 91

Add. 29

MESA, IAAB, and IRAP also fall within the zone of interests protected by the INA. Where MESA's purpose is to foster "study and public understanding of the Middle East," J.R. 431-32, and IAAB is focused on "address[ing] issues affecting the Iranian Diaspora Community, Kharazzi Aff. ¶ 17, these organizations necessarily engage in collaboration and exchange with foreign nationals who visit the United States. Accordingly, they necessarily have a substantial interest in the effective operation of the INA, particularly its provisions for admitting foreign scholars and other foreign nationals to the United States as nonimmigrants to attend educational conferences. *See, e.g.*, 9 Foreign Affairs Manual § 402.2-5(B)(5). Likewise, as an organization focused on refugee resettlement, IRAP has a need to engage foreign-national employees familiar with parts of the world with refugee populations and periodically to have those employees travel to and from the United States for planning, direction, and training. It, too, has an ongoing interest in operation of the INA's nonimmigrant visa provisions. *See* 9 Foreign Affairs Manual § 402.2-5(B)(3) (stating that one of the permitted activities on a B-1 visa is to "consult with business associates"). Thus, as organizations that depend on the entry of foreign nationals into the United States under the INA, MESA, IAAB, and IRAP are within the zone of interest of the law. *See Abourezk*, 785 F.2d at 1050-51 (finding that organizations that invited foreign nationals to the United States to speak at a rally had a cognizable stake in the Government's interpretation of a provision of the INA).

The Court also finds that these organizational injuries are fairly traceable to Defendants' actions and likely to be redressed by a favorable decision because the Proclamation imposes an entry ban on nationals from the Designated Countries who would otherwise be able to apply for visas to enter the United States and participate in the organizational events. *See Hollingsworth*,

Add. 30

133 S. Ct. at 2661.  Therefore, the Court finds that MESA, IAAB, and IRAP each have standing to challenge the Proclamation as a violation of the INA.

Finally, several organizations can assert standing as representatives of their members.  To establish associational standing, an organization must establish that (1) its members would have standing to sue in their own right; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Lujan*, 504 U.S. at 563 (stating that a single member with standing in his or her own right is sufficient to establish that an organization has standing).  An organization must "make specific allegations establishing that at least one *identified member* had suffered or would suffer harm."  *Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

MESA and YAMA both identify at least one individual member who is a U.S. citizen or LPR seeking to secure an immigrant visa for a close relative from one of the Designated Countries.  MESA alleges that one of its members of Syrian descent is imminently filing a petition seeking an immigrant visa for his mother-in-law, a Syrian national.   YAMA asserts that one of its members, "Ahmed," is a U.S. citizen whose wife has petitioned for his Yemeni national wife and their five Yemeni national children to immigrate to the United States.

The interests raised by Plaintiffs' claims are germane to the organizations' purposes. MESA seeks to foster greater understanding and dialogue with Middle East nations, including one or more of the Designated Countries.  YAMA, in part, seeks to help Yemeni American business owners navigate immigration issues they face.  Plaintiffs' interest in obtaining an

30

Add. 31

injunction to preserve the ability of foreign nationals from the Designated Countries to travel to the United States squarely relates to both of these missions. Finally, where the claims in these cases consist of constitutional and statutory challenges to the Proclamation, there is no discernible reason why the participation of individual members, as opposed to their representatives in the form of the organization, is required for the effective advancement of this lawsuit. With all the requirements met, the Court concludes that MESA and YAMA have standing to assert their INA claims on behalf of their members. *See Hunt*, 432 U.S. at 343.

## 2. Establishment Clause

To have standing to assert an Establishment Clause claim, a plaintiff must meet the same elements as for any other claim: (1) a cognizable injury, (2) fairly traceable to the defendant's actions; and (3) a likelihood that the injury will be redressed by a favorable decision. *Suhre v. Haywood Cty.*, 131 F.3d 1082, 1085 (4th Cir. 1997). To show an injury in the context of the Establishment Clause, the plaintiff must have "personal contact with the alleged establishment of religion" resulting in a personal injury. *Id.* at 1086. The injury can take the form of noneconomic, intangible harm to spiritual beliefs, such as "[f]eelings of marginalization and exclusion" because "one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion that they are outsiders, not full members of the political community." *Moss v. Spartanburg Cty. Sch. Dist. Seven*, 683 F.3d 599, 607 (4th Cir. 2012); *see Suhre*, 131 F.3d at 1086; *Awad v. Ziriax*, 670 F.3d 1111, 1122-23 (10th Cir. 2012) (holding that a Muslim plaintiff residing in Oklahoma suffered a cognizable injury in the form of condemnation of his religion and exposure to "disfavored treatment" based on a voter-approved state constitutional amendment prohibiting Oklahoma state courts from considering Sharia law); *Catholic League v. City & Cty. of San*

31

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 76 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 32 of 91
Add. 32

*Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) (stating that a "psychological consequence" constitutes a concrete injury where it is "produced by government condemnation of one's own religion or endorsement of another's in one's own community").  The injury, however, needs to be a "personal injury suffered" by the plaintiff "*as a consequence* of the alleged constitutional error." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982).

Here, multiple Individual Plaintiffs have asserted "personal contact" with the Proclamation's alleged Establishment Clause violation to demonstrate standing.  As discussed above, multiple Plaintiffs have asserted that they have been personally injured by the Proclamation through the harm of prolonged separation from close relatives who would be barred from entry to the United States under the Proclamation.  *See supra* Part I.A.1.  Thus, contrary to Defendants' claim, they are asserting a personal injury sustained as a consequence of the alleged constitutional error, not an injury to others.  *See Suhre*, 131 F.3d at 1086 (finding that "unwelcome direct contact with a religious display that appears to be endorsed by the state" is a personal injury).  It is this personal impact that separates the claims of Plaintiffs here from those in *Valley Forge*, in which the plaintiffs had merely read about a conveyance of property to a religious institution that they believed to be unfairly advantageous, *Valley Forge*, 454 U.S. at 468-69, 485, or in *In re Navy Chaplaincy*, 543 F.3d 756, 764 (D.C. Cir. 2008), in which Protestant Navy chaplains alleging that Catholic chaplains received a preference in the chaplain retirement system had observed the impact of the alleged Establishment Clause violation on others but had not suffered any personal consequences from it, *id.* at 764-65.

Several of these Plaintiffs have also asserted specific, intangible injuries resulting from this personal contact with the alleged Establishment Clause violation.  Among the IRAP

Add. 33

Plaintiffs, John Doe No. 4 states that he "felt insulted" by EO-1 and received "more suspicious looks from people," which caused him to feel that "I am being labeled as a Muslim more often," and that the Proclamation "has made me feel this more strongly" such that "I continue to feel demeaned by the ban."   J.R. 461-62.   Jane Doe No. 2 states that she understands the Proclamation to fulfill campaign promises to condemn her religion, which has made her feel depressed and has caused her to question whether to remain in the United States because she does not want her children to face discrimination.   Afsaneh Khazaeli states that the Proclamation and the predecessor travel bans have made him feel like a "second-class citizen" and has made his family the target of abuse and discrimination. J.R. 465-66.   Shapour Shirani states that the anti-Muslim nature of the travel ban has made the separation from his wife "more painful," and the Proclamation has made him "feel even worse" and worry that discrimination against Muslims will persist and interfere with his rights.   J.R. 476-77.

Of the IAAB Plaintiffs, Doe Plaintiff No. 2, Doe Plaintiff No. 3, Doe Plaintiff No. 5, and Doe Plaintiff No. 6 have all expressed similar intangible harms arising from the Proclamation's alleged Establishment Clause violation.   For example, Doe Plaintiff No. 2 states that because the Proclamation "targets" her based on her religion, "I feel insecure and I fear for my safety and the safety of my loved ones," and "I feel that I am being treated as an outsider in my own country." Jane Doe No. 2 Aff. ¶ 9, IAAB Mot. Prelim. Inj. Ex. 3, ECF No. 26-5.   Doe Plaintiff No. 3 has stated that she fears the Proclamation will result in "more hatred and attacks against my community" such that "I fear for my safety and the safety of my loved ones."   Jane Doe No. 3 Aff. ¶ 9, IAAB Mot. Prelim. Inj. Ex. 4, ECF No. 26-6.   Both Doe Plaintiff No. 5 and Doe Plaintiff No. 6 express that they feel attacked, targeted, and disparaged by the Proclamation's hostility to Muslims and that they fear for their safety as a result.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 78 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 34 of 91
Add. 34

Zakzok Plaintiffs Fahed Muqbil, Eblal Zakzok, Sumaya Hamadmad, John Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 all express that they feel condemned, stigmatized, attacked, or discriminated against as a result of the Proclamation.  For example, Fahed Muqbil feels "as if I and my fellow American Muslims are unwanted, different, and somehow dangerous" as a result of the Proclamation.  Fahed Muqbil Decl.¶ 15, Zakzok Mot. Prelim. Inj. Ex. 1, ECF No. 6-1.

These feelings of marginalization constitute an injury in fact in an Establishment Clause case.  *See Moss*, 683 F.3d at 607 (holding that a Jewish father and daughter suffered an injury when they felt like "outsiders" upon receiving a school letter stating that academic credit was available for taking a class at a Christian bible school).  Furthermore, these injuries are traceable in whole or in part to the Proclamation, and an injunction is likely to redress these injuries by removing the stigma associated with the Proclamation.  Multiple Individual Plaintiffs can establish both a personal contact with the alleged establishment of religion through the prolonged separation from their family members and a direct injury from the Proclamation through their feelings of marginalization and exclusion.  These Plaintiffs include IRAP Plaintiffs John Doe No. 4, Jane Doe No. 2, and Shapour Shirani; IAAB Plaintiffs Doe Plaintiff No. 3, Doe Plaintiff No. 5, and Doe Plaintiff No. 6; and Zakzok Plaintiffs Eblal Zakzok, Jane Doe No. 2, and Sumaya Hamadmad.

Finally, MESA and YAMA, which have standing to assert an INA claim based on their representation of members injured by the Proclamation, likewise have standing to assert an Establishment Clause claim on behalf of their members.  As discussed above, both have asserted that at least one specific member faces prolonged separation from a close relative as a result of the Proclamation. *See supra* Part I.A.1.  Both also assert that the same member has experienced feelings of marginalization or emotional distress as a result of the Proclamation's alleged anti-

Add. 35

Muslim message. According to MESA, the various versions of the travel ban have caused its member "extreme stress" and "ma[d]e him feel unwelcome, even more so now that he is a citizen." J.R. 429. According to YAMA, Ahmed, one of its members facing a prolonged separation from family, states that the ban has made him "scared here in the United States because the message is coming from the highest people in government that Muslims are terrorists." J.R. 486.

Where both of these organizations have at least one member with both a personal contact with the alleged establishment of religion and a direct injury as a result of it, the injury-in-fact requirement has been satisfied. Since MESA serves to foster understanding of the Middle East, in which there are many predominantly Muslim nations, and YAMA was founded in part to oppose what its members perceived to be a Muslim ban arising from EO-1, the interests they seek to protect through an Establishment Clause claim are germane to their organizations' purposes. *Hunt*, 432 U.S. at 343. Lastly, as discussed above, there is no discernible reason why the individual members themselves must participate in this suit, rather than their membership organization. *Id.* Accordingly, MESA and YAMA have standing to assert an Establishment Clause claim on behalf of their members.

Having found that multiple Individual and Organizational Plaintiffs have standing to assert both INA and Establishment Clause claims, the Court need not address whether the remaining Plaintiffs have standing. By not addressing those arguments, the Court does not convey any view on whether those Plaintiffs have standing to assert one or more claims.

**B.    Ripeness**

The Government also argues that Plaintiffs' claims are not ripe because their relatives have not yet been denied both a visa and a waiver. For the Individual Plaintiffs discussed above

Add. 36

whose family members are already in the process of seeking visas, denial of visas is generally mandated because they are ineligible based on the plain language of the Proclamation. Although a claim is generally not ripe if it is based on contingent future events, *Texas v. United States*, 523 U.S. 296, 300 (1998), the potential to receive a waiver does not render the claims unripe because the waiver process itself presents an additional hurdle not faced by other visa applicants which would delay reunification, thus creating a harm not contingent on future events. *See Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1541 (11th Cir. 1994) (finding in a Fair Housing Act action that plaintiffs' claim was ripe where, "assuming that [plaintiffs] successfully prove at trial that this [challenged] additional hurdle was interposed with discriminatory purpose and/or with disparate impact, then the additional hurdle itself is illegal whether or not it might have been surmounted").

In assessing ripeness, courts are to consider the fitness of the issues for decision and the hardship to the parties of withholding judicial consideration. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Where this case centers on legal issues arising from the Proclamation, which has been issued in its final form, and is not dependent on facts that may derive from application of the waiver process, it is now fit for decision. *See Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). In light of the individual Plaintiffs' circumstances, withholding judicial consideration of their claims until waivers are adjudicated would cause undue hardship in the form of additional prolonged separation. The Court therefore finds that the claims are now ripe.

## C.     Consular Nonreviewability

Defendants argue that Plaintiffs' claims are not justiciable pursuant to the doctrine of consular nonreviewability, citing *Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1994).

36

Add. 37

Defendants also cite *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950), in which the Supreme Court held that a foreign national could not challenge the Attorney General's decision to exclude her from the country and deny her a hearing to which she would ordinarily be entitled. *Id.* at 547. Defendants assert that, taken together, these cases establish that any judicial review of the President's decision to exclude an alien for any reason is unreviewable.

Plaintiffs, however, challenge not individual visa decisions by consular officers, but the overarching travel ban policy imposed by the Proclamation. *See Hawaii*, 859 F.3d at 768 (rejecting the argument that consular nonreviewability barred judicial review of statutory claims challenging EO-2 and noting that "[c]ourts can and do review both constitutional and statutory challenges to the substance and implementation of immigration policy") (citation omitted); *Washington*, 847 F.3d at 1162; *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985) (distinguishing challenges to consular decisions on individual visa applications from a challenge to general operational instructions promulgated by the Immigration and Naturalization Service); *cf. Immigration and Naturalization Serv. v. Chadha*, 462 U.S. 919, 940-41 (1983) (noting that although Congress has plenary authority over immigration, the Court could still review an immigration statute to ensure that it implemented that authority by "constitutionally permissible means")*. The Defendants' reliance on *Knauff* and *Saavedra Bruno* is thus misplaced. These decisions relate only to aliens appealing individual denials of entry into the United States. *Knauff*, 338 U.S. at 539; *Saavedra Bruno*, 197 F.3d at 1155, 1163-64. Where Plaintiffs include U.S. citizens asserting statutory and constitutional claims challenging a broader policy as opposed to individual consular determinations, the doctrine of consular nonreviewability is not applicable. *See Hawaii*, 859 F.3d at 768-69; *see also IRAP*, 857 F.3d at 587.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 82 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 38 of 91
Add. 38

### D.    APA

Defendants assert that the APA has foreclosed the Plaintiffs' statutory claims on multiple grounds.  The APA provides standing for any party that is "adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702; *see LAVAS*, 45 F.3d at 471.  This general grant of standing is subject to several limitations.  Judicial review is available only for "final agency action," 5 U.S.C. § 704, and is not available if "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2).

First, Defendants argue that Plaintiffs cannot bring a claim under the APA because they are not "adversely affected or aggrieved" within the meaning of the APA.  As discussed above, the Individual Plaintiffs and several Organizational Plaintiffs are within the zone of interests of the INA and are injured by the denial of immigrant or nonimmigrant visas for family members or expected conference attendees.  *See supra* Part I.A.1.  They are thus "adversely affected or aggrieved" by Defendants' use of their authority under the INA.  5 U.S.C. § 702; *see LAVAS*, 45 F.3d 471-72 (finding that U.S. family members of Vietnamese nationals desiring to be processed for visas in Hong Kong but ordered to return to Vietnam were "aggrieved" under the APA and within the "zone of interests" of the INA); *Abourezk*, 785 F.2d at 1051 (finding that U.S. citizens who invited foreign nationals to speak were "aggrieved" by the State Department's interpretation of an INA definition that led to the exclusion of the intended speakers).

Second, Defendants assert that judicial review is not available because the Proclamation was issued by the President, not the head of a federal department or agency, and thus is not a "final agency action" within the meaning of the APA.  In *Franklin v. Massachusetts*, 505 U.S. 788 (1992), the Supreme Court held that the President is not subject to the APA such that his actions cannot be reviewed under that law.  *Id.* at 800-01.  To the extent that the Plaintiffs seek

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 83 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 39 of 91
Add. 39

an injunction against the President himself, this argument has merit.  *See id.* at 802 (stating that "a grant of injunctive relief against the President himself is extraordinary and should . . . raise[] judicial eyebrows"); *see also IRAP*, 857 F.3d at 605.   However, Plaintiffs have named as defendants federal agency officials who will implement the Proclamation.  "[I]t is now well established" that "[r]eview of the legality of a Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (permitting judicial review of an Executive Order through a suit against the Secretary of Labor).   Such review is warranted because there is a "strong presumption in favor of judicial review of administrative action." *Immigration and Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 298 (2001).  As for Defendants' claim that the agency action to date is not "final," the Proclamation is already in effect as to certain individuals and is being enforced by federal agencies, and, as discussed above in relation to ripeness, a formal denial of a visa or waiver is not necessary for the case to be subject to review. *See supra* Part I.B.

Third, Defendants claim that review of the Proclamation is foreclosed by 5 U.S.C. § 701(a)(2) as "committed to agency discretion by law."  Under their view, Congress committed the use of § 1182(f) to the sole discretion of the President, such that a reviewing court has no manageable standard by which to evaluate it.  Despite the Government's asserted claim of a lack of intelligible standard, courts have had no difficulty reaching the merits of challenges to the President's use of § 1182(f).  *See Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 187 (1993); *Hawaii*, 859 F.3d at 770-74; *cf. Abourezk*, 785 F.2d at 1051 (finding that the INA "does not commit to unguided agency discretion the decision to exclude an alien").

Add. 40

More generally, courts have regularly reviewed Presidential action, including action taken in the context of foreign policy and immigration, to ensure that it fits within the bounds of federal statutes. *See, e.g., Sale*, 509 U.S. at 187 (reviewing on the merits an INA challenge to President's use of § 1182(f)); *Dames & Moore v. Regan*, 453 U.S. 654, 669-88 (1981) (reviewing on the merits an Executive Order regarding the attachment of Iranian assets pursuant to the International Emergency Economic Powers Act); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring) (establishing the framework for judicial review of Presidential action). Defendants' contention that the Plaintiffs cannot contest the Proclamation in court cannot square with this body of precedent. The Court therefore finds that this case is justiciable and proceeds to the merits of the Plaintiffs' claims.

