# Exhibit 28

No. 17-965

# In the Supreme Court of the United States

—————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

STATE OF HAWAII, ET AL.

—————

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

—————

**BRIEF FOR THE PETITIONERS**

—————

NOEL J. FRANCISCO
  *Solicitor General*
   *Counsel of Record*
CHAD A. READLER
  *Acting Assistant Attorney*
   *General*
JEFFREY B. WALL
EDWIN S. KNEEDLER
  *Deputy Solicitors General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney*
   *General*
JONATHAN C. BOND
MICHAEL R. HUSTON
  *Assistants to the Solicitor*
   *General*
SHARON SWINGLE
H. THOMAS BYRON III
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTIONS PRESENTED

The Constitution and Acts of Congress confer on the President broad authority to suspend or restrict the entry of aliens outside the United States when he deems it in the Nation's interest. Exercising that authority after a worldwide review by multiple governmental agencies of whether foreign governments provide adequate information to enable the United States to sufficiently vet their nationals, the President issued Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 27, 2017). In accordance with the recommendation of the Acting Secretary of Homeland Security following the multi-agency review, the Proclamation suspends entry, subject to case-by-case waivers, of certain categories of aliens abroad from eight countries that do not share adequate information with the United States or that present other risk factors. The district court issued a preliminary injunction barring enforcement of the Proclamation's entry suspensions worldwide, except as to nationals of two countries. The court of appeals affirmed, except as to persons without a credible claim of a bona fide relationship with a person or entity in the United States. The courts concluded that the Proclamation violates the Immigration and Nationality Act.

The questions presented are:

1. Whether respondents' challenge to the President's suspension of entry of aliens abroad is justiciable.

2. Whether the Proclamation is a lawful exercise of the President's authority to suspend entry of aliens abroad.

3. Whether the Proclamation violates the Establishment Clause.

4. Whether the global injunction is impermissibly overbroad.

(I)

## PARTIES TO THE PROCEEDING

Petitioners (defendants-appellants below) are Donald J. Trump, in his official capacity as President of the United States; the U.S. Department of Homeland Security; Kirstjen M. Nielsen, in her official capacity as Secretary of Homeland Security; the U.S. Department of State; Rex W. Tillerson, in his official capacity as Secretary of State; and the United States of America.[*]

Respondents (plaintiffs-appellees below) are the State of Hawaii, Dr. Ismail Elshikh, John Does 1 and 2, and the Muslim Association of Hawaii, Inc.

---

[*] Former Acting Secretary of Homeland Security Elaine C. Duke was a defendant-appellant in this case.  When Kirstjen M. Nielsen became Secretary of Homeland Security on December 6, 2017, Secretary Nielsen was automatically substituted.

(II)

# TABLE OF CONTENTS

Page

Opinions below ................................................................ 1
Jurisdiction ..................................................................... 1
Constitutional and statutory provisions involved ................ 2
Statement ...................................................................... 2
    A.   Legal framework ..................................................... 3
    B.   The Executive Orders and Proclamation .................... 4
    C.   Procedural history .................................................. 11
    D.   Related litigation ................................................... 13
Summary of argument ...................................................... 14
Argument:
    I.   Respondents' challenge to the Proclamation is not
        justiciable ................................................................. 17
        A.   Respondents' statutory claims are not
            justiciable ......................................................... 18
            1.   Congress has not authorized review of
               respondents' statutory claims ...................... 18
            2.   Neither the APA nor principles of equity
               authorize review of respondents' statutory
               claims ...................................................... 22
        B.   Respondents' Establishment Clause claim is
            not justiciable ................................................... 26
    II.  The Proclamation is a lawful exercise of the
        President's authority to suspend or restrict entry
        of aliens abroad ........................................................ 30
        A.   The Proclamation is authorized by 8 U.S.C.
            1182(f), 8 U.S.C. 1185(a)(1), and the
            Constitution ..................................................... 30
            1.   The President validly exercised his
               statutory authority to suspend entry of
               aliens in the national interest ...................... 31
            2.   The President's authority to suspend entry
               is not subject to the court of appeals'
               atextual limitations ................................... 40

(III)

IV

Table of Contents—Continued:                                    Page

      3.   The court of appeals' narrow view of the
           President's constitutional authority is
           incorrect............................................................ 47

   B.   The Proclamation is consistent with 8 U.S.C.
      1152(a)(1)(A) ........................................................ 48

      1.   Section 1152(a)(1)(A) does not conflict with
           the President's authority under Sections
           1182(f) and 1185(a)(1) ...................................... 49

      2.   In the event of a conflict, Section
           1152(a)(1)(A) does not restrict the
           President's exercise of his authority
           under Sections 1182(f) and 1185(a)(1) ............ 55

      3.   Section 1152(a)(1)(A) cannot justify
           enjoining the Proclamation............................. 57

III. The Proclamation does not violate the
    Establishment Clause ................................................. 58

   A.   The Proclamation is constitutional under
      *Mandel* and *Din* ................................................. 58

   B.   The Proclamation is constitutional under
      domestic Establishment Clause precedent .......... 64

IV. The global injunction is vastly overbroad .................. 72

Conclusion ....................................................................... 76

Appendix — Constitutional and statutory provisions .......... 1a

**TABLE OF AUTHORITIES**

Cases:

   *Abourezk* v. *Reagan*, 785 F.2d 1043
     (D.C. Cir. 1986), aff'd by an equally
     divided Court, 484 U.S. 1 (1987) .......................21, 31, 44

   *Allen* v. *Wright*, 468 U.S. 737 (1984) .............................. 29

   *Allende* v. *Shultz*, 845 F.2d 1111 (1st Cir. 1988)............ 44

   *Arizona* v. *United States*, 567 U.S. 387 (2012)............... 46

V

Cases—Continued:                                                 Page

*Armstrong* v. *Exceptional Child Ctr., Inc.*,
  135 S. Ct. 1378 (2015) .................................................. 26

*Block* v. *Community Nutrition Inst.*,
  467 U.S. 340 (1984) ................................................23, 24

*Brownell* v. *Tom We Shung*, 352 U.S. 180 (1956) .......... 20

*Chicago & S. Air Lines, Inc.* v. *Waterman S.S.
  Corp.*, 333 U.S. 103 (1948) ........................................... 39

*Church of the Lukumi Babalu Aye, Inc.* v.
  *City of Hialeah*, 508 U.S. 520 (1993) ......................... 65

*City of Los Angeles* v. *Lyons*, 461 U.S. 95 (1983) .....72, 73

*Clinton* v. *City of New York*, 524 U.S. 417 (1998).......... 46

*Crosby* v. *National Foreign Trade Council*,
  530 U.S. 363 (2000) ....................................................... 45

*DaimlerChrysler Corp.* v. *Cuno*,
  547 U.S. 332 (2006) ....................................................... 72

*Dalton* v. *Specter*, 511 U.S. 462 (1994) ........................... 24

*Demore* v. *Kim*, 538 U.S. 510 (2003) .............................. 59

*Department of the Navy* v. *Egan*,
  484 U.S. 518 (1988) ....................................................... 39

*Edward J. DeBartolo Corp.* v. *Florida Gulf
  Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988) ....................................................... 54

*Eisen* v. *Carlisle & Jacquelin*, 417 U.S. 156 (1974)....... 76

*Elk Grove Unified Sch. Dist.* v. *Newdow*,
  542 U.S. 1 (2004)............................................................ 27

*Fiallo* v. *Bell*, 430 U.S. 787 (1977) ......................18, 21, 59

*Franklin* v. *Massachusetts*, 505 U.S. 788 (1992) ........... 23

*Galvan* v. *Press*, 347 U.S. 522 (1954) ................................. 46

*Grupo Mexicano de Desarrollo S. A.* v. *Alliance
  Bond Fund, Inc.*, 527 U.S. 308 (1999).......................... 72

*Harisiades* v. *Shaughnessy*, 342 U.S. 580 (1952) .......... 18

*Hawaii* v. *Trump*, 859 F.3d 741 (9th Cir. 2017)............... 6

VI

Cases—Continued:                                              Page

*Hein* v. *Freedom From Religion Found., Inc.*,
   551 U.S. 587 (2007) ....................................................... 67

*Holder* v. *Humanitarian Law Project*,
   561 U.S. 1 (2010)............................................................. 55

*INS* v. *Chadha*, 462 U.S. 919 (1983) ................................ 46

*IRAP* v. *Trump*:
   265 F. Supp. 3d 570 (D. Md. 2017) .......................... 13, 66
   No. 17-2231, 2018 WL 894413
      (4th Cir. Feb. 15, 2018).................................... *passim*

*IRAP* v. *Trump*, 857 F.3d 554 (4th Cir. 2017) ................. 5

*The Japanese Immigrant Case*, 189 U.S. 86 (1903)........... 47

*Kent* v. *Dulles*, 357 U.S. 116 (1958)...................................... 47

*Kerry* v. *Din*, 135 S. Ct. 2128 (2015).............. 27, 61, 62, 63

*Kleindienst* v. *Mandel*, 408 U.S. 753 (1972)...........*passim*

*Legal Assistance for Vietnamese Asylum*
   *Seekers* v. *Department of State*, 45 F.3d 469
   (D.C. Cir. 1995), vacated on other grounds,
   519 U.S. 1 (1996)........................................................25, 52

*Lewis* v. *Casey*, 518 U.S. 343 (1996) ................................ 72

*Lujan* v. *National Wildlife Fed'n*,
   497 U.S. 871 (1990) ....................................................... 25

*Madsen* v. *Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ....................................................... 72

*McCreary County* v. *ACLU of Ky.*,
   545 U.S. 844 (2005) ....................................................*passim*

*McGowan* v. *Maryland*, 366 U.S. 420 (1961) ......27, 28, 65

*Milner* v. *Department of the Navy*,
   562 U.S. 562 (2011) ....................................................... 42

*Morfin* v. *Tillerson*, 851 F.3d 710 (7th Cir.),
   cert. denied, 138 S. Ct. 380 (2017)................................ 62

*Nademi* v. *INS*, 679 F.2d 811 (10th Cir.),
   cert. denied, 459 U.S. 872 (1982)................................. 53

VII

Cases—Continued:                                   Page

*National Ass'n of Home Builders* v. *Defenders of Wildlife*, 551 U.S. 644 (2007)..............................55, 56

*Navy Chaplaincy, In re*, 534 F.3d 756 (D.C. Cir. 2008), cert. denied, 556 U.S. 1167 (2009) ..................................... 29

*Nishimura Ekiu* v. *United States*, 142 U.S. 651 (1892)....................................18, 22

*Nixon* v. *Fitzgerald*, 457 U.S. 731 (1982) ....................... 67

*Pittston Coal Grp.* v. *Sebben*, 488 U.S. 105 (1988)......... 42

*Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ....................... 36, 59, 67, 69

*Saavedra Bruno* v. *Albright*, 197 F.3d 1153 (D.C. Cir. 1999)..................................... 19, 20, 21, 23, 25

*Sale* v. *Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) ................................................22, 50

*Sessions* v. *Morales-Santana*, 137 S. Ct. 1678 (2017) ...............................................58, 61

*Shaughnessy* v. *United States ex rel. Mezei*, 345 U.S. 206 (1953) ...................................... 18

*Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83 (1998) ........................................... 22

*Texas* v. *United States*, 809 F.3d 134 (5th Cir. 2015), aff'd by an equally divided Court, 136 S. Ct. 2271 (2016)........................... 74

*Thompson* v. *North Am. Stainless, LP*, 562 U.S. 170 (2011) ...................................... 24

*Town of Chester* v. *Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017) ................................... 72

*Trump* v. *Hawaii*, 138 S. Ct. 377 (2017)........................... 6

*Trump* v. *Hawaii*, 138 S. Ct. 542 (2017)................... 2, 11

VIII

Cases—Continued:                                    Page

   *Trump* v. *IRAP*:

      137 S. Ct. 2080 (2017) ........................................... 6, 11

      138 S. Ct. 353 (2017) ................................................. 6

   *Trump* v. *IRAP*, 138 S. Ct. 542 (2017) .......................... 13

   *United States* v. *Chemical Found., Inc.*,
      272 U.S. 1 (1926) ........................................................ 68

   *United States* v. *Curtiss-Wright Exp. Corp.*,
      299 U.S. 304 (1936) .................................................... 45

   *United States* v. *Mendoza*, 464 U.S. 154 (1984) ............. 75

   *United States* v. *Munsingwear, Inc.*,
      340 U.S. 36 (1950) ........................................................ 6

   *United States* v. *Nixon*, 418 U.S. 683 (1974) ................. 67

   *United States* v. *Verdugo-Urquidez*,
      494 U.S. 259 (1990) .................................................... 26

   *United States* v. *Witkovich*, 353 U.S. 194 (1957) .......... 47

   *United States ex rel. Knauff* v. *Shaughnessy*,
      338 U.S. 537 (1950) ...............................................*passim*

   *United States R.R. Ret. Bd.* v. *Fritz*,
      449 U.S. 166 (1980) .................................................... 61

   *Valley Forge Christian Coll.* v. *Americans*
      *United for Separation of Church & State,*
      *Inc.*, 454 U.S. 464 (1982)................................................ 29

   *Washington* v. *Trump*:

      847 F.3d 1151 (9th Cir. 2017) ...................................... 5

      858 F.3d 1168 (9th Cir. 2017) .................................... 61

   *Webster* v. *Doe*, 486 U.S. 592 (1988) ............. 24, 26, 35, 36

   *Youngstown Sheet & Tube Co.* v. *Sawyer*,
      343 U.S. 579 (1952) .................................................... 48

   *Zadvydas* v. *Davis*, 533 U.S. 678 (2001) ........................... 47

   *Zemel* v. *Rusk*, 381 U.S. 1 (1965).................................... 47

   *Ziglar* v. *Abbasi*, 137 S. Ct. 1843 (2017) ........................ 36

IX

Cases—Continued:                                    Page

*Zivotofsky ex rel. Zivotofsky* v. *Clinton*,
566 U.S. 189 (2012) ...................................................... 21

*Zivotofsky ex rel. Zivotofsky* v. *Kerry*,
135 S. Ct. 2076 (2015) .........................................46, 47, 60

Constitution, statutes, regulations, and rule:

U.S. Const.:
Art. I ................................................................. 46
§ 8, Cl. 4 ..................................................... 74
§ 9, Cl. 3 (Ex Post Facto Clause)........................ 46
Art. II .............................................................. 54
§ 1, Cl. 8 ..................................................... 67
Art. III............................................................17, 72
Amend. I .......................................................27, 58, 1a
Establishment Clause............................ *passim*, 1a
Act of May 22, 1918, ch. 81, § 1(a), 40 Stat. 559 ............. 32
Act of June 21, 1941, ch. 210, § 1, 55 Stat. 252-253 ........ 32
Act of Sept. 26, 1961, Pub. L. No. 87-301,
§ 5(a), 75 Stat. 651-653 (8 U.S.C. 1105a(b)
(Supp. III 1961)) ............................................................ 20
Act of Oct. 3, 1965, Pub. L. No. 89-236,
79 Stat. 911:
§ 1, 79 Stat. 911 (8 U.S.C. 1101(a)(27)
(Supp. I 1965))................................................... 57
§ 3, 79 Stat. 912-915 (8 U.S.C. 1151(b)
(Supp. I 1965))................................................... 57
§ 8(a), 79 Stat. 916 (8 U.S.C. 1153
(Supp. I 1965))................................................... 57
Administrative Procedure Act, 5 U.S.C. 701 *et seq.* ...... 12
5 U.S.C. 701(a)(1) .................................................23, 1a
5 U.S.C. 701(a)(2) .............................................23, 24, 1a
5 U.S.C. 702  .....................................................22, 2a

X

Statutes, regulations, and rule—Continued:      Page

5 U.S.C. 702(1).................................................23, 3a

5 U.S.C. 703 .......................................................26, 3a

5 U.S.C. 704 .......................................................25, 4a

Foreign Relations Authorization Act,
Fiscal Year 1979, Pub. L. No. 95-426,
§ 707(a), 92 Stat. 992-993........................................32, 56

Immigration and Nationality Act,
ch. 477, 66 Stat. 163 (8 U.S.C. 1101 *et seq.*) ..................3

§ 212(e), 66 Stat. 188 ..............................................32

§ 215(a)(1), 66 Stat. 190 ..........................................32

8 U.S.C. 1101(a)(4) ................................................3

8 U.S.C. 1104 .....................................................50

8 U.S.C. 1105a (1994) ..............................................20

8 U.S.C. 1152(a)............................................ 53, 57, 6a

8 U.S.C. 1152(a)(1) .......................................... 54, 6a

8 U.S.C. 1152(a)(1)(A) .............................. *passim*, 6a

8 U.S.C. 1152(a)(1)(B) ...................................50, 52, 6a

8 U.S.C. 1181 .....................................................3

8 U.S.C. 1182 ...................................................49, 11a

8 U.S.C. 1182(a)..............................................4, 43, 11a

8 U.S.C. 1182(a)(3)(B) .........................................62, 19a

8 U.S.C. 1182(a)(3)(C)(i)....................................56, 25a

8 U.S.C. 1182(a)(7)(A)(i)....................................3, 30a

8 U.S.C. 1182(a)(7)(B)(i)(II)...............................3, 30a

8 U.S.C. 1182(a)(7)(B)(iv)....................................3, 31a

8 U.S.C. 1182(f) ........................................ *passim*, 32a

8 U.S.C. 1185(a)..........................................25, 56, 32a

8 U.S.C. 1185(a)(1) .................................. *passim*, 33a

8 U.S.C. 1185(d)...........................................3, 50, 33a

8 U.S.C. 1187 (2012 & Supp. IV 2016) ...............3, 33a

8 U.S.C. 1187(a)(12) (Supp. IV 2016)................64, 38a

XI

Statutes, regulations, and rule—Continued:          Page

8 U.S.C. 1187(a)(12)(A)(i) (Supp. IV 2016) ..........3, 38a
8 U.S.C. 1187(a)(12)(A)(ii) (Supp. IV 2016) .........3, 38a
8 U.S.C. 1187(a)(12)(D)(i) (Supp. IV 2016)..........4, 39a
8 U.S.C. 1187(a)(12)(D)(ii) (Supp. IV 2016).........4, 40a
8 U.S.C. 1201 (2012 & Supp. IV 2016) ..............50, 78a
8 U.S.C. 1201(a)(1) ............................................3, 78a
8 U.S.C. 1201(g)........................................ 4, 49, 51, 82a
8 U.S.C. 1201(h)............................................3, 50, 83a
8 U.S.C. 1202(h)...................................................... 3
8 U.S.C. 1203 .......................................................... 3
8 U.S.C. 1225(a)................................................3, 84a
8 U.S.C. 1252 (Supp. II 1996) ................................ 20
8 U.S.C. 1252 ......................................................... 19
8 U.S.C. 1253(d)...................................................... 56
Judiciary Act of 1789, ch. 20, 1 Stat. 73....................... 72
6 U.S.C. 236(b) ....................................................... 50
6 U.S.C. 236(b)(1)................................................20, 4a
6 U.S.C. 236(c) ........................................................ 50
6 U.S.C. 236(c)(1) ...............................................20, 5a
6 U.S.C. 236(f)....................................................19, 5a
Exec. Order No. 12,172, 44 Fed. Reg. 67,947
      (Nov. 28, 1979) ...........................................37, 53
Exec. Order No. 12,206, 45 Fed. Reg. 24,101
      (Apr. 9, 1980) .................................................. 53
Exec. Order No. 13,712, 80 Fed. Reg. 73,633
      (Nov. 25, 2015) ............................................... 38
Exec. Order No. 13,769, 82 Fed. Reg. 8977
      (Feb. 1, 2017) ............................................ 4, 5, 6
Exec. Order No. 13,780, 82 Fed. Reg. 13,209
      (Mar. 9, 2017)................................................... 5

XII

Regulations and rule—Continued:                              Page

Exec. Order No. 13,815, 82 Fed. Reg. 50,055
  (Oct. 27, 2017) .................................................................... 6

Proclamation No. 4865, 46 Fed. Reg. 48,107
  (Oct. 1, 1981) .................................................................... 37

Proclamation No. 5517, 51 Fed. Reg. 30,470
  (Aug. 26, 1986) ............................................................ 43, 53

Proclamation No. 5829, 53 Fed. Reg. 22,289
  (June 14, 1988) .................................................................. 41

Proclamation No. 5887, 53 Fed. Reg. 43,185
  (Oct. 26, 1988) .................................................................. 38

Proclamation No. 6749, 59 Fed. Reg. 54,119
  (Oct. 27, 1994) .................................................................. 43

Proclamation No. 6958, 61 Fed. Reg. 60,007
  (Nov. 26, 1996) ............................................................ 36, 38

Proclamation No. 7524, 67 Fed. Reg. 8857
  (Feb. 26, 2002) .................................................................. 37

Proclamation No. 7750, 69 Fed. Reg. 2287
  (Jan. 14, 2004) .................................................................. 43

Proclamation No. 8015, 71 Fed. Reg. 28,541
  (May 16, 2006) .................................................................. 38

Proclamation No. 8342, 74 Fed. Reg. 4093
  (Jan. 22, 2009) .................................................................. 39

Proclamation No. 8693, 76 Fed. Reg. 44,751
  (July 27, 2011) .................................................................. 37

Proclamation No. 8697, 76 Fed. Reg. 49,277
  (Aug. 9, 2011) .................................................................. 43

Proclamation No. 9645, 82 Fed. Reg. 45,161
  (Sept. 27, 2017) .................................................................. 2

22 C.F.R.:

    Section 41.102 ................................................................ 3

    Section 41.121(a) ............................................................ 3

    Section 42.62 .................................................................. 3

    Section 42.81(a) .............................................................. 3

XIII

Regulation and rule—Continued:                                    Page

  82 Fed. Reg. 56,100 (Nov. 27, 2017) ................................ 3

  Fed. R. Civ. P. 23 .................................................................. 75

Miscellaneous:

  The American Presidency Project, Jimmy Carter,
    *Sanctions Against Iran Remarks Announcing*
    *U.S. Actions* (Apr. 7, 1980), https://goo.gl/4iX168 ...... 53

  Samuel L. Bray, *Multiple Chancellors:*
    *Reforming the National Injunction*,
    131 Harv. L. Rev. 417 (2017) ................................... 73, 75

  Bureau of Consular Affairs, U.S. Dep't of State,
    *Report of the Visa Office 2017*, Tbls. XIV, XVIII,
    https://goo.gl/zuGnxH (last visited Feb. 20, 2018) ....... 57

  CIA, *The World Factbook: Africa (Chad)*,
    https://goo.gl/WJDQP (last visited Feb. 20, 2018) ...... 64

  98 Cong. Rec. (1952):

      pp. 4304-4305 ............................................................ 42

      p. 4423 ........................................................................ 42

      p. 5114 ........................................................................ 43

  DHS, *DHS Announces Further Travel*
    *Restrictions for the Visa Waiver Program*
    (Feb. 18, 2016), https://goo.gl/OXTqb5 .......................... 4

  The Declaration of Independence (U.S. 1776) ............... 48

  4 Jonathan Elliot, *The Debates in the Several State*
    *Conventions, on the Adoption of the Federal*
    *Constitution* (2d ed. 1836) ............................................ 48

  The Federalist No. 72 (Alexander Hamilton)
    (Cooke ed., 1961) ................................................................ 48

  1 Charles Gordon et al., *Immigration Law and*
    *Procedure* (2017) ............................................................ 49

  H.R. Rep. No. 1365, 82d Cong., 2d Sess. (1952) ........ 32, 43

  H.R. Rep. No. 1086, 87th Cong., 1st Sess. (1961) .......... 20

  H.R. Rep. No. 745, 89th Cong., 1st Sess. (1965) ........... 52

XIV

Miscellaneous—Continued:                            Page

*Immigration Laws and Iranian Students*,
  4A Op. O.L.C. 133 (1979)................................................53

Dan Merica, *Trump Signs Executive Order to
  Keep Out 'Radical Islamic Terrorists*,' CNN.com
  (Jan. 30, 2017), https://goo.gl/dMZEvO......................68

S. Rep. No. 1137, 82d Cong., 2d Sess. (1952) ...........32, 43

S. Rep. No. 748, 89th Cong., 1st Sess. (1965)................52

U.S. Dep't of State, 9 *Foreign Affairs Manual*
  302.14-3(B) (2017) ...............................................51

# In the Supreme Court of the United States

————————

No. 17-965

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES,
ET AL., PETITIONERS

*v.*

STATE OF HAWAII, ET AL.

————————

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

————————

**BRIEF FOR THE PETITIONERS**

————————

### OPINIONS BELOW

The amended opinion of the court of appeals (Pet. App. 2a-65a) is reported at 878 F.3d 662. The district court's order converting its temporary restraining order (TRO) into a preliminary injunction (Pet. App. 68a-69a) is not published. The district court's order granting a TRO (Pet. App. 70a-106a) is reported at 265 F. Supp. 3d 1140.

### JURISDICTION

The judgment of the court of appeals was entered on December 22, 2017. The petition for a writ of certiorari was filed on January 5, 2018, and was granted on January 19, 2018. The jurisdiction of this Court rests on 28 U.S.C. 1254(1).

(1)

2

### CONSTITUTIONAL AND STATUTORY
### PROVISIONS INVOLVED

Pertinent constitutional and statutory provisions are reproduced in an appendix to this brief.  App., *infra*, at 1a-85a.

### STATEMENT

"The exclusion of aliens is a fundamental act of sovereignty" that rests on the "legislative power" and "is inherent in the executive power to control the foreign affairs of the nation."  *United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 542 (1950).  The Constitution and Acts of Congress thus both confer on the President broad authority to suspend or restrict the entry of aliens outside the United States when he deems it in the Nation's interest.  See 8 U.S.C. 1182(f), 1185(a)(1).  Past Presidents have routinely invoked that authority to restrict entry of aliens from abroad in order to advance national-security and foreign-policy objectives.

