# Exhibit 29

No. 17-965

# In the Supreme Court of the United States

———————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES
ET AL., PETITIONERS

*v.*

STATE OF HAWAII, ET AL.

———————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

———————

**REPLY BRIEF FOR THE PETITIONERS**

———————

NOEL J. FRANCISCO
*Solicitor General
Counsel of Record
Department of Justice
Washington, D.C. 20530-0001
SupremeCtBriefs@usdoj.gov
(202) 514-2217*

## TABLE OF CONTENTS

Page

I.  The decision below is in need of review ........................ 1
II. The decision below is wrong ............................................ 3
    A.  Respondents' statutory claims are not
        justiciable ...................................................................... 3
    B.  The Proclamation is a lawful exercise of the
        President's authority to suspend entry of aliens
        abroad ............................................................................ 4
    C.  The Proclamation does not violate the
        Establishment Clause ................................................ 9
    D.  The global injunction is vastly overbroad ............. 11

## TABLE OF AUTHORITIES

Cases:

*Abourezk* v. *Reagan*, 785 F.2d 1043 (D.C. Cir. 1986),
    aff'd by an equally divided Court, 484 U.S. 1 (1987) ......... 5
*Arizona* v. *United States*, 567 U.S. 387 (2012) .................... 6
*Centeno* v. *Shultz*, 817 F. 2d 1212 (5th Cir. 1987),
    cert. denied, 484 U.S. 1005 (1988) ................................... 4
*Galvan* v. *Press*, 347 U.S. 522 (1954) .................................... 6
*IRAP* v. *Trump*, 265 F. Supp. 3d 570 (D. Md. 2017).......... 10
*Kleindienst* v. *Mandel*, 408 U.S. 753 (1972) ....................... 10
*United States ex rel. Knauff* v. *Shaughnessy*,
    338 U.S. 537 (1950)............................................................ 3, 6
*Zivotofsky ex rel Zivotofsky* v. *Kerry*, 135 S. Ct. 2076
    (2015)................................................................................ 6, 7
*Zemel* v. *Rusk*, 381 U.S. 1 (1965) .......................................... 7

(I)

II

Statutes, regulations, and rule:                    Page

Administrative Procedure Act, 5 U.S.C. 701 *et seq*............. 3
Immigration and Nationality Act,
8 U.S.C. 1101 *et seq*............................................................... 2
   8 U.S.C. 1152(a)(1)(A) ............................................. 3, 8, 9
   8 U.S.C. 1182 ............................................................... 8
   8 U.S.C. 1182(a)........................................................... 5
   8 U.S.C. 1182(a)(2)-(3) ................................................. 5
   8 U.S.C. 1182(f)..................................................... *passim*
   8 U.S.C. 1185(a)(1)............................................. 3, 5, 7, 8, 9
   8 U.S.C. 1201(h)........................................................... 8
Exec. Order No. 13,780, 82 Fed. Reg. 13,209
   (Mar. 9, 2017)............................................... 2, 10, 11
Proclamation No. 9645, 82 Fed. Reg. 45,161
   (Sept. 27, 2017) .............................................. 1, 4, 5, 8, 11
Sup. Ct. R. 10(c) .............................................................. 1

# In the Supreme Court of the United States

————

No. 17-965

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES
ET AL., PETITIONERS

*v.*

STATE OF HAWAII, ET AL.

————

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

————

**REPLY BRIEF FOR THE PETITIONERS**

————

## I.  THE DECISION BELOW IS IN NEED OF REVIEW

Apart from arguing that the decision below is correct, respondents are virtually silent on the need for this Court's review.  See Pet. 33-34.  They do not dispute that the court of appeals has decided a critically important question of federal law, see Sup. Ct. R. 10(c), and indeed they concede that this case is comparable to others where "the question is of vital importance to the Nation as a whole," Br. in Opp. 36.  About that, respondents are correct.  The court of appeals affirmed a global injunction against a Presidential Proclamation that furthers important national-security and foreign-relations objectives.  Proclamation No. 9645, 82 Fed. Reg. 45,161 (Sept. 27, 2017), Pet. App. 121a-148a.

