**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BRENNAN CENTER FOR JUSTICE
AT NEW YORK UNIVERSITY
SCHOOL OF LAW,

                Plaintiff,

     -v.-

UNITED STATES DEPARTMENT OF
STATE,

               Defendant.

Case No. 17 Civ. 7520 (PGG)

### PLAINTIFFS' L.R. 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Brennan Center for Justice at New York University School of Law submits this
Statement of Undisputed Material Facts, pursuant to Local Rule 56.1 of the United States District
Court for the Southern District of New York, in Support of Plaintiff's Cross-Motion for
Summary Judgment.

### HISTORY OF DONALD TRUMP'S STATEMENTS AGAINST MUSLIMS

1.      In the fall of 2015, then-candidate Trump said that he would require Muslims in
the United States to register with the government. *See* Vaughn Hillyard, *Donald Trump's Plan
for a Muslim Database Draws Comparison to Nazi Germany*, NBC News (Nov. 20, 2015),
https://www.nbcnews.com/politics/2016-election/trump-says-he-would-certainly-implement-
muslim-database-n466716, Declaration of Ishita Kala ("Kala Decl.") Ex. 3.

2.      In December 2015, President Trump claimed that Muslims "believe only in Jihad,
and have no sense of reason or respect for human life." Press Release, Donald J. Trump for
President, Donald J. Trump Statement on Preventing Muslim Immigration (Dec. 7, 2015),
http://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-

immigration [https://web.archive.org/web/20151207230751/http://www.donaldjtrump.com/

press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration], Kala Decl. Ex. 4.

3.      Also in December 2015, President Trump called "for a total and complete

shutdown of Muslims entering the United States." *Id.*

4.      President Trump suggested, in order to implement his policy, that customs agents

ask individuals, pointblank at the border, "are you Muslim?"  *Hardball with Chris Matthews*

(MSNBC television broadcast Dec. 8, 2015) (transcript available at

http://www.msnbc.com/transcripts/hardball/2015-12-08), Kala Decl. Ex. 5.

5.      In March 2016, President Trump explained in an interview that "I think Islam

hates us . . . . And we can't allow people coming into this country who have this hatred of the

United States and of people who are not Muslim." *Anderson Cooper 360°* (CNN television

broadcast Mar. 9, 2016) (transcript available at

http://www.cnn.com/TRANSCRIPTS/1603/09/acd.01.html), Kala Decl. Ex. 6.

6.      In October 2016, President Trump explained that his idea had "morphed into a[n]

extreme vetting from certain areas of the world." The American Presidency Project, Transcript of

Presidential Debate at Washington Univ. in St. Louis, Oct. 9, 2016 (Gerhard Peters & John T.

Woolley, eds.), http://www.presidency.ucsb.edu/ws/index.php?pid=119038, Kala Decl. Ex. 7.

## HISTORY OF THE FIRST TRAVEL BAN

7.      President Trump issued the first of his three Muslim bans on January 27, 2017.

Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017), Kala Decl. Ex. 8.

8.      The first ban temporarily halted entry of all nationals from seven Muslim-

majority countries — Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen. *Id.*

9.      The first ban also temporarily suspended the U.S. Refugee Admissions Program. *Id.* at § 5.

10.     The first ban also established a policy of prioritizing claims from persons fleeing "religious-based persecution," but only if the claimant belonged to a "minority religion in the individual's country of nationality." *Id.* at § 5(b).

11.     The first ban also indefinitely barred Syrian refugees from the United States. *Id.* at § 5(c).

12.     The ban applied to legal permanent residents of the United States. *Id.* § 3(c).

13.     An associate of President Trump, who currently serves as an attorney-advisor to President Trump, stated that the president asked about "legally" implementing his "Muslim ban." Rebecca Savransky, *Giuliani: Trump Asked Me How To Do a Muslim Ban 'Legally'*, The Hill (Jan. 29, 2017), http://thehill.com/homenews/administration/316726-giuliani-trump-asked-me-how-to-do-a-muslim-ban-legally, Kala Decl. Ex. 9.

