UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRENNAN CENTER FOR JUSTICE AT
NEW YORK UNIVERSITY SCHOOL OF
LAW,

              Plaintiff,

    - against -

UNITED STATES DEPARTMENT OF
STATE,

              Defendant.

**ORDER**

17 Civ. 7520 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Brennan Center for Justice brings this action against Defendant U.S.

Department of State to compel compliance with the Freedom of Information Act ("FOIA"), 5

U.S.C. § 552. (Cmplt. (Dkt. No. 1) ¶ 1) Plaintiff seeks documents referenced in President

Trump's September 24, 2017 Proclamation entitled "Enhancing Vetting Capabilities and

Processes for Detecting Attempted Entry into the United States by Terrorists or Other

Public-Safety Threats[.]" (Id. ¶ 2, Ex. A (Proclamation) (Dkt. No. 1-1); see also Proclamation

No. 9,645, 82 Fed. Reg. 45,161 (Sept. 24, 2017)) Plaintiff also seeks reports concerning certain

countries identified or described in the Proclamation. (Cmplt. (Dkt. No. 1) ¶ 2)

        The State Department has identified five records responsive to Plaintiff's request,

but has withheld the records in full, deeming them entirely exempt from disclosure pursuant to

the "presidential communications privilege" encompassed within FOIA Exemption 5, and

partially exempt from disclosure on several other grounds. (Def. Br. (Dkt. No. 44) at 6-7) The

State Department has moved for summary judgment, contending that it has sufficiently

demonstrated that it conducted an adequate search for the requested records, and that the

responsive records fall within the exemptions it has described.  (See Mot. (Dkt. No. 43); Def. Br.

(Dkt. No. 44 at 13-14))  Plaintiff has cross-moved for partial summary judgment, seeking a

declaration that the documents it requests do not fall with the ambit of Exemption 5.  (Cross-

Mot. (Dkt. No. 48); Pltf. Br. (Dkt. No. 49) at 10)  In the alternative, Plaintiff requests that the

Court order Defendant to disclose the records for in camera review, or require Defendant to

provide further justification for its claimed exemptions.  (Pltf. Br. (Dkt. No. 49) at 16, 30, 32)

For the reasons stated below, the Court will direct Defendant to produce the

withheld responsive records for in camera review by April 8, 2019.

### BACKGROUND[1]

### I.    THE PRESIDENT'S EXECUTIVE ORDERS AND PROCLAMATION

On January 27, 2017, President Trump issued Executive Order No. 13,769 –

"Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO–1"), 82 Fed.

Reg. 8977 (Jan. 27, 2017) – which bars entry into the United States of individuals from seven

Muslim-majority countries for 90 days, suspends the United States Refugee Admission Program

for 120 days, and bans the entry of Syrian refugees indefinitely.  See EO-1, 82 Fed. Reg. 8,977,

§§ 3(c), 5(a), 5(c).

On March 6, 2017 – after several courts enjoined implementation of EO-1 –

President Trump issued Executive Order 13,780 ("EO-2"), "Protecting the Nation From Foreign

Terrorist Entry Into the United States," 82 Fed. Reg. 13,209 (Mar. 6, 2017).  EO-2 revokes EO-1

and suspends entry into the United States of nationals from Iran, Libya, Somalia, Sudan, Syria,

and Yemen for 90 days.  See EO-2, 82 Fed. Reg. 13,209, § 2(c).  EO-2 also directs a "worldwide

---

[1]  Familiarity with this Court's January 10, 2018 and April 16, 2018 orders (Dkt. Nos. 30, 37) is presumed.

review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the [Immigration and Nationality Act] . . . in order to determine that the individual is not a security or public-safety threat." Id. § 2(a). EO-2 instructs the "Secretary of Homeland Security, in consultation with the Secretary of State and the Director of Intelligence, . . . [to] submit to the President a report on the results of worldwide review[.]" Id. § 2(b). Several courts also issued nationwide injunctions enjoining implementation of EO-2. See, e.g., Hawaii v. Trump, 859 F.3d 741, 789 (9th Cir. 2017); Int'l Refugee Assistance Project v. Trump, 857 F.3d 554, 606 (4th Cir. 2017).[2]

