UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRENNAN CENTER FOR JUSTICE AT
NEW YORK UNIVERSITY SCHOOL OF
LAW,

                              Plaintiff,

              - against -

UNITED STATES DEPARTMENT OF
STATE,

                              Defendant.

**ORDER**

17 Civ. 7520 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

           This is an action brought under the Freedom of Information Act ("FOIA"),

5 U.S.C. § 552.  Plaintiff Brennan Center for Justice seeks documents from the United States

Department of State that are referenced in President Trump's September 24, 2017 Proclamation

entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the

United States by Terrorists or Other Public-Safety Threats."  (Cmplt. (Dkt. No. 1) ¶¶ 1-2; id., Ex.

A (Dkt. No. 1-1); see also Proclamation No. 9,645, 82 Fed. Reg. 45,161 (Sept. 24, 2017))  Plaintiff

also seeks reports concerning certain countries listed or described in the Proclamation.  (Id. ¶ 2)

           The State Department has identified five records as responsive to Plaintiff's

request, but has withheld these records in their entirety, asserting that they are exempt from

disclosure in full pursuant to the "presidential communications privilege" set forth in FOIA

Exemption 5, and exempt in part on several other grounds.[1]  (Def. Br. (Dkt. No. 44) at 6-7 (citing

---

[1]  Plaintiff no longer seeks production of one of the five responsive documents, as it was
produced as part of a settlement in an unrelated litigation.  (See Feb. 20, 2025 Pltf. Ltr. (Dkt. No.
99) at 1 n.1)

5 U.S.C. §§ 552(b)(1), (5), (7)(E))  The State Department has moved for summary judgment, contending that it has sufficiently demonstrated that it conducted an adequate search for the requested records, and that the responsive records fall within the exemptions it has described. (See Def. Mot. (Dkt. No. 43); Def. Br. (Dkt. No. 44) at 13-14))  Plaintiff has cross-moved for partial summary judgment, seeking a declaration that the documents it requests do not fall within the presidential communications privilege or Exemption 5.  (Pltf. Mot. (Dkt. No. 48); Pltf. Br. (Dkt. No. 49) at 10)

On March 29, 2019, this Court directed the State Department to produce the requested records for in camera review, so that this Court could determine the applicability of the presidential communications privilege.  (Mar. 29, 2019 Order (Dkt. No. 71) at 14)

This Court having conducted an in camera review, and for the reasons stated below, Plaintiff's motion will be granted in part and denied in part, and Defendant's motion will be granted in part and denied in part.

## BACKGROUND

### I.    THE PRESIDENT'S EXECUTIVE ORDERS AND PROCLAMATION

On January 27, 2017, President Trump issued Executive Order No. 13,769 – "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO-1"), 82 Fed. Reg. 8977 (Jan. 27, 2017) – which barred nationals of seven Muslim-majority countries from entering the United States for 90 days, suspended the United States Refugee Admission Program for 120 days, and banned the entry of Syrian refugees indefinitely.  See EO-1, 82 Fed. Reg. 8,977, §§ 3(c), 5(a), 5(c).

On March 6, 2017 – after several courts enjoined implementation of EO-1 – President Trump issued Executive Order 13,780 ("EO-2"), "Protecting the Nation From Foreign

Terrorist Entry Into the United States," 82 Fed. Reg. 13,209 (Mar. 6, 2017). EO-2 revokes EO-1 and suspends entry into the United States of nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen for 90 days. See EO-2, 82 Fed. Reg. 13,209, § 2(c). EO-2 also directs a "worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the [Immigration and Nationality Act] . . . in order to determine that the individual is not a security or public-safety threat." Id. § 2(a). EO-2 instructs the "Secretary of Homeland Security, in consultation with the Secretary of State and the Director of National Intelligence, [to] submit to the President a report on the results of the worldwide review[.]" Id. § 2(b).

EO-2 also directs the Secretary of State to conduct a 50-day engagement period with foreign governments to encourage them to improve their information-sharing systems, after which the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, is to submit to the President a list of countries recommended for inclusion in a proclamation that will limit entry of foreign nationals from such countries. Id. §§ 2(d)-(e).

These executive orders were challenged in court, but the cases challenging the bans were dismissed as moot after the challenged provisions expired. See Int'l Refugee Assistance Project v. Trump, 876 F.3d 116 (4th Cir. 2017); Hawaii v. Trump, 874 F.3d 1112 (9th Cir. 2017).

On September 24, 2017, President Trump issued Proclamation 9,645 (the "Proclamation"). (Cmplt. (Dkt. No. 1) ¶ 17; Proclamation No. 9,645, 82 Fed. Reg. 45,161 ("Procl.") (Sept. 24, 2017)) The Proclamation restricts entry into the United States of individuals from "six Muslim-majority countries (and two non-Muslim majority countries)": Chad, Iran,

Libya, Syria, Yemen, Somalia, Venezuela, and North Korea.[2]  (Cmplt. (Dkt. No. 1) ¶ 18; Procl.,
§§ 2(a)-(h))

    The Proclamation justifies these entry restrictions on the basis of the "worldwide review" of the "information-sharing practices, policies, and capabilities of foreign governments" directed in EO-2.  See Procl., §§ 1(c), (i).  The Proclamation states that – after conducting this "worldwide review" – the Secretary of State "engaged with the countries reviewed in an effort to address deficiencies and achieve improvements."  Procl. Preamble.  However, "a small number of countries . . . remain deficient . . . with respect to their identity-management and information-sharing capabilities, protocols, and practices[, and i]n some cases, these countries also have a significant terrorist presence within their territory."  Id.  The Proclamation announces "certain conditional restrictions and limitations . . . on entry into the United States of nationals of the countries identified [as deficient.]"  Id.