## II.    Legal Standard

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 85 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 41 of 91

Add. 41

## III.    Likelihood of Success on the Merits

Because "courts should be extremely careful not to issue unnecessary constitutional rulings," *Am. Foreign Serv. Ass'n v. Garfunkel*, 490 U.S. 153, 161 (1989) (per curiam), the Court first addresses the statutory claims and then proceeds, if necessary, to the constitutional claim.

### A.    Immigration and Nationality Act

Plaintiffs assert that the Proclamation violates provisions of the INA.  The formulation of immigration policies is entrusted exclusively to Congress.  *Galvan v. Press*, 347 U.S. 522, 531 (1954).  In the Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163, Congress delegated some of its power to the President in the form of what is now Section 212(f) of the INA, codified at 8 U.S.C. § 1182(f) ("§ 1182(f)"), which provides that:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

Congress has also authorized the President to take action relating to entry into the United States in what is now Section 215(a) of the INA, codified at 8 U.S.C. § 1185(a) ("§ 1185(a)"):

> Unless otherwise ordered by the President, it shall be unlawful—
>
> (1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1).  The Proclamation relies on these two provisions as the statutory authority for the President's action.

Plaintiffs assert that the Proclamation violates the INA in three ways.  First, they argue, as they did in challenging EO-2, that the Proclamation violates Section 202(a) of the INA,

Add. 42

codified at 8 U.S.C. § 1152(a) ("§ 1152(a)"), which bars discrimination on the basis of nationality in the issuance of immigrant visas. Second, they assert that the Proclamation fails to comply with the requirement in § 1182(f) that the President find that the suspension of entry by nationals from the Designated Countries would "be detrimental to the interests of the United States." Third, they contend that the Proclamation exceeds the authority granted by § 1182(f) because it effectively re-writes portions of the INA or otherwise intrudes on Congress's legislative power.

### 1. Nationality Discrimination

Plaintiffs argue that the Proclamation's suspension of entry into the United States by immigrants from the Designated Countries violates the INA's bar on discrimination based on nationality in the issuance of immigrant visas. In opposition, the Government asserts that the Proclamation was lawful because it was issued pursuant to § 1182(f), which grants the President broad authority to bar the entry of immigrants, and that the non-discrimination provisions of § 1152(a) do not limit the President's § 1182(f) authority.

Section 1152(a) provides that, with certain exceptions:

> No person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of his race, sex, nationality, place of birth, or place of residence[.]

8 U.S.C. § 1152(a)(1)(A).

Section 1152(a) was enacted as part of the Immigration and Nationality Act of 1965, which was adopted expressly to abolish the "national origins system" imposed by the Immigration Act of 1924, which keyed yearly immigration quotas for particular nations to the percentage of foreign-born individuals of that nationality who were living in the continental United States, based on the 1920 census, in order to "maintain, to some degree, the ethnic

42

Add. 43

composition of the American people."  H. Rep. No. 89-745, at 9 (1965).  President Lyndon B.

Johnson sought this reform because the national origins system was at odds with "our basic

American tradition" that we "ask not where a person comes from but what are his personal

qualities." *Id.* at 11.

In reviewing the motion for a preliminary injunction of EO-2, this Court considered the

interplay between § 1182(f) and § 1152(a) and concluded, based on canons of statutory

construction, that the President's authority under § 1182(f) is limited by the § 1152(a) bar on

discrimination based on nationality in the issuance of immigrant visas.  *See IRAP*, 241 F.

Supp.3d at 553-56.  The Court reaches the same conclusion here as to both § 1182(f) and §

1185(a).  Under the canon that a later-adopted provision controls over an earlier one, § 1152(a),

enacted in 1965, controls over § 1182(f) and the relevant text of § 1185(a)(1), enacted in 1952.[3]

*See Watt v. Alaska*, 451 U.S. 259, 266 (1981).   Section 1152(a) is also the more specific

provision, in that it requires a particular result, namely non-discrimination in the issuance of

immigrant visas on specific, enumerated bases, while § 1182(f) and § 1185(a) mandate no

particular action, but instead set out general parameters for the President's power to bar entry and

impose rules and regulations on entry and departure.  Thus, to the extent that § 1152(a) may

conflict with § 1182(f) and § 1185(a) on whether the President can bar the issuance of immigrant

visas based on nationality, § 1152(a), as the more specific provision, controls.  *See RadLAX*

*Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) ("The general/specific

canon is perhaps the most frequently applied . . . To eliminate the contradiction, the specific

provision is construed as the exception to the general one."); *Edmond v. United States*, 520 U.S.

---

[3]    Section 1185 was amended in 1978, to broaden its applicability beyond times of war or
national emergency, but the operative language of § 1185(a)(1) remained unchanged.  *See*
Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95-426, § 707(a), 92 Stat.
992-993 (1978).

Add. 44

651, 657 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs."); *United States v. Smith*, 812 F.2d 161, 166 (4th Cir. 1987).

Finally, it is highly significant that § 1152(a) explicitly excludes certain sections of the INA from its scope, specifically §§ 1101(a)(27), 1151(b)(2)(A)(i), and 1153, but does not exclude § 1182(f) or § 1185(a) from its reach.  8 U.S.C. § 1152(a)(1)(A).  The absence of any reference to § 1182(f) or § 1185(a) among these exceptions provides strong evidence that Congress did not intend for those provisions to be exempt from the anti-discrimination provision of § 1152(a).  *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001) ("[T]he mention of some implies the exclusion of others not mentioned."); *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001) (noting that Congress "knows how to expand the jurisdictional reach of a statute").  Thus, pursuant to § 1152(a), a proclamation under § 1182(f) or § 1185(a) may not discriminate in the issuance of immigrant visas.

This conclusion is consistent with that of the Ninth Circuit, which found a likelihood of success on the merits of the claim that EO-2's ban on entry by immigrants based on nationality exceeded the President's § 1182(f) authority, concluding that "§ 1152(a)(1)(A)'s non-discrimination mandate cabins the President's authority under § 1182(f)."  *Hawaii*, 859 F.3d at 778.  To reach this determination, the Ninth Circuit similarly applied the canons of statutory construction and relied on the facts that § 1152(a) was more recently enacted, § 1152(a) was the more specific statute, and § 1182(f) was not listed among sections of the INA exempt from the non-discrimination requirements of § 1152(a)(1)(A).  *See id.* at 778.

The Government argues that the Proclamation does not conflict with § 1152(a) because it suspended the entry of immigrants, not the issuance of visas.  There is a textual difference.  Section 1182(f) authorizes the President to bar "entry" to certain classes of aliens.  8 U.S.C. §

44

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 89 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 45 of 91
Add. 45

1182(f).   Section 1152(a) bars discrimination based on nationality in the "issuance of an immigrant visa."  *Id.* § 1152(a)(1)(A).  These activities, however, usually go hand-in-hand.  An immigrant cannot seek entry without first obtaining an immigrant visa.  But receiving an immigrant visa is meaningless without later receiving permission to enter.   Thus, the denial of entry to immigrants would generally have the effect of causing the denial of immigrant visas. *See Hawaii,* 859 F.3d at 776 (holding that the EO-2's suspension on entry "in substance operates as a ban on visa issuance on the basis of nationality"); *see also IRAP*, 857 F.3d at 637 (Thacker, J., concurring) ("Here, the ultimate effect of what EO-2 actually *does* is require executive agencies to deny visas based on nationality.").  If § 1182(f) can be used to deny entry based on nationality, "the President could circumvent the limitations set by § 1152(a)(1)(A) by permitting the issuance of visas to nationals of . . . designated countries, but then deny them entry. Congress could not have intended to permit the President to flout § 1152(a) so easily."  *Hawaii*, 859 F.3d at 777.

There may be scenarios under which denial of entry based on nationality under § 1182(f) or § 1185(a) could be deemed to have such a limited impact that it would not also effect a denial of an immigrant visa.  For example, a nationality-based denial of entry of limited duration, such as during a specific urgent national crisis or public health emergency, that was not designed to halt visa issuances but instead simply to impose a delay or limitations on migration, arguably would not result in discrimination in the issuance of immigrant visas in violation of § 1152(a). President Reagan's 1986 decision to bar entry to Cuban nationals in retaliation for Cuba's suspension of an immigration agreement and facilitation of illegal migration into the United States, the only historical example of the use of § 1182(f) authority to bar entry based on nationality, falls into this category.  That bar of entry, by its own terms, was to continue only

Add. 46

until "the restoration of normal migration procedures between the two countries." Proclamation 5,517, 51 Fed. Reg. 30,470 (Aug. 22, 1986). Likewise, President Carter's invocation of 8 U.S.C. § 1185(a)(1) in response to the Iran Hostage Crisis authorized "limitations and exceptions on the rules and regulations governing the entry" of Iranians into the United States without any reference to visa issuance. Exec. Order 12,172, 44 Fed. Reg. 67947 (Nov. 26, 1979); Exec. Order 12,206, 45 Fed. Reg. 24,101 (Apr. 7, 1980). Accordingly, when considering EO-2, which imposed only a 90-day "temporary pause" during which some entry could have been denied without impacting the issuance of visas, this Court drew a distinction between entry and visa issuance. *See IRAP*, 241 F. Supp.3d at 556.

Here, however, the Proclamation has no specified end date and no requirement of renewal. Where the Proclamation has effectively imposed a permanent, rather than temporary, ban on immigrants from the Designated Countries, and has effectively stopped the issuance of immigrant visas indefinitely, the bar on entry is the equivalent of a ban on issuing immigrant visas based on nationality. This conclusion is supported by the Proclamation itself, which, even more than EO-2, makes clear that its intended effect is to deny the issuance of immigrant visas, in violation of § 1152(a). First, unlike EO-2, which generally barred entry by nationals of the Designated Countries, the Proclamation explicitly and specifically targets nationals seeking to immigrate to the United States. The Proclamation states, "For all but one of those 7 countries . . . I am restricting the entry of all immigrants." Procl. § 1(h)(ii). Second, the text of the Proclamation reveals that its primary effect is not that nationals of the Designated Countries holding immigrant visas will be denied entry at the border by CBP, but that the State Department and consular officers will stop issuing immigrant visas to such nationals. Indeed, the Proclamation actually permits entry by any nationals holding approved visas. *Id.* § 3(a)(iii).

46

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 91 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 47 of 91

Add. 47

Thus, as a result of the Proclamation, Defendants will effect the travel ban by no longer issuing immigrant visas to nationals of the Designated Countries.   Moreover, the fact that the Proclamation provides that the Secretary of State and consular officers may grant waivers to the entry ban, Procl. § 3(c), further reveals that the Proclamation generally imposes a ban on visa issuance, because those officials' statutory role is to issue visas, not to oversee actual entry into the United States.  *See* 8 U.S.C. § 1101(a)(16) (stating that an "immigrant visa" is "issued by a consular officer").  Indeed, the Proclamation erases the line between the issuance of a visa and entry into the United States when it specifically provides that a waiver issued by a consular officer "will be effective both for the issuance of a visa and for any subsequent entry on that visa."  Procl. § 3(c)(iii).  Finally, any claim that the Proclamation relates only to the question of entry to the United States is belied by its multiple references to visa issuance, including the provision stating that "visa adjudications for nationals of Somalia and decisions regarding their entry as nonimmigrants should be subject to additional scrutiny."  Procl. § 2(h)(ii).  Notably, the State Department publicly describes the Proclamation not as limiting entry, but as a "Presidential Proclamation on Visas."  *New Presidential Proclamation on Visas September 24, 2017*, U.S. Department of State, Bureau of Consular Affairs (Sept. 24, 2017), https://travel.state.gov /content/travel/en/news/important-announcement.html.  Because § 1152(a) does not permit such discriminatory denials of immigrant visas, the Proclamation exceeds the President's statutory authority under § 1182(f) and § 1185(a).  *See Abourezk*, 785 F.2d at 1061 (noting that the President's authority in the immigration context derives from "the statutory authority conferred by Congress").

Defendants' remaining arguments do not alter this conclusion.   Defendants unpersuasively claim that § 1182(f) and § 1185(a) do not conflict with § 1152(a) because they

47

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 92 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 48 of 91
Add. 48

"limit the universe of individuals eligible to receive visas" to which the non-discrimination provision of § 1152(a) would apply. This argument fails because there is nothing in the text of either statute that remotely suggests that they serve any function relating to visa eligibility. Moreover, acceptance of the Government's construction, under which discrimination would be permitted before the application of the non-discrimination provision, would render § 1152(a) meaningless. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973) (stating that "all parts of a statute, if at all possible, are to be given effect").

Likewise, the Court finds unpersuasive Defendants' assertion that nationality discrimination is permissible under 8 U.S.C. § 1152(a)(1)(B), which states that "[n]othing in [§ 1152(a)] shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed." This provision applies only to the Secretary of State and thus does not provide a basis to uphold discriminatory action in a Presidential Proclamation. More importantly, where the Proclamation now imposes an indefinite travel ban based on nationality, rather than a 90-day "pause," such an action cannot fairly be construed as a change in "procedures" or the "location" of visa processing. § 1152(a)(1)(B).

The Court therefore finds that Plaintiffs are likely to succeed on the merits of their claim that the Proclamation violates the non-discrimination provision of § 1152(a) to the extent that it bars entry by immigrants on the basis of nationality. Because this argument does not apply to nonimmigrants seeking entry to the United States, the Court must consider Plaintiffs' remaining statutory arguments.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 93 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 49 of 91
Add. 49

## 2.    Section 1182(f) Finding

Plaintiffs further contend that the President has failed to make an adequate finding to support his invocation of authority under § 1182(f).  Section 1182(f) requires that the President *find* that the entry of a class of aliens *would be detrimental* to the *interests of the United States*.  8 U.S.C. § 1182(f) (emphasis added); *see also Hawaii*, 859 F.3d at 770, 774 (concluding that EO-2 did not contain adequate findings that the entry of nationals from the countries subject to that travel ban would be detrimental to the interests of the United States).  The INA does not define key elements of this requirement, such as "find" or "detrimental to the interests of the United States."  *See* 8 U.S.C. § 1101 (defining terms used in the INA).  "Classes of aliens" is also not defined, but examples are given in 8 U.S.C. § 1182(a).  These examples include aliens who have "engaged in a terrorist activity," § 1182(a)(3)(B)(i)(I), and "illegal entrants and immigration violators," § 1182(a)(6).  None of these examples are based on nationality.  *See* §§ 1182(a)(1)-(10).

The President explicitly made the finding that "absent the security measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons" barred from entry by the proclamation "would be detrimental to the interests of the United States."  Procl. pmbl.  In support of that finding, the Proclamation describes two purposes.  First, the Proclamation helps to prevent the "entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States."  Procl. § 1(h)(i).  Second, the Proclamation will help "elicit improved identity-management and information-sharing protocols and practices from foreign governments" and thus "advance foreign policy, national security, and counterterrorism objectives."  *Id.*  The Proclamation contains additional information in support of its conclusion that a ban on entry of

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 94 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 50 of 91

Add. 50

Designated Country nationals will further these two goals. With regard to addressing information deficiencies, the Proclamation states that "information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols of the United States," and, citing the September 15, 2017 DHS Report, concludes that seven of the Designated Countries "continue to have 'inadequate identity-management protocols, information-sharing practices, and risk factors." Procl. § 1(b), (g). It further states that Somalia, although not identified as inadequate in the DHS Report, "lacks command and control of its territory" such that its ability to share information about nationals who pose terrorist risks is compromised. *Id.* § 2(h)(i). Without this information from the Designated Countries, the President finds, nationality-based restrictions are needed to prevent the entry of individuals about whom there is insufficient risk information. *Id.* § 1(h)(i). According to the Proclamation, a nationality-based policy also fits with the diplomatic purpose of the Proclamation to encourage foreign governments to improve their information-sharing practices. *See Hawaii*, 859 F.3d at 772 n.13 (noting that the two past nationality-based entry bans as to Cuba and Iran were for "retaliatory diplomatic measures responsive to government conduct").

Plaintiffs assert compelling arguments that the Proclamation's nationality-based restrictions are not actually necessary. Under current policy, applicants for immigrant or nonimmigrant visas, not their governments, are required to produce the information necessary to demonstrate that they are eligible to enter the United States. *See* 8 U.S.C. § 1361. Dozens of former national security officials have stated that this travel ban is unnecessary, that it serves no national security purpose, and that there is no evidence that the United States needs to shift away from this individualized vetting system to nationality-based bans. *See* Joint Decl. of Former

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 95 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 51 of 91

Add. 51

Nat'l Sec. Officials, J.R. 770.  Notably, the Proclamation does not provide examples of vetting failures involving nationals from the Designated Countries that resulted in the entry of terrorists or others who should not have been admitted.

Plaintiffs also question the choices made in the Proclamation given that Somalia met the Proclamation's baseline criteria and was included in the entry ban, while Iraq did not meet the baseline criteria but was not included.  Procl. § 1(g), 2(h).  Further, the Proclamation appears to be overbroad with regard to its purported goals.  It prohibits almost all Designated Country nationals from entering the United States, regardless of age, health, or even connection to the Designated Country itself.  At least one of the Plaintiffs, Dr. Sumaya Hamadmad, seeks to reunite with her sister, a Syrian national who has spent her entire life in Jordan, about whom the Syrian government would have no relevant information.

Under a more robust standard of review, these criticisms might carry the day.  But there is no requirement that a § 1182(f) entry restriction meet more stringent standards found elsewhere in the law, such as that it be "narrowly tailored" or the "least restrictive means" to obtain its stated aims.  *See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993); 42 U.S.C. § 2000bb-1(b)(2) (2012).  The text of § 1182(f) does not even require the President to find that suspending the entry of a class of aliens would be detrimental to national security, only that it is detrimental to the *interests* of the United States.  8 U.S.C. § 1182(f).  Under this broad standard, previous § 1182(f) proclamations have provided far less detail regarding their findings.  *See, e.g.*, Proclamation 8,015, 71 Fed. Reg. 28,541 (May 12, 2006) (barring entry of members of the Government of Belarus based on "the importance to the United States of fostering democratic institutions in Belarus"); Exec. Order. No. 12,807, 57 Fed. Reg. 21,133 (May 24, 1992) (barring entry of "any defined vessel carrying [illegal] aliens" based

Add. 52

on a finding that "there continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally").  Against this background, the Court cannot conclude that Plaintiffs are likely to succeed on their claim that the Proclamation fails to make a finding of detrimental interest sufficient to invoke § 1182(f).