After a worldwide review of the processes for vetting aliens seeking entry from abroad, the President determined that it was necessary to impose tailored entry restrictions on certain nationals of eight countries whose governments do not share adequate information with the United States or have other national-security risk factors, in order to induce those governments to improve their cooperation and to protect this Nation until they do.  Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 27, 2017) (Proclamation) (Pet. App. 121a-148a).  The district court enjoined enforcement of the Proclamation worldwide, except as to aliens from two countries. Pet. App. 68a-106a.  This Court stayed the injunction pending appellate review.  *Trump* v. *Hawaii*, 138 S. Ct. 542 (2017).  The court of appeals affirmed except as to aliens who lack a credible claim of a bona fide

3

relationship with a person or entity in the United States. Pet. App. 1a-65a.

### A.  Legal Framework

1. Under the Immigration and Nationality Act (INA), ch. 477, 66 Stat. 163 (8 U.S.C. 1101 *et seq*.), admission to the United States normally requires a valid visa or other travel document.  See 8 U.S.C. 1181, 1182(a)(7)(A)(i) and (B)(i)(II), 1203.  Applying for a visa typically requires an in-person interview and results in a decision by a State Department consular officer. 8 U.S.C. 1201(a)(1), 1202(h); 22 C.F.R. 41.102, 41.121(a), 42.62, 42.81(a).  Although a visa normally is necessary for admission, it does not guarantee admission; the alien still must be found admissible upon inspection at a port of entry.  8 U.S.C. 1201(h), 1185(d), 1225(a); see 8 U.S.C. 1101(a)(4) (application for visa is distinct from application for admission).

In order to facilitate easier entry for certain low-risk travelers, Congress enacted the Visa Waiver Program to enable nationals of particular countries to seek short-term admission without a visa.  8 U.S.C. 1182(a)(7)(B)(iv); 8 U.S.C. 1187 (2012 & Supp. IV 2016).  In 2015, Congress excluded from travel under that Program most aliens who are nationals of or recent visitors to Iraq or Syria—where the Islamic State of Iraq and Syria (ISIS) maintained a formidable force—and countries designated by the Secretary of State as state sponsors of terrorism (Iran, Sudan, Syria, and, as of November 2017, North Korea).  8 U.S.C. 1187(a)(12)(A)(i) and (ii) (Supp. IV 2016); see 82 Fed. Reg. 56,100 (2017). Congress also authorized the Department of Homeland Security (DHS) to designate additional countries based on the threat of terrorism.

4

8 U.S.C. 1187(a)(12)(D)(i) and (ii) (Supp. IV 2016). In February 2016, applying those criteria, DHS designated recent travelers to Libya, Somalia, and Yemen.[1]

2. The INA establishes numerous grounds on which an alien abroad may be inadmissible to the United States and ineligible for a visa. See, *e.g.*, 8 U.S.C. 1182(a), 1201(g). Congress also has accorded the President broad authority to suspend or restrict the entry of aliens. Section 1182(f) of Title 8 provides in relevant part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Section 1185(a)(1) of Title 8 further grants the President broad authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe."

### B. The Executive Orders And Proclamation

1. Shortly after taking office, the President directed the Secretary of Homeland Security, in consultation with other agencies, to assess whether foreign governments provide adequate information to sufficiently vet foreign nationals applying for U.S. visas. Exec. Order No. 13,769, 82 Fed. Reg. 8977, 8977-8978 (Feb. 1, 2017)

---

[1] DHS, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://goo.gl/OXTqb5.

5

(EO-1).   Pending that review, EO-1 suspended for 90 days the entry of foreign nationals of the seven countries that Congress or the Executive had already recognized as posing heightened terrorism-related concerns in the context of the Visa Waiver Program, subject to case-by-case exceptions.  *Id.* at 8978.  A district court enjoined the entry suspension, and the Ninth Circuit declined to stay that injunction.  *Washington* v. *Trump*, 847 F.3d 1151, 1164-1167 (2017) (per curiam).

2.  Responding to the Ninth Circuit's decision, the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017) (EO-2) (Pet. App. 148a-172a), which again directed a worldwide review.  Pet. App. 157a-158a.  To diminish the risk that potentially dangerous individuals would enter without adequate vetting, and to reduce investigative burdens during the review, EO-2 temporarily suspended the entry (with exceptions) of foreign nationals from six of the countries previously covered by EO-1:  Iran, Libya, Somalia, Sudan, Syria, and Yemen.  *Id.* at 158a.  EO-2 explained that those countries had been singled out by Congress or the Executive because each "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones."  *Id.* at 152a; see *id.* at 149a-150a.[2]

EO-2's temporary entry suspension was partially enjoined by two district courts, and the Fourth and Ninth Circuits upheld those injunctions in substantial part. *IRAP* v. *Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc);

---

[2]  EO-2 did not suspend entry from Iraq, noting "the close cooperative relationship" between the U.S. and Iraqi governments and that, since the issuance of EO-1, "the Iraqi government ha[d] expressly undertaken steps" to supply information necessary to help identify possible threats.  Pet. App. 155a-156a.

6

*Hawaii* v. *Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam).  This Court granted certiorari and stayed the injunctions pending review except for aliens with a "credible claim of a bona fide relationship with" a U.S. person or entity.  *Trump* v. *IRAP*, 137 S. Ct. 2080, 2086, 2088-2089 (2017) (per curiam).  After EO-2's entry suspension expired, this Court vacated the lower courts' rulings as moot.  *Trump* v. *IRAP*, 138 S. Ct. 353 (2017) (citing *United States* v. *Munsingwear, Inc.*, 340 U.S. 36, 39 (1950)); *Trump* v. *Hawaii*, 138 S. Ct. 377 (2017) (same).[3]

3. a. DHS, in consultation with the State Department and the Office of the Director of National Intelligence, conducted the review EO-2 had directed.  Pet. App. 124a (Proclamation § 1(c)).  The agencies undertook "to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA * * * in order to determine that the individual is not a security or public-safety threat."  *Ibid.*  The review examined "[i]nformation-sharing and identity-management protocols and practices of foreign governments," because it is those governments that "manage the identity and travel documents of their nationals and residents" and "control the circumstances under which they provide

---

[3] EO-1 and EO-2 also included provisions addressing the U.S. Refugee Admissions Program. 82 Fed. Reg. at 8979-8980; Pet. App. 165a-166a.  When EO-2's refugee provision expired, the President issued an order generally resuming the Refugee Program, while noting that several Departments had announced ongoing efforts to improve refugee vetting and, in the interim, that they would temporarily suspend or deprioritize adjudicating certain categories of refugee applications. Exec. Order No. 13,815, 82 Fed. Reg. 50,055 (Oct. 27, 2017).  The Departments' temporary policies were challenged in various courts but are not at issue here (and have since expired).

7

* * * information about known or suspected terrorists and criminal-history information." *Id.* at 123a (§ 1(b)).

The agencies developed a "baseline" for the information required from foreign governments, which incorporated three components:

(i) identity-management information, *i.e.*, "information needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be," which includes "whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports";

(ii) national-security and public-safety information about whether a person seeking entry poses a risk, which includes "whether the country makes available * * * known or suspected terrorist and criminal-history information upon request," "whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States," and "whether the country provides passport and national-identity document exemplars"; and

(iii) a national-security and public-safety risk assessment, which includes "whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program * * * that meets all of [the Program's] requirements, and

8

whether it regularly fails to receive its nationals subject to final orders of removal from the United States."

Pet. App. 124a-125a (§ 1(c)).

DHS, in coordination with the State Department, collected and evaluated data regarding all foreign governments. Pet. App. 125a (§ 1(d)). Applying the baseline factors, DHS identified 16 countries as having "inadequate" information-sharing practices and risk factors, and another 31 countries as "at risk" of becoming "inadequate." *Id.* at 126a (§ 1(e)). The State Department then conducted a 50-day diplomatic engagement to encourage all foreign governments to improve their performance, yielding significant improvements from many countries. *Ibid.* (§ 1(f)). Multiple countries provided travel-document exemplars to combat fraud and/or agreed to share information on known or suspected terrorists. *Ibid.*

After completing the review, the Acting Secretary of Homeland Security identified seven countries that, even after diplomatic engagement, continue to have inadequate identity-management protocols or information-sharing practices, or other heightened risk factors: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. Pet. App. 126a-127a (§ 1(g) and (h)). She recommended that the President impose entry restrictions on certain nationals from those countries. *Ibid.* She also recommended entry restrictions for certain nationals of Somalia, because although Somalia generally satisfies the information-sharing component of the baseline standards, it has other heightened risk factors, including "identity-management deficiencies"

9

and a "significant terrorist presence." *Id.* at 130a-131a
(§ 1(i)).[4]

b. On September 24, 2017, after evaluating the Act-
ing Secretary's recommendations in consultation with
multiple Cabinet members and other officials, the Pres-
ident issued the Proclamation. Pet. App. 121a-148a; *id.*
at 128a-129a (§ 1(h)(i)). Considering numerous factors—
including each country's "capacity, ability, and willing-
ness to cooperate with our identity-management and
information-sharing policies and each country's risk
factors," as well as "foreign policy, national security,
and counterterrorism goals"—the President found that
entry of certain foreign nationals from the eight coun-
tries identified by the Acting Secretary "would be det-
rimental to the interests of the United States." *Id.* at
123a, 128a (Preamble, § 1(h)(i)).

Based on that finding and "in accordance with the
[Acting Secretary's] recommendations," the President
imposed tailored restrictions on those nationals' entry.
Pet. App. 128a-130a (§ 1(h)(i)-(iii)). He determined that
the restrictions are "necessary to prevent the entry of
those foreign nationals about whom the United States
Government lacks sufficient information to assess the
risks they pose to the United States," and "to elicit im-
proved identity-management and information-sharing
protocols and practices from foreign governments." *Id.*
at 128a-129a (§ 1(h)(i)). He explained that these "country-

---

[4] The Acting Secretary assessed that Iraq does not meet the base-
line, but she recommended not restricting entry of Iraqi nationals
given the close cooperative relationship between the U.S. and Iraqi
governments, the strong U.S. diplomatic presence in Iraq, the sig-
nificant presence of U.S. forces there, and Iraq's commitment to
combatting ISIS. Pet. App. 127a (§ 1(g)).

10

specific restrictions" would be the "most likely to encourage cooperation given each country's distinct circumstances," while "protect[ing] the United States until such time as improvements occur." *Id.* at 128a (§ 1(h)(i)).

For countries that refuse to cooperate regularly with the United States (Iran, North Korea, and Syria), the Proclamation largely suspends entry of all nationals, except for Iranians seeking nonimmigrant student (F and M) and exchange-visitor (J) visas. Pet. App. 132a-134a (§ 2(b)(ii), (d)(ii), and (e)(ii)). For countries that are valuable counter-terrorism partners but have deficiencies (Chad, Libya, and Yemen), the Proclamation suspends entry only of nationals seeking immigrant visas and nonimmigrant business, tourist, and business/tourist visas. *Id.* at 131a-135a (§ 2(a)(ii), (c)(ii), and (g)(ii)). For Somalia, the Proclamation suspends entry of nationals seeking immigrant visas and requires additional scrutiny of nationals seeking nonimmigrant visas, in light of the "special concerns that distinguish it from other countries." *Id.* at 135a-137a (§ 2(h)(i) and (ii)). For Venezuela, which refuses to cooperate in information sharing but for which alternative means are available to identify its nationals, the Proclamation suspends entry only of government officials "involved in screening and vetting procedures" and "their immediate family members" on nonimmigrant business or tourist visas. *Id.* at 134a-135a (§ 2(f)(i) and (ii)).

The Proclamation provides for exceptions and case-by-case waivers when a foreign national demonstrates undue hardship and that his entry would not pose a threat to the national security or public safety and would be in the national interest. Pet. App. 138a-139a (§ 3(c)(i)(A)-(C)). It also requires the agencies to assess on an ongoing basis whether entry restrictions should

11

be continued, modified, terminated, or supplemented, and to report to the President every 180 days. *Id.* at 142a-144a (§ 4).

**C. Procedural History**

Respondents are the State of Hawaii, three individuals (Dr. Ismail Elshikh, John Doe #1, and John Doe #2), and the Muslim Association of Hawaii, Inc. (Association). Pet. App. 72a. As relevant here, they filed suit in the District of Hawaii challenging the Proclamation's entry restrictions (except for nationals of North Korea and Venezuela) under the INA and the Establishment Clause. *Id.* at 76a n.8, 78a n.10. The individual respondents are U.S. citizens or lawful permanent residents who have relatives from Syria, Yemen, and Iran seeking immigrant or nonimmigrant visas. *Id.* at 82a-85a. The Association is a nonprofit organization that, among other things, operates mosques in Hawaii. *Id.* at 85a-86a.

1. The district court granted a worldwide TRO barring enforcement of the Proclamation's entry suspensions (except as to nationals of Venezuela and North Korea) and denied a stay. Pet. App. 70a-106a. The court held that the Proclamation violates the INA and "decline[d] to reach" respondents' other claims. *Id.* at 92a. The government did not oppose conversion of the TRO into a preliminary injunction. *Id.* at 68a-69a.

2. a. The government appealed and sought a stay. The court of appeals denied a stay except as to "foreign nationals who [do not] have a credible claim of a bona fide relationship with a person or entity in the United States." Pet. App. 66a (quoting *IRAP*, 137 S. Ct. at 2088). This Court then stayed the injunction in full pending the government's appeal and proceedings in this Court. *Hawaii*, 138 S. Ct. 542. The government thereafter put the Proclamation into full effect.

12

b. The court of appeals affirmed the injunction
based on the INA, except as to aliens without a credible
claim of a bona fide relationship with a person or entity
in the United States. Pet. App. 1a-65a. The court de-
clined to reach respondents' Establishment Clause
claims. *Id.* at 64a-65a.

The court of appeals first held that respondents'
statutory challenge to the Proclamation is justiciable.
Pet. App. 14a-24a. It found that respondents' claims are
ripe and are not precluded by the doctrine of consular
nonreviewability. *Id.* at 14a-18a. The court further de-
termined that respondents may seek review under the
Administrative Procedure Act (APA), 5 U.S.C. 701 *et
seq.*, or alternatively in an equitable action, Pet. App.
19a-24a.

On the merits, the court of appeals held that re-
spondents are likely to succeed on their statutory
claims. Pet. App. 24a-56a. The court held that the Proc-
lamation exceeds the President's authority under
8 U.S.C. 1182(f) and 1185(a)(1), reasoning that it fails to
make an adequate finding that entry of the excluded
aliens "would be detrimental to the interests of the
United States." Pet. App. 43a (quoting 8 U.S.C. 1182(f));
see *id.* at 34a-48a. The court further held that the Proc-
lamation exceeds limitations the court discerned in Sec-
tion 1182(f), because it imposes indefinite entry re-
strictions, pursues objectives addressed in part by
other INA provisions, and does not respond to an "exi-
genc[y]." *Id.* at 26a-42a. The court also held that the
Proclamation violates 8 U.S.C. 1152(a)(1)(A), which
bars "discriminat[ing]" or granting a "preference or
priority" in the "issuance of an immigrant visa because
of" an alien's "nationality." Pet. App. 48a-53a. The
court acknowledged that Presidents Carter and Reagan

13

had suspended entry of nationals of Iran and Cuba, respectively, but it dismissed those actions as "outliers." *Id.* at 53a.

The court of appeals determined that respondents would suffer irreparable harm without an injunction. Pet. App. 56a-58a.  The court largely affirmed the injunction's worldwide scope, excluding only "foreign national[s] who lack[] any connection to this country." *Id.* at 63a (citation omitted).

### D. Related Litigation

The Proclamation was also challenged in other courts.  A district court in Maryland entered a global preliminary injunction of the Proclamation's entry suspensions, except for nationals of Venezuela and North Korea as well as persons without "a credible claim of a bona fide relationship with a person or entity in the United States."  *IRAP* v. *Trump*, 265 F. Supp. 3d 570, 633 (2017).  The *IRAP* district court rejected arguments based on Section 1182(f) virtually identical to the ones the Ninth Circuit accepted, *id.* at 609-616, but held that the Proclamation violates Section 1152(a)(1)(A), *id.* at 605-609, and also the Establishment Clause, *id.* at 616-629. The government appealed and sought a stay, but the Fourth Circuit did not act on the government's stay motion.  The government accordingly sought a stay from this Court, which stayed the *IRAP* injunction pending appeal and proceedings in this Court.  *Trump* v. *IRAP*, 138 S. Ct. 542 (2017).

The Fourth Circuit, sitting en banc sua sponte, affirmed the preliminary injunction, concluding that the plaintiffs' constitutional claims are justiciable and that the Proclamation violates the Establishment Clause. *IRAP* v. *Trump*, No. 17-2231, 2018 WL 894413 (Feb. 15,

14

2018), slip op. 27-61. Four separate concurring opinions, none of which garnered a majority, reached varying distinct conclusions on the plaintiffs' statutory claims. *Id.* at 62-220. Judge Traxler dissented, explaining that, although he had voted to affirm an injunction of EO-2, the Proclamation "has sufficiently addressed [his] concerns" in light of the "investigation and analysis" of the multi-agency review process, the "consultation * * * between the President and his advisors," and "the logical conclusions and rationale for the Proclamation." *Id.* at 271-273. Judges Niemeyer, Agee, and Shedd also dissented on both justiciability and the merits. *Id.* at 221-270 (Niemeyer, J.); *id.* at 274-285 (Agee, J.).

### SUMMARY OF ARGUMENT

The court of appeals barred implementation of a formal national-security and foreign-relations directive of the President, acting at the height of his power and after consulting with multiple Cabinet-level officials. The court's ruling contradicts fundamental principles of judicial review, statutory and constitutional interpretation, and equitable relief; it also departs from decades of historical practice and improperly limits the Executive's authority to protect the Nation and its borders.

I. Respondents' statutory claims are foreclosed by the general rule that courts may not review the political branches' decisions to exclude aliens abroad. Congress has never authorized judicial review of claims like respondents', and the text, structure, and history of the INA show Congress understood and intended that such review is unavailable. Respondents cannot bypass that barrier by invoking the APA or equitable remedies. This Court has engaged in limited review of constitutional claims only where a U.S. citizen contended that

15

exclusion of an alien violated the citizen's own constitutional rights. But the Proclamation applies only to aliens abroad, who have no constitutional rights regarding entry, and respondents' claimed injuries here, which flow indirectly from the exclusion of third parties abroad, do not stem from any violation of respondents' *own* constitutional rights.

II. The Proclamation is a valid exercise of the President's broad authority under the INA. Congress has granted the President sweeping power to suspend or restrict entry of aliens abroad. 8 U.S.C. 1182(f), 1185(a)(1). The President lawfully exercised that power based on his express findings—following a worldwide, multi-agency review—that entry of the covered aliens would be detrimental to the national interest in light of their governments' inadequate information-sharing practices or other risk factors. The President imposed restrictions that he determined are best suited to induce improved cooperation by foreign governments and to protect this Nation in the interim.

The court of appeals improperly invalidated the President's judgment based on its erroneous views that the INA requires the President to articulate publicly an even more detailed justification, and further that the President's authority to suspend entry must be used only for a limited time and during circumstances the court considered "exigent." Those views cannot be squared with the INA's text, its context, or longstanding historical practice. The court impermissibly substituted its own determinations for the President's judgment on matters Congress and the Constitution have entrusted to the Executive.

The court of appeals further erred in holding that the Proclamation violates 8 U.S.C. 1152(a)(1)(A)'s bar on

16

nationality-based discrimination in the issuance of immigrant visas. Section 1152(a)(1)(A) does not mention the process for obtaining entry as opposed to seeking a visa, and it does not compel issuance of visas to aliens who are ineligible to receive them under some other provision of the INA, including 8 U.S.C. 1182(f) or 1185(a)(1) through a presidential order suspending entry for national-security and foreign-policy reasons. The court's novel construction of Section 1152(a)(1)(A) would have rendered unlawful past actions by Presidents Carter and Reagan, and would raise grave constitutional questions by constraining the ability of this and future Presidents to discharge their duties.

III. The Proclamation also does not violate the Establishment Clause. Respondents' claim is governed by, and fails under, *Kleindienst* v. *Mandel*, 408 U.S. 753 (1972), which requires upholding the Proclamation because it rests on a "facially legitimate and bona fide reason." *Id.* at 770. The Proclamation's tailored restrictions are expressly based on the President's national-security and foreign-policy judgments informed by the worldwide review of multiple agency heads whose motives have never been questioned. The Proclamation further sets forth a detailed factual basis for those determinations. *Mandel*'s rational-basis standard precludes "look[ing] behind" the President's judgments. *Ibid.*

Respondents' claim would fail even under domestic Establishment Clause precedent. The Proclamation's "'text, legislative history, and implementation'" all confirm that its "official objective" is religion-neutral. *McCreary County* v. *ACLU of Ky.*, 545 U.S. 844, 862 (2005) (citation omitted). The multi-agency review that

17

produced the Proclamation and its tailored entry restrictions dispel any contention that it is infused with religious animus.   The Fourth Circuit in *IRAP* v. *Trump*, No. 17-2231, 2018 WL 894413 (Feb. 15, 2018) (en banc), imputed an improper religious motive to the Proclamation by focusing on EO-2 and relying on other extrinsic material.   Slip op. 40-53.   This Court's precedent prohibits such "judicial psychoanalysis of a drafter's heart of hearts."   *McCreary*, 545 U.S. at 862.

IV.   The court of appeals compounded its error by affirming global injunctive relief.   Article III and principles of equity require confining injunctive relief to only what is necessary to redress cognizable injuries to the parties before the court.   Even if respondents had shown such injury, it could be fully redressed by relief limited to enjoining application of the Proclamation to the specific aliens whose denial of entry harms respondents.

## ARGUMENT

### I.   RESPONDENTS' CHALLENGE TO THE PROCLAMATION IS NOT JUSTICIABLE

It is a fundamental separation-of-powers principle, long recognized by this Court and Congress in the INA, that the political branches' decisions to exclude aliens abroad generally are not judicially reviewable.   That principle bars any review of respondents' statutory claims.   Respondents have also invoked the Establishment Clause, but they assert no cognizable violation of their *own* rights under that Clause.

18

## A. Respondents' Statutory Claims Are Not Justiciable

### 1. Congress has not authorized review of respondents' statutory claims

a. This Court "ha[s] long recognized the power to * * * exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy* v. *United States ex rel. Mezei*, 345 U.S. 206, 210 (1953)). Because "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power," "[s]uch matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades* v. *Shaughnessy*, 342 U.S. 580, 588-589 (1952) (Jackson, J.). This Court has accordingly held that "[t]he conditions of entry for every alien, the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, [and] the grounds on which such determination shall be based" are "wholly outside the power of this Court to control." *Fiallo*, 430 U.S. at 796 (citation omitted).

Of course, Congress generally "may, if it sees fit, * * * authorize the courts to" review decisions to exclude aliens. *Nishimura Ekiu* v. *United States*, 142 U.S. 651, 660 (1892) (citation omitted). Absent such affirmative authorization, however, judicial review of the exclusion of aliens outside the United States is unavailable. "Whatever the rule may be concerning deportation of persons who have gained entry into the United States," this Court has explained, "it is not within the province

19

of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 543 (1950); see *id.* at 542-547 (Attorney General's decision to exclude alien wife of U.S. citizen "for security reasons" was "final and conclusive"); see also *Saavedra Bruno* v. *Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (denial of visa to an alien abroad "is not subject to judicial review * * * unless Congress says otherwise"); *IRAP* v. *Trump*, No. 17-2231, 2018 WL 894413 (4th Cir. Feb. 15, 2018) (*IRAP*) (en banc), slip op. 236-239 (Niemeyer, J., dissenting).

Courts have referred to this principle as "the doctrine of consular nonreviewability," *Saavedra Bruno*, 197 F.3d at 1159, but that shorthand label merely reflects the context in which the principle most often arises: challenges to visa-denial decisions by consular officers. The principle underlying that doctrine applies regardless of how the Executive decides to deny entry to an alien abroad.

b. That longstanding principle is now embodied in the INA. In 8 U.S.C. 1252, Congress established a comprehensive statutory framework for judicial review of decisions concerning aliens' ability to enter or remain in the United States, including aliens who lack a visa or are found inadmissible. But that review is available only to aliens who are physically present in the United States. Neither Section 1252 nor any other provision of the INA provides for judicial review of the denial of a visa or entry to an alien abroad, or of a determination that such an alien is inadmissible. Indeed, Congress has expressly rejected a cause of action to seek judicial review of visa denials—even by the alien affected, much less by third parties like respondents. *E.g.*, 6 U.S.C.

20

236(f) (no "private right of action" to challenge decision "to grant or deny a visa"); see 6 U.S.C. 236(b)(1) and (c)(1).

The one time this Court held that aliens physically present in the United States could seek review of their exclusion orders under the APA, the Court emphasized it was *not* "suggest[ing]" that "an alien who has never presented himself at the borders of this country may avail himself of the declaratory judgment action by bringing the action from abroad." *Brownell* v. *Tom We Shung*, 352 U.S. 180, 184-186 & n.3 (1956). Congress then intervened to foreclose APA review even for aliens present here, see *Saavedra Bruno*, 197 F.3d at 1157-1162, because allowing such APA suits would "give recognition to a fallacious doctrine that an alien has a 'right' to enter this country which he may litigate in the courts of the United States against the U.S. government as a defendant," H.R. Rep. No. 1086, 87th Cong., 1st Sess. 33 (1961). Congress therefore precluded APA suits challenging exclusion orders and permitted review only through habeas corpus—a remedy that is unavailable to an alien seeking entry from abroad. See Act of Sept. 26, 1961, Pub. L. No. 87-301, § 5(a), 75 Stat. 651-653 (8 U.S.C. 1105a(b) (Supp. III 1961)).[5] Both this Court's opinion and Congress's statutory response confirm the principle that aliens abroad have no right to judicial review of their exclusion.

c. The court of appeals nonetheless held that the nonreviewability rule does not apply to respondents' statutory claims, Pet. App. 16a-18a, but its reasons lack merit. First, the court stated that this Court's prece-

---

[5] Congress subsequently replaced 8 U.S.C. 1105a (1994) with 8 U.S.C. 1252 (Supp. II 1996).