In light of the multi-agency review process that preceded the Proclamation, this case warrants review even

(1)

2

more than when this Court granted certiorari to review injunctions of EO-2, Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017).  Respondents contend (at 2) that the court of appeals' decision is "limited to the particular facts of this order," but the court's interpretations of the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*—requiring the President to make remarkably detailed findings, Pet. App. 44a-46a, imposing a temporal limit on the President's authority to suspend entry of aliens abroad, Pet. App. 26a-27a, and barring the President from using entry suspensions directed at particular countries as a diplomatic tool in all but the most exceptional circumstances, Pet. App. 53a—would constrain the ability of this and future Presidents to discharge their duties.

Although this Court's review is warranted, there is no sound reason for respondents' suggestion (at 35-36) that the Court dramatically expedite merits briefing. Because the parties expedited briefing on the government's petition for a writ of certiorari, if the Court grants the petition, the case may be scheduled for argument during the Court's April sitting with relatively minor modifications to the briefing schedule provided in the Court's Rules.  By contrast, respondents' proposal for an argument during the Court's March sitting would require not a "slight reduction" in the briefing schedule, Br. in Opp. 36, but a severe one:  there are eight weeks between the Court's next conference on January 19 and the start of the March sitting.  Preparing opening and reply briefs so quickly would prejudice the government in light of the multiple agencies involved and the number and complexity of the legal issues presented.

3

## II. THE DECISION BELOW IS WRONG

Respondents have not shown that their statutory challenge to the Proclamation is judicially reviewable based on express authorization from Congress. On the merits, they have further failed to show that the Proclamation is unlawful. Respondents can claim that the Proclamation violates the INA only by rewriting the actual text of 8 U.S.C. 1182(f), 1185(a)(1), and 1152(a)(1)(A). And their Establishment Clause claim rests on attacking the multi-agency review process in ways that have no support in the record.

### A. Respondents' Statutory Claims Are Not Justiciable

Respondents contend (at 9) that their claims are justiciable through two routes: the Administrative Procedure Act (APA), 5 U.S.C. 701 *et seq.*, and a suit in equity outside the APA. Neither supplies the "express[ ] authoriz[ation]" that this Court requires before "any court" can review the exclusion of "a given alien" from the United States. *United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 543 (1950); see Pet. 17-19. Contrary to respondents' suggestion (at 10), although the claims in *Knauff* arose in a suit by an individual alien, the claims amounted to a facial challenge to executive policy, 338 U.S. at 542, and the claims were reviewable only because habeas corpus was available to an alien detained at the border, *id.* at 540, an option that obviously is not open to aliens abroad (who are not in custody).

Respondents erroneously suggest that the nonreviewability doctrine is limited to "discretion[ary]" decisions to exclude aliens. Br. in Opp. 10; accord *ibid.* ("There is no question  * * *  that courts may review whether executive officials have exceeded their authority under the immigration laws."). The bar to review

4

also extends to alleged statutory violations, lest it be easily circumvented. *E.g.*, *Centeno* v. *Shultz*, 817 F.2d 1212, 1213 (5th Cir. 1987) (per curiam) (holding that the denial of a visa to an alien was "not reviewable by a federal court" even though the alien alleged, *inter alia*, that the denial "was not authorized by the [INA]"), cert. denied, 484 U.S. 1005 (1988). If Congress wants to authorize review expressly for statutory violations, of course it can do so, but unless and until it does, the separation-of-powers principles that bar review of individual consular officers' decisions apply with even greater force to a decision of the President on national-security and foreign-relations grounds.