14.     The Administration did not consult experts in its Defense or State Departments or the Department of Homeland Security ("DHS") before issuing the ban. Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017), https://www.nytimes.com/2017/01/29/us/politics/donald-trump-rush-immigration-order-chaos.html, Kala Decl. Ex. 10.

15.     Shortly after going into effect, courts across the nation enjoined key provisions of the first ban. *See, e.g. Washington v. Trump*, 847 F. 3d 1151 (9th Cir. 2017); *Aziz v. Trump*, 234 F.Supp.3d 724 (E.D.Va. 2017); *Darweesh v. Trump*, No. 1:17-cv-00480 (E.D.N.Y. 2017); *Louhghalam v. Trump*, 230 F. Supp 3d 26 (D.Mass. 2017); *Mohammed v. United States*, No. 2:17-cv-00786 (C.D. Cal. 2017).

16.     While in effect, "[m]ore than 100,000 visas for foreigners inside and outside the

United States" were revoked from the first ban's listed countries. Anjali Singhvi & Alicia

Parlapiano, *Ban: Who Is Barred and Who Is Not*, N.Y. Times (Feb. 3, 2017),

https://www.nytimes.com/interactive/2017/01/31/us/politics/trump-immigration-ban-

groups.html, Kala Decl. Ex. 11.

## HISTORY OF THE SECOND TRAVEL BAN

17.     On March 6, 2017, President Trump issued Executive Order 13780, the second

Muslim ban, forgoing an appeal of the first ban. *See* Exec. Order No. 13,780, 82 Fed. Reg.

13,209 (Mar. 9, 2017), Kala Decl. Ex. 12.

18.     The second ban instituted a 90-day travel ban against persons from six Muslim-

majority countries — the same as were named in the first ban, except Iraq. *Id.* at §2(c).

19.     The second ban also instituted a worldwide 120-day suspension of refugee

processing. *Id.* at § 6(a).

20.     The Administration had not developed information since it had taken office about

the difficulties of vetting nationals from the affected countries before imposing this second ban,

and did not heed a DHS report concluding that country of citizenship was "unlikely to be a

reliable indicator of potential terrorist activity." Federation of American Scientists, *Citizenship*

*Likely an Unreliable Indicator of Terrorist Threat to the United States* (2017),

https://fas.org/irp/eprint/dhs-7countries.pdf (prepared at the request of the Acting Under

Secretary for Intelligence and Analysis, U.S. Dep't of Homeland Security)., Kala Decl. Ex. 13.

21.     The second ban instructed the Secretary of the Department of Homeland Security

("DHS") to conduct a "worldwide review" to "identify whether, and if so what, additional

information will be needed from each foreign country to adjudicate an application by a national

of that country for a visa, admission, or other benefit under the INA (adjudications) in order to determine that the individual is not a security or public-safety threat." Kala Decl. Ex. 12 at § 2.

22.     The second ban was also successfully challenged in court. *See Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554 (4th Cir. 2017); *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017).

23.     In June 2017, the U.S. Supreme Court allowed the second ban's provisions to be implemented against persons who lack a "bona fide relationship with a person or entity in the United States." *Trump v. Int'l Refugee Assistance Proj.*, 137 S. Ct. 2080 (2017).

24.     The second ban expired, by its terms, in September 2017. *See* Kala Decl. Ex. 12.

### HISTORY OF THE THIRD TRAVEL BAN: THE PROCLAMATION

25.     On September 24, 2017, President Trump released the third iteration of the Muslim ban in the form of Proclamation 9645 ("Proclamation"). *See* Dkt. #1-1.

26.     The Proclamation is based on the "worldwide review" ordered in the second ban. *See id.* at § 1(c)-(j).

27.     Specifically, the Proclamation is based on two reports issued by the Secretary of DHS to the President in July 2017 ("Report") and September 2017 ("Memorandum"). *See id.*

28.     The Proclamation restricts entry of persons into the United States from six Muslim-majority countries — Chad, Iran, Libya, Somalia, Syria, and Yemen — and two non-Muslim majority countries — North Korea and Venezuela. *See id.* at § 2(a)-(h).