On September 24, 2017, President Trump issued Proclamation 9,645 (the "Proclamation"). (Cmplt. (Dkt. No. 1) ¶ 17; Proclamation No. 9,645, 82 Fed. Reg. 45,161 (Sept. 24, 2017)) The Proclamation restricts entry into the United States of individuals from "six Muslim-majority countries (and two non-Muslim majority countries)": Chad, Iran, Libya, Syria, Yemen, Somalia, Venezuela, and North Korea.[3] (Cmplt. ¶ 18; Proclamation No. 9,645, 82 Fed. Reg. 45,161, §§ 2(a)-(h))

The Proclamation justifies these entry restrictions on the basis of the "worldwide review" of the "information-sharing practices, policies, and capabilities of foreign governments" directed in EO-2 (See Proclamation No. 9,645, 82 Fed. Reg. 45,161, §§ 1(c), (i)) The

---

[2] On June 26, 2017, the Supreme Court granted the Government's petition for certiorari to review the lower courts' grant of injunctive relief related to EO-2. See Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2083 (2017). The Supreme Court vacated and remanded both cases in October 2017, directing the lower courts to dismiss the actions as moot, because the challenged provisions of EO-2 had expired. See Trump v. Int'l Refugee Assistance, 138 S. Ct. 353 (2017) (citations omitted); Trump v. Hawaii, 138 S. Ct. 377 (2017) (citations omitted).
[3] Chad has since been removed from the list of nations subject to restrictions. (Pltf. Rule 56.1 Stmt. (Dkt. No. 51) ¶ 29)

Proclamation states that – after conducting this "worldwide review" – the Secretary of State

"engaged with the countries reviewed in an effort to address deficiencies and achieve

improvements." (Proclamation No. 9,645, 82 Fed. Reg. 45,161)  However, "a small number of

countries . . . remain deficient . . . with respect to their identity-management and information-

sharing capabilities, protocols, and practices[, and i]n some cases, these countries also have a

significant terrorist presence within their territory." (Id.)  Accordingly, the Proclamation

announces "certain conditional restrictions and limitations . . . on entry into the United States of

nationals of the countries identified [as deficient.]" (Id.)  The Proclamation cites several reports

on which Executive Branch officials relied, including July 9, 2017 and September 15, 2017

reports submitted by the Secretary of Homeland Security to President Trump.[4]  (See id. §§ 1(c),

(h))

## II.   PLAINTIFF'S FOIA REQUEST AND PROCEDURAL HISTORY

On July 10, 2017, Plaintiff submitted a FOIA request to Defendant.  (Pltf. R. 56.1

Stmt. (Dkt. No. 51) ¶ 51)  The FOIA request seeks disclosure of 23 categories of records,

designated "a" through "w."  (FOIA Request (Dkt. No. 1-2) at 9-13)  Category "w" encompasses

> All records pertaining to the worldwide review process conducted under Section 2
> of Executive Order 13780 and 17 STATE 72000, including the Report that was
> submitted to President Trump, copies of instructions to foreign governments
> regarding the requirements that must be met to avoid travel restrictions, and a list
> of all countries that have:
>
> > i.    been designated as providing adequate information to the U.S.
> >       government;

---

[4]  On June 26, 2018, the Supreme Court reversed lower court orders enjoining enforcement of the
Proclamation's entry restrictions, concluding that "the Government has set forth a sufficient
national security justification" for the restrictions, and that plaintiffs had not shown a likelihood
of success on the merits of their claims.  Trump v. Hawaii, 138 S. Ct. 2392, 2423 (2018).  In so
holding, the Supreme Court emphasized that the Proclamation "reflects the results of a
worldwide review process undertaken by multiple Cabinet officials and their agencies." Id. at
2421.

        ii.      been designated as providing inadequate information to the U.S. government; and/or

        iii.     been designated as being at risk of providing inadequate information to the U.S. government.