    The Proclamation cites several reports on which Executive Branch officials relied in making their deficiency determinations, including a Department of Homeland Security July 9, 2017 report and a September 15, 2017 memorandum submitted by the Secretary of Homeland Security to President Trump.  See id. §§ 1(c), (h).  According to the Proclamation, the July 9, 2017 report – which was the product of the "worldwide review" – presents the baseline for the type of information required from foreign governments in order to assess whether foreign nationals from those countries should be permitted to enter the United States.  Id. § 1(c).  The July 9, 2017 report lists sixteen countries whose controls are "inadequate," and thirty-one countries whose controls are "at risk" of being found inadequate under these standards.  Id. §

---

[2]  Chad was removed from the restricted nations list on April 10, 2018.  (Pltf. R. 56.1 Stmt. (Dkt. No. 51) ¶ 29)

1(d)-(e).  According to the Proclamation, the September 15, 2017 memorandum describes the

outcome of the Secretary of State's 50-day engagement with foreign governments, and provides

a recommendation as to which foreign nationals should be subject to entry restrictions.  Id. § 1(f)-

(i).

        The Proclamation was challenged in court.  A judge in the District of Hawaii

granted a nationwide preliminary injunction barring enforcement of the entry restrictions, see

State v. Trump, 265 F. Supp. 3d 1140, 1155-59 (D. Haw. 2017), and the Ninth Circuit affirmed.

See Hawaii v. Trump, 878 F.3d 662, 701 (9th Cir. 2017).  On June 26, 2018, the Supreme Court

reversed lower court orders enjoining enforcement of the Proclamation's entry restrictions,

concluding that "the Government has set forth a sufficient national security justification" for the

restrictions, and that plaintiffs had not shown a likelihood of success on the merits of their

claims.  Trump v. Hawaii, 585 U.S. 667, 710 (2018).  In so holding, the Supreme Court noted that

the Proclamation "reflects the results of a worldwide review process undertaken by multiple

Cabinet officials and their agencies."  Id. at 707.

        President Biden revoked the Proclamation on January 20, 2021.  See Proclamation

No. 10141, 86 Fed. Reg. 7005 (Jan. 20, 2021).

## II.    PLAINTIFF'S FOIA REQUEST AND PROCEDURAL HISTORY

        On July 20, 2017, Plaintiff submitted a FOIA request to Defendant seeking

disclosure of certain documents, including documents pertaining to the Proclamation.  (Cmplt.,

Ex. B ("FOIA Request") (Dkt. No. 1-2); Pltf. R. 56.1 Stmt. (Dkt. No. 51) ¶ 51)  The FOIA request

seeks disclosure of twenty-three categories of records, designated "a" through "w."  (FOIA

Request (Dkt. No. 1-2) at 9-13)  Category "w" includes:

        All records pertaining to the worldwide review process conducted under Section 2
        of Executive Order 13780 and 17 STATE 72000, including the Report that was

submitted to President Trump, copies of instructions to foreign governments
regarding the requirements that must be met to avoid travel restrictions, and a list
of all countries that have:

    i.    been designated as providing adequate information to the U.S.
government;

    ii.    been designated as providing inadequate information to the U.S.
government; and/or

    iii.    been designated as being at risk of providing inadequate information to the
U.S. government.

(Id. at 13)  Plaintiff also sought expedited processing of its FOIA request.  (Id. at 13-15)

Although Defendant granted the request for expedited processing on July 24, 2017, as of October

1, 2017, Defendant still had not made a determination as to the FOIA request.  (Pltf. R. 56.1 Stmt.

(Dkt. No. 51) ¶¶ 53-54)

        The Complaint was filed on October 2, 2017.  (Cmplt. (Dkt. No. 1))  Plaintiff

claims that Defendant is improperly withholding agency records in violation of FOIA, and seeks

"a discrete subset of the documents covered by request 'w.'"  (Id. ¶¶ 27, 60)  Those documents

are as follows:

1.    The report submitted by the Secretary of the Department of Homeland
Security to President Trump on July 9, 2017, referred to in Section 1(c)
of the Proclamation issued by President Trump on September 24, 2017,
"Enhancing Vetting Capabilities and Processes for Detecting
Attempted Entry into the United States by Terrorists or Other Public-
Safety Threats" (the "Proclamation," attached as Exhibit A);[3]

2.    The report submitted by the Secretary of Homeland Security to
President Trump on September 15, 2017, referred to in Section 1(h) of
the Proclamation;

3.    If not included in the reports referred to in Sections 1(c) and 1(h) of the
Proclamation, the final reports submitted by the Secretary of
Homeland Security to President Trump on each of the eight countries

---

[3]  Plaintiff is no longer seeking production of this document.  (See Feb. 20, 2025 Pltf. Ltr. (Dkt.
No. 99) at 1 n.1)

identified in Section 2 of the Proclamation, i.e., Chad, Iran, Libya,
North Korea, Syria, Venezuela, Yemen, and Somalia; and

4.  If not included in the reports referred to in Sections 1(c) and 1(h) of the
    Proclamation, the final reports submitted by the Secretary of
    Homeland Security to President Trump on the sixteen countries
    identified by the Secretary as being "inadequate," referred to in
    Section 1(e) of the Proclamation, to the extent that they were not
    included in the list of seven countries in Section 1(h)(ii).