### 3. Section 1182(f) Authority

Lastly, Plaintiffs argue that the Proclamation's ban on entry of nationals from the Designated Countries exceeds the authority granted to the President in § 1182(f).  Specifically, Plaintiffs assert that the Proclamation effectively revises the INA by imposing alternative visa issuance criteria that conflict with statutory criteria and thereby overrides Congress's policy judgments, particularly those made in establishing the Visa Waiver Program ("VWP").  Defendants counter that (1) the issue of whether the Proclamation exceeds the authority granted in § 1182(f) is not judicially reviewable; and (2) even if subject to review, the Proclamation is an appropriate use of the President's broad authority under § 1182(f).  Although the Proclamation also relies on § 1185(a)(1), the parties do not argue that this section provides broader authority than § 1182(f).  Therefore, the Court need only consider whether the Proclamation exceeds the President's delegated authority under § 1182(f).

The Court first addresses Defendants' claim that the President's exercise of authority pursuant to § 1182(f) is not subject to judicial review.  In Defendants' view, review of § 1182(f) would be inappropriate because it would amount to a second-guessing of a decision that is appropriately committed to the President.  Yet the Supreme Court had no difficulty reaching the merits of a challenge asserting that the President's use of § 1182(f) to blockade illegal migrants from Haiti violated another provision of the INA.  *See Sale*, 509 U.S. at 170-74, 187.  Moreover, in evaluating Plaintiffs' argument, the Court is not second-guessing the President's discretion,

52

Add. 53

but examining whether the Proclamation fits within the President's grant of authority.  Such review of whether executive action exceeds statutory authority is plainly within the purview of the courts.  *See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015) (reviewing whether the President's decision to not list "Jerusalem, Israel" as a birthplace on a passport conflicted with a provision of the 2003 Foreign Relations Authorization Act); *Dames & Moore*, 453 U.S at 668 (stating, in reviewing a claim that President Carter's actions in freezing Iranian assets during the Iran Hostage Crisis exceeded his statutory and constitutional authorities, that "the validity of the President's action, at least so far as separation-of-powers principles are concerned, hinges on a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action").  Thus, the Court rejects the argument that it may not review Plaintiffs' claim that the Proclamation exceeds the authority granted in § 1182(f).

Plaintiffs' claim centers on two alleged transgressions.  First, Plaintiffs argue that the Proclamation imposes new criteria on the issuance of visas that conflict with Congress's statutorily established criteria.  Indeed, although the text of § 1182(f) authorizes the President only to "suspend the entry" of classes of immigrants and nonimmigrants, the Proclamation goes further.  The Proclamation does not stop nationals of the Designated Countries from entering the United States if they already have a valid visa or if they are able to obtain one through the processes described in the Proclamation.  Rather, as with EO-2, the Proclamation effectuates the travel ban by using the visa issuance process.  *See Hawaii*, 859 F.3d at 777 (noting the Government's acknowledgment that "the entry ban" under EO-2 "would be implemented through visa denials").  Thus, Plaintiffs correctly observe that the Proclamation goes beyond mere suspension of entry and delves into the criteria for issuing visas to nationals of the

53

Add. 54

Designated Countries.  Specifically, the Proclamation allows a consular officer to issue waivers to such nationals that would be "effective both for the issuance of a visa and for any subsequent entry on that visa."  Procl. § 3(c)(iii).  These waivers may be granted only if a foreign national demonstrates that denial of entry would cause "undue hardship," that entry would not pose a threat to the United States, and that entry will be in the "national interest."  Procl. §§ 3(c)(i)(A), (C).  The Proclamation then directs the Secretary of State and the Secretary of Homeland Security to establish guidance for consular officials to use when making waiver determinations and establishes factors that the guidance must consider along with specific factual scenarios that would generally justify a waiver.

Arguably, these criteria conflict with Congress's detailed system governing the issuance of immigrant and nonimmigrant visas.  As part of this system, Congress places on applicants for visas the burden to establish eligibility, including to show that they do not fall into any categories of individuals ineligible for visas.  *See* 8 U.S.C. § 1361; *id.* § 1182(a).  These categories include those with possible links to terrorism or criminal activity.  *See* 8 U.S.C. §§ 1182(a)(2)-(3)(B).  Plaintiffs thus assert, with some force, that the Proclamation adds additional criteria that nationals of the Designated Countries must satisfy before they can obtain an immigrant or nonimmigrant visa to gain entry to the United States.  This addition of such criteria, Plaintiffs argue, impermissibly replaces Congress's list of criteria with the President's own.  The Court agrees that, as constructed, the Proclamation effectively adds new criteria for the issuance of visas and entry by nationals of certain countries beyond those formally imposed by Congress.

Second, Plaintiffs argue that the Proclamation exceeds the bounds of § 1182(f) because it conflicts with Congress's policy judgments in addressing the same problem purportedly addressed by the Proclamation:  poor information sharing by foreign governments.  As evidence,

54

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 99 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 55 of 91
Add. 55

Plaintiffs reference the VWP, established by Congress, which allows nationals of certain foreign countries to enter the United States for periods of less than 90 days without a visa.  8 U.S.C. § 1187(a)(1).  To be eligible for this program, a country must meet certain standards relating to cooperation and the sharing of information with the United States.  § 1187(c)(2).  Notably, many of the standards applied to determine if a country qualifies for the VWP are strikingly similar to those considered in the Proclamation.  For example, among the criteria for VWP eligibility are whether a country provides its nationals with an electronic machine-readable passport containing biographic and biometric data, § 1187(a)(3), and whether the country reports lost and stolen passports to the United States, § 1187(c)(2)(D).  The Proclamation lists these same criteria as "identity management information" considered in the assessment whether a country should be added to the travel ban list.  Procl. § 1(c)(i).  Other VWP criteria include whether a foreign government shares information on whether its nationals traveling to the United States pose a security threat, 8 U.S.C. § 1182(c)(2)(F), the same type of information considered by the Proclamation under the category of "National security and public-safety information," Procl. § 1(c)(ii).  Likewise, the VWP considers whether a country is a safe haven for terrorists, 8 U.S.C. § 1187(a)(12)(D)(ii)(III), and whether the country generally accepts the repatriation of its own nationals subject to orders of removal from the United States, § 1187(c)(2)(E).   These factors, along with whether a country is a participant in the VWP program itself, are the "National security and public-safety risk assessment" factors considered by the Proclamation in assessing whether a country should be subject to the travel ban.  Thus, in determining which countries to subject to a travel ban, the Proclamation duplicates many of the same criteria, and revisits many of the same issues, that Congress considered in crafting the VWP.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 100 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 56 of 91

Add. 56

Further, the Proclamation imposes a travel ban on some of the same nations, based on the some of the same criteria, on which Congress imposed lesser restrictions in its recent amendments to the VWP.  In 2015, Congress amended the VWP to exclude individuals from participating countries who were dual citizens of, or had traveled to, Iraq, Syria, a country designated by the State Department as a state sponsor of terrorism (Iran, Syria, and Sudan), or other countries designated by the Department of Homeland Security (Libya, Somalia, and Yemen).  *See* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015, Pub. L. No. 114-113, Div. O, Title II, § 203, 129 Stat. 2242 (codified at 8 U.S.C. § 1187(a)(12)). For example, a French national who had traveled to Syria or was also a Syrian national would not be eligible for visa-free travel to the United States, even though France is a VWP country. Instead, Congress required such an individual to apply for a nonimmigrant visa and submit to a consular interview and adjudication by a consular officer.  *See* 8 U.S.C. § 1187(a)(12).   In light of this statutory scheme, Plaintiffs argue that the Proclamation exceeds the bounds of § 1182(f) because it conflicts with Congress's policy judgments relating to the same issues and same nations.  The Court agrees with Plaintiffs that the Proclamation addresses some of the same issues considered by Congress, specifically, information sharing by foreign nations relating to travel of foreign nationals to the United States and the consequences for failing to engage in it, and that the Proclamation imposes significantly more restrictive limitations that go beyond what Congress has previously imposed.

Contrary to the Defendants' characterization, Plaintiffs' claim is not one of implied repeal.  *See Branch v. Smith*, 538 U.S. 254, 273 (2003) (establishing the standard for claims that a later provision has effectively revealed a prior provision).  No one is arguing that § 1182(f) has effectively been repealed.  Rather, Plaintiffs' argument appears to be that Congress's legislative

Add. 57

action, in enacting the VWP and criteria for issuance of visas, has implicitly limited the President's § 1182(f) authority to bar intrusions into these areas.  In a different context, the Supreme Court recognized a similar theory when it held that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."  *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (holding that the Food and Drug Administration's statutory authority to regulate medical "devices" did not extend to regulation of tobacco, in part because Congress's frequent legislation relating to tobacco signaled that Congress did not intend that result).  Indeed, not only has Congress amended the VWP as recently as 2015, but it has regularly revised various aspects of the immigration system affecting visa issuance over the past 15 years.  *See, e.g.,* Consolidated Appropriations Act, Pub. L. No. 110-161, Div. J, § 691(d), 121 Stat. 1844 (2008) (designating the Taliban as a terrorist organization representatives of which are inadmissible under the INA); Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 7203, 118 Stat. 3638 (requiring that all visa applications be reviewed and adjudicated by a consular officer).  Thus, Plaintiffs have offered a legitimate theory that the Proclamation has gone beyond suspending entry into legislating changes to Congress's statutory scheme.

However, this theory is undermined in two ways.  First, with respect to the new visa issuance criteria arising from the waiver provisions, § 1182(f) explicitly grants the President the authority not just to suspend entry, but to "impose on the entry of aliens any restrictions he may deem to be appropriate."  8 U.S.C. § 1182(f).  Thus, even if the waiver requirements are deemed to be additional criteria that must be met by an alien seeking admission, a fair reading of §

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 102 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 58 of 91
Add. 58

1182(f) is that it allows the President to impose such additional restrictions outside of previously listed requirements.

Second, it is not clear that the Proclamation directly conflicts with the judgments reflected in Congress's construction of the VWP. The VWP covers certain participating countries that have agreed to abide by certain conditions set by the United States, including information-sharing conditions, in exchange for visa-less travel to the United States for their nationals. *See* 8 U.S.C. § 1187(c)(2). It does not directly address whether nationals of certain non-VWP countries should be subject to even greater scrutiny than the standard visa issuance process. Likewise, the 2015 amendments related to the treatment of nationals of VWP countries who were either dual nationals of or had traveled to certain countries, including five of the countries covered by the Proclamation. *See* Visa Waiver Program Improvement and Terrorist Travel Prevention Act of 2015 § 203. Those individuals are not affected by the Proclamation. *See* Procl. § 3(b)(iv) (excepting dual nationals of Designated Countries traveling on a passport of a different country). Thus, although the Proclamation and the VWP address similar problems and consider similar factors, the two are not in such conflict that the VWP could fairly be deemed to foreclose the restrictions imposed through the Proclamation pursuant to § 1182(f). The Court therefore does not conclude that there is a likelihood of success on the claim that the Proclamation has effectively legislated changes to the INA in contravention of Congressional intent.

Finally, Plaintiffs point to the sheer scope of the Proclamation and argue that it must be beyond the limit of any authority delegated by Congress. Indeed, the Proclamation is unique among past invocations of § 1182(f). Of the 42 proclamations issued pursuant to § 1182(f) or § 1185(a)(1) prior to EO-1, none have sought to ban entry by nationals of more than one country at

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 103 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 59 of 91
Add. 59

once, let alone eight countries with approximately 150 million nationals.  *See* Kate M. Manuel,

Cong. Research Serv., R44743, Executive Authority to Exclude Aliens: In Brief 6-10 (2017).

The only uses of § 1182(f) or § 1185(a)(1) to bar entry by nationals of a specific country were

triggered by a specific foreign policy dispute:  the Iran Hostage Crisis and a decision by the

Cuban government to cancel a migration agreement with the United States.  Exec. Order No.

12,172, 44 Fed. Reg. 67947; Exec. Order No. 12,206, 45 Fed. Reg. 24,101; Proclamation No.

5,517, 51 Fed. Reg. 30,470.  None explicitly affected the issuance of visas to the same extent as

the Proclamation.  Indeed, most § 1182(f) proclamations were issued in response to a discrete

event and were limited to a specific group of individuals associated with that event.  Manuel,

*supra*, at 6-10.  As a typical example, President Clinton invoked § 1182(f) to suspend entry of

Sudanese government and military officials for their failure to comply with a United Nations

Security Council Resolution.  *See, e.g.,* Proclamation No. 6,958, 61 Fed. Reg. 60,007 (Nov. 22,

1996); *see also* Exec. Order No. 13,606, 77 Fed. Reg. 24,571 (Apr. 22, 2012) (suspending entry

of certain persons associated with human rights abuses by the Iranian and Syrian governments

through the use of information technology).  Thus, the Proclamation is unprecedented in its

combination of a broad sweep impacting millions of people based on their nationality, its

imposition of additional criteria for visa issuance, and its arguable conflict with Congressional

immigration policy.  If there is an example of a § 1182(f) order, past or present, that exceeds the

authority of that statute, it would be this one.

But other than the specific nationality restriction of § 1152(a), Plaintiffs have not

identified, nor has the Court found, any clear limit on the President's authority under § 1182(f)

that this proclamation has crossed.  Nor have Plaintiffs cited any case where a court has struck

down a § 1182(f) order as beyond the scope of that provision.  In the only Supreme Court

Add. 60

decision considering such an argument, the Court held that the statute gave "the President ample power to establish a naval blockade" to prevent Haitian migrants from entering the United States. *Sale*, 509 U.S. at 187. Rather, courts have generally recognized that § 1182(f) provides the President with a "sweeping proclamation power." *Abourezk,* 785 F.2d at 1049 n. 2; *see Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992) (stating that § 1182(f) provides the President with "broad discretionary authority"); *Allende*, 845 F.2d at 1117-1118 (stating that § 1182(f) grants the President "vast power to exclude any individual alien or class of aliens whose entry might harm the national interest"); *Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980) (referring to § 1182(f) as an "extreme power").

The text of the statute itself is similarly unhelpful for discerning its limit. As discussed above, § 1182(f) does not impose a time limit on the President, stating that any restriction is "for such period as he shall deem necessary." 8 U.S.C. § 1182(f). The President can impose restrictions on "any aliens or [] any class of aliens." *Id.* The President is not required to find that entry would be detrimental to the nation's security, only to its "interests," a term that encompasses any number of reasons. *Id.*

Nevertheless, Plaintiffs are correct that there must be some limit on § 1182(f) authority. *See, e.g.*, *Kent v. Dulles*, 357 U.S. 116, 129-30 (1985) (holding that a broad statute authorizing the Secretary of State to issue passports under rules established by the President did not allow the Secretary to deny passports to Communists due to constitutional considerations); *Zemel v. Rusk*, 381 U.S. 1, 7 (1965) (noting that statutes affecting foreign relations often "leave the exercise of power to [the President's] unrestricted judgment," but that does not mean that the President has "totally unrestricted freedom of choice"). For example, Plaintiffs persuasively argue that the use of § 1182(f) to rewrite immigration law, such as to ban all family-based immigrant visas, would

60

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 105 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 61 of 91

Add. 61

likely go too far.   But that line has yet to be drawn.   Where the Proclamation does not clearly

run afoul of any identified limit on § 1182(f) authority with regard to nonimmigrant visas, the

Court cannot find that Plaintiffs have shown a likelihood of success on the merits of this claim.

Because Plaintiffs' statutory arguments do not support their requested relief in its entirety, the

Court must consider their constitutional claims.

###### B.       Establishment Clause

Plaintiffs assert that the Proclamation's ban on citizens from the Designated Countries is

the next step in a "clear and direct chain" that began with President Trump's campaign promise

to ban Muslims from entering the United States and continued through EO-1 and EO-2.   IRAP

Mot. Prelim. Inj. at 24.   They argue that the Proclamation therefore violates the Establishment

Clause.

###### 1.       Legal Standard

Defendants first argue that Plaintiffs' Establishment Clause claim summarily fails upon

application of the standard set forth in *Kleindienst v. Mandel*, 408 U.S. 753 (1972).   Under

*Mandel*, pursuant to Congress's plenary power over immigration, courts review a claim that a

consular officer denied a visa in contravention of constitutional rights only to determine whether

there was a "facially legitimate and bona fide reason" for the denial, in which case the court will

not "look behind the exercise of that discretion."   *Id.* at 770 (rejecting a claim that the denial of a

visa to Mandel, a Marxist, violated the First Amendment rights of professors who invited him to

speak because the Government offered the facially legitimate reason that on a prior visit, Mandel

had engaged in activities outside the scope of his visa).   Although *Mandel* involved the denial of

an individual visa, the Supreme Court extended the use of the *"facially legitimate and bona fide"*

standard to a categorical immigration determination in *Fiallo v. Bell*, 430 U.S. 787 (1977), where

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 106 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 62 of 91
Add. 62

a father alleged that the INA's grant of an immigration preference to illegitimate children based on their relationship with their mothers, but not their fathers, violated the Equal Protection Clause. *Id.* at 788-89, 795.

There are persuasive reasons to conclude that the *Mandel* standard does not apply to Plaintiffs' Establishment Clause claim. First, there is a more recent line of cases recognizing that courts must not simply defer to the political branches when constitutional rights are at stake. *See Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (emphasizing that in immigration matters, the judicial branch is not required wholly to defer to the political branches because their plenary "power is subject to important constitutional limitations"); *Chadha*, 462 U.S. at 940-41 (underscoring that even when another branch of government has "plenary authority," courts may still review whether that branch chose "a constitutionally permissible means of implementing that power"). Here, where the right at issue arises from the Establishment Clause, the *Mandel* standard is a poor fit because the core harm of a violation of the Establishment Clause, as opposed to the Free Speech Clause or the Equal Protection Clause, is not a limitation on an individual's right—whether to speak, listen, or be treated equally to another—but the dissemination of a public message that the Government has adopted an official policy of favoring one religion. A "facially legitimate and bona fide" standard designed to evaluate an individual visa determination is therefore not compatible with a fair evaluation of that public message, which necessarily requires some evaluation of the purpose behind the message. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 532 (stating that an Establishment Clause violation consists of "an official purpose" to disapprove of a religion). Notably, the Supreme Court has not applied the *Mandel* standard to an Establishment Clause claim.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 107 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 63 of 91
Add. 63

Nevertheless, in light of the Fourth Circuit's application of *Mandel* to its review of EO-2, *see IRAP*, 857 F. 3d at 588-91, Plaintiffs do not seriously contest, and this Court accepts, the applicability of *Mandel*.   The Court then looks to the concurring opinion of Justice Kennedy in *Kerry v. Din*, 135 S. Ct. 2128 (2015), to understand the distinction between "facially legitimate" and "bona fide."   *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (citation omitted).   An action is "facially legitimate" if there is a valid reason for it on the face of the action.   *Din*, 135 S. Ct. at 2140-41 (Kennedy, J. concurring).   An action is "bona fide" if there has been no "affirmative showing of bad faith" by the decisionmaker.   *Id.* at 2141.   Based on *Din*, this Court concludes that if there is a particularized showing of bad faith, a court should then "look behind" the action to evaluate its justification.   *Id.* at 2040-41; *see also IRAP*, 857 F.3d at 590-91.