21

dents permit "narrow judicial review" of decisions to exclude aliens. *Id.* at 16a (citation omitted). But the primary decision on which the court relied, *Fiallo*, 430 U.S. at 794-795, referred to certain types of *constitutional* claims, which this Court has treated differently from statutory claims, see Part I.B, *infra*.[6]

Second, the court of appeals stated that the rule of nonreviewability applies only to "individual visa denials" by consular officers, not to presidential directives suspending entry of aliens. Pet. App. 16a-18a. That distinction is fundamentally flawed. The nonreviewability rule rests on the separation-of-powers principle that the exclusion of aliens abroad is a foreign-policy and national-security judgment committed to the political branches, and thus bars judicial review "of decisions made by the Congress *or the President* in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (emphasis added; citation omitted); *Knauff*, 338 U.S. at 542. It would invert the constitutional structure to deny review of decisions by consular officers—subordinate Executive Branch officials—while permitting review of the President's national-security and foreign-relations

---

[6] The court of appeals also cited *Zivotofsky ex rel. Zivotofsky* v. *Clinton*, 566 U.S. 189 (2012), Pet. App. 16a, but that case did not involve the exclusion of aliens abroad. The court further cited *Abourezk* v. *Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) (R.B. Ginsburg, J.), aff'd by an equally divided Court, 484 U.S. 1 (1987) (per curiam), which held that the APA authorized review. Pet. App. 16a-17a. But as the D.C. Circuit subsequently explained, *Abourezk* "rested in large measure" on an INA provision that was later amended to "make[] clear that district courts do not have general jurisdiction over claims arising under the immigration laws." *Saavedra Bruno*, 197 F.3d at 1164.

22

judgments. See *IRAP*, slip op. 249-250 (Niemeyer, J., dissenting).[7]

Third, the court of appeals concluded that *Sale* v. *Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), "foreclose[s]" the nonreviewability rule here. Pet. App. 17a. *Sale*, however, rejected the aliens' claims on the merits without addressing, much less rejecting, the argument that their claims were unreviewable, and it therefore does not control that issue here. See *Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 91 (1998). The Court in *Sale* also considered only the aliens' asserted right under a U.S. treaty and implementing statute not to be returned to their home country, see 509 U.S. at 158-159, whereas the aliens here have no such claim but rather seek entry into the United States. Moreover, the Court in *Sale* did not question the President's determination under Section 1182(f) that entry of the affected aliens would be detrimental to the interests of the United States. See *id.* at 171-172, 187-188. Respondents here, by contrast, have asked the courts to second-guess that very determination.

### 2. *Neither the APA nor principles of equity authorize review of respondents' statutory claims*

The court of appeals concluded that respondents' statutory claims are reviewable both under the APA, 5 U.S.C. 702, and at equity. Pet. App. 19a-23a. The court was wrong on both counts.

---

[7] *Knauff* does not suggest that aliens abroad are entitled to judicial review of a presidential order denying them entry. See *IRAP*, slip op. 70-71 (Gregory, J., concurring). *Knauff* involved an alien who was detained at a port of entry (Ellis Island), and review was based on habeas corpus. 338 U.S. at 539-540; see *Nishimura Ekiu*, 142 U.S. at 660.

23

a. i. As an initial matter, the APA embraces the general rule of nonreviewability. First, the APA does not apply "to the extent that * * * statutes preclude judicial review," 5 U.S.C. 701(a)(1), which is "determined not only from [a statute's] express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block* v. *Community Nutrition Inst.*, 467 U.S. 340, 345 (1984) (*CNI*). Here, the conclusion is "unmistakable" from the INA's text, structure, and history—especially Congress's abrogation of *Tom We Shung*—that "the immigration laws 'preclude judicial review' of the consular visa decisions." *Saavedra Bruno*, 197 F.3d at 1160 (citation omitted); see p. 20, *supra*.

Second, the APA's cause of action expressly leaves intact other "limitations on judicial review." 5 U.S.C. 702(1). "[T]he doctrine of consular nonreviewability—the origin of which predates passage of the APA—thus represents one of" those areas "'in which legislative action [and] traditional practice indicate that courts are unqualified or that issues are inappropriate for judicial determination.'" *Saavedra Bruno*, 197 F.3d at 1160 (citation omitted; brackets in original). The nonreviewability rule accordingly precludes APA suits challenging the denial of entry to aliens abroad, *ibid.*, and the President's actions are not reviewable under the APA at all, see *Franklin* v. *Massachusetts*, 505 U.S. 788, 800-801 (1992).

ii. APA review is unavailable here for two additional reasons. First, the APA does not permit review of action "committed to agency discretion by law." 5 U.S.C. 701(a)(2). The statutes that authorize the Proclamation, 8 U.S.C. 1182(f) and 1185(a)(1), "exude[] deference" to the President and "foreclose the application of any

24

meaningful judicial standard of review." *Webster* v. *Doe*, 486 U.S. 592, 600 (1988). The court of appeals stated that Section 701(a)(2) "does not apply" because respondents allege that the President "exceeded [his] statutory authority." Pet. App. 21a. But virtually any challenge to the Executive's exercise of discretion conferred by statute could be recast in those terms. The court's position would eviscerate the "longstanding" rule that "[h]ow the President chooses to exercise the discretion Congress has granted him"—here in 8 U.S.C. 1182(f) and 1185(a)(1)—"is not a matter for [judicial] review." *Dalton* v. *Specter*, 511 U.S. 462, 474, 476 (1994).

Second, the APA's "general cause of action" exists only for "persons adversely affected or aggrieved by agency action within the meaning of a relevant statute," *CNI*, 467 U.S. at 345 (citation and quotation marks omitted)—*i.e.*, persons to whom Congress intended to accord privately enforceable rights. See *Thompson* v. *North Am. Stainless, LP*, 562 U.S. 170, 177-178 (2011). None of the statutes respondents invoke confers on any third party in the United States a judicially cognizable interest in the denial of a visa or entry to an alien abroad. Sections 1182(f) and 1185(a)(1) confer discretion on the President, not rights on private parties. And Section 1152(a)(1)(A) is addressed to *aliens* seeking immigrant visas, not their relatives or other persons or entities in the United States.

The court of appeals stated that respondents are within the zone of interests of *other* INA provisions that authorize U.S. citizens and permanent residents to petition for the classification of certain relatives as immigrants. Pet. App. 22a. But those other provisions are immaterial because they are not the ones "whose violation forms the legal basis for [respondents'] complaint."

25

*Lujan* v. *National Wildlife Fed'n*, 497 U.S. 871, 883 (1990). The court identified no cognizable right conferred on respondents by the particular INA provisions they invoke: Sections 1182(f), 1185(a), and 1152(a)(1)(A).[8] Moreover, even when the INA permits a U.S. person to petition for a foreign relative's classification as eligible for immigrant status, any interest he has "terminate[s]" "[w]hen [his] petition [i]s granted." *Saavedra Bruno*, 197 F.3d at 1164. Nothing in the INA permits the U.S. person to go on and challenge the later denial of a visa to his relative. *A fortiori*, persons or entities that the INA does not entitle even to petition for classification of aliens (*e.g.*, the Association) cannot challenge the denial of a visa.[9]

---

[8] The court of appeals cited cases addressing constitutional claims, Pet. App. 21a, but those are subject to different standards, see Part I.B, *infra*. The court also cited *Legal Assistance for Vietnamese Asylum Seekers* v. *Department of State*, 45 F.3d 469 (D.C. Cir. 1995) (*LAVAS*), vacated on other grounds, 519 U.S. 1 (1996) (per curiam), but the reasoning of that vacated ruling cannot be reconciled with the D.C. Circuit's subsequent decision in *Saavedra Bruno*, 197 F.3d at 1164.

[9] The APA is limited to "final agency action." 5 U.S.C. 704. If review were available at all, it would require respondents to show particular aliens who have applied for a visa, been found eligible to receive one, and been denied a visa and a waiver under the Proclamation. See *National Wildlife Federation*, 497 U.S. at 891 (an APA claim is not "ripe" until the agency takes "some concrete action applying the regulation  * * *  in a fashion that harms or threatens to harm [the plaintiff]"). Respondents have asserted that "the mother of one of the John Does has had her visa denied" and that they would "supplement the record to reflect this fact." Br. in Opp. 9 & n.4. But respondents' representation only underscores that most of the respondents have suffered no cognizable injury and that, if injunctive relief were warranted at all, the lower courts should have confined relief only to persons who have received final decisions.

26

b. The court of appeals alternatively held that respondents may obtain review through an equitable cause of action. Pet. App. 23a. But the "judge-made remedy" of equitable relief to enjoin executive action does not permit plaintiffs to sidestep "express and implied statutory limitations" on judicial review of nonconstitutional claims, such as under the APA; "'[c]ourts of equity can no more disregard'" those limitations than may "'courts of law.'" *Armstrong* v. *Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384-1385 (2015) (citation omitted) (federal statute "implicitly preclude[d] private enforcement" actions "in equity"). Indeed, a suit for injunctive or declaratory relief is the primary vehicle for challenging government action under the APA itself. See 5 U.S.C. 703. Exempting equitable actions from the nonreviewability rule would eviscerate both that rule and the APA's other limits on judicial review.

## B. Respondents' Establishment Clause Claim Is Not Justiciable

Constitutional claims are judicially reviewable unless "clear[ly]" "preclude[d]." *Webster*, 486 U.S. at 603. But respondents have not demonstrated a violation of their *own* Establishment Clause rights, because the Proclamation applies only to aliens abroad, who have no such rights.

1. The exclusion of aliens abroad typically raises no constitutional questions because "an alien who seeks admission to this country may not do so under any claim of right." *Knauff*, 338 U.S. at 542. "Admission of aliens to the United States is a privilege granted by the sovereign United States Government," and "only upon such terms as the United States shall prescribe." *Ibid.*; see *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Kleindienst* v. *Mandel*, 408 U.S. 753, 762 (1972).

27

This Court has, however, twice engaged in limited judicial review when a U.S. citizen contended that the denial of a visa to an alien abroad violated the citizen's own constitutional rights. In *Mandel*, the Court considered a claim by U.S. citizens that the denial of a waiver of visa-ineligibility to a Belgian national who wished to speak to U.S. citizens about communism violated the citizens' own First Amendment right to receive information. 408 U.S. at 756-759, 762-770. And in *Kerry* v. *Din*, 135 S. Ct. 2128 (2015), the Court considered a claim by a U.S. citizen that the exclusion of her husband violated her own due-process rights. *Id.* at 2131 (opinion of Scalia, J.); *id.* at 2139 (Kennedy, J., concurring in the judgment).

2. *Mandel* and *Din* do not help respondents because respondents' claimed injuries do not stem from alleged infringement of their own Establishment Clause rights. In *McGowan* v. *Maryland*, 366 U.S. 420 (1961), this Court held that individuals who are indirectly injured by alleged religious discrimination against others generally may not sue, because they have not suffered violations of their own constitutional rights to religious freedom. *Id.* at 429-430; see *Elk Grove Unified Sch. Dist.* v. *Newdow*, 542 U.S. 1, 15-18 & n.8 (2004). The *McGowan* Court concluded that the plaintiffs— employees of a store subject to a State's Sunday-closing law—lacked standing to challenge that law on free-exercise grounds because they "d[id] not allege any infringement of their own religious freedoms." 366 U.S. at 429. By contrast, the plaintiffs could pursue their Establishment Clause claim, because they alleged a "direct * * * injury, allegedly due to the imposition on them of the tenets of the Christian religion": namely,

28

they had been prosecuted under the Sunday-closing law. *Id*. at 430-431; see *id*. at 422.

Here, the Proclamation does not regulate respondents at all; it applies only to aliens abroad. Respondents claim that the Proclamation violates the Establishment Clause because it discriminates against their foreign-national relatives, clients, and potential students. See Resps. C.A. Br. 6, 13. But U.S. plaintiffs cannot assert a derivative Establishment Clause claim predicated on indirect effects of alleged discrimination against aliens who themselves have no rights to assert. Put another way, the Proclamation cannot plausibly be said to discriminate against respondents or any other U.S. citizens or residents on the basis of religion, because they are not subject to the Proclamation and their religion is irrelevant to its operation. And respondents' foreign relatives and associates have no rights to claim under the Establishment Clause. For those reasons, all of the Establishment Clause standing cases cited by the Fourth Circuit, see *IRAP*, slip op. 31-32, are inapposite.

The individual respondents and the Association asserted below that the Proclamation conveys a message "denigrat[ing]" their religion, Pet. App. 82a, and the Fourth Circuit held that the plaintiffs had standing to assert an Establishment Clause claim on the same basis, *IRAP*, slip op. 33-34. But even beyond the absence of any religious message, that purported stigmatic injury is not a basis for standing. See *id*. at 283-285 (Agee, J., dissenting). This Court has "ma[de] clear" that "the stigmatizing injury often caused by racial [or other invidious] discrimination * * * accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory

29

conduct." *Allen* v. *Wright*, 468 U.S. 737, 755 (1984) (citation omitted). Although *Allen* applied that rule to an equal-protection claim, see *IRAP*, slip op. 33 n.6, the Court has applied the same rule to Establishment Clause claims: "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not the type of "personal injury" that supports standing, "even though the disagreement is phrased in [Establishment Clause] terms." *Valley Forge Christian Coll.* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-486 (1982).

To be sure, a plaintiff may suffer a "spiritual" injury from the violation of his own Establishment Clause rights where he himself has been "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them." *Valley Forge*, 454 U.S. at 486-487 n.22. But the Proclamation says nothing about religion and does not subject respondents to any religious exercise. Allowing a putative Establishment Clause plaintiff to "re-characterize[ ]" an abstract injury flowing from "government *action*" directed against others as a personal injury from "a governmental *message* [concerning] religion" directed at the plaintiff would "eviscerate well-settled standing limitations." *In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008) (Kavanaugh, J.), cert. denied, 556 U.S. 1167 (2009). Respondents' position would mean that the plaintiffs in *Valley Forge* would have had standing if they had simply alleged that the transfer of land without cost to a Christian college sent a pro-Christian or anti-atheist message. That cannot be correct.

30

\* \* \* \* \*

By reaching out to resolve the merits of respondents' challenge, the court of appeals departed from foundational principles of justiciability deeply rooted in the structure of the Constitution, the INA, and the APA. The Court should reverse the judgment below on that basis alone.

## II. THE PROCLAMATION IS A LAWFUL EXERCISE OF THE PRESIDENT'S AUTHORITY TO SUSPEND OR RESTRICT ENTRY OF ALIENS ABROAD

Even if respondents' statutory claims were justiciable, the court of appeals' ruling that the Proclamation violates the INA rests on fundamental misunderstandings of the statute. Congress has granted the President broad authority to suspend the entry of aliens abroad based on his determination that their entry would be detrimental to the national interest. The President lawfully exercised that authority based on detailed findings after a worldwide, multi-agency review and recommendation process. The court of appeals imposed limitations on the President's authority that have no basis in the statutory text, that contradict historical practice, and that would severely constrain the ability of this and future Presidents to discharge their duties. See *IRAP*, slip op. 250-260 (Niemeyer, J., dissenting).

### A. The Proclamation Is Authorized By 8 U.S.C. 1182(f), 8 U.S.C. 1185(a)(1), And The Constitution

The court of appeals held that the President failed to make sufficient findings of detriment to the national interest and that the Proclamation oversteps substantive limitations on his statutory and constitutional power. Both conclusions are incorrect.

31

***1. The President validly exercised his statutory authority to suspend entry of aliens in the national interest***

a.  The INA grants the President broad authority to suspend or restrict entry of aliens abroad.  Section 1182(f) provides in pertinent part:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. 1182(f).

By its terms, Section 1182(f) confirms the President's discretion at every turn.  It reserves to him the decisions (1) whether, when, and on what basis to suspend entry ("[w]henever [he] finds that the entry" of aliens "would be detrimental" to the national interest); (2) whose entry to suspend ("all aliens or any class of aliens," whether as "immigrants or nonimmigrants"); (3) for how long ("for such period as he shall deem necessary"); (4) and on what terms ("any restrictions he may deem to be appropriate").  8 U.S.C. 1182(f).  As courts have recognized, Section 1182(f) confers a "sweeping proclamation power" to suspend entry of aliens based on findings that would not otherwise mandate inadmissibility under the INA.  *Abourezk* v. *Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.), aff'd by an equally divided Court, 484 U.S. 1 (1987) (per curiam).

32

Section 1185(a)(1) additionally makes it "unlawful" for an alien to "depart from or enter  * * *  the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."  8 U.S.C. 1185(a)(1). This provision is different from Section 1182(f) in at least two respects:  first, it does not require a determination of detriment to the national interest; and, second, it allows the President to regulate both entry and departure.

Notwithstanding the differences, today these provisions substantially overlap when the President suspends or restricts entry because Congress has repeatedly expanded the President's power.  The authority now codified in Section 1185(a)(1), first enacted in 1918 and expanded in 1941, was always understood to allow the President to exclude aliens but was previously confined to times of "war" and "national emergency."  Act of May 22, 1918, ch. 81, § 1(a), 40 Stat. 559; Act of June 21, 1941, ch. 210, § 1, 55 Stat. 252-253.  In 1952, Congress reenacted that authority without change, and at the same time it granted the President specific authority to suspend or restrict entry, in what is now Section 1182(f).  INA §§ 212(e), 215(a)(1), 66 Stat. 188, 190.  Congress recognized that Section 1185(a)(1) conferred broad power but was subject to wartime and national-emergency limitations, whereas the new authority in Section 1182(f) was not subject to those limits.  H.R. Rep. No. 1365, 82d Cong., 2d Sess. 53 (1952) (House Report); S. Rep. No. 1137, 82d Cong., 2d Sess. 14 (1952) (Senate Report) (same).  In 1978, Congress amended Section 1185(a)(1) to its current form, removing the war-or-emergency limitation.  Foreign Relations Authorization Act, Fiscal

33

Year 1979 (FRAA), Pub. L. No. 95-426, § 707(a), 92 Stat. 992-993.

The court of appeals disregarded this history, concluding that Section 1185(a)(1) is more general than Section 1182(f), and therefore that the latter alone controls every presidential entry suspension.  Pet. App. 47a-48a.  That was incorrect, but this Court need not resolve here the precise relationship between the two statutes because, as explained below, the Proclamation is consistent with both.

b. The President lawfully exercised the authority Congress conferred in Sections 1182(f) and 1185(a)(1). The Proclamation "suspend[s]" and "restrict[s]" "entry" of certain "class[es] of aliens," 8 U.S.C. 1182(f), based on the President's express finding that, "absent the measures set forth in [the Proclamation], the immigrant and nonimmigrant entry into the United States of persons described in section 2 of [the Proclamation] would be detrimental to the interests of the United States," Pet. App. 122a-123a (Preamble).

Moreover, the President set forth his reasoning in detail.  The Proclamation explains that the multi-agency review process demonstrated deficiencies in the information shared by certain foreign governments, or other risk factors.  Pet. App. 123a-131a (§ 1).  "Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness" of the United States' "screening and vetting protocols" because it is governments that manage "identity and travel documents of their nationals and residents" and "control the circumstances under which they provide  * * *  information about known or suspected terrorists and criminal-history information."  *Id.*

34

at 123a (§ 1(b)).  Entry of the restricted foreign nation-
als would be detrimental to the national interest be-
cause "the United States Government lacks sufficient
information to assess the risks they pose to the United
States." *Id.* at 128a-129a (§ 1(h)(i)).[10]

In addition, the President considered foreign-policy
goals and determined that the entry restrictions are
"needed to elicit improved identity-management and
information-sharing protocols and practices from for-
eign governments." Pet. App. 128a-129a (§ 1(h)(i)).  He
therefore "craft[ed] those country-specific restrictions
that" in his judgment "would be most likely to encour-
age cooperation given each country's distinct circum-
stances," while "protect[ing] the United States until
such time as improvements occur." *Ibid.*  To ensure
that the restrictions remain in force only as long as
needed "to address th[e] inadequacies and risks" the
Proclamation identified, *id.* at 128a (§ 1(h))—which is to
say, the period the President "deem[ed] necessary,"
8 U.S.C. 1182(f)—he further directed the Department
of State to continue to engage with the deficient coun-
tries, with the goal of "relax[ing] or remov[ing]" the
Proclamation's entry suspensions "as soon as possible."
Pet. App. 128a (§ 1(h)); see *id.* at 143a (§ 4(b)).

c. The court of appeals nevertheless held that the
Proclamation is not authorized because Section 1182(f)
requires the President to "provide a rationale"—which
the court must deem sufficient—"why permitting entry

---

[10] As the Proclamation explains, it does not set forth details
regarding all of the reasons for the restrictions imposed on each
country because "[d]escribing all of those reasons publicly  * * *
would cause serious damage to the national security of the United
States, and many such descriptions are classified."  Pet. App. 131a
(§ 1(j)).

35

of nationals [covered by the Proclamation] would be detrimental to the interests of the United States." Pet. App. 43a (citation omitted). The court concluded that the Proclamation's findings and explanations were insufficient. See *id.* at 44a-46a. Both the court's interpretation of the statute and its application of that test here were deeply misguided.

i.  Section 1182(f) does not require the President to articulate detailed findings before he may suspend or restrict entry of aliens abroad.  The court of appeals' contrary interpretation turns upside down the broad grant of authority in the statutory text.  The sole prerequisite Congress imposed in Section 1182(f) is that the "President find[]" that entry of covered aliens "would be detrimental to the interests of the United States," 8 U.S.C. 1182(f), and the Proclamation expressly makes that finding.  Congress did not require the President to explain publicly and in detail the basis for his conclusions.  And although the court of appeals objected to the breadth of the Proclamation, see Pet. App. 38a, the statute expressly contemplates that the President may make the relevant determinations on a broad scale, authorizing him to "suspend the entry of all aliens or any class of aliens."  8 U.S.C. 1182(f).

*Webster* v. *Doe*, *supra*, confirms that the court of appeals erred in reading Section 1182(f) to require detailed explanations.  In *Webster*, this Court confronted a statute that similarly granted the Director of Central Intelligence authority to terminate an employee if he "*deem*[*ed*] such termination necessary or advisable in the interests of the United States." 486 U.S. at 600 (citation omitted).  The Court "s[aw] no basis on which a reviewing court could properly assess an Agency termination

36

decision." *Ibid.* So too here, Section 1182(f) "fairly exudes deference to the [President]" and "appears * * * to foreclose the application of any meaningful judicial standard of review." *Ibid.*

Deference is especially warranted because the President's determinations directly implicate his core foreign-affairs and national-security responsibilities. See, *e.g.*, *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1861 (2017). As this Court has explained, "[t]he Executive should not have to disclose its * * * reasons for deeming nationals of a particular country a special threat," or even when it "simply wish[es] to antagonize a particular foreign country by focusing on that country's nationals," because the reasons may rest on classified or sensitive material. *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) (*AAADC*). And even if the President does disclose his reasons, courts are "ill equipped to determine their authenticity and utterly unable to assess their adequacy." *Ibid.* The court of appeals erred by supplanting the deference owed to the Executive's foreign-policy and national-security judgments with a standard of searching judicial scrutiny.

The court of appeals' insistence on detailed explanations is also irreconcilable with historical practice. Presidential orders dating back decades have suspended or restricted entry without publicly disclosing detailed justifications. Many have explained the President's rationale in one or two sentences that broadly declare the Nation's interests. See, *e.g.*, Proclamation No. 6958, 61 Fed. Reg. 60,007 (1996) (President Clinton) ("In light of the refusal of the Government of Sudan to comply with [U.N. Security Council resolutions], I have determined that it is in the foreign policy interests of the United States to restrict the entry into the

37

United States of aliens described in  * * *  this procla-
mation.").[11]

ii.  Even if the court of appeals' interpretation of Sec-
tion 1182(f) were correct, its conclusion that the Procla-
mation's findings are inadequate still could not stand
because the Proclamation sets forth in detail the bases
for the President's national-interest determination.  See
pp. 6-10, 33-34, *supra*.  The Proclamation is more de-
tailed as a matter of both process and substance than
any prior order issued by a President under Section
1182(f) or 1185(a)(1).  The court of appeals' criticisms of
the President's findings lack merit.

The court of appeals faulted the Proclamation for not
finding that "nationality alone renders entry of this
broad class of individuals a heightened security risk to
the United States," or that "nationality  * * *  renders
their entry into the United States on certain forms of
visas detrimental to the interests of the United States."
Pet. App. 45a-46a.  The court, however, simply misun-
derstood the Proclamation's stated rationale.  The Pres-
ident did not find that all nationals of the covered coun-
tries are likely terrorists—nor did he have to.  Rather,
because those countries' governments have deficiencies
in information sharing or other risk factors, the Presi-
dent determined that it was in the national interest to
restrict entry of aliens who could not be vetted with ad-
equate information—both to protect national security
and to elicit improvement by those governments.

---

[11] See also Proclamation No. 8693, 76 Fed. Reg. 44,751 (2011)
(President Obama); Proclamation No. 7524, 67 Fed. Reg. 8857
(2002) (President G.W. Bush); Proclamation No. 4865, 46 Fed.
Reg. 48,107 (1981) (President Reagan); Exec. Order No. 12,172, 44 Fed.
Reg. 67,947 (1979) (President Carter).