### B. The Proclamation Is A Lawful Exercise Of The President's Authority To Suspend Entry Of Aliens Abroad

1. Respondents repeatedly mischaracterize the government's position as claiming "boundless" or "limitless" power for the President to exclude aliens abroad. Br. in Opp. 1, 13, 14, 15. The Proclamation does not come close to the limits of the President's powers under the INA and the Constitution because he made the very finding that 8 U.S.C. 1182(f) requires: that entry of the covered foreign nationals would be detrimental to the interests of the United States. Pet. 21-22. The President also explained why, based on national-security and foreign-policy determinations that are the very focus of the statute: the multi-agency review determined that certain foreign governments do not share needed information or have other risk factors, and tailored entry restrictions will both prevent entry of persons about whom the United States lacks sufficient information and incentivize the deficient countries to improve. Procl. § 1(h)(i).

5

Those purposes are fully consistent with the INA, which, as respondents note (at 26), requires the government to vet visa applicants to determine whether they are inadmissible because of criminal history, connections to terrorism, or other reasons.  See, *e.g.*, 8 U.S.C. 1182(a)(2)-(3).  The effectiveness of those "finely reticulated vetting procedures," Br. in Opp. 26, depends in significant part on "[i]nformation-sharing and identity-management protocols and practices of foreign governments."  Procl. § 1(b).  The President found that certain countries' failure to provide adequate information prevents the United States from "assess[ing] the risks [their nationals] pose."  *Id.* § 1(h)(i).  The Proclamation thus fully refutes respondents' charge (at 26) that it "subverts," rather than reasonably supplements, Section 1182(a).  See *Abourezk* v. *Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (R.B. Ginsburg, J.) (the President's power under Section 1182(f) is "sweeping" and may be used to exclude aliens based on a finding that is not sufficient to mandate inadmissibility under Section 1182(a)), aff'd by an equally divided Court, 484 U.S. 1 (1987) (per curiam).

Respondents and the court of appeals have no textual basis for the limits they would graft onto the President's authority under Sections 1182(f) and 1185(a)(1).  Notably, respondents do not defend the court's primary submission that a presidential entry-suspension order must be limited in time.  See Pet. 23-25.  Respondents instead propose their own set of limitations, contending that Sections 1182(f) and 1185(a)(1) can be applied only to "harmful" aliens akin to "spies," or else during an "exigency" such as an "'epidemic' or an economic crisis, in which 'it is impossible for Congress to act.'"  Br. in

6

Opp. 21, 23-24 (citation omitted). Those suggested restrictions on the President likewise have no grounding in the statutory text. Respondents barely mention that when Congress enacted the current Section 1182(f) in 1952, it debated—and rejected—limiting the President's power to suspend entry to times of war or national emergency. See Pet. 26-27. Nor are respondents' standards workable in practice, because courts are not well equipped to evaluate the President's judgments about when a foreign government's actions constitute a sufficient exigency that action is warranted.

Respondents argue (at 16-17) that their atextual limits are necessary to avoid nondelegation concerns. But *Knauff* rejected a similar nondelegation argument by an alien who had reached our shores, 338 U.S. at 542, and it follows that respondents' objection here—to Congress's vesting of authority in the President to suspend entry of aliens abroad—is even weaker. *Knauff* directly contradicts respondents' repeated contention that immigration policy must be made "exclusive[ly]" by Congress, Br. in Opp. 2 (quoting *Arizona* v. *United States*, 567 U.S. 387, 409 (2012), and *Galvan* v. *Press*, 347 U.S. 522, 531 (1954)), by holding that "[t]he exclusion of aliens is a fundamental act of sovereignty" that "stems not alone from the legislative power but is inherent in the executive power," 338 U.S. at 542.

Contrary to respondents' argument (at 17), this Court has never "rejected" *Knauff*'s holding. *Galvan* held that an alien may not challenge his removal from the United States under the Ex Post Facto Clause. 347 U.S. at 531. *Arizona* held that a state's statutes were preempted by federal immigration policy. 567 U.S. at 392-393. And *Zivotofksy ex rel Zivotofsky* v. *Kerry*, 135 S. Ct. 2076 (2015), likewise did not address *Knauff* or

7

the exclusion of aliens at all.  Indeed, although the Court explained that the President does not have inherent authority over all matters implicating foreign affairs, *id.* at 2089-2090, it nevertheless ruled in favor of the President on the specific foreign-affairs question presented there despite an explicitly contrary statutory directive, *id.* at 2094-2095.  Respondents' only other citations are to inapposite cases involving regulations of citizens or aliens already in this country.  Br. in Opp. 14 (quoting, *e.g.*, *Zemel* v. *Rusk*, 381 U.S. 1, 17 (1965)).