29.     The Administration lifted the travel ban on citizens from Chad on April 10, 2018. Proclamation No. 9723, 83 Fed. Reg. 15937 (Apr. 10, 2018), Kala Decl. Ex. 14.

30.     The Proclamation bans 76% of nonimmigrant visa applicants and 91% of immigrant visa applicants affected by the previous versions of the ban. *See* Harsha Panduranga, et al., *Extreme Vetting & the Muslim Ban*, Brennan Ctr. for J. (2017), Kala Decl. Ex. 15, at 14.

31.     According to the Proclamation, the July 2017 report by the Secretary of DHS "developed a baseline for the kinds of information required from foreign governments to support the United States Government's ability to confirm the identity of individuals seeking entry into the United States." Dkt. #1-1, at § 1(c).

32.     This baseline captured information about identity-management, national security, and public safety. Dkt. #1-1, at § 1.

33.     Following a 50-day engagement period with foreign countries, the Secretary of DHS apparently issued a second report to President Trump identifying the countries for inclusion in what would become the Proclamation. *See id.*

34.     The Administration asserted that President Trump "adopt[ed]" the Secretary's conclusions. Transcript of Oral Argument, *Trump v. Hawaii*, 138 S. Ct. 923 (2018) (No. 17-965), https://www.supremecourt.gov/opinions/17pdf/17-965_h315.pdf, Kala Decl. Ex. 16.

35.     The Proclamation detailed the deficiencies in information-sharing and identity-management practices by the eight countries included in the ban. *See* Dkt. #1-1, at § 2(a)-(h).

36.     A fact sheet released by the Administration related to the Proclamation stated that the baseline standards proposed in the Report were "communicated . . . globally." Fact Sheets: Proclamation on Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats, White House (Sept. 24, 2017), https://www.whitehouse.gov/briefings-statements/fact-sheet-proclamation-enhancing-vetting-capabilities-processes-detecting-attempted-entry-united-states-terrorists-public-safety-threats/, Kala Decl. Ex. 17 (emphasis added).

37.     Another fact sheet released by the Administration related to the Proclamation stated that the global dissemination of the baseline standard ("minimum security requirements")

happened in July 2017. Fact Sheets: President Donald J. Trump Strengthens Security Standards

for Traveling to America, White House (Sept. 24, 2017), https://www.whitehouse.gov/briefings-

statements/president-donald-j-trump-strengthens-security-standards-traveling-america/, Kala

Decl. Ex. 18.

38.     The frequently-asked-questions document released by the Administration along

with the Proclamation explained that the baseline requirements were crafted from "long-standing

U.S. Government goals" and "standards established by . . . the [UN], [ICAO], and INTERPOL,"

which "incorporate best practices derived from proven and effective security partnerships, such

as the Visa Waiver Program, and from internationally-recognized identity management practices,

law enforcement practices, and national security initiatives, such as the adoption of ePassports."

FAQ: Proclamation on Enhancing Vetting Capabilities and Processes for Detecting Attempted

Entry Into the United States by Terrorists or Other Public-Safety Threats, White House (Sept. 24,

2017), https://www.whitehouse.gov/briefings-statements/faq-proclamation-enhancing-vetting-

capabilities-processes-detecting-attempted-entry-united-states-terrorists-public-safety-threats/,

Kala Decl. Ex. 19.

39.     A statement issued by the White House further reiterated that the baseline

requirements were "based on accepted international norms, best practices, and expert

determinations regarding the minimum information the United States needs to validate traveler

identities, prevent fraud, and ensure individuals do not represent a national security or public-

safety threat." President Donald J. Trump Announces Enhanced Security Measures, White House

(Sept. 24, 2017), https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-

announces-enhanced-national-security-measures/, Kala Decl. Ex. 20.

40.     In September 2017, the spokesperson for Defendant explained that "the State Department along with DHS sent notes and had diplomatic engagements with every country around the globe," during which it conveyed "the kind of information . . . that we required that our consular affairs officials could verify [in order to] give somebody a visa." Press Briefing, U.S. Dep't of State (Sept. 26, 2017) https://www.state.gov/r/pa/prs/dpb/2017/09/274443.htm, Kala Decl. Ex. 21.