(Id. at 13)  Plaintiff also sought expedited processing of its FOIA request. (Id. at 13-15)

Although Defendant granted the request for expedited processing on July 24, 2017, as of October

1, 2017, Defendant still had not made a determination as to the FOIA request. (Pltf. R. 56.1

Stmt. (Dkt. No. 51) ¶¶ 53-54)

        The Complaint was filed on October 2, 2017.  (Cmplt. (Dkt. No. 1))  Plaintiff

claims that Defendant is improperly withholding agency records in violation of FOIA, and seeks

"a discrete subset of the documents covered by request 'w.'" (Cmplt. (Dkt. No. 1) ¶¶ 27, 60)

This "discrete subset" consists of the reports that the Secretary of Homeland Security submitted

to President Trump on July 9, 2017 and September 15, 2017, as well as the final reports the

Secretary of Homeland Security submitted to President Trump concerning (1) each of the eight

countries covered by the Proclamation, and (2) each of the sixteen countries identified by the

Secretary as being 'inadequate' in the Proclamation, to the extent that reports concerning these

twenty-four countries are not included in the July 9, 2017 and September 15, 2017 reports.  (Id. ¶

2; Pltf. R. 56.1 Stmt. (Dkt. No. 51) ¶ 56)

        On December 5, 2017, Defendant informed Plaintiff that it had located responsive

records, including "two reports (and associated attachments) submitted by the Secretary of the

Department of Homeland Security (DHS) to the President."[5] (Dec. 14, 2017 Stein Decl. (Dkt.

No. 26) ¶ 9) On February 9, 2018 – pursuant to this Court's order granting Plaintiff's motion to

---

[5] Defendant initially represented that six responsive records had been located, but subsequently stated that it had identified only five such records. (See May 14, 2018 Stein Decl. (Dkt. No. 45) at ¶ 9 n.1)

expedite this action (Mot. (Dkt. No. 22); Mem. Op. & Order (Dkt. No. 30) at 17) – Defendant

produced a Vaughn index[6] to Plaintiff. (Vaughn Index (Dkt. No. 31-1))

On March 15, 2018, Plaintiff – contending that Defendant's Vaughn index is

deficient – moved to compel Defendant to produce an index consistent with this Court's January

10, 2018 order. (Mot. (Dkt. No. 34); Pltf. Br. (Dkt. No. 35) at 2) On April 16, 2018, this Court

denied the motion to compel, reserved decision on the sufficiency of the Vaughn index, and set a

briefing schedule for cross-motions for summary judgment. (Order (Dkt. No. 37) at 7)

Defendant produced a revised Vaughn index on May 14, 2018. (Rev. Vaughn Index (Dkt. No.

45-2))

Defendant's revised Vaughn index describes each of the five responsive records

Defendant has located, and lists – as to each document – the date of creation, page length, and

the exemptions Defendant contends justify full or partial withholding, along with the government

agency invoking the exemption. (Rev. Vaughn Index (Dkt. No. 45-2)) The five documents are:

(1) the July 9, 2017 Report, which is a twenty-page document entitled "20-day Report to the

President on Section 2(b) of Executive Order 13780:  Protecting the Nation from Foreign

Terrorist Entry in the United States"; (2) Attachment A to the July 9, 2017 Report, which is a

three-page document that concerns "assessment of certain countries' information-sharing

capabilities"; (3) Attachment B to the July 9, 2017 Report, which is a five-page document that

concerns the "methodology used to assess countries' information-sharing capabilities"; (4) the

---

[6] "A Vaughn index typically lists the titles and descriptions of the . . . documents [responsive to
a FOIA request] that the Government contends are exempt from disclosure.  A so-called
'classical' Vaughn index . . . is one that lists titles and descriptions of documents with cites to
claimed FOIA exemptions for each document listed." New York Times Co. v. U.S. Dep't of
Justice, 758 F.3d 436, 438–39 (2d Cir.) (citations omitted), supplemented, 762 F.3d 233 (2d Cir.
2014).