(Cmplt. (Dkt. No. 1) ¶ 2; see Pltf. R. 56.1 Stmt. (Dkt. No. 51) ¶ 56)

On December 5, 2017, the State Department informed Plaintiff that it had located

responsive records, including "two reports (and associated attachments) submitted by the

Secretary of the Department of Homeland Security (DHS) to the President."[4]  (Dec. 14, 2017

Stein Decl. (Dkt. No. 26) ¶ 9)  On February 9, 2018 – pursuant to this Court's order granting

Plaintiff's motion to expedite this action (Mot. (Dkt. No. 22); Mem. Op. & Order (Dkt. No. 30)

at 17) – Defendant produced a Vaughn index[5] to Plaintiff.  (Vaughn Index (Dkt. No. 31-1))

In a March 15, 2018 submission, Plaintiff contended that Defendant's Vaughn

index was deficient, and moved for an order compelling Defendant to produce an index that

complied with this Court's January 10, 2018 order.  (Mot. (Dkt. No. 34); Pltf. Br. (Dkt. No. 35) at

2)  On April 16, 2018, this Court denied the motion to compel and reserved decision on the

sufficiency of the Vaughn index, finding that summary judgment is the proper context in which

to evaluate the sufficiency of a Vaughn index.  (Order (Dkt. No. 37) at 6)  Accordingly, the Court

---

[4]  Defendant initially represented that it had located six responsive records.  The State
Department later stated that only five records had been found, because one document had been
given two identification numbers.  (See May 14, 2018 Stein Decl. (Dkt. No. 45) at ¶ 9 n.1)
[5]  "A Vaughn index typically lists the titles and descriptions of the . . .  documents [responsive to
a FOIA request] that the Government contends are exempt from disclosure. . . .  A so-called
'classical' Vaughn index . . . is one that lists titles and descriptions of documents with cites to
claimed FOIA exemptions for each document listed."  New York Times Co. v. U.S. Dep't of
Justice, 758 F.3d 436, 438-39 (2d Cir.) (citations omitted), supplemented, 762 F.3d 233 (2d Cir.
2014).

set a briefing schedule for cross-motions for summary judgment.  (<u>Id.</u> at 7)  Defendant produced

a revised <u>Vaughn</u> index on May 14, 2018.  (Rev. <u>Vaughn</u> Index (Dkt. No. 45-2))[6]

      Defendant's revised <u>Vaughn</u> index describes each of the responsive records

Defendant has located and lists – as to each document – the date of creation, page length, and the

exemptions Defendant contends justify full or partial withholding, along with the government

agency invoking the exemption.  (Rev. <u>Vaughn</u> Index (Dkt. No. 45-2))  The five documents in the

index are:

    1.  the July 9, 2017 Report, which is a twenty-page document entitled "20-day Report to the President on Section 2(b) of Executive Order 13780:  Protecting the Nation from Foreign Terrorist Entry in the United States";

    2.  Attachment A to the July 9, 2017 Report, which is a three-page document that concerns "assessment of certain countries' information-sharing capabilities";

    3.  Attachment B to the July 9, 2017 Report, which is a five-page document that concerns the "methodology used to assess countries' information-sharing capabilities";

    4.  the September 15, 2017 Memorandum, which is a sixteen-page document described as a "Memorandum from the Acting Secretary of DHS to the President regarding Section 2(e) of Executive Order 13780"; and

    5.  Attachment A to the September 15, 2017 Memorandum, which is a one-page document that concerns "assessment of countries' information-sharing capabilities and vetting procedures."

(Rev. <u>Vaughn</u> Index (Dkt. No. 45-2))

      According to the revised <u>Vaughn</u> index, the Department of Homeland Security has

determined that all five documents are properly withheld in full pursuant to the presidential

---

[6]  After Defendant produced a revised <u>Vaughn</u> index in connection with its summary judgment motion, Plaintiff did not renew its arguments regarding the sufficiency of Defendant's <u>Vaughn</u> index.  (<u>See</u> Pltf. Br. (Dkt. No. 49); Pltf. Reply (Dkt. No. 56)) Accordingly, any such argument has been waived.  <u>See</u> <u>Avillan v. Donahoe</u>, No. 13 CIV. 509 PAE, 2015 WL 728169, at *7 (S.D.N.Y. Feb. 19, 2015) ("Where a party fails to raise an 'argument in his opposition to summary judgment,' that 'argument has been waived.'") (quoting <u>Palmieri v. Lynch</u>, 392 F.3d 73, 87 (2d Cir. 2004))

communications privilege.  This privilege falls within the ambit of 5 U.S.C. § 552(b)(5)

("Exemption 5"), one of nine statutorily enumerated categories of exemptions from FOIA

disclosure.  The State Department, the Department of Homeland Security, and the Federal

Bureau of Investigation claim that portions of the five documents are also properly withheld

pursuant to certain other exemptions.  (Id.)

       In August 2018, the State Department moved for summary judgment (Dkt. No.