Here, the Proclamation states that the President, pursuant to § 1182(f) and § 1185(a), is suspending entry into the United States of nationals from the Designated Countries "to protect the security and interests of the United States and its people."   Procl. pmbl.   This national security interest is a facially legitimate reason for the actions set forth in the Proclamation, to the extent authorized by those statutes.   *See Din*, 135 S. Ct. at 2140 (Kennedy, J. concurring).

Plaintiffs, however, assert that the Proclamation's proffered national security rationale is not the true motivation behind the restrictions, but is instead a pretext for an anti-Muslim bias. In support of their assertion of bad faith, Plaintiffs, as part of their challenge to EO-2, previously offered President Trump's statements during his presidential campaign calling for a "Muslim ban"; his statements that he would fulfill his campaign promise of a Muslim ban by focusing on

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 108 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 64 of 91
Add. 64

territories rather than religion; EO-1, adopted without agency consultation, which targeted only majority-Muslim countries and contained preferences for religious minorities within those countries; and statements of President Trump and his advisors that EO-2 had the same policy goals as EO-1.  Plaintiffs also pointed to the continued focus in EO-2 on countries with majority-Muslim populations, and what they asserted was a lack of correlation between the stated national security aims of EO-2 and the mechanisms outlined to achieve it.   Based on these facts, this Court concluded that the primary purpose for EO-2 was to effect the equivalent of a Muslim ban. *IRAP*, 241 F. Supp. 3d at 560, 562-63.   The Court now reaffirms that finding for purposes of the present analysis.

In their challenge to the Proclamation, Plaintiffs link it to this history of bad faith by noting that the Proclamation is the specific result of the President's directive in EO-2 that agencies develop a list of countries to be subject to a travel ban.  They have supplemented the previous factual record with statements by President Trump since the injunctions against EO-2 were entered urging a return to and a toughening of the travel ban.  They again note what they see as the misalignment between the stated national security goals of the ban and the means implemented to achieve them.   They also assert that the Proclamation continues disproportionately to affect Muslims, despite the inclusion of two non-Muslim majority nations on the list of Designated Countries.  This combined record provides facts that plausibly allege with sufficient particularity an affirmative showing of bad faith in the stated rationale for the Proclamation.  *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring).

Having found that Plaintiffs have plausibly alleged that the Government's stated, facially legitimate, reason for the Proclamation is not bona fide, this Court "look[s] behind" that stated reason.  *See id.* at 2040-41.  The Court thus turns to a traditional constitutional analysis, in this

Add. 65

case by applying the traditional tests for evaluating an Establishment Clause claim. *See Zadvydas*, 533 U.S. at 695; *Chadha*, 462 U.S. at 940-41; *see also IRAP*, 857 F. 3d at 590-91.

The First Amendment prohibits any "law respecting an establishment of religion," U.S. Const. amend. I, and "mandates governmental neutrality between religion and religion, and between religion and nonreligion," *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). When a government action does not differentiate among religions on its face, courts apply the test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to evaluate an Establishment Clause challenge. *See Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989). Under *Lemon*, to withstand an Establishment Clause challenge (1) an act must have a secular purpose, (2) "its principal or primary effect must be one that neither advances nor inhibits religion," and (3) it must not "foster 'an excessive government entanglement with religion.'" *Id.* at 612-613 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970)). All three prongs of the test must be satisfied. *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987).

As the first prong of the *Lemon* test makes clear, in Establishment Clause cases, "purpose matters." *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 n.14 (2005). Thus the purpose test is not satisfied by the identification of any secular purpose. *McCreary*, 545 U.S. at 865 n.13. Such a rule "would leave the purpose test with no real bite, given the ease of finding some secular purpose for almost any government action." *Id.* ("[A]n approach that credits *any* valid purpose . . . has not been the way the Court has approached government action that implicates establishment." (emphasis added)). Although governmental statements of purpose generally receive deference, an identified secular purpose must be "genuine, not a sham, and not merely secondary to a religious objective." *Id.* at 864. Further, if a religious purpose for the government action is the predominant or primary purpose, and the secular purpose is

65

Add. 66

"secondary," the purpose test has not been satisfied.  *Id.* at 860, 862-65; *see also Edwards*, 482

U.S. at 594 (finding a violation of the Establishment Clause where the "primary purpose" of the

challenged act was "to endorse a particular religious doctrine").

An assessment of the purpose of an action is a "common" task for courts.  *McCreary*, 545

U.S. at 861.  An "understanding of official objective" can emerge from "readily discoverable

fact" without "any judicial psychoanalysis" of the decisionmaker.  *Id.* at 862.  In determining

purpose, a court acts as an "objective observer" who considers "the traditional external signs that

show up in the text, legislative history, and implementation of the statute, or comparable official

act."  *McCreary*, 545 U.S. at 862 (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308

(2000)).   Because "the world is not made brand new every morning," *McCreary*, 545 U.S. at

866 (quoting *Santa Fe*, 530 U.S. at 315), the Court must also consider the "historical context" of

a challenged action and the "specific sequence of events" leading up to it.  *Edwards*, 482 U.S. at

594-95.  Such evidence is "perfectly probative" and considering it is a matter of "common

sense," because when determining purpose, courts are "forbid[den] . . . 'to turn a blind eye to the

context in which [the] policy arose.'"  *McCreary*, 545 U.S. at 866 (quoting *Santa Fe*, 530 U.S. at

315).

## 2.      Historical Context

This Court previously applied the *Lemon* test to EO-2 and found that it likely failed the

purpose prong because there was substantial direct evidence that the travel ban was motivated by

a desire to ban Muslims as a group from entering the United States.  *IRAP*, 241 F. Supp. 3d at

560, 562-63.  In making this factual determination, the Court relied largely on a record of public

statements made by President Trump and his advisors before his election, before the issuance of

EO-1, and after the decision to issue EO-2.  *Id.* at 558-59, 562, 564.  *See Green v. Haskell Cty.*

Add. 67

*Bd. of Comm'rs*, 568 F.3d 784, 801 (10th Cir. 2009) (considering quotations from county commissioners that appeared in news reports in finding that a Ten Commandments display violated the Establishment Clause); *Glassroth v. Moore*, 335 F.3d 1282, 1282, 1284-85, 1297 (11th Cir. 2003) (finding an Establishment Clause violation based on a record that included the state chief justice's campaign materials, including billboards and television commercials, proclaiming him to be the "Ten Commandments Judge").

That record revealed that on December 7, 2015, while still a Republican primary candidate, Trump posted a "Statement on Preventing Muslim Immigration" on his campaign website "calling for a total and complete shutdown of Muslims entering the United States until our representatives can figure out what is going on." J.R. 85. Then in a March 22, 2016 Fox Business interview, Trump reiterated his call for a ban on Muslim immigration, explaining that his call for the ban had gotten "tremendous support" and that "we're having problems with the Muslims, and we're having problems with Muslims coming into the country." J.R. 261. On December 21, 2016, when asked whether a recent attack in Germany affected his proposed Muslim ban, President-Elect Trump replied, "You know my plans. All along, I've proven to be right. 100% correct." J.R. 245. After becoming the Republican presidential nominee, Trump clarified his plans for a Muslim ban. In a July 24, 2016 interview on *Meet the Press*, Trump asserted that immigration should be immediately suspended "from any nation that has been compromised by terrorism." J.R. 219. When questioned whether his new formulation was a "rollback" of his call for a "Muslim ban," he described it as an "expansion" and explained that "[p]eople were so upset when I used the word Muslim," so he was instead "talking territory instead of Muslim." J.R. 220.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 112 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 68 of 91
Add. 68

Within a week of taking office, President Trump issued EO-1.  Upon signing it, President Trump remarked, "This is the 'Protection of the Nation from Foreign Terrorist Entry into the United States.'  We all know what that means."  J.R. 142.  The next day, Mayor Giuliani asserted on Fox News that President Trump told him he wanted a Muslim ban and asked Giuliani to "[s]how me the right way to do it legally."  J.R. 247.  Giuliani explained that, after consulting with others, he proposed that the action be "focused on, instead of religion . . . the areas of the world that create danger for us," specifically "places where there are [*sic*] substantial evidence that people are sending terrorists into our country."  J.R. 247-48.

EO-1 mirrored this rhetoric.  It suspended for 90 days the immigrant and nonimmigrant entry into the United States of aliens from Iraq, Iran, Libya, Sudan, Somalia, Syria, and Yemen, all countries where the vast majority of the population is Muslim.  The stated purpose of this suspension was to "protect the American people from terrorist attacks by foreign nationals admitted to the United States."  EO-1 pmbl.  EO-1 cautioned that this threat required the United States to be "vigilant during the visa-issuance process," a process that "plays a crucial role in detecting individuals with terrorist ties and stopping them from entering the United States."  EO-1 § 1.  However, EO-1 contained no facts tying the seven banned countries to any particular terror threats or to any visa-issuance failures.  EO-1 also expressly drew distinctions based on religion, requiring that refugee claims on the basis of religious persecution be prioritized for individuals who were members of a minority religion in their country of nationality.

EO-1 was issued without traditional interagency consultation.  Considering this abbreviated process, the similarity between the provisions of EO-1 and the public statements about the form the promised Muslim ban would take, the express references to religion within its text, and the lack of any articulated connection between the scope of the ban and particular

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 113 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 69 of 91

Add. 69

national security threats, this Court concluded, in resolving the motion for a preliminary injunction against EO-2, that there was a "convincing case" that the purpose of EO-1 was "to accomplish, as nearly as possible, President Trump's promised Muslim ban" through a policy of restricting entry of nationals of predominantly Muslim countries deemed to be dangerous territory. *IRAP*, 241 F. Supp. 3d at 558-59. This Court reaffirms this finding for purposes of the present analysis.

That conclusion echoed the determination of the United States District Court for the Eastern District of Virginia, which had enjoined EO-1 on Establishment Clause grounds. *Aziz*, 234 F. Supp.3d at 730, 737-38 (quoting from a July 17, 2016 interview during which then-candidate Trump, upon hearing a tweet stating "Calls to ban Muslims from entering the U.S. are offensive and unconstitutional," responded  "So you call it territories. OK? We're gonna do territories."). Similarly, in reviewing a TRO halting EO-1, the Ninth Circuit opined that an Establishment Clause claim as to EO-1 raised "serious allegations" and presented "significant constitutional questions." *Washington*, 847 F.3d at 1168.

EO-2 followed only six weeks after EO-1. EO-2 again instituted a 90-day suspension of entry from Designated Countries. However, EO-2 removed Iraq from the list of Designated Countries, which was otherwise the same, exempted certain categories of individuals from the ban, and delineated other categories of individuals who might be eligible for a case-by-case waiver. It also removed the preference for refugees from religious minorities and contained no express mention of religion. EO-2 contained a more fulsome factual predicate for its stated national security purpose, asserting that there is a heightened risk that individuals from the Designated Countries will be "terrorist operatives or sympathizers" because each Designated Country is "a state sponsor of terrorism, has been significantly compromised by terrorist

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 114 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 70 of 91

Add. 70

organizations, or contains active conflict zones," such that their governments will therefore be less willing or able to "share or validate important information about individuals seeking to travel to the United States." EO-2 § 1(d).

EO-2 required that the Secretary of Homeland Security, in consultation with the Secretary of State and the DNI, conduct a "worldwide review to identify whether, and if so what, additional information" would be needed from each foreign country to adjudicate a visa application and determine that the applicant is not a security threat.  EO-2 § 2(a).  A report on that review was to be submitted 20 days after the effective date of EO-2.  Then, the Secretary of State was to begin a 50-day process of requesting that foreign governments bring their practices into compliance with any of the report's recommendations.  After that period, the Secretary of Homeland Security, after consultation with the Secretary of State and the DNI, was to "submit to the President of list of countries recommended for inclusion in a Presidential proclamation that would prohibit entry of appropriate categories of foreign nationals of countries that have not provided the information requested."  EO-2 § 2(e).  This review and recommendation plan (collectively, the "DHS Review") was largely unchanged from a comparable review process contained in EO-1.

In public statements, the Trump Administration repeatedly emphasized that EO-2 was, in substance, the same as EO-1.  On February 16, 2017, before EO-2 was issued, Stephen Miller, Senior Policy Advisor to the President, characterized the changes made as "mostly minor technical differences" and asserted that the "basic policies are still going to be in effect."  J.R. 319.  When EO-2 was signed on March 6, 2017, White House Press Secretary Sean Spicer emphasized that "[t]he principles of the [second] executive order remain the same" as those of

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 115 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 71 of 91
Add. 71

EO-1.  J.R. 118.  EO-2 itself explicitly stated that changes from EO-1, particularly the addition of exemption and waiver categories, were made to address "judicial concerns."  EO-2 § 1(i).

Considering EO-2 in this context, this Court concluded that despite the modifications from EO-1 and the removal of any reference to religion, the history of public statements "continued to provide a convincing case that the purpose of EO-2 remains the realization of the long-envisioned Muslim ban."  *IRAP*, 241 F. Supp. 3d at 559.  In so finding, the Court determined that the core policy outcome of a ban on entry of nationals from the Designated Countries remained intact, that EO-2 continued to have the same practical mechanics of a Muslim ban by another name that President Trump had so publicly described, and that the national security rationale, under the circumstances, represented at most a secondary purpose for the travel ban.  *Id.* at 559-60, 562-63.  This Court accordingly found that the Plaintiffs were likely to succeed on their claim that EO-2 violated the Establishment Clause.  *Id.* at 560, 564; *see also IRAP*, 857 F.3d at 601.  The Court reaffirms this finding for purposes of the present analysis.

It is against this backdrop that the Court must now assess the likelihood of success of Plaintiffs' claim that the Proclamation violates the Establishment Clause.  Because "reasonable observers have reasonable memories," past Establishment Clause violations are relevant to the assessment of present government actions.  *McCreary,* 545 U.S. at 866, 874.  *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000) (rejecting the argument, in a case involving successive school-prayer policies, that adoption of a new, facially neutral school-prayer policy "insulates the continuation of such prayers from constitutional scrutiny," because any such inquiry "must include an examination of the circumstances surrounding its enactment").  When faced with allegations of a successive Establishment Clause violation, a court must thus not lapse

Add. 72

into the role of "an absentminded objective observer," but must instead remain "familiar with the history of the government's action and competent to learn what history has to show." *McCreary*, 545 U.S. at 866. Here, where EO-1 and EO-2 were each likely to violate the Establishment Clause, and the third iteration, the Proclamation, was issued close on their heels—within nine and six months, respectively—it is "common sense" that the Proclamation stands in their shadow. *McCreary*, 545 U.S. at 855, 869-72, 874 (evaluating the purpose of a third proposed display of the Ten Commandments in light of two prior proposals made within the course of a year).

However, past actions do not "forever taint" present ones. *McCreary*, 545 U.S. at 874. While courts should reject an "implausible claim that governmental purpose has changed," they should also "take account of genuine changes in constitutionally significant conditions." *Id.* The Supreme Court has not articulated what kind of changes are necessary to obviate the taint of a prior Establishment Clause violation. On this point, *Felix v. City of Bloomfield*, 841 F.3d 848 (10th Cir. 2016), cited by Defendants, is instructive. In *Felix*, the United States Court of Appeals for the Tenth Circuit stated that "it is possible that a government may begin with an impermissible purpose, or create an unconstitutional effect, but later take affirmative actions to neutralize" the Establishment Clause violation. *Id.* at 863. In assessing "whether curative effects are sufficient to overcome an objective observer's impression" of an impermissible Establishment Clause violation, governmental curative actions would have "not only to persuasively present a primary nonreligious effect, but also to disassociate the [government action] from its previous religious effect." *Id.* Specifically, the governmental cure should be (1) "purposeful," (2) "public," and (3) "at least as persuasive" as the initial Establishment Clause violation. *Id.*

72

Add. 73

### 3.   The Proclamation

The Government argues that the Proclamation does not violate the Establishment Clause because unlike EO-2, it is based on a worldwide review by the Acting Secretary of Homeland Security of information-sharing practices and other factors relevant to the visa issuance process. A comparison of the two orders reveals certain changes that support this argument.  First, the Proclamation describes the review process conducted in advance of the Proclamation's issuance, which included consideration of baseline criteria for assessing available information relevant to the visa issuance process, an assessment of each country against those factors, the consultation with foreign governments to increase compliance, and recommendations on restrictions for countries whose compliance remains inadequate.  Procl. §§ 1(e), (f).  Second, the Proclamation also alters the list of Designated Countries.  In EO-1 and EO-2, all the banned countries were majority-Muslim; the Proclamation's Designated Countries include two non-majority Muslim countries:   North Korea and Venezuela.   Like EO-2, the Proclamation includes certain exceptions and authorizes case-by-case waivers, but its restrictions are more finely tuned, with distinctions made for most of the Designated Countries as to particular kinds of visas subject to suspension.

Defendants also emphasize that the Proclamation makes no express distinctions based on religion.  As with EO-2, the fact that, within the four corners of the document, there is no explicit distinction among countries based on religion does not end the inquiry.   Establishment Clause violations can arise from facially neutral government action.  *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 699-702 (1994); *cf. Church of the Lukumi Babalu Aye*, 508 U.S. at 534, 542 (holding that a facially neutral city ordinance prohibiting animal sacrifice and intended to target the Santeria faith violated the Free Exercise Clause because "the Free

73

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 118 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 74 of 91

Add. 74

Exercise Clause, like the Establishment Clause, extends beyond facial discrimination" and action targeting religion "cannot be shielded by mere compliance with the requirement of facial neutrality"). As in *Kiryas Joel*, where a facially neutral delegation of civic power to "qualified voters" of a village predominantly comprised of followers of Satmas Hasidism was deemed to be a "purposeful and forbidden" violation of the Establishment Clause, a simple check on the demographics of the geographic area affected by the Proclamation, with a combined population that is predominantly Muslim, reveals that its impact closely aligns with religious affiliation. *Kiryas Joel*, 512 U.S. at 699-702.