38

The court of appeals found that explanation insufficient because "there is no finding that the present vetting procedures are inadequate." Pet. App. 44a. That is manifestly incorrect. The Proclamation explains that "the [deficient] countries' identity-management protocols, information-sharing inadequacies, and other risk factors" deprive the United States of "sufficient information to assess the risks [their nationals] pose to the United States." *Id.* at 127a-128a (§ 1(h)-1(h)(i)).

The court of appeals did not accept respondents' position that inducing foreign governments to improve is an invalid basis for suspending entry. See Resps. C.A. Br. 28; see also *IRAP*, slip op. 146 (Keenan, J., concurring). And for good reason: Presidents have frequently invoked Sections 1182(f) and 1185(a)(1) in part to further diplomatic goals.[12] Instead, the court of appeals deemed the Proclamation's explanation inadequate because "[t]he *degree* of desired improvement is left unstated." Pet. App. 44a (emphasis added). But even if Section 1182(f) required such mathematical precision—

---

[12] See, *e.g.*, Exec. Order No. 13,712, 80 Fed. Reg. 73,633 (2015) (President Obama) (suspending entry of persons who "undermine democratic processes or institutions" in Burundi, in light of "national security and foreign policy" interests of the United States); Proclamation No. 8015, 71 Fed. Reg. 28,541 (2006) (President G.W. Bush) (suspending entry of persons responsible for actions that "impede[d] the transition to democracy in Belarus" in light of, *inter alia*, "the importance to the United States of fostering democratic institutions"); Proclamation No. 6958, 61 Fed. Reg. 60,007 (1996) (President Clinton) (suspending entry of governmental and military personnel of Sudan, citing "foreign policy interests of the United States" based on refusal to comply with U.N. Security Council resolution); Proclamation No. 5887, 53 Fed. Reg. 43,185 (1988) (President Reagan) (suspending entry of certain Nicaraguan nationals in light of, *inter alia*, expulsion of U.S. diplomats).

39

which it obviously does not—the Proclamation indicates that the deficient countries are expected to improve to meet the baseline criteria it identifies. *Id.* at 124a-125a (§ 1(c)). By contrast, many past presidential orders have included no details regarding the desired degree of improvement. See, *e.g.*, Proclamation No. 8342, 74 Fed. Reg. 4093 (2009) (President Obama) (suspending entry of foreign government officials responsible for failing to combat human trafficking "until such time as the Secretary of State determines that [the suspension] is no longer necessary").

The court of appeals discounted the President's diplomatic analysis, opining "there is little evidence" that the Proclamation "will, indeed, incentivize countries to improve their practices." Pet. App. 27a. The court had no warrant to substitute its own assessment for the Executive's "[p]redictive judgment[s]" on matters of foreign policy and national security. *Department of the Navy* v. *Egan*, 484 U.S. 518, 529 (1988). Such judgments "are delicate, complex, and involve large elements of prophecy," and "ha[ve] long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & S. Air Lines, Inc.* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

Moreover, experience under the Proclamation and the President's prior Orders shows that his approach was well founded. After EO-1 imposed a temporary suspension on nationals of Iraq, "the Iraqi government * * * expressly undert[ook] steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal." Pet. App. 156a (EO-2 § 1(g)). And after the review process ordered by EO-2 initially identified deficient countries, the State Department's 50-day diplomatic-engagement

40

period "yielded significant improvements in many countries." *Id.* at 126a (Proclamation § 1(f)). The court of appeals' speculative second-guessing of the President's foreign-policy determination was unwarranted.

### 2. *The President's authority to suspend entry is not subject to the court of appeals' atextual limitations*

In addition to determining that the Proclamation lacked sufficient findings, the court of appeals concluded that the Proclamation's specific entry restrictions exceed the President's statutory authority. Pet. App. 25a. The court erroneously read into the statute limitations that cannot be squared with its text or well-settled historical practice.

a. The court of appeals held that the Proclamation's entry suspensions violate Section 1182(f) because they lack a fixed end date. Pet. App. 26a. "The word 'suspend,'" it reasoned, "'connotes a temporary deferral,'" not restrictions "of unlimited and indefinite duration." *Ibid.* (citations omitted). The Proclamation makes clear, however, that it is intended to remain in force only as long as needed "to address th[e] inadequacies and risks" it identified. *Id.* at 128a (§ 1(h)). The President directed the State Department to continue to engage with the deficient governments, and he requested an ongoing review of and regular reports on whether the entry suspensions should be modified or terminated, "so that the restrictions and limitations imposed by this proclamation may be relaxed or removed as soon as possible." *Ibid.*; *id.* at 142a-145a (§§ 4, 5).

The President was not required to prescribe in advance a date certain on which the entry restrictions will expire. Section 1182(f) authorizes the President to suspend entry "for such period as he shall deem nec-

41

essary." 8 U.S.C. 1182(f).   When the President sus-
pends entry in response to a diplomatic dispute or ad-
verse conditions in a foreign country—as past Presi-
dents have done—he may "deem" a suspension "neces-
sary" even though he does not know in advance how
long that situation will persist.  See, *e.g.*, Proclamation
No. 5829, 53 Fed. Reg. 22,289 (1988) (President Reagan)
(suspending entry of certain Panamanian nationals "un-
til such time as  * * *  democracy has been restored in
Panama").  So too here, the President validly suspended
entry until the conditions that gave rise to the suspen-
sion are redressed.

The court of appeals' decision is also contrary to
longstanding historical practice.  As the court itself rec-
ognized, in nearly every instance, past Presidents' "or-
ders or proclamations invoking [Section] 1182(f) did not
provide for a set end date."  Pet. App. 26a n.10; see
pp. 37-38 nn.11-12, *supra*.  The court responded that
those orders were "narrower in scope than the Procla-
mation."  Pet. App. 26a n.10.  But the text does not tie
substantive breadth to temporal duration:  the court's
sliding-scale view of Section 1182(f)—*i.e.*, the more
countries a suspension includes, the shorter in duration
it must be, all subject to judicial weighing—has no basis
in the statute.  And it runs headlong into Congress's ex-
press grant of exclusive authority to the *President* to
determine how long a suspension should last.

b. The court of appeals also concluded, drawing on
legislative debates over Section 1182(f), that entry sus-
pensions must be confined to an "exigency" where "it
would be difficult, if not impossible, for Congress to
react" promptly.  Pet. App. 33a-34a.  That limitation
likewise has no footing in Section 1182(f)'s text, and
courts should not "allow[ ] ambiguous legislative history

42

to muddy clear statutory language." *Milner* v. *Department of the Navy*, 562 U.S. 562, 572 (2011). In any event, the text, legislative history, and historical practice all undermine the Ninth Circuit's reasoning.

As discussed, when Congress enacted Section 1182(f) in 1952, it consciously departed from the predecessor to Section 1185(a)(1), which at the time limited the President's entry-suspension authority to times of war or national emergency. See p. 32, *supra*. Some Members objected to the breadth of the President's power under Section 1182(f) and proposed amendments to cabin it similarly. See Pet. App. 32a; 98 Cong. Rec. 4423 (1952) (statement of Rep. Multer). But Congress enacted Section 1182(f) without those proposed limitations. Then later, Congress removed the war-or-exigency limitation from Section 1185(a)(1). See pp. 32-33, *supra*. The statutory text and history thus unambiguously foreclose the court of appeals' conclusion that Sections 1182(f) and 1185(a)(1) are limited to "exigent" circumstances.

Notwithstanding the clear text, the court of appeals noted that, in debating Section 1182(f), some Members gave examples where it would be difficult or impossible for Congress to act. Pet. App. 33a. Of course, "[w]here, as here, "the text of the [relevant] statute" is plain, it controls. *Pittston Coal Grp.* v. *Sebben*, 488 U.S. 105, 115 (1988). In any event, the legislative history itself contradicts the court of appeals' conclusion that the statute is limited to exigencies, because some Members argued that Section 1182(f) would give the President "very, very broad" authority "in times of emergency, and in time of nonemergency, to shut off immigration"—and no one suggested otherwise. 98 Cong. Rec. 4304-4305 (1952) (statement of Rep. Celler); see 98 Cong. Rec. at

43

4423 (statement of Rep. Multer); 98 Cong. Rec. 5114 (1952) (statement of Sen. Lehman); see also Senate Report 4 (minority views); House Report 53.

The court of appeals' insistence on an "exigency" limitation also contradicts decades of historical practice. Presidents have repeatedly suspended entry for reasons unrelated to crises that Congress could not address—for example, in retaliation for *past* harmful actions abroad.[13]   In all of those instances, it was the President—not courts—who determined that suspending entry was warranted as a diplomatic tool.   And although some retaliatory suspensions were directed at particular aliens or fast-moving situations, others were directed at entire nationalities due to ongoing disputes with their governments.   In August 1986, for example, President Reagan invoked Section 1182(f) to "suspend entry into the United States as immigrants by all Cuban nationals," subject to exceptions, in retaliation for Cuba's decision in May 1985—more than a year earlier—to suspend an immigration agreement.   Proclamation No. 5517, 51 Fed. Reg. 30,470 (Aug. 26, 1986).

c.   The court of appeals further held that the President was not permitted to invoke, as a justification for suspending entry, concerns that are related to those addressed by other INA provisions.   Pet. App. 28a-32a.   For example, the court noted that Section 1182(a)

---

[13] See, *e.g.*, Proclamation No. 8697, 76 Fed. Reg. 49,277 (2011) (President Obama) (suspending entry of persons who committed serious human-rights abuses); Proclamation No. 7750, 69 Fed. Reg. 2287 (2004) (President G.W. Bush) (suspending entry of persons who have engaged in or benefitted from various forms of corruption); Proclamation No. 6749, 59 Fed. Reg. 54,119 (1994) (President Clinton) (suspending entry of persons who provided support to Bosnian Serb forces in violation of U.N. Security Council resolutions).

44

excludes aliens who have "engaged in a terrorist activity" or committed various crimes. *Id.* at 29a (citation omitted). In the court's view, the President may not suspend aliens on related grounds.

The court of appeals fundamentally misunderstood the role of Section 1182(f) in the INA. Section 1182(f) vests authority in the President to impose *additional* limitations on entry beyond those that would already be grounds for exclusion under the INA. The Proclamation thus does not "nullif[y]" any provision of the INA, including Section 1182(a)'s inadmissibility criteria based on terrorism ties or criminal history. Pet. App. 32a. To the contrary, it complements those inadmissibility criteria by taking steps to improve the vetting process for determining whether they apply.

The D.C. Circuit correctly recognized Section 1182(f)'s role in supplementing Section 1182(a)'s inadmissibility grounds in its decision in *Abourezk*. There, as then-Judge Ginsburg explained, although the State Department could not exclude certain aliens under one of Section 1182(a)'s inadmissibility grounds based on their membership in particular organizations (because another part of Section 1182(a) addressed that very issue and required a greater showing), Section 1182(f)'s "sweeping" authority allowed the President to exclude those aliens even if they were not barred by Section 1182(a). 785 F.2d at 1049 n.2, 1056-1058; accord *Allende* v. *Shultz*, 845 F.2d 1111, 1118-1119 (1st Cir. 1988).

Moreover, contrary to the court of appeals' reasoning, Congress's decisions regarding the Visa Waiver Program do not suggest that the President is disabled from invoking Section 1182(f) to address foreign governments' deficient information sharing. When Con-

45

gress created a faster lane for low-risk travelers (primarily tourists) from certain countries for short-term stays, and then denied that benefit to dual nationals of or recent travelers to certain other high-risk countries, Congress did not implicitly prohibit further improvements to the vetting system.  Nor did it bar the President from using his independent authority to protect national security and conduct foreign relations based on similar concerns.  The INA is a vast and complex statute, and virtually any international incident or national-security concern could arguably be related to something that Congress has already addressed somewhere in the INA.  If that relation alone disabled the President from invoking Section 1182(f), it would cripple the Executive's ability to use that authority to protect the Nation and conduct foreign affairs.

d.  Finally, the court of appeals sought to justify its cramped interpretation of Section 1182(f) as necessary to avoid a perceived nondelegation problem.  Pet. App. 39a-42a.  As this Court made clear in *Knauff* when rejecting a similar challenge to Section 1185(a)(1)'s precursor, nondelegation concerns are at their nadir in the context of excluding aliens abroad, because that authority "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." 338 U.S. at 542.  Statutes broadly vesting authority in the President on matters affecting foreign affairs and national security are supported by consistent legislative practice that dates "almost from the inception of the national government."  *United States* v. *Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 322 (1936); see *id.* at 322-328 (describing such statutes); see also, *e.g.*, *Crosby* v. *National Foreign Trade Council*, 530 U.S.

46

363, 374-375 (2000). At a minimum, nondelegation concerns cast no doubt on the President's invocation of Section 1182(f) to address matters at the core of his foreign-affairs and national-security authority, which is precisely where the Proclamation operates.

The court of appeals resisted this conclusion, reasoning that Congress has "exclusive" authority to regulate entry of aliens abroad. Pet. App. 39a (citation omitted). *Knauff* squarely forecloses that view. 338 U.S. at 542. And no case cited by the court of appeals supports it—indeed, none even addressed a claim that Congress had impermissibly delegated authority to the President to exclude aliens abroad. In *Galvan* v. *Press*, 347 U.S. 522, 531 (1954), the Court held that an alien may not challenge his removal from the United States under the Ex Post Facto Clause. In *Arizona* v. *United States*, 567 U.S. 387, 409 (2012), the Court held that a State's statutes were preempted by federal immigration policy. In *Clinton* v. *City of New York*, 524 U.S. 417, 439 (1998), and *INS* v. *Chadha*, 462 U.S. 919, 951-952 (1983), the Court confronted statutes that permitted the Executive Branch or a single House of Congress to undo the operation of laws duly enacted by Congress and signed by the President, outside the process prescribed by Article I. Section 1182(f) does no such thing; it gives the President power to suspend entry in situations when he deems it necessary on grounds beyond those the INA itself prescribes. As for *Zivotofsky ex rel. Zivotofsky* v. *Kerry*, 135 S. Ct. 2076 (2015), although the Court explained that the President's inherent authority over foreign affairs is not all encompassing, *id.* at 2089-2090, it ruled in favor of the President on the specific foreign-

47

affairs question presented there despite an explicitly contrary statutory directive, *id.* at 2094-2095.[14]

### 3. *The court of appeals' narrow view of the President's constitutional authority is incorrect*

After erroneously concluding that the Proclamation exceeds the President's statutory authority, the court of appeals proceeded to address whether it is supported by the President's inherent constitutional authority, and concluded that it is not. Pet. App. 54a-56a. The court should not have reached that constitutional question, and there is no need for this Court to do so, because the Proclamation falls well within the President's express authority under Sections 1182(f) and 1185(a)(1). But the court of appeals took an improperly narrow view of the Executive's constitutional authority in this area.

The court of appeals reasoned that "control over the entry of aliens is a power within the exclusive province of Congress." Pet. App. 54a. As discussed above, that premise is flatly contradicted by *Knauff*, which confirms that the President's authority to exclude aliens "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." 338 U.S. at 542. Accordingly, the court was wrong to conclude that the President's authority here is

---

[14] As further support for its "[c]onstitutional [a]voidance" holding, the court of appeals cited *Zemel* v. *Rusk*, 381 U.S. 1, 7-8 (1965), and *United States* v. *Witkovich*, 353 U.S. 194, 199 (1957). Pet. App. 39a-42a. But both cases are inapposite because they concerned regulation of citizens or aliens already present in this country, not aliens abroad. So too did *Zadvydas* v. *Davis*, 533 U.S. 678, 693 (2001), *Kent* v. *Dulles*, 357 U.S. 116, 118 (1958), and *The Japanese Immigrant Case*, 189 U.S. 86, 101 (1903), cited in *IRAP*, slip op. 98-99 (Gregory, J., concurring). None of those cases creates any doubt about Section 1182(f)'s constitutionality.

at its "lowest ebb." Pet. App. 54a (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J. concurring)). Quite to the contrary, the Proclamation is a quintessential exercise of the President's power at its peak. See *Youngstown*, 343 U.S. at 635-637.

Recognition of the President's role in these areas dates to the Founding. Although the court of appeals analogized the Proclamation to the "absolute Tyranny" of King George III, Pet. App. 55a-56a (quoting The Declaration of Independence para. 2 (U.S. 1776)), the Framers described "[t]he actual conduct of foreign negotiations" as a part of "the administration of government" that "falls peculiarly within the province of the executive department." The Federalist No. 72, at 486-487 (Alexander Hamilton) (Cooke ed., 1961); see 4 Jonathan Elliott, *The Debates in the Several State Conventions, on the Adoption of the Federal Constitution* 140-141 (2d ed. 1836) (statement of James Iredell at N. Carolina ratifying convention) (the President is to "regulate all intercourse with foreign powers"). The court of appeals took a cramped and ahistorical view of the President's authority to control the Nation's borders and supervise entry into the United States.

### B. The Proclamation Is Consistent With 8 U.S.C. 1152(a)(1)(A)

The court of appeals also held that the Proclamation is inconsistent with 8 U.S.C. 1152(a)(1)(A), which prohibits "discriminat[ion]" or granting a "preference or priority" in the "issuance of an immigrant visa because of," *inter alia*, an alien's "nationality." *Ibid.*; Pet. App. 48a-53a. That provision addresses the issuance of immigrant visas to aliens *who are otherwise eligible* for visas. Section 1152(a)(1)(A) has no effect on aliens who

49

are not permitted to enter the United States because of
other INA provisions, including Sections 1182(f) and
1185(a)(1).  The court's contrary interpretation creates
a conflict between those provisions where none exists,
disregards historical practice, and raises serious ques-
tions about Section 1152(a)(1)(A)'s constitutionality.

### 1. Section 1152(a)(1)(A) does not conflict with the President's authority under Sections 1182(f) and 1185(a)(1)

a. The court of appeals read Section 1152(a)(1)(A)'s
rule regarding "issuance of an immigrant visa" to con-
flict with the President's entry-suspension authority
under Sections 1182(f) and 1185(a)(1).  Pet. App. 50a.
But there is no conflict because the statutes, by their
terms, address different subjects.

i.  The court of appeals misunderstood the differ-
ence between admissibility to enter the United States
and issuance of visas.  A visa is a travel document:  it is
issued by a State Department consular officer, and it
allows an alien to "obtain transportation to the United
States" and seek admission at a port of entry.  1 Charles
Gordon et al., *Immigration Law and Procedure*
§ 8.04[1] (2017).  A visa, however, may not be issued if
the applicant "is ineligible to receive a visa  * * *  under
[S]ection 1182."  8 U.S.C. 1201(g).  Section 1182 lists
many such grounds of ineligibility, including health,
criminal history, terrorist affiliation, potentially serious
adverse foreign-policy consequences—and a presiden-
tial determination under Section 1182(f) that the alien's
entry would be detrimental to the interests of the
United States.  Moreover, even when a visa is issued, it
does not entitle an alien "to be admitted [to] the United
States, if, upon arrival at a port of entry in the United

50

States, he is found to be inadmissible under this chapter, or any other provision of law," including Section 1182(f) or 1185(a)(1).  8 U.S.C. 1201(h); see 8 U.S.C. 1185(d); see also *IRAP*, slip op. 253-254 (Niemeyer, J., dissenting).

Section 1152(a)(1)(A) thus operates in a different sphere than Sections 1182(f) and 1185(a)(1).  It provides that, *within* the universe of aliens who have not been barred from entering the country or receiving a visa, consular officers and other governmental officials may not discriminate on the basis of nationality when issuing immigrant visas.  The text of the statutes underscores that critical distinction.  Sections 1182(f) and 1185(a)(1) grant "the President" authority to suspend or restrict "entry" of aliens.  By contrast, Section 1152(a)(1)(A) does not mention the President and does not mention entry into the United States.  See *Sale*, 509 U.S. at 171-173 (a statutory reference to particular executive officials did not encompass power vested in the President under Section 1182(f)).  It refers instead to "the issuance of an immigrant visa," 8 U.S.C. 1152(a)(1)(A), a function typically performed by consular officers under the State Department's authority.  See 8 U.S.C. 1152(a)(1)(B) (preserving State Department's authority to set procedures for "processing of immigrant visa applications"); 8 U.S.C. 1104; 8 U.S.C. 1201 (2012 & Supp. IV 2016); 6 U.S.C. 236(b) and (c).

Congress would not have limited Section 1152(a)(1)(A) to the issuance of immigrant visas if it had meant to bar the *President* from adopting a nationality-based suspension of *entry* under Section 1182(f) or 1185(a)(1). Under Sections 1201(h) and 1185(d), issuance of an immigrant visa does not permit entry of an alien if he is

51

inadmissible under another provision of the INA, including Section 1182(f) or 1185(a)(1). For this reason, if aliens are subject to a presidential entry suspension under Section 1182(f) or 1185(a)(1), issuing them immigrant visas accomplishes nothing; they still can be refused entry. The State Department's practice therefore, consistent with Section 1201(g), has been to treat aliens covered by presidential orders under Section 1182(f) as ineligible for visas. See U.S. Dep't of State, 9 *Foreign Affairs Manual* 302.14-3(B) (2017). That approach makes practical sense, as there would be little reason to issue a visa to an alien who is barred from entering the country, only for the alien to travel to this Nation and be denied entry upon arrival at the border.

ii. The court of appeals rejected this reading of the statutory text, but none of its reasons has merit. It stated that, even though Section 1152(a)(1)(A) says nothing about the President's authority to suspend entry, it must be construed to constrain that authority in order to prevent the President from "circumvent[ing]" Section 1152(a)(1)(A). Pet. App. 51a. But Section 1152(a)(1)(A) targets nationality-based discrimination by the State Department against immigrant-visa-eligible aliens, and thus it is not "circumvented" if the President exercises his separate authority to suspend entry of certain aliens for national-security and foreign-policy reasons. Put differently, if an alien abroad is subject to the Proclamation and does not qualify for a waiver, he is denied an immigrant visa because he is "ineligible" to enter "under [S]ection 1182" for national-security and foreign-policy reasons, 8 U.S.C. 1201(g)—

52

not "because of" the type of nationality-based discrimination in immigrant-visa issuance prohibited by 8 U.S.C. 1152(a)(1)(A).[15]

The court of appeals invoked the legislative history of Section 1152(a)(1)(A), Pet. App. 49a-50a, but that likewise does not support the court's conclusion.  As the court noted, the 1965 amendment enacting what is now Section 1152(a)(1)(A) was designed to eliminate the prior country-based quota system for immigrants.  *Ibid.*  The legislative history indicates, however, that Section 1152(a)(1)(A) was not designed to constrain the President's authority to protect the national interest and conduct foreign affairs, or to modify the eligibility criteria for admission or limit preexisting restraints on eligibility or entry such as those in Section 1182(f) or 1185(a)(1).  See H.R. Rep. No. 745, 89th Cong., 1st Sess. 12-13 (1965) ("Under this [new] system, selection from among those *eligible to be immigrants* * * * will be based upon the existence of a close family relationship to U.S. citizens or permanent resident aliens and not on the existing basis of birthplace or ancestry.") (emphasis added); S. Rep. No. 748, 89th Cong., 1st Sess. 11, 13 (1965) (similar).  This does not mean that the President could use Section 1182(f) or 1185(a)(1) to revive the quota system, which would contradict Section 1152(a)(1)'s core purpose.  But the Proclamation does nothing of the sort.  Its restrictions are based on particularized risk factors or deficiencies in the information that some foreign governments provide.

---

[15] The court of appeals relied on *LAVAS*, Pet. App. 50a, but that case involved the government's refusal to process visa applications for Vietnamese immigrants at certain locations; it did not involve a presidential order denying entry, 45 F.3d at 471-473.  *LAVAS* was also abrogated by statute.  See 8 U.S.C. 1152(a)(1)(B).

53

b.  Historical practice further refutes the court of appeals' interpretation.  Section 1152(a) has never been viewed as a constraint on the President's suspension authority, and Presidents have invoked Section 1182(f) to draw distinctions based in part on nationality.  As mentioned, President Reagan invoked Section 1182(f) to "suspend entry into the United States as immigrants by all Cuban nationals," subject to exceptions.  Proclamation No. 5517, 51 Fed. Reg. 30,470.

Likewise, President Carter invoked Section 1185(a)(1) to deny and revoke visas to Iranian nationals.  In 1979, the Office of Legal Counsel concluded that that provision authorizes the President to "declare that the admission of Iranians or certain classes of Iranians would be detrimental to the interests of the United States." *Immigration Laws and Iranian Students*, 4A Op. O.L.C. 133, 140.  President Carter thus ordered the Secretary of State and the Attorney General to limit "entry" of Iranian nationals.  Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (1979) (Iranians holding nonimmigrant visas), amended by Exec. Order 12,206, 45 Fed. Reg. 24,101 (1980) (expanding directive to encompass all Iranian nationals); see *Nademi* v. *INS*, 679 F.2d 811, 814 (10th Cir.), cert. denied, 459 U.S. 872 (1982).  President Carter explained that the State Department would implement that directive by immediately "invalidat[ing] all visas issued to Iranian citizens for future entry into the United States" and "w[ould] not reissue visas" or "issue new visas, except for compelling and proven humanitarian reasons or where the national interest of our own country requires."[16]

---

[16] The American Presidency Project, Jimmy Carter, *Sanctions Against Iran Remarks Announcing U.S. Actions* (Apr. 7, 1980), https://goo.gl/4iX168.