Respondents specifically deny that the President may use Sections 1182(f) and 1185(a)(1) to create diplomatic pressure on recalcitrant foreign governments, arguing that entry suspensions must be limited to aliens who themselves threaten harm to the United States.  Br. in Opp. 25, 28.  That argument is refuted by the text of Section 1182(f), which authorizes the President to suspend entry of "all aliens or any class of aliens" if he finds that entry would be detrimental to the national interest.  Respondents' argument also would invalidate the orders of President Carter, President Reagan, and the several other Presidents who suspended entry of classes of aliens not because they posed an ongoing threat, but because of their prior bad acts, thereby serving to sanction and deter that conduct.  See Pet. App. 36a-37a (citing examples).

Respondents also contend (at 27-28) that the Proclamation fails to make an "adequate" finding under Section 1182(f).  But their criticisms of the Proclamation hardly demonstrate that it lacks any rational basis—the deferential standard that they concede applies (if, contrary to the government's submission, judicial review is available at all).  Br. in Opp. 27.  Respondents' suggestion that individual consular officers can address

8

information-sharing deficiencies would not create pressure on foreign governments to adopt more secure practices, and the President is entitled to address systemic problems with systemic solutions. Respondents also note that the Proclamation does not impose blanket bans but allows entry of some classes of nationals from the covered countries. That is because the President balanced multiple objectives, and the Proclamation explains its reasoning for tailoring the restrictions as to every country. Procl. §§ 1(h)(ii)-(iii), 2.

2. Respondents urge this Court to read 8 U.S.C. 1152(a)(1)(A) as a limitation on the President's power to suspend entry of aliens abroad under Sections 1182(f) and 1185(a)(1). But they have no answer for the textual features of Section 1152(a)(1)(A) that show the statute serves a different function. Section 1152(a)(1)(A) bars nationality discrimination only in "the issuance of immigrant visa[s]." Congress would not have so limited the statute if it had meant to bar the President from suspending entry of aliens based on nationality under Section 1182(f), because Congress itself has provided that mere issuance of a visa does not guarantee entry to an alien who is inadmissible under Section 1182. See 8 U.S.C. 1201(h). Respondents also offer no explanation why Congress would have restricted the President's authority to suspend entry based on nationality only as to immigrants but not nonimmigrants.

Instead, Section 1152(a)(1)(A) does just what its text and legislative history say: it bars discrimination among aliens who are eligible to receive a visa (and it thereby eliminates the country-based quota system for immigrants that was previously in effect), but it does not disturb the grounds of inadmissibility in Section 1182, including 1182(f), or require the issuance of a visa

9

to inadmissible aliens. See Pet. 29. The government agrees that the President could not use Sections 1182(f) and 1185(a)(1) to revive the quota system, Br. in Opp. 29, but the Proclamation does nothing of the sort. Its nationality distinctions are based not on "'the racial origin of prospective immigrants,'" *id.* at 31, but rather on deficiencies in the United States' ability to assess the risk those foreign nationals pose.

The other sure sign that respondents are mistaken about the meaning of Section 1152(a)(1)(A) is that they cannot bear the implications of their position for the President's responsibilities and prior Executive practice: President Carter and President Reagan both responded to international disputes with entry restrictions directed at aliens of a single nationality. Respondents thus propose exceptions to their interpretation of Section 1152(a)(1)(A) for presidential orders that are "closely drawn to address a 'compelling' exigency." Br. in Opp. 31 (citation omitted). But the absence of any such express exceptions in the text is strong evidence that Congress did not mean Section 1152(a)(1)(A) to intrude on the President's authority to suspend entry based on the Nation's security and foreign-policy interests. Respondents confidently assert that it is "not difficult" to opine on which historical events and current international disputes qualify as compelling exigencies. Br. in Opp. 32. Section 1152(a)(1)(A), however, provides no standards for a court to use to second guess the President on those inherently Executive determinations.