41.     The Administration has publicly touted the worldwide review, calling it "the critical difference[] between the President's prior orders and the Proclamation," Appl. (17A560) for Stay Pending Appeal at 5, *Trump v. Int'l Refugee Assistance Proj.*, No. 8:17-cv-00361-TDC (S. Ct. Nov. 21, 2017), Kala Decl. Ex. 22, at 5

42.     The Administration also asserted that, because of the Report and Memorandum, the President's  "[P]roclamation [is] not like any of the other [] proclamations that have ever come before it." Oral Argument, *Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554 (2017) (No. 17-1351), https://www.c-span.org/video/?437105-1/fourth-circuit-hears-oral-argument-revised-travel-ban-audio, Kala Decl. Ex. 23.

## HISTORY OF THE 17 STATE 72000 CABLE

43.     On July 12, 2017, an unclassified cable was transmitted by Defendant to all consular outposts without any limitation on further dissemination. *See* Elizabeth Culliford, *Exclusive: U.S. Demands Nations Provide More Traveler Data or Face Sanctions*, Reuters (July 13, 2017), http://live.reuters.com/Event/Live_US_Politics/1012197528, Kala Decl. Ex. 24.

44.     The cable "outline[d] the results of the report submitted to the President on July 10" pursuant to the second travel ban (EO 13780). *Id.*

45.     The cable explained that the Report "outlines the new standards that all 191 countries are required to meet for (1) information sharing on identity management and (2)

8

information sharing on security and public safety threats," "concluded that three types of information sharing/cooperation are needed to establish a traveler's identity, and four types of information sharing/cooperation are needed to ensure that a traveler is not a terrorist or public safety threat," "discusses 'national security risk indicators' that helped prioritize countries for engagement," and "provides a classified list of countries that DHS has preliminarily assessed as not providing adequate information, as well as countries at risk of not providing adequate information." *Id.*

46.    The cable instructed recipients to "[a]nnounce the new standards" laid out in the Report "to all foreign governments" and provided "talking points" for doing so. *Id.*

47.    The talking points detailed three standards for identity-related information-sharing,[1] five standards for information-sharing related to terrorism or public safety threats,[2] and

---

[1] "Countries should issue, or have active plans to issue, electronic passports that conform to ICAO specifications and include a facial biometric image to enable verification of travel documents; Countries should regularly report lost and stolen passports, whether issued or blank, to the INTERPOL Stolen and Lost Travel Document Database to maintain the integrity of travel documents; and Countries should make available any other identity information at the request of the U.S. including, as appropriate, additional biographic and biometric data and relevant immigration status." Kala Decl. Ex. 24.

[2] "Countries should make available information, including biographic and biometric data, on individuals it knows or has reasonable grounds to believe are terrorists, including foreign terrorist fighters, through appropriate bilateral or multilateral channels; Countries should make available through appropriate bilateral or multilateral channels criminal history record information, including biographic and biometric data, on its nationals, as well as permanent and temporary residents, who are seeking U.S. visas or border or immigration benefits; Countries should provide exemplars of all passports and national identity documents they issue to the U.S. Department of Homeland Security's Immigration and Customs Enforcement Forensic Laboratory, including applicable date ranges and numbering sequences, as required, in order to improve U.S. Government fraud detection capabilities; Countries should not impede the transfer to the U.S. Government of information about passengers and crew traveling to the United States, such as Advance Passenger Information and Passenger Name Records; and Countries should not designate individuals for international watchlisting as national security threats or criminals solely based on their political or religious beliefs." *Id.*

three security risk indicators relevant to the Administration's ability to vet a country's nationals for admissibility.[3] *See id.*

48.     The talking points also provided additional instructions for "non-Visa Waiver Program countries," "Visa Waiver Program countries," "Category A countries," "Category B countries," and "non-VWP countr[ies] that [are] in neither Category A nor B." *Id.*

49.     The talking points also outlined nine "leave-behind questions" tailored to the standards outlined in the Report. *Id.*

50.     The cable additionally explained that the standards set out in the Report were "buil[t] upon [] existing partnerships with other countries and multilateral organizations such as ICAO[,] [] INTERPOL, . . . [and] UN Security Council Resolutions." *Id.*

## PROCEDURAL HISTORY

51.     Plaintiff submitted its FOIA request on July 20, 2017. Dkt. #1-2.

52.     In its FOIA request, Plaintiff generally requested information related to the Administration's extreme vetting practices. Dkt. #1-2.