September 15, 2017 Memorandum, which is a sixteen-page document described as a "Memorandum from the Acting Secretary of DHS to the President regarding Section 2(e) of Executive Order 13780"; and (5) Attachment A to the September 15, 2017 Memorandum, which is a one-page document that concerns "assessment of countries' information-sharing capabilities and vetting procedures." (Rev. Vaughn Index (Dkt. No. 45-2))  Portions of each of these documents are classified at the "Secret" level.  (Holzer Decl. (Dkt. No. 46) ¶¶ 14-15)

According to the revised Vaughn index, the Department of Homeland Security has determined that all five documents are properly withheld pursuant to the presidential communications privilege.  This privilege falls within the ambit of 5 U.S.C. § 552(b)(5) ("Exemption 5"), one of nine statutorily enumerated categories of exemptions from FOIA disclosure.[7]  The State Department, the Department of Homeland Security, and the Federal Bureau of Investigation claim that portions of the five documents are also properly withheld pursuant to certain other exemptions.[8]  (Rev. Vaughn Index (Dkt. No. 45-2))

---

[7] Exemption 5 exempts from FOIA disclosure "inter-agency or intra-agency memorand[a] or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5).

[8] The revised Vaughn index states that:

(1) The Department of Homeland Security has determined that portions of the July 9, 2017 Report should be withheld from disclosure pursuant to the deliberative process privilege, which also falls under Exemption 5; and the FBI has determined that portions of this Report should be withheld pursuant to Exemption (b)(7)(E), which exempts from disclosure information that "would disclose techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E).

(2) The Department of Homeland Security and Department of State have determined that portions of Attachment A to the July 9, 2017 Report should be withheld from disclosure pursuant to Exemption (b)(1), which exempts from disclosure information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense and foreign policy" and "are in fact properly classified pursuant to such Executive order," 5 U.S.C. § 552(b)(1); the Department of Homeland

## III.   *IN CAMERA* **REVIEW**

The State Department argues that it is entitled to summary judgment because "the [requested] records are properly withheld in full pursuant to Exemption 5, and in part pursuant to other exemptions." (Def. Br. (Dkt. No. 44) at 7)

In order to prevail on its motion, Defendant must demonstrate "that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. United States Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994). Defendant may make such a showing through "agency [declarations that] describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith." Am. Civil Liberties Union v. United States Dep't of Def., 901 F.3d 125, 133 (2d Cir. 2018), as amended (Aug. 22, 2018) (internal quotation marks and citation omitted).

The presidential communications privilege is "'a presumptive privilege for [p]residential communications,'" Loving v. Dep't of Def., 550 F.3d 32, 37 (D.C. Cir. 2008)

---

Security has also determined that portions of this document should be withheld pursuant to both the deliberative process privilege and Exemption (b)(7)(E).

(3) The Department of Homeland Security has determined that portions of Attachment B to the July 9, 2017 Report should be withheld pursuant to both Exemption (b)(1) and the deliberative process privilege, and the Department of State and FBI have determined that portions should be withheld pursuant to Exemption (b)(7)(E).

(4) The Department of Homeland Security and the State Department have determined that portions of the September 15, 2017 Memorandum should be withheld from disclosure pursuant to Exemption (b)(1), and the Department of Homeland Security has determined that portions should also be withheld pursuant to the deliberative process privilege and Exemption (b)(7)(E).

(5) The Department of Homeland Security has determined that portions of Attachment A to the September 15, 2017 Memorandum should be withheld from disclosure pursuant to Exemption (b)(1), Exemption (b)(7)(E), and the deliberative process privilege.

(Rev. Vaughn Index (Dkt. No. 45-2))

(quoting United States v. Nixon, 418 U.S. 683, 708 (1974)), which "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." Id. (citing Judicial Watch, Inc. v. Dep't of Justice, 365 F.3d 1108, 1112 (D.C. Cir. 2004)). Accordingly, the privilege "protects 'communications "in performance of a President's responsibilities," . . . "of his office," . . . and made "in the process of shaping policies and making decisions.""" Amnesty Int'l USA v. C.I.A., 728 F. Supp. 2d 479, 522 (S.D.N.Y. 2010) (quoting Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 449 (1977) (quoting United States v. Nixon, 418 U.S. at 708)); see also Loving 550 F.3d at 37 ("[T]he privilege protects 'communications directly involving and documents actually viewed by the President,' as well as documents 'solicited and received' by the President or his 'immediate White House advisers [with] . . . broad and significant responsibility for investigating and formulating the advice to be given the President.'" (quoting Judicial Watch, Inc., 365 F.3d at 1114)).