43), contending that it had sufficiently demonstrated that (1) it had conducted an adequate search

for the requested records; and (2) the five responsive records are exempt in full under the

"presidential communications privilege, 5 U.S.C. § 552(b)(5).  (Def. Br. (Dkt. No. 44) at 6)  The

State Department also argued that these records are partially exempt from disclosure on the

following grounds:  (1) FOIA Exemption 5, the "deliberative process privilege"; (2) FOIA

Exemption 1, which addresses classified national security information; and (3) FOIA Exemption

7(E), which addresses information compiled for law enforcement purposes that would disclose

law enforcement techniques and procedures.  (Id. at 6-7; see also 5 U.S.C. § 552(b)(1), (5),

(7)(E))

       Plaintiff cross-moved for partial summary judgment (see Dkt. No. 48), arguing

that FOIA Exemption 5 does not protect the responsive documents from disclosure, and that the

record is not adequate to permit the Court to rule on the other claimed exemptions.  (Pltf. Br.

(Dkt. No. 49) at 16-32)  As to FOIA Exemption 5, Plaintiff argued that (1) the presidential

communications privilege does not apply, because the responsive documents and information

contained therein were widely shared within the executive branch and with the public; and (2)

the deliberative process privilege does not apply, because the records implemented a decision

that had already been made, and accordingly the responsive documents are not "predecisional" or

"deliberative."  (Id. at 17-28)  As to the remaining exemptions, Plaintiff asked that the Court

perform an in camera review of the responsive documents, and that the State Department be

directed to provide further justification for application of these exemptions.  (Id. at 28-32)

        In a March 29, 2019 order, this Court directed the State Department to produce the

five responsive records for an "in camera review . . . to determine the applicability of the

presidential communications privilege."  (Mar. 29, 2019 Order (Dkt. No. 71) at 14)  In

determining that in camera review was necessary, this Court noted that

> Defendant's papers are not illuminating as to the extent to which the information
> contained in the five withheld documents has been distributed.  Defendant instead
> emphasizes that Plaintiff has not identified an instance in which "any of the
> records themselves were either disseminated within the Executive Branch or
> publicly disclosed." (Def. Reply Br. (Dkt. No. 52) at 12)  But if the information
> contained within the withheld documents has been widely and publicly
> disseminated, the rationale for applying the presidential communications privilege
> is much less compelling.  Here, the Court does not have sufficient information to
> gauge whether the information contained in the withheld records has been
> disseminated in a manner that undermines application of the presidential
> communications privilege.

(Id. at 12)  Accordingly, this Court granted Plaintiff's motion to the extent it requested in camera

review of the responsive documents, and reserved decision on the remainder of the parties' cross-

motions for summary judgment.  (Id. at 14)

        In a February 20, 2025 letter, Plaintiff states that it is no longer seeking

production of the July 9, 2017 Report, because "the government has since produced the Report as

part of a settlement of another litigation."  (Feb. 20, 2025 Pltf. Ltr. (Dkt. No. 99) at 1 n.1)

III.    **CROSS-MOTIONS FOR SUMMARY JUDGMENT**

        The Court has conducted an in camera review of the four remaining documents at

issue, and is now prepared to rule on the parties' cross-motions for summary judgment.

### A.    Legal Standard

"Summary judgment is the usual mechanism for resolving disputes under FOIA." Brennan Ctr. for Just. at New York Univ. Sch. of L. v. Dep't of Homeland Sec., 331 F. Supp. 3d 74, 83 (S.D.N.Y. 2018) (citations omitted).  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA."  Carney v. U.S. Dep't of Just., 19 F.3d 807, 812 (2d Cir. 1994) (citations omitted).  Defendant may make such a showing through "agency [declarations that] describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith."  Am. Civil Liberties Union v. United States Dep't of Def., 901 F.3d 125, 133 (2d Cir. 2018), as amended (Aug. 22, 2018) (internal quotation marks and citation omitted).

### B.    The Adequacy of the State Department's Search

As an initial matter, the State Department argues that it is entitled to summary judgment concerning "the adequacy of its search for responsive records," because it "reasonably identified the office within the agency most likely to possess responsive records, conducted a search of that office's electronic files reasonably calculated to discover the records, and in fact located the records Plaintiffs sought."  (Def. Br. (Dkt. No. 44) at 13-14)  Plaintiff counters that the State Department "has not met its burden," because it "has not adequately addressed the final country reports[] . . . central to the 'worldwide review' mandated by [President Trump's] second ban" set forth in EO-2.  (Pltf. Br. (Dkt. No. 49) at 17 (quoting Exec. Order No. 13,780))

1.      **Applicable Law**

"To prevail on a summary judgment motion in a FOIA case, the defending agency

bears the burden of establishing the adequacy of its search, and it may satisfy this burden by

submitting 'affidavits or declarations supplying facts indicating that the agency has conducted a

thorough search.'" Brennan Ctr., 331 F. Supp. 3d at 84 (quoting Long v. Office of Pers. Mgmt.,

692 F.3d 185, 190-91 (2d Cir. 2012)).

"To show that its search was 'adequate,' an agency must demonstrate that 'the

search was reasonably calculated to discover the requested documents, not whether it actually

uncovered every document extant.'" Gonzalez v. United States Citizenship & Immigr. Servs.,

475 F. Supp. 3d 334, 346 (S.D.N.Y. 2020) (quoting Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d

473, 489 (2d Cir. 1999)). "This standard does not demand perfection, and thus failure to return

all responsive documents is not necessarily inconsistent with reasonableness . . . ." Adamowicz

v. Internal Revenue Serv., 552 F. Supp. 2d 355, 361 (S.D.N.Y. 2008). "A declaration in support

of the reasonableness of a search should explain 'the search terms and the type of search

performed, and aver[] that all files likely to contain responsive materials . . . were searched.'"