Likewise, the inclusion of two non-majority Muslim nations, North Korea and Venezuela, does not persuasively show a lack of religious purpose behind the Proclamation. The Venezuela ban is qualitatively different from the others because it extends only to government officials, and the ban on North Korea will, according to Department of State statistics, affect fewer than 100 people, only a fraction of one percent of all those affected by the Proclamation. In short, the inclusion of Venezuela and North Korea in the Proclamation has little practical consequence. The Court must therefore still assess whether, as has occurred in other Establishment Clause cases, the insertion of these countries was "a litigating position" rather than an earnest effort to "cast off" the prior "unmistakable" objective. *McCreary*, 545 U.S. at 871-72 (finding that the addition of secular texts to a Ten Commandments display did not remedy a prior Establishment Clause violation).

As with EO-2, the Court must consider not whether the Proclamation has stated a non-religious purpose for the travel ban, but whether that purpose is, in fact, the primary purpose for the travel ban, rather than a purpose secondary to the religious animus that the Court has found, and continues to find, to be the primary purpose for the EO-2. *McCreary*, 545 U.S. at 860, 862-

74

Add. 75

65.    The Court also considers whether the governmental curative action since EO-2 was purposeful, public, and "at least as persuasive as the initial endorsement of religion." *Felix*, 841 F.3d at 863.   At the outset of this analysis, the Court notes that, on its face, the Proclamation is not entirely independent of the President's history of public advocacy for a Muslim ban.   In a July 24, 2016 interview on Meet the Press, then-candidate Trump, when asked about his proposed "Muslim ban," responded by stating that "[w]e must immediately suspend immigration from any nation that has been compromised by terrorism until such time as proven vetting mechanisms have been put in place." J.R. 219-20.   When asked if this formulation represented a "rollback" of the Muslim ban, President Trump answered that it was an "expansion," noting that he was now "looking at territories" because "[p]eople were so upset when I used the word Muslim." J.R. 220.  President Trump's characterization of the Muslim ban on that occasion, as a suspension of immigration until vetting mechanisms have been implemented, appears to mirror the contours of the Proclamation.   Likewise, the permanent travel ban imposed by the Proclamation was forecast at the time of EO-1 and EO-2.   On January 30, 2017, three days after issuing the 90-day ban under EO-1, ostensibly for the purpose of conducting an internal review of vetting procedures, President Trump seemed to predict the results of that review, stating, "we're going to have a very, very strict ban." J.R. 123.   Shortly after the issuance of EO-2, White House officials, noting that EO-2's provisions were temporary, stated that the ban might be extended past 90 days and to additional countries.  J.R. 116.

Upon consideration of the text of EO-1, EO-2, and the Proclamation, there are substantial reasons to question whether the asserted national security purpose has now indeed become the primary purpose.   First, the underlying architecture of the prior Executive Orders and the Proclamation is fundamentally the same.   Each of these executive actions bans the issuance of

75

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 120 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 76 of 91

Add. 76

immigrant and nonimmigrant visas on the basis of nationality to multiple majority-Muslim countries on the basis of concerns about terrorism.  The Proclamation does not abandon this fundamental approach, but rather doubles down on it, because rather than imposing a temporary, 90-day travel ban, the Proclamation establishes an indefinite travel ban, which is subject to periodic review, but which would become permanent in the absence of additional action.

Although the Government frames the Proclamation review process as an independent action that has cured any taint from EO-2, a close read of EO-1 and EO-2 reveals that the outcome of the DHS Review was at least partially pre-ordained.   It is undisputed that the DHS Review was conducted pursuant to the President's directive, contained in both EO-1 and EO-2, mandating a review of information-sharing practices, but that directive also telegraphed the expected recommendations.   Specifically, EO-2 instructed that the Secretary of Homeland Security "shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals."  EO-2 § 2(e), *see* EO-1 § 2(e) (omitting the phrase "appropriate categories of").  This language does not permit the Secretary to recommend that no nationality-based travel ban is necessary.  The language of EO-2 thus indicates that the President had decided, even before the study had been conducted, that regardless of the results, some nationals would be subject to a travel ban.  Where EO-2 contemplated and planned for the very type of travel ban imposed by the Proclamation, the Proclamation cannot be framed as an independent product of bureaucratic operation.

Moreover, a comparison of EO-2 with the Proclamation reveals that many of the criteria considered in the DHS Review, and used to justify the ban on specific countries in the Proclamation, were substantially similar to those used to select the list of countries banned by

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 121 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 77 of 91

Add. 77

EO-2.  EO-2 explained its choice of countries by noting that some or all were "a state sponsor of terrorism," had "been significantly compromised by terrorist organizations," and made it difficult for the United States to deport their nationals because they "typically delay issuing, or refuse to issue, travel documents."  EO-2 § 1(d).  These factors largely track the "National security and public-safety risk assessment" factors considered in the DHS Review, which include whether a country is a "known or potential terrorist safe haven" and "fails to receive its nationals subject to final orders of removal from the United States."  Proclamation § 1(c)(iii).  Likewise, EO-2 ostensibly selected banned countries in part because country circumstances diminished "the foreign government's willingness or ability to share or validate important information about individuals seeking to travel to the United States," a consideration that encompasses many of the "Identity-management information" and "National security and public-safety information" criteria used as the baseline for the DHS Report.  *Id.* § 1(c)(i)-(ii).

Many of EO-2's specific findings about banned countries are also substantially the same as those described in the Proclamation.  For example, EO-2 noted as one factor in banning Iran that it "regularly fails to cooperate with the United States Government in identifying security risks," EO-2 § 2(e)(i), while the Proclamation concluded that "Iran does not cooperate with the United States in counterterrorism efforts," Procl. § 2(b) (i).  EO-2 justified the ban on Somalia in part because "most countries do not recognize Somali identity documents," EO-2 § 2(e)(iii), one of the same factors used to justified the Somali ban in the Proclamation, *see* Procl. § 2(h)(i).  In both orders, the ban on Syria is justified in part by the fact that Syria is a state sponsor of terrorism and does not cooperate with the United States in addressing security or terrorism risks.  This substantial overlap between EO-2 and the Proclamation in terms of the criteria considered and applied in identifying countries to ban undermines the characterization of the Proclamation's

Add. 78

determination to impose a travel ban as the product of an independent evaluation unconnected to

the earlier, tainted travel bans, and further suggests that many of the results may have been pre-

ordained.  Where the President ordered the submission of a list of countries to be banned, and the

criteria used to arrive at that list substantially aligned with those he applied to generate the list of

banned countries in the tainted EO-2, it is not surprising that agency officials acting in good faith

could and did propose a similar list of countries to be banned in the Proclamation.

Some of the specific determinations made in the Proclamation, by deviating from the

general findings of the DHS Review, also undermine the argument that the Designated Countries

were selected by an independent process completely untethered to the President's earlier

statements advocating for a Muslim ban.  For example, although the Proclamation's travel ban is

purportedly designed to combat deficient information-sharing practices, Somalia, which was

found to have adequate information-sharing practices, is nevertheless on the list of Designated

Countries and is subject to a ban on all immigrants from that nation.  Somalia is a majority-

Muslim country that was included in the list of Designated Countries in both EO-1 and EO-2.

Venezuela, meanwhile, a non-majority Muslim nation, was determined to have inadequate

information-sharing practices, to have at least one national security risk factor, and to not reliably

receive its nationals slated for deportation.  Despite these deficiencies, only officials of the

Venezuelan government are barred from entry.  Thus, by its own terms, the Proclamation did not

simply rely on the results of an objective information-sharing review but instead made certain

subjective determinations that resulted in a disproportionate impact on majority-Muslim nations,

and a greater alignment with the travel ban of EO-2, than would otherwise flow from the

objective factors considered in the review.  Moreover, the exception given to Venezuela serves to

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 123 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 79 of 91

Add. 79

reveal that information-sharing deficiencies do not necessarily warrant a broad, nationality-based ban.

That fact brings into relief a continued lack in the Proclamation, as in EO-1 and EO-2, of facts establishing that a broad nationality-based travel ban is justified by possible failures in the visa-issuance process and the terrorist and public safety threats that the Proclamation's ban is meant to thwart.  While the President's findings may meet the low bar of "detrimental interest," 8 U.S.C.§ 1182(f); *see supra* part II.A.2, they do not explain why the broad travel ban is necessary in a way that convincingly demonstrates that its primary purpose is now unrelated to religious animus.   As discussed above, a nationality-based travel ban against eight nations consisting of over 150 million people is unprecedented.  Since the enactment of § 1182(f), only two of the 42 invocations of that authority have sought to bar entry based on nationality, and in those cases only against a single nation and in response to a specific diplomatic dispute with that nation.  *See* Exec. Order No. 12,172, 44 Fed. Reg. 67947; Exec. Order No. 12,206, 45 Fed. Reg. 24,101; Proclamation No. 5,517, 51 Fed. Reg. 30,470.  Such a ban was not even imposed after the September 11, 2001 attacks.  Furthermore, while EO-1 and EO-2 sought to justify the travel ban based on prior acts of terrorism involving nationals of the Designated Countries, Defendants offer no evidence, even in the form of classified information submitted to the Court, showing an intelligence-based terrorism threat justifying a ban on entire nationalities; rather, the Proclamation relies primarily on the lack of information sharing from the Designated Countries. Numerous distinguished former national security officials have attested to the unique nature of this travel ban and the lack of a discernible national security rationale for it, including any rationale that would flow from information-sharing deficiencies.  Notably, in the context of the VWP, Congress as recently as 2015 examined this same issue and responded with legislation that

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 124 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 80 of 91
Add. 80

falls well short of any kind of nationality-based travel ban. *See supra* part III.A.3. Thus, the Proclamation fails adequately to explain not the need to respond to information-sharing deficiencies, but the need for the specific response of an unprecedented, sweeping nationality-based travel ban against majority-Muslim nations.

The Court does not reference the record evidence showing the apparent disconnect between the identified problem and the broad, nationality-based travel ban to evaluate the merits of the travel ban as a national security matter. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010) (stating that generally, courts should afford deference to national security and foreign policy judgments of the Executive Branch). Nor does it question that information-sharing deficiencies can have a national security impact and should be addressed. Rather, it considers this context only to assess whether the Proclamation persuasively establishes that the primary purpose of the travel ban is no longer religious animus. Based on the facts that the Proclamation's ban generally resembles President Trump's earlier description of the Muslim ban, EO-2 dictated the Proclamation's outcome of a recommended list of nations to be subjected to a travel ban, the criteria used to select countries were highly correlated with those used to select the countries for EO-2, the terms of the Proclamation's travel ban skew against Muslim nations as compared to the objective measures applied in the DHS Review, and the proposed response has not been adequately explained as a necessary one to the identified problem, the Court cannot conclude that the Proclamation sufficiently offers a "purposeful" curative action that establishes that the taint of EO-2 no longer underlies the travel ban. *See Felix,* 841 F. 3d at 863.

To the extent that the Government might have provided additional evidence to establish that national security is now the primary purpose for the travel ban, it has not done so. It has not offered classified information such as the September 15, 2017 DHS Report which, even though

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 125 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 81 of 91

Add. 81

not "public," could have been submitted to the Court to explain the shift in purpose. Of course, even if such evidence was forthcoming, its value in obviating the taint of the earlier Executive Orders would be limited. As noted, in Establishment Clause cases, it is the opinion of the reasonable observer that controls. *McCreary*, 545 U.S. at 866 (quoting *Santa Fe*, 530 U.S. at 315). Purposes that can be discerned only if one "burrow[s] into a difficult-to-access" record do little to "assure [the public] that the government is not endorsing a religious view." *Felix*, 841 F. 3d at 863.

Beyond the Proclamation itself, Defendants have offered only one additional "public" statement to bolster the case that the Proclamation is now cured of religious animus: a speech by the President delivered in Saudi Arabia in May 2017 in which he made various positive statements about Islam. *See Felix,* 841 F. 3d at 863. Such a statement, however, did not in any way repudiate the President's prior intention to impose a Muslim ban. Particularly where, in August 2017, President Trump tweeted a statement that a method hostile to Islam—shooting Muslims with bullets dipped in pig's blood—should be used to deter future terrorism, there is no record of public statements showing any change in the President's intentions relating to a Muslim ban.

Rather, the only other available public statements not only fail to advance, but instead undermine, the position that the primary purpose of the travel ban now derives from the need to address information-sharing deficiencies. Even while interagency consultation regarding the travel ban took place behind closed doors, another conversation continued in the public eye. The day after EO-2 was enjoined, President Trump proclaimed at a rally that it had been a "watered down version of the first one" that had been "tailor[ed]" by lawyers to respond to legal challenges. J.R. 652-53. He suggested instead that "we ought to go back to the first one and go

Case 1:17-cv-07520-PGG  Document 50-23  Filed 08/02/18  Page 126 of 158
Case 8:17-cv-00361-TDC  Document 219  Filed 10/17/17  Page 82 of 91

Add. 82

all the way, which is what I wanted to do in the first place." J.R. 653.  In a June 3, 2017 tweet, days after the Fourth Circuit's opinion upholding this Court's injunction against EO-2, President Trump declared in a tweet that "We need the Travel Ban as an extra level of safety!" J.R. 662. On June 5, 2017, President Trump tweeted that "[t]he Justice Dept. should have stayed with the original Travel Ban, not the watered down, politically correct version they submitted to [the Supreme Court]," and that "the Justice Dept. should ask for an expedited hearing of the watered down Travel Ban before the Supreme Court - & seek much tougher version!" J.R. 664.  Then, on September 15, 2017, the same day that the Acting Secretary of Homeland Security submitted her report, President Trump again called for an expansion of the travel ban, tweeting that "the travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!" J.R. 705.

Thus, while Defendants assert that the Proclamation's travel ban was arrived at through the routine operations of the government bureaucracy, the public was witness to a different genealogy, one in which the President—speaking "straight to the American people," J.R. 667—announced his intention to go back to and get even tougher than in EO-1 and EO-2.  Notably, the June 5 tweet calling for a "much tougher version" reveals that even before President Trump had received any reports on the DHS Review that ostensibly identified the need for a travel ban, the first of which he received over a month later on July 9, 2017, the President had already decided that the travel ban would continue.  His September 15, 2017 tweet calling for a "far larger, tougher" travel ban, issued the same day that that the final report was received, reinforced this position.  Against the backdrop of two prior Executive Orders that this Court and others have deemed likely violated the Establishment Clause, *see, e.g.*, *Aziz*, 234 F. Supp.3d at 739 and *Hawaii*, 241 F. Supp. 3d at 1137-38, this Court is obligated to pay attention to such statements.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 127 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 83 of 91

Add. 83

*See McCreary,* 545 U.S. at 866 (cautioning courts that they cannot become "an absentminded objective observer," but must instead remain "familiar with the history of the government's action and competent to learn what history has to show").   The reasonable observer using a "head with common sense" would rely on the statements of the President to discern the purpose of a Presidential Proclamation.   *McCreary,* 545 U.S. at 874.   Here, those statements do not offer "persuasive" rejection of the President's prior calls for a Muslim ban, or his stated intention to use a ban on certain "dangerous territory" to effectuate a Muslim ban, *Felix,* 841 F.3d at 863, nor do they show that the stated intention to impose a Muslim ban has been "repealed or otherwise repudiated," *McCreary,* 545 U.S. at 871-72.   Rather, they cast the Proclamation as the inextricable re-animation of the twice-enjoined Muslim ban, and, in echoes of *McCreary*, convey the message that the third iteration of the ban—no longer temporary—will be the "enhanced expression" of the earlier ones.   *Id.* at 872.

The "initial" announcement of the Muslim ban, offered repeatedly and explicitly through President Trump's own statements, forcefully and persuasively expressed his purpose in unequivocal terms.   Under *Felix*, the Government's cure must be made "as persuasively as the initial" violation.   *Felix*, 841 F.3d at 863.   Here, the Court concludes that where the Proclamation itself is not sufficiently independent of EO-2 to signal a purposeful, persuasive change in the primary purpose of the travel ban, and there were no other public signs that "as persuasively" as the original violation established a different primary purpose for the travel ban, it cannot find that a "reasonable observer" would understand that the primary purpose of the Proclamation's travel ban is no longer the desire to impose a Muslim ban.   *See McCreary*, 545 U.S. at 872 (finding that a third version of a Ten Commandments display continued to have a primarily religious purpose); *Felix,* 841 F. 3d at 863.   The Court therefore finds that Plaintiffs have demonstrated

Add. 84

that they are likely to succeed on the merits of their Establishment Clause claim. Having reached

this conclusion, the Court need not address Plaintiffs' likelihood of success on their Equal

Protection Clause claim.

## IV.   Irreparable Harm

Having concluded that Plaintiffs have established a likelihood of success on the merits on

their § 1152(a) and Establishment Clause claims, the Court turns to whether they have shown a

likelihood of irreparable harm. The Supreme Court has held that "loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding irreparable harm upon a violation of the

freedom of association). The Fourth Circuit has applied this holding to cases involving the

freedom of speech and expression. *E.g.*, *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184,

190, 191-92 (4th Cir. 2013); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011).

Although the Fourth Circuit has not held that a violation of the Establishment Clause likewise

necessarily results in irreparable harm, other circuits have. *See, e.g.*, *Chaplaincy of Full Gospel

Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006); *Ingebretsen ex rel. Ingebretsen v.

Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Parents' Ass'n of P.S. 16 v. Quinones*,

803 F.2d 1235, 1242 (2d Cir. 1986); *Am. Civil Liberties Union of Ill. v. City of St. Charles*, 794

F.2d 265, 275 (7th Cir. 1986) (finding irreparable harm in an Establishment Clause case and

stating that the "harm is irreparable as well as substantial because an erosion of religious liberties

cannot be deterred by awarding damages to the victims of such erosion").

Here, as in *Elrod*, "First Amendment interests were either threatened or in fact being

impaired at the time relief was sought." 427 U.S. at 373. "[W]hen an Establishment Clause

violation is alleged, infringement occurs the moment the government action takes place."

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 129 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 85 of 91

Add. 85

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 303.   The Court accordingly finds that Plaintiffs have established a likelihood of irreparable harm arising from their Establishment Clause claim at the time the Proclamation takes effect.

The Court also finds that Plaintiffs with a family member seeking an immigrant visa have established a likelihood of irreparable harm as a result of the Proclamation's violation of the INA.   Irreparable harm occurs when the threatened injury impairs a court's ability to grant an effective remedy, such as a harm that cannot be compensated by money damages at a later trial. *See Hawaii*, 859 F.3d at 782; *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 1998).   The injury must be likely, not merely speculative, in order to be considered irreparable.   Wright & Miller, *supra*, § 2948.1.   Without an injunction, Plaintiffs will be subjected to imminent and irreparable harm as a result of the prolonged separation from their family members caused by the Proclamation.   *Hawaii*, 859 F.3d at 782 (considering separation from family members in finding a likelihood of irreparable harm); *see also IRAP*, 857 F.3d at 611-12 (Keenan, J., concurring).   The absence of a family member cannot be cured through a later payment of money damages, and is therefore irreparable.   For the same reason that Plaintiffs' claims are ripe, the injury is not speculative, despite the Proclamation's waiver provisions.   *See supra* part I.B.   Thus, Plaintiffs have shown irreparable harm as a result of the Proclamation.