54

The court of appeals' interpretation would render the orders of Presidents Reagan and Carter unlawful. The court did not disagree; it merely observed that "those restrictions were never challenged in court" and dismissed them as "outliers." Pet. App. 53a. The court's reasoning misses the point: although Presidents have suspended entry for different reasons, when the purpose of the suspension has been to bring pressure on a foreign government, some Presidents have extended the suspension to nationals of that country generally. This Court should hesitate to throw that historical practice to the wind based on a novel and atextual interpretation of Section 1152(a)(1).

c. The court of appeals' interpretation also would invite rather than avoid grave constitutional questions. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Construing Section 1152(a)(1)(A) to prevent the President from suspending entry based in part on nationality would undermine the President's Article II authority as Commander-in-Chief and his power over foreign affairs because it would mean that, by statute, the President could not suspend entry of aliens from a specified country even if he were aware of a particular threat from an unidentified national of that country, or the United States were on the brink of war with it.

The court of appeals declined to decide whether a President could suspend entry based on nationality "under special circumstances and for a limited time." Pet. App. 53a. But there is no textual basis for such ad hoc exceptions. The absence of any such textual exception is strong evidence that Congress did not mean Section 1152(a)(1)(A) to intrude on the President's authority to suspend entry based on the Nation's security and

55

foreign-policy interests. Nor is the judiciary well suited to determine what constitutes "special circumstances" in matters of national security. See *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 34 (2010) ("[W]hen it comes to collecting evidence and drawing factual inferences" in the national-security context, "'the lack of competence on the part of the courts is marked,' and respect for the Government's conclusions is appropriate.") (citation omitted). Section 1152(a)(1)(A) provides no standards that would enable the judiciary to assess whether the situation in North Korea justifies entry restrictions but the terrorist threats in Chad, Somalia, Syria, and Yemen, for example, do not. Section 1152(a)(1)(A) can and should be construed to avoid asking the judiciary to second-guess those inherently Executive determinations.

### 2. *In the event of a conflict, Section 1152(a)(1)(A) does not restrict the President's exercise of his authority under Sections 1182(f) and 1185(a)(1)*

Even if Section 1152(a)(1)(A) were thought to pose some conflict with Sections 1182(f) and 1185(a)(1), the latter would control for at least two reasons.

First, Section 1152(a)(1)(A) contains no clear indication that Congress intended its limitation on immigrant-visa issuance by consular officers to supersede the *President's* authority to suspend entry. "While a later enacted statute * * * can sometimes operate to amend or even repeal an earlier statutory provision[,] * * * 'repeals by implication are not favored' and will not be presumed unless the 'intention of the legislature to repeal [is] clear and manifest.'" *National Ass'n of Home Builders* v. *Defenders of Wildlife*, 551 U.S. 644, 662 (2007) (brackets in original; citation omitted). The same is true of "implied amendments," which "are no more

56

favored than implied repeals." *Id.* at 664 n.8.  Although Section 1152(a)(1)(A) was enacted later in time (in 1965) than Section 1182(f) (in 1952), nothing in Section 1152(a)(1)(A)'s text—which does not mention either entry or the President—demonstrates a "clear and manifest" congressional intent to narrow Section 1182(f)'s special grant of authority.  *Id.* at 662 (citation omitted).  And Section 1152(a)(1)(A) was adopted before Section 1185(a)(1) was modified to its current form in 1978—leaving Section 1185(a)(1) as the latest provision in time and thus the controlling one even on the Ninth Circuit's approach.  See FRAA § 707(a), 92 Stat. 992-993.

Second, whereas Section 1152(a)(1)(A) sets a general rule prohibiting discrimination on various grounds in the issuance of immigrant visas, Section 1182(f) confers a more specific power directly on the President to suspend or restrict entry of aliens when he finds that the "interests of the United States" so require.  The court of appeals observed that Section 1152(a)(1)(A) expressly enumerates certain exceptions but does not include Sections 1182(f) and 1185(a).  Pet. App. 52a.  But the INA makes clear that the exceptions to Section 1152(a)(1)(A) are not exhaustive:  other provisions authorize the Secretary of State to deny visas to nationals from any country that refuses or unreasonably delays accepting its nationals who are subject to final orders of removal from this country, 8 U.S.C. 1253(d), or to deny entry where "the Secretary of State has reasonable ground to believe [the alien's entry] would have potentially serious adverse foreign policy consequences for the United States," which might well take account of nationality, 8 U.S.C. 1182(a)(3)(C)(i).  Congress may have enumerated the specific exceptions that it did because those provisions were simultaneously amended in connection

57

with Congress's repeal of the quota system.  See Act of Oct. 3, 1965, Pub. L. No. 89-236, §§ 1, 3, 8(a), 79 Stat. 911-916 (8 U.S.C. 1101(a)(27), 1151(b), 1153 (Supp. I 1965)).  In light of the presumption against implied repeal, however, Congress had no need to specify that it was not overriding the President's existing authority to suspend or restrict entry based on his finding of the national interest.

### 3. *Section 1152(a)(1)(A) cannot justify enjoining the Proclamation*

At a bare minimum, Section 1152(a) cannot support the injunction entered below.  Section 1152(a)(1)(A) is expressly limited to the issuance of "immigrant visa[s]," so even if the court of appeals were correct that it prevails over Sections 1182(f) and 1185(a)(1) and forbids the government from withholding visas to aliens subject to the Proclamation, it could not justify enjoining the Proclamation's suspension of *entry*.  The court failed to address this limitation on Section 1152(a)(1)(A)'s scope. Pet. App. 51a n.23.  Similarly, the court's rationale cannot justify enjoining the Proclamation as to aliens seeking *nonimmigrant* visas.  The district court recognized this limitation on the statute's reach, *id.* at 101a-102a n.20, but the court of appeals never addressed it.  Over the last three fiscal years, approximately ninety percent of visas issued to nationals from the countries covered by the Proclamation were nonimmigrant visas.[17]  Even on its own terms, then, the court of appeals' statutory analysis cannot support the injunction as to the great majority of aliens affected by the Proclamation.

---

[17] See Bureau of Consular Affairs, U.S. Dep't of State, *Report of the Visa Office 2017*, Tbls. XIV, XVIII, https://goo.gl/zuGnxH.

58

### III. THE PROCLAMATION DOES NOT VIOLATE THE ESTABLISHMENT CLAUSE

Respondents contended below, and the Fourth Circuit in *IRAP* concluded, that the Proclamation violates the Establishment Clause. Pet. App. 64a; *IRAP*, slip op. 40-53. That contention fails because the President's national-security and foreign-relations determinations provide "a facially legitimate and bona fide reason" for the Proclamation's restrictions. *Mandel*, 408 U.S. at 770. Even applying respondents' preferred test, the Proclamation's process and substance dispel any plausible argument that it had religious animus as its "official objective." *McCreary County* v. *ACLU of Ky.*, 545 U.S. 844, 862 (2005). Its tailored restrictions draw no religious distinctions and were adopted after a worldwide review of security risks by multiple agency heads whose motives have never been questioned.

#### A. The Proclamation Is Constitutional Under *Mandel* And *Din*

1. a. Respondents' Establishment Clause challenge is governed by *Mandel*, which this Court recently described as providing for "minimal scrutiny (rational-basis review)." *Sessions* v. *Morales-Santana*, 137 S. Ct. 1678, 1693 (2017). In *Mandel*, the Attorney General (through his delegee) denied admission to a Belgian journalist, Ernest Mandel, who wished to speak about communism. 408 U.S. at 756-759. This Court rejected a First Amendment challenge by U.S. citizens who wished to hear Mandel speak because the Executive gave "a facially legitimate and bona fide reason" for denying Mandel a waiver of inadmissibility: Mandel had violated the conditions of a previous visa. *Id.* at 770; see *id.* at 759, 769. When the Executive supplies such a reason, this Court held, "courts will neither look behind

59

the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens. *Id.* at 770.

That deferential standard reflects the Constitution's "exclusive[]" allocation of power over the admission of aliens to the "political branches." *Mandel*, 408 U.S. at 765 (citation omitted); see *Fiallo*, 430 U.S. at 792-796. It also reflects that aliens outside the United States seeking a visa or initial admission have no constitutional rights at all regarding entry into the country. In this context, *Mandel*'s limited requirement of "a facially legitimate and bona fide reason" for exclusion, 408 U.S. at 770, accords the necessary respect for the Nation's sovereign authority to protect its borders, even if a further assessment might be called for in purely domestic contexts. See *Demore* v. *Kim*, 538 U.S. 510, 521 (2003).

*Mandel*'s approach has particular force here for three reasons. First, courts are generally "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's "reasons for deeming nationals of a particular country a special threat." *AAADC*, 525 U.S. at 491. Those limitations require a standard that does not entail probing government officials' subjective intentions or second-guessing national-security determinations. Second, the Proclamation is an exercise of the broad authority that Congress expressly granted to the President to suspend entry of classes of aliens abroad. Just as Congress's legislative determinations regarding admissibility of classes of aliens must be sustained if supported by a "facially legitimate and bona fide reason," *Fiallo*, 430 U.S. at 794-795, so too must the President's exercise of power Congress has given him. Third, Congress vested

60

that expansive authority directly in the President himself, in recognition of his unique constitutional role in matters of foreign affairs and national security.  Congress's expansive grant of authority means that the President's power "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky*, 135 S. Ct. at 2083-2084 (citation omitted).

b. *Mandel* compels rejecting respondents' Establishment Clause challenge.  The Proclamation is explicitly premised on facially legitimate purposes:  protecting national security and the national interest by preventing entry of persons about whom the United States lacks sufficient information to assess the risk they pose, and furthering foreign policy by encouraging other nations to improve their practices.  Pet. App. 121a-131a (Preamble, § 1); see *IRAP*, slip op. 41 (assuming that Proclamation's purpose is facially legitimate).

The Proclamation also sets forth a bona fide factual basis for that justification.  It describes the worldwide, multi-agency review process and the neutral criteria against which all nations were assessed.  Pet. App. 124a-126a (§ 1(c)-(f)).  It explains the inadequacies that the review revealed in certain countries' information-sharing practices, and other risk factors, that could not be resolved through diplomatic engagement.  *Id.* at 126a-128a (§ 1(g) and (h)).  The Proclamation then sets forth, on a country-by-country basis, many of the risks and other considerations the President found that warrant the restrictions imposed.  *Id.* at 131a-137a (§ 2); see pp. 8-10, *supra*.  The Proclamation thus amply establishes a "facially legitimate and bona fide reason" for its restrictions.  *Mandel*, 408 U.S. at 770.

61

2.  Respondents argued below, and the Fourth Circuit concluded, that *Mandel*'s reference to a "bona fide" reason and Justice Kennedy's concurring opinion in *Din*, *supra*, permit courts to "look behind" the Proclamation's stated rationale and search for pretext. *IRAP*, slip op. 41-42 (citations omitted); see D. Ct. Doc. 382, at 18 (Oct. 15, 2017).  That is incorrect.

i.  *Mandel* expressly rejected "look[ing] behind" the government's stated reason for denying a waiver of grounds of inadmissibility.  408 U.S. at 770.  The Court declined Justice Marshall's invitation in dissent to take "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver," which he asserted was a "sham."  *Id.* at 778; see *IRAP*, slip op. 245 (Niemeyer, J., dissenting).  Instead, the Court applied what it has termed "rational-basis review," *Morales-Santana*, 137 S. Ct. at 1693, which assesses only whether the denial of entry is rationally related to the government's stated, facially legitimate objective.  See *United States R.R. Ret. Bd.* v. *Fritz*, 449 U.S. 166, 179 (1980) (under rational-basis review, if "there are plausible reasons for" the challenged action, the "inquiry is at an end").

The Fourth Circuit's approach is also irreconcilable with *Mandel*'s central holding that the exclusion of aliens abroad calls for especially deferential judicial review.  408 U.S. at 769-770.  And its extension of domestic Establishment Clause case law to justify a free-ranging search for subjective purpose, *IRAP*, slip op. 44-53, is particularly misguided in this context.  The "unreasoned assumption that courts should simply plop Establishment Clause cases from the domestic context"—involving religious displays, subsidies for religious schools, and the like—"over to the foreign affairs context ignores the realities of our world."  *Washington* v.

62

*Trump*, 858 F.3d 1168, 1178 n.6 (9th Cir. 2017) (Bybee, J., dissenting from denial of reconsideration en banc).

ii. Nor does Justice Kennedy's concurrence in *Din* support the Fourth Circuit's ruling. In *Din*, a U.S. citizen claimed that she had a due-process right to receive a more extensive explanation for a consular officer's denial of a visa to her husband. 135 S. Ct. at 2131 (opinion of Scalia, J.). Justice Kennedy, joined by Justice Alito, reserved judgment on that issue because, "even assuming [the U.S.-citizen plaintiff] ha[d] such an interest," her claim failed under *Mandel*. *Id.* at 2139 (Kennedy, J., concurring in the judgment); see *id.* at 2140-2141. There was no question that the government's stated reason for excluding the alien—"terrorism-related" activities—was "facially legitimate." *Id.* at 2140 (citing 8 U.S.C. 1182(a)(3)(B)). And the government's decision "indicate[d] it relied upon a bona fide factual basis" by citing a statutory ground for inadmissibility that "specifie[d] discrete factual predicates the consular officer must find to exist before denying a visa." *Id.* at 2140-2141. Because the U.S.-citizen plaintiff offered nothing to demonstrate that the officer lacked a valid factual basis, the concurring Justices explained that "*Mandel* instructs us not to 'look behind' the Government's exclusion of" the alien. *Id.* at 2141.

The *Din* concurrence's reference to "bad faith" did not propose an enormous loophole in *Mandel* or approve a wide-ranging search for pretext in reviewing a consular officer's visa-refusal decision. See *Morfin* v. *Tillerson*, 851 F.3d 710, 713 (7th Cir.) (*Din* "left things as *Mandel* had left them," and "*Mandel* tells us not to go behind a facially legitimate and bona fide explanation"), cert. denied, 138 S. Ct. 380 (2017). Justice Ken-

63

nedy's concurrence merely hypothesized that, in an extreme case where the U.S.-citizen plaintiff makes an "affirmative showing," "plausibly alleged with sufficient particularity," that the consular officer did not have a "bona fide factual basis" for excluding an alien on the cited ground, the plaintiff may be able to seek "additional factual details" (provided the information is not classified). *Din*, 135 S. Ct. at 2140-2141. But when the government does identify a bona fide factual basis for exclusion—as in *Mandel* and *Din*—that is the end of the analysis.

The type of inquiry hypothesized by the *Din* concurrence is inapposite here for two independent reasons. First, the statutes that authorize the Proclamation do not specify any particularized factual predicates. See pp. 31-32, 35-37, *supra*. Second, the Proclamation contains a more than ample factual basis to support the President's country-specific findings. See pp. 33-34, *supra*. Nothing in *Din* contemplates that respondents here are entitled to still-further factual details—let alone that courts may second-guess the President's facially legitimate, factually supported rationale.

Even if *Din* could fairly be read to allow a bad-faith inquiry into a consular officer's subjective motive—and even assuming such an inquiry could ever be proper with respect to a national-security directive of the President—it would at least require the clearest affirmative showing that multiple Cabinet officials and the President acted in bad faith. Respondents cannot clear that high bar. After the agencies completed the worldwide review directed by EO-2, the President made detailed findings of inadequacies in particular countries and explained why the chosen country-specific restrictions are needed. Of the seven countries to which EO-2 and its

64

predecessor applied, the Proclamation omits two Muslim-majority countries (Sudan and Iraq). It also adds entry restrictions for three new countries, two of which are not Muslim-majority (Venezuela and North Korea), and a third of which (Chad) has an approximately 48% non-Muslim population.[18]

The five other Muslim-majority countries included were all previously identified by Congress or the Executive Branch as posing terrorism-related concerns, see 8 U.S.C. 1187(a)(12) (Supp. IV 2016), and many of the ongoing deficiencies in those countries were confirmed in the worldwide review, see Pet. App. 126a-129a, 131a-137a (§§ 1(g) and (h)(i), 2). Even for some of those countries, the Proclamation contains significant exceptions for aliens seeking certain types of nonimmigrant visas. See, *e.g.*, *id.* at 131a-133a, 135a-137a (§ 1(a)-(c), (g) and (h)) (permitting students and exchange visitors from Iran, while restricting business and tourist nonimmigrant entry for nationals of Libya, Yemen, and Chad, and imposing no exclusions on nonimmigrant entry for Somali nationals). Both the review process and the end result refute the contention that the Proclamation's national-security and foreign-policy conclusions were adopted in bad faith.

### B. The Proclamation Is Constitutional Under Domestic Establishment Clause Precedent

1. Even apart from *Mandel*, courts deciding whether official action in the domestic context has an improper religious purpose look to "the 'text, legislative history, and implementation of the statute,' or comparable official act." *McCreary*, 545 U.S. at 862 (citation omitted). They may not engage in "judicial psychoanalysis of a

---

[18] CIA, *The World Factbook: Africa (Chad)*, https://goo.gl/WJDQP.

65

drafter's heart of hearts," because only an "official objective" of favoring or disfavoring religion can implicate the Establishment Clause. *Ibid.*

The Proclamation is valid under that standard. Its express purpose is to promote national security. Pet. App. 121a-131a (Preamble, § 1). Unlike *McCreary*, which involved displays of an explicitly religious message, the Proclamation's text says nothing about religion, and its restrictions draw no distinctions based on religion. And it was the result of a worldwide review and diplomatic-engagement process undertaken collaboratively by multiple Cabinet officials whose motives have never been questioned. See pp. 6-11, *supra.*

The Proclamation's practical "operation," *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 535 (1993), confirms that it is religion-neutral. The Proclamation applies to nationals of the designated countries without regard to religion. Moreover, its omission of two Muslim-majority countries covered by EO-1 and EO-2, its inclusion of two new non-Muslim-majority countries, its tailored restrictions for each country based on country-specific risks, and the fact that it does not cover the vast majority of Muslims in the world all show that the Proclamation does not target aliens based on their religion. See pp. 63-64, *supra*; see *McGowan*, 366 U.S. at 447-449 (Sunday-closing law's secular exceptions indicated non-religious purpose).

2. Neither the Fourth Circuit nor respondents have identified anything in the text, development, or operation of the Proclamation that prescribes any "official objective," *McCreary*, 545 U.S. at 862, concerning religion. They begin instead from the premise that EO-2 was the product of religious animus, and then contend that the

66

Proclamation failed to "cure the 'taint.'" *IRAP*, slip op. 49; see *id.* at 46-53; Resps. C.A. Br. 54-58. Both steps in that reasoning are mistaken.

a. The Fourth Circuit and respondents are wrong to ascribe a religious objective to EO-2. Like the Proclamation, EO-2 was adopted expressly in furtherance of national-security objectives, not religion. Pet. App. 149a-157a (§ 1). It imposed temporary, 90-day entry restrictions on six countries while the worldwide review was underway. Those six countries, which Congress or the Executive had previously identified as presenting heightened terrorism-related concerns, were selected based on risk, not religion, and EO-2's restrictions applied to their nationals without regard to their religion. The multi-agency review, moreover, confirmed that many of the security concerns underlying EO-2 were well founded. Compare *id.* at 132a-137a (Proclamation § 2(b), (c), (e), (g), and (h)), with *id.* at 153a-155a (EO-2 § 1(e)).

The Fourth Circuit imputed a religious objective to EO-2 based on extrinsic material. *IRAP*, slip op. 42, 47-49. Unlike respondents and the district court in *IRAP* v. *Trump*, 265 F. Supp. 3d 570 (D. Md. 2017)—which relied extensively on campaign statements by then-candidate Trump—the Fourth Circuit expressly declined to "rely on pre-election statements." *IRAP*, slip op. 46. And for good reason. Impugning the official objective of a formal national-security and foreign-policy judgment of the President based on campaign-trail statements is inappropriate and fraught with intractable difficulties. *Id.* at 263-266 (Niemeyer, J., dissenting). The *IRAP* district court, for example, had relied on statements made in December 2015, 265 F. Supp. 3d at 619—more than a year before the

67

President took the prescribed oath to "preserve, protect and defend the Constitution," U.S. Const. Art. II, § 1, Cl. 8, and formed a new Administration, including Cabinet-level officials who recommended adopting the Proclamation.

Instead, the Fourth Circuit reasoned that statements made by the President and aides after he took office demonstrate that EO-2 aimed at a religious purpose. *IRAP*, slip op. 47-49. But probing the President's supposed true reasons for suspending the entry of foreign nationals in EO-2 based on such material represents precisely the sort of "judicial psychoanalysis of" a government official's "heart of hearts" that this Court has rejected. *McCreary*, 545 U.S. at 862. It also thrusts "ill equipped" courts into the untenable position of evaluating the "adequacy" and "authenticity" of the Executive's foreign-affairs and national-security judgments. *AAADC*, 525 U.S. at 491. And it invites impermissible intrusion on privileged internal Executive Branch deliberations, see *United States* v. *Nixon*, 418 U.S. 683, 708 (1974), and potential litigant-driven discovery that would disrupt the President's execution of the laws, see *Nixon* v. *Fitzgerald*, 457 U.S. 731, 749-750 (1982). This Court should reject a rule that invites such probing of the Chief Executive's supposed subjective views. See *Hein* v. *Freedom From Religion Found., Inc.*, 551 U.S. 587, 616-617 (2007) (Kennedy, J., concurring).

In any event, the post-inauguration remarks cited by the Fourth Circuit, see *IRAP*, slip op. 47-49, do not demonstrate that EO-2 had a religiously based objective. For example, the court cited statements by presidential aides made before EO-2's adoption that the "basic policy outcomes" and "principles" underlying it

68

would be the "same" as EO-1. *Id.* at 47 (citations omitted).  But as EO-2 itself explained, that same overarching objective was the protection of national security by facilitating a review of existing screening and vetting procedures.  Pet. App. 149a-157a (§ 1(b)-(i)).  The statements on which the Fourth Circuit relied do not show that EO-2 was motivated by religious animus.

The Fourth Circuit also cited a passing remark by the President when signing EO-1.  *IRAP*, slip op. 15.  After reading its title—"Protecting the Nation From Foreign Terrorist Entry into the United States"—the President said "[w]e all know what that means."  *Ibid.* (citation omitted).  Minutes earlier, however, in the presence of the newly sworn-in Secretary of Defense, the President had said, "I am establishing new vetting measures to keep radical Islamic terrorists out of the United States of America. * * * We want to ensure that we are not admitting into our country the very threats our soldiers are fighting overseas."[19]  In context, the President's passing remark at the signing of EO-1 referred to terrorist groups like ISIS and al Qaeda, not all Muslims.  At a bare minimum, the "presumption of regularity" that attaches to all federal officials' actions, *United States* v. *Chemical Found., Inc.*, 272 U.S. 1, 14 (1926), as well as the respect due the head of a coordinate branch, should have foreclosed the Fourth Circuit from invalidating a presidential proclamation based on an uncharitable interpretation of an offhand, six-word comment made in connection with a prior directive.

b. Neither the Fourth Circuit nor respondents have identified anything demonstrating that the *Proclamation*—which differs from EO-2 both in process

---

[19] Dan Merica, *Trump Signs Executive Order to Keep Out 'Radical Islamic Terrorists,'* CNN.com (Jan. 30, 2017), https://goo.gl/dMZEvO.

69

and in substance—has the objective of favoring or disfavoring any religion. It resulted from a review process undertaken by multiple Cabinet officials. It rests on express findings of inadequacies in other countries' identity-management protocols, information-sharing practices, and risk factors, as well as a presidential determination that tailored entry restrictions will both protect the Nation and encourage those countries to improve. And it covers different countries and categories of their nationals than EO-2. See pp. 63-64, *supra*; *IRAP*, slip op. 272-273 (Traxler, J., dissenting).

The Fourth Circuit's grounds for concluding that the Proclamation is tainted by EO-2 do not withstand scrutiny. The Fourth Circuit deemed the review process entirely irrelevant because the Department of Homeland Security has not made its report "publicly available." *IRAP*, slip op. 51. But this Court has held that the President generally need not "disclose" his "reasons for deeming nationals of a particular country a special threat." *AAADC*, 525 U.S. at 491. In any event, the Proclamation recites many of the report's findings, as well as the President's country-specific determinations informed by that report. Pet. App. 123a-137a (§§ 1, 2). It also explains that disclosing additional details, "many [of which] are classified," "would cause serious damage to the national security." *Id.* at 131a (§ 1(j)).

In the Fourth Circuit's view, those country-specific determinations do not justify "the list of countries actually included in the Proclamation," citing the restrictions on Somalia and Iran. *IRAP*, slip op. 51 & n.17. But in each case, the Proclamation explained why the President's determinations were justified by individual country conditions. Although Somalia generally satisfies the information-sharing component of DHS's baseline, it has

70

"significant identity-management deficiencies," a "persistent terrorist threat," and a government that "stands apart * * * in the degree to which [it] lacks command and control of its territory." Pet. App. 136a-137a (§ 2(h)(i)). And although Iran is not the only country that fails to receive its nationals subject to final orders of removal from the United States, the Proclamation did not include every country that flunked any one of the baseline criteria, but rather covered the countries that were found "inadequate" based on all of them. *Id.* at 126a-127a (§ 1(g)). Iran, for example, also "regularly fails to cooperate with the [U.S.] government in identifying security risks" and "is the source of significant terrorist threats." *Id.* at 132a (§ 2(b)(i)).

The Fourth Circuit also minimized the differences between EO-2 and the Proclamation, analogizing the changes to the successive Ten Commandments displays in *McCreary*, *supra*. *IRAP*, slip op. 50. But the differences in the Proclamation's scope—including its addition of multiple non-Muslim-majority countries, its omission of several previously covered Muslim-majority countries, and its tailored entry restrictions—forcefully confirm that its objective is to safeguard national security, not to promote or disparage any religion. Those "genuine changes in constitutionally significant conditions" contrast sharply with *McCreary*, which concerned displays with explicitly religious content and whose religious purpose was expressly reflected in official pronouncements; indeed, the third and final display was even more overtly religious than those that preceded it. 545 U.S. at 874; see *id.* at 868-874; *IRAP*, slip op. 267-269 (Niemeyer, J., dissenting). To be sure, the Proclamation imposes restrictions on many of the same foreign nationals as EO-2, but that is because the review

71

process confirmed that most (though not all) of the countries Congress or the Executive had previously singled out as presenting special concerns indeed pose heightened risks that warrant restrictions.