### C. The Proclamation Does Not Violate The Establishment Clause

Although the district court and court of appeals did not address respondents' Establishment Clause challenge to the Proclamation, the United States agrees

10

that the Court should add a question presented in this case to decide that issue. Respondents pressed that claim in their request for a temporary restraining order, and preserved it on appeal. Addressing the full range of claims against the Proclamation would provide much-needed clarity to the government, respondents, and the public. The question was decided (incorrectly) by the district court in *IRAP* v. *Trump*, 265 F. Supp. 3d 570 (D. Md. 2017), see Pet. 15, but the Fourth Circuit has not yet ruled on the government's appeal in that case.

Although the question warrants review, respondents' Establishment Clause challenge to the Proclamation is not justiciable and plainly fails on the merits. See U.S. Stay Appl. 22-24, 28-35, *Trump* v. *IRAP*, No. 17A560 (Nov. 21, 2017). The conclusions of the multi-agency review and recommendation process, and the tailoring of the Proclamation's restrictions, provide a "facially legitimate and bona fide reason" for the exclusion of the covered aliens. *Kleindienst* v. *Mandel*, 408 U.S. 753, 770 (1972). Moreover, the Proclamation's process and substance confirm that its purpose was to achieve national-security and foreign-policy goals, not to impose anti-Muslim bias.

Rather than engage with the Proclamation, respondents focus (at 32-33) on the choice of countries covered by EO-2's temporary restrictions, even though those restrictions have expired and EO-2 explained that those countries had previously been singled out by Congress or the Executive as posing heightened terrorism-related concerns. See Pet. App. 149a-152a (EO-2 § 1). Regardless, the Proclamation is fundamentally different from EO-2 because it covers different countries and different

11

nationals within the covered countries, and its restrictions were adopted following the comprehensive review process, during which multiple agencies assessed over 200 countries by applying national-security criteria that have nothing to do with religion.

Respondents are left to assert (at 33) that the outcome of the review process was largely "predetermined by EO-2." But that assertion is flatly inconsistent with EO-2 itself, which left to the agencies' judgment whether any categories of foreign nationals would be "appropriate" for entry restrictions at the conclusion of the review. Pet. App. 159a (EO-2 § 2(e)). Nor do respondents point to any basis for their accusation that those agencies conducted a sham review "primarily to improve the Government's 'litigating position.'" Br. in Opp. 33-34 (citation omitted). Likewise, respondents' contention (at 33) that the President "substantially deviated from the recommendations he received" has no foundation and is contradicted by the Proclamation, which states that the President adopted entry restrictions "in accordance with the recommendations of the [Acting] Secretary of Homeland Security." Procl. § 1(h)(iii). And respondents offer no persuasive explanation why an alleged "Muslim ban" would *drop* two Muslim-majority countries covered by prior entry suspensions (Iraq and Sudan), and *exempt* significant categories of non-immigrant visas from five covered Muslim-majority countries (Chad, Iran, Libya, Somalia, and Yemen). Br. in Opp. 34.

### D. The Global Injunction Is Vastly Overbroad

It is fundamental to Article III and principles of equity that a district court may not grant relief beyond what is necessary to redress the injuries of the plaintiffs before the court. Contrary to respondents' suggestion

12

(at 34), this Court has never retreated from that principle for a "facial challenge," and doing so would conflate the legal theory of the merits claim with the scope of the proper relief.  As for respondents' objection (at 35) that they "cannot identify in advance precisely which individuals may wish to enroll in [Hawaii's] University or join the [Muslim Association of Hawaii]," the speculative nature of the Proclamation's potential effects on nonparties is reason to *withhold* injunctive relief from entities that have no rights under the INA concerning the admission of aliens abroad, not to enjoin the Proclamation wholesale.

\* \* \* \* \*

For the foregoing reasons and those stated in the petition for a writ of certiorari, the petition should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*

JANUARY 2018