53.     On July 24, 2017, Defendant granted Plaintiff's request for expedited processing. *See* Dkt. #1-3.

54.     Defendant had not made a determination regarding the Plaintiff's request as of October 1, 2017. *See* Dkt. #24, at ¶ 2; 5 U.S.C. § 552(a)(6)(A)(i).

55.     Plaintiff filed the instant action on October 2, 2017. *See* Dkt. #1.

---

[3] "Countries should take measures to ensure that they are not and do not have the potential to become a terrorist safe haven; Countries should accept the repatriation of their nationals who are subject to a final order of removal in the United States and provide travel documents to facilitate their removal; Visa Waiver Program countries should meet the statutory and policy requirements of the Visa Waiver Program." *Id.*

56.     Plaintiff's action only sought the following: the report submitted by the Secretary of the Department of Homeland Security to President Trump on July 9, 2017, referred to in Section 1(c) of the Proclamation; the report submitted by the Secretary to the President on September 15, 2017, referred to in Section 1(h) of the Proclamation; and, to the extent the twenty-four countries referenced in Sections 1(c) and 1(h) of the Proclamation were not included in those reports, the final reports submitted by the Secretary to the President for those countries. *See* Dkt. #1.

57.     Plaintiff moved to expedite the action because Defendant had not made a determination regarding the subset of Plaintiff's request as of November 30, 2017. *See* Dkt. #22.

58.     On January 10, 2018, this Court granted the Plaintiff's motion to expedite. *See* Dkt. #30.

59.     In granting the motion, the Court relied, in part, on the fact that "the public interest [would be] served 'by the expedited release of the requested documents.'"  Dkt. #30, at 11 (citation omitted).

60.     Defendant eventually identified five documents responsive to the subset of Plaintiff's request at issue in this action — the Report, Attachments A and B thereto, the Memorandum, and Attachment A thereto. *See See* Second Declaration of Eric F. Stein ("Second Stein Decl.") Exs. 1-2, Kala Decl. Exs. 1-2.

61.     Defendant withheld each of the aforementioned documents in full based on its application of the presidential communications privilege under Exemption 5 to the FOIA. *See id*.

62.     Defendant asserted that Exemptions 1, 5 (deliberative process privilege), and 7(E) applied to the documents in part. *See id.*

63.   Defendant moved for summary judgment on May 14, 2018.  *See* Memorandum of

Law in Support of Defendant's Motion for Summary Judgment.


Dated: New York, New York                    Respectfully submitted,
     July 9, 2018

     s/ Neil K. Roman
       Neil K. Roman

Neil K. Roman                                Johnathan Smith
Ishita Kala                                  Sirine Shebaya
COVINGTON & BURLING LLP                       MUSLIM ADVOCATES
The New York Times Building                   P.O. Box 66408
620 Eighth Avenue                            Washington, DC 20035
New York, NY 10018-1405                       (202) 897-1897
(212) 841-1000                               johnathan@muslimadvocates.org
nroman@cov.com                               sirine@muslimadvocates.org
ikala@cov.com

Mark H. Lynch[i]                             Richard B. Katskee[i]
Jaclyn E. Martínez Resly[i]                  Eric Rothschild[i]
COVINGTON & BURLING LLP                       Andrew L. Nellis[i]
One CityCenter                               AMERICANS UNITED FOR SEPARATION
850 Tenth St. NW                             OF CHURCH AND STATE
Washington, DC 20001-4956                     1310 L St. NW, Suite 200
(202) 662-6000                               Washington, DC 20005
mlynch@cov.com                               (202) 466-3234
jmartinezresly@cov.com                        katskee@au.org
                                             rothschild@au.org
[i] *Admitted pro hac vice*                   nellis@au.org


*Attorneys for Plaintiff Brennan Center for Justice at New York University School of Law*