"[I]t is axiomatic[, however,] that the privilege's purpose of promoting candor and confidentiality between the President and his closest advisors becomes more attenuated, and the public's interest in transparency and accountability more heightened, the more extensively a presidential communication is distributed." Ctr. for Effective Gov't v. U.S. Dep't of State, 7 F. Supp. 3d 16, 26 (D.D.C. 2013). "The purpose underlying the distribution of a presidential communication beyond the President's closest advisers is paramount[:]  [i]f distribution is limited to advisory purposes, the privilege may apply; but if distribution is far broader, the purposes animating the privilege will not justify its application." Id. at 29.

The State Department contends that the records at issue here are

> quintessential examples of records that fall squarely within the bounds of the privilege. . . . [T]hey are communications from a Cabinet-level official directly to the President, drafted and disseminated pursuant to an Executive Order, for the express purposes of advising the President in connection with his review of the

9

United States' visa vetting procedures, and assisting the President in carrying out his responsibilities in the areas of immigration and national security.

(Def. Br. (Dkt. No. 44) at 16)

The State Department further maintains that "the records have been closely held within the Executive Branch." (Id.) A declaration from the Deputy Chief FOIA Officer for the Department of Homeland Security Privacy Office, James V.M.L. Holzer, addresses the distribution of the subject records as follows:

> These records were, and remain, closely held within the Executive Branch. The [July 9, 2017] Report, the [September 15, 2017] Memorandum, and their respective attachments were transmitted directly from the Acting Secretary of Homeland Security to the President. Consistent with the Executive Order, the records were also provided to the Secretary of State and the Director of National Intelligence[,] among other critical Executive Branch agencies. Further, DHS circulated the records to a limited number of high-ranking personnel within certain DHS components charged with enforcing the immigration laws and regulating ports of entry: namely[,] U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Citizenship and Immigration Services.

(Holzer Decl. (Dkt. No. 46) ¶ 17) The Holzer declaration does not identify the "other critical Executive Branch agencies" to which disclosure was made, nor does the declaration state whether the "high-ranking personnel" to whom the records were circulated were prohibited from further disseminating the records.

Plaintiff does not dispute that the documents the State Department has withheld are of a type that the presidential communications privilege would typically encompass. Instead, Plaintiff disputes Defendant's characterization of the records as "closely held," and argues that the privilege does not apply here "[b]ecause the documents at issue have been widely shared throughout the executive branch and described both to the public and foreign governments." (Pltf. Br. (Dkt. No. 49) at 18)

10

For example, Plaintiff cites to a July 12, 2017 unclassified cable obtained by Reuters and "transmitted . . . to all consular outposts with no limitation on further dissemination." (Id. at 19 (emphasis removed); Kala Decl., Ex. 24 (Dkt. No. 50-25)) According to the cable, the cable "initiates a 50-day engagement period, as called for in Section 2(d) of the EO, in which posts must inform host governments of the new information sharing standards and request that host governments provide the requested information or develop a plan to do so." (Kala Decl., Ex. 24 (Dkt. No. 50-25) at 2) The cable further states that it "outlines the results of the report submitted to the President on July 10" – presumably, the July 9, 2017 Report – "and provides posts with guidance to help foreign governments understand and meet the standards developed in the report, as called for in Section 2(d) of the EO." (Id. at 3)

The July 12, 2017 cable goes on to provide several sets of "talking points."[9] The "talking points" include a list of standards that "[t]he Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, has established . . . for identity-related information-sharing by foreign governments whose nationals seek to travel to the United States[.]" (Id. at 5) The cable also includes a questionnaire, and directs posts "to work with their host country to submit answers," in an effort to "enhance an assessment of whether foreign governments meet the new baseline standards." (Id. at 7)

Plaintiff also cites numerous fact sheets, press releases, and related documents publicly disseminated by the President's administration, and argues that these disclosures

---

[9] The cable sets out talking points for "all countries"; for "non-Visa Waiver Program countries"; for "Visa Waiver Program countries"; for "countries identified . . . as failing to meet the information standards set out in the report (Category A countries)"; for "countries identified . . . as at risk of failing to meet the standards set out in the report (Category B countries)"; and for "a non-VWP [Visa Waiver Program] country that is neither Category A nor Category B." (Kala Decl., Ex. 24 (Dkt. No. 50-25) at 5-7)