Gonzalez, 475 F. Supp. 3d at 347 (quoting Iturralde v. Comptroller of Currency, 315 F.3d 311, 315

(D.C. Cir. 2003)). "The declaration need not 'set forth with meticulous documentation the

details of an epic search.'" Id. (quoting Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982) (per

curiam)).

2.      **Analysis**

In arguing that it conducted an adequate search, the State Department relies on the

declaration of Eric Stein, the Director of its Office of Information Programs and Services

("IPS"). (Stein Decl. (Dkt. No. 45) ¶ 1) Stein explains that, in processing FOIA requests, IPS

begins by "determin[ing] which offices, overseas posts, or other records systems within [the] State [Department] may reasonably be expected to contain the records requested." (Id. ¶ 12) Applying its "familiarity with the holdings of [the] State[] [Department's] records systems," IPS bases this determination on, inter alia, "the description of the records" sought by the requester. (Id.)

Here, "[a]fter reviewing the portions of the Complaint describing the records Plaintiff sought," IPS determined that the Bureau of Consular Affairs "was likely to have responsive records." (Id. ¶ 15) Consular Affairs is responsible for, inter alia, "U.S. border security and facilitation of legitimate travel to the United States." (Id. ¶ 16) Within Consular Affairs, the Office of Visa Services ("Visa Services") is responsible "for all aspects of visa services for foreign nationals who wish to enter the United States" and "serves as a liaison with DHS[.]" (Id. ¶ 17)

Here, a Visa Services employee searched the Visa Services' "classified email account to locate the documents specifically named in Plaintiff's request[.]" (Id. ¶ 18) The Visa Services employee used "20 Day Report" and "50 Day Report" as search terms, with a time period of "January 26, 2017 through October 1, 2017." (Id.) The search yielded "five responsive documents (a report, a memorandum, and three attachments)[.]" (Id. ¶ 19) The State Department "verified with officials who had worked on creating the records" that "(a) these were the full and final versions of the records described by Plaintiff; and (b) no further records existed that were responsive to the portions of Plaintiff's request described in the Complaint." (Id.)

This Court concludes that the search conducted by the State Department was "'reasonably calculated'" to locate responsive documents. See Brennan Ctr., 331 F. Supp. 3d at 85 (quoting Seife v. Dep't of State, 298 F. Supp. 3d 592, 607 (S.D.N.Y. 2018)). The Stein

declaration adequately describes how a staff assistant searched the Visa Services classified email account to locate responsive documents, and explains why – based on Plaintiff's request and the subject matter expertise of IPS – it was reasonable to search this database for documents responsive to Plaintiff's request.  (Stein Decl. (Dkt. No. 45) ¶¶ 12-19); see Brennan Ctr., 331 F. Supp. 3d at 86-87 (citing the importance of agency declarations concerning the structure of agency databases in determining the adequacy of agency's search).

Plaintiff argues, however, that the State Department's search was inadequate because it did not address certain "country reports . . . central to the 'worldwide review' mandated by [EO-2]."  (Pltf. Br. (Dkt. No. 49) at 17)  That certain documents which a FOIA plaintiff claims "must exist" (id.) were not found is not a basis to find an agency's search inadequate, however, because the adequacy of a FOIA search is "determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  Iturralde, 315 F.3d at 315.  In this regard. the Stein declaration is "'accorded a presumption of good faith,'" and "[t]his presumption 'cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.'"  Grand Cent. Partnership, 166 F.3d at 489 (quoting Carney, 19 F.3d at 812 and SafeCard Servs., Inc. v. S.E.C., 926 F.2d 1197, 1200 (D.C. Cir. 1991)).  In sum, the fact that the "country reports" cited by Plaintiff were not located does not change this Court's determination that the State Department's search was reasonably calculated to locate responsive documents.[7]

---

[7]  Moreover, it is a FOIA plaintiff's obligation to "reasonably describe[]" the records sought. 5 U.S.C. § 552(a)(3)(A).  Here, Plaintiff sought "the final [country] reports submitted by the Secretary of Homeland Security to President Trump."  (Cmplt. (Dkt. No. 1) ¶¶ 2(c)-(d) (emphasis added))  As the Defendant points out, it was not obligated to search for, or opine on the potential existence of, records that are beyond the scope of Plaintiff's request – i.e., reports that were not submitted by the Secretary of Homeland Security to President Trump.  (See Def. Reply Br. (Dkt. No. 52) at 8 n.2 (citing Adamowicz, 552 F. Supp. 2d at 362)); see also McLean

Katzman v. C.I.A., 903 F. Supp. 434 (E.D.N.Y. 1995) – cited by Plaintiff (see Pltf. Br. (Dkt. No. 49) at 16; Pltf. Reply (Dkt. No. 54) at 14) – is not on point.  In Katzman, a CIA employee responsible for supervising the FOIA search "incorrectly identified the subject of the search as . . . plaintiff's attorney, and not the plaintiff." Katzman, 903 F. Supp. at 435.  "[I]n view of th[is] processing error," the court found "a genuine issue of fact to exist concerning the thoroughness of the agency's search procedures."  Id. at 439.  Here, there was no such glaring error in the State Department's response.