## V.   Balance of the Equities

In balancing the equities, the Court considers the significant, irreparable harm Plaintiffs would face both from the prolonged separation from family members and the Establishment Clause violation.   While Plaintiffs would likely face irreparable harm in the absence of an injunction and would plainly benefit from an injunction, Defendants are not directly harmed by a

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 130 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 86 of 91

Add. 86

preliminary injunction preventing them from enforcing a Proclamation likely to be found unconstitutional.  *See Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Aziz*, 234 F. Supp.3d at 738.

At the same time, the Supreme Court has stated that "no governmental interest is more compelling than the security of the Nation."  *Haig v. Agee*, 453 U.S. 280, 307 (1981).  Although the Proclamation seeks to further information-sharing and diplomatic purposes, Defendants have not shown that national security cannot be maintained without an unprecedented eight-country travel ban.  An injunction would not grant entry to any individual foreign national, but would only preclude the use of a blanket ban.  Even with an injunction, visa applicants from the Designated Countries would be screened through the standard, individualized vetting process under which the burden is on individual applicants to prove that they are not inadmissible to the United States.  8 U.S.C. § 1361.  An injunction would not shift or lessen that burden or prevent the denial of any particular visa application.  Thus, as a general matter, the balance of the equities favors the issuance of an injunction.

However, in partially staying the injunction of EO-2, the Supreme Court noted that the balance of equities varies depending on a foreign national's strength of connection to the United States.  *See Trump*, 137 S. Ct. at 2088.  For those individuals who lack "a credible claim of a bona fide relationship with a person or entity in the United States," the equities shift such that Defendants' interest in national security prevails over any harms resulting from the Proclamation's likely Establishment Clause or INA violations.  *See id*.  Accordingly, this factor supports an injunction extending only to individuals with a bona fide relationship with an individual or entity in the United States, as discussed below.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 131 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 87 of 91
Add. 87

## VI.    Public Interest

Preventing an Establishment Clause violation provides a significant public benefit.  The Supreme Court has recognized the "fundamental place held by the Establishment Clause in our constitutional scheme." *Wallace v. Jaffree*, 472 U.S. 38, 60 (1985).  The Founders "brought into being our Nation, our Constitution, and our Bill of Rights with its prohibition against any governmental establishment of religion" because they understood that "governmentally established religions and religious persecution go hand in hand."  *Engel v. Vitale*, 370 U.S. 421, 432-33 (1962).  When the government chooses sides among religions, the "inevitable result" is "hatred, disrespect, and even contempt" from those who adhere to different beliefs. *See id.* at 431.  Thus, to avoid sowing seeds of division in our nation, upholding this fundamental constitutional principle at the core of our Nation's identity serves a significant public interest.

The Court also finds that granting an injunction on the Proclamation's violation of the INA advances the public interest.  Section 1152(a) represents a judgment by Congress that our immigration policy should not discriminate on the basis of nationality.  To the extent that this judgment is undermined by the Proclamation, the public interest is furthered by an injunction on those grounds.

Although the Government's interest in national security is a significant public interest, for the reasons discussed above, *see supra* part V, those interests are not paramount in this instance.  Accordingly, the Court finds that the public interest favors an injunction.

## VII.    Scope of Relief

The Plaintiffs' Establishment Clause and § 1152(a) arguments focused primarily on the travel ban for citizens of the eight Designated Countries in Section 2 of the Proclamation.  The Court will therefore enjoin Section 2 only, subject to the following exceptions.

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 132 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 88 of 91

Add. 88

As discussed above, because the balance of equities favor Defendants as to visa applicants with no ties to the United States, the injunction is limited to barring enforcement of Section 2 against those individuals "who have a credible claim of a bona fide relationship with a person or entity in the United States." *Trump*, 137 S. Ct. at 2088. For individuals, the injunction covers visa applications by individuals with immediate family members, such as parents, children, or siblings, as well as "grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States." *Id.*; *Hawaii v. Trump*, 871 F.3d 646, 658 (9th Cir. 2017) (clarifying the scope of the injunction against EO-2). For organizations, the connection must be "formal, documented, and formed in the ordinary course" rather than for the purposes of evading the Proclamation. *Trump*, 137 S. Ct. at 2088. For example, IRAP's employee or an invited speaker for MESA's annual meeting or IAAB's conference would qualify. *See id.* (including a "lecturer invited to address an American audience" and a "worker who accepted an offer of employment" within the scope of the injunction). A member of MESA or another membership organization who formally joined the organization before the date of the injunction and seeks to enter the United States for organized activities or meetings of the association would also fall within its scope. *See id.* Pursuant to the Supreme Court's stay of the Ninth Circuit's determination that a refugee with a formal sponsorship assurance from a U.S. resettlement agency has a bona fide connection to the United States, the Court concludes that clients of IRAP and HIAS, and those similarly situated, are not covered by the injunction absent a separate bona fide relationship as defined above. *See id.* at 2088; *Hawaii*, 871 F.3d at 661-64 (finding that a refugee with a formal sponsorship assurance from a U.S. resettlement agency has a bona fide connection to the United States); *Trump v.*

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 133 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 89 of 91
Add. 89

*Hawaii*, No. 17A275, 2017 WL 3975174 (Sept. 11, 2017) (staying the Ninth Circuit mandate "with respect to refugees covered by a formal assurance").

The injunction also will not apply to travelers from Venezuela or North Korea because the balance of equities favors Defendants with respect to those two countries.   Section 1152(a) provides no basis to support an injunction relating to Venezuela because the Proclamation does not bar immigrants from Venezuela.   Given the extremely limited number of visas typically issued to individuals from North Korea, Plaintiffs have neither argued nor shown how any individuals from that nation with a bona fide relationship to a person or entity in the United States will be harmed by the § 1152(a) violation.   Likewise, they have not shown how travelers from Venezuela or North Korea would be harmed by the likely Establishment Clause violation. Accordingly, the injunction will not apply to nationals of Venezuela or North Korea.

Finally, in light of the constitutional concerns associated with enjoining the President of the United States, this injunction does not apply to the President and instead applies only to the other Defendants and the federal officials who will actually enforce the Proclamation.   *See Franklin,* 505 U.S. at 800-01.

The injunction will apply nationwide.   It is "well established" that a federal district court has "wide discretion to fashion appropriate injunctive relief in a particular case."   *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992); *see also Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (holding that the "Constitution vests the District Court with 'the judicial Power of the United States,'" which "extends across the country" (quoting U.S. Const. art. III § 1)), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016).   Injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."   *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).   However, nationwide injunctions

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 134 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 90 of 91

Add. 90

are appropriate if necessary to afford relief to the prevailing party. *See id.*; *Richmond Tenants Org., Inc.*, 956 F.3d at 1308-39; *Texas*, 809 F.3d at 188.

The Court has found that Plaintiffs are likely to succeed on their claims that Section 2 of the Proclamation violates the Establishment Clause and § 1152(a).   The Individual and Organizational Plaintiffs are located in different parts of the United States, indicating that nationwide relief may be appropriate. *Richmond Tenants Org., Inc.*, 956 F.3d at 1309 (holding that a nationwide injunction was "appropriately tailored" because the plaintiffs lived in different parts of the country).   Moreover, although the Government has argued that relief should be strictly limited to the specific interests of Plaintiffs, an Establishment Clause violation has impacts beyond the personal interests of individual parties. *Joyner v. Forsyth Cty.*, 653 F.3d 341, 355 (4th Cir. 2011) ("[T]hese plaintiffs are not so different from other citizens who may feel in some way marginalized on account of their religious beliefs and who decline to risk the further ostracism that may ensue from bringing their case to court or who simply lack the resources to do so."); *City of St. Charles*, 794 F.2d at 275 (stating that a violation of the Establishment Clause causes "harm to society").   Here, nationwide relief is appropriate because this case involves an alleged violation of the Establishment Clause by the federal government manifested in immigration policy with nationwide effect. *See Decker v. O'Donnell*, 661 F.2d 598, 618 (7th Cir. 1980) (affirming a nationwide injunction in a facial challenge to a federal statute and regulations on Establishment Clause grounds).

Nationwide relief is also warranted on the § 1152(a) claim, with respect to applicants for immigrant visas, because under these facts, a "fragmented" approach "would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington*, 847 F.3d at 1166-67.   "Congress has instructed that the immigration laws of the United States

90

Case 1:17-cv-07520-PGG   Document 50-23   Filed 08/02/18   Page 135 of 158
Case 8:17-cv-00361-TDC   Document 219   Filed 10/17/17   Page 91 of 91

Add. 91

should be enforced vigorously and *uniformly*, and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *Texas*, 80 F.3d at 187-88 (footnotes omitted). Accordingly, Section 2 of the Proclamation, with the exceptions and to the extent described above, will be enjoined on a nationwide basis.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motions for a Preliminary Injunction are GRANTED IN PART and DENIED IN PART. The Court will issue a preliminary injunction barring enforcement of Section 2 of the Proclamation, subject to the terms stated in the separate Order.

Date:  October 17, 2017

THEODORE D. CHUANG
United States District Judge



Federal Register

Vol. 82, No. 45

Thursday, March 9, 2017

# Presidential Documents

Title 3—

The President

Executive Order 13780 of March 6, 2017

## Protecting the Nation From Foreign Terrorist Entry Into the United States

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, and section 301 of title 3, United States Code, and to protect the Nation from terrorist activities by foreign nationals admitted to the United States, it is hereby ordered as follows:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks, including those committed by foreign nationals. The screening and vetting protocols and procedures associated with the visa-issuance process and the United States Refugee Admissions Program (USRAP) play a crucial role in detecting foreign nationals who may commit, aid, or support acts of terrorism and in preventing those individuals from entering the United States. It is therefore the policy of the United States to improve the screening and vetting protocols and procedures associated with the visa-issuance process and the USRAP.

(b) On January 27, 2017, to implement this policy, I issued Executive Order 13769 (Protecting the Nation from Foreign Terrorist Entry into the United States).

(i) Among other actions, Executive Order 13769 suspended for 90 days the entry of certain aliens from seven countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. These are countries that had already been identified as presenting heightened concerns about terrorism and travel to the United States. Specifically, the suspension applied to countries referred to in, or designated under, section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), in which Congress restricted use of the Visa Waiver Program for nationals of, and aliens recently present in, (A) Iraq or Syria, (B) any country designated by the Secretary of State as a state sponsor of terrorism (currently Iran, Syria, and Sudan), and (C) any other country designated as a country of concern by the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence. In 2016, the Secretary of Homeland Security designated Libya, Somalia, and Yemen as additional countries of concern for travel purposes, based on consideration of three statutory factors related to terrorism and national security: ''(I) whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States; (II) whether a foreign terrorist organization has a significant presence in the country or area; and (III) whether the country or area is a safe haven for terrorists.'' 8 U.S.C. 1187(a)(12)(D)(ii). Additionally, Members of Congress have expressed concerns about screening and vetting procedures following recent terrorist attacks in this country and in Europe.

(ii) In ordering the temporary suspension of entry described in subsection (b)(i) of this section, I exercised my authority under Article II of the Constitution and under section 212(f) of the INA, which provides in relevant part: ''Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.''

8 U.S.C. 1182(f). Under these authorities, I determined that, for a brief period of 90 days, while existing screening and vetting procedures were under review, the entry into the United States of certain aliens from the seven identified countries—each afflicted by terrorism in a manner that compromised the ability of the United States to rely on normal decision-making procedures about travel to the United States—would be detrimental to the interests of the United States. Nonetheless, I permitted the Secretary of State and the Secretary of Homeland Security to grant case-by-case waivers when they determined that it was in the national interest to do so.

(iii) Executive Order 13769 also suspended the USRAP for 120 days. Terrorist groups have sought to infiltrate several nations through refugee programs. Accordingly, I temporarily suspended the USRAP pending a review of our procedures for screening and vetting refugees. Nonetheless, I permitted the Secretary of State and the Secretary of Homeland Security to jointly grant case-by-case waivers when they determined that it was in the national interest to do so.

(iv) Executive Order 13769 did not provide a basis for discriminating for or against members of any particular religion. While that order allowed for prioritization of refugee claims from members of persecuted religious minority groups, that priority applied to refugees from every nation, including those in which Islam is a minority religion, and it applied to minority sects within a religion. That order was not motivated by animus toward any religion, but was instead intended to protect the ability of religious minorities—whoever they are and wherever they reside—to avail themselves of the USRAP in light of their particular challenges and circumstances.

(c) The implementation of Executive Order 13769 has been delayed by litigation. Most significantly, enforcement of critical provisions of that order has been temporarily halted by court orders that apply nationwide and extend even to foreign nationals with no prior or substantial connection to the United States. On February 9, 2017, the United States Court of Appeals for the Ninth Circuit declined to stay or narrow one such order pending the outcome of further judicial proceedings, while noting that the "political branches are far better equipped to make appropriate distinctions" about who should be covered by a suspension of entry or of refugee admissions.

(d) Nationals from the countries previously identified under section 217(a)(12) of the INA warrant additional scrutiny in connection with our immigration policies because the conditions in these countries present heightened threats. Each of these countries is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones. Any of these circumstances diminishes the foreign government's willingness or ability to share or validate important information about individuals seeking to travel to the United States. Moreover, the significant presence in each of these countries of terrorist organizations, their members, and others exposed to those organizations increases the chance that conditions will be exploited to enable terrorist operatives or sympathizers to travel to the United States. Finally, once foreign nationals from these countries are admitted to the United States, it is often difficult to remove them, because many of these countries typically delay issuing, or refuse to issue, travel documents.

(e) The following are brief descriptions, taken in part from the Department of State's *Country Reports on Terrorism 2015* (June 2016), of some of the conditions in six of the previously designated countries that demonstrate why their nationals continue to present heightened risks to the security of the United States:

(i) *Iran.* Iran has been designated as a state sponsor of terrorism since 1984 and continues to support various terrorist groups, including Hizballah, Hamas, and terrorist groups in Iraq. Iran has also been linked to support

for al-Qa'ida and has permitted al-Qa'ida to transport funds and fighters through Iran to Syria and South Asia. Iran does not cooperate with the United States in counterterrorism efforts.

(ii) *Libya.* Libya is an active combat zone, with hostilities between the internationally recognized government and its rivals. In many parts of the country, security and law enforcement functions are provided by armed militias rather than state institutions. Violent extremist groups, including the Islamic State of Iraq and Syria (ISIS), have exploited these conditions to expand their presence in the country. The Libyan government provides some cooperation with the United States' counterterrorism efforts, but it is unable to secure thousands of miles of its land and maritime borders, enabling the illicit flow of weapons, migrants, and foreign terrorist fighters. The United States Embassy in Libya suspended its operations in 2014.

(iii) *Somalia.* Portions of Somalia have been terrorist safe havens. Al-Shabaab, an al-Qa'ida-affiliated terrorist group, has operated in the country for years and continues to plan and mount operations within Somalia and in neighboring countries. Somalia has porous borders, and most countries do not recognize the Somali identity documents. The Somali government cooperates with the United States in some counterterrorism operations but does not have the capacity to sustain military pressure on or to investigate suspected terrorists.

(iv) *Sudan.* Sudan has been designated as a state sponsor of terrorism since 1993 because of its support for international terrorist groups, including Hizballah and Hamas. Historically, Sudan provided safe havens for al-Qa'ida and other terrorist groups to meet and train. Although Sudan's support to al-Qa'ida has ceased and it provides some cooperation with the United States' counterterrorism efforts, elements of core al-Qa'ida and ISIS-linked terrorist groups remain active in the country.

(v) *Syria.* Syria has been designated as a state sponsor of terrorism since 1979. The Syrian government is engaged in an ongoing military conflict against ISIS and others for control of portions of the country. At the same time, Syria continues to support other terrorist groups. It has allowed or encouraged extremists to pass through its territory to enter Iraq. ISIS continues to attract foreign fighters to Syria and to use its base in Syria to plot or encourage attacks around the globe, including in the United States. The United States Embassy in Syria suspended its operations in 2012. Syria does not cooperate with the United States' counterterrorism efforts.

(vi) *Yemen.* Yemen is the site of an ongoing conflict between the incumbent government and the Houthi-led opposition. Both ISIS and a second group, al-Qa'ida in the Arabian Peninsula (AQAP), have exploited this conflict to expand their presence in Yemen and to carry out hundreds of attacks. Weapons and other materials smuggled across Yemen's porous borders are used to finance AQAP and other terrorist activities. In 2015, the United States Embassy in Yemen suspended its operations, and embassy staff were relocated out of the country. Yemen has been supportive of, but has not been able to cooperate fully with, the United States in counterterrorism efforts.

(f) In light of the conditions in these six countries, until the assessment of current screening and vetting procedures required by section 2 of this order is completed, the risk of erroneously permitting entry of a national of one of these countries who intends to commit terrorist acts or otherwise harm the national security of the United States is unacceptably high. Accordingly, while that assessment is ongoing, I am imposing a temporary pause on the entry of nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen, subject to categorical exceptions and case-by-case waivers, as described in section 3 of this order.

(g) Iraq presents a special case. Portions of Iraq remain active combat zones. Since 2014, ISIS has had dominant influence over significant territory in northern and central Iraq. Although that influence has been significantly

reduced due to the efforts and sacrifices of the Iraqi government and armed forces, working along with a United States-led coalition, the ongoing conflict has impacted the Iraqi government's capacity to secure its borders and to identify fraudulent travel documents. Nevertheless, the close cooperative relationship between the United States and the democratically elected Iraqi government, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combat ISIS justify different treatment for Iraq. In particular, those Iraqi government forces that have fought to regain more than half of the territory previously dominated by ISIS have shown steadfast determination and earned enduring respect as they battle an armed group that is the common enemy of Iraq and the United States. In addition, since Executive Order 13769 was issued, the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal. Decisions about issuance of visas or granting admission to Iraqi nationals should be subjected to additional scrutiny to determine if applicants have connections with ISIS or other terrorist organizations, or otherwise pose a risk to either national security or public safety.

(h) Recent history shows that some of those who have entered the United States through our immigration system have proved to be threats to our national security. Since 2001, hundreds of persons born abroad have been convicted of terrorism-related crimes in the United States. They have included not just persons who came here legally on visas but also individuals who first entered the country as refugees. For example, in January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses. And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction as part of a plot to detonate a bomb at a crowded Christmas-tree-lighting ceremony in Portland, Oregon. The Attorney General has reported to me that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation.