Finally, the Fourth Circuit again invoked extrinsic statements to impugn the Proclamation's national-security purpose, such as the President's call for a "far larger, tougher, and more specific" suspension than EO-2's temporary pause. *IRAP*, slip op. 48; see *id.* at 47-49. That statement reflects no religious animus in calling for more stringent standards for entry into this Nation. The Proclamation, moreover, speaks for itself, and actually includes *narrower* entry restrictions than EO-1 or EO-2. Regardless, relying on such statements to impute an illicit purpose to a formal national-security directive of the President is misplaced for all the reasons explained above. See pp. 66-67, *supra*. And that reliance is doubly misplaced with respect to the Proclamation because the criteria for the underlying review were developed by multiple governmental agencies and their Cabinet officers. These officials' motives have never been questioned, and neither the Fourth Circuit nor respondents have substantiated any plausible reason to doubt the legitimacy of their conclusions. Instead, the Fourth Circuit simply discounted those officials' work altogether, invoking the Constitution's "unitary executive." *IRAP*, slip op. 50 n.16. But it is not at all inconsistent with the principle of a unitary executive to determine the Proclamation's official objective by looking to the President's reliance on the recommendations of his advisors after a review applying neutral criteria, rather than by looking to his statements outside the process of issuing the Proclamation.

72

## IV.  THE GLOBAL INJUNCTION IS VASTLY OVERBROAD

The court of appeals compounded its error by continuing a troubling and increasing trend of issuing global preliminary injunctions at the behest of individual plaintiffs.  That ruling contravenes constitutional and equitable principles that require limiting injunctive relief to what is necessary to redress a plaintiff's own cognizable injuries.

A. Article III requires that "a plaintiff must demonstrate standing  * * *  for each form of relief that is sought." *Town of Chester* v. *Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).  "[T]he remedy" sought therefore must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996)); see *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 101-110 (1983).

Equitable principles independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  This Court "ha[s] long held that 'the jurisdiction'" conferred by the Judiciary Act of 1789, ch. 20, 1 Stat. 73, "over 'all suits . . . in equity' * * * 'is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries.'" *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (brackets and citations omitted).  Global injunctions that go beyond redressing any harm to named

73

plaintiffs and regulate a defendant's conduct with respect to nonparties did not exist at equity. They are a modern creation, with no direct antecedent in English practice—or apparently in the United States until the mid-twentieth century. See Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 424-445 (2017).

The decision below contravenes these principles. The district court enjoined enforcement of the Proclamation's challenged provisions "in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas," which occurs at consular posts worldwide. Pet. App. 69a. The court of appeals largely upheld that relief, *id.* at 61a-65a, excluding from the injunction only aliens who lack "a credible bona fide relationship with a person or entity in the United States," *id.* at 64a. Even if respondents had shown any cognizable, irreparable injuries from the anticipated exclusion of the particular aliens whose entry they seek, but see Part I, *supra*, those purported injuries would be fully redressed by an injunction limited to those aliens. Those injuries could not justify further enjoining the Proclamation as to numerous other aliens abroad to whom respondents have no connection whatsoever. See *Lyons*, 461 U.S. at 111.

B. The court of appeals reasoned that a more limited injunction would not cure the purported legal defects in the Proclamation and that its application to nonparties would be equally unlawful. See Pet. App. 62a-63a; accord *IRAP*, slip op. 60. But that reasoning conflates the scope of respondents' legal theory (*i.e.*, that the enjoined provisions are invalid on their face) with the scope of relief they personally may obtain. Regardless of the nature of respondents' legal challenge, they may

74

not obtain relief beyond what is necessary to redress their own cognizable injuries.

The court of appeals also invoked the importance of uniformity in immigration law, citing Congress's authority to establish a "uniform Rule of Naturalization," Pet. App. 62a (quoting U.S. Const. Art. I, § 8, Cl. 4) (emphasis omitted), and Congress's "instruct[ion] that 'the immigration laws of the United States should be enforced vigorously and uniformly,'" *ibid.* (quoting *Texas* v. *United States*, 809 F.3d 134, 187-188 (5th Cir. 2015), aff'd by an equally divided Court, 136 S. Ct. 2271 (2016) (per curiam)) (emphasis omitted); accord *IRAP*, slip op. 60. The court's conclusion, however, does not follow from its premise. The desirability of uniformity has nothing to do with the extent of respondents' own putative injuries, and it has no bearing on whether enjoining the Proclamation as to aliens abroad to whom respondents have no connection is needed to redress their claimed harms.

In any event, courts' preference for uniform enforcement cannot justify barring enforcement of huge swaths of the Proclamation based on injury to at most a handful of individuals. To the contrary, proper respect for uniform enforcement and for a coordinate branch compels leaving those provisions in place, with individualized exceptions for particular plaintiffs if they demonstrate cognizable, irreparable harm. The Proclamation's severability clause confirms that conclusion. It states that, if "the application of any provision to any person or circumstance[] is held to be invalid," then its application "to any other persons or circumstances shall not be affected thereby." Pet. App. 147a (§ 8(a)). The Proclamation's plain terms required the court to limit

75

any injunction to the invalid applications and preserve the remainder.[20]

C. The lower courts' decisions in this litigation and in *IRAP* repeatedly upholding global injunctive relief against the President's Proclamation and the Executive Orders that preceded it reflect a disturbing recent trend. Lower courts increasingly grant categorical injunctive relief barring enforcement of federal policies everywhere at the behest of individual litigants. See Bray 457-460. That practice not only is inconsistent with settled constitutional and equitable rules, but also disserves the orderly, evenhanded development of the law.

Such an order by a single district court enjoining a federal policy everywhere frequently brings judicial review in all other fora to a halt and deprives other courts, including this Court, of differing perspectives on important questions. See *United States* v. *Mendoza*, 464 U.S. 154, 160, 162 (1984) (rejecting application of nonmutual issue preclusion against the government for similar reasons). Permitting such global injunctions also undercuts the primary mechanism Congress has authorized to permit broader relief: class actions. It enables all potential claimants to benefit from global injunctive relief by prevailing in a single district court, without satisfying the prerequisites of Federal Rule of

---

[20] Contrary to the Fourth Circuit's suggestion, this Court's June 2017 stay ruling does not support enjoining the Proclamation broadly as to all aliens with a bona fide relationship with a U.S. person or entity. *IRAP*, slip op. 58-59. EO-2 was a temporary suspension before the results of the review were known, and the fact that this Court's balancing of the equities resulted in a partial rather than a full stay does not mean this Court agreed on the merits that a nationwide injunction was proper.

76

Civil Procedure 23, but without affording the government the corresponding benefit of a definitive resolution of the underlying legal issue as to all potential claimants if it prevails instead. See *Eisen* v. *Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974). This Court should reject that deeply misguided practice and reiterate that injunctions should be tailored to redress the plaintiffs' own cognizable, irreparable harms.

## CONCLUSION

The judgment of the court of appeals should be reversed.

Respectfully submitted.

NOEL J. FRANCISCO
  *Solicitor General*
CHAD A. READLER
  *Acting Assistant Attorney*
  *General*
JEFFREY B. WALL
EDWIN S. KNEEDLER
  *Deputy Solicitors General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney*
  *General*
JONATHAN C. BOND
MICHAEL R. HUSTON
  *Assistants to the Solicitor*
  *General*
SHARON SWINGLE
H. THOMAS BYRON III
  *Attorneys*

FEBRUARY 2018

# APPENDIX

1.   U.S. Const. Amend. I provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.


2.   5 U.S.C. 701 provides:

**Application; definitions**

(a)   This chapter applies, according to the provisions thereof, except to the extent that—

   (1)   statutes preclude judicial review; or

   (2)   agency action is committed to agency discretion by law.

(b)   For the purpose of this chapter—

   (1)   "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

      (A)   the Congress;

      (B)   the courts of the United States;

      (C)   the governments of the territories or possessions of the United States;

      (D)   the government of the District of Columbia;

(1a)

2a

(E)   agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

(F)   courts martial and military commissions;

(G)   military authority exercised in the field in time of war or in occupied territory; or

(H)   functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891-1902, and former section 1641(b)(2), of title 50, appendix; and

(2)   "person", "rule", "order", "license", "sanction", "relief", and "agency action" have the meanings given them by section 551 of this title.


3.   5 U.S.C. 702 provides:

**Right of review**

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.   An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.   The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States:   *Provided*, That any mandatory or in-

3a

junctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance.   Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

4.   5 U.S.C. 703 provides:

**Form and venue of proceeding**

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.   Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

4a

5.   5 U.S.C. 704 provides:

**Actions reviewable**

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.   A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.   Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

6.   6 U.S.C. 236 provides in pertinent part:

**Visa issuance**

\*     \*     \*     \*     \*

**(b)   In general**

Notwithstanding section 104(a) of the Immigration and Nationality Act (8 U.S.C. 1104(a)) or any other provision of law, and except as provided in subsection (c) of this section, the Secretary—

(1)   shall be vested exclusively with all authorities to issue regulations with respect to, administer, and enforce the provisions of such Act [8 U.S.C. 1101 et seq.], and of all other immigration and nationality laws, relating to the functions of consular officers of the United States in connection with the granting or

5a

refusal of visas, and shall have the authority to refuse visas in accordance with law and to develop programs of homeland security training for consular officers (in addition to consular training provided by the Secretary of State), which authorities shall be exercised through the Secretary of State, except that the Secretary shall not have authority to alter or reverse the decision of a consular officer to refuse a visa to an alien; and

(2)   shall have authority to confer or impose upon any officer or employee of the United States, with the consent of the head of the executive agency under whose jurisdiction such officer or employee is serving, any of the functions specified in paragraph (1).

**(c)   Authority of the Secretary of State**

**(1)   In general**

Notwithstanding subsection (b) of this section, the Secretary of State may direct a consular officer to refuse a visa to an alien if the Secretary of State deems such refusal necessary or advisable in the foreign policy or security interests of the United States.

\*   \*   \*   \*   \*

**(f)   No creation of private right of action**

Nothing in this section shall be construed to create or authorize a private right of action to challenge a decision of a consular officer or other United States official or employee to grant or deny a visa.

\*   \*   \*   \*   \*

7.   8 U.S.C. 1152(a) provides:

**Numerical limitations on individual foreign states**

**(a)   Per country level**

   **(1)   Nondiscrimination**

     (A)   Except as specifically provided in paragraph (2) and in sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153 of this title, no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence.

     (B)   Nothing in this paragraph shall be construed to limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications or the locations where such applications will be processed.

   **(2)   Per country levels for family-sponsored and employment-based immigrants**

     Subject to paragraphs (3), (4), and (5), the total number of immigrant visas made available to natives of any single foreign state or dependent area under subsections (a) and (b) of section 1153 of this title in any fiscal year may not exceed 7 percent (in the case of a single foreign state) or 2 percent (in the case of a dependent area) of the total number of such visas made available under such subsections in that fiscal year.

   **(3)   Exception if additional visas available**

     If because of the application of paragraph (2) with respect to one or more foreign states or dependent

7a

areas, the total number of visas available under both subsections (a) and (b) of section 1153 of this title for a calendar quarter exceeds the number of qualified immigrants who otherwise may be issued such a visa, paragraph (2) shall not apply to visas made available to such states or areas during the remainder of such calendar quarter.

**(4) Special rules for spouses and children of lawful permanent resident aliens**

**(A) 75 percent of 2nd preference set-aside for spouses and children not subject to per country limitation**

**(i) In general**

Of the visa numbers made available under section 1153(a) of this title to immigrants described in section 1153(a)(2)(A) of this title in any fiscal year, 75 percent of the 2-A floor (as defined in clause (ii)) shall be issued without regard to the numerical limitation under paragraph (2).

**(ii) "2-A floor" defined**

In this paragraph, the term "2-A floor" means, for a fiscal year, 77 percent of the total number of visas made available under section 1153(a) of this title to immigrants described in section 1153(a)(2) of this title in the fiscal year.

8a

**(B)  Treatment of remaining 25 percent for countries subject to subsection (e)**

**(i)  In general**

Of the visa numbers made available under section 1153(a) of this title to immigrants described in section 1153(a)(2)(A) of this title in any fiscal year, the remaining 25 percent of the 2-A floor shall be available in the case of a state or area that is subject to subsection (e) only to the extent that the total number of visas issued in accordance with subparagraph (A) to natives of the foreign state or area is less than the subsection (e) ceiling (as defined in clause (ii)).

**(ii)  "Subsection (e) ceiling" defined**

In clause (i), the term "subsection (e) ceiling" means, for a foreign state or dependent area, 77 percent of the maximum number of visas that may be made available under section 1153(a) of this title to immigrants who are natives of the state or area under section 1153(a)(2) of this title consistent with subsection (e).

**(C)  Treatment of unmarried sons and daughters in countries subject to subsection (e)**

In the case of a foreign state or dependent area to which subsection (e) applies, the number of immigrant visas that may be made available to natives of the state or area under section 1153(a)(2)(B) of this title may not exceed—

(i)   23 percent of the maximum number of visas that may be made available under section 1153(a) of this title to immigrants of the state or area described in section 1153(a)(2) of this title consistent with subsection (e), or

(ii)   the number (if any) by which the maximum number of visas that may be made available under section 1153(a) of this title to immigrants of the state or area described in section 1153(a)(2) of this title consistent with subsection (e) exceeds the number of visas issued under section 1153(a)(2)(A) of this title,

whichever is greater.

**(D)  Limiting pass down for certain countries subject to subsection (e)**

In the case of a foreign state or dependent area to which subsection (e) applies, if the total number of visas issued under section 1153(a)(2) of this title exceeds the maximum number of visas that may be made available to immigrants of the state or area under section 1153(a)(2) of this title consistent with subsection (e) (determined without regard to this paragraph), in applying paragraphs (3) and (4) of section 1153(a) of this title under subsection (e)(2) all visas shall be deemed to have been required for the classes specified in paragraphs (1) and (2) of such section.

10a

**(5)  Rules for employment-based immigrants**

**(A)  Employment-based immigrants not subject to per country limitation if additional visas available**

If the total number of visas available under paragraph (1), (2), (3), (4), or (5) of section 1153(b) of this title for a calendar quarter exceeds the number of qualified immigrants who may otherwise be issued such visas, the visas made available under that paragraph shall be issued without regard to the numerical limitation under paragraph (2) of this subsection during the remainder of the calendar quarter.

**(B)  Limiting fall across for certain countries subject to subsection (e)**

In the case of a foreign state or dependent area to which subsection (e) applies, if the total number of visas issued under section 1153(b) of this title exceeds the maximum number of visas that may be made available to immigrants of the state or area under section 1153(b) of this title consistent with subsection (e) (determined without regard to this paragraph), in applying subsection (e) all visas shall be deemed to have been required for the classes of aliens specified in section 1153(b) of this title.

11a

8.   8 U.S.C. 1182 provides in pertinent part:

**Inadmissible aliens**

**(a)   Classes of aliens ineligible for visas or admission**

Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

**(1)   Health-related grounds**

**(A)   In general**

Any alien—

(i)   who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance;[1]

(ii)   except as provided in subparagraph (C), who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases:  mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,

---

[1]  So in original.   The semicolon probably should be a comma.

12a

(iii)  who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)—

(I)  to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

(II)  to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

(iv)  who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict,

is inadmissible.

**(B)   Waiver authorized**

For provision authorizing waiver of certain clauses of subparagraph (A), see subsection (g) of this section.

**(C)   Exception from immunization requirement for adopted children 10 years of age or younger**

Clause (ii) of subparagraph (A) shall not apply to a child who—

13a

(i)   is 10 years of age or younger,

(ii)   is described in subparagraph (F) or (G) of section 1101(b)(1) of this title;[1] and

(iii)  is seeking an immigrant visa as an immediate relative under section 1151(b) of this title,

if, prior to the admission of the child, an adoptive parent or prospective adoptive parent of the child, who has sponsored the child for admission as an immediate relative, has executed an affidavit stating that the parent is aware of the provisions of subparagraph (A)(ii) and will ensure that, within 30 days of the child's admission, or at the earliest time that is medically appropriate, the child will receive the vaccinations identified in such subparagraph.

**(2)   Criminal and related grounds**

**(A)   Conviction of certain crimes**

**(i)   In general**

Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of—

(I)   a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

---

[1]  So in original.   The semicolon probably should be a comma.

14a

(II)  a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of title 21),

is inadmissible.

**(ii)  Exception**

Clause (i)(I) shall not apply to an alien who committed only one crime if—

(I)  the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

(II)  the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

15a

**(B)   Multiple criminal convictions**

Any alien convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether the offenses involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more is inadmissible.

**(C)   Controlled substance traffickers**

Any alien who the consular officer or the Attorney General knows or has reason to believe—

(i)   is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so; or

(ii)   is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity,

is inadmissible.

16a

**(D)   Prostitution and commercialized vice**

Any alien who—

(i)   is coming to the United States solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, admission, or adjustment of status,

(ii)   directly or indirectly procures or attempts to procure, or (within 10 years of the date of application for a visa, admission, or adjustment of status) procured or attempted to procure or to import, prostitutes or persons for the purpose of prostitution, or receives or (within such 10-year period) received, in whole or in part, the proceeds of prostitution, or

(iii)   is coming to the United States to engage in any other unlawful commercialized vice, whether or not related to prostitution,

is inadmissible.

**(E)   Certain aliens involved in serious criminal activity who have asserted immunity from prosecution**

Any alien—

(i)   who has committed in the United States at any time a serious criminal offense (as defined in section 1101(h) of this title),

(ii)   for whom immunity from criminal jurisdiction was exercised with respect to that offense,

17a

(iii) who as a consequence of the offense and exercise of immunity has departed from the United States, and

(iv) who has not subsequently submitted fully to the jurisdiction of the court in the United States having jurisdiction with respect to that offense,

is inadmissible.

**(F)   Waiver authorized**

For provision authorizing waiver of certain subparagraphs of this paragraph, see subsection (h) of this section.

**(G)   Foreign government officials who have committed particularly severe violations of religious freedom**

Any alien who, while serving as a foreign government official, was responsible for or directly carried out, at any time, particularly severe violations of religious freedom, as defined in section 6402 of title 22, is inadmissible.

**(H)   Significant traffickers in persons**

**(i)   In general**

Any alien who commits or conspires to commit human trafficking offenses in the United States or outside the United States, or who the consular officer, the Secretary of Homeland Security, the Secretary of State, or the Attorney General knows or has reason to believe is or has been a knowing aider, abettor, assister, conspirator, or colluder with such a

18a

trafficker in severe forms of trafficking in persons, as defined in the section 7102 of title 22, is inadmissible.

**(ii)   Beneficiaries of trafficking**

Except as provided in clause (iii), any alien who the consular officer or the Attorney General knows or has reason to believe is the spouse, son, or daughter of an alien inadmissible under clause (i), has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity, is inadmissible.

**(iii)   Exception for certain sons and daughters**

Clause (ii) shall not apply to a son or daughter who was a child at the time he or she received the benefit described in such clause.

**(I)      Money laundering**

Any alien—

(i)  who a consular officer or the Attorney General knows, or has reason to believe, has engaged, is engaging, or seeks to enter the United States to engage, in an offense which is described in section 1956 or 1957 of title 18 (relating to laundering of monetary instruments); or

(ii) who a consular officer or the Attorney General knows is, or has been, a knowing aider, abettor, assister, conspirator, or colluder with

19a

others in an offense which is described in such section;

is inadmissible.

**(3)  Security and related grounds**

**(A)  In general**

Any alien who a consular officer or the Attorney General knows, or has reasonable ground to believe, seeks to enter the United States to engage solely, principally, or incidentally in—

(i)  any activity (I) to violate any law of the United States relating to espionage or sabotage or (II) to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information,

(ii)  any other unlawful activity, or

(iii)  any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means,

is inadmissible.

**(B)  Terrorist activities**

**(i)  In general**

Any alien who—

(I)  has engaged in a terrorist activity;

(II)  a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after en-

20a

try in any terrorist activity (as defined in clause (iv));

(III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;

(IV) is a representative (as defined in clause (v)) of—

  (aa)  a terrorist organization (as defined in clause (vi)); or

  (bb)  a political, social, or other group that endorses or espouses terrorist activity;

(V)   is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

(VI)  is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

(VII)  endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

(VIII) has received military-type training (as defined in section 2339D(c)(1) of title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

21a

(IX)  is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years,

is inadmissible.   An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this chapter, to be engaged in a terrorist activity.

**(ii)  Exception**

Subclause (IX) of clause (i) does not apply to a spouse or child—

(I)   who did not know or should not reasonably have known of the activity causing the alien to be found inadmissible under this section; or

(II)  whom the consular officer or Attorney General has reasonable grounds to believe has renounced the activity causing the alien to be found inadmissible under this section.

**(iii)  "Terrorist activity" defined**

As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

(I)   The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

22a

(II)  The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III)  A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of title 18) or upon the liberty of such a person.

(IV)  An assassination.

(V)    The use of any—

(a)   biological agent, chemical agent, or nuclear weapon or device, or

(b)   explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI)  A threat, attempt, or conspiracy to do any of the foregoing.

**(iv)   "Engage in terrorist activity" defined**

As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization—

(I)    to commit or to incite to commit, under circumstances indicating an intention

23a

to cause death or serious bodily injury, a terrorist activity;

(II)   to prepare or plan a terrorist activity;

(III) to gather information on potential targets for terrorist activity;

(IV) to solicit funds or other things of value for—

(aa)   a terrorist activity;

(bb)   a terrorist organization described in clause (vi)(I) or (vi)(II); or

(cc)   a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization;

(V)   to solicit any individual—

(aa)   to engage in conduct otherwise described in this subsection;

(bb)   for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or

(cc)   for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

24a

(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

(aa)  for the commission of a terrorist activity;

(bb)  to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;

(cc)  to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or

(dd)  to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

**(v)  "Representative" defined**

As used in this paragraph, the term "representative" includes an officer, official, or spokesman of an organization, and any person who directs, counsels, commands, or induces an organization or its members to engage in terrorist activity.

25a

**(vi)  "Terrorist organization" defined**

As used in this section, the term "terrorist organization" means an organization—

(I)    designated under section 1189 of this title;

(II) otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in the activities described in subclauses (I) through (VI) of clause (iv); or

(III) that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, the activities described in subclauses (I) through (VI) of clause (iv).

**(C)   Foreign policy**

**(i)    In general**

An alien whose entry or proposed activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is inadmissible.

**(ii)   Exception for officials**

An alien who is an official of a foreign government or a purported government, or who is a candidate for election to a foreign govern-

26a

ment office during the period immediately preceding the election for that office, shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) solely because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States.

**(iii)  Exception for other aliens**

An alien, not described in clause (ii), shall not be excludable or subject to restrictions or conditions on entry into the United States under clause (i) because of the alien's past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States, unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest.

**(iv)  Notification of determinations**

If a determination is made under clause (iii) with respect to an alien, the Secretary of State must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identity of the alien and the reasons for the determination.

27a

**(D)  Immigrant membership in totalitarian party**

**(i)    In general**

Any immigrant who is or has been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), domestic or foreign, is inadmissible.

**(ii)   Exception for involuntary membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that the membership or affiliation is or was involuntary, or is or was solely when under 16 years of age, by operation of law, or for purposes of obtaining employment, food rations, or other essentials of living and whether necessary for such purposes.

**(iii)  Exception for past membership**

Clause (i) shall not apply to an alien because of membership or affiliation if the alien establishes to the satisfaction of the consular officer when applying for a visa (or to the satisfaction of the Attorney General when applying for admission) that—

(I)   the membership or affiliation terminated at least—

(a)  2 years before the date of such application, or

28a

(b)  5 years before the date of such application, in the case of an alien whose membership or affiliation was with the party controlling the government of a foreign state that is a totalitarian dictatorship as of such date, and

(II)  the alien is not a threat to the security of the United States.

**(iv)  Exception for close family members**

The Attorney General may, in the Attorney General's discretion, waive the application of clause (i) in the case of an immigrant who is the parent, spouse, son, daughter, brother, or sister of a citizen of the United States or a spouse, son, or daughter of an alien lawfully admitted for permanent residence for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest if the immigrant is not a threat to the security of the United States.

**(E)  Participants in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing**

**(i)  Participation in Nazi persecutions**

Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—

(I)  the Nazi government of Germany,

(II)  any government in any area occupied by the military forces of the Nazi government of Germany,

29a

(III) any government established with the assistance or cooperation of the Nazi government of Germany, or

(IV) any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion is inadmissible.

**(ii)   Participation in genocide**

Any alien who ordered, incited, assisted, or otherwise participated in genocide, as defined in section 1091(a) of title 18, is inadmissible.

**(iii)  Commission of acts of torture or extrajudicial killings**

Any alien who, outside the United States, has committed, ordered, incited, assisted, or otherwise participated in the commission of—

(I)    any act of torture, as defined in section 2340 of title 18; or

(II)   under color of law of any foreign nation, any extrajudicial killing, as defined in section 3(a) of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note),

is inadmissible.

**(F)  Association with terrorist organizations**

Any alien who the Secretary of State, after consultation with the Attorney General, or the Attorney General, after consultation with the Sec-

30a

retary of State, determines has been associated with a terrorist organization and intends while in the United States to engage solely, principally, or incidentally in activities that could endanger the welfare, safety, or security of the United States is inadmissible.