"foreclose reliance on the presidential communications privilege to shield the responsive documents from the public." (Pltf. Br. (Dkt. No. 49) at 20-22)

Defendant's papers are not illuminating as to the extent to which the information contained in the five withheld documents has been distributed. Defendant instead emphasizes that Plaintiff has not identified an instance in which "any of the records themselves were either disseminated within the Executive Branch or publicly disclosed." (Def. Reply Br. (Dkt. No. 52) at 12) But if the information contained within the withheld documents has been widely and publicly disseminated, the rationale for applying the presidential communications privilege is much less compelling. Here, the Court does not have sufficient information to gauge whether the information contained in the withheld records has been disseminated in a manner that undermines application of the presidential communications privilege.

"When an agency withholds records and the requestor challenges such withholdings," the district court "'may examine the contents of . . . agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions." Am. Civil Liberties Union v. Nat'l Sec. Agency, No. 13 Civ. 9198 (KMW) (JCF), 2017 WL 6387731, at *3 (S.D.N.Y. Aug. 17, 2017) (quoting 5 U.S.C. § 552(a)(4)(B)). "[I]n camera review may be particularly appropriate when . . . the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency." Quinon v. F.B.I., 86 F.3d 1222, 1228 (D.C. Cir. 1996) "Furthermore, when the requested documents 'are few in number and of short length in camera review may save time and money.'" Adelante Alabama Worker Ctr. v. U.S. Dep't of Homeland Security, No. 1:17-CV-9557-GHW, 2019 WL 1380334, at *9 (S.D.N.Y. Mar. 26, 2019) (quoting Carter v. U.S. Dep't of Commerce, 830 F. 2d 388, 393 (D.C Cir. 1987). Finally, in camera review may be

appropriate "'[w]hen the dispute turns on the actual contents of the documents,' as opposed to 'when the dispute centers . . . on the parties' differing interpretations as to whether the exemption applies to such information.'" Am. Civil Liberties Union v. U.S. Dep't of Justice, 90 F. Supp. 3d 201, 216 n.2 (S.D.N.Y. 2015) (quoting Carter, 830 F.3d at 393). "[T]he propriety of [requesting in camera review] is a matter entrusted to the district court's discretion." Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B., 845 F.2d 1177, 1180 (2d Cir. 1988).

Here, the Court concludes that "in camera review is the appropriate and most efficient means to resolve the parties' dispute." Adelante Alabama Worker Ctr., 2017 WL 2019 WL 1380334, at *9. Defendant's submissions have not adequately explained how the information contained in the withheld documents differs from the information that the Administration has publicly disseminated. See Am. Civil Liberties Union v. Dep't of Justice, No. 15 CIV. 1954 (CM), 2016 WL 889739, at *5 (S.D.N.Y. Mar. 4, 2016) (ordering in camera review of "Presidential Policy Guidance" where "it is certainly possibly that the claimed [presidential communications] privilege applies[,] [b]ut the court does not know how widely the document has been distributed, or to whom, . . . [or] whether any part of it . . . closely tracks the information that was [publicly] disclosed"). Moreover, the documents in question are "few in number and of short length," and the dispute over the applicability of the privilege turns primarily on the content of the information contained in the documents. Finally, a determination as to the applicability of the presidential communication privilege may obviate the need to address other exemptions Defendant cites to justify partial withholding of the requested documents. See Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency, 811 F. Supp. 2d 713, 739 n. 92 (S.D.N.Y. 2011) (identifying "judicial economy" as a factor weighing in favor of in camera inspection), amended on reconsideration (Aug. 8, 2011).

14

## CONCLUSION

For the reasons stated above, Plaintiff's motion for partial summary judgment is granted to the extent it requests that the Court order in camera review of the requested records to determine the applicability of the presidential communication privilege.  The remainder of Plaintiff's motion is denied without prejudice, pending this Court's in camera review. Defendant's motion for summary judgment is denied without prejudice to renewal of the motion following the Court's in camera review.  Defendant will provide the Court with copies of the five documents at issue in this case by April 8, 2019.  The Clerk of Court is directed to terminate the motions (Dkt. Nos. 43, 48).

Dated:  New York, New York
         March 29, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge

14