This Court concludes that the State Department's search was "reasonably calculated to discover" – and in fact did discover – documents responsive to Plaintiff's FOIA request, and therefore was "adequate."  See Grand Cent. Partnership, 166 F.3d at 489.  The State Department is entitled to summary judgment on the issue of whether the search it conducted was adequate.

C.    **Whether the Responsive Records are Exempt Under FOIA**

The State Department has withheld the responsive records in full, arguing that they are entirely exempt from disclosure pursuant to the "presidential communications privilege" encompassed within FOIA Exemption 5, and exempt in part on several other grounds.  (Def. Br. (Dkt. No. 44) at 6-7 (citing 5 U.S.C. § 552(b)(1), (5), (7)(E)); Holzer Decl. (Dkt. No. 46) ¶¶ 10-12; Stein Decl. (Dkt. No. 45) ¶¶ 20-34; see id., Ex. 2 (Dkt. No. 45-2))

As to the presidential communications privilege, the State Department contends that the records at issue are

---

on Behalf of J.N.M. v. Soc. Sec. Admin., No. 17CV06978CMKHP, 2019 WL 1074273, at *5 (S.D.N.Y. Mar. 6, 2019) ("Having searched only for documents within the scope of the FOIA request, the agency cannot be expected to have searched for and located documents outside the scope of the request and detailed the results of [the] same for Plaintiff.").

> quintessential examples of records that fall squarely within the bounds of the
> privilege. . . . [T]hey are communications from a Cabinet-level official directly to
> the President, drafted and disseminated pursuant to an Executive Order, for the
> express purposes of advising the President in connection with his review of the
> United States' visa vetting procedures, and assisting the President in carrying out
> his responsibilities in the areas of immigration and national security.

(Def. Br. (Dkt. No. 44) at 16)  The State Department further maintains that "the records have

been closely held within the Executive Branch."  (Id.)

A declaration from the Deputy Chief FOIA Officer for the Department of

Homeland Security Privacy Office, James V.M.L. Holzer, addresses the distribution of the

subject records as follows:

> These records were, and remain, closely held within the Executive Branch.  The
> [July 9, 2017] Report, the [September 15, 2017] Memorandum, and their respective
> attachments were transmitted directly from the Acting Secretary of Homeland
> Security to the President.  Consistent with the Executive Order, the records were
> also provided to the Secretary of State and the Director of National Intelligence[,]
> among other critical Executive Branch agencies.  Further, DHS circulated the
> records to a limited number of high-ranking personnel within certain DHS
> components charged with enforcing the immigration laws and regulating ports of
> entry:  namely[,] U.S. Immigration and Customs Enforcement, U.S. Customs and
> Border Protection, and U.S. Citizenship and Immigration Services.

(Holzer Decl. (Dkt. No. 46) ¶ 17)  Holzer does not identify the "other critical Executive Branch

agencies" to which disclosure was made, however, nor does he state whether the "high-ranking

personnel" to whom the records were circulated were prohibited from further disseminating the

records.

Plaintiff does not dispute that the documents the State Department has withheld

are of a type that typically would be subject to the presidential communications privilege.

Plaintiff argues, however, that the records at issue were not "closely held" – as the State

Department asserts – and in fact were "widely shared throughout the executive branch and

described both to the public and foreign governments[.]"  (Pltf. Br. (Dkt. No. 49) at 18)  Citing

numerous fact sheets, press releases, and related documents publicly disseminated by the Trump administration, Plaintiff contends that these disclosures "foreclose reliance on the presidential communications privilege to shield the responsive documents from the public."  (Id. at 20-22)

The Court considers below whether the four records that remain in dispute are exempt from disclosure under the presidential communications privilege or the other FOIA exemptions cited by the State Department.

### 1.    <u>Applicable Law</u>

When an agency asserts a FOIA exemption, it "'bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure.'" <u>N.Y. Times Co. v. U.S. Dep't of Just.</u>, 756 F.3d 100, 112 (2d Cir. 2014) (quoting <u>Wilner v. Nat'l Sec. Agency</u>, 592 F.3d 60, 69 (2d Cir. 2009)).  "'[C]onsistent with the Act's goal of broad disclosure, these exemptions have consistently been given a narrow compass.'"  <u>Dep't of Interior v. Klamath Water Users Protective Ass'n</u>, 532 U.S. 1, 8 (2001) (quoting <u>U.S. Dep't of Just. v. Tax Analysts</u>, 492 U.S. 136, 151 (1989)).

### a.    <u>FOIA Exemption 5</u>

FOIA Exemption 5 shields from disclosure "interagency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "As relevant here, Exemption 5 encompasses the presidential communications and deliberative process privileges."  <u>Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention</u>, 560 F. Supp. 3d 810, 827 (S.D.N.Y. 2021) (citing <u>ACLU v. U.S. Dep't of Def.</u>, 435 F. Supp. 3d 539, 557 (S.D.N.Y. 2020)).