(i) Given the foregoing, the entry into the United States of foreign nationals who may commit, aid, or support acts of terrorism remains a matter of grave concern. In light of the Ninth Circuit's observation that the political branches are better suited to determine the appropriate scope of any suspensions than are the courts, and in order to avoid spending additional time pursuing litigation, I am revoking Executive Order 13769 and replacing it with this order, which expressly excludes from the suspensions categories of aliens that have prompted judicial concerns and which clarifies or refines the approach to certain other issues or categories of affected aliens.

**Sec. 2**. *Temporary Suspension of Entry for Nationals of Countries of Particular Concern During Review Period.* (a) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat. The Secretary of Homeland Security may conclude that certain information is needed from particular countries even if it is not needed from every country.

(b) The Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, shall submit to the President a report on the results of the worldwide review described in subsection (a) of this section, including the Secretary of Homeland Security's determination of the information needed from each country for adjudications and a list of countries that do not provide adequate information, within 20 days of the effective date of this order. The Secretary of Homeland Security

shall provide a copy of the report to the Secretary of State, the Attorney General, and the Director of National Intelligence.

(c) To temporarily reduce investigative burdens on relevant agencies during the review period described in subsection (a) of this section, to ensure the proper review and maximum utilization of available resources for the screening and vetting of foreign nationals, to ensure that adequate standards are established to prevent infiltration by foreign terrorists, and in light of the national security concerns referenced in section 1 of this order, I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the unrestricted entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen would be detrimental to the interests of the United States. I therefore direct that the entry into the United States of nationals of those six countries be suspended for 90 days from the effective date of this order, subject to the limitations, waivers, and exceptions set forth in sections 3 and 12 of this order.

(d) Upon submission of the report described in subsection (b) of this section regarding the information needed from each country for adjudications, the Secretary of State shall request that all foreign governments that do not supply such information regarding their nationals begin providing it within 50 days of notification.

(e) After the period described in subsection (d) of this section expires, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means. The Secretary of State, the Attorney General, or the Secretary of Homeland Security may also submit to the President the names of additional countries for which any of them recommends other lawful restrictions or limitations deemed necessary for the security or welfare of the United States.

(f) At any point after the submission of the list described in subsection (e) of this section, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, may submit to the President the names of any additional countries recommended for similar treatment, as well as the names of any countries that they recommend should be removed from the scope of a proclamation described in subsection (e) of this section.

(g) The Secretary of State and the Secretary of Homeland Security shall submit to the President a joint report on the progress in implementing this order within 60 days of the effective date of this order, a second report within 90 days of the effective date of this order, a third report within 120 days of the effective date of this order, and a fourth report within 150 days of the effective date of this order.

**Sec. 3**. *Scope and Implementation of Suspension.*

(a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and any waiver under subsection (c) of this section, the suspension of entry pursuant to section 2 of this order shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the effective date of this order;

(ii) did not have a valid visa at 5:00 p.m., eastern standard time on January 27, 2017; and

(iii) do not have a valid visa on the effective date of this order.

(b) *Exceptions.* The suspension of entry pursuant to section 2 of this order shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any foreign national who is admitted to or paroled into the United States on or after the effective date of this order;

(iii) any foreign national who has a document other than a visa, valid on the effective date of this order or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission, such as an advance parole document;

(iv) any dual national of a country designated under section 2 of this order when the individual is traveling on a passport issued by a non-designated country;

(v) any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C–2 visa for travel to the United Nations, or G–1, G–2, G–3, or G–4 visa; or

(vi) any foreign national who has been granted asylum; any refugee who has already been admitted to the United States; or any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture.

(c) *Waivers.* Notwithstanding the suspension of entry pursuant to section 2 of this order, a consular officer, or, as appropriate, the Commissioner, U.S. Customs and Border Protection (CBP), or the Commissioner's delegee, may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended if the foreign national has demonstrated to the officer's satisfaction that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat to national security and would be in the national interest. Unless otherwise specified by the Secretary of Homeland Security, any waiver issued by a consular officer as part of the visa issuance process will be effective both for the issuance of a visa and any subsequent entry on that visa, but will leave all other requirements for admission or entry unchanged. Case-by-case waivers could be appropriate in circumstances such as the following:

(i) the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the effective date of this order, seeks to reenter the United States to resume that activity, and the denial of reentry during the suspension period would impair that activity;

(ii) the foreign national has previously established significant contacts with the United States but is outside the United States on the effective date of this order for work, study, or other lawful activity;

(iii) the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry during the suspension period would impair those obligations;

(iv) the foreign national seeks to enter the United States to visit or reside with a close family member (*e.g.,* a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry during the suspension period would cause undue hardship;

(v) the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;

(vi) the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of such an employee) and the employee can document that he or she has provided faithful and valuable service to the United States Government;

(vii) the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C. 288 *et seq.,* traveling for purposes of conducting meetings or business with the United States Government, or traveling

to conduct business on behalf of an international organization not designated under the IOIA;

(viii) the foreign national is a landed Canadian immigrant who applies for a visa at a location within Canada; or

(ix) the foreign national is traveling as a United States Government-sponsored exchange visitor.

**Sec. 4**. *Additional Inquiries Related to Nationals of Iraq.* An application by any Iraqi national for a visa, admission, or other immigration benefit should be subjected to thorough review, including, as appropriate, consultation with a designee of the Secretary of Defense and use of the additional information that has been obtained in the context of the close U.S.-Iraqi security partnership, since Executive Order 13769 was issued, concerning individuals suspected of ties to ISIS or other terrorist organizations and individuals coming from territories controlled or formerly controlled by ISIS. Such review shall include consideration of whether the applicant has connections with ISIS or other terrorist organizations or with territory that is or has been under the dominant influence of ISIS, as well as any other information bearing on whether the applicant may be a threat to commit acts of terrorism or otherwise threaten the national security or public safety of the United States.

**Sec. 5**. *Implementing Uniform Screening and Vetting Standards for All Immigration Programs.* (a) The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall implement a program, as part of the process for adjudications, to identify individuals who seek to enter the United States on a fraudulent basis, who support terrorism, violent extremism, acts of violence toward any group or class of people within the United States, or who present a risk of causing harm subsequent to their entry. This program shall include the development of a uniform baseline for screening and vetting standards and procedures, such as in-person interviews; a database of identity documents proffered by applicants to ensure that duplicate documents are not used by multiple applicants; amended application forms that include questions aimed at identifying fraudulent answers and malicious intent; a mechanism to ensure that applicants are who they claim to be; a mechanism to assess whether applicants may commit, aid, or support any kind of violent, criminal, or terrorist acts after entering the United States; and any other appropriate means for ensuring the proper collection of all information necessary for a rigorous evaluation of all grounds of inadmissibility or grounds for the denial of other immigration benefits.

(b) The Secretary of Homeland Security, in conjunction with the Secretary of State, the Attorney General, and the Director of National Intelligence, shall submit to the President an initial report on the progress of the program described in subsection (a) of this section within 60 days of the effective date of this order, a second report within 100 days of the effective date of this order, and a third report within 200 days of the effective date of this order.

**Sec. 6**. *Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017.* (a) The Secretary of State shall suspend travel of refugees into the United States under the USRAP, and the Secretary of Homeland Security shall suspend decisions on applications for refugee status, for 120 days after the effective date of this order, subject to waivers pursuant to subsection (c) of this section. During the 120-day period, the Secretary of State, in conjunction with the Secretary of Homeland Security and in consultation with the Director of National Intelligence, shall review the USRAP application and adjudication processes to determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States, and shall implement such additional procedures. The suspension described in this subsection shall not apply to refugee applicants who, before the effective date of this order, have been formally scheduled for transit by the Department of State. The Secretary of State shall resume travel of refugees into the

United States under the USRAP 120 days after the effective date of this order, and the Secretary of Homeland Security shall resume making decisions on applications for refugee status only for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined that the additional procedures implemented pursuant to this subsection are adequate to ensure the security and welfare of the United States.

(b) Pursuant to section 212(f) of the INA, I hereby proclaim that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States, and thus suspend any entries in excess of that number until such time as I determine that additional entries would be in the national interest.

(c) Notwithstanding the temporary suspension imposed pursuant to subsection (a) of this section, the Secretary of State and the Secretary of Homeland Security may jointly determine to admit individuals to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the entry of such individuals as refugees is in the national interest and does not pose a threat to the security or welfare of the United States, including in circumstances such as the following: the individual's entry would enable the United States to conform its conduct to a preexisting international agreement or arrangement, or the denial of entry would cause undue hardship.

(d) It is the policy of the executive branch that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees. To that end, the Secretary of State shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement.

**Sec. 7**. *Rescission of Exercise of Authority Relating to the Terrorism Grounds of Inadmissibility.* The Secretary of State and the Secretary of Homeland Security shall, in consultation with the Attorney General, consider rescinding the exercises of authority permitted by section 212(d)(3)(B) of the INA, 8 U.S.C. 1182(d)(3)(B), relating to the terrorism grounds of inadmissibility, as well as any related implementing directives or guidance.

**Sec. 8**. *Expedited Completion of the Biometric Entry-Exit Tracking System.* (a) The Secretary of Homeland Security shall expedite the completion and implementation of a biometric entry-exit tracking system for in-scope travelers to the United States, as recommended by the National Commission on Terrorist Attacks Upon the United States.

(b) The Secretary of Homeland Security shall submit to the President periodic reports on the progress of the directive set forth in subsection (a) of this section. The initial report shall be submitted within 100 days of the effective date of this order, a second report shall be submitted within 200 days of the effective date of this order, and a third report shall be submitted within 365 days of the effective date of this order. The Secretary of Homeland Security shall submit further reports every 180 days thereafter until the system is fully deployed and operational.

**Sec. 9**. *Visa Interview Security.* (a) The Secretary of State shall immediately suspend the Visa Interview Waiver Program and ensure compliance with section 222 of the INA, 8 U.S.C. 1202, which requires that all individuals seeking a nonimmigrant visa undergo an in-person interview, subject to specific statutory exceptions. This suspension shall not apply to any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C-2 visa for travel to the United Nations, or G-1, G-2, G-3, or G-4 visa; traveling for purposes related to an international organization designated under the IOIA; or traveling for purposes of conducting meetings or business with the United States Government.

(b) To the extent permitted by law and subject to the availability of appropriations, the Secretary of State shall immediately expand the Consular Fellows Program, including by substantially increasing the number of Fellows, lengthening or making permanent the period of service, and making language training at the Foreign Service Institute available to Fellows for assignment to posts outside of their area of core linguistic ability, to ensure that nonimmigrant visa-interview wait times are not unduly affected.

**Sec. 10**. *Visa Validity Reciprocity.* The Secretary of State shall review all nonimmigrant visa reciprocity agreements and arrangements to ensure that they are, with respect to each visa classification, truly reciprocal insofar as practicable with respect to validity period and fees, as required by sections 221(c) and 281 of the INA, 8 U.S.C. 1201(c) and 1351, and other treatment. If another country does not treat United States nationals seeking nonimmigrant visas in a truly reciprocal manner, the Secretary of State shall adjust the visa validity period, fee schedule, or other treatment to match the treatment of United States nationals by that foreign country, to the extent practicable.

**Sec. 11**. *Transparency and Data Collection.* (a) To be more transparent with the American people and to implement more effectively policies and practices that serve the national interest, the Secretary of Homeland Security, in consultation with the Attorney General, shall, consistent with applicable law and national security, collect and make publicly available the following information:

(i) information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation with or provision of material support to a terrorism-related organization, or any other national-security-related reasons;

(ii) information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and who have engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States;

(iii) information regarding the number and types of acts of gender-based violence against women, including so-called ''honor killings,'' in the United States by foreign nationals; and

(iv) any other information relevant to public safety and security as determined by the Secretary of Homeland Security or the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

(b) The Secretary of Homeland Security shall release the initial report under subsection (a) of this section within 180 days of the effective date of this order and shall include information for the period from September 11, 2001, until the date of the initial report. Subsequent reports shall be issued every 180 days thereafter and reflect the period since the previous report.

**Sec. 12**. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of the actions directed in this order.

(b) In implementing this order, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations, including, as appropriate, those providing an opportunity for individuals to claim a fear of persecution or torture, such as the credible fear determination for aliens covered by section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A).

(c) No immigrant or nonimmigrant visa issued before the effective date of this order shall be revoked pursuant to this order.

(d) Any individual whose visa was marked revoked or marked canceled as a result of Executive Order 13769 shall be entitled to a travel document confirming that the individual is permitted to travel to the United States and seek entry. Any prior cancellation or revocation of a visa that was solely pursuant to Executive Order 13769 shall not be the basis of inadmissibility for any future determination about entry or admissibility.

(e) This order shall not apply to an individual who has been granted asylum, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture. Nothing in this order shall be construed to limit the ability of an individual to seek asylum, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 13**. *Revocation.* Executive Order 13769 of January 27, 2017, is revoked as of the effective date of this order.

**Sec. 14**. *Effective Date.* This order is effective at 12:01 a.m., eastern daylight time on March 16, 2017.

**Sec. 15**. *Severability.* (a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby.

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements.

**Sec. 16**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 6, 2017.*

[FR Doc. 2017–04837
Filed 3–8–17; 11:15 am]
Billing code 3295–F7–P


# Presidential Documents

Proclamation 9645 of September 24, 2017

## Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats

### By the President of the United States of America

### A Proclamation

In Executive Order 13780 of March 6, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), on the recommendations of the Secretary of Homeland Security and the Attorney General, I ordered a worldwide review of whether, and if so what, additional information would be needed from each foreign country to assess adequately whether their nationals seeking to enter the United States pose a security or safety threat. This was the first such review of its kind in United States history. As part of the review, the Secretary of Homeland Security established global requirements for information sharing in support of immigration screening and vetting. The Secretary of Homeland Security developed a comprehensive set of criteria and applied it to the information-sharing practices, policies, and capabilities of foreign governments. The Secretary of State thereafter engaged with the countries reviewed in an effort to address deficiencies and achieve improvements. In many instances, those efforts produced positive results. By obtaining additional information and formal commitments from foreign governments, the United States Government has improved its capacity and ability to assess whether foreign nationals attempting to enter the United States pose a security or safety threat. Our Nation is safer as a result of this work.

Despite those efforts, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, has determined that a small number of countries—out of nearly 200 evaluated—remain deficient at this time with respect to their identity-management and information-sharing capabilities, protocols, and practices. In some cases, these countries also have a significant terrorist presence within their territory.

As President, I must act to protect the security and interests of the United States and its people. I am committed to our ongoing efforts to engage those countries willing to cooperate, improve information-sharing and identity-management protocols and procedures, and address both terrorism-related and public-safety risks. Some of the countries with remaining inadequacies face significant challenges. Others have made strides to improve their protocols and procedures, and I commend them for these efforts. But until they satisfactorily address the identified inadequacies, I have determined, on the basis of recommendations from the Secretary of Homeland Security and other members of my Cabinet, to impose certain conditional restrictions and limitations, as set forth more fully below, on entry into the United States of nationals of the countries identified in section 2 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in section 2 of this proclamation would be detrimental to the

Add. 104

interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. They enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share identity and threat information with our immigration screening and vetting systems.

(c) Section 2(a) of Executive Order 13780 directed a ''worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat.'' That review culminated in a report submitted to the President by the Secretary of Homeland Security on July 9, 2017. In that review, the Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, developed a baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States as immigrants and nonimmigrants, as well as individuals applying for any other benefit under the immigration laws, and to assess whether they are a security or public-safety threat. That baseline incorporates three categories of criteria:

(i) *Identity-management information.* The United States expects foreign governments to provide the information needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be. The identity-management information category focuses on the integrity of documents required for travel to the United States. The criteria assessed in this category include whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports.

(ii) *National security and public-safety information.* The United States expects foreign governments to provide information about whether persons who seek entry to this country pose national security or public-safety risks. The criteria assessed in this category include whether the country makes available, directly or indirectly, known or suspected terrorist and criminal-history information upon request, whether the country provides passport and national-identity document exemplars, and whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States.

(iii) *National security and public-safety risk assessment.* The national security and public-safety risk assessment category focuses on national security risk indicators. The criteria assessed in this category include whether the country is a known or potential terrorist safe haven, whether it is

a participant in the Visa Waiver Program established under section 217 of the INA, 8 U.S.C. 1187, that meets all of its requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States.

(d) The Department of Homeland Security, in coordination with the Department of State, collected data on the performance of all foreign governments and assessed each country against the baseline described in subsection (c) of this section. The assessment focused, in particular, on identity management, security and public-safety threats, and national security risks. Through this assessment, the agencies measured each country's performance with respect to issuing reliable travel documents and implementing adequate identity-management and information-sharing protocols and procedures, and evaluated terrorism-related and public-safety risks associated with foreign nationals seeking entry into the United States from each country.

(e) The Department of Homeland Security evaluated each country against the baseline described in subsection (c) of this section. The Secretary of Homeland Security identified 16 countries as being "inadequate" based on an analysis of their identity-management protocols, information-sharing practices, and risk factors. Thirty-one additional countries were classified "at risk" of becoming "inadequate" based on those criteria.

(f) As required by section 2(d) of Executive Order 13780, the Department of State conducted a 50-day engagement period to encourage all foreign governments, not just the 47 identified as either "inadequate" or "at risk," to improve their performance with respect to the baseline described in subsection (c) of this section. Those engagements yielded significant improvements in many countries. Twenty-nine countries, for example, provided travel document exemplars for use by Department of Homeland Security officials to combat fraud. Eleven countries agreed to share information on known or suspected terrorists.

(g) The Secretary of Homeland Security assesses that the following countries continue to have "inadequate" identity-management protocols, information-sharing practices, and risk factors, with respect to the baseline described in subsection (c) of this section, such that entry restrictions and limitations are recommended: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. The Secretary of Homeland Security also assesses that Iraq did not meet the baseline, but that entry restrictions and limitations under a Presidential proclamation are not warranted. The Secretary of Homeland Security recommends, however, that nationals of Iraq who seek to enter the United States be subject to additional scrutiny to determine if they pose risks to the national security or public safety of the United States. In reaching these conclusions, the Secretary of Homeland Security considered the close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS).