**(G)   Recruitment or use of child soldiers**

Any alien who has engaged in the recruitment or use of child soldiers in violation of section 2442 of title 18 is inadmissible.

\*   \*   \*   \*   \*

**(7)   Documentation requirements**

**(A)   Immigrants**

**(i)   In general**

Except as otherwise specifically provided in this chapter, any immigrant at the time of application for admission—

(I)   who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title, or

(II)   whose visa has been issued without compliance with the provisions of section 1153 of this title,

31a

is inadmissible.

**(ii)  Waiver authorized**

For provision authorizing waiver of clause (i), see subsection (k) of this section.

**(B)  Nonimmigrants**

**(i)  In general**

Any nonimmigrant who—

(I)  is not in possession of a passport valid for a minimum of six months from the date of the expiration of the initial period of the alien's admission or contemplated initial period of stay authorizing the alien to return to the country from which the alien came or to proceed to and enter some other country during such period, or

(II) is not in possession of a valid non-immigrant visa or border crossing identification card at the time of application for admission,

is inadmissible.

**(ii)  General waiver authorized**

For provision authorizing waiver of clause (i), see subsection (d)(4) of this section.

**(iii) Guam and Northern Mariana Islands visa waiver**

For provision authorizing waiver of clause (i) in the case of visitors to Guam or the Commonwealth of the Northern Mariana Islands, see subsection (*l*).

32a

**(iv)  Visa waiver program**

For authority to waive the requirement of clause (i) under a program, see section 1187 of this title.

\*   \*   \*   \*   \*

**(f)  Suspension of entry or imposition of restrictions by President**

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.   Whenever the Attorney General finds that a commercial airline has failed to comply with regulations of the Attorney General relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States (including the training of personnel in such detection), the Attorney General may suspend the entry of some or all aliens transported to the United States by such airline.

\*   \*   \*   \*   \*

33a

9.   8 U.S.C. 1185 provides in pertinent part:

**Travel control of citizens and aliens**

**(a)   Restrictions and prohibitions**

Unless otherwise ordered by the President, it shall be unlawful—

(1)   for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe;

\*   \*   \*   \*   \*

**(d)   Nonadmission of certain aliens**

Nothing in this section shall be construed to entitle an alien to whom a permit to enter the United States has been issued to enter the United States, if, upon arrival in the United States, he is found to be inadmissible under any of the provisions of this chapter, or any other law, relative to the entry of aliens into the United States.

\*   \*   \*   \*   \*

10.   8 U.S.C. 1187 (2012 & Supp. IV 2016) provides:

**Visa waiver program for certain visitors**

**(a)   Establishment of program**

The Secretary of Homeland Security and the Secretary of State are authorized to establish a program (hereinafter in this section referred to as the "program") under which the requirement of paragraph (7)(B)(i)(II)

of section 1182(a) of this title may be waived by the Secretary of Homeland Security, in consultation with the Secretary of State and in accordance with this section, in the case of an alien who meets the following requirements:

**(1)   Seeking entry as tourist for 90 days or less**

The alien is applying for admission during the program as a nonimmigrant visitor (described in section 1101(a)(15)(B) of this title) for a period not exceeding 90 days.

**(2)   National of program country**

The alien is a national of, and presents a passport issued by, a country which—

(A)   extends (or agrees to extend), either on its own or in conjunction with one or more other countries that are described in subparagraph (B) and that have established with it a common area for immigration admissions, reciprocal privileges to citizens and nationals of the United States, and

(B)   is designated as a pilot program country under subsection (c) of this section.

**(3)   Passport requirements**

The alien, at the time of application for admission, is in possession of a valid unexpired passport that satisfies the following:

**(A)   Machine readable**

The passport is a machine-readable passport that is tamper-resistant, incorporates document authentication identifiers, and otherwise satisfies

35a

the internationally accepted standard for machine readability.

**(B)   Electronic**

Beginning on April 1, 2016, the passport is an electronic passport that is fraud-resistant, contains relevant biographic and biometric information (as determined by the Secretary of Homeland Security), and otherwise satisfies internationally accepted standards for electronic passports.

**(4)   Executes immigration forms**

The alien before the time of such admission completes such immigration form as the Secretary of Homeland Security shall establish.

**(5)   Entry into the United States**

If arriving by sea or air, the alien arrives at the port of entry into the United States on a carrier, including any carrier conducting operations under part 135 of title 14, Code of Federal Regulations, or a noncommercial aircraft that is owned or operated by a domestic corporation conducting operations under part 91 of title 14, Code of Federal Regulations[1] which has entered into an agreement with the Secretary of Homeland Security pursuant to subsection (e).   The Secretary of Homeland Security is authorized to require a carrier conducting operations under part 135 of title 14, Code of Federal Regulations, or a domestic corporation conducting operations under part 91 of that title, to give suitable and proper bond, in such reasonable amount and containing such conditions as the Secretary of Homeland

---

[1]  So in original.   Probably should be followed by a comma.

36a

Security may deem sufficient to ensure compliance with the indemnification requirements of this section, as a term of such an agreement.

**(6)   Not a safety threat**

The alien has been determined not to represent a threat to the welfare, health, safety, or security of the United States.

**(7)   No previous violation**

If the alien previously was admitted without a visa under this section, the alien must not have failed to comply with the conditions of any previous admission as such a nonimmigrant.

**(8)   Round-trip ticket**

The alien is in possession of a round-trip transportation ticket (unless this requirement is waived by the Secretary of Homeland Security under regulations or the alien is arriving at the port of entry on an aircraft operated under part 135 of title 14, Code of Federal Regulations, or a noncommercial aircraft that is owned or operated by a domestic corporation conducting operations under part 91 of title 14, Code of Federal Regulations).

**(9)   Automated system check**

The identity of the alien has been checked using an automated electronic database containing information about the inadmissibility of aliens to uncover any grounds on which the alien may be inadmissible to the United States, and no such ground has been found.

37a

**(10) Electronic transmission of identification information**

Operators of aircraft under part 135 of title 14, Code of Federal Regulations, or operators of non-commercial aircraft that are owned or operated by a domestic corporation conducting operations under part 91 of title 14, Code of Federal Regulations, carrying any alien passenger who will apply for admission under this section shall furnish such information as the Secretary of Homeland Security by regulation shall prescribe as necessary for the identification of any alien passenger being transported and for the enforcement of the immigration laws. Such information shall be electronically transmitted not less than one hour prior to arrival at the port of entry for purposes of checking for inadmissibility using the automated electronic database.

**(11) Eligibility determination under the electronic system for travel authorization**

Beginning on the date on which the electronic system for travel authorization developed under subsection (h)(3) is fully operational, each alien traveling under the program shall, before applying for admission to the United States, electronically provide to the system biographical information and such other information as the Secretary of Homeland Security shall determine necessary to determine the eligibility of, and whether there exists a law enforcement or security risk in permitting, the alien to travel to the United States.  Upon review of such biographical information, the Secretary of Homeland Security shall determine whether the alien is eligible to travel to the United States under the program.

38a

**(12)  Not present in Iraq, Syria, or any other country or area of concern**

**(A)   In general**

Except as provided in subparagraphs (B) and (C)—

(i)   the alien has not been present, at any time on or after March 1, 2011—

(I)   in Iraq or Syria;

(II)   in a country that is designated by the Secretary of State under section 4605(j) of title 50 (as continued in effect under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)), section 2780 of title 22, section 2371 of title 22, or any other provision of law, as a country, the government of which has repeatedly provided support of acts of international terrorism; or

(III) in any other country or area of concern designated by the Secretary of Homeland Security under subparagraph (D); and

(ii)   regardless of whether the alien is a national of a program country, the alien is not a national of—

(I)   Iraq or Syria;

(II)   a country that is designated, at the time the alien applies for admission, by the Secretary of State under section 4605(j) of title 50 (as continued in effect under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)), section 2780 of title

39a

22, section 2371 of title 22, or any other pro-
vision of law, as a country, the government of
which has repeatedly provided support of
acts of international terrorism; or

(III) any other country that is designated,
at the time the alien applies for admission, by
the Secretary of Homeland Security under
subparagraph (D).

**(B)   Certain military personnel and government
employees**

Subparagraph (A)(i) shall not apply in the case
of an alien if the Secretary of Homeland Security
determines that the alien was present—

(i)   in order to perform military service in
the armed forces of a program country; or

(ii)  in order to carry out official duties as a
full time employee of the government of a pro-
gram country.

**(C)   Waiver**

The Secretary of Homeland Security may waive
the application of subparagraph (A) to an alien if
the Secretary determines that such a waiver is in
the law enforcement or national security interests
of the United States.

**(D)   Countries or areas of concern**

**(i)   In general**

Not later than 60 days after December 18,
2015, the Secretary of Homeland Security, in
consultation with the Secretary of State and the
Director of National Intelligence, shall deter-

40a

mine whether the requirement under subparagraph (A) shall apply to any other country or area.

**(ii)  Criteria**

In making a determination under clause (i), the Secretary shall consider—

(I)    whether the presence of an alien in the country or area increases the likelihood that the alien is a credible threat to the national security of the United States;

(II)    whether a foreign terrorist organization has a significant presence in the country or area; and

(III)  whether the country or area is a safe haven for terrorists.

**(iii)  Annual review**

The Secretary shall conduct a review, on an annual basis, of any determination made under clause (i).

**(E)    Report**

Beginning not later than one year after December 18, 2015, and annually thereafter, the Secretary of Homeland Security shall submit to the Committee on Homeland Security, the Committee on Foreign Affairs, the Permanent Select Committee on Intelligence, and the Committee on the Judiciary of the House of Representatives, and the Committee on Homeland Security and Governmental Affairs, the Committee on Foreign Relations, the Select Committee on Intelligence, and

41a

the Committee on the Judiciary of the Senate a report on each instance in which the Secretary exercised the waiver authority under subparagraph (C) during the previous year.

**(b)  Waiver of rights**

An alien may not be provided a waiver under the program unless the alien has waived any right—

(1)  to review or appeal under this chapter of an immigration officer's determination as to the admissibility of the alien at the port of entry into the United States, or

(2)  to contest, other than on the basis of an application for asylum, any action for removal of the alien.

**(c)  Designation of program countries**

**(1)  In general**

The Secretary of Homeland Security, in consultation with the Secretary of State, may designate any country as a program country if it meets the requirements of paragraph (2).

**(2)  Qualifications**

Except as provided in subsection (f), a country may not be designated as a program country unless the following requirements are met:

**(A)  Low nonimmigrant visa refusal rate**

Either—

(i)  the average number of refusals of nonimmigrant visitor visas for nationals of that country during—

42a

(I)  the two previous full fiscal years was less than 2.0 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during those years; and

(II)  either of such two previous full fiscal years was less than 2.5 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during that year; or

(ii)  such refusal rate for nationals of that country during the previous full fiscal year was less than 3.0 percent.

**(B)  Passport program**

**(i)   Issuance of passports**

The government of the country certifies that it issues to its citizens passports described in subparagraph (A) of subsection (a)(3), and on or after April 1, 2016, passports described in subparagraph (B) of subsection (a)(3).

**(ii)   Validation of passports**

Not later than October 1, 2016, the government of the country certifies that it has in place mechanisms to validate passports described in subparagraphs (A) and (B) of subsection (a)(3) at each key port of entry into that country. This requirement shall not apply to travel between countries which fall within the Schengen Zone.

43a

**(C)   Law enforcement and security interests**

The Secretary of Homeland Security, in consultation with the Secretary of State—

(i)   evaluates the effect that the country's designation would have on the law enforcement and security interests of the United States (including the interest in enforcement of the immigration laws of the United States and the existence and effectiveness of its agreements and procedures for extraditing to the United States individuals, including its own nationals, who commit crimes that violate United States law);

(ii)   determines that such interests would not be compromised by the designation of the country; and

(iii)   submits a written report to the Committee on the Judiciary, the Committee on Foreign Affairs, and the Committee on Homeland Security of the House of Representatives and the Committee on the Judiciary, the Committee on Foreign Relations, and the Committee on Homeland Security and Governmental Affairs of the Senate regarding the country's qualification for designation that includes an explanation of such determination.

**(D)   Reporting lost and stolen passports**

The government of the country enters into an agreement with the United States to report, or make available through Interpol or other means as designated by the Secretary of Homeland Security, to the United States Government infor-

44a

mation about the theft or loss of passports not later than 24 hours after becoming aware of the theft or loss and in a manner specified in the agreement.

**(E)   Repatriation of aliens**

The government of the country accepts for repatriation any citizen, former citizen, or national of the country against whom a final executable order of removal is issued not later than three weeks after the issuance of the final order of removal.   Nothing in this subparagraph creates any duty for the United States or any right for any alien with respect to removal or release. Nothing in this subparagraph gives rise to any cause of action or claim under this paragraph or any other law against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien.

**(F)   Passenger information exchange**

The government of the country enters into an agreement with the United States to share information regarding whether citizens and nationals of that country traveling to the United States represent a threat to the security or welfare of the United States or its citizens, and fully implements such agreement.

**(G)   Interpol screening**

Not later than 270 days after December 18, 2015, except in the case of a country in which there is not an international airport, the government of the country certifies to the Secretary of

45a

Homeland Security that, to the maximum extent allowed under the laws of the country, it is screening, for unlawful activity, each person who is not a citizen or national of that country who is admitted to or departs that country, by using relevant databases and notices maintained by Interpol, or other means designated by the Secretary of Homeland Security.   This requirement shall not apply to travel between countries which fall within the Schengen Zone.

**(3)   Continuing and subsequent qualifications**

For each fiscal year after the initial period—

**(A)   Continuing qualification**

In the case of a country which was a program country in the previous fiscal year, a country may not be designated as a program country unless the sum of—

(i)   the total of the number of nationals of that country who were denied admission at the time of arrival or withdrew their application for admission during such previous fiscal year as a nonimmigrant visitor, and

(ii)   the total number of nationals of that country who were admitted as nonimmigrant visitors during such previous fiscal year and who violated the terms of such admission,

was less than 2 percent of the total number of nationals of that country who applied for admission as nonimmigrant visitors during such previous fiscal year.

46a

**(B)   New countries**

In the case of another country, the country may not be designated as a program country unless the following requirements are met:

**(i)   Low nonimmigrant visa refusal rate in previous 2-year period**

The average number of refusals of non-immigrant visitor visas for nationals of that country during the two previous full fiscal years was less than 2 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during those years.

**(ii)   Low nonimmigrant visa refusal rate in each of the 2 previous years**

The average number of refusals of non-immigrant visitor visas for nationals of that country during either of such two previous full fiscal years was less than 2.5 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during that year.

**(4)   Initial period**

For purposes of paragraphs (2) and **(3),** the term "initial period" means the period beginning at the end of the 30-day period described in subsection (b)(1) of this section and ending on the last day of the first fiscal year which begins after such 30-day period.

47a

**(5)  Written reports on continuing qualification; designation terminations**

**(A)  Periodic evaluations**

**(i)  In general**

The Secretary of Homeland Security, in consultation with the Secretary of State, periodically (but not less than once every 2 years)—

(I)  shall evaluate the effect of each program country's continued designation on the law enforcement and security interests of the United States (including the interest in enforcement of the immigration laws of the United States and the existence and effectiveness of its agreements and procedures for extraditing to the United States individuals, including its own nationals, who commit crimes that violate United States law);

(II)  shall determine, based upon the evaluation in subclause (I), whether any such designation ought to be continued or terminated under subsection (d) of this section;

(III)  shall submit a written report to the Committee on the Judiciary, the Committee on Foreign Affairs, the Permanent Select Committee on Intelligence, and the Committee on Homeland Security, of the House of Representatives and the Committee on the Judiciary, the Committee on Foreign Relations, the Select Committee on Intelligence and the Committee on Homeland Security and Governmental Affairs of the Senate regarding the continuation or termination

48a

of the country's designation that includes an explanation of such determination and the effects described in subclause (I);

(IV)  shall submit to Congress a report regarding the implementation of the electronic system for travel authorization system under subsection (h)(3) and the participation of new countries in the program through a waiver under paragraph (8); and

(V)  shall submit to the committees described in subclause (III), a report that includes an assessment of the threat to the national security of the United States of the designation of each country designated as a program country, including the compliance of the government of each such country with the requirements under subparagraphs (D) and (F) of paragraph (2), as well as each such government's capacity to comply with such requirements.

**(ii)  Effective date**

A termination of the designation of a country under this subparagraph shall take effect on the date determined by the Secretary of Homeland Security, in consultation with the Secretary of State.

**(iii)  Redesignation**

In the case of a termination under this subparagraph, the Secretary of Homeland Security shall redesignate the country as a program country, without regard to subsection (f) of this section or paragraph (2) or (3), when

49a

the Secretary of Homeland Security, in consultation with the Secretary of State, determines that all causes of the termination have been eliminated.

**(B)  Emergency termination**

**(i)  In general**

In the case of a program country in which an emergency occurs that the Secretary of Homeland Security, in consultation with the Secretary of State, determines threatens the law enforcement or security interests of the United States (including the interest in enforcement of the immigration laws of the United States), the Secretary of Homeland Security shall immediately terminate the designation of the country as a program country.

**(ii)  Definition**

For purposes of clause (i), the term "emergency" means—

(I)   the overthrow of a democratically elected government;

(II)   war (including undeclared war, civil war, or other military activity) on the territory of the program country;

(III) a severe breakdown in law and order affecting a significant portion of the program country's territory;

(IV) a severe economic collapse in the program country; or

50a

(V)   any other extraordinary event in the program country that threatens the law enforcement or security interests of the United States (including the interest in enforcement of the immigration laws of the United States) and where the country's participation in the program could contribute to that threat.

**(iii)  Redesignation**

The Secretary of Homeland Security may redesignate the country as a program country, without regard to subsection (f) of this section or paragraph (2) or (3), when the Secretary of Homeland Security, in consultation with the Secretary of State, determines that—

(I)    at least 6 months have elapsed since the effective date of the termination;

(II)   the emergency that caused the termination has ended; and

(III) the average number of refusals of nonimmigrant visitor visas for nationals of that country during the period of termination under this subparagraph was less than 3.0 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during such period.

**(iv)  Program suspension authority**

The Director of National Intelligence shall immediately inform the Secretary of Homeland Security of any current and credible

51a

threat which poses an imminent danger to the United States or its citizens and originates from a country participating in the visa waiver program.   Upon receiving such notification, the Secretary, in consultation with the Secretary of State—

(I)   may suspend a country from the visa waiver program without prior notice;

(II)   shall notify any country suspended under subclause (I) and, to the extent practicable without disclosing sensitive intelligence sources and methods, provide justification for the suspension; and

(III) shall restore the suspended country's participation in the visa waiver program upon a determination that the threat no longer poses an imminent danger to the United States or its citizens.

**(C)   Treatment of nationals after termination**

For purposes of this paragraph—

(i)   nationals of a country whose designation is terminated under subparagraph (A) or (B) shall remain eligible for a waiver under subsection (a) of this section until the effective date of such termination; and

(ii)   a waiver under this section that is provided to such a national for a period described in subsection (a)(1) of this section shall not, by such termination, be deemed to have been rescinded or otherwise rendered invalid, if the waiver is granted prior to such termination.

52a

(6)   **Computation of visa refusal rates**

For purposes of determining the eligibility of a country to be designated as a program country, the calculation of visa refusal rates shall not include any visa refusals which incorporate any procedures based on, or are otherwise based on, race, sex, or disability, unless otherwise specifically authorized by law or regulation.   No court shall have jurisdiction under this paragraph to review any visa refusal, the denial of admission to the United States of any alien by the Secretary of Homeland Security, the Secretary's computation of the visa refusal rate, or the designation or nondesignation of any country.

(7)   **Visa waiver information**

(A)   **In general**

In refusing the application of nationals of a program country for United States visas, or the applications of nationals of a country seeking entry into the visa waiver program, a consular officer shall not knowingly or intentionally classify the refusal of the visa under a category that is not included in the calculation of the visa refusal rate only so that the percentage of that country's visa refusals is less than the percentage limitation applicable to qualification for participation in the visa waiver program.

(B)   **Reporting requirement**

On May 1 of each year, for each country under consideration for inclusion in the visa waiver program, the Secretary of State shall provide to the appropriate congressional committees—

53a

(i)   the total number of nationals of that country that applied for United States visas in that country during the previous calendar year;

(ii)   the total number of such nationals who received United States visas during the previous calendar year;

(iii)   the total number of such nationals who were refused United States visas during the previous calendar year;

(iv)   the total number of such nationals who were refused United States visas during the previous calendar year under each provision of this chapter under which the visas were refused; and

(v)   the number of such nationals that were refused under section 1184(b) of this title as a percentage of the visas that were issued to such nationals.

**(C)   Certification**

Not later than May 1 of each year, the United States chief of mission, acting or permanent, to each country under consideration for inclusion in the visa waiver program shall certify to the appropriate congressional committees that the information described in subparagraph (B) is accurate and provide a copy of that certification to those committees.

**(D) Consideration of countries in the visa waiver program**

Upon notification to the Secretary of Homeland Security that a country is under consideration for inclusion in the visa waiver program, the Secretary of State shall provide all of the information described in subparagraph (B) to the Secretary of Homeland Security.

**(E) Definition**

In this paragraph, the term "appropriate congressional committees" means the Committee on the Judiciary and the Committee on Foreign Relations of the Senate and the Committee on the Judiciary and the Committee on International Relations of the House of Representatives.

**(8) Nonimmigrant visa refusal rate flexibility**

**(A) Certification**

**(i) In general**

On the date on which an air exit system is in place that can verify the departure of not less than 97 percent of foreign nationals who exit through airports of the United States and the electronic system for travel authorization required under subsection (h)(3) is fully operational, the Secretary of Homeland Security shall certify to Congress that such air exit system and electronic system for travel authorization are in place.

55a

**(ii)   Notification to Congress**

The Secretary shall notify Congress in writing of the date on which the air exit system under clause (i) fully satisfies the biometric requirements specified in subsection (i).

**(iii)   Temporary suspension of waiver authority**

Notwithstanding any certification made under clause (i), if the Secretary has not notified Congress in accordance with clause (ii) by June 30, 2009, the Secretary's waiver authority under subparagraph (B) shall be suspended beginning on July 1, 2009, until such time as the Secretary makes such notification.

**(iv)   Rule of construction**

Nothing in this paragraph shall be construed as in any way abrogating the reporting requirements under subsection (i)(3).

**(B)   Waiver**

After certification by the Secretary under subparagraph (A), the Secretary, in consultation with the Secretary of State, may waive the application of paragraph (2)(A) for a country if—

(i)   the country meets all security requirements of this section;

(ii)   the Secretary of Homeland Security determines that the totality of the country's security risk mitigation measures provide assurance that the country's participation in the program would not compromise the law enforcement,

56a

security interests, or enforcement of the immigration laws of the United States;

(iii)  there has been a sustained reduction in the rate of refusals for nonimmigrant visas for nationals of the country and conditions exist to continue such reduction;

(iv)  the country cooperated with the Government of the United States on counterterrorism initiatives, information sharing, and preventing terrorist travel before the date of its designation as a program country, and the Secretary of Homeland Security and the Secretary of State determine that such cooperation will continue; and

(v)(I)  the rate of refusals for nonimmigrant visitor visas for nationals of the country during the previous full fiscal year was not more than ten percent; or

(II)  the visa overstay rate for the country for the previous full fiscal year does not exceed the maximum visa overstay rate, once such rate is established under subparagraph (C).

(C)  **Maximum visa overstay rate**

(i)  **Requirement to establish**

After certification by the Secretary under subparagraph (A), the Secretary and the Secretary of State jointly shall use information from the air exit system referred to in such subparagraph to establish a maximum visa overstay rate for countries participating in the program pursuant to a waiver under subpara-

57a

graph (B).  The Secretary of Homeland Security shall certify to Congress that such rate would not compromise the law enforcement, security interests, or enforcement of the immigration laws of the United States.

**(ii)  Visa overstay rate defined**

In this paragraph the term "visa overstay rate" means, with respect to a country, the ratio of—

(I)   the total number of nationals of that country who were admitted to the United States on the basis of a nonimmigrant visa whose periods of authorized stays ended during a fiscal year but who remained unlawfully in the United States beyond such periods; to

(II)  the total number of nationals of that country who were admitted to the United States on the basis of a nonimmigrant visa during that fiscal year.

**(iii)  Report and publication**

The Secretary of Homeland Security shall on the same date submit to Congress and publish in the Federal Register information relating to the maximum visa overstay rate established under clause (i).  Not later than 60 days after such date, the Secretary shall issue a final maximum visa overstay rate above which a country may not participate in the program.

58a

**(9)   Discretionary security-related considerations**

In determining whether to waive the application of paragraph (2)(A) for a country, pursuant to paragraph (8), the Secretary of Homeland Security, in consultation with the Secretary of State, shall take into consideration other factors affecting the security of the United States, including—

(A)   airport security standards in the country;

(B)   whether the country assists in the operation of an effective air marshal program;

(C)   the standards of passports and travel documents issued by the country; and

(D)   other security-related factors, including the country's cooperation with the United States' initiatives toward combating terrorism and the country's cooperation with the United States intelligence community in sharing information regarding terrorist threats.

**(10)  Technical assistance**

The Secretary of Homeland Security, in consultation with the Secretary of State, shall provide technical assistance to program countries to assist those countries in meeting the requirements under this section.   The Secretary of Homeland Security shall ensure that the program office within the Department of Homeland Security is adequately staffed and has resources to be able to provide such technical assistance, in addition to its duties to effectively monitor compliance of the countries participating in the program with all the requirements of the program.

59a

**(11)  Independent review**

**(A)    In general**

Prior to the admission of a new country into the program under this section, and in conjunction with the periodic evaluations required under subsection (c)(5)(A), the Director of National Intelligence shall conduct an independent intelligence assessment of a nominated country and member of the program.