###### i.        __The Presidential Communications Privilege__

The presidential communications privilege is a "'presumptive privilege for [p]residential communications,'" Loving v. Dep't of Def., 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting United States v. Nixon, 418 U.S. 683, 708 (1974)), which "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." Id. (citing Judicial Watch, Inc. v. Dep't of Justice, 365 F.3d 1108, 1112 (D.C. Cir. 2004)).  The privilege "protects 'communications "in performance of a President's responsibilities," . . . "of his office," . . . and made "in the process of shaping policies and making decisions."'" Amnesty Int'l USA v. C.I.A., 728 F. Supp. 2d 479, 522 (S.D.N.Y. 2010) (quoting Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 449 (1977) (quoting Nixon, 418 U.S. at 708, 711, 713)); see also Loving, 550 F.3d at 37 ("[T]he privilege protects 'communications directly involving and documents actually viewed by the President,' as well as documents 'solicited and received' by the President or his 'immediate White House advisers [with] . . . broad and significant responsibility for investigating and formulating the advice to be given the President.'" (quoting Judicial Watch, Inc., 365 F.3d at 1114)).

"[I]t is axiomatic[, however,] that the privilege's purpose of promoting candor and confidentiality between the President and his closest advisors becomes more attenuated, and the public's interest in transparency and accountability more heightened, the more extensively a presidential communication is distributed." Ctr. for Effective Gov't v. U.S. Dep't of State, 7 F. Supp. 3d 16, 26 (D.D.C. 2013).  "The purpose underlying the distribution of a presidential communication beyond the President's closest advisers is paramount[:]  [i]f distribution is limited to advisory purposes, the privilege may apply; but if distribution is far broader, the purposes animating the privilege will not justify its application." Id. at 29.

ii.      **The Deliberative Process Privilege**

"'Courts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure,' including . . . the deliberative process privilege." Brennan Ctr., 331 F. Supp. 3d at 93 (quoting Am. Civil Liberties Union v. U.S. Dep't of Justice, 210 F. Supp. 3d 467, 476 (S.D.N.Y. 2016)). "The deliberative process privilege is designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." Nat'l Council of La Raza v. Dep't of Just., 411 F.3d 350, 356 (2d Cir. 2005).

The deliberative process privilege is "a sub-species of work-product privilege that 'covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated[.]'" Tigue v. U.S. Dep't of Just., 312 F.3d 70, 76 (2d Cir. 2002) (quoting Klamath, 532 U.S. at 8). "For the privilege to apply to a document, the document must be (i) 'predecisional, i.e., prepared in order to assist an agency decisionmaker in arriving at his decision,' and (ii) 'deliberative, i.e., actually related to the process by which policies are formulated.'" Brennan Ctr., 331 F. Supp. 3d at 93 (quoting Nat'l Council of La Raza, 411 F.3d at 356).

b.      **FOIA Exemption 1**

FOIA "Exemption 1 permits the Government to withhold information 'specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy' if that information has been 'properly classified pursuant to such Executive order.'" ACLU v. Dep't of Just., 681 F.3d 61, 69 (2d Cir. 2012) (quoting 5 U.S.C. § 552(b)(1)(A)). In connection with this exemption, the Second Circuit has instructed that courts should show "'defer[ence] to executive affidavits predicting harm to the national security, and

ha[s] found it unwise to undertake searching judicial review.'" Id. at 70 (quoting Ctr. for Nat'l

Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003)).

### c.    FOIA Exemption 7(E)

Exemption 7(E) excludes from the disclosure requirement "records or information

compiled for law enforcement purposes[, the release of which] . . . would disclose techniques

and procedures for law enforcement investigations or prosecutions, or would disclose guidelines

for law enforcement investigations or prosecutions if such disclosure could reasonably be

expected to risk circumvention of the law[.]"  5 U.S.C. § 552(b)(7)(E).  In order to demonstrate

the applicability of this exemption, an agency must satisfy two conditions:

> First, the agency must show that the records were "compiled for law enforcement
> purposes."  5 U.S.C. § 552(b)(7).  Second, the agency must show that the records
> either (1) "would disclose techniques and procedures for law enforcement
> investigations or prosecutions"; or (2) "would disclose guidelines for law
> enforcement investigations or prosecutions" and "such disclosure could
> reasonably be expected to risk circumvention of the law." Id. at § 552(b)(7)(E).

Knight First Amend. Inst. at Columbia Univ. v. United States Citizenship & Immigr. Servs., 30

F.4th 318, 327 (2d Cir. 2022).

### 2.    Analysis

The four documents that remain at issue are (1) Attachment A to the July 9, 2017

Report; (2) Attachment B to the July 9, 2017 Report; (3) the September 15, 2017 Memorandum;

and (4) Attachment A to the September 15, 2017 Memorandum.  The Court addresses each

document below.