(h) Section 2(e) of Executive Order 13780 directed the Secretary of Homeland Security to "submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals of countries that have not provided the information requested until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means." On September 15, 2017, the Secretary of Homeland Security submitted a report to me recommending entry restrictions and limitations on certain nationals of 7 countries determined to be "inadequate" in providing such information and in light of other factors discussed in the report. According to the report, the recommended restrictions would help address the threats that the countries' identity-management protocols, information-sharing inadequacies, and other risk factors pose to the security and welfare of the United

States. The restrictions also encourage the countries to work with the United States to address those inadequacies and risks so that the restrictions and limitations imposed by this proclamation may be relaxed or removed as soon as possible.

(i) In evaluating the recommendations of the Secretary of Homeland Security and in determining what restrictions to impose for each country, I consulted with appropriate Assistants to the President and members of the Cabinet, including the Secretaries of State, Defense, and Homeland Security, and the Attorney General. I considered several factors, including each country's capacity, ability, and willingness to cooperate with our identity-management and information-sharing policies and each country's risk factors, such as whether it has a significant terrorist presence within its territory. I also considered foreign policy, national security, and counterterrorism goals. I reviewed these factors and assessed these goals, with a particular focus on crafting those country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. These restrictions and limitations are also needed to elicit improved identity-management and information-sharing protocols and practices from foreign governments; and to advance foreign policy, national security, and counterterrorism objectives.

(ii) After reviewing the Secretary of Homeland Security's report of September 15, 2017, and accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to restrict and limit the entry of nationals of 7 countries found to be "inadequate" with respect to the baseline described in subsection (c) of this section: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. These restrictions distinguish between the entry of immigrants and nonimmigrants. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants even after national security concerns arise, which heightens the costs and dangers of errors associated with admitting such individuals. And although immigrants generally receive more extensive vetting than nonimmigrants, such vetting is less reliable when the country from which someone seeks to emigrate exhibits significant gaps in its identity-management or information-sharing policies, or presents risks to the national security of the United States. For all but one of those 7 countries, therefore, I am restricting the entry of all immigrants.

(iii) I am adopting a more tailored approach with respect to nonimmigrants, in accordance with the recommendations of the Secretary of Homeland Security. For some countries found to be "inadequate" with respect to the baseline described in subsection (c) of this section, I am restricting the entry of all nonimmigrants. For countries with certain mitigating factors, such as a willingness to cooperate or play a substantial role in combatting terrorism, I am restricting the entry only of certain categories of nonimmigrants, which will mitigate the security threats presented by their entry into the United States. In those cases in which future cooperation seems reasonably likely, and accounting for foreign policy, national security, and counterterrorism objectives, I have tailored the restrictions to encourage such improvements.

(i) Section 2(e) of Executive Order 13780 also provided that the "Secretary of State, the Attorney General, or the Secretary of Homeland Security may also submit to the President the names of additional countries for which

any of them recommends other lawful restrictions or limitations deemed necessary for the security or welfare of the United States.'' The Secretary of Homeland Security determined that Somalia generally satisfies the information-sharing requirements of the baseline described in subsection (c) of this section, but its government's inability to effectively and consistently cooperate, combined with the terrorist threat that emanates from its territory, present special circumstances that warrant restrictions and limitations on the entry of its nationals into the United States. Somalia's identity-management deficiencies and the significant terrorist presence within its territory make it a source of particular risks to the national security and public safety of the United States. Based on the considerations mentioned above, and as described further in section 2(h) of this proclamation, I have determined that entry restrictions, limitations, and other measures designed to ensure proper screening and vetting for nationals of Somalia are necessary for the security and welfare of the United States.

(j) Section 2 of this proclamation describes some of the inadequacies that led me to impose restrictions on the specified countries. Describing all of those reasons publicly, however, would cause serious damage to the national security of the United States, and many such descriptions are classified.

**Sec. 2**. *Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to categorical exceptions and case-by-case waivers, as described in sections 3 and 6 of this proclamation:

(a) *Chad.*

(i) The government of Chad is an important and valuable counterterrorism partner of the United States, and the United States Government looks forward to expanding that cooperation, including in the areas of immigration and border management. Chad has shown a clear willingness to improve in these areas. Nonetheless, Chad does not adequately share public-safety and terrorism-related information and fails to satisfy at least one key risk criterion. Additionally, several terrorist groups are active within Chad or in the surrounding region, including elements of Boko Haram, ISIS-West Africa, and al-Qa'ida in the Islamic Maghreb. At this time, additional information sharing to identify those foreign nationals applying for visas or seeking entry into the United States who represent national security and public-safety threats is necessary given the significant terrorism-related risk from this country.

(ii) The entry into the United States of nationals of Chad, as immigrants, and as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended.

(b) *Iran.*

(i) Iran regularly fails to cooperate with the United States Government in identifying security risks, fails to satisfy at least one key risk criterion, is the source of significant terrorist threats, and fails to receive its nationals subject to final orders of removal from the United States. The Department of State has also designated Iran as a state sponsor of terrorism.

(ii) The entry into the United States of nationals of Iran as immigrants and as nonimmigrants is hereby suspended, except that entry by such nationals under valid student (F and M) and exchange visitor (J) visas is not suspended, although such individuals should be subject to enhanced screening and vetting requirements.

(c) *Libya.*

(i) The government of Libya is an important and valuable counterterrorism partner of the United States, and the United States Government looks forward to expanding on that cooperation, including in the areas of immigration and border management. Libya, nonetheless, faces significant challenges in sharing several types of information, including public-safety

and terrorism-related information necessary for the protection of the national security and public safety of the United States. Libya also has significant inadequacies in its identity-management protocols. Further, Libya fails to satisfy at least one key risk criterion and has been assessed to be not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States. The substantial terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya, as immigrants, and as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended.

(d) *North Korea.*

(i) North Korea does not cooperate with the United States Government in any respect and fails to satisfy all information-sharing requirements.

(ii) The entry into the United States of nationals of North Korea as immigrants and nonimmigrants is hereby suspended.

(e) *Syria.*

(i) Syria regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorist threats, and has been designated by the Department of State as a state sponsor of terrorism. Syria has significant inadequacies in identity-management protocols, fails to share public-safety and terrorism information, and fails to satisfy at least one key risk criterion.

(ii) The entry into the United States of nationals of Syria as immigrants and nonimmigrants is hereby suspended.

(f) *Venezuela.*

(i) Venezuela has adopted many of the baseline standards identified by the Secretary of Homeland Security and in section 1 of this proclamation, but its government is uncooperative in verifying whether its citizens pose national security or public-safety threats. Venezuela's government fails to share public-safety and terrorism-related information adequately, fails to satisfy at least one key risk criterion, and has been assessed to be not fully cooperative with respect to receiving its nationals subject to final orders of removal from the United States. There are, however, alternative sources for obtaining information to verify the citizenship and identity of nationals from Venezuela. As a result, the restrictions imposed by this proclamation focus on government officials of Venezuela who are responsible for the identified inadequacies.

(ii) Notwithstanding section 3(b)(v) of this proclamation, the entry into the United States of officials of government agencies of Venezuela involved in screening and vetting procedures—including the Ministry of the Popular Power for Interior, Justice and Peace; the Administrative Service of Identification, Migration and Immigration; the Scientific, Penal and Criminal Investigation Service Corps; the Bolivarian National Intelligence Service; and the Ministry of the Popular Power for Foreign Relations—and their immediate family members, as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended. Further, nationals of Venezuela who are visa holders should be subject to appropriate additional measures to ensure traveler information remains current.

(g) *Yemen.*

(i) The government of Yemen is an important and valuable counterterrorism partner, and the United States Government looks forward to expanding that cooperation, including in the areas of immigration and border management. Yemen, nonetheless, faces significant identity-management challenges, which are amplified by the notable terrorist presence within its territory. The government of Yemen fails to satisfy critical identity-management requirements, does not share public-safety and terrorism-related information adequately, and fails to satisfy at least one key risk criterion.

(ii) The entry into the United States of nationals of Yemen as immigrants, and as nonimmigrants on business (B–1), tourist (B–2), and business/tourist (B–1/B–2) visas, is hereby suspended.

(h) *Somalia.*

(i) The Secretary of Homeland Security's report of September 15, 2017, determined that Somalia satisfies the information-sharing requirements of the baseline described in section 1(c) of this proclamation. But several other considerations support imposing entry restrictions and limitations on Somalia. Somalia has significant identity-management deficiencies. For example, while Somalia issues an electronic passport, the United States and many other countries do not recognize it. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. Terrorists use under-governed areas in northern, central, and southern Somalia as safe havens from which to plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The State Department's 2016 Country Reports on Terrorism observed that Somalia has not sufficiently degraded the ability of terrorist groups to plan and mount attacks from its territory. Further, despite having made significant progress toward formally federating its member states, and its willingness to fight terrorism, Somalia continues to struggle to provide the governance needed to limit terrorists' freedom of movement, access to resources, and capacity to operate. The government of Somalia's lack of territorial control also compromises Somalia's ability, already limited because of poor record-keeping, to share information about its nationals who pose criminal or terrorist risks. As a result of these and other factors, Somalia presents special concerns that distinguish it from other countries.

(ii) The entry into the United States of nationals of Somalia as immigrants is hereby suspended. Additionally, visa adjudications for nationals of Somalia and decisions regarding their entry as nonimmigrants should be subject to additional scrutiny to determine if applicants are connected to terrorist organizations or otherwise pose a threat to the national security or public safety of the United States.

**Sec. 3.** *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and any waiver under subsection (c) of this section, the suspensions of and limitations on entry pursuant to section 2 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date under section 7 of this proclamation;

(ii) do not have a valid visa on the applicable effective date under section 7 of this proclamation; and

(iii) do not qualify for a visa or other valid travel document under section 6(d) of this proclamation.

(b) *Exceptions.* The suspension of entry pursuant to section 2 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any foreign national who is admitted to or paroled into the United States on or after the applicable effective date under section 7 of this proclamation;

(iii) any foreign national who has a document other than a visa—such as a transportation letter, an appropriate boarding foil, or an advance parole document—valid on the applicable effective date under section 7 of this proclamation or issued on any date thereafter, that permits him or her to travel to the United States and seek entry or admission;

(iv) any dual national of a country designated under section 2 of this proclamation when the individual is traveling on a passport issued by a non-designated country;

(v) any foreign national traveling on a diplomatic or diplomatic-type visa, North Atlantic Treaty Organization visa, C–2 visa for travel to the United Nations, or G–1, G–2, G–3, or G–4 visa; or

(vi) any foreign national who has been granted asylum by the United States; any refugee who has already been admitted to the United States; or any individual who has been granted withholding of removal, advance parole, or protection under the Convention Against Torture.

(c) *Waivers.* Notwithstanding the suspensions of and limitations on entry set forth in section 2 of this proclamation, a consular officer, or the Commissioner, United States Customs and Border Protection (CBP), or the Commissioner's designee, as appropriate, may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate and consistent with subsections (i) through (iv) of this subsection. The Secretary of State and the Secretary of Homeland Security shall coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants.

(i) A waiver may be granted only if a foreign national demonstrates to the consular officer's or CBP official's satisfaction that:

(A) denying entry would cause the foreign national undue hardship;

(B) entry would not pose a threat to the national security or public safety of the United States; and

(C) entry would be in the national interest.

(ii) The guidance issued by the Secretary of State and the Secretary of Homeland Security under this subsection shall address the standards, policies, and procedures for:

(A) determining whether the entry of a foreign national would not pose a threat to the national security or public safety of the United States;

(B) determining whether the entry of a foreign national would be in the national interest;

(C) addressing and managing the risks of making such a determination in light of the inadequacies in information sharing, identity management, and other potential dangers posed by the nationals of individual countries subject to the restrictions and limitations imposed by this proclamation;

(D) assessing whether the United States has access, at the time of the waiver determination, to sufficient information about the foreign national to determine whether entry would satisfy the requirements of subsection (i) of this subsection; and

(E) determining the special circumstances that would justify granting a waiver under subsection (iv)(E) of this subsection.

(iii) Unless otherwise specified by the Secretary of Homeland Security, any waiver issued by a consular officer as part of the visa adjudication process will be effective both for the issuance of a visa and for any subsequent entry on that visa, but will leave unchanged all other requirements for admission or entry.

(iv) Case-by-case waivers may not be granted categorically, but may be appropriate, subject to the limitations, conditions, and requirements set forth under subsection (i) of this subsection and the guidance issued under subsection (ii) of this subsection, in individual circumstances such as the following:

(A) the foreign national has previously been admitted to the United States for a continuous period of work, study, or other long-term activity, is outside the United States on the applicable effective date under section 7 of this proclamation, seeks to reenter the United States to resume that activity, and the denial of reentry would impair that activity;

(B) the foreign national has previously established significant contacts with the United States but is outside the United States on the applicable effective date under section 7 of this proclamation for work, study, or other lawful activity;

(C) the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry would impair those obligations;

(D) the foreign national seeks to enter the United States to visit or reside with a close family member (*e.g.,* a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry would cause the foreign national undue hardship;

(E) the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;

(F) the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of such an employee), and the foreign national can document that he or she has provided faithful and valuable service to the United States Government;

(G) the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOIA), 22 U.S.C. 288 *et seq.,* traveling for purposes of conducting meetings or business with the United States Government, or traveling to conduct business on behalf of an international organization not designated under the IOIA;

(H) the foreign national is a Canadian permanent resident who applies for a visa at a location within Canada;

(I) the foreign national is traveling as a United States Government–sponsored exchange visitor; or

(J) the foreign national is traveling to the United States, at the request of a United States Government department or agency, for legitimate law enforcement, foreign policy, or national security purposes.

**Sec. 4**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of Homeland Security shall, in consultation with the Secretary of State, devise a process to assess whether any suspensions and limitations imposed by section 2 of this proclamation should be continued, terminated, modified, or supplemented. The process shall account for whether countries have improved their identity-management and information-sharing protocols and procedures based on the criteria set forth in section 1 of this proclamation and the Secretary of Homeland Security's report of September 15, 2017. Within 180 days of the date of this proclamation, and every 180 days thereafter, the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, the Director of National Intelligence, and other appropriate heads of agencies, shall submit a report with recommendations to the President, through appropriate Assistants to the President, regarding the following:

(i) the interests of the United States, if any, that continue to require the suspension of, or limitations on, the entry on certain classes of nationals of countries identified in section 2 of this proclamation and whether the restrictions and limitations imposed by section 2 of this proclamation should be continued, modified, terminated, or supplemented; and

(ii) the interests of the United States, if any, that require the suspension of, or limitations on, the entry of certain classes of nationals of countries not identified in this proclamation.

(b) The Secretary of State, in consultation with the Secretary of Homeland Security, the Secretary of Defense, the Attorney General, the Director of National Intelligence, and the head of any other executive department or agency (agency) that the Secretary of State deems appropriate, shall engage the countries listed in section 2 of this proclamation, and any other countries that have information-sharing, identity-management, or risk-factor deficiencies as practicable, appropriate, and consistent with the foreign policy, national security, and public-safety objectives of the United States.

(c) Notwithstanding the process described above, and consistent with the process described in section 2(f) of Executive Order 13780, if the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, and the Director of National Intelligence, determines, at any time, that a country meets the standards of the baseline described in section 1(c) of this proclamation, that a country has an adequate plan to provide such information, or that one or more of the restrictions or limitations imposed on the entry of a country's nationals are no longer necessary for the security or welfare of the United States, the Secretary of Homeland Security may recommend to the President the removal or modification of any or all such restrictions and limitations. The Secretary of Homeland Security, the Secretary of State, or the Attorney General may also, as provided for in Executive Order 13780, submit to the President the names of additional countries for which any of them recommends any lawful restrictions or limitations deemed necessary for the security or welfare of the United States.

**Sec. 5**. *Reports on Screening and Vetting Procedures.* (a) The Secretary of Homeland Security, in coordination with the Secretary of State, the Attorney General, the Director of National Intelligence, and other appropriate heads of agencies shall submit periodic reports to the President, through appropriate Assistants to the President, that:

(i) describe the steps the United States Government has taken to improve vetting for nationals of all foreign countries, including through improved collection of biometric and biographic data;

(ii) describe the scope and magnitude of fraud, errors, false information, and unverifiable claims, as determined by the Secretary of Homeland Security on the basis of a validation study, made in applications for immigration benefits under the immigration laws; and

(iii) evaluate the procedures related to screening and vetting established by the Department of State's Bureau of Consular Affairs in order to enhance the safety and security of the United States and to ensure sufficient review of applications for immigration benefits.

(b) The initial report required under subsection (a) of this section shall be submitted within 180 days of the date of this proclamation; the second report shall be submitted within 270 days of the first report; and reports shall be submitted annually thereafter.

(c) The agency heads identified in subsection (a) of this section shall coordinate any policy developments associated with the reports described in subsection (a) of this section through the appropriate Assistants to the President.

**Sec. 6**. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations, including those that provide an opportunity for individuals to enter the United States on the basis of a credible claim of fear of persecution or torture.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date under section 7 of this proclamation shall be revoked pursuant to this proclamation.

(d) Any individual whose visa was marked revoked or marked canceled as a result of Executive Order 13769 of January 27, 2017 (Protecting the Nation from Foreign Terrorist Entry into the United States), shall be entitled to a travel document confirming that the individual is permitted to travel to the United States and seek entry under the terms and conditions of the visa marked revoked or marked canceled. Any prior cancellation or revocation of a visa that was solely pursuant to Executive Order 13769 shall not be the basis of inadmissibility for any future determination about entry or admissibility.

(e) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture. Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.

**Sec. 7.** *Effective Dates.* Executive Order 13780 ordered a temporary pause on the entry of foreign nationals from certain foreign countries. In two cases, however, Federal courts have enjoined those restrictions. The Supreme Court has stayed those injunctions as to foreign nationals who lack a credible claim of a bona fide relationship with a person or entity in the United States, pending its review of the decisions of the lower courts.

(a) The restrictions and limitations established in section 2 of this proclamation are effective at 3:30 p.m. eastern daylight time on September 24, 2017, for foreign nationals who:

(i) were subject to entry restrictions under section 2 of Executive Order 13780, or would have been subject to the restrictions but for section 3 of that Executive Order, and

(ii) lack a credible claim of a bona fide relationship with a person or entity in the United States.

(b) The restrictions and limitations established in section 2 of this proclamation are effective at 12:01 a.m. eastern daylight time on October 18, 2017, for all other persons subject to this proclamation, including nationals of:

(i) Iran, Libya, Syria, Yemen, and Somalia who have a credible claim of a bona fide relationship with a person or entity in the United States; and

(ii) Chad, North Korea, and Venezuela.

**Sec. 8.** *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 9.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

Add. 144

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-fourth day of September, in the year of our Lord two thousand seventeen, and of the Independence of the United States of America the two hundred and forty-second.

[FR Doc. 2017–20899
Filed 9–26–17; 11:15 am]
Billing code 3295–F7–P