**(B)    Reporting requirement**

The Director shall provide to the Secretary of Homeland Security, the Secretary of State, and the Attorney General the independent intelligence assessment required under subparagraph (A).

**(C)    Contents**

The independent intelligence assessment conducted by the Director shall include—

(i)    a review of all current, credible terrorist threats of the subject country;

(ii)   an evaluation of the subject country's counterterrorism efforts;

(iii)  an evaluation as to the extent of the country's sharing of information beneficial to suppressing terrorist movements, financing, or actions;

(iv)   an assessment of the risks associated with including the subject country in the program; and

60a

(v)  recommendations to mitigate the risks identified in clause (iv).

**(12)  Designation of high risk program countries**

**(A)    In general**

The Secretary of Homeland Security, in consultation with the Director of National Intelligence and the Secretary of State, shall evaluate program countries on an annual basis based on the criteria described in subparagraph (B) and shall identify any program country, the admission of nationals from which under the visa waiver program under this section, the Secretary determines presents a high risk to the national security of the United States.

**(B)    Criteria**

In evaluating program countries under subparagraph (A), the Secretary of Homeland Security, in consultation with the Director of National Intelligence and the Secretary of State, shall consider the following criteria:

(i)    The number of nationals of the country determined to be ineligible to travel to the United States under the program during the previous year.

(ii)    The number of nationals of the country who were identified in United States Government databases related to the identities of known or suspected terrorists during the previous year.

(iii) The estimated number of nationals of the country who have traveled to Iraq or Syria

61a

at any time on or after March 1, 2011 to engage in terrorism.

(iv) The capacity of the country to combat passport fraud.

(v) The level of cooperation of the country with the counter-terrorism efforts of the United States.

(vi) The adequacy of the border and immigration control of the country.

(vii) Any other criteria the Secretary of Homeland Security determines to be appropriate.

**(C) Suspension of designation**

The Secretary of Homeland Security, in consultation with the Secretary of State, may suspend the designation of a program country based on a determination that the country presents a high risk to the national security of the United States under subparagraph (A) until such time as the Secretary determines that the country no longer presents such a risk.

**(D) Report**

Not later than 60 days after December 18, 2015, and annually thereafter, the Secretary of Homeland Security, in consultation with the Director of National Intelligence and the Secretary of State, shall submit to the Committee on Homeland Security, the Committee on Foreign Affairs, the Permanent Select Committee on Intelligence, and the Committee on the Judiciary of the House of Representatives, and the Committee on Home-

62a

land Security and Governmental Affairs, the Committee on Foreign Relations, the Select Committee on Intelligence, and the Committee on the Judiciary of the Senate a report, which includes an evaluation and threat assessment of each country determined to present a high risk to the national security of the United States under subparagraph (A).

**(d)   Authority**

Notwithstanding any other provision of this section, the Secretary of Homeland Security, in consultation with the Secretary of State, may for any reason (including national security) refrain from waiving the visa requirement in respect to nationals of any country which may otherwise qualify for designation or may, at any time, rescind any waiver or designation previously granted under this section.   The Secretary of Homeland Security may not waive any eligibility requirement under this section unless the Secretary notifies, with respect to the House of Representatives, the Committee on Homeland Security, the Committee on the Judiciary, the Committee on Foreign Affairs, and the Committee on Appropriations, and with respect to the Senate, the Committee on Homeland Security and Governmental Affairs, the Committee on the Judiciary, the Committee on Foreign Relations, and the Committee on Appropriations not later than 30 days before the effective date of such waiver.

**(e)   Carrier agreements**

**(1)   In general**

The agreement referred to in subsection (a)(4) is an agreement between a carrier (including any car-

63a

rier conducting operations under part 135 of title 14, Code of Federal Regulations) or a domestic corporation conducting operations under part 91 of that title and the Secretary of Homeland Security under which the carrier (including any carrier conducting operations under part 135 of title 14, Code of Federal Regulations) or a domestic corporation conducting operations under part 91 of that title agrees, in consideration of the waiver of the visa requirement with respect to a nonimmigrant visitor under the program—

(A)  to indemnify the United States against any costs for the transportation of the alien from the United States if the visitor is refused admission to the United States or remains in the United States unlawfully after the 90-day period described in subsection (a)(1)(A) of this section,

(B)  to submit daily to immigration officers any immigration forms received with respect to nonimmigrant visitors provided a waiver under the program,

(C)  to be subject to the imposition of fines resulting from the transporting into the United States of a national of a designated country without a passport pursuant to regulations promulgated by the Secretary of Homeland Security, and

(D)  to collect, provide, and share passenger data as required under subsection (h)(1)(B) of this section.

**(2)  Termination of agreements**

The Secretary of Homeland Security may terminate an agreement under paragraph (1) with five days' notice to the carrier (including any carrier

64a

conducting operations under part 135 of title 14, Code of Federal Regulations) or a domestic corporation conducting operations under part 91 of that title for the failure by a carrier (including any carrier conducting operations under part 135 of title 14, Code of Federal Regulations) or a domestic corporation conducting operations under part 91 of that title to meet the terms of such agreement.

**(3)   Business aircraft requirements**

**(A)   In general**

For purposes of this section, a domestic corporation conducting operations under part 91 of title 14, Code of Federal Regulations[2] that owns or operates a noncommercial aircraft is a corporation that is organized under the laws of any of the States of the United States or the District of Columbia and is accredited by or a member of a national organization that sets business aviation standards.   The Secretary of Homeland Security shall prescribe by regulation the provision of such information as the Secretary of Homeland Security deems necessary to identify the domestic corporation, its officers, employees, shareholders, its place of business, and its business activities.

**(B)   Collections**

In addition to any other fee authorized by law, the Secretary of Homeland Security is authorized to charge and collect, on a periodic basis, an amount from each domestic corporation conducting operations under part 91 of title 14, Code of

---

[2]   So in Original.   Probably should be followed by a comma.

65a

Federal Regulations, for nonimmigrant visa waiver admissions on noncommercial aircraft owned or operated by such domestic corporation equal to the total amount of fees assessed for issuance of nonimmigrant visa waiver arrival/departure forms at land border ports of entry. All fees collected under this paragraph shall be deposited into the Immigration User Fee Account established under section 1356(h) of this title.

**(f)   Duration and termination of designation**

**(1)   In general**

**(A)   Determination and notification of disqualification rate**

Upon determination by the Secretary of Homeland Security that a program country's disqualification rate is 2 percent or more, the Secretary of Homeland Security shall notify the Secretary of State.

**(B)   Probationary status**

If the program country's disqualification rate is greater than 2 percent but less than 3.5 percent, the Secretary of Homeland Security shall place the program country in probationary status for a period not to exceed 2 full fiscal years following the year in which the determination under subparagraph (A) is made.

**(C)   Termination of designation**

Subject to paragraph (3), if the program country's disqualification rate is 3.5 percent or more, the Secretary of Homeland Security shall terminate the country's designation as a program country

66a

effective at the beginning of the second fiscal year following the fiscal year in which the determination under subparagraph (A) is made.

**(2)   Termination of probationary status**

**(A)   In general**

If the Secretary of Homeland Security determines at the end of the probationary period described in paragraph (1)(B) that the program country placed in probationary status under such paragraph has failed to develop a machine-readable passport program as required by section[3] (c)(2)(C), or has a disqualification rate of 2 percent or more, the Secretary of Homeland Security shall terminate the designation of the country as a program country.   If the Secretary of Homeland Security determines that the program country has developed a machine-readable passport program and has a disqualification rate of less than 2 percent, the Secretary of Homeland Security shall redesignate the country as a program country.

**(B)   Effective date**

A termination of the designation of a country under subparagraph (A) shall take effect on the first day of the first fiscal year following the fiscal year in which the determination under such subparagraph is made.   Until such date, nationals of the country shall remain eligible for a waiver under subsection (a) of this section.

---

[3]   So in original.   Probably should be "subsection".

67a

**(3)   Nonapplicability of certain provisions**

Paragraph (1)(C) shall not apply unless the total number of nationals of a program country described in paragraph (4)(A) exceeds 100.

**(4)   "Disqualification rate" defined**

For purposes of this subsection, the term "disqualification rate" means the percentage which—

(A)   the total number of nationals of the program country who were—

(i)   denied admission at the time of arrival or withdrew their application for admission during the most recent fiscal year for which data are available; and

(ii)   admitted as nonimmigrant visitors during such fiscal year and who violated the terms of such admission; bears to

(B)   the total number of nationals of such country who applied for admission as nonimmigrant visitors during such fiscal year.

**(5)   Failure to report passport thefts**

If the Secretary of Homeland Security and the Secretary of State jointly determine that the program country is not reporting the theft or loss of passports, as required by subsection (c)(2)(D) of this section, the Secretary of Homeland Security shall terminate the designation of the country as a program country.

68a

**(6)   Failure to share information**

**(A)   In general**

If the Secretary of Homeland Security and the Secretary of State jointly determine that the program country is not sharing information, as required by subsection (c)(2)(F), the Secretary of Homeland Security shall terminate the designation of the country as a program country.

**(B)   Redesignation**

In the case of a termination under this paragraph, the Secretary of Homeland Security shall redesignate the country as a program country, without regard to paragraph (2) or (3) of subsection (c) or paragraphs (1) through (4), when the Secretary of Homeland Security, in consultation with the Secretary of State, determines that the country is sharing information, as required by subsection (c)(2)(F).

**(7)   Failure to screen**

**(A)   In general**

Beginning on the date that is 270 days after December 18, 2015, if the Secretary of Homeland Security and the Secretary of State jointly determine that the program country is not conducting the screening required by subsection (c)(2)(G), the Secretary of Homeland Security shall terminate the designation of the country as a program country.

**(B)   Redesignation**

In the case of a termination under this paragraph, the Secretary of Homeland Security shall

69a

redesignate the country as a program country, without regard to paragraph (2) or (3) of subsection (c) or paragraphs (1) through (4), when the Secretary of Homeland Security, in consultation with the Secretary of State, determines that the country is conducting the screening required by subsection (c)(2)(G).

**(g)  Visa application sole method to dispute denial of waiver based on a ground of inadmissibility**

In the case of an alien denied a waiver under the program by reason of a ground of inadmissibility described in section 1182(a) of this title that is discovered at the time of the alien's application for the waiver or through the use of an automated electronic database required under subsection (a)(9) of this section, the alien may apply for a visa at an appropriate consular office outside the United States.  There shall be no other means of administrative or judicial review of such a denial, and no court or person otherwise shall have jurisdiction to consider any claim attacking the validity of such a denial.

**(h)  Use of information technology systems**

**(1)  Automated entry-exit control system**

**(A)  System**

Not later than October 1, 2001, the Secretary of Homeland Security shall develop and implement a fully automated entry and exit control system that will collect a record of arrival and departure for every alien who arrives and departs by sea or air at a port of entry into the United States and is provided a waiver under the program.

70a

**(B)   Requirements**

The system under subparagraph (A) shall satisfy the following requirements:

**(i)   Data collection by carriers**

Not later than October 1, 2001, the records of arrival and departure described in subparagraph (A) shall be based, to the maximum extent practicable, on passenger data collected and electronically transmitted to the automated entry and exit control system by each carrier that has an agreement under subsection (a)(4) of this section.

**(ii)   Data provision by carriers**

Not later than October 1, 2002, no waiver may be provided under this section to an alien arriving by sea or air at a port of entry into the United States on a carrier unless the carrier is electronically transmitting to the automated entry and exit control system passenger data determined by the Secretary of Homeland Security to be sufficient to permit the Secretary of Homeland Security to carry out this paragraph.

**(iii)   Calculation**

The system shall contain sufficient data to permit the Secretary of Homeland Security to calculate, for each program country and each fiscal year, the portion of nationals of that country who are described in subparagraph (A) and for whom no record of departure exists, expressed as a percentage of the total number of such nationals who are so described.

71a

**(C)  Reporting**

**(i)  Percentage of nationals lacking departure record**

As part of the annual report required to be submitted under section 1365a(e)(1) of this title, the Secretary of Homeland Security shall include a section containing the calculation described in subparagraph (B)(iii) for each program country for the previous fiscal year, together with an analysis of that information.

**(ii)  System effectiveness**

Not later than December 31, 2004, the Secretary of Homeland Security shall submit a written report to the Committee on the Judiciary of the United States House of Representatives and of the Senate containing the following:

(I)  The conclusions of the Secretary of Homeland Security regarding the effectiveness of the automated entry and exit control system to be developed and implemented under this paragraph.

(II)  The recommendations of the Secretary of Homeland Security regarding the use of the calculation described in subparagraph (B)(iii) as a basis for evaluating whether to terminate or continue the designation of a country as a program country.

The report required by this clause may be combined with the annual report required to be submitted on that date under section 1365a(e)(1) of this title.

72a

**(2)   Automated data sharing system**

**(A)   System**

The Secretary of Homeland Security and the Secretary of State shall develop and implement an automated data sharing system that will permit them to share data in electronic form from their respective records systems regarding the admissibility of aliens who are nationals of a program country.

**(B)   Requirements**

The system under subparagraph (A) shall satisfy the following requirements:

**(i)   Supplying information to immigration officers conducting inspections at ports of entry**

Not later than October 1, 2002, the system shall enable immigration officers conducting inspections at ports of entry under section 1225 of this title to obtain from the system, with respect to aliens seeking a waiver under the program—

(I)   any photograph of the alien that may be contained in the records of the Department of State or the Service; and

(II)  information on whether the alien has ever been determined to be ineligible to receive a visa or ineligible to be admitted to the United States.

**(ii)   Supplying photographs of inadmissible aliens**

The system shall permit the Secretary of Homeland Security electronically to obtain any

73a

photograph contained in the records of the Secretary of State pertaining to an alien who is a national of a program country and has been determined to be ineligible to receive a visa.

### (iii) Maintaining records on applications for admission

The system shall maintain, for a minimum of 10 years, information about each application for admission made by an alien seeking a waiver under the program, including the following:

(I)   The name or Service identification number of each immigration officer conducting the inspection of the alien at the port of entry.

(II)   Any information described in clause (i) that is obtained from the system by any such officer.

(III)  The results of the application.

### (3)   Electronic system for travel authorization

### (A)   System

The Secretary of Homeland Security, in consultation with the Secretary of State, shall develop and implement a fully automated electronic system for travel authorization (referred to in this paragraph as the "System") to collect such biographical and other information as the Secretary of Homeland Security determines necessary to determine, in advance of travel, the eligibility of, and whether there exists a law enforcement or

74a

security risk in permitting, the[4] alien to travel to the United States.

**(B)  Fees**

**(i)   In general**

No later than 6 months after March 4, 2010, the Secretary of Homeland Security shall establish a fee for the use of the System and begin assessment and collection of that fee.   The initial fee shall be the sum of—

(I)   $10 per travel authorization; and

(II)  an amount that will at least ensure recovery of the full costs of providing and administering the System, as determined by the Secretary.

**(ii)   Disposition of amounts collected**

Amounts collected under clause (i)(I) shall be credited to the Travel Promotion Fund established by subsection (d) of section 2131 of title 22. Amounts collected under clause (i)(II) shall be transferred to the general fund of the Treasury and made available to pay the costs incurred to administer the System.

**(iii)  Sunset of Travel Promotion Fund fee**

The Secretary may not collect the fee authorized by clause (i)(I) for fiscal years beginning after September 30, 2020.

---

[4]  So in original.   Probably should be "an".

75a

**(C)  Validity**

**(i)  Period**

The Secretary of Homeland Security, in consultation with the Secretary of State, shall prescribe regulations that provide for a period, not to exceed three years, during which a determination of eligibility to travel under the program will be valid.  Notwithstanding any other provision under this section, the Secretary of Homeland Security may revoke any such determination or shorten the period of eligibility under any such determination at any time and for any reason.

**(ii)  Limitation**

A determination by the Secretary of Homeland Security that an alien is eligible to travel to the United States under the program is not a determination that the alien is admissible to the United States.

**(iii)  Not a determination of visa eligibility**

A determination by the Secretary of Homeland Security that an alien who applied for authorization to travel to the United States through the System is not eligible to travel under the program is not a determination of eligibility for a visa to travel to the United States and shall not preclude the alien from applying for a visa.

**(iv)  Judicial review**

Notwithstanding any other provision of law, no court shall have jurisdiction to review an eligibility determination under the System.

76a

**(D)   Fraud detection**

The Secretary of Homeland Security shall research opportunities to incorporate into the System technology that will detect and prevent fraud and deception in the System.

**(E)   Additional and previous countries of citizenship**

The Secretary of Homeland Security shall collect from an applicant for admission pursuant to this section information on any additional or previous countries of citizenship of that applicant. The Secretary shall take any information so collected into account when making determinations as to the eligibility of the alien for admission pursuant to this section.

**(F)   Report on certain limitations on travel**

Not later than 30 days after December 18, 2015, and annually thereafter, the Secretary of Homeland Security, in consultation with the Secretary of State, shall submit to the Committee on Homeland Security, the Committee on the Judiciary, and the Committee on Foreign Affairs of the House of Representatives, and the Committee on Homeland Security and Governmental Affairs, the Committee on the Judiciary, and the Committee on Foreign Relations of the Senate a report on the number of individuals who were denied eligibility to travel under the program, or whose eligibility for such travel was revoked during the previous year, and the number of such individuals determined, in accordance with subsection (a)(6), to represent a threat to the national security of the

77a

United States, and shall include the country or countries of citizenship of each such individual.

**(i)   Exit system**

**(1)   In general**

Not later than one year after August 3, 2007, the Secretary of Homeland Security shall establish an exit system that records the departure on a flight leaving the United States of every alien participating in the visa waiver program established under this section.

**(2)   System requirements**

The system established under paragraph (1) shall—

(A)   match biometric information of the alien against relevant watch lists and immigration information; and

(B)   compare such biometric information against manifest information collected by air carriers on passengers departing the United States to confirm such aliens have departed the United States.

**(3)   Report**

Not later than 180 days after August 3, 2007, the Secretary shall submit to Congress a report that describes—

(A)   the progress made in developing and deploying the exit system established under this subsection; and

(B)   the procedures by which the Secretary shall improve the method of calculating the rates

78a

of nonimmigrants who overstay their authorized period of stay in the United States.

11.    8 U.S.C. 1201 (2012 & Supp. IV 2016) provides:

**Issuance of visas**

**(a)   Immigrants; nonimmigrants**

(1)    Under the conditions hereinafter prescribed and subject to the limitations prescribed in this chapter or regulations issued thereunder, a consular officer may issue

(A)    to an immigrant who has made proper application therefor, an immigrant visa which shall consist of the application provided for in section 1202 of this title, visaed by such consular officer, and shall specify the foreign state, if any, to which the immigrant is charged, the immigrant's particular status under such foreign state, the preference, immediate relative, or special immigrant classification to which the alien is charged, the date on which the validity of the visa shall expire, and such additional information as may be required; and

(B)    to a nonimmigrant who has made proper application therefor, a nonimmigrant visa, which shall specify the classification under section 1101(a)(15) of this title of the nonimmigrant, the period during which the nonimmigrant visa shall be valid, and such additional information as may be required.

(2)    The Secretary of State shall provide to the Service an electronic version of the visa file of each alien who has been issued a visa to ensure that the data in that visa file is available to immigration inspectors at

79a

the United States ports of entry before the arrival of the alien at such a port of entry.

**(b)   Registration; photographs; waiver of requirement**

Each alien who applies for a visa shall be registered in connection with his application, and shall furnish copies of his photograph signed by him for such use as may be by regulations required.   The requirements of this subsection may be waived in the discretion of the Secretary of State in the case of any alien who is within that class of nonimmigrants enumerated in sections 1101(a)(15)(A), and 1101(a)(15)(G) of this title, or in the case of any alien who is granted a diplomatic visa on a diplomatic passport or on the equivalent thereof.

**(c)   Period of validity; renewal or replacement**

**(1)   Immigrant visas**

An immigrant visa shall be valid for such period, not exceeding six months, as shall be by regulations prescribed, except that any visa issued to a child lawfully adopted by a United States citizen and spouse while such citizen is serving abroad in the United States Armed Forces, or is employed abroad by the United States Government, or is temporarily abroad on business, shall be valid until such time, for a period not to exceed three years, as the adoptive citizen parent returns to the United States in due course of his service, employment, or business.

**(2)   Nonimmigrant visas**

A nonimmigrant visa shall be valid for such periods as shall be by regulations prescribed.   In prescribing the period of validity of a nonimmigrant visa in the case of nationals of any foreign country who

80a

are eligible for such visas, the Secretary of State shall, insofar as practicable, accord to such nationals the same treatment upon a reciprocal basis as such foreign country accords to nationals of the United States who are within a similar class; except that in the case of aliens who are nationals of a foreign country and who either are granted refugee status and firmly resettled in another foreign country or are granted permanent residence and residing in another foreign country, the Secretary of State may prescribe the period of validity of such a visa based upon the treatment granted by that other foreign country to alien refugees and permanent residents, respectively, in the United States.

**(3)   Visa replacement**

An immigrant visa may be replaced under the original number during the fiscal year in which the original visa was issued for an immigrant who establishes to the satisfaction of the consular officer that the immigrant—

(A)   was unable to use the original immigrant visa during the period of its validity because of reasons beyond his control and for which he was not responsible;

(B)   is found by a consular officer to be eligible for an immigrant visa; and

(C)   pays again the statutory fees for an application and an immigrant visa.

**(4)   Fee waiver**

If an immigrant visa was issued, on or after March 27, 2013, for a child who has been lawfully adopted,

81a

or who is coming to the United States to be adopted, by a United States citizen, any statutory immigrant visa fees relating to a renewal or replacement of such visa may be waived or, if already paid, may be refunded upon request, subject to such criteria as the Secretary of State may prescribe, if—

> (A)   the immigrant child was unable to use the original immigrant visa during the period of its validity as a direct result of extraordinary circumstances, including the denial of an exit permit; and

> (B)   if such inability was attributable to factors beyond the control of the adopting parent or parents and of the immigrant.

**(d)   Physical examination**

Prior to the issuance of an immigrant visa to any alien, the consular officer shall require such alien to submit to a physical and mental examination in accordance with such regulations as may be prescribed. Prior to the issuance of a nonimmigrant visa to any alien, the consular officer may require such alien to submit to a physical or mental examination, or both, if in his opinion such examination is necessary to ascertain whether such alien is eligible to receive a visa.

**(e)   Surrender of visa**

Each immigrant shall surrender his immigrant visa to the immigration officer at the port of entry, who shall endorse on the visa the date and the port of arrival, the identity of the vessel or other means of transportation by which the immigrant arrived, and such other endorsements as may be by regulations required.

82a

**(f)   Surrender of documents**

Each nonimmigrant shall present or surrender to the immigration officer at the port of entry such documents as may be by regulation required.   In the case of an alien crewman not in possession of any individual documents other than a passport and until such time as it becomes practicable to issue individual documents, such alien crewman may be admitted, subject to the provisions of this part, if his name appears in the crew list of the vessel or aircraft on which he arrives and the crew list is visaed by a consular officer, but the consular officer shall have the right to deny admission to any alien crewman from the crew list visa.

**(g)   Nonissuance of visas or other documents**

No visa or other documentation shall be issued to an alien if (1) it appears to the consular officer, from statements in the application, or in the papers submitted therewith, that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law, (2) the application fails to comply with the provisions of this chapter, or the regulations issued thereunder, or (3) the consular officer knows or has reason to believe that such alien is ineligible to receive a visa or such other documentation under section 1182 of this title, or any other provision of law:   *Provided*, That a visa or other documentation may be issued to an alien who is within the purview of section 1182(a)(4) of this title, if such alien is otherwise entitled to receive a visa or other documentation, upon receipt of notice by the consular officer from the Attorney General of the giving of a bond or undertaking providing indemnity as in the case of aliens admitted under section 1183 of this title:   *Provided fur-*

83a

*ther*, That a visa may be issued to an alien defined in section 1101(a)(15)(B) or (F) of this title, if such alien is otherwise entitled to receive a visa, upon receipt of a notice by the consular officer from the Attorney General of the giving of a bond with sufficient surety in such sum and containing such conditions as the consular officer shall prescribe, to insure that at the expiration of the time for which such alien has been admitted by the Attorney General, as provided in section 1184(a) of this title, or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under section 1258 of this title, such alien will depart from the United States.

**(h)   Nonadmission upon arrival**

Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted[1] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law.   The substance of this subsection shall appear upon every visa application.

**(i)   Revocation of visas or documents**

After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation.   Notice of such revocation shall be communicated to the Attorney General, and such revocation shall invalidate the visa or other documentation from the date of issuance:   *Provided*, That carriers or transportation companies, and mas-

---

[1]  So in original.   Probably should be followed by "to".

84a

ters, commanding officers, agents, owners, charterers, or consignees, shall not be penalized under section 1323(b) of this title for action taken in reliance on such visas or other documentation, unless they received due notice of such revocation prior to the alien's embarkation. There shall be no means of judicial review (including review pursuant to section 2241 of title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title) of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

12.  8 U.S.C. 1225(a) provides:

**Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing**

**(a)  Inspection**

    **(1)  Aliens treated as applicants for admission**

        An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

    **(2)  Stowaways**

        An arriving alien who is a stowaway is not eligible to apply for admission or to be admitted and shall be ordered removed upon inspection by an immigration officer.  Upon such inspection if the alien indicates an intention to apply for asylum under section 1158

85a

of this title or a fear of persecution, the officer shall refer the alien for an interview under subsection (b)(1)(B) of this section. A stowaway may apply for asylum only if the stowaway is found to have a credible fear of persecution under subsection (b)(1)(B) of this section. In no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 1229a of this title.

**(3)   Inspection**

All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

**(4)   Withdrawal of application for admission**

An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States.

**(5)   Statements**

An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.