### a.    Attachments A and B to the July 9, 2017 Report

Attachment A to the July 9, 2017 Report is a 3-page report from DHS to the

President regarding DHS's assessment of certain countries' information-sharing capabilities.  The

document contains "the names of countries that performed poorly in the information sharing

categories identified in the paragraphs above the list of countries," which was "based on confidential exchanges with the host governments, as well as critical evaluations of host country capabilities by U.S. Government officials."  (Stein Decl. (Dkt. No. 45) ¶ 35)

Attachment B to the July 9, 2017 Report is a 5-page report from DHS to the President regarding the methodology used to assess countries' information-sharing capabilities. Attachment B describes "various sources of information that are shared with other countries and that are used in assessing applications to enter the United States."  (Id. ¶ 36)

Attachments A and B are classified as "SECRET," and "NOFORN" (i.e., non-releasable to foreign nationals).  (Id. ¶¶ 35-36)

Having reviewed Attachments A and B in camera, this Court concludes that they are exempt from disclosure under the presidential communications privilege and FOIA Exemption 1.  The Court finds that (1) the presidential communications privilege was – as to these documents – not waived by prior disclosure; and (2) these documents contain classified information that, if revealed, could cause "serious damage to national security[,]" and "inject friction into, or cause damage to, a number of our bilateral relationships with countries whose cooperation is important to U.S. National Security."  (Id. ¶¶ 20-30)

### b.    The September 15, 2017 Memorandum from the Acting Secretary of Homeland Security to the President

The September 15, 2017 Memorandum from the Acting Secretary of Homeland Security to the President is a 16-page document that contains "an assessment of the deficiencies in the information that certain countries are willing or able to share with the United States, including foreign policy considerations that may color the assessment of the countries' information-sharing capabilities."  (Id. ¶ 37)  The first three pages of this document are unclassified.  The remainder of the report is classified as "SECRET."

Having reviewed this document in camera, the Court finds that the first three pages are not exempt from disclosure. These pages contain general background material, and the State Department has not asserted any specific FOIA exemptions as to these pages. Any claim that the presidential communications privilege applies is not persuasive given that the information contained in these pages has been disclosed in other publicly available documents. See Ctr. for Effective Gov't, 7 F. Supp. 3d at 26.

As to the remaining pages of this document, the Court finds that (1) the presidential communications privilege was – as to these pages – not waived by prior disclosure; and (2) these documents contain classified information that, if revealed, could cause "serious damage to national security[,]" and "inject friction into, or cause damage to, a number of our bilateral relationships with countries whose cooperation is important to U.S. National Security." (Stein Decl. (Dkt. No. 45) ¶¶ 20-30)

### c.      Attachment A to the September 15, 2017 Memorandum

Attachment A to the September 15, 2017 Memorandum is a 1-page document regarding the assessment of countries' information-sharing capabilities and vetting procedures. (Rev. Vaughn Index (Dkt. No. 45-2) at 2)  Attachment A is classified as "SECRET."  (Id.; Stein Decl. (Dkt. No. 45) ¶ 37)

Having reviewed this document in camera, this Court concludes that it is exempt from disclosure under the presidential communications privilege and FOIA Exemption 1.  The Court finds that (1) the presidential communications privilege was – as to this document – not waived by prior disclosure; and (2) the document contains classified information that, if revealed, could cause "serious damage to national security[,]" and "inject friction into, or cause

22

damage to, a number of our bilateral relationships with countries whose cooperation is important to U.S. National Security."  (Stein Decl. (Dkt. No. 45) ¶¶ 20-30)

     **D.**    <u>**Segregability**</u>

     "FOIA . . . provides that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt[.]'" <u>Conti v. U.S. Dep't of Homeland Sec.</u>, No. 12 CIV. 5827 AT, 2014 WL 1274517, at *25 (S.D.N.Y. Mar. 24, 2014) (quoting 5 U.S.C. § 552(b)).  "[T]he agency must provide a detailed justification for its decision that non-exempt material is not segregable," but "is entitled to a presumption that it complied with its obligation to disclose reasonably segregable material." <u>Id.</u> (citing <u>Mead Data Cent., Inc. v. U.S. Dep't. of Air Force</u>, 566 F.2d 242, 261 (D.C. Cir. 1977) and <u>Sussman v. U.S. Marshals Serv.</u>, 494 F.3d 1106, 1117 (D.C. Cir. 2007)).  "[T]o justify withholding an entire document[,] the [agency] . . . must demonstrate that [it] cannot delineate between exempt and non-exempt information therein." <u>Ayyad v. U.S. Dep't. of Justice</u>, 2002 WL 654133, at *2 (S.D.N.Y. Apr. 18, 2002).

     Here, the State Department states that it has "carefully reviewed all of the documents addressed herein for reasonable segregation of non-exempt information and has implemented segregation when possible.  Otherwise, the Department determined that no segregation of meaningful information in the documents could be made without disclosing information warranting protection under the law."  (Stein Decl. (Dkt. No. 45) ¶ 38)

     Having reviewed the relevant documents <u>in camera</u>, and having ruled that a portion of one of the withheld documents should be disclosed, this Court finds that no further segregation of non-exempt information is possible without disclosing information warranting protection under the law.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment (Dkt. No. 43) and Plaintiff's cross-motion for summary judgment (Dkt. No. 48) are each granted in part and denied in part. More specifically, the Court rules that:

1. Attachments A and B to the July 9, 2017 Report are not subject to disclosure;

2. the first three pages of the September 15, 2017 Memorandum will be disclosed to Plaintiff within ten days of this Order, but the remainder of the document is not subject to disclosure; and

3. Attachment A to the September 15, 2017 Memorandum is not subject to disclosure.

The Clerk of Court is directed to enter judgment and to close this case.

Dated: New York, New York
       March 10, 2025

                                    SO ORDERED.

                                    _____
                                    Paul G. Gardephe
                                    United